**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION<br><br>This Document Relates To: All Class Actions | No.  16 MD 2704 (PAE)<br><br>**JURY TRIAL DEMANDED** |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

OVERVIEW OF THE ACTION ............................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 13

PARTIES ............................................................................................................................. 14

    A.    Plaintiffs ............................................................................................................ 14

    B.    Defendants ........................................................................................................ 15

FACTUAL ALLEGATIONS ............................................................................................... 27

I.    THE MARKET FOR INTEREST RATE SWAPS ...................................................... 27

    A.    Interest Rate Swaps Generally ........................................................................ 27

    B.    Trading of Interest Rate Swaps ....................................................................... 28

II.    DEFENDANTS CONSPIRED TO BLOCK COMPETITIVE TRADING OF
    INTEREST RATE SWAPS ......................................................................................... 35

    A.    The Dealer Defendants Took Control of Tradeweb to Prevent the
    Development of a More Competitive Trading Platform and to Use it As a
    Vehicle for Collusion ....................................................................................... 35

    B.    The Dealer Defendants Utilize Other Forums to Collude ................................ 48

    C.    The Dealer Defendants Prevented Interdealer Brokers From Opening All-
    to-All Platforms to the Buy Side...................................................................... 51

    D.    The Dealer Defendants Conspired to Block Swap Execution Facilities and
    Exchange-Like Trading Platforms From Entering the Market ........................... 57

        1.    The Dealer Defendants boycotted TeraExchange...................................... 60

        2.    The Dealer Defendants boycotted Javelin ................................................. 75

        3.    The Dealer Defendants boycotted TrueEX............................................... 83

        4.    The Dealer Defendants' boycotts chilled market progress ........................ 85

    E.    The Dealer Defendants Penalize Buy-Side Customers Who Engage in All-
    to-All Trading .................................................................................................. 85

        1.    The Dealer Defendants withhold clearing services to buy-side
        firms that attempt to trade IRS in an all-to-all environment...................... 86

2.  The Dealer Defendants insist on "name give-up" to deter buy-side participation on all-to-all trading platforms ................................................. 88

3.  The Dealer Defendants place transgressors in the "penalty box" .............. 96

F.  The Dealer Defendants Collectively Prevented Clearinghouses from Bringing All-to-All Trading to the Buy Side .......................................... 99

III.  ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY SIDE ...................................................... 101

A.  The Dealer Defendants Have Substantial Market Power .................................... 101

B.  Defendants' Conspiracy Has Imposed Significant Harm on Buy-side Investors ...................................................................................................... 102

C.  Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support the Development of the IRS Market .............. 107

D.  Investigations and Litigation Concerning the Credit Default Swaps Market Show that the Dealer Defendants Collude to Block Exchange Trading ............. 110

IV.  EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY ...................................... 114

A.  Defendants' Conspiracy Was Concealed From Plaintiffs .................................... 115

B.  Plaintiffs' Inability to Discover the Conspiracy Did Not Result from a Lack of Diligence ............................................................................................... 120

CLASS ACTION ALLEGATIONS ................................................................................... 122

CAUSES OF ACTION ....................................................................................................... 125

FIRST CAUSE OF ACTION (CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT) ........................................... 125

SECOND CAUSE OF ACTION (UNJUST ENRICHMENT) .................................................. 126

PRAYER FOR RELIEF ..................................................................................................... 127

JURY DEMAND ................................................................................................................ 129

Plaintiffs Public School Teachers' Pension and Retirement Fund of Chicago, the Mayor and City Council of Baltimore, and Genesee County Employees' Retirement System (collectively, "Plaintiffs"), individually and on behalf of all persons and entities who from January 1, 2008, through the present entered into interest rate swaps transactions with Defendants in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.      Interest rate swaps ("IRS") are an important financial tool used by an array of investors in the United States and worldwide.  IRS allow investors, including Plaintiffs and other pension funds, asset managers, endowment funds, corporations, insurance companies, municipalities, hedge funds, and others (*i.e.*, members of the proposed Class here) to manage risk and protect themselves from changes in interest rates.  IRS investors comprise what is known as the "buy side" of the IRS market, and they are both the "direct purchasers" and "end users" of IRS as those terms are used under the U.S. antitrust laws.  IRS comprise one of the largest financial markets with billions of dollars in swaps (in notional value) traded each day.

2.      This case concerns a conspiracy among the major banks who for many years have acted as the primary "dealers" or "market makers" in the IRS market (the "Dealer Defendants"[1]).  As detailed herein, the Dealer Defendants unlawfully conspired to ensure their continued dominance of the IRS market by preventing the buy side from trading IRS on modern, open, and competitive trading platforms.  Because these trading platforms would provide more efficient

---

[1]   As defined more fully below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

and transparent trading options than those available under the status quo, their entry into the market threatened to remove the Dealer Defendants from their privileged position in the IRS market — a position that generated enormous profits.

3.      To combat this threat, the Dealer Defendants secretly agreed to work together to prevent the buy side from trading on these platforms, including by jointly boycotting any platforms that facilitated greater competition among dealers or permitted buy-side investors to trade directly with each other.  Defendants implemented this scheme through, among other means, secret face-to-face and telephonic meetings among senior personnel which occurred regularly from late 2007 through 2015.

4.      The most common type of IRS is an agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time.  In the most common (or "plain vanilla") swap, one party pays a fixed interest rate to a receiving counterparty who, in return, pays a floating interest rate based on a benchmark.  This arrangement permits an investor to mitigate the risk of changes in, or to speculate on the future movement of, interest rates.  For example, one party might agree to pay a fixed interest rate on a $10 million notional amount in exchange for the other party paying a floating rate (such as one tied to the London Interbank Offered Rate, or "LIBOR") for that same ten-year period.

5.      Plain vanilla IRS have long been viable candidates for electronic trading since they are standardized investments and trade frequently.  Specifically, they have been well-suited for electronic trading protocols that can facilitate an "all-to-all" trading environment, which would allow investors to trade IRS anonymously with a larger community of market participants, including smaller banks and other investors.  On platforms that offer all-to-all trading protocols, an investor can trade with *any* qualified trading partner and is not artificially limited to trading

with just the banks which have historically acted as dealers.  All-to-all trading yields greater price competition because it increases the number of potential counterparties with whom buy-side investors can trade.  The increase in price competition saves buy-side investors money by lowering their transaction costs.

6.      Despite the buy side's demand for more efficient and competitive electronic trading of IRS, and despite the numerous entities that made substantial investments to provide all-to-all trading platforms to the buy side, investors today remain stuck in an inefficient and antiquated market environment that forces them to trade IRS exclusively through the Dealer Defendants.  As detailed herein, the perpetuation of this state of affairs is the result of a carefully planned and well-orchestrated conspiracy.  This conspiracy involved the Dealer Defendants, among other things, conspiring to boycott and destroy trading platforms that sought to provide all-to-all trading protocols to the buy side.

7.      The Dealer Defendants conspired because they "want desperately to preserve the status quo"[2] in order to protect the tremendous information advantage they enjoy in the market, which enables them to make extraordinary profits.  As noted, the Dealer Defendants have historically acted as the primary market makers in the "over the counter" ("OTC") market for IRS, meaning one of them was typically on one side of every IRS trade.  In this historical OTC market, trading was typically conducted by "voice" — *i.e.*, over the telephone.

8.      The voice-based, OTC market for IRS conferred tremendous advantages on IRS dealers at the expense of buy-side investors.  Voice-based, OTC trading in IRS forced the buy side to rely exclusively on dealers for price information because there was little or no price

---

[2]   Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

visibility available elsewhere.  In order to obtain an actionable price quote from a dealer, a buy-side entity had to contact a dealer and disclose its identity, the intended direction of the trade (pay fixed or receive fixed), and the desired notional amount — critically important information that buy-side entities did not want to disclose and that dealers could use to their own advantage.

9.      Executing an IRS trade in the voice-based, OTC market was also very restrictive. To complete a transaction, dealers required buy-side clients to execute trades "on the wire," meaning that executable prices were only available when the buy-side client was physically engaged with the respective dealer over the phone.  As a result, investors were limited in their ability to force multiple dealers to compete directly on price.  In short, the voice-based, OTC market for IRS was an opaque form of trading that did not provide an efficient means of competitive price shopping by investors and denied investors access to actionable, real-time price information.  The deck was stacked in favor of the dealers and against their customers.

10.     As a result, the voice-based, OTC market allowed the Dealer Defendants to generate tremendous profits.  For every IRS, a Dealer Defendant has a "bid" price, at which it will purchase the IRS, and an "ask" price, at which it will sell the IRS.  When the dealer purchases an IRS at a lower bid price, and then sells an IRS with the same terms at a higher ask price, the dealer realizes a profit on the difference (or the "spread") between the lower and higher prices at which the dealer transacted.  In the OTC market, these bid/ask spreads are grossly inflated.

11.     But financial markets develop and evolve — or at least they are supposed to.  By the 1990s, technological advances were bringing electronic trading to a variety of financial markets.  Electronic trading in fixed income securities was introduced in the mid-1990s and began gathering momentum in the IRS market in the early 2000s.  By 2003, electronic trading in

IRS had developed to the point where Defendant ICAP Capital Markets LLC ("ICAP") launched an electronic IRS trading platform called i-Swap.  i-Swap was, however, limited to dealer-to-dealer (or "interdealer") trading.  Around that same time, Defendant Barclays attempted to offer the first single-dealer IRS trading platform for its clients — an offering the other Dealer Defendants perceived as a betrayal.

12.  The evolution of the IRS market to electronic trading should have displaced the archaic and inefficient protocols from the voice-based, OTC trading regime.  But the Dealer Defendants worked together to ensure that archaic remnants from the days of voice trading continue to permeate the IRS market, protecting their privileged market position.  By limiting the amount of price transparency, restricting the number of market makers, and denying buy-side investors the ability to negotiate and trade with each other directly, the Dealer Defendants have maintained artificially wide bid/ask spreads in the IRS market up to the present day.

13.  The Dealer Defendants are well aware of the benefits that investors would enjoy from open and transparent IRS trading through electronic platforms.  Indeed, the Dealer Defendants actively support such protocols when trading *with each other* in the inter-dealer market.  For years, inter-dealer brokers ("IDBs") like ICAP have hosted platforms that allow dealers continuously to stream bid and offer prices to each other, creating an environment where the best available prices in the market are visible to and executable by all platform participants.

14.  But the Dealer Defendants have conspired to ensure that the IDB market remains *exclusive to dealers* and have prevented the buy side from accessing these IDB platforms.  If an IDB were to allow investors access to the dealer-only platforms, investors would also be able to trade with one another, and the bifurcation of the market desired by the Dealer Defendants would collapse.  Many IDBs, including ICAP, wanted to open their platforms to the buy side, because

doing so was in their independent financial interest.  But the Dealer Defendants made sure that any IDB that dared to open its platform to the buy side would be punished.  One way the Dealer Defendants disciplined IDBs was to boycott those who stepped out of line, starving them of the brokerage fees and liquidity they needed to survive — a practice known as being put in the "penalty box."  Accordingly, under collective pressure from the dealers, IDBs today allow only *dealer-to-dealer* transactions.

15.    The Dealer Defendants also conspired to squash any nascent platforms that dared offer the buy side the same types of competitive and transparent trading protocols the Dealer Defendants enjoy in the IDB space.  As a result, buy-side clients are denied the benefits provided by open and transparent IRS trading and are relegated to transacting in the inefficient dealer-to-client trading platforms that prevent investors from trading with one another.  The Dealer Defendants have, in other words, "shut out" buy-side investors from the "paradise of infinite liquidity and tight pricing" that the Dealer Defendants themselves enjoy.[3]

16.    Absent collusion, the lack of transparency and limited price competition that pervades the IRS market would have disappeared long ago.  Because of the clear benefits of transparency, competitive pricing, and more immediate execution, markets for financial products have historically moved to exchanges or exchange-like forms of all-to-all trading platforms soon after the products become sufficiently standardized and liquid.  Because of their maturity, size, and high level of standardization, IRS have long been primed for exchange-like, all-to-all trading.

---

[3]  Joe Rennison, *Meet the New OTC Market Makers*, Risk (Feb. 27, 2014), http://www.risk.net/risk-magazine/feature/2331122/meet-the-new-otc-market-makers.

17.     In recent years, however, it has become all too clear that collusion was rampant at these Wall Street banks.  Not only did they have no meaningful safeguards or oversight in place to prevent bank personnel from conspiring with their competitors, but, to the contrary, these banks had a pervasive culture of pursuing short-term profits at any cost.  In their pursuit of the bottom line by any means, the banks established mechanisms and forums for illicit conversations among competitors in order to advance the banks' collective financial interests over those of their customers.  As detailed herein, the Dealer Defendants used these mechanisms and forums for collusion to protect their privileged position in the IRS market.

18.     Since 2007, one of the primary forums for Defendants' collusion with regard to the IRS market has been Defendant Tradeweb Markets LLC ("Tradeweb").  In late 2007, the Dealer Defendants began to be concerned about plans by Tradeweb, which was then owned by Thomson Reuters, to introduce a buy-side-friendly, all-to-all trading platform.  To respond to this threat from Tradeweb, and other entities planning similar initiatives, senior personnel from Goldman Sachs championed a "consortium strategy."  As part of this strategy, Goldman Sachs proposed to work together with other primary dealers in the IRS market (*i.e.*, Goldman Sachs' competitors) to co-opt Tradeweb by jointly investing in the company, taking over its Board of Directors and other key committees, and preventing it from moving forward with its plans for a new trading platform.  Goldman Sachs also recognized that, once Tradeweb was so neutralized, the Dealer Defendants could use it as a forum to coordinate their conduct and control the IRS market going forward.

19.     In October 2007, as part of a coordinated effort they named "Project Fusion," the Dealer Defendants (specifically, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS, later joined by Citigroup, Bank of America, and then Barclays)

7

purchased interests in Tradeweb so they could jointly direct its business strategy for the IRS

market.  While publicly presenting the purchase as a "minority" stake,[4] these Dealer Defendants

in fact took over effective control of Tradeweb through a series of behind-the-scenes agreements

and the creation of a shadow company they named Tradeweb New Markets LLC.  Behind closed

doors, the Dealer Defendants used this shadow company to make sure that Tradeweb's IRS

trading platform would *not* allow anonymous all-to-all trading of IRS by the buy side or take any

steps to threaten their privileged position in the market.

20.    Tradeweb agreed with the Dealer Defendants, against its own economic self-

interest, to shutter the possibility of offering buy-side investors access to competitive IRS trading

and to forgo the lucrative fees that would come from facilitating such transactions.  Tradeweb

has abided by that agreement until the present day.

21.    Beyond bringing Tradeweb into their collusive scheme, the Dealer Defendants

also used Tradeweb as a forum for coordinating their actions under the cover of a supposedly

lawful and independent enterprise.  They installed themselves on Tradeweb's Board of Directors

and a variety of other "committees."  From 2008 to the present, key strategic personnel from the

Dealer Defendants — including those identified by name and position below — regularly held

secret meetings under the auspices of Tradeweb to coordinate their conduct and to ensure the

IRS market did not develop in ways that threatened their collective dominance.

22.    The true nature of the Dealer Defendants' conspiracy jointly to oppose any

potential threat to their privileged position in the IRS market only recently came to light when

---

[4]  TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (October 11, 2007), http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-Thomson-Financial-Form-Premier-Electronic-Trading-Venture-Using-TradeWeb/.

the Dealer Defendants were forced to take still more aggressive actions to limit competition.  In the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or the "Dodd-Frank Act"), Congress sought to bring more competition to derivatives markets, including the IRS market, by mandating, among other things, that certain IRS move to exchanges or exchange-like "Swap Execution Facilities" ("SEFs").  SEFs were envisioned as all-to-all trading platforms that would allow the buy side to trade with one another, as well as with dealers.

23.     But the Dealer Defendants conspired to shut down or constrain any SEF they perceived as posing a threat.  These SEFs included, among others, TeraExchange Inc. ("TeraExchange"), Javelin Capital Markets LLC ("Javelin"), and TrueEX Group LLC ("TrueEX").  Reflecting the widespread belief that the market was ready, if not long overdue, to open up to new platforms, these market entrants spent millions of dollars and invested years of resources in an effort to "loosen[] the stranglehold that the [Dealer Defendants] have on the multi-trillion dollar [IRS] market."[5]  But these entrants were unsuccessful because they did not know — as *no one* other than Defendants knew — that Defendants had secretly conspired to prevent any such entrant from succeeding.

24.     TeraExchange, for example, built an award-winning order book designed for anonymous, all-to-all trading of IRS by buy-side investors.  TeraExchange enlisted support from many large trading entities that were poised to provide liquidity to the platform — and at *smaller* bid/ask spreads than those that were prevailing in the IRS market.  In response to this threat, several of the Dealer Defendants (including Bank of America, Barclays, and Goldman Sachs) first offered to "invest" in TeraExchange, in order to take over the platform to neutralize it as a threat — just as the Dealer Defendants had done with Tradeweb.

---

[5]  Levinson, *supra* note 2.

25.    After TeraExchange rebuffed those offers, the Dealer Defendants took a strikingly coordinated series of actions to prevent trades from taking place on TeraExchange, including by denying the clearing services that are preconditions for such trades.[6]  By June 2014, while battling these roadblocks, TeraExchange was finally able to process a single IRS trade on its platform between two buy-side entities.  But because BNPP's clearing office served as the clearing agent, it was immediately made aware the trade had taken place.  BNPP's clearing office notified its trading desk of this trade, and the trading desk then contacted the parties to the trade threatening them with a loss of access to clearing and other banking services if they dared to trade again on TeraExchange's platform.

26.    The next day, BNPP, Citi, JP Morgan, and UBS each separately contacted TeraExchange, demanding to "audit" TeraExchange's rulebook and stating they would not clear any further trades on TeraExchange's platform until the supposed audit was complete.  These banks had no genuine need to conduct any such audit and never actually intended to do so (and never did).  Nor did they have any basis for refusing to clear trades on TeraExchange's platform.  But the fact that each of these banks made this pretextual demand and threat on the same day, in the same manner, and in response to the same single trade being executed on TeraExchange, reflects the high level of coordination of Dealer Defendants' cartel.

27.    The Dealer Defendants also engaged in other efforts, detailed below, to ensure TeraExchange would fail.  Certain bank personnel even told TeraExchange the banks had determined they would not let TeraExchange live because they viewed it as a "Trojan Horse"

---

[6]    In a cleared transaction, a central clearinghouse guarantees each side's payments so that a default by one party will not affect its counterparty.  As detailed herein, the Dealer Defendants have ensured they play a critical intermediary role in the clearing process and utilized that role to further their conspiracy.

that, if allowed to enter the market, could destroy their market dominance. The Dealer Defendants took similarly aggressive steps to boycott Javelin and to limit TrueEx to trading using a request-for-quote ("RFQ") protocol that essentially replicates the limitations of the voice-based, OTC trading model. As a result of the Dealer Defendants' systematic efforts, the only SEFs that have any meaningful end-user trading activity today effectively require that platform participants trade directly with a dealer and deny the buy side the benefits of all-to-all trading.

28.     The result is a bifurcated IRS market: on one side is an efficient *dealer-to-dealer* market, where information is transparent and bid/ask prices are set by market forces; on the other side is an inefficient *dealer-to-client* market where investors must trade with select dealers and cannot trade with one another. By conspiring to maintain this bifurcated market structure, the Dealer Defendants have preserved their positions as the primary market makers for IRS. The Dealer Defendants have ensured they will continue to be on one side of every trade, extracting a toll in the form of inflated bid/ask spreads virtually every time any investor buys or sells IRS. In the process, they have maintained their control over client-flow information in the IRS market.

29.     Many even regard the IRS market as *less* efficient today than it was in 2008. The General Counsel of Tradeweb, Douglas Friedman, acknowledged at a recent industry conference[7] that even after SEFs entered the market, the "mode of execution has largely stayed the same" for IRS investors.[8] Similarly, Larry Tabb, the Founder and CEO of the TABB Group,

---

[7]    The conference, "SEFCON," is an annual industry event featuring panels composed of representatives from SEFs, dealers, buy-side firms, and government regulators. All references to "SEFCON" herein are to "SEFCON VI," which was held on October 26, 2015, at the Waldorf Astoria in New York City, unless otherwise noted. Plaintiffs' counsel attended the conference, and all quotes attributed to SEFCON speakers and participants are direct quotes that were made during speeches or panel discussions.

[8]    *See also* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 12 (2016), http://www.bis.org/publ/mktc07.pdf ("*The majority of swap trading still*

a market research firm, recently described the market for IRS as "basically the same two-tiered market of before [Dodd-Frank] with a greater percentage of the market cleared." Will Rhode, Director of Fixed-Income Research at Tabb Group LLC, noted in 2014 that "[t]he walls are not coming down."[9] Michael Koegler, former Managing Director at Javelin has similarly observed: "Almost all of the [dealer-to-client] business being done in the market is happening via RFQ which is essentially *business as usual*."[10]

30.    This action is brought under the federal antitrust laws to address the "supreme evil of antitrust"[11] — collusion among entities that are, in our free market economy, supposed to compete. While Dodd-Frank sought to bring more competition to the IRS market, Congress did not direct the Commodity Futures Trading Commission (the "CFTC"), the Dodd Frank Act's primary regulator, to police collusion among the banks or to address the artificial bifurcation of the IRS market. As CFTC Chairman Massad has observed, Dodd-Frank "doesn't specifically go to the wholesale versus retail distinction."[12] Instead, Congress expressly preserved the crucial and longstanding role of the antitrust laws in preventing competitors, including the Dealer

---

*occurs in response to an RFQ, rather than via a [central limit order book]*. The growth in electronic trading has allowed some PTFs to enter as liquidity providers, but *banks remain the dominant market-makers*.") (emphases added).

[9]    Matthew Leising, *Swaps Revolution Falling Flat as Brokers Keep Grip on New Market*, BLOOMBERG (Mar. 4, 2014), http://www.bloomberg.com/news/articles/2014-03-05/swaps-revolution-falling-flat-as-brokers-keep-grip-on-new-market.

[10]    Jesse Colin, *SEF NY Interview: Michael Koegler, Managing Director, Javelin Capital Markets*, TOTAL ASSET (Aug. 18, 2014), http://blogs.terrapinn.com/total-asset/2014/08/18/sef-ny-interview-michael-koegler-managing-director-javelin-capital-markets/ (emphasis added).

[11]    *Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).

[12]    FINANCIAL TIMES, *CFTC Not Planning on Anonymity for Swaps Market* (Oct. 26, 2015), http://www.ft.com/fastft/414101/us-swaps-market. The IRS market is sometimes described as bifurcated into "wholesale" (dealer-to-dealer) and "retail" (dealer-to-client) divisions.

Defendants, from conspiring to thwart competition. *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified.").[13]

## JURISDICTION AND VENUE

31.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32.    This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

33.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

34.    Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

35.    Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many Defendants are subject to personal jurisdiction in the United States because they, as set forth

_____

[13]    *See also* H.R. REP. NO. E1347-01 (2010) (Conf. Rep.) (statement of Rep. Conyers, Jr.), 2010 WL 2788137 ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

below, were formed in or have their principal places of business in the United States. In addition, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and class members residing in, located in, or doing business throughout the United States. For example, and as set forth more fully below, the Defendants directly conspired through and with Tradeweb, whose principal place of business is in New York City, and at Tradeweb Board of Directors meetings in Miami and elsewhere. Defendants also conspired to boycott SEFs, such as Javelin, TeraExchange, and TrueEx, all based in New York City.

36.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. The contracts governing the IRS at issue in this action often included a clause submitting the parties to jurisdiction in this District. And the IRS at issue were regularly traded through the desks of the Dealer Defendants located in New York City. The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded IRS swaps in the United States as their agents, and if they did not, the Dealer Defendants would have to have made those trades themselves.

## PARTIES

### A.     Plaintiffs

37.     Established by the Illinois state legislature in 1895, the Public School Teachers' Pension and Retirement Fund of Chicago (also, the "Chicago Teachers' Pension Fund" or "CTPF") is the administrator of a defined benefit public employee retirement system, providing retirement, survivor, and disability benefits for certain certified teachers and employees of the

Chicago Public Schools.  During the Class Period, CTPF entered into IRS transactions directly with multiple Dealer Defendants.

38.    The Mayor and City Council of Baltimore ("Baltimore") is an independent city in the State of Maryland.  During the Class Period, Baltimore entered into IRS transactions directly with multiple Dealer Defendants.

39.    Plaintiff Genesee County Employees' Retirement System ("Genesee") is a multiple-employer defined benefit pension plan with its principal place of business in Flint, Michigan.  Participating employer units include Genesee County, Genesee County Road Commission, Genesee County Health Systems, Genesee County Division of Water and Waste Services, Genesee District Library, and the City of Mt. Morris.  During the Class Period, Genesee transacted in IRS with multiple Dealer Defendants.

**B.    Defendants**

40.    Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

41.    Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  During the Class Period, BAC was a shareholder in Tradeweb.  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York.  BANA is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer.  In addition, as part

of the conspiracy, BANA agreed with the other Defendants to boycott the SEFs, which are located in New York.  On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the CFTC.

42.    As used herein, the term "**Bank of America**" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Bank of America directly sold IRS to and bought IRS from class members.  Bank of America also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

43.    Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York.  Barclays Bank PLC is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer.  In addition, as part of the conspiracy, Barclays Bank PLC agreed with the other Defendants to boycott the SEFs, which are located in New York.  During the Class Period, Barclays Bank PLC was a shareholder of Tradeweb.  Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York.  Barclays Capital Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

44.    As used herein, the term "**Barclays**" includes Defendants Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Barclays Bank PLC maintains a New York branch.  Barclays transacts business in New York, New York.  During the Class Period, Barclays, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Barclays also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

45.    Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of the France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch.  BNPP SA is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer.  In addition, as part of the conspiracy, BNPP SA agreed with the other Defendants to boycott the SEFs, which are located in New York. Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

46.    As used herein, the term "**BNPP**" includes Defendants BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  BNPP transacts business in New York, New York.  During the Class Period, BNPP, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  BNPP also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

47.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the Class Period, Citigroup was a shareholder of Tradeweb.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York.  Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.  Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Citibank, Citigroup Global Markets Inc., Citigroup Global Markets Limited are registered swap dealers with the CFTC, and, during the Class Period, each entered into IRS contracts in the United States with the Class, including as a dealer.  In addition, as part of the conspiracy, Citibank, Citigroup Global Markets Inc., Citigroup Global Markets Limited agreed with each other and with the other Defendants to boycott the SEFs, which are located in New York.  In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

48.     As used herein, the term "**Citi**" includes Defendants Citigroup, Citibank, Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Citi, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Citi also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

49.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  During the

Class Period, Credit Suisse Group AG was a shareholder of Tradeweb.  Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Credit Suisse International is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer.  In addition, as part of the conspiracy, Credit Suisse International agreed with the other Defendants to boycott the SEFs, which are located in New York.  Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

50.     As used herein, the term "**Credit Suisse**" includes Defendants Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Credit Suisse transacts business in New York, New York.  During the Class Period, Credit Suisse, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Credit Suisse also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

51.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany.  Deutsche Bank AG is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer.  And, as part of the conspiracy, Deutsche Bank AG agreed with the other Defendants to boycott the SEFs, which are located in New York.  In addition, during the Class Period, Deutsche Bank AG was a

shareholder of Tradeweb.  Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

52.    As used herein, the term "**Deutsche Bank**" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Deutsche Bank transacts business in New York, New York, and maintains a New York branch.  During the Class Period, Deutsche Bank, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. Deutsche Bank also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

53.    Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the Class Period, Goldman Sachs Group was a shareholder of Tradeweb.  Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs Bank USA is a New York state-chartered bank and a member of the Federal Reserve's system, with its principal place of business in New York, New York.  Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Goldman Sachs Group.  Goldman Sachs & Co.; Goldman

Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International are registered swap dealers with the CFTC, and, during the Class Period, each entered into IRS contracts in the United States with the Class, including as a dealer.  And, as part of the conspiracy, Goldman Sachs & Co.; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International agreed with each other and with the other Defendants to boycott the SEFs, which are located in New York.  In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

54.    As used herein, the term "**Goldman Sachs**" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Goldman Sachs, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. Goldman Sachs also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

55.    Defendant HSBC Bank PLC is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant HSBC Bank USA, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia, and branch locations in New York, New York.  HSBC Bank PLC and HSBC Bank USA, N.A. are registered swap dealers with the CFTC, and, during the Class Period, each entered into IRS contracts in the United States with the Class, including as a dealer. And, as part of the conspiracy, HSBC Bank PLC and HSBC Bank USA, N.A. agreed with each other and with the other Defendants to boycott the SEFs, which are located in New York. Defendant HSBC Securities (USA) Inc. is a corporation organized and existing under the laws of

the State of Delaware, with its principal place of business in New York, New York. In addition, Defendant HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

56. As used herein, the term "**HSBC**" includes Defendants HSBC Bank PLC, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. HSBC transacts business in New York, New York. During the Class Period, HSBC, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. HSBC also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

57. Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the Class Period, J.P. Morgan Chase & Co. was a shareholder of Tradeweb. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co. J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc are registered swap dealers with the CFTC, and, during the Class Period, each entered into IRS contracts in the United States with the Class, including as a dealer. And, as part of the conspiracy, J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc agreed with each other and with the other Defendants to

boycott the SEFs, which are located in New York.  In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

58.     As used herein, the term "**JP Morgan**" includes Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Securities Plc, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, JP Morgan, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  JP Morgan also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

59.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the Class Period, MS was a shareholder of Tradeweb.  Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah.  Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is MS.  Defendant Morgan Stanley Bank International Limited is a bank organized and existing under the laws of England and Wales, with its principal place of business

in London, England, and is a wholly owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS. Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited are registered swap dealers with the CFTC, and, during the Class Period, each entered into IRS contracts in the United States with the Class, including as a dealer. And, as part of the conspiracy, Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited agreed with each other and with the other Defendants to boycott the SEFs discussed herein, which are located in New York. In addition, MS&C is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

60. As used herein, the term "**Morgan Stanley**" includes Defendants MS; Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and Morgan Stanley Capital Products LLC, that entered into IRS contracts with the Class, including as a dealer. During the Class Period, Morgan Stanley, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. Morgan Stanley also agreed with other Defendants to boycott the SEFs, which are located in New York.

61. Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut.

RBS PLC is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer. And, as part of the conspiracy, RBS PLC agreed with the other Defendants to boycott the SEFs, which are located in New York. In addition, during the Class Period, RBS Group PLC was a shareholder of Tradeweb. Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC. In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

62.     As used herein, the term "**RBS**" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. RBS PLC maintains a New York branch. RBS transacts business in New York, New York. During the Class Period, RBS, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. RBS also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

63.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. UBS AG is a registered swap dealer with the CFTC, and, during the Class Period, it entered into IRS contracts in the United States with the Class, including as a dealer. And, as part of the conspiracy, UBS AG agreed with the other Defendants to boycott the SEFs, which are located in New York. In addition, during the Class Period, UBS AG was a shareholder of Tradeweb. Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary

of UBS AG.  In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

64.    As used herein, the term "**UBS**" includes Defendants UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  UBS maintains a New York branch and transacts business in New York, New York. During the Class Period, UBS, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  UBS also agreed with other Defendants to boycott the SEFs discussed herein, which are located in New York.

65.    Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  As used herein, the term "**ICAP**" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities. In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers.  As explained below, ICAP agreed with the Dealer Defendants that it would not allow its platform to be accessed by the buy-side of the IRS market.

66.    Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  In addition, Tradeweb Markets is the successor by merger to Tradeweb New Markets LLC, a financial services company with its principal place of business in New York, New York.  As used herein, the term "**Tradeweb**" includes Tradeweb Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS, CDS, and other asset classes.  Tradeweb's historical focus has been on providing electronic trading services in

the dealer-to-client side of the market.  Tradeweb is jointly owned by Thomson Reuters and a consortium of the Dealer Defendants.  Besides the ownership stakes of some Dealer Defendants in Tradeweb, as detailed below all of the Dealer Defendants exercise control over Tradeweb through their dominance of its board and governance committees and their provision of liquidity to its platforms.  As explained below, the Dealer Defendants took control of Tradeweb to prevent it from developing a trading platform for IRS that would end the artificial bifurcation between efficient dealer-to-dealer transactions and antiquated, costly dealer-to-client trades — a bifurcation the Dealer Defendants have collectively imposed.  Tradeweb agreed with the Dealer Defendants to abide by their wishes.

## FACTUAL ALLEGATIONS

## I.    THE MARKET FOR INTEREST RATE SWAPS

### A.    Interest Rate Swaps Generally

67.    An IRS is a type of financial derivative.  It is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time.  In the most common type of swap — often referred to as a "plain vanilla" swap — one counterparty pays the other a *fixed* interest rate in exchange for receiving a *floating* interest rate.  The floating rate is often tied to an industry benchmark (or "reference rate"), such as the London Interbank Offered Rate, or "LIBOR."  The counterparty paying a fixed rate is typically referred to as the "buyer," and the counterparty making payments at the floating rate is known as the "seller."

68.    A vibrant IRS market provides benefits to both the buy side and to the U.S. economy as a whole when competition is not suppressed.  As noted, an IRS allows investors to protect themselves against future fluctuations of interest rates and adverse events.  Other benefits of an efficient IRS market include enabling borrowers to obtain mortgages and other loans at lower cost and enabling investors to raise capital more cheaply and thus provide more funding to

help U.S. companies, industries, and the economy as a whole to grow.  An efficient IRS market also enables the buy side to diversify its investor base by being able to reach both those who prefer to receive fixed rates as well as those who prefer floating rates simultaneously.  The buy side and the U.S. economy as a whole are harmed when dominant IRS market participants collude to restrain competition and transparency.

69.     In the early days of IRS trading, IRS contracts were not yet standardized and typically had to be negotiated and documented on a trade-by-trade basis.  As a result, IRS trading involved high transaction costs.  Nonetheless, because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of investors.  Some buy-side entities also began to use IRS to speculate on movements in interest rates.

70.     Over time, IRS trading became more standardized.  The industry adoption of the ISDA Master Agreement, first created in 1987, drove the standardization of IRS.  By no later than 2000, all of the material terms of most IRS — the tenor (*i.e.*, the maturity or term of the swap), the fixed rate, the reference index used to calculate floating payments, and the timing of payments — were standardized, resulting in lower transaction costs and higher volumes.

71.     The IRS market has grown exponentially over the last three decades.  By 2006, the outstanding notional value of IRS was approximately $230 trillion.  By 2014, it was approximately $381 trillion.

**B.     Trading of Interest Rate Swaps**

72.     As demand for IRS increased, the Dealer Defendants took on the role of market makers, providing liquidity in the IRS market.  These banks became the dealers of IRS, offering fixed and floating-rate cash flows to their customers, which include pension funds, asset managers, endowment funds, corporations, insurance companies, municipalities, real estate

investment trusts, and others — that is, the "buy side" comprising Plaintiffs and class members here.

73.    IRS trading typically works as follows:  a buy-side customer asks a dealer for a quote either (1) to pay the floating rate and receive a fixed rate, or (2) to pay the fixed rate and receive a floating rate.  The rate at which the dealer will pay the fixed rate is known as the "bid," and the rate at which it will receive the fixed rate is known as the "offer" or the "ask."  In a simple example, a five-year IRS may be quoted by a dealer at a bid of 25 and an ask of 30, meaning that the dealer will either pay the fixed rate at a 25 basis-point premium above the five-year U.S. Treasury yield, or receive the fixed rate payments at a 30 basis-point premium above the five-year U.S. Treasury yield.  The floating rate in either case is typically based on LIBOR or another reference rate.  A buy-side entity that is seeking to pay the floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed rate.  A buy-side entity seeking to pay the fixed rate and receive the floating rate will pay the "ask" or "offer" price quoted by a dealer for the fixed rate.

74.    The Dealer Defendants typically profit by paying at a low fixed rate (*i.e.*, the bid price) and receiving at a higher fixed rate (*i.e.*, the ask or offer price).  This difference is known as the "bid/ask spread" (or "bid/offer spread") or the "spread."  The wider the spread, the more money the dealer makes.  The mid-point of the spread is generally considered to be the mid-market price.

75.    Trading of IRS between dealers and buy-side investors has historically occurred in a voice-based, OTC market environment.  In the voice-based trading environment, the trading process is almost exclusively conducted on the telephone, which has several features that limit

the trading capabilities of the buy side, while also providing significant advantages to major IRS dealers.

76.    Voice-based trading in IRS forced the buy side, for example, to rely exclusively on the dealers for real-time pricing information because there was very little reliable pre-trade pricing visibility.  Calling all available dealers for price information was not realistic, so often investors would engage a very small community of dealers.  In addition, in order to obtain price information, buy-side entities would have to disclose to each dealer they called their identity, the direction of their intended trade (pay fixed or receive fixed), and notional amount.  This provided a one-way flow of information about upcoming trades to the dealer, which it could in turn use to its own trading advantage.

77.    Executing a trade in the historically voice-based IRS market was even more restrictive than the price discovery process.  To complete a transaction, dealers required buy-side clients to execute trades "on the wire" which means that executable markets were only available when the buy-side client was physically engaged with the respective dealer over the phone.  As a result, buy-side customers were unable to shop around to as many dealers as they would like, compare all of the dealers' quotes, and force the dealers to compete directly on price.[14]

78.    Electronic trading in fixed income was introduced in the mid 1990s and began gathering momentum in the IRS market in the early 2000s.  In 2003, ICAP launched i-Swap for dealer-to-dealer trading.  Around that same time, Barclays Capital launched a multi-currency IRS

---

[14]    Moreover, prior to central clearing, buy-side investors had to have bilateral credit agreements in place with a dealer in order to trade IRS.  Structurally, this reinforced the practices of the historically voice-based, OTC market because buy-side investors were unable to trade directly with each other without credit agreements and were forced to trade exclusively with market makers with whom they had valid credit agreements in place

trading platform on Bloomberg, the first single-dealer electronic trading platform for IRS — an offering which the other Dealer Defendants perceived as a betrayal.[15]

79.    Technology had the potential to make IRS trading much more efficient, transparent, and competitive for the buy side, just as it had done in other financial markets.  In the IRS market, however, the dealer-to-dealer and the dealer-to-client markets took very different paths.  The former developed, but the latter did not.  While the IDB platforms that support dealer-to-dealer trading evolved to become systems that promoted transparency and ease of access, the dealer-to-client markets adopted protocols that replicated many of the historical voice-based, OTC practices.

80.    The differences between the two IRS electronic trading protocols restrict the options of buy-side investors and advantage a small group of market makers of IRS — that is, the Dealer Defendants.  The protocol differences between the two sides of this bifurcated market, as they exist today, are summarized in the following chart:

---

[15]    *See infra* ¶¶ 283-84.



81.     While some dealers have launched trading platforms for buy-side customers in the past few years, these platforms do not alter the entrenched market dynamics. These trading platforms typically use an RFQ protocol whereby an investor can request quotes from several dealers at once, but not from anyone else. It basically amounts to calling dealers to obtain quotes, except using electronic messages instead of the telephone. And, as with a voice-based transaction, an investor requesting a quote over an RFQ must disclose its identity at the time of the request. Accordingly, the RFQ protocol, by design, largely replicates the limitations of the voice-based, OTC market.

82.     Simply put, whether trading occurs over the telephone, in a Bloomberg chat, or through an RFQ platform, buy-side investors in the IRS market do not have access to the price transparency or competitive pricing endemic to modern markets that support more efficient trading through the facilitation of all-to-all trading.

83.    By marked contrast, as shown in the chart above, the Dealer Defendants trade with *each other* in a separate marketplace that took a much different developmental path from the dealer-to-client market.  When dealers want to trade or lay off risk on other dealers, they trade on dealer-only competitive and transparent platforms provided by IDBs.

84.    When trading with each other on an IDB platform, dealers submit their bid and ask prices to the IDB, which then anonymously publicizes the best quotes (known as the "inside market") to all other dealers on the platform.  A dealer can immediately enter into an IRS contract at a quoted price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price.  Because several standardized IRS products have been actively traded for years, IDBs also make available to dealers electronic platforms that are akin to "order books" and which automatically and efficiently match the best bids and offers.[16]

85.    The price transparency and immediate execution available in the interdealer segment of the IRS market results in direct price competition among dealers.  As noted, the interdealer market is also pre-trade anonymous:  the dealers' identities are concealed from one another until they agree to enter into a trade; it is only at the time of execution that counterparty identities are revealed.  In return for facilitating dealer-to-dealer trades, an IDB earns a fixed-rate commission, known as a "brokerage fee" on each consummated trade.

86.    The competitive structure of the interdealer electronic platforms benefits the Dealer Defendants as long as these platforms remain exclusive to them.  By preserving their information advantage over the buy side, this environment allows the Dealer Defendants to

---

[16]    Luke Jeffs, *GFI Boss Defends Hedge Funds Access to Platforms*, FINANCIAL NEWS (Oct. 1, 2007) (Mickey Gooch, the founder and Chief Executive of GFI, stated that "[f]or the most liquid, electronic markets, there is little difference between the exchanges and the IDBs.").

leverage the transparent and accessible pricing available on the IDB platforms when responding to buy-side requests to trade. Armed with exclusive knowledge of buy-side flow information the Dealer Defendants can, at the expense of the buy side, manipulate execution levels so they systematically guarantee themselves higher profits than they would otherwise be able to make in an all-to-all marketplace.

87.    The existence of these IDB platforms demonstrate that IRS can be *and are* traded in a way that promotes competitiveness and transparent pricing. As a result of the increased standardization of IRS, the high amount of transaction frequency, and the availability of clearing, the dealer-to-client IRS market should have also adopted transparent and competitive electronic trading protocols like all-to-all trading years ago. As Professor Darrell Duffie, widely recognized as one of the world's foremost experts on OTC financial markets, has observed: "simple interest rate swaps . . . seem like natural candidates for exchange-based trade but are normally traded over the counter. At this point, we lack convincing theories that explain why such simple and heavily traded instruments are traded over the counter."[17]

88.    The explanation is Defendants' collusion. As detailed herein, the Dealer Defendants have prevented buy-side investors from entering the interdealer market and relegated them to dealer-to-client platforms that preserve the dealers' inherent advantages (and buy sides' inherent restrictions) from the voice-based, OTC market. The Dealer Defendants have also actively blocked the entry of all-to-all trading platforms, which would give the buy side access to competitive marketplaces similar to those the Dealer Defendants have enjoyed for years. When innovative entities have tried to introduce more competitive protocols to IRS trading platforms,

---

[17]    *See* DARRELL DUFFIE, DARK MARKETS 6-7 (2012).

or to open existing IDB marketplaces to the buy side, the Dealer Defendants have worked together to preserve the status quo by preventing such efforts from succeeding.

89.    The only reason this archaic and inefficient market structure persists is that the Defendants have operated as a classic cartel.  Through their cartel, Defendants have blocked the buy side from access to all-to-all trading.  They have imposed and perpetuated the barriers that prevent buy-side investors from trading with one another, thereby limiting competition in market making and ensuring that one of the Dealer Defendants remains a counterparty to nearly every IRS trade.

## II.    DEFENDANTS CONSPIRED TO BLOCK COMPETITIVE TRADING OF INTEREST RATE SWAPS

### A.    The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform and to Use it As a Vehicle for Collusion

90.    Tradeweb was founded in 1998 as a private, dealer-backed firm that focused on creating an online marketplace for fixed-income products, such as U.S. Treasuries.  Tradeweb subsequently offered a dealer-to-client RFQ platform for IRS that lacked anonymous trading.  On that platform, buy-side investors could request non-executable and non-binding quotes from multiple dealers, but not from other buy-side end users.  Tradeweb's platform facilitated the dealers' roles as the sole market makers for IRS and streamlined trades with customers.  Because Tradeweb's platform relied on the dealers to make markets, its success was dependent on the dealers providing liquidity to meet buy-side trading requests.

91.    In 2004, the dealers sold Tradeweb to Thomson Reuters, confident its dependency on the dealers' liquidity would effectively keep it within their control.  IRS trading volumes thereafter continued to grow.  With the increased demand for IRS and advances in trade

documentation, IRS products became standardized.  As the primary IRS dealers at the time, the

Dealer Defendants earned massive profits by making markets for the buy side.

92.    Soon after 2004, IRS had evolved to the point where it was ready for the

introduction of all-to-all trading.  By well before 2007, hundreds of trillions of IRS, in notional

value, were traded in standard forms.  There was no need to maintain a privileged set of dealers

to provide liquidity in the market.  While OTC dealers are sometimes useful sources of

immediacy for infrequently traded financial instruments, the IRS market has not had those

conditions for many years.  The benefits that central clearing (described below) and all-to-all

trading could bring to the IRS market were widely recognized by market participants, regulators,

and economists.  There was no procompetitive reason for the OTC system to continue to

dominate IRS trading.

93.    There was also tremendous demand from the buy side for competitive platforms

on which they could trade IRS not only with dealers, but also with each other.  Any dealer that

would have acted to provide such a platform would have been rewarded with more business and

lucrative brokerage fees from the buy side.

94.    Recognizing the threat this impending market evolution posed to the Dealer

Defendants' privileged position as the primary market makers, Goldman Sachs' Principal

Strategic Investments Group ("PSI") devised a "dealer consortium" strategy to work with its

biggest competitors, *i.e.*, the other Dealer Defendants, to control how key markets in which

Goldman Sachs operated as a dealer would evolve.[18]  The Goldman Sachs PSI group was

organized principally for the specific purpose of controlling market evolution to protect the

---

[18]    *See generally* Liz Moyer, *Goldman Group Takes Stakes in Market Evolution*,
MARKETWATCH (Jan. 23, 2012), http://www.marketwatch.com/story/goldman-group-takes-
stakes-in-market-evolution-2012-01-23.

"dealer community" from the emergence of electronic exchanges and exchange-like trading that would, in the banks' internal terminology, "disintermediate" them as dealers.

95.    Many of the other Dealer Defendants employ similar "market strategy" groups to coordinate with competitors to control market structures.[19]  For example, JP Morgan's Strategic Investments Group "co-invest[s] with other strategic investors, including banks and market structure firms to gain and sustain competitive advantage by developing and executing principal strategic investments."[20]  Bank of America's group, Global Strategic Capital Initiatives, was headed by Mary Harman from in or around 2006 to 2015.  Credit Suisse's practice is known as the Strategic Principal Investments Group, and it has been run by Theofilos Kotridis since 2004.

96.    Deutsche Bank utilizes a group referred to as Strategic Investments, which was headed by Stephen Wolff from 2004 until 2014.  Morgan Stanley's group is also called the Strategic Principal Investments Group; it has been led by Gary Offner since 2005.  Citi also has a specific strategic investments group, which is headed by William Hartnett.

97.    Those Dealer Defendants without distinct market strategy groups, including Barclays and BNPP, conduct similar strategic activities through their trading businesses.  As discussed in more detail below, these individuals and other personnel in these divisions regularly communicate with their counterparts at other Dealer Defendants to ensure that the dealers are acting in a uniform fashion.

---

[19]    Philip Georgiadis & Tim Cave, *Strategic investment units driving the evolution of trading*, FINANCIAL NEWS (Mar. 31, 2015), http://m.efinancialnews.com/story/2015-03-31/banks-strategic-investment-units-drive-the-evolution-of-trading ("While most bulge-bracket banks have principal strategic investment units, US investment banking giants dominate the space and Goldman Sachs, in particular, is widely viewed as one of the largest and most organised.").

[20]    *Id.*

98.     The Dealer Defendants' strategic investment units are "intensely secretive."[21] The banks purposely keep their operations hidden from public scrutiny, and very little has ever been disclosed about them publicly.[22]  When one publication attempted to research these groups in 2015, for example, all ten banks that were approached refused to discuss their groups on the record.[23]

99.     What little information the banks have allowed to trickle out about these groups is often intentionally misleading.  A briefing note on Goldman Sachs's group, for example, claims that the group's purpose is to "make existing markets more efficient."[24]  In fact, the true goal of this group is the exact opposite — it is to preserve *inefficient* market structures that place Goldman Sachs and other dealers at the center of the market, allowing them to collect monopoly rents on each trade.

100.    Nor has there been any significant public disclosure about the extent to which these groups coordinate strategies *among the banks*.  These groups secretly work together to protect the interests of something they call the "dealer community," which mainly involves protecting their privileged status as dealers.  Group heads met with each other regularly, and secretly, over the Class Period, in person and by telephone and through electronic communications, to develop and implement strategies to protect the banks' role as dealers in a

---

[21]  *Id.*

[22]  *Id.*; Moyer, *supra* note 18.

[23]  *See* Georgiadis & Cave, *supra* note 19.

[24]  *Id.*

bifurcated IRS market.  They also collaborated closely with the respective heads of their IRS trading desks.[25]

101.    By late 2007, Tradeweb itself was poised to introduce electronic all-to-all trading to the IRS market — a development in high demand by the IRS market.  The Dealer Defendants realized that a modern all-to-all electronic trading platform would be favorable to the buy side and disruptive to the established order of the OTC market.  Tradeweb touted itself as a "real-time trading platform" and boasted it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[26]

102.    In response, the Dealer Defendants resolved to regain control of Tradeweb.  In late 2007, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Lehman Brothers (later of Barclays and Morgan Stanley), all members of their respective dealers' market strategy groups, devised and, with the help of the other Dealer Defendants, put in place a conspiracy to eliminate the threat from Tradeweb and to organize themselves to secretly control the future development of the IRS market.

103.    Messrs. Levy, Senft, and Wolff recognized that Tradeweb's liquidity contracts with the Dealer Defendants — which Tradeweb needed in order to drive volume to its RFQ platform — were expiring.  As a result, Tradeweb began to worry the banks would steer liquidity to alternate trading platforms, starving it of necessary trading volume and revenue.  According to

---

[25]    *Id.* ("For these units to be successful, strong relationships, both with heads of trading across asset classes externally, are key to success, according to people close to the units.").

[26]    *See* TRADEWEB, *Thomson to Acquire TradeWeb* (Apr. 8, 2004), http://www.tradeweb .com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[27]

104.    Messrs. Levy, Senft, and Wolff thus recruited other Dealer Defendants — through contact with members of their market strategy groups — to join an initiative they called "Project Fusion," which was designed for the Dealer Defendants to capitalize on Tradeweb's vulnerability to take back effective control of the company.  Project Fusion also included a secret plan to keep the Dealer Defendants' true actions and intentions hidden from public view.

105.    Part of the plan was a publicity strategy designed to shape press coverage in a way that obscured the Dealer Defendants' true intentions.  In October 2007, Tradeweb and the Dealer Defendants issued a press release announcing that "the dealers will invest approximately $180 million to purchase a minority stake in TradeWeb's established markets."[28]  This press release was intended to lead numerous journalists to relay the same tale, repeating virtually verbatim the conspirators' description of the banks' "minority" investment.  "NINE BANKS TO BUY MINORITY STAKE IN TRADEWEB," read a typical headline.

106.    But the Dealer Defendants' press releases concealed the true nature of the transaction.  Nowhere was it revealed that they had simultaneously created a shadow company, called Tradeweb New Markets LLC, of which the Dealer Defendants would own an overwhelming majority (80%) purchased from Thompson at an additional cost of $280 million. Only a single passing reference in the press releases to vague, otherwise unspecified investments pointed to the real program:  "Separately," the press releases mentioned, "Thomson and the

---

[27]    Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

[28]    TRADEWEB, *supra* note 4.

dealers will fund additional investment in asset class expansion." The passing remark concealed its meaning with both a nebulous reference to ownership ("Thomson and the dealers") as well as the intended action ("fund[ing] additional investment in asset class expansion").

107.    Tradeweb Markets LLC and Tradeweb New Markets LLC were formed within 24 hours of each other between October 1 and 2 of 2007. Tradeweb Markets LLC was technically the first to be born, and was the entity designed by Defendants to be the public face of the transaction — the receiver of the "minority" interest and $180 million investment. Next came Tradeweb New Markets LLC, which was conceived and created with one central purpose: to host the conspiracy.

108.    Tradeweb New Markets LLC was given a name meant to be confused for Tradeweb Markets LLC, which together both sound like Tradeweb LLC; and all of which finally, easily fused into the generic name "Tradeweb." The Dealer Defendants' press releases elided the distinctions altogether, referring only to "Tradeweb," and never acknowledging creation of the critical entity they created and dominated — Tradeweb New Markets LLC — which was the entity that provided them with control of the rulebooks and business logic of future IRS trading.

109.    The Dealer Defendants also hid their true purpose by making the misleading statement in the press release that the second (unnamed) investment was limited to "asset-class expansion." The "old" parent Tradeweb platform had largely provided OTC bond trading services. The new publicized, headline platform would take on the "old" asset classes. In particular, the Thomson-majority owned Tradeweb Markets LLC would absorb its equities IOI system, AutEx, as well as its FIX connectivity platform. As noted, Thomson would own 85% of this operation. Its main mission, however, was to lease itself to the platform that the Dealer

Defendants controlled with an 80% majority:  the new derivatives and future IRS platform of Tradeweb New Markets LLC.  In exchange for this 80% share of the new shadowy Tradeweb entity, the Dealer Defendants paid Thompson approximately $280 million — a figure that does not show up in the press releases or press coverage.

110.    The Dealer Defendants structured the transaction in this way so they could control the incipient IRS trading platform without *being seen* as controlling it.  By proclaiming to have only a small stake in the platform that in reality held assets they regarded as unimportant, Dealer Defendants hid their greatest asset.

111.    As part of their joint agreement, the Dealer Defendants that invested in Tradeweb (*i.e.*, Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS[29]) secretly agreed with each other that they would not support other trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all trading.

112.    As explained more fully below, Barclays was initially not allowed to participate in Tradeweb because the other Dealer Defendants had placed it in the "penalty box" for attempting to launch an IRS electronic trading platform.  *See infra* ¶¶ 283-84.  Barclays later was allowed to become an investor in Tradeweb in 2009 (after its penalty had expired).

113.    The Dealer Defendants installed their senior personnel, many of whom came from their strategic investment groups, on the boards of directors of both Tradeweb Markets and Tradeweb New Markets.  The Dealer Defendants' personnel occupied sixteen of the twenty-six seats on the Tradeweb Markets Board of Directors and sixteen of the twenty-four seats on the

---

[29]    Bank of America became an investor in 2008, after it acquired Merrill Lynch.  Citi also became an investor in 2008.  TRADEWEB, *Citi Takes Equity Stake in Tradeweb* (Apr. 8, 2008), http://www.tradeweb.com/News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb/.

Tradeweb New Markets Board of Directors.  By holding a collective majority vote on each board, the Dealer Defendants effectively controlled both Tradeweb entities.

114.    The Dealer Defendants selected Lee Olesky, the former Chief Operating Officer for Fixed Income at Credit Suisse, to serve as CEO of both entities.  And they installed one of the chief architects of their consortium strategy, Vic Simone, a Managing Director at Goldman Sachs and then-Global Head of its PSI Group, as Chairman of the Board of Directors of Tradeweb Markets.[30]

115.    Brad Levy, a chief architect of the Dealer Defendants' takeover of Tradeweb, served as a board member of both Tradeweb Markets and Tradeweb New Markets.  In 2011, Mr. Levy took over as Global Head of Goldman Sachs' PSI Group and, at the same time, became the Chairman of the Board of Directors of Tradeweb Markets.  Goldman Sachs also installed Colin Corgan, a partner on its Rates Desk, on the boards of both Tradeweb Markets and Tradeweb New Markets.

116.    The Dealer Defendants also installed key strategic personnel on the governance committees of both entities, so they could control Tradeweb's IRS business strategy and use the entities to collude in secret.

117.    Bank of America installed Shea Wallon, a Managing Director in the bank's Global Strategic Capital Initiatives group, on the Boards of both Tradeweb Markets and Tradeweb New Markets.  Other Bank of America personnel on the Tradeweb New Markets Board included Luke Halestrap, the Head of Emerging Markets Interest Rates, and David Moore, the Head of North America Rates Trading.

---

[30]    *See* TRADEWEB, *Tradeweb Appoints New CEO* (Sept. 9, 2008), http://www.tradeweb. com/News/News-Releases/Tradeweb-Appoints-New-CEO/.

118.    Barclays personnel on the Tradeweb Markets Board of Directors included Dexter Senft, who subsequently headed Morgan Stanley's Fixed Income E-Commerce division, and Andrew Challis, the Head of eFICC Distribution and Market Strategic Investments.  Barclays personnel on the Tradeweb New Markets Board of Directors included Christopher Mosher.

119.    Citi installed Sandeep Arora, the Chief Operating Officer, and Nicholas Brophy, the Head of Rates Trading in the Americas, on the boards of both Tradeweb Markets and Tradeweb New Markets.

120.    Credit Suisse installed Sean Flynn, the Global Head of Investment Banking Strategy, and Timothy Blake, the Head of Interest Rates Trading in the United States, on the boards of both Tradeweb Markets and Tradeweb New Markets.

121.    Deutsche Bank filled the boards of Tradeweb Markets and Tradeweb New Markets with Michele Faissola, the Head of Global Rates, and Stephen Wolff, the Head of Strategic Investments and Head of Fixed Income e-Commerce.

122.    JP Morgan installed Simon Maisey on the Tradeweb Markets Board of Directors (he later joined Tradeweb as a Managing Director in 2014), and Christopher Paul Willcox, the Global Head of Rates Trading and the Head of Global Rates Strategic Investments, on the Tradeweb New Markets Board of Directors.  In addition, Kemal Askar, JP Morgan's Head of Rates Trading in the United States, served on the boards of both Tradeweb Markets and Tradeweb New Markets.

123.    Morgan Stanley installed Dexter Senft, the Global Head of Fixed Income E-Commerce, on the Tradeweb Markets Board of Directors and David Moore, the Global Head of Structured Interest Rates, on the Tradeweb New Markets Board of Directors.

124.    RBS placed Richard Volpe, the Global Head of Dollar Interest Rates, on the Tradeweb Markets Board of Directors, and Michelle Neal, the Global Head of Electronic Markets and co-head of FICC Prime Services, on the Tradeweb New Markets Board of Directors.

125.    UBS personnel on the Tradeweb Markets Board of Directors included Joan Lavis, Global Head of Strategic Investments, and Paolo Croce, Head of European Rates.  UBS placed Stuart Taylor, the Head Global eBusiness in Fixed Income, on the Tradeweb New Markets Board of Directors.[31]

126.    These personnel are many of the primary architects of the conspiracy.  The Dealer Defendants used and continue to use the cover of Tradeweb to meet in private to conspire to control the IRS market.  The aforementioned individuals, and others, met regularly under the cover of Tradeweb's Board and informally, outside of formal Board duties, to coordinate their joint efforts to prevent the buy side from being able to trade IRS in an all-to-all, limit order book model.

127.    In addition to conference calls, which took place as often as every week, the Board meets annually in person in Miami, Florida.  The Dealer Defendants used these calls and meetings to discuss and coordinate their strategy for controlling the IRS market and to further their conspiracy.

128.    These personnel also regularly discussed market structure issues outside of the board or committee meetings.  Chris D'Annibale, the Head of Interest Rate Swaps for

---

[31]    Tradeweb New Markets LLC merged into Tradeweb Markets LLC in 2010, leaving Tradeweb Markets LLC as the sole company.  The Dealer Defendants have continued to hold a controlling majority of seats on the Board of Directors of Tradeweb Markets LLC ever since the merger, giving them continuing control over Tradeweb Markets LLC.

Tradeweb's interdealer SEF, Dealerweb, hosted dinners during the Class Period at his home in Long Island and at restaurants in New York City that were attended by representatives of the Dealer Defendants.  The Dealer Defendants used these meetings to coordinate their strategies for the IRS market.  They discussed their plans for keeping the market bifurcated and preventing the natural progression to all-to-all trading.

129.    The Dealer Defendants also exercise control of Tradeweb via its governance committees.  Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[32]  Acting through these committees, the Dealer Defendants met and agreed how to coordinate their conduct to ensure any threat to their collective dominance of the IRS market would not succeed.  To facilitate the conspiracy and ensure that their collusion would not be detected, Tradeweb kept the existence of these committees and the identities of their members largely hidden from the public.

130.    Tradeweb held itself out as an independent company, pursuing its own objectives in the market.  The Dealer Defendants, however, pressured Tradeweb to take actions against its own individual interest.  For instance, the independent (*i.e.*, non-bank) managers of Tradeweb recognized it would be in Tradeweb's interest to launch an all-to-all anonymous electronic trading platform, and took steps to implement such a platform.  But upon learning of these attempts by Tradeweb's personnel, the Dealer Defendants pressured them to change course.

---

[32]    *See* TRADEWEB, *DW SEF LLC:  SEF Participation Committee Charter*, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Particip ation%20Committee%20Charter.pdf (last visited Sept. 8, 2016); TRADEWEB, *TW SEF LLC:  SEF Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/TW%20SEF%20Participation%20Committee%20Char ter.pdf (last visited Sept. 8, 2016).

Responding to this pressure, the Tradeweb managers agreed with the Dealer Defendants that Tradeweb would not implement these procompetitive changes to its trading platform.

131.    The Dealer Defendants publicly touted Tradeweb as a modern, efficient trading platform that could provide "accurate pricing information" and "greater market transparency."[33] But these claims were a sham to provide cover for their conspiratorial objectives.  Pursuant to its agreement with the Dealer Defendants, Tradeweb merely put a new sheen on the dealer-to-client OTC market structure — it facilitates *only* dealer-to-client trades on an RFQ platform, rather than all-to-all trading via an RFQ or an order book.  Buy-side investors cannot trade directly with one another.

132.    As a result, the Dealer Defendants were able to use Tradeweb to maintain their privileged positions as the primary market makers for IRS and extract the same supracompetitive profits on dealer-to-client trades that they have historically realized.  Absent a conspiracy, this would have been against Tradeweb's independent interest.  Making an efficient, all-to-all trading platform available to all market participants would have increased the number of trades on Tradeweb and thus the fees it obtained.

133.    Pursuant to its agreement with the Dealer Defendants, Tradeweb plays an active role in maintaining a two-tiered market structure.  Tradeweb currently operates two different SEFs:  Dealerweb, which is "designed exclusively for dealers" and allows anonymous, competitive trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[34]  As Jon Williams, former Managing Director and

---

[33]    TRADEWEB, *supra* note 28.

[34]    DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES DEALERS CLUB 12 (Feb. 2016), https://www.bettermarkets.com/sites/default/files/

Head of U.S. Institutional Market Operations at Tradeweb, stated during a recent panel discussion at SEFCON in New York City: "we don't have buy-side participants" on Dealerweb.

134.    Tradeweb charges $50,000 per month — and a year's minimum — to trade on Dealerweb, but only approximately $100 per month to trade on Tradeweb. It is "challenging to find a legitimate rationale for this enormous cost differential between these two platforms operated by the same company."[35] That is because the real reason for this cost structure — which was instituted by the Dealer Defendants — is to "effectively establish[] and entrench[] a bifurcated dealer-to-dealer and dealer-to-customer marketplace" in furtherance of Defendants' conspiracy.[36]

135.    In fact, while Tradeweb's SEF ostensibly offers an "order book," the Dealer Defendants actively discourage their clients from using it and threaten clients who take steps to do so. As a result, this platform is not even viewed as an active trading platform by those in the industry. While Tradeweb could offer an all-to-all RFQ platform, it has limited its RFQ to facilitate dealer-to-client or dealer-to-dealer trading by only allowing dealers to respond to the quote requests submitted to the platform. Again, this is the result of Tradeweb's agreement with the Dealer Defendants.

**B.    The Dealer Defendants Utilize Other Forums to Collude**

136.    While Tradeweb is the principal consortium through which the Dealer Defendants secretly work together to control the IRS market, they use other forums for this purpose as well. One of these is the International Swaps and Derivatives Association ("ISDA"). ISDA is

---

Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

[35]  *Id.*

[36]  *Id.* at 12-13.

nominally an industry trade group, but in reality, during the Class Period, it served the interests of the Dealer Defendants.

137.    From 2008 to the present, the Dealer Defendants controlled ISDA's Board of Directors and used those roles to discuss the IRS market and further their conspiracy.  The following employees of the Dealer Defendants hold positions on the ISDA Board of Directors, and used ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-all electronic platforms for IRS trading:  Stephen O'Connor (Morgan Stanley:  Chairman), Ciaran O'Flynn (Morgan Stanley:  Director), Keith Bailey (Barclays:  Secretary), Diane Genova (JP Morgan:  Treasurer), Biswarup Chatterjee (Citigroup:  Director), Kieran Higgins (RBS:  Director), Thibaut de Roux (HSBC:  Director), Elie El Hayek (HSBC:  Director), Christopher Murphy (UBS:  Director), Will Roberts (Bank of America:  Director), and Eraj Shirvani (Credit Suisse:  Director).

138.    The Dealer Defendants also met and colluded under the auspices of meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of various FIA "working groups."  The following employees of the Dealer Defendants hold positions on the Board of Directors of FIA America (FIA's American division):  M. Clark Hutchison (Deutsche Bank), Emily Portney (JP Morgan), Michael Dawley (head of Goldman Sachs' FCM), Craig Abruzzo (Morgan Stanley), Malcolm Clark Hutchison (Morgan Stanley), Jeffrey Jennings (Credit Suisse), Raymond Kahn (head of Barclays' FCM), Jerome Kemp (Citi), Najib Lamhaouar (HSBC), Edward Pia (UBS), and George Simonetti (Merrill Lynch, Pierce, Fenner & Smith).

139.    ISDA and FIA often coordinate to create "working groups" that provide additional forums for collusion.  One such working group was devoted to the drafting of the

"Cleared Derivatives Execution Agreement" ("CDEA") — a standard form contract intended to govern the relationship between clearing agents and their customers. The "CDEA Drafting Committee" was chaired by Maria Chiodi, a Director and In-House Counsel at Credit Suisse.

140.    The CDEA Drafting Committee held numerous meetings throughout 2010 and 2011. One such meeting was held on April 8, 2011 at the offices of Credit Suisse in New York City. James Cawley, then Javelin's CEO, and Suellen Galish, Javelin's General Counsel, learned of the meeting in advance, and requested an invitation because they were concerned that the CDEA Drafting Committee was being used to prevent or limit trading on all-to-all anonymous trading platforms.

141.    At the meeting, Ms. Galish asked how the CDEA — which appeared to have been drafted solely for OTC transactions and did not seem to cover IRS trades executed on a SEF — would work for trades executed on a SEF. Athanassios Diplas, then a Managing Director at Deutsche Bank and Co-Chair of ISDA's Industry Governance Committee, immediately demanded to know Ms. Galish's name and for whom she worked. He then refused to answer her question.

142.    After the meeting, Ms. Chiodi emailed Mr. Cawley and told him it would be inappropriate for any representatives of SEFs to attend future CDEA Drafting Committee meetings. The CDEA prevented Javelin from attending any further meetings of the Drafting Committee. Thus, although drafting of the CDEA documentation was meant to be open to the industry, SEFs offering all-to-all trading to the buy side, including Javelin, were excluded, while SEFs that complied with the Dealer Defendants, such as Tradeweb and ICAP, were allowed to be involved in the process.

143.     The Dealer Defendants also met and conspired through Tradition SEF, another IDB.  From 2013 to 2015, Tradition personnel hosted monthly meetings in New York City with the collective heads of the Dealer Defendants' IRS trading desks to discuss issues relating to SEFs.  The Dealer Defendants used these meetings to coordinate their positions regarding the IRS market and to ensure that none of them broke ranks from each other to support electronic trading platforms that would threaten the Dealer Defendants' control of the market.

144.     The heads of the Dealer Defendants' IRS trading desks also maintained an ongoing dialogue about their preferred structure of the IRS market during the Class Period. These "heads of rates" regularly communicated with each other during the Class Period through email, Bloomberg messages, lunches and dinners, industry conferences, and other similar events. In these discussions, these heads of rates desks discussed their mutual desire to maintain the status quo and to prevent the buy side from disintermediating the dealers.

## C.     The Dealer Defendants Prevented Interdealer Brokers From Opening All-to-All Platforms to the Buy Side

145.     The Dealer Defendants also identified IDBs as potential platforms for facilitating all-to-all trading by the buy side and worked jointly to eliminate that threat.

146.     By 2008, a number of IDBs were well-positioned to bring to market all-to-all IRS trading platforms that would allow buy-side entities to trade with one another, as well as with dealers.  Many IDBs already operated such platforms exclusively for dealers in the interdealer market, and there was no technological impediment to opening them to buy-side entities.  Since IDBs earned brokerage fees on each trade on their platforms, they had strong financial incentives to open their platforms to buy-side firms.  There was great demand for these developments from the buy side.

147.    The Dealer Defendants jointly used a carrot-and-stick approach to prevent IDBs, including ICAP, from opening their platforms to the buy side and allowing all-to-all trading.  As a carrot, the Dealer Defendants agreed with ICAP and other IDBs that the dealers would direct their IRS transactions onto IDB platforms and that, in exchange for this dependable revenue stream, the IDBs would not allow buy-side firms to trade on their platforms.  As part of this arrangement, the Dealer Defendants committed to the IDBs that they would prevent any client-facing platforms from expanding into the interdealer space, including into the IRS interdealer market.  At the same time, the Dealer Defendants also threatened the IDBs with collective boycotts if they allowed buy-side access to their platforms.[37]

148.    In 2009, ICAP, the leading IDB in IRS, was poised to break from this arrangement and begin operating an all-to-all IRS trading platform that was open to the buy side.  In April 2009, Tradeweb (which at this point was owned by the Dealer Defendants) had decided to enter the mortgage bond market, offering a trading platform through a division known as Dealerweb.[38]  The result was that ICAP "lost 85 percent of its business over six weeks" in the mortgage bond market after Dealerweb "basically walked away with the market."[39]  Tradeweb's move left ICAP and other IDBs concerned about whether Tradeweb would launch a similar

---

[37]    *See, e.g.*, Levinson, *supra* note 2 (noting that when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform").  GFI's platform was targeted at the CDS market, but similar behavior occurred in the IRS market.

[38]    *See* Bryce Elder & Neil Hume, *Icap Hurt by Banks' Platform*, FINANCIAL TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz 419KBvtLz.

[39]    Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009), http://www.bloomberg.com/apps/news?pid=news archive&sid=aCxaCOeOAPBE.

platform in other asset classes, including IRS — a move that clearly would be in Tradeweb's self-interest.

149.    In retaliation for capturing the mortgage bond market, ICAP threatened the Dealer Defendants with launching an all-to-all trading platform for IRS that would be open to the buy side.  ICAP was already developing an electronic-trading platform for the European IDB IRS market called i-Swap that it could have launched as an all-to-all fully anonymous IRS trading platform in the United States.[40]  And ICAP could already include buy-side entities in its current marketplace, allowing buy-side entities to trade with one another, as well as with dealers.  ICAP thus threatened to collapse the bifurcated IRS market the Dealer Defendants were working together to maintain.

150.    But ICAP never launched the platform.  To avoid damaging each other's business, ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer Defendants would not further expand (through Dealerweb) into the IDB space in exchange for ICAP not expanding into the dealer-to-client space by establishing an all-to-all anonymous IRS trading platform.

151.    Despite it being in Tradeweb's economic self-interest to repeat its rapid success in the mortgage bond interdealer market in other markets, Dealerweb did not expand into IRS or any other market, pursuant to its agreement with the Dealer Defendants.  Similarly, pursuant to

---

[40]    *See* Michael McKenzie, *Rate Swap Traders Wait For No Man*, FINANCIAL TIMES (Oct. 19, 2010), http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html #axzz3p2lJ0933 (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market").

its agreement with the Dealer Defendants, and against its own economic self-interest, ICAP did not open its i-Swap platform to end users. Instead, it limited the platform to dealers only.[41]

152.    In February 2013, ICAP expanded i-Swap to the United States, but again limited participation to the dealers.[42] Although ICAP publicly promoted that its platforms were open to all entities in order to comply with certain provisions of Dodd-Frank, its brokers in actuality prevented buy-side access to i-Swap by refusing to accept bids or offers from buy-side entities for voice-brokered trades or for inclusion on any electronic-trading platform. ICAP refused such access to buy-side entities as a result of its agreement with the Dealer Defendants, which continues to the present day.

153.    In return, the Dealer Defendants supported i-Swap by directing their business to it, a strategy designed to keep ICAP happy by prolonging its status as the lead IRS IDB and ensuring it would not open the platform to the buy side. Certain of the Dealer Defendants also entered into written agreements that they would not support other electronic IDB platforms and would inform each other if they were approached by such a platform.

154.    ICAP's restriction on the use of i-Swap was the result of its agreement with the Dealer Defendants to maintain the bifurcation of the market for IRS. Absent Defendants' conspiracy, it would have been in ICAP's interest to launch i-Swap as an all-to-all anonymous trading platform where the buy side could trade directly with each other without going through a dealer.

---

[41]    *See* ICAP, *i-Swap*, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Sept. 8, 2016) (noting that upon launch, i-Swap was not open to buy-side participants, that i-Swap "has a number of features that are specifically developed to reflect the trading strategies of the banks" and that, even today, i-Swap is not directly open to the buy side).

[42]    *See* ICAP, *ICAP Launches i-Swap in the US* (Feb. 19, 2013), http://newsroom.icap.com/icap-launches-i-swap-in-the-us.

155.    In exchange for ICAP's agreement to block all-to-all trading open to the buy side, the Dealer Defendants continue to direct liquidity only to SEF operators, such as co-conspirators ICAP and Tradeweb, that play by the agreed-upon rules of the market.  Trading platforms that comply with the rules of the conspiracy receive the vast majority of the trading volume of the Dealer Defendants, resulting in high revenues.

156.    ICAP (like Tradeweb) also provided the Dealer Defendants with a forum for their illicit communications.  ICAP regularly hosts meetings attended by senior officials of the Dealer Defendants, thereby facilitating conspiratorial communications.

157.    Industry data demonstrates the market bifurcation resulting from Defendants' conspiracy.[43]  Clarus reports daily trading volume for each SEF, and each SEF is categorized as either a "D2C" (Dealer-to-Client) or "D2D" (Dealer-to-Dealer) SEF.

158.    As shown in the figure below, approximately 98% of what Clarus considers Dealer-to-Client trading volume occurs on Tradeweb and Bloomberg.  Trading on these two platforms occurs exclusively through a dealer-to-client RFQ protocol with post-trade "name give-up."  As discussed in greater detail below, name give-up requires that the names of each counterparty to an IRS be disclosed to the other, which prevents trades from being done anonymously.  The Dealer Defendants have agreed to insist on name give-up on IRS trading platforms in order to prevent anonymous trading on SEFs and to discourage buy-side participation on all-to-all trading platforms, such as a SEF order book or all-to-all RFQs.

159.    These trading features, which ensure that buy-side entities cannot trade with one another and that a dealer is on one side of every trade, are at the core of the conspiracy.  Trading volume is withheld from any buy-side-facing SEF that disturbs this status quo.[44]

---

[43]    The data below comes from Clarus SEFView, *Data for 02/16/2016 – 02/22/2016.*



160.    The D2D side of the market is made up of SEFs that have agreed to play by the rules of the conspiracy.  *None* of the D2D SEFs allow end users to trade on their platforms.



---

44   Bloomberg is perhaps the only non-dealer entity that is large and powerful enough not to be fully coopted by the Dealer Defendants.  Bloomberg has also pursued a model that does not directly threaten their interests.  In compliance with the Dealer Defendants' wishes, Bloomberg constrains trading to non-anonymous, dealer-to-client RFQ trading.  In addition, while Bloomberg nominally offers an order book, this platform sees little activity in IRS because the Dealer Defendants refuse to trade on it and buy-side firms fear that they will face retaliation from the Dealer Defendants if they do so.

161.    Notably, the Dealer Defendants have maintained the market share of Dealerweb, the inter-dealer SEF owned and operated by Tradeweb, at a mere 2%.  This reflects the fact that the Dealer Defendants are — jointly — rewarding the IDBs for complying with their demands that IDB platforms remain off-limits to the buy side.  At the same time, the Dealer Defendants maintain Dealerweb as a nascent threat to those IDBs.  The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their liquidity to Dealerweb, as they had done before, for example, in the mortgage-bond market, when the Dealer Defendants abruptly shifted 85% of trading volume to Dealerweb, "walking away with the market."[45]

### D.    The Dealer Defendants Conspired to Block Swap Execution Facilities and Exchange-Like Trading Platforms From Entering the Market

162.    In recent years, as part of their cartel, the Dealer Defendants engaged in strikingly coordinated actions to boycott and crush certain trading platforms called Swap Execution Facilities, or "SEFs."

163.    In 2010, Congress passed the Dodd-Frank Act in an effort to bring increased transparency and competition to swaps and other derivatives markets.  Among other things, Dodd-Frank mandated that certain derivatives, including IRS, be centrally cleared and traded on exchanges or SEFs.  Congress envisioned that exchanges or SEFs would include all-to-all trading platforms on which the buy side could trade electronically with other investors or dealers — thereby reaping the benefits of exchange trading in the form of price transparency and competitive pricing.

164.    Faced with the threat that electronic trading platforms or SEFs would upset their privileged and dominant position in the IRS market, the Dealer Defendants aggressively worked

---

[45]    Leising & Shenn, *supra* note 39.

together to prevent all-to-all trading platforms from introducing greater competition and transparency to the buy side. Among other things, the Dealer Defendants conspired to ensure that no SEF would succeed in opening anonymous all-to-all trading platforms.

165. The Dealer Defendants' strategic groups, including those personnel identified by name above, met regularly to discuss and coordinate their collective strategy with respect to market structure and development issues. They discussed their joint opposition to all-to-all IRS trading. They also discussed and acknowledged that such functionality would bring pricing transparency and competition, which would in turn result in the compression of bid/ask spreads and lower profits for the Dealer Defendants. During these secret discussions, the Dealer Defendants mapped out strategies for combating and thwarting the threat posed by SEFs.

166. The Dealer Defendants' joint efforts to prevent the SEFs from succeeding in opening up all-to-all trading were well organized, extensive, and "relentless — sometimes buried in SEF rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[46] As a result of these collective steps, Defendants have successfully prevented meaningful change in the market.[47] As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel explained, there remains "a two-tier market today on the S[EF]s — dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."[48]

---

[46] KELLEHER et al., *supra* note 34, at 12.

[47] *See* Leising, *supra* note 9 ("Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change — and little indication that it's coming. Banks are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another.").

[48] Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, RISK (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-anonymity.

167.    There is nothing natural or inevitable about the IRS market continuing to operate this way.  Not long ago, market participants forecasted "that 40 to 50 firms could end up competing for swaps execution business."[49]  Those forecasts reflect the widespread judgment of market participants that the IRS market was poised to evolve, and they also reflect the fact that Defendants' collusion was then unknown.  Today, the few independent SEFs that offer anything close to anonymous all-to-all trading are on their last legs.[50]

168.    Most notably, three different SEFs — TeraExchange, Javelin, and TrueEx — developed the necessary technology, secured the required regulatory approvals, and garnered sufficient support to introduce anonymous all-to-all trading platforms to the buy side, bringing more competition and transparency to the market.  The Dealer Defendants, however, effectively shut down TeraExchange and Javelin by refusing to trade on their platforms or, in many cases, to clear any trades executed on their platforms.  The Dealer Defendants also threatened to retaliate against anyone who would trade on their platforms.  Simply put, the Dealer Defendants conspired to boycott these entities.[51]  With respect to TrueEx, the Dealer Defendants used similar strategies to ensure that it would be limited to trading in RFQ protocols only.

169.    When new trading platforms, such as those operated by the SEFs described below, solicited the participation of the Dealer Defendants, the Dealer Defendants would speak

---

[49]    Mike Kentz, *SEF Start-ups Face Obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[50]    *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

[51]    Each of these three SEFS — TeraExchange, Javelin, and TrueEx — are headquartered in New York City, and thus the Dealer Defendants' boycott, which involved the participation of foreign Dealer Defendants, was focused squarely on this District.  All three SEFs had face-to-face meetings with Dealer Defendants in New York City.  In addition, many of the secret meetings where the Dealer Defendants agreed to boycott these three SEFs were held in New York.

with each other to ensure a coordinated response. When, for instance, a SEF approached Goldman Sachs, the dealer's point of contact would be a member of the e-commerce division, whose job was to review the platform and then present it to senior staff, including the Head of Interest Rates, members of the Principal Strategic Investments Group, and heads of the relevant trading desks, along with a recommendation as to whether Goldman Sachs should use the platform. The e-commerce employee also called his or her counterparts at the other Dealer Defendants to ensure that they were unified in their response to the platform.

170.    The result of the Dealer Defendants' boycott is that the buy side continues to be shut out of all-to-all electronic trading.

### 1.    *The Dealer Defendants boycotted TeraExchange*

171.    TeraExchange invested a great deal of time and money to create viable anonymous all-to-all trading platforms that would have, immediately, made IRS available at lower bid/ask spreads, saving the members of the proposed Class here significant amounts of money. But the Dealer Defendants effectively destroyed TeraExchange in a well-orchestrated and effective campaign to drive it from the marketplace. In their own words, the Dealer Defendants viewed TeraExchange as a "Trojan Horse" — if its platform was able to succeed, the Dealer Defendants' privileged position in the marketplace would be severely threatened.

172.    TeraExchange was formed in 2010. After raising $7 million in capital on a $27 million valuation, it developed all-to-all trading platforms (both an RFQ and an anonymous order book) for several asset classes, including IRS.[52] These platforms offered firm pricing, and greater price transparency and competition than the OTC-like trading platforms that were

---

[52]    TERAEXCHANGE, http://www.teraexchange.com/about.html (last visited Sept. 8, 2016).

available in the market.  TeraExchange's order book included a pre-execution credit

confirmation tool to ensure firm prices, rather than just indications of interest as was the case in

historical OTC dealer-to-client trading.  TeraExchange also included technology to connect its

platforms to industry-standard credit hubs that allow market participants' credit limits to be

accessed pre-trade, such as that operated by Traiana, Inc.,[53] in order to provide risk mitigation.  It

also connected to the clearinghouse of the Chicago Mercantile Exchange ("CME"), and worked

to develop a portfolio margining system so participants could easily calculate and post collateral

for their cleared IRS.[54]

173.    TeraExchange's business plan did not depend on signing up the Dealer

Defendants as liquidity providers in the first instance.  Instead, TeraExchange focused on

recruiting large proprietary trading firms that were eager to trade IRS — including entities that

were members of the FIA Principal Traders Group (such as Allston Trading; Chicago Trading

Company; Chopper Trading LLC; DRW Holdings, LLC; Geneva Trading USA, LLC; HTG

Capital Partners; IMC Chicago LLC; Jump Trading LLC; KCG Holdings; Liquid Capital;

Marquette Partners, LP; Optiver US LLC; Spot Trading LLC; Sun Trading, LLC; Teza

Technologies; Tower Research Capital, LLC) and other large trading institutions.

---

[53]    Traiana, Inc. is jointly owned by ICAP and Dealer Defendants Bank of America, Barclays, Citigroup, Deutsche Bank, JP Morgan, and RBS.  Luke Jeffs, *ICAP sells stake in Traiana to seven investment banks*, REUTERS (Jan. 14, 2013), http://www.reuters.com/article/ icap-banks-traiana-idUSL6N0AJAEU20130114.  The Dealer Defendants' FCMs used their control over Traiana to discriminate against all-to-all SEFs, such as TeraExchange, by posting high credit limits for client trades on dealer-friendly SEFs, such as Tradeweb, while posting a credit limit of zero for all-to-all platforms.  This effectively prevented the FCMs' clients from trading on the all-to-all platforms.

[54]    *See* PR NEWSWIRE, *TeraExchange Connects to CME Clearing to Provide Margin Relief to Customers Trading Interest Rate Swaps, Eurodollar and Treasury Futures* (June 25, 2013), http://www.prnewswire.com/news-releases/teraexchange-connects-to-cme-clearing-to-provide-margin-relief-to-customers-trading-interest-rate-swaps-eurodollar-and-treasury-futures-212928021.html.

174.    While many of these entities were historically considered to be on the buy side, they were increasingly providing liquidity in various other asset classes while trading at large volumes.  TeraExchange recognized that members of the Principal Traders Group were natural early adopters of its platform because they understood its value proposition and represented large portions of the volume in equity, currency, and futures products traded at the time.  These entities were ready, willing, and able to provide the liquidity to the TeraExchange platform that would allow the platform to thrive.

175.    TeraExchange also recognized that these non-dealer (or "non-traditional") liquidity providers had trading strategies that differed from those of the Dealer Defendants.  In particular, they typically engaged in high volume trading involving little warehousing of risk, making them largely risk neutral.  These entities were more eager than traditional dealers to trade more IRS and were willing to quote immediately executable bid/ask spreads.  As a result of this approach, these entities were also willing to trade IRS at tighter bid/ask spreads than traditional dealers — something which would greatly benefit the buy side by providing lower prices, greater transparency, and lower transaction costs.

176.    This willingness to trade at tighter bid/ask spreads meant that the participation of these firms on TeraExchange's platform would, in turn, quickly drive Dealer Defendants to the platform as well.  This is because the Dealer Defendants' clients demand that the dealers engage in "best execution," which refers to a trading entity's duty to secure the best price available in executing a trade when acting as the client's agent.  Best execution typically requires a dealer, when executing orders, to take all reasonable steps to obtain the best possible result for clients.  Banks like the Dealer Defendants are generally required by regulation or contract (or both) to obtain best execution.

177.    Accordingly, TeraExchange recognized that, if IRS trades were available on TeraExchange at tighter bid/ask spreads due to the liquidity provided by proprietary trading firms, the buy side would quickly demand that the Dealer Defendants execute their trades there as well.  The Dealer Defendants also recognized this and identified TeraExchange as a major threat to their continued market dominance — in their own words, it was a "Trojan Horse."

178.    TeraExchange spent millions of dollars developing its platforms.  It launched in 2011 with a robust offering that industry observers recognized was "poised to take business from the big banks that have dominated swaps trading."[55]  The strong potential of TeraExchange and other such platforms was widely acknowledged, with the *Wall Street Letter*, a respected source on information on trading technology, nominating TeraExchange for three Institutional Trading Awards in 2013, and with TeraExchange receiving the "Highly Commended" award for best derivatives trading platform.  In a 2013 survey, market participants ranked TeraExchange as one of the top two SEFs they planned to explore as a trading venue.  By the end of 2013, based on the strength of its offerings, TeraExchange was valued at more than $50 million.

179.    As noted, TeraExchange focused its initial sales efforts on recruiting non-traditional liquidity providers to its platform.  TeraExchange met with hundreds of market participants and received a positive response from many.  Many of these entities committed to provide liquidity to the platforms, including Annaly Capital Management, Inc.; AQR Funds; DRW Holdings, LLC; Fortress Investment Group LLC; Kepos Capital; Linden Capital Partners; Mizuho Bank, Ltd.; MKP Capital; Saba Capital group; SF Group; Susquehanna International Group, LLP; and Virtu Financial.  The members of FIA's Principal Traders Group were, in

---

[55]    Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

particular, very receptive, as TeraExchange's offering fit with this group's mission to promote cost-effective and transparent access to U.S. financial markets. Many of these entities carried out successful tests of TeraExchange's technology in connection with their trading interfaces.

180.    After learning of TeraExchange's plans, the Dealer Defendants conducted secret meetings, including under the cover of Tradeweb, to discuss how to neutralize this threat. One tactic they agreed upon was to replicate what they had done with Tradeweb — the Dealer Defendants would jointly "invest" in TeraExchange, under the pretense of offering it more capital, but with the real goal of taking it over and shutting it down.

181.    Because TeraExchange's model did not require signing up the Dealer Defendants as liquidity providers in the first instance, its sales efforts did not focus on the Dealer Defendants. Several of the Dealer Defendants, however, sought meetings with TeraExchange under the guise of exploring whether they would sign up for its platform. At a series of meetings in early 2013, TeraExchange had a strikingly similar experience with a number of these banks: TeraExchange would walk into a meeting expecting to meet with the head of IRS trading only to be met by strategic investment personnel offering to take a stake in TeraExchange's company.

182.    At a meeting with Goldman Sachs, for example, TeraExchange had been led to believe it would be meeting with members of the IRS trading desk. But, instead, Brad Levy and Kimberly Trautmann of the PSI group attended. They claimed they wanted to invest in TeraExchange and asked to find out more about the platform. In fact, Goldman Sachs had no real intention of supporting the platform, but was gathering intelligence that could be used to shut it down or crush it. Similar bait and switches were pulled by the strategic investment groups of Barclays, Bank of America (Shea Wallon attended), Credit Suisse, Citi (William Hartnett attended), Deutsche Bank, and Morgan Stanley.

183.    TeraExchange declined the offers.  While the Dealer Defendants claimed to express an interest in supporting TeraExchange in meetings, in fact not one of them agreed to sign up for TeraExchange's platform.  To the present day, not a single Dealer Defendant has agreed to provide liquidity to TeraExchange's platform, pursuant to their agreement to starve TeraExchange of liquidity.

184.    With their first effort to neutralize TeraExchange unsuccessful, the Dealer Defendants agreed to take more aggressive tactics.  In particular, they jointly refused to "clear" any of their buy-side clients' trades occurring on TeraExchange in order to prevent those trades from occurring.  Because Dodd-Frank requires that any trades occurring on SEFs be cleared, the clearing subsidiaries of the Dealer Defendants could prevent those trades from occurring by refusing to clear trades for clients on TeraExchange.

185.    Clearing serves an important risk-mitigation function.  In the OTC market, counterparties face each other directly, meaning they bear the full risk of loss if their counterparty defaults.  For IRS with high notional values and long tenors, the effect of a counterparty default can amount to millions of dollars in losses on an individual trade.  Clearing resolves this problem.  For cleared transactions, the clearinghouse centralizes counterparty risk and mutualizes the exposure if a clearing member defaults.  Clearing members effectively face the clearinghouse, greatly reducing counterparty risk.

186.    At the behest of the Dealer Defendants, clearinghouses have insisted on requiring clearing members to contribute large amounts of capital to the clearinghouse's default (or "guaranty").[56]  This practice of insisting that clearing members must satisfy extremely large

---

[56]  For example, CME requires clearing members to hold $50,000,000 in capital *and* contribute at least $15,000,000 in cash to its guaranty fund in order to clear IRS.  *See* CME

capital requirements is unnecessary and is itself one way that the Dealer Defendants block entry and competition.  Since large banks like the Dealer Defendants are generally the only entities that can satisfy these large capital requirements, this requirement allows them to function as critical waypoints (or roadblocks) on the path to clearing.

187.    The dealer-owned entities that serve as clearing members are known as Futures Commission Merchants, or "FCMs."  FCMs generate revenues by clearing trades on behalf of firms that are not clearing members of a clearinghouse, such as buy-side class members.

188.    This relationship should be mutually beneficial — the FCMs earn fees on each trade they submit for clearing, and their buy-side customers are able to gain access to clearing without having to comply with onerous capital requirements.  The figure below illustrates how two buy-side clients connect through their respective FCMs to a clearinghouse.[57]



---

GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (Feb. 2016), http://www.cmegroup.com/company/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

57    INTERNATIONAL FINANCIAL LAW R., *Derivatives after the crash* (Mar. 18, 2015), http://www.iflr.com/Article/3437700/Derivatives-after-the-crash.html.

189.    By regulation, the Dealer Defendants' FCMs must operate separately from the Dealer Defendants' trading desks, and FCMs derive no revenues from IRS trading.[58]  Thus, in a competitive marketplace, FCMs would be agnostic as to which trading platforms their customers use and as to their customers' counterparties.  In fact, an FCM operating in its own interest would, subject to credit limits, want to maximize the amount of trades it clears for clients, regardless of where or how the trades were executed.  This is because the only risk that FCMs face is the risk that their buy-side clearing clients default, a risk in no way connected to the platform on which a client conducts an IRS trade.

190.    Determined to stop TeraExchange and other SEFs, the Dealer Defendants jointly withheld clearing services from any buy-side entity or second-tier dealer seeking to trade on SEFs operating all-to-all anonymous trading platforms, including TeraExchange (and also including Javelin and TrueEx, as discussed more fully below).[59]

191.    This agreement was directly contrary to the economic self-interests of the Dealer Defendants' FCM affiliates.  In reaching this agreement, the Dealer Defendants' FCMs capitulated to the demands of their respective trading desks — the heads of which are often

---

[58]    *See* 17 C.F.R. § 23.605(d)(1) ("No swap dealer or major swap participant shall directly or indirectly interfere with or attempt to influence the decision of the clearing unit of any affiliated clearing member of a derivatives clearing organization to provide clearing services and activities to a particular customer"); *id*. § 23.605(d)(2) ("Each swap dealer and major swap participant shall create and maintain an appropriate informational partition . . . between business trading units of the swap dealer or major swap participant and clearing units of any affiliated clearing member of a derivatives clearing organization to reasonably ensure compliance with the Act and the prohibitions specified in paragraph (d)(1) of this section.").

[59]    *See* KELLEHER et al., *supra* note 34, at 12 (noting that dealers "deny[] their clearing customers the credit limits necessary to trade on SEFs that don't acquiesce to the dealers' demands").

Tradeweb board members[60] — and management, who are focused on keeping buy-side entities from trading on anonymous all-to-all platforms. The Dealer Defendants' agreement not to clear trades conducted on all-to-all anonymous SEFs effectively prevents IRS trades from occurring at all on these platforms.

192.    FCMs must also confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place, and will not allow the trade to move forward if a customer fails this "pre-trade credit check."[61] To prevent customers from trading on an all-to-all anonymous trading platform, the Dealer Defendants' FCMs frequently refuse to conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF. When customers (such as buy-side firms) attempt to trade on an all-to-all anonymous SEF, the trade thus cannot occur, because the Dealer Defendants' FCMs will not conduct a pre-trade credit check, "breaking" the trade before it takes place.

---

[60] For example, Luke Halestrap (Head of Emerging Markets Interest Rates for Bank of America), David Moore (Head of North America Rates Trading for Bank of America), Nicholas Brophy (Head of Rates Trading in the Americas for Citi), Timothy Blake (Head of Interest Rates Trading in the United States for Credit Suisse), Michele Faissola (Head of Global Rates for Deutsche Bank), Stephen Wolff (Head of Strategic Investments and Head of Fixed Income e-Commerce for Deutsche Bank), Simon Maisey (Head Global Rates, ecommerce, and Market Structure for JP Morgan), Christopher Paul Wilcox (Global Head of Rates Trading and Global Rates Strategic Investments for JP Morgan), Kemal Askar (Head of Rates Trading in the United States for JP Morgan), David Moore (Global Head of Structured Interest Rates for Morgan Stanley), Richard Volpe (Global Head of Dollar Interest Rates for RBS), and Paolo Croce (Head of European Rates for UBS) all served on the Tradeweb Board of Directors.

[61] A pre-trade credit check can occur via either a "ping" or a "push" system. Under a "ping" system, a SEF will "ping" an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade. Under a "push" system, an FCM will pre-authorize a customer to clear trades up to a certain credit limit, a practice commonly referred to as "pushing limits." As an example, JP Morgan might "push" a limit of $500 million to a SEF for its customer, buy-side customer X, meaning that X could trade and clear up to $500 million of IRS on that SEF without needing to re-obtain approval from JP Morgan before every trade.

193.    The Dealer Defendants routinely clear trades executed on co-conspirator Tradeweb's SEF, and other platforms they do not view as threats to the bifurcated market. The Dealer Defendants' FCMs thus use their gatekeeping roles to steer business away from all-to-all anonymous SEFs and towards their co-conspirators and other, compliant, dealer-to-client and dealer-to-dealer trading platforms as a reward for "playing by their rules."

194.    The Dealer Defendants' ability to prevent clearing has blocked market entry for all-to-all anonymous trading platforms, including those offered by SEFs. Without access to clearing, buy-side firms and second-tier dealers cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient dealer-to-client trading structure of the OTC market.

195.    As TeraExchange moved forward with launching its platform, it began receiving reports from those who had signed up that the Dealer Defendants' FCMs were refusing to clear trades executed on TeraExchange. Once again, the Dealer Defendants were taking this identical position in unison, while often providing the same pretextual and illogical reasons for doing so.

196.    The FCMs took steps to obscure the true nature of their boycott. For example, at times, they would not refuse to clear any trades on TeraExchange outright. Instead, they would quote extremely high clearing fees for trades on TeraExchange, while quoting far lower fees for clearing trades on other platforms they did not view as threats. For example, when Knight Capital Group ("Knight") attempted to execute trades on TeraExchange's order book, Jeffrey Valentino and Don Degraff of Bank of America's FCM informed Knight and TeraExchange, at a June 26, 2012 meeting, that it would only clear the trades in exchange for exorbitant clearing fees. At the same time, it charged Knight no clearing fees for trades executed on dealer-friendly

platforms such as Tradeweb and Bloomberg. Bank of America's discrimination against all-to-all platforms made it economically impossible for Knight to trade on TeraExchange's order book.

197.    TeraExchange attempted to convince the FCMs to reconsider their refusal to clear trades on TeraExchange's platform, but the banks maintained their boycott despite having no legitimate excuse. When, for instance, TeraExchange met with Bob Burke, managing director and head of Global OTC Clearing for Bank of America, Mr. Burke simply said: "My bosses are never going to let me" clear trades for TeraExchange.

198.    Similarly, Raymond Kahn (Managing Director, Global Head of Futures Clearing & Americas Head of Agency Derivative Services, Barclays) told TeraExchange that Barclays could not clear trades from TeraExchange because it was "resource constrained." Piers Murray of Deutsche Bank, personnel at Morgan Stanley, and Steve Mahoney of Credit Suisse similarly informed TeraExchange that their banks were also too "resource constrained" to work with TeraExchange. These strikingly similar excuses were plainly coordinated and pretextual, as clearing trades from TeraExchange required minimal resources, and they performed similar services for clients using other SEFs.

199.    HSBC's FCM similarly gave TeraExchange the runaround for over a year before finally refusing to clear for the platforms. During this time, Julianna Salazar, Vice President of Futures & OTC Clearing for HSBC's FCM, required approximately half a dozen demonstrations of TeraExchange's trading platforms and their connectivity to HSBC's FCM. Despite repeated successful demonstrations, Ms. Salazar repeatedly refused to give a clear answer on whether HSBC would clear its customers' trades coming from the platforms. At the end of nearly eighteen months, Ms. Salazar finally told TeraExchange that HSBC would not sign on as a clearing member without approval from the IRS trading desk — approval that was never given.

200.    ANZ Bank is a large entity that was poised and eager to provide liquidity on TeraExchange's platform.  It traditionally cleared its trades through FCMs at Bank of America and Citi.  When, at an April 13, 2012 meeting, ANZ asked Citi to clear its trades from TeraExchange, Chris Perkins, managing director and global head of OTC clearing at Citi, told ANZ it would not clear ANZ's trades from TeraExchange's platforms.  It instead stated that it would only clear trades done directly with its own trading desk.  Absent collusion, Citi's FCM would not have flatly refused to clear these trades for fear losing the business of this major client to Bank of America's FCM.  But, because the two banks were conspiring, Citi knew that Bank of America's FCM would also refuse to clear ANZ's trades on TeraExchange's platforms.[62]

201.    The Dealer Defendants' collective refusal to clear trades on TeraExchange's platform was a major blow.  As a result, TeraExchange began to see early supporters withdraw from its platform.  TeraExchange also learned that buy-side entities were facing reprisals even for meeting with TeraExchange.  Michael O'Brien of Eaton Vance, for instance, expressed his fear that "JP Morgan knew" of its September 16, 2013 meeting with TeraExchange.  Brian Hurst, CEO of AQR, informed TeraExchange that it was interested in the platform but it doubted any of the Dealer Defendants' FCMs would let AQR trade on the platform.  Susquehanna International Group, LLP, for instance, withdrew its commitment to the platforms in October 2014.

202.    Despite these tremendous obstacles, TeraExchange made some limited progress.  On June 13, 2014, Annaly Capital Management, Inc. and Mizuho Bank, Ltd., two large trading

---

[62]    Many of the heads of the Dealer Defendants' FCMs, such as Michael Dawley (Goldman Sachs) and Raymond Kahn (Barclays), sat on the FIA's Board of Directors, using it as a forum to collude and coordinate their boycott of TeraExchange and other SEFs offering all-to-all platforms.

entities that supported the platform, successfully conducted the first trade on TeraExchange's order book for a notional amount of $10 million.

203.    The trade was to be cleared through the CME's clearinghouse by BNP Paribas Securities Corp., the clearing affiliate of BNPP.  Accordingly, BNPP's clearing office was immediately made aware of the trade and notified BNPP's trading desk.  BNPP's trading desk then immediately contacted the parties to the trade and threatened them with a loss of access to clearing and other banking services, including execution services in other asset classes and access to general market research, if they continued to trade on TeraExchange.

204.    The following day, BNPP, Citi, JP Morgan, and UBS each separately contacted TeraExchange demanding to "audit" TeraExchange's rule book and stating they would not clear any further trades until the audit was complete.  TeraExchange's rule book had been approved by the CFTC, and these banks had no genuine need to "audit" TeraExchange's rule book.  Their real goal was to stop TeraExchange in its tracks.

205.    At around the same time, Bank of America's FCM threatened buy-side clients with inflated clearing fees and liquidity boycotts if they made markets or traded on TeraExchange's all-to-all trading platforms.  Because the Dealer Defendants' FCMs jointly refuse to clear trades conducted on TeraExchange' platforms, no further trades have taken place on those platforms.

206.    TeraExchange had an alternative strategy to build out its platform, which the Dealer Defendants shut down as well.  Under Dodd-Frank, certain IRS trades involving U.S. persons, whether trading domestically or internationally, must be executed through a CFTC-registered SEF.  TeraExchange recognized that European IDBs servicing U.S. banks (either an

international branch or guaranteed affiliate) must therefore either become a SEF or execute their trades through a SEF.

207.    TeraExchange saw an opportunity to approach second-tier IDBs who were looking to grow their business and offering them fully-compliant execution and reporting services for their swap trades.  Execution of the IDBs' dealer transactions on TeraExchange's SEF provided the benefit of open access, pre-trade credit checks, execution on a regulated platform, central clearing, and swap data repository reporting.  It also avoided the need for the IDBs to build and operate proprietary SEFs, which many of the second-tier IDBs were in no position to do.

208.    Between December 2013 and September 2014, multiple IDBs responded favorably to the opportunity provided by TeraExchange and executed agreements with TeraExchange, including OTCex, RP Martin, Cloud9, GMG Brokers, Sunrise Brokers, LLC, and Continental Capital Markets, some of Europe's most diverse and active IDBs.  If TeraExchange had been able to move forward with these IDBs, it would have been able to grow its business and eventually expand the IDB offerings to the buy side.

209.    But the Dealer Defendants learned of this effort, and they shut it down.  In strikingly parallel fashion, in early- and mid-2014, the Dealer Defendants informed the IDBs that they would not accept any trades reported or executed on TeraExchange.  In February 2014, for example, Laura Martin of Citi informed OTCex that "per internal policy," Citi would not allow OTCex to use TeraExchange, claiming it was because "Citi is not currently signed onto the TeraSEF Rulebook."  After OTCex pointed out that Citi did not need to join TeraExchange or sign onto its rule book which was, in any event, approved by the CFTC, Ms. Martin responded by saying that Citi's refusal to allow IDBs to execute trades on TeraExchange was "more of an

internal policy rather than a regulatory one," confirming that there was no valid basis for Citi's refusal. And she informed OTCex that co-conspirator ICAP was Citi's "preferred solution."

210.    Other Dealer Defendants took remarkably similar (and similarly pretextual) positions. BNPP, for example, reached out to Annaly Capital Management in mid 2014 and asked Annaly to "abstain from executing on Tera while they resolve some operational issues on their end related to trades executed on Tera." There were no operational issues, and BNPP provided no more information. Similarly, the CEO of ED&F Man, one of the second-tier IDBs, informed TeraExchange that the major swap dealers would not allow him to sign up with the program.

211.    As a whole, the Dealer Defendants uniformly took the position they would not allow IDBs to book or execute trades on TeraExchange. The reasons for this became explicit when certain Dealer Defendants told the IDBs and even TeraExchange personnel themselves, in separate communications, that they saw TeraExchange's program as a "Trojan Horse."[63] This terminology, which was used by separate Dealer Defendants in separate conversations, reflects the fact that the Dealer Defendants saw TeraExchange as a threat to their privileged position in the marketplace. They were determined to stop it and, through their aggressive joint actions, have effectively done so.

212.    Despite the Dealer Defendants' actions, second-tier IDBs have continued to express interest in processing trades through TeraExchange's order book. But, to date, no IDB has been able to process a trade through TeraExchange's order book, and some have since gone out of business.

---

[63]    In fact, multiple Dealer Defendants referred to TeraExchange as a "Trojan Horse" in separate conversations with TeraExchange's clients, reflecting the fact that this is how the Dealer Defendants described TeraExchange in their conspiratorial communications with each other.

213.    Facing a boycott from the Dealer Defendants, TeraExchange has shifted its focus, bringing to market the first regulated Bitcoin derivative listed for trading and continues to this day bringing regulated services and award winning technology to market participants.

2.    *The Dealer Defendants boycotted Javelin*

214.    Javelin was formed in 2009 by a group of industry professionals who sought to capitalize on buy-side demand for all-to-all trading.  Javelin developed two all-to-all IRS trading platforms, one an anonymous RFQ and the other an anonymous order book.  Javelin planned for both platforms "to offer firm pricing for swaps as opposed to the indicative quotes that are offered on most other platforms."[64]  This would have been a major step forward for the buy side, granting them access to anonymous all-to-all trading platforms similar to those used by the Dealer Defendants.

215.    In 2011, Javelin began soliciting support for its platforms by demonstrating their utility to many buy-side entities and dealers, including Dealer Defendants such as BNPP, Deutsche Bank, Goldman Sachs, JP Morgan, and RBS.[65]  Javelin offered these Dealer Defendants attractive terms, including the opportunity to receive a portion of Javelin's brokerage fees if they traded on the platform.

216.    Javelin began conducting test trades on its order book in December 2011, successfully executing and clearing trades in a nearly instantaneous manner, which was appealing to buy-side entities that wanted to execute trades more quickly.

217.    Most of the Dealer Defendants refused outright to support Javelin.  As noted above, they had agreed with each other only to support platforms they could control.  For

---

[64]    Kentz, *supra* note 49.

[65]    Many of these meetings were held at Javelin's offices in New York City.

instance, Mark Millindorf, a Vice President at Deutsche Bank, informed a Javelin executive that the bank would not use the platform and disclosed that Deutsche Bank was holding weekly meetings to discuss its strategy for responding to SEFs like Javelin.

218.    Following repeated messages from Javelin and its clients, Deutsche Bank finally tested and approved Javelin's system on April 30, 2014.  On May 15, 2014, however, Paul Tartanella of Blenheim Capital Management tried to arrange trades on Javelin with Deutsche Bank serving as its FCM, only to learn that Deutsche Bank had not approved trading on Javelin. A Javelin executive called Mark Millindorf later that same day to investigate the problem, and Mr. Millindorf responded that, despite the prior successful test, Javelin now had to be approved by Deutsche Bank's legal department, a plainly pretextual excuse for its refusal to clear trades across Javelin.

219.    On June 2, 2014, a Javelin executive asked for an update on the legal review, and Mr. Millindorf responded:  "As of right now our legal team is busy elsewhere (limited resources, various other things in the hopper) — right now it is on hold."  The Javelin executive inquired again on December 15, 2014, and Mr. Millindorf responded stating:  "No, no movement at the moment . . .  Will certainly let you know.  Right now we are on a status quo."  Deutsche Bank's legal department has never completed this supposed review of Javelin, and thus it has never cleared trades for its clients on the platform.

220.    Javelin met with Cassandra Tok (Head of Futures and OTC Clearing Sales) and Tony Smith (Vice President, Network Engineering) from Goldman Sachs & Co. in New York City, on September 24, 2013.  At the meeting, Ms. Tok and Mr. Smith were careful not to state outright that Goldman Sachs would not support Javelin, but they demonstrated hostility to

Javelin operating an order book open to the buy side. They also asked for the names of buy-side entities that had signed up to use the platform.

221.    On September 30, 2013, Javelin employees met with Tony Smith of Goldman Sachs and confronted him about Goldman Sachs' refusal to clear trades for Javelin. Mr. Smith responded that under no circumstances would Goldman Sachs deal with Javelin. He stated that, if Goldman Sachs was somehow forced to clear trades for Javelin, it would simply set the credit limits for all of its customers who attempted to trade on Javelin at "zero," thereby preventing them from clearing any trades. That is, Goldman Sachs' FCM was willing to forego clearing revenues and damage customer relationships in order to shut Javelin out of the market.

222.    Javelin nevertheless moved forward with launching its platform. On September 19, 2013, the CFTC granted temporary registration to Javelin as a SEF. By this time, Javelin's platforms were fully operational and nearing launch. And by late 2013, Javelin had signed up seven second-tier dealers to trade on the platform. The Dealer Defendants, however, became increasingly concerned as Javelin prepared to go live. They recognized that, if Javelin successfully launched an anonymous, all-to-all trading platform for IRS, it would attract liquidity, bringing price transparency and competition to the market, which would imperil their privileged status as market makers in a bifurcated market, as well as the supracompetitive bid/ask spreads they extracted from the buy side.

223.    Between 2013 and 2015, Javelin met with senior employees at each of the Dealer Defendants on numerous occasions, in hopes of gaining their support for the platforms. But, with the exception of RBS (and then only for a short period of time), the Dealer Defendants collectively refused to trade on or provide liquidity to Javelin. In those instances where a Dealer Defendant did not flat-out refuse to use the platforms, it instead provided an endless stream of

pretextual excuses for refusing to trade on Javelin's platforms.  One Dealer Defendant, for instance, stated it needed to review Javelin's internal documentation, but it never actually performed the review.

224.    While some of the Dealer Defendants, including JP Morgan and RBS, were willing to test the platform's operability, others, such as Deutsche Bank and Goldman Sachs, flatly refused to engage.  One Javelin employee was informed by an acquaintance who worked for a Dealer Defendant that he should "look for a new job."

225.    In September 2013, Javelin conducted a series of mock trading sessions to showcase its all-to-all anonymous trading platforms to dealers and buy-side entities.  Numerous buy-side entities and second-tier dealers signed on for the sessions, including AIG Financial Products, Alphadyne Asset Management, Argonaut Capital, Babson Capital, Brevan Howard, CIBC, CRT Capital, ETrade, FHLB Boston, Flagstar, FTN Financial, Mariner Investment Group, Millenium Management, Mitsubishi, Nationwide, NISA Investment Advisors, Pierpont Securities, and Suntrust.

226.    In advance of the trading sessions, Javelin asked many of the Dealer Defendants' FCMs to conduct pre-trade credit checks for their buy-side customers to participate in the sessions.  As was the case with TeraExchange, however, the Dealer Defendants' FCMs largely refused to provide pre-trade credit checks or push credit to the platform, effectively preventing the buy side from using its platforms.  When, for instance, Javelin asked Goldman Sachs to clear trades for its customer Babson Capital, Goldman Sachs refused to clear trades for any client coming from the platforms.  Deutsche Bank similarly made explicit its refusal to clear trades coming from Javelin, while JP Morgan used the pre-trade credit checks requirement to hinder

customers, including Mitsubishi UFJ Financial Group ("Mitsubishi") and Natixis Global Asset Management, from trading on the platform.

227.    Some Dealer Defendants went further and actively pressured their customers not to trade on Javelin.  As of August 22, 2013, NISA Investment Advisors LLC ("NISA"), a large buy-side firm, was eager to trade on Javelin.  When Goldman Sachs & Co., NISA's FCM, learned of this, Cassandra Tok of Goldman Sachs called John Choe of NISA and informed him that if NISA traded on Javelin, Goldman Sachs would withdraw all clearing services for the buy-side entity in any trading venue.  Ms. Tok later told Javelin that she and Mr. Choe jointly decided that NISA would no longer utilize Javelin's platforms.  Mr. Choe, however, later informed Javelin officials that Goldman Sachs had forced him to stop trading on the platform.

228.    Similarly, buy-side entity Citadel Fixed Income Master Fund executed a number of trades on Javelin's platforms between January 7, 2014 and February 26, 2014.  It suddenly stopped trading on the platform, however, after its Chief Operating Officer received calls from the Dealer Defendants telling him not to use Javelin's platforms.

229.    Despite these formidable obstacles, Javelin was able to get some trading volume from its participants.  By late 2014, as a result of its persistence and the promise of its platform, it had signed up approximately 80 entities to trade on the all-to-all platforms, including Annaly, AQR Capital Management, Blackwell Partners, Carlson Capital, Citadel, the Duke Endowment, Duke Univesity LTP, Eaton Vance, Flagstar, ING Group, the John D. and Catherine T. MacArthur Foundation, Lloyds Bank, Mitusbishi UFJ Financial Group ("Mitusbishi"), Mizuho Securities, the National Bank of Canada, Natixis Global Asset Management ("Natixis"), PIMCO, Scotiabank, and Suntrust.  As a result of difficulty with some FCMs and threats from the Dealer Defendants, however, few were willing to execute trades on the platform.  The FCMs of Morgan

Stanley and Goldman Sachs, for instance, refused to provide necessary pre-trade credit checks for their buy-side clients to trade on Javelin.

230.    Mitsubishi repeatedly attempted to trade on Javelin for approximately nine months in 2014, but ultimately ceased all activity.  When asked why they had stopped trading on Javelin, Mitsubishi traders informed Javelin that they had received "too much static" from JP Morgan, their FCM, for doing so.

231.    In October 2014, buy-side interest in Javelin and other all-to-all trading platforms collapsed as investors grew concerned that trades on the platforms were not sure to be anonymous and could thus expose them to retaliation by the Dealer Defendants.  Many buy-side firms initially explored all-to-all trading through aggregator platforms that streamed quotes from multiple SEFs, including IDBs and Javelin.  The buy side found aggregators useful because they provided a consolidated view of the market and access to greater all-to-all trading liquidity.  However, use of aggregators steeply declined when news spread that Compagnie Financière Tradition, SA ("Tradition"), a dealer-friendly IDB, had contacted Mitsubishi to complain about Mitsubishi's use of Tradition's order book, Trad-X, after an aggregator had routed a Mitsubishi trade to that platform.

232.    Meanwhile, the Dealer Defendants continued to apply pressure directly on Javelin.  In October 2014, a Javelin executive met with Sagar Gohel, a Deutsche Bank executive, outside of Deutsche Bank's New York, New York office to discuss the platform.  The Deutsche Bank executives told the Javelin official that if he continued to push for Javelin's success, he would "never work" on Wall Street again.

233.    As noted, RBS was initially a liquidity provider on Javelin, viewing its participation on Javelin's platform as a way for them to ensure it had sufficient control over the

direction of Javelin and could prevent management from disrupting the bifurcated market structure. RBS demanded assurances that it would have a significant degree of control in the operation and strategy of the platform.

234.    On October 18, 2013, Javelin's CEO, James Cawley, filed the SEF industry's first Made-Available-to-Trade ("MAT") application to the CFTC that, if granted, would have mandated a wide range of cleared IRS to be executed on SEFs. When news of Javelin's MAT submission became known, Patrick Wegner, a senior IRS trader at RBS called the CEO of Javelin to complain about Javelin's MAT submission, despite the fact it would have required more IRS volume to trade on Javelin's platform, benefitting RBS as one of Javelin's premier market makers. RBS then immediately withdrew all of its liquidity on the platform.

235.    In the days that followed, RBS placed enormous pressure on Javelin to retract its MAT submission. RBS enlisted Dawn Newsome, Adam Lister, Rich Volpe, Patrick Wegner, Darren Shames, and its legal counsel to pressure James Cawley to retract Javelin's MAT application. On October 30, less than two weeks later, Javelin filed a revised MAT submission, significantly narrowing the range of IRS instruments that would be mandated to trade on a SEF.

236.    Javelin continued to receive pressure from RBS and other Dealer Defendants to reduce the scope of its MAT application further. Since the Dealer Defendants control almost all of the liquidity in the IRS market, they were able to squash Javelin's attempt at offering a wider range of IRS products. RBS only began providing Javelin with liquidity again after it revised its MAT submission.

237.    From that point on, however, RBS distanced themselves from Javelin. Management at Javelin was told to remove RBS from all of its marketing materials. James Cawley was told in no uncertain terms by Rich Volpe, head of IRS trading at RBS, that Javelin

was to never again mention to anyone that RBS was a market maker on its platform. Patrick

Wegner, the senior trader responsible for providing electronic IRS markets on Javelin, began

widening the bid/ask spread he would stream to Javelin. RBS traders would also not respond to

inquiries from the Javelin voice desk, even if it meant that RBS would be able to enter into an

IRS transaction at a profitable level. Eventually, on April 26, 2015, RBS withdrew as a

participant on Javelin's platform

238.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no

revenues and facilitates no IRS trading.[66] Despite years of development and millions of dollars

in investment capital, less than 200 trades have been executed on Javelin since its launch.

Absent the Dealer Defendants' anticompetitive boycott, buy-side firms would have traded

between and amongst themselves and dealers on Javelin's platform, leading to greater

competition in the IRS market and tighter bid/ask spreads, which would have benefited Plaintiffs

and the Class.

239.    The Dealer Defendants' joint opposition to Javelin was coordinated. Javelin

employees had numerous conversations with representatives from the Dealer Defendants (*i.e.*,

Bank of America, Barclays, BNPP, Citi, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan

Stanley, and UBS) from August 2013 to April 2015 (and RBS beginning in 2015), where the

Dealer Defendants' representatives proffered nearly identical excuses for their refusal to deal,

pointing to a supposed lack of buy-side participation on Javelin as the reason for their actions.

240.    In fact, these excuses were pretextual, given that the Dealer Defendants had gone

to great lengths to ensure that buy-side firms did not trade on Javelin. As noted above, Javelin

---

[66] *See* Mike Kentz, *Cawley Exit Signals SEF Troubles*, INT'L FIN. REV. (May 10, 2014),
http://www.ifre.com/cawley-exit-signals-sef-struggles/21144521.article.

had committed liquidity providers by this point, guaranteeing the Dealer Defendants would have counterparties with whom to trade, and frequently featured IRS prices that were competitive with or better than rival platforms like Tradeweb. The real reason for the Dealer Defendants' collective refusal to deal was their unlawful agreement to boycott any platform that threatened to bring all-to-all trading of IRS to the buy side.

3.    *The Dealer Defendants boycotted TrueEX*

241.    In 2013, TrueEX sought to bring to market a SEF offering an anonymous IRS order book, as well as an RFQ platform, both of which would facilitate all-to-all trading between and amongst buy- and sell-side entities. TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for CDS for an IDB called Creditex.

242.    TrueEX was the "first swaps exchange to be approved by the [CFTC]."[67]  It offered "trading features, such as anonymous trading, that regulators and traders at funds say will encourage smaller banks and other players, such as hedge funds, to enter the market as dealers[, which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[68]  TrueEX "took a very old way of executing and brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[69]

---

[67]    Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER (Apr. 1, 2013), http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-10574731.html.

[68]    Levinson, *supra* note 5.

[69]    Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INV'R. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

243.    With these attractive features and Mr. Hirani's background in electronic trading, TrueEX was ready and able to become a successful all-to-all trading platform for IRS.  Mr. Hirani publicly stated that the platform had signed up sixty-two buy-side participants, noting that "[c]learly the buy[-]side demand is there."[70]

244.    But "[m]any of the top derivatives dealers, including Goldman Sachs, Deutsche Bank, Citigroup, Barclays, Bank of America Corp, and Morgan Stanley, have declined to use [T]rueEX," stonewalling the trading platform.[71]  The Dealer Defendants, again acting in concert to prevent the success of an all-to-all trading facility open to the buy side, collectively thwarted the success of TrueEX's IRS trading platforms.

245.    Today, as a direct result of the Dealer Defendants' concerted conduct, the vast majority of trades that are conducted through TrueEX take place on its *RFQ* platform on a name-disclosed basis.[72]  Most of these trades are, in actuality, "compression" trades — which merely consolidate multiple offsetting trades into one position — done mainly to reduce regulatory capital and margin requirements associated with unnecessary and redundant swap positions.  No bid/ask spread is associated with "compression" trades, so TrueEX's execution of those trades does not threaten the Dealer Defendants' positions as the primary market makers for IRS.  In sum, the Dealer Defendants have successfully neutralized TrueEX from becoming a competitive threat.

---

[70]    Levinson, *supra* note 5.

[71]    *Id.*

[72]    *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, TABB FORUM (Feb. 26, 2015), http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print_preview=true&single=true.

4.    *The Dealer Defendants' boycotts chilled market progress*

246.    Beyond their immediate effects on TeraExchange, Javelin, and TrueEx, the Dealer Defendants' boycotts also sent a clear message to the industry that *any* SEF platform attempting to offer the buy-side access to an anonymous all-to-all trading platform would be collectively punished and strangled until it failed.

247.    As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side entity, stated during a recent SEFCON panel discussion: "No one wants to do anything because no one wants to be the next person to piss everyone off."

248.    SEFs are afraid even to apply to make IRS "available to trade" (and buy-side firms are afraid to trade IRS on all-to-all trading platforms) because of the risk of collective retaliation by the Dealer Defendants.

249.    Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background." Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs (head of the FCM), enforce market discipline by making direct threats to SEFs. In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

250.    As a result, the Dealer Defendants have effectively deterred any entities from offering anonymous all-to-all trading to the buy side.

**E.    The Dealer Defendants Penalize Buy-Side Customers Who Engage in All-to-All Trading**

251.    The Dealer Defendants have taken other steps to discourage their customers from using all-to-all trading platforms. They have withheld services to their buy-side customers who

attempt to trade on anonymous all-to-all platforms, they have insisted on post-trade disclosure practices to discourage the buy side from using all-to-all trading, and they have even put their customers in a "penalty box" to discourage future transgressions.

252.    These acts, which the Dealer Defendants have undertaken in concert, are designed to make all-to-all trading unattractive to customers and, in some cases, to coerce them away from attempting to disrupt the dealer-to-client OTC market.  "[T]his meaningfully disincentivizes [dealer-to-client] SEFs from making any changes that may receive retaliation from the biggest dealer banks.  As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[73]

> 1.    _The Dealer Defendants withhold clearing services to buy-side firms that attempt to trade IRS in an all-to-all environment_

253.    The Dealer Defendants have conspired to dissuade buy-side firms from trading on all-to-all platforms by threatening them with the withdrawal of clearing services or across-the-board increases in clearing fees that make IRS trading cost prohibitive.

254.    Because clearing performs an important risk mitigation function for many IRS, denial of clearing services effectively hamstrings the buy side's ability to trade IRS.  Therefore, the mere possibility that the Dealer Defendants can, through their FCMs, cut off access to clearing is sufficient to deter many end users from even attempting to trade on all-to-all platforms or push for all-to-all trading.

255.    The Dealer Defendants' FCMs are able to coordinate their activities because, among other things, their clearing operations communicate regularly with each other.  For example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank,

---

[73]    KELLEHER et al., _supra_ note 34, at 12.

used to work as the Global Head of Rates Clearing at JP Morgan.[74]  Mr. Murray regularly communicates with his counterparts at other Dealer Defendants, such as Robert Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services, and Michael Dawley, the head of Goldman Sachs' FCM.  And, as noted above, many of the heads of the Dealer Defendants' meet and collude under the cover of FIA board meetings.

256.    For example, in July 2015, certain of the Dealer Defendants' FCMs, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began collectively penalizing certain transgressor buy-side firms by hiking their clearing fees "by as much as ten-fold," while obedient buy-side entities "have been protected."[75]  In a competitive market, the Dealer Defendants' FCMs would compete with each other to provide clearing services to their clients.  Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others have collectively threatened to raise or actually raised clearing fees for certain buy-side firms due to their attempts to trade on all-to-all trading platforms.  Absent collusion, the FCMs would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants.

257.    The Dealer Defendants' conduct is strikingly consistent.  For example, an interest rates head at a high-frequency trading firm "noticed . . . indirect push-back," including that "one dealer . . . put the brakes on talks to clear for the firm."[76]  The clearing talks "just stalled" after

---

[74]    Matt Cameron, *Deutsche Snares JP Morgan's Murray for Clearing Role*, RISK (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

[75]    Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, RISK (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

[76]    Rennison, *supra* note 3.

the dealer learned that the buy-side firm "wanted to start acting as a market-maker on S[EFS]."[77]
"A number of other sources at hedge funds and proprietary trading firms" encountered similar
"resistance from their dealers."[78]  Several buy-side firms have told "similar stories."[79]

> 2. *The Dealer Defendants insist on "name give-up" to deter buy-side participation on all-to-all trading platforms*

258.    As part of their effort to maintain an overwhelming information advantage over
the buy side, the Dealer Defendants have agreed to insist on a practice known as "name give-up."
This practice prevents anonymous trading on SEFs and discourages buy-side participation on all-
to-all trading platforms, such as a SEF order book or all-to-all RFQs.  The practice has
contributed significantly to the persistence of a two-tiered IRS market.

259.    Name give-up requires that the names of each counterparty to an IRS be disclosed
to the other, which prevents trades from being done anonymously.  This practice has been widely
decried by buy-side firms and independent SEFs.

260.    The Dealer Defendants know that name give-up effectively deters end users from
utilizing all-to-all trading platforms.  Specifically, name give-up causes end users uncontrolled
"information leakage" in that they must reveal their trading positions, and thus elements of their
trading strategies, to both dealers and other end users, which may be able to exploit that
information against them.

261.    Many end users go to great lengths to keep their trading strategies confidential.
As Ken Griffin, founder of Citadel Investment Group ("Citadel"), has explained, name give-up
allows dealers unfairly to "position their book by taking advantage of their trading

---

[77]    *Id.*

[78]    *Id.*

[79]    *Id.*

counterparties' market insights."[80]  Michael O'Brien, Director of Global Trading at Eaton Vance, has stated:  "I don't want to show the size of my trades, I don't want people to know how I'm trading.  Information is the most valuable asset we have."[81]  Similarly, Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel has stated:  "Forcing end-users to disclose themselves if they are in a [order book] is a means to discourage alternative market participants from participating in what were historically interdealer [order books.]"[82]

262.    As noted, there is great buy-side demand for all-to-all, anonymous trading.[83]  As a result, "[s]ome asset managers have claimed their use of [order books] will increase if they are allowed to trade anonymously."[84]  Richard Mazzella explained that "removing these barriers is important in allowing" a true order book to come to market.[85]  Ken Griffin noted that

---

[80]    Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, Risk (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

[81]    Levinson, *supra* note 5.

[82]    Madigan, *supra* note 48 (O'Brien:  "I would like my desk to be executing any trades possible on central limit order books").

[83]    *See* Rennison, *supra* note 3 (quoting Sam Priyadarshi, head of fixed income derivatives at Vanguard Asset Management, as stating "[w]e have a deep desire to be able to access these markets"); *id.* (quoting Marc Vesecky, Chief Risk Officer for Tower Research Capital, as stating "Tower is definitely supportive of swap trading moving toward open, efficient electronic trading"); *id.* (quoting the Chief Risk Officer of a large hedge fund as stating:  "I might have an interest in being a liquidity provider.  We already have people on our team who can do that and we are interested in showing bids and offers to the market both for our own portfolio and to take advantage of pricing discrepancies").

[84]    Peter Madigan, *Massad:  Sefs Fear Retaliation if They End Name Give-up*, Risk (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, Risk (Aug. 6, 2015), http://www.risk.net/risk-magazine/feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading firm as stating:  "If volume moves more towards [order books], then that's where we'll get more engaged").

[85]    Madigan, *supra* note 48.

"anonymous markets foster competition," adding that "[i]t should not matter who provides the best price."[86]  And George Harrington, CFA, Global Head of Fixed Income, Currency, and Commodity Execution at Bloomberg LP stated during a panel discussion at SEFCON on October 26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

263.    The Dealer Defendants also use name give-up to police their conspiracy:  "In practice, in a SEF environment, this unnecessary disclosure of swap counterparties only serves to inform the dealers of the non-dealer firms [or] banks that are attempting to trade on their platforms, and invit[es] retaliation."  Name give-up thus serves as a policing mechanism because it allows the Dealer Defendants to identify (and discipline) any platforms not abiding by the Dealer Defendants' unwritten rules.

264.    For instance, if a transaction on an all-to-all platform with name give-up closes with a dealer on one side, that dealer is able immediately to see if a buy-side participant has (a) been allowed access to the platform, and (b) had the audacity to try to capitalize on that access by entering into a transaction over the platform rather than in the dealer-to-client OTC (or, more recently, RFQ) systems.  And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with end users, even on an all-to-all trading platform, meaning that they are able to quickly identify any buy-side entity trading on such a platform.

265.    There is no legitimate reason for name give-up's continued existence in the IRS market.  Name give-up is a historical artifact; and because IRS trades conducted on SEFs are now centrally cleared, there is no justification for maintaining the practice.  Neutral commentators, regulators, and even the Dealer Defendants' employees agree as much.  For

---

[86]   Devasabai, *supra* note 80.

instance, Declan Graham of UBS admitted during a panel discussion at SEFCON on October 26, 2015, that name give-up on order books is pointless for cleared swaps.

266.    CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared."[87]  Mr. Massad explained that the CFTC had "heard market participants express concern about potential negative consequences of this practice with respect to its effects on liquidity and participation" and he had "not heard a compelling justification" for the practice of name give-up in today's IRS market.[88]  Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you should also be post-trade anonymous . . . .  [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[89]  And former CFTC Commissioner Mark Wetjen has stated that it is "difficult to rationalize trading protocols that reveal the identities of counterparties on an anonymous, central limit order book."[90]

267.    Although central clearing eliminated all legitimate reasons for requiring name give-up, the Dealer Defendants recognized its importance in maintaining market bifurcation. Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Barclays

---

[87]    Madigan, *supra* note 84.  The CFTC does not police secret, horizontal collusion between direct competitors in the IRS or any other market.  Moreover, the CFTC Chairman has recently stated that the CFTC has no plans to combat name give-up.  *See* FINANCIAL TIMES, *supra* note 10.

[88]    Remarks of Chairman Timothy Massad Before the ISDA 30th Annual General Meeting (Apr. 23, 2015), http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-17.

[89]    Madigan, *supra* note 48.

[90]    *See CFTC Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit* (Nov. 14, 2014), http://www.cftc.gov/PressRoom/Speeches Testimony/opawetjen-10.

and Morgan Stanley, among others, conspired to keep the practice in place by making their Defendant Dealers' provision of liquidity to a trading platform conditional on the use of the practice. The remainder of the Dealer Defendants joined the agreement.

268.    Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform that refused to include name give-up as a feature. As a former IDB employee explained, when the IDB attempted to bring buy-side entities onto its trading platform in a different asset class, the Dealer Defendants discovered as much through name give-up and responded with collective threats "to simply move their business to another broker."[91] He stated that, as a result, the IDB relented, limiting its platform to dealers. The employee added: "We didn't have much choice but to shut it down."[92] When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition SEF (an IDB), bluntly explained that SEFs were not willing to stand up to the dealers and go anonymous because of the risk "of the loss of liquidity."

269.    The Dealer Defendants also ensure that name give-up persists through a service known as MarkitWIRE, which is operated by MarkitSERV. MarkitSERV is dominated by the Dealer Defendants. In fact, it is dominated by some of the principal architects of the Dealer Defendants' conspiracy: Brad Levy (formerly of Goldman Sachs' PSI group) is currently the CEO of MarkitSERV, and Stephen Wolff (formerly the Head of Strategic Investments and Head of Fixed Income e-Commerce at Deutsche Bank) is the Head of Group Corporate Strategy at

---

[91]    Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, Risk (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

[92]    *Id.*

MarkitSERV. MarkitWIRE itself is run by Chip Carver, who previously managed fixed income derivatives trading for Goldman Sachs and was responsible for the bank's ecommerce for global interest rate products.

270. MarkitWIRE is a trade processing service for IRS and other asset classes offered by MarkitSERV, which delivers trades to clearinghouses once they have been executed by counterparties. Although IRS trades could easily employ "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed — the Dealer Defendants force IDBs to send trades to MarkitWIRE *before* they are cleared.[93] MarkitWIRE then offers the counterparties to an IRS transaction a "last look" at the trade, where they learn each other's identities and have the option to terminate the transaction. This process is inefficient and more cumbersome than exchange trading, and it subjects the parties to unnecessary post-trade name give-up.[94] Javelin's platform, for instance, has the capability to confirm trades and send them to the clearinghouse directly while maintaining full anonymity.

271. The IDBs only use MarkitWIRE, and disclose the names of the parties to an IRS transaction post-trade, because the Dealer Defendants collectively insist that they do so. Buy-side firms have complained that this practice "is applied to please dealers and that it discourages non-banks from trading, helping to preserve the traditional market structure in which dealer-to-client and interdealer markets were separate."[95]

---

[93] *See* Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, RISK (Aug. 5, 2015), http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[94] *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire"). During a recent SEFCON panel discussion, Declan Graham of UBS stated that the lack of straight-through processing delays trade processing and clearing by up to six hours.

[95] *Id.*

272.     As a result of collective pressure from the Dealer Defendants, numerous SEFs have agreed to impose name give-up on their platforms.  Today, the largest interdealer SEFs — BGC, DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up, thereby effectively preventing buy-side entities from trading on them.[96]  These entities recognize the collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are careful about "not biting the hand that feeds you."[97]

273.     When, in February 2013, Tradition launched an IDB order book by the name of "Trad-X," it made sure to include name give-up.  As a result, the Dealer Defendants supported the platform, meaning that while they were boycotting the anonymous all-to-all SEF order books open to the buy side, they jointly supported an order book open only to themselves.

274.     The Dealer Defendants even touted the benefits of order book trading of IRS, while neglecting to note that they had conspired to save those benefits for themselves alone. Christian Mundigo, Global Head of Rates Trading and Co-Head of Americas Fixed Income at BNPP, for instance, stated that "BNP Paribas believes Trad-X will provide the USD swap market with an efficient electronic execution venue for trading interest rate swaps.  We are pleased to support the expansion of this market leading platform across both the Euro and USD markets, where we are committed to be strongly engaged with both the dealer community and our clients."[98]  Elie El Hayek, Managing Director, Global Head of Rates Global Banking and

---

[96]     *See* RISK, *Top of the Swaps* (Nov. 2014), https://www.citadelsecurities.com/ _files/uploads/sites/2/2014/12/Ken-Griffin-Risk-Magazine-Top-Of-The-Swaps-November-2014.pdf (noting that dealer-run platforms feature name give-up).

[97]     Mike Kentz, *New Dawn as Non-bank Enters Interdealer Order Book*, INT'L FIN. REV. (July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-book/21154986.article.

[98]     TRADITION, *Trad-X launches USD Interest Rate Swaps* (Feb. 15, 2013), http://www.trad-x.com /media/2939/trad-x_launches_usd_interest_rate_swaps.pdf.

Markets at HSBC stated "HSBC is very pleased to support the launch of Trad-X in USD interest rate swaps.  Trad-X has proved the concept of a hybrid solution with deep liquidity in EUR swaps and we look forward to continue to be a key player in an industry initiative in the US that brings transparency and trade certainty to the market."[99]

275.    Ciaran O'Flynn, Managing Director Global Head of Rates eTrading at Morgan Stanley, commented that "Morgan Stanley is committed to supporting execution of swaps trading on electronic venues like Trad-X.  These venues increase the transparency of the swaps market and facilitate the move towards mandatory clearing."[100]  Christopher Murphy, Global Head of Rates & Credit at UBS, added:  "UBS is very pleased to be supporting the launch of Trad-X in USD interest rate swaps.  We believe that Trad-X brings a compliant, transparent solution for interest rate swap trading along with deep and firm liquidity.  We hope that the launch in USD will build on the success of Euro interest rate swaps."[101]

276.    Name give-up is an effective deterrent to the buy side's use of all-to-all platforms.  Therefore, when Mitsubishi UFJ Financial Group, a second-tier dealer (and buy-side entity in the eyes of some Dealer Defendants), attempted to trade IRS on Trad-X, its identity was disclosed and it immediately received a phone call from Tradition SEF at the behest of a Dealer Defendant demanding to know why the buy-side firm had not instead traded directly with the Dealer Defendant.  The Dealer Defendants and IDBs thus work together to ensure that buy-side firms are not trading on IDB platforms.  As a direct consequence of maintaining name give-up, "[t]o

---

[99]    *Id.*

[100]    *Id.*

[101]    *Id.*

date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[102]

277.    Paul Hamill, formerly employed by UBS and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment, stating that exchanges without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[103]  CFTC Chairman Timothy Massad has said that numerous "[i]nvestors have complained that they are unable to break into the inter-dealer markets because they are not anonymous — with names given up after trading."[104]  Indeed, one U.S.-based hedge fund manager stated that "[e]nding name give-up on broker [SEFs would] remove[] the ability for dealers to effect retribution on their clients."[105]

### 3.    *The Dealer Defendants place transgressors in the "penalty box"*

278.    At the same time the Dealer Defendants collectively prevent anonymous all-to-all SEFs that are open to the buy side from succeeding, they themselves use such platforms. Tradeweb and a number of IDBs, including ICAP, operate such all-to-all SEFs, but they are open only to dealers.

279.    There is no technical reason why these entities could not allow buy-side entities to trade on their platforms as well, but the Dealer Defendants pressure them not to allow this.  In fact, the Dealer Defendants have "threaten[ed] to withdraw liquidity from any trading platform

---

[102]    Timms, *supra* note 69.

[103]    MARKETS MEDIA, *SEFs Win Qualified Praise* (Oct. 8, 2013), http://marketsmedia.com/sefs-win-qualified-praise/.

[104]    FINANCIAL TIMES, *supra* note 12.

[105]    Rennison, *supra* note 3.

that admits buy-side firms onto its [order book]."[106]  Such a practice is commonly referred to as "pulling the line" on the interdealer broker or placing it in the "penalty box."

280.    For example, when an interdealer SEF "run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform."[107]  In particular, GFI "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity.[108]  GFI promptly reversed course.

281.    The Dealer Defendants similarly threaten any buy-side investor with being put in the "penalty box" if it attempts to trade on an all-to-all platform, whether it is operated by an IDB or an independent SEF.[109]  In such instances, the Dealer Defendants often refuse to trade with the investor in any venue.  Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the investor from trading IRS as long as it is in the "penalty box."  In even more egregious circumstances, the Dealer Defendants collectively threaten a transgressing investor with withdrawal of key banking services.  Such threats carry great weight and have had the intended deterrent effects.

---

[106]  Madigan, *supra* note 84; Kim Hunter, *Growing Pains*, Markit (Winter 2014), http://content.markitcdn.com/corporate/Company/Files/MagazineEntireIssue?CMSID=1277525de02549adbf7b422b9b34f641) ("The first [IDB] that goes anonymous is sending a signal that the buyside is becoming part of its platform.  You'll get wider spreads or even dealers withdrawing from the platform.").

[107]  Levinson, *supra* note 5.

[108]  Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[109]  *See* Rennison, *supra* note 3 (quoting a U.S.-based hedge fund manager as stating: "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

282.     The Dealer Defendants also use the "penalty box" to prevent any conspiring dealer from breaking ranks, and will refuse to trade with co-conspirators who are suspected of supporting buy-side access to all-to-all trading.

283.     For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.[110]  The other Dealer Defendants promptly put Barclays in the "penalty box" and refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.

284.     BARX eventually ended its IRS business and became devoted mainly to foreign exchange ("FX") trading.  Even then, Barclays was only allowed out of the "penalty box" and into the Dealer Defendants' clubhouse in 2008, when Barclays acquired the assets and personnel of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep connections with the other Dealer Defendants and went on to bring those relationships and that network to Morgan Stanley in 2010.  This acquisition significantly bolstered Barclays' share of the IRS market, and Mr. Senft used his connections to help Barclays ingratiate itself with the other Dealer Defendants, including by taking a stake in Tradeweb.[111]  Mr. Senft similarly used his connections to maintain Morgan Stanley's involvement in the conspiracy after he joined in 2010.

---

[110]     *See* FINEXTRA, *Bloomberg and Barclays Capital Launch Interest Rate Swaps Trading* (July 21, 2003), https://www.finextra.com/news/fullstory.aspx?newsitemid=9515.

[111]     TRADEWEB, *supra* note 28.

**F.    The Dealer Defendants Collectively Prevented Clearinghouses from Bringing All-to-All Trading to the Buy Side**

285.    The Dealer Defendants have also coordinated with respect to their preferred IRS clearinghouse and boycotted any clearinghouse that might open the door to all-to-all trading for the buy side.

286.    As noted above, because, as a result of central clearing, there is no longer counterparty risk, there is no longer any need to know the identity of the counterparty to an IRS trade.  As a clearinghouse could easily evolve into an all-to-all trading platform, threatening disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse they saw as a threat to their bifurcation of the IRS market.  As a JP Morgan report stated:  "the main concern for the Investment Banking industry is that *clearing is the first step leading to exchange*/SEF trading for OTC products."[112]  The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[113]

287.    On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS.  At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IRS contracts.  CME publicly announced that "the first order of business . . . is to broaden the product base.  The CME plans to

---

[112]    J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks:  Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, GLOBAL EQUITY RESEARCH (Sept. 8, 2010) (emphasis added).

[113]    PETER NORMAN, THE RISK CONTROLLERS:  CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS 302 (2011).

roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[114]

288.    In July 2007, CME announced its plans to offer the market a cleared IRS product, including IRS denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

289.    CME is a threat to the Dealer Defendants because, as an established exchange, it had the potential to offer integrated exchange trading and central clearing of IRS.  In fact, CME stated in July 2007 that "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[115]

290.    The threat to the Dealer Defendants was compounded on February 4, 2008, when CME announced that thirty three buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[116]  The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

291.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream.  They instead jointly committed to clear IRS transactions only through a clearinghouse they knew they could control — LCH.Clearnet.  They

---

[114]  Daniel P. Collins, *CME Acquires Swapstream*, FUTURES MAGAZINE (July 24, 2006), http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

[115]  CME GROUP, *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants* (July 17, 2007), http://investor.cme group.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[116]  PR NEWSWIRE, *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap* (Feb. 4, 2008), http://www.prnews wire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

also used their market power and influence to prevent other sell-side banks and IDBs from

dealing with Swapstream.[117]  Because, unbeknownst to Plaintiffs, the Dealer Defendants jointly

agreed to refuse to deal with Swapstream, the product never launched.[118]

292.    As a result of the Dealer Defendants' concerted action and agreements to refuse to

deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked

the emergence of all-to-all trading of IRS.

## III.    ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY SIDE

### A.    The Dealer Defendants Have Substantial Market Power

293.    As a result of their conspiracy, the Dealer Defendants continue to possess a

significant share of the IRS market, and they collectively dominate the market.  Based on

available market-share information, the Dealer Defendants collectively control at least 70% of

the market.  In 2014, five of the ten Dealer Defendants collectively controlled over 50% of the

IRS market by themselves while the remaining five Dealer Defendants controlled at least an

additional 20% of the IRS market.[119]

---

[117]  E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond:  The Path to Electronic Markets*, DERIVALERT (Jan. 2010), https://cdn2.hubspot.net/hub/75625/file-15533740-pdf/docs/otc_interest_rate_swaps_and_beyond_-_the_path_to_electronic_markets.pdf.

[118]  *Id.*

[119]  In 2014, Bank of America was reported to control 12.6% of the IRS market, JP Morgan was reported to control 11.4% of the IRS market, Deutsche Bank was reported to control 9.5% of the IRS market, Citi was reported to control 9.2% of the IRS market, and Barclays was reported to control 8.2% of the IRS market.  In 2012 Goldman Sachs was reported to control 6.9% of the IRS market, HSBC was reported to control 5.0% of the IRS market, BNPP was reported to control 4.9% of the IRS market, and Morgan Stanley was reported to control 3.2% of the IRS market.  The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012.  *See* GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES:  DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

294.   The Dealer Defendants' market power is well-recognized.  As Paul Rowady of the TABB Group stated:  "Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."[120]  Mr. Rowady also stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the moves, as they are counterparty to every trade."[121]

### B.   Defendants' Conspiracy Has Imposed Significant Harm on Buy-side Investors

295.   As detailed above, the Dealer Defendants have colluded to maintain an artificial bifurcation of the IRS market (between a "wholesale" dealer-to-dealer side of the market and a "retail" dealer-to-client side of the market) up to the present day.  The Dealer Defendants have relegated the buy side to dealer-to-client trading in the functional equivalent of the OTC market to protect their own supracompetitive profits.  This bifurcation is wholly artificial.  According to John Brady of MF Global, IRS "could theoretically be put on to a exchange — were it not for the fact . . . that dealers tend to want to control the way that prices are set — particularly when they deal with corporate clients, because the business is so lucrative."[122]

296.   The Dealer Defendants recognized that if the retail side of the IRS market shifted to all-to-all platforms, buy-side entities would be able to trade directly with one another, thereby "disintermediating" the Dealer Defendants (*i.e.*, trading without them) and denying them the

---

[120]   Michael Mackenzie & Gillian Tett, *Markets:  Frozen in Time*, FINANCIAL TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0.html#axzz 3sFYwvyw0.

[121]   *Id.*

[122]   *Id.*

substantial profits they derive from intermediating trades in the dealer-to-client market.[123]   The Dealer Defendants also knew that all-to-all anonymous trading of IRS would bring more direct price competition between more entities, thereby leading to the tightening of bid/ask spreads.

297.    The buy side would benefit in numerous ways from trading IRS on modern all-to-all platforms:  "A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[124] The introduction of all-to-all trading thus brings pricing transparency and competition to the marketplace, typically resulting in a narrowing of bid/ask spreads.  All-to-all anonymous trading would also encourage alternative providers of liquidity to enter the market in competition against the traditional market makers (*i.e.*, the Dealer Defendants), yielding further spread compression and other benefits to the buy side.[125]   And it would also dilute the lopsided information advantage the Dealer Defendants currently have and exploit in the market to benefit their own trading positions at the expense of others in the market.

---

[123]   *See, e.g.*, Adam Sussman, *US Interest Rate Swap Futures*:  *Why Market Participants Would Switch*, TABB GROUP (2012), http://www.cmegroup.com/education/files/tabb-strong-prospects-for-interest-rate-swap-futures.pdf ("[T]here is little doubt in our minds that dealers want to preserve the traditional swaps market for as long as possible.").

[124]   *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS, *supra* note 8, at 23.

[125]   All-to-all, anonymous electronic trading platforms yield numerous procompetitive benefits common to all class members:  "An electronic trading venue can enhance market quality due to the so-called liquidity externality.  Concentrating a trade at one place and time reduces search costs and intensifies competition over price.  Electronic venues can bring together a large and diverse participant pool and hence reduce the need for intermediaries that match demand and supply between segmented traders.  Also, they can lower operational costs by automating processing, settlement and record-keeping.  Still, venues must be carefully designed to avoid the unwanted dissemination of information.  Participants may avoid venues if they believe negotiating or trading at the venue would expose their activity unnecessarily (information leakage)."  *Id.* at 20 (internal citations omitted).

298. The cost savings to buy-side entities of being able to supply quotes to other buy-side entities is itself enormous. Even if only one of every three trades by a buy-side firm was executed this way, total net trade costs for the buy-side firm could decrease by as much as two-thirds from the current RFQ regime, for a given bid/ask spread.

299. Absent Defendants' conspiracy, the buy-side entities that comprise the class in this matter would have experienced spread compression and other benefits. If all-to-all trading platforms had been available in a truly competitive marketplace — *i.e.*, one where Defendants were not colluding — there would have been a rapid migration of IRS trading onto those platforms which, in turn, would have led to a significant tightening of bid/ask spreads paid by the buy side. As noted by a recent report:

> In a free market populated by competitive, profit-maximizing dealers and price conscious customers, it would not make sense to expect otherwise. The margins from making markets in such a liquid marketplace with still sizable bid/offer[] spreads to capture would surely be attractive to many market participants outside the few traditional incumbent swaps dealers. As risk-reduction mechanisms, such as netting, compression, and clearing, became easier and more prevalent, the attendant counterparty risks and balance sheet usage declined sharply year after year, further reducing barriers to entry. There is no question that other derivatives market participants wanted to be dealers in this market, and were actively — seemingly unlawfully — kept out.[126]

300. As explained in a recent report by the Bank for International Settlements, anonymous all-to-all trading has had precisely this impact on *inter-dealer* fixed income markets, similar to IRS: "Electronification of trading platforms is often associated with increased competition over price, which ensures low transaction costs (at least for small tickets). A

---

[126] KELLEHER et al., *supra* note 34, at 2 (Feb. 2016).

centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[127]

301.    There is wide consensus among experts, based on numerous studies of historical examples, that standardization, migration to anonymous all-to-all trading, and spread compression is a natural progression of financial products.  For instance, the introduction of electronic trading to equity options and currency markets has had a major impact on spreads and the costs associated with trading in those markets.

302.    In 1973, for example, the Chicago Board Options Exchange introduced all-to-all exchange trading for equity options, which had been until that point traded entirely OTC. Eventually, the increased competition introduced by all-to-all trading tightened spreads drastically.  Option bid/ask spreads were typically ¼ cent or less, driven down in part by competition "from more than 15 market makers for each Order Book Official (OBO) station."[128]

303.    The FX market, which covers both spot currencies and derivatives, is extremely large, and until recently had been dominated by OTC dealer intermediation.  Eventually, dealer domination of the huge OTC FX market was reduced dramatically, in part by the increased use of all-to-all electronic trading platforms that were accessible to non-dealers.  These trading

---

[127]    *See* BANK FOR INT'L SETTLEMENTS, *supra* note 8, at 23.

[128]    JOHN C. COX & MARK RUBINSTEIN, OPTIONS MARKETS 23-24 (1985); *see also* Robert C. Klemkosky & Terry S. Maness, *The Impact of Options on the Underlying Securities*, 6 J. PORTFOLIO MGMT. 2, at 1 (1980); Joseph Finnerty, *The Chicago Board Options Exchange and Market Efficiency*, J. FIN. & QUANTITATIVE ANALYSIS, Mar. 1978, at 29-38.

platforms now account for over 50% of all trades.[129]  The bid/ask spreads for the less-liquid

emerging market currencies declined by over 50% from 2004 to 2013.[130]

304.    But for Defendants' anticompetitive acts, members of the proposed Class would

have similarly traded IRS on all-to-all electronic platforms, with far greater transparency and

substantially reduced bid/ask spreads than they experience in the functional equivalent of the

dealer-to-client OTC IRS market controlled by the Dealer Defendants.

305.    Bid/ask spreads did not meaningfully tighten across any IRS tenor after SEFs —

crippled or coopted by Defendants — entered the IRS market.  Had the introduction of SEFs

truly increased transparency and price competition for the buy side, there would be a significant

narrowing of bid/ask spreads following the introduction of the SEFs.  Thus, the introduction of

SEFs has done little to nothing to improve the lot of buy-side entities, who continue to be

prisoners of the antiquated dealer-to-client OTC-like model, even after the passage of Dodd-

Frank and the introduction of SEFs.[131]

306.    As a result of the Dealer Defendants' efforts, the SEFs that have been successful

are either effectively controlled by the Dealer Defendants (Tradeweb), have explicitly entered

into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial

---

[129]  *See* Dagfinn Rime & Andreas Schrimpf, *The Anatomy of the Global FX Market Through the Lens of the 2013 Triennial Survey*, BIS QUARTERLY REVIEW, Dec. 2013, http://www.bis.org/publ/qtrpdf/r_qt1312e.pdf.

[130]  *See id.*

[131]  This is in marked contrast to the market for equities, where the introduction of non-conventional market makers such as high-frequency trading firms had a "dramatic" impact on bid/ask spreads, reducing them by as much as 50% in one European equity market.  *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS, *supra* note 8, at 20 (internal citations omitted).

market division (ICAP), or have recognized that the only way to avoid retaliation is to focus on providing a dealer-to-client RFQ platform with name give-up (Bloomberg).

307.    As a result of Defendants' collusion, the Dealer Defendants trade amongst and between themselves on state-of-the art, electronic, all-to-all platforms where they enjoy efficient execution, price transparency, and direct competition, while buy-side entities, by contrast, are restricted to the functional equivalent of the antiquated dealer-to-client OTC market where they must transact with dealers and operate at material price and informational disadvantages.

### C.    Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support the Development of the IRS Market

308.    Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solutions to the buy side.  Instead, because of Defendants' conspiracy, the SEFs that *have* tried to offer such platforms have been put out of business, and SEFs like Tradeweb that replicate the structure of the OTC market by offering the buy side only a dealer-to-client RFQ have remained successful.  Without the Defendants' collusion, offerings such as those by Javelin, TeraExchange, and TrueEX would have generated large new revenue streams through increased volume and market share.

309.    Absent a conspiracy, it would be economically rational for a SEF like Tradeweb to offer a fully anonymous all-to-all trading platform for IRS that is open to the buy side, or for an IDB to open its all-to-all platform to the buy side.  Doing so would enable them to attract a greater volume of IRS trades and earn higher revenues.  But, as discussed above, SEFs that attempted to bring anonymous all-to-all trading to the buy side, such as Javelin, TeraExchange,

and TrueEX, have received credible threats, backed up by business-destroying boycotts.[132]  Due to the Dealer Defendants' conspiracy, not a single all-to-all anonymous SEF open to the buy side currently does any meaningful trading in the IRS market.

310.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well.  Evolution to all-to-all trading open to the entire market would have been inevitable — it is the natural progression when financial products become highly standardized, high-volume products.  This is particularly true where, as here, solution providers were actively entering the market to make this happen in response to strong buy-side demand.  Given its inevitability, each Dealer Defendant, absent coordination, would have advanced its own self-interest by partnering with a solution provider in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.  In the absence of collusion, each Dealer Defendant would have been dragged onto all-to-all platforms by client demand, pursuing the revenue available on such platforms.  Dealers who failed to adhere to their client's demands would quickly find themselves losing business.

311.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to the buy side in the form of fully anonymous all-to-all trading, as clients shifted their trades away from other dealers onto the trading platform.  An individual Dealer Defendant could also have obtained an equity share in the trading platform, allowing it to share in the profits of the enterprise.  Even leaving aside the potential to be an industry leader and gain a first-mover advantage, each Dealer Defendant would have an independent interest in trading on the new platforms and providing clearing services, all

---

[132]    *See also* Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, REUTERS (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

of which could have been a profitable source of income. Because no individual Dealer Defendant could prevent all-to-all trading for the whole market from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of all-to-all trading platforms.

312.    Absent a conspiracy, it would have been in the self-interest of buy-side members to support and utilize all-to-all platforms. Such platforms would have allowed them to trade anonymously and would have compressed bid/ask spreads due to increased competition and transparency. It would also have afforded them the opportunity to trade with market participants other than the major dealers.

313.    Because of Defendants' conspiracy, none of this happened. Not because IRS are not ready for all-to-all trading. Not because the buy side does not want all-to-all trading. Not because solution providers were not ready, willing, and able to offer all-to-all trading to the buy side. The IRS market exists as it does because the Dealer Defendants collectively blocked the market's evolution. Only a conspiracy that gave each Dealer Defendant an assurance that all-to-all trading would not occur explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

314.    Defendants' agreements were *per se* illegal agreements to thwart competition among horizontal competitors. The Dealer Defendants' collective refusals to deal with those SEFs, end users, and other entities that would not play ball amounted to group boycotts that are illegal under the antitrust laws.

315.    With respect to IRS, the Dealer Defendants used their market power to enforce a division between the interdealer and the dealer-to-client markets. The effect of the Dealer

Defendants' anticompetitive agreements (such as with each other, IDBs, clearinghouses, and certain SEFs) and collective refusals to deal (with similar platforms that did not go along with the scheme) was to maintain the divided market structure where the buy side was limited to trades with dealers, and to deny buy-side firms access to interdealer trading platforms or other opportunities to trade in an all-to-all environment. All class members were harmed by these illegal acts because they were all deprived of the opportunity to transact IRS at tighter bid/ask spreads.

### D.    Investigations and Litigation Concerning the Credit Default Swaps Market Show that the Dealer Defendants Collude to Block Exchange Trading

316.    This is not the first time the Dealer Defendants abused their collective influence over the market's infrastructure to preserve their supracompetitive profits, nor the first time they did so with respect to a derivatives product. To the contrary, the Dealer Defendants' strategy here parallels their misconduct in the CDS market.

317.    The Dealer Defendants' misconduct in the CDS market has been the subject of two separate investigations by the United States Department of Justice ("DOJ") and the European Commission ("EC"). The DOJ and EC investigations were spurred by complaints by market participants that the Dealer Defendants, who were the major CDS dealers, were abusing their control of the market to limit price transparency and competition.[133] In one widely reported email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain, lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of

---

[133]    *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL ST. J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[134]

318.    The concerns expressed by the DOJ and EC are similar to present-day complaints about anticompetitive behavior in the IRS market.  For example, the EC stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[135] The EC believed that "the investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[136]

319.    The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group boycotts and consortium investments.  For instance, CME (which, as discussed above, also tried to create an open trading platform for IRS) backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through an order book.  Modeling showed that CMDX would support "the trading and clearing of the most extensive CDS product set in the industry."[137]

320.    In June 2008, CMDX was presented to the market.  Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.  Initially, some dealers were tempted.  A Barclays report

---

[134]    Serena Ng, *Friction on Swaps Response*, WALL. ST. J. (June 3, 2009), http://online.wsj.com/news/articles/SB124390301244674747.

[135]    European Commission, *Press Release — Antitrust:  Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[136]    *Id.*

[137]    *About CMDX — Overview*, CMDX.COM (Feb. 15, 2009), http://web.archive.org/web/20090215203639/http://cmdx.com/about-us-overview.html.

found that such offers should help the already "well positioned" venture "get off the ground," which was also helped by the fact that at least some CDS "already lend themselves to trade in an exchange-like fashion."[138]  Chris Adams, Global Products Head, Alternative Funds at BNPP, praised the venture in an interview with the *Financial Times*.[139]

321.    CMDX was operationally ready by the fall of 2008[140] and was initially backed by several dealers.[141]  CMDX ran into a brick wall, however, once the CDS dealers, including the Dealer Defendants, appreciated the platform's potential and were able to circle the wagons.  As here, the dealers enjoyed the benefit of owning, and being on the boards of, entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

322.    Though CMDX announced operational readiness, it believed it first needed to seek licenses from Markit and ISDA to use certain intellectual property.  But government investigations indicated that the dealers used their control over Markit and ISDA, and thus over licensing decisions, to prevent CMDX from launching with exchange-like features — instead

---

[138]    BARCLAYS CAPITAL EQUITY RESEARCH, *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008).

[139]    Hal Weitzman & Jeremy Grant, *CME-Citadel Form Clearing Facility*, FINANCIAL TIMES (Oct. 7, 2008), http://on.ft.com/1lQEfNs.

[140]    Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

[141]    *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

insisting that a dealer stand on one side of every transaction, just like they did in the IRS market.[142]

323.     A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS.  The cases were consolidated into a single action.  Though the defendants continue to deny liability, a class-action settlement was recently given final approval, pursuant to which the defendants collectively paid over $1.86 billion, and agreed to injunctive relief that will help clear the way for exchange trading of CDS.[143]

324.     It is telling that today IRS SEF operators and buy-side firms lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants.  While the markets at issue are different, today's complaints by SEF operators and buy-side firms — that the Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

325.     As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[144]  As a trader at one buy-side firm noted regarding the

---

[142]    EUROPEAN COMMISSION, *Press Release:  Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[143]    *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL ST. J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

[144]    Levinson, *supra* note 5.

challenges that independent SEFs face, "[i]t's been a really tough environment for the start-up SEFs, [because] the market is designed not to allow new entrants."[145]  Similar to how the major CDS dealers allegedly used their control over the CDS market to block new entrants and artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

## IV.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

326.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence that they were injured by Defendants' conspiracy to prevent all-to-all trading open to the buy side in the IRS market, much less who caused that injury, until sometime after June 2014, when the Dealer Defendants' campaign to squash SEFs from offering anonymous all-to-all trading to the buy side became apparent.

327.    Before that point, no one other than the Defendants themselves knew or could have known about the Dealer Defendants' secret conspiracy to control the IRS market.  While the Dealer Defendants had taken steps, detailed herein, to rig the market in their favor and to organize themselves, they had not yet publicly demonstrated their ability and intention to squash any threat to their collective dominance.

328.    When Congress passed Dodd-Frank in July 2010, it expected the changes it mandated, including SEFs, would move the market towards all-to-all trading platforms and reap the benefits of exchange trading in the form of price transparency and competitive pricing.  This

---

[145] *See* Mike Kentz, *Make or Break Time for SEFs*, INT'L FIN. REV. (May 2014), http://www.ifre.com/make-or-break-time-for-sefs/21146200.fullarticle.

shows that Congress did not realize the Dealer Defendants had organized an illegal conspiracy to prevent the market changes it intended to bring about.

329.     Nor did other participants in the market.  In fact, none of the efforts undertaken by sophisticated market participants to bring all-to-all trading to IRS markets would have been rational if the Dealer Defendants' conspiracy was publicly known.  For example, investors spent millions to launch TeraExchange in 2011 with the expectation the market would move to the all-to-all trading the buy side clearly demanded.  Javelin launched its business at the end of 2011 and, by late 2014, had signed up approximately 80 buy-side entities to trade on its all-to-all platform.  In 2013, TrueEX also sought to bring anonymous all-to-all trading to market.  It would have been economically irrational for these businesses — which included industry experts — to make these large investments to pursue all-to-all trading of IRS if there had been any indication of the Dealer Defendants' conspiracy.

### A.     Defendants' Conspiracy Was Concealed From Plaintiffs

330.     By its very nature, Defendants' conspiracy was self-concealing.  The Dealer Defendants knew their joint efforts to boycott market offerings that expanded competition to the buy side would not have succeeded if they had been made public.

331.     Accordingly, as detailed herein, Defendants executed their conspiracy, in large part, through secret meetings and discussions.  These meetings were often, although not exclusively, held under the cover of meetings connected with ostensibly independent market actors, like Tradeweb or ISDA or other industry bodies or consortia identified herein.  These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions, in fact, often had no valid connection to the legitimate work of the boards, committees, and other entities.  Plaintiffs had no reason to believe these meetings were being used by Defendants to execute a conspiracy to block the anonymous, all-to-all trading of IRS.

332.    Defendants also met secretly at the offices and homes of their senior executives and at restaurants in New York City.  The details of these meetings were secret, as were the identities of the individuals attending the meetings.  Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a whole.  Defendants also regularly communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging.  Plaintiffs had no way to access such communications.

333.    The nature and structure of the opaque, OTC market for IRS that Defendants had fostered kept their conspiracy concealed from the public.  In this market, the Dealer Defendants' actual quotes and prices for IRS were not public information, making any comparison of quotes among competitors, or scrutiny of bid/ask spreads by a Dealer Defendant, effectively impossible.

334.    Defendants also repeatedly offered false and misleading public explanations for their conduct, which were intended to conceal the true reasons for their actions.  Defendants made false and misleading statements in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of evolution in the IRS market, and they represented that their actions were beneficial to the market.

335.    When the Dealer Defendants effectively took control of Tradeweb in 2007, they purportedly limited their collective investment to 15% of its equity in order to perpetuate Tradeweb's outward appearance of independence.  In reality, Dealer Defendants actually created two companies:  a publicly promoted one through which they could display a minority ownership interest, but also, a second, secret company, in which Dealer Defendants in fact commanded 80% majority ownership and control.  As discussed above, Dealer Defendants purposefully issued

press releases trumpeting the "minority" stake in the first company exclusively, while concealing their dominance of the other company they newly created, which was the company from which strategic IRS trading was to be controlled.  The Dealer Defendants did this in a deliberate effort to hide their conduct from attention and scrutiny.  And this effort was successful.

336.    Tradeweb publicly claimed that the deal would be beneficial to the buy side because it would provide "[a]ccess to a deep pool of dealer liquidity for interest rate swaps," "[a]ccurate pricing information off which to drive analytics and modeling," and "[g]reater market transparency, increased trading effectiveness and reduced operational complexity for both the buy-side and sell-side."[146]  In reality, the deal allowed the Dealer Defendants to build a forum for collusion and market control through which they could prevent all of the market evolution that Tradeweb claimed would result from the deal.

337.    At the same time, the Dealer Defendants perpetuated the false claim that the investment was a procompetitive partnership with Tradeweb that would help Tradeweb make more innovative offerings to the market.  Vic Simone, Global Head of Principal Strategic Investments for Goldman Sachs, stated, on behalf of the Dealer Defendants taking over Tradeweb, that they were "pleased to partner with TradeWeb to provide our clients with the transparency, price discovery and efficiency of electronic execution."[147]  Mr. Simone added: "Together, we will provide new solutions that reduce technology complexity, increase settlement accuracy and drive best-execution pricing."[148]

---

[146]    TRADEWEB, *supra* note 4.

[147]    *Id.*

[148]    *Id.*

338.    Similarly, when Barclays acquired a stake in Tradeweb in 2009, Harry Harrison, the Head of Rates for Barclays, falsely claimed that the purchase was an effort to "deliver[] best-in-class service, liquidity and reliability in the electronic trading space to our clients."[149]  He added that "[o]ur stake in Tradeweb also complements our strategy for improving market efficiency and transparency alongside our market-leading electronic trading platform, BARX."  Billy Hult, President of Tradeweb, claimed that including Barclays in the venture was important because of its ability to provide "improved price transparency, speed of execution and more streamlined post-trade processing."[150]

339.    Defendants also attacked order-book trading of IRS to cover their collusive efforts.  Dexter Senft, Morgan Stanley's Global Head of Fixed Income E-Commerce, stated that "[f]ixed income securities[, which include IRS,] just aren't suitable to trade on [an order book] as it's too risky to be a price maker."[151]  Laurent Paulhac, the CEO of ICAP's SEF, has similarly warned that "[i]n electronic trading, market participants can get hurt very quickly, especially if they are in a central limit order book.  In times of stress you need to be able to put buyers and sellers together."[152]  Such statements were intentionally misleading in light of the fact, for example, that ICAP offers an order book and that it is used by the Dealer Defendants, including Morgan Stanley.[153]

---

[149]    TRADEWEB, *supra* note 4.

[150]    *Id.*

[151]    Helen Bartholomew, *Swaps Market Structure Changes Create Fragility*, INT'L FIN. REV. (Sept. 24, 2015), http://www.ifre.com/swaps-market-structure-changes-create-fragility/ 21217649.fullarticle.

[152]    *Id.*

[153]    Ironically, Senft, in a momentary lapse from Defendants' script, intimated that the buy-side should use all-to-all anonymous order books, stating that the buy-side "should access [SEFs] in the way that gives them the best execution.  At the moment, there's arguably not

340.     At the same time that the Dealer Defendants used their collective power to constrain the buy side to their positions as clients in the dealer-to-client market structure, representatives of the Dealer Defendants made statements that the buy side could act as market makers if they wished.  Kevin Arnold, former Head of FX Trading, Rates, and Credit for the Americas at UBS, for instance, has stated as recently as August 2015 that "[n]on-banks are welcome" to provide liquidity in interest rate swaps.[154]

341.     Defendants also intentionally provided pretextual reasons for the persistence of post-trade name give-up.  Laurent Paulhac, for instance, claimed in April 2015 that ICAP continues the practice because anonymity "would be a difficult step for any platform to take, but for operational and competitive reasons, rather than any fear of retaliation."[155]  Such claims falsely attribute the persistence of name give-up to market choice.

342.     Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the IRS market.  The Dealer Defendants have the power to make buy-side firms thrive or perish.  Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation.  Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.  Defendants'

---

enough liquidity in the central limit order books to constitute best execution, but once it's there, and I think that's just a question of time, folks will experiment and determine what is best execution."  Daniel O'Leary, *SEF Sector Participants Look Beyond Short Term Hitches*, GLOBALCAPITAL (July 7, 2014), http://www.globalcapital.com/article/m438s24rf8l4/sef-sector-participants-look-beyond-short-term-hitches.

[154]   Smith, *supra* note 84.

[155]   Madigan, *supra* note 84.

power, and willingness to use it to silence, penalize, and exclude those who oppose their interests, help explain why the first hints of Defendants' conspiracy did not emerge until 2015.

343.    These actions and statements by Defendants, individually and in the aggregate, affirmatively concealed Defendants' conspiracy.  These affirmative representations, acts of concealment, and the inherently self-concealing nature of the conduct at issue made it impossible for Plaintiffs to discover Defendants' conspiracy prior to June 2014 at the earliest.

**B.**    **Plaintiffs' Inability to Discover the Conspiracy Did Not Result from a Lack of Diligence**

344.    Because Defendants employed acts and techniques that were calculated to conceal the existence of such illegal conduct, Plaintiffs could not have discovered the existence of this unlawful conduct through their exercise of due diligence any earlier than June 2014.

345.    Plaintiffs, either directly or through professional investment advisors and/or managers they hired, regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.

346.    Throughout the Class Period, Plaintiffs, either directly or through professional investment advisors and/or managers they hired, regularly monitored news reports concerning the financial industry and the IRS market.  Plaintiffs undertook such activity in order to invest wisely and maximize the returns on their investments.  Throughout the Class Period, Plaintiffs, either directly or through professional investment advisors and/or managers they hired, also regularly monitored prices and bid/ask spreads within the IRS market, to the extent such monitoring was possible.  For example, Plaintiffs, directly or through their investment managers or advisors, regularly monitored available IRS pricing data through electronic databases and other sources, including Bloomberg and ICAP.

347.    Practically speaking, there were limits to what could be done, given that so much of the IRS market was shrouded in secrecy due to Defendants' conduct.  The pricing data available to Plaintiffs did not reflect real-time bid/ask spreads available in the market.  Plaintiffs' inability to obtain real-time data on bid/ask spreads was a direct result of the agreements Defendants reached to keep the IRS market opaque.

348.    Plaintiffs also retained and consulted with sophisticated investment managers to manage their investments, including their IRS investments, monitor the financial markets, including the IRS market and their IRS investments, and obtain the best possible IRS pricing.  In this regard, one of Chicago Teachers' investment managers that was retained to manage a portion of the Fund's assets, and is familiar with the market, invested in IRS contracts on behalf of Chicago Teachers.  Similarly, one of Genesee's investment managers that was retained to manage a portion of the Fund's assets, and is familiar with the market, invested in IRS contracts on Genesee's behalf.  For each IRS contract Baltimore entered into, it engaged a swaps advisor that advised Baltimore on the best hedging strategy for the city.  This included advising Baltimore on the structuring, execution and negotiation of IRS contracts, as well as helping it select the best counterparties and terms for its IRS purchases.

349.    None of these Plaintiffs was informed by their investment managers of facts that would have put a reasonable person on notice of the fact that Defendants were colluding to prevent buy-side access to all-to-all trading in the IRS market.  These Plaintiffs relied on the advice, monitoring, and diligence of their investment managers.

350.    Thus, at no time prior to the June 2014 events identified above did any of the Plaintiffs believe or have reason to believe that the Dealer Defendants' pricing of IRS was a

result of or affected by a secret and unlawful conspiracy among the Defendants to block competition from all-to-all trading and to keep bid/ask spreads artificially inflated.

351.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

352.    Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

353.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

> All persons or entities who, from January 1, 2008 to the present, directly entered into fixed-for-floating, floating-for-fixed, or floating-for-floating interest rate swaps with the Dealer Defendants, or their respective affiliates, in the United States and its territories. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, and current subsidiaries or affiliates (the "Class").

354.    *Numerosity.*  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are thousands of class members geographically dispersed throughout the United States.

355.    *Typicality.*  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when they were on the other side of a swap.

356.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.

Accordingly, by proving its own claims, Plaintiffs will prove other class members' claims as well.

357.    ***Adequacy of Representation.***  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

358.    ***Commonality.***  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves and to boycott all-to-all trading platforms that were open to the buy side, thereby inflating prices associated with the purchase and sale of IRS in the United States;

b.    Whether Defendants' conduct violated the antitrust laws;

c.    Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

d.    The effect of Defendants' alleged conspiracy on the prices associated with the purchase and sale of IRS sold in the United States during the Class Period;

e.    The appropriate measure of damages sustained by Plaintiffs and other members of the Class;

f.    Whether Plaintiffs and other class members are entitled to injunctive relief; and

g.    The appropriate injunction needed to restore competition.

359.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

360.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

361.    *Ascertainability*.  The members of the Class are ascertainable by applying objective criteria to business records.

362.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

363.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

364.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to restrict competition in the dealer-to-client IRS market and to jointly boycott entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

365.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

366.    IRS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

367.     Other derivative products are not substitutable for IRS.  The rapid rise in IRS volume following their inception in the mid-1980s demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

368.     The relevant geographic market is the United States.  The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

369.     As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in IRS trades between Defendants and their non-dealer customers has been severely curtailed.  Plaintiffs and class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Plaintiffs' and each class member's damages are directly attributable to Defendants' conduct, which resulted in all class members paying artificially inflated bid/ask spreads on every IRS they purchased or sold during the Class Period.  Plaintiffs' injuries consist of artificially inflated costs associated with the purchase and sale of IRS in the United States caused by Defendants' misconduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

370.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

371.     Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

372.     Plaintiffs and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

373.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a.      Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

b.      Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

c.      Award the Class treble damages;

d.      Award reasonable attorneys' fees and costs;

e.      Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

f.      Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of fully anonymous all-to-all trading of IRS open to the buy side in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class;

h.      Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market valuable to not only Plaintiffs and class members but also to the nation's

financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.     Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and

the proposed Class, demand a trial by jury on all issues so triable.


DATED: New York, New York
September 9, 2016

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:    /s/ J. Douglas Richards
J. Douglas Richards
Michael B. Eisenkraft
Sharon K. Robertson
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com
srobertson@cohenmilstein.com

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Fax: (312) 357 0369
cgilden@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Jeffrey Dubner (*pro hac vice*)
Robert W. Cobs (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408 4600
Fax: (202) 408 4699
stoll@cohenmilstein.com
jdubner@cohenmilstein.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:    /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Daniel Cunningham
Justin Reinheimer
David LeRay
Miles H. Plant
Kanika Shah (*pro hac vice*)
Thomas Popejoy (admission pending)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
danielcunningham@quinnemanuel.com
justinreinheimer@quinnemanuel.com
davidleray@quinnemanuel.com
milesplant@quinnemanuel.com
kanikashah@quinnemanuel.com
thomaspopejoy@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*

129

**JACOBS BURNS ORLOVE &
HERNANDEZ**

Joseph M. Burns
William W. Leathem
150 North Michigan Avenue, Suite 1000
Chicago, Illinois 60601
Telephone: (312) 327-3446
Fax: (312) 580-7175
jburns@jbosh.com
wleathem@jbosh.com

*Attorneys for Public School Teachers'
Pension and Retirement Fund of Chicago*

**LABATON SUCHAROW LLP**

Gregory S. Asciolla
David J. Goldsmith
Karin E. Garvey
Robin A. van der Meulen
Matthew J. Perez
140 Broadway
New York, New York 10006
Telephone: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
dgoldsmith@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Attorneys for Genesee County Employees'
Retirement System*

**SUSMAN GODFREY L.L.P.**

William Christopher Carmody
Arun Subramanian
Seth Ard
Cory Buland
Elisha B. Barron
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
cbuland@susmangodfrey.com
ebarron@susmangodfrey.com

*Attorneys for Mayor and City Council of
Baltimore*