UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              :
IN RE:                                                        :
                                                              :
INTEREST RATE SWAPS ANTITRUST LITIGATION                      :        16-MD-2704 (PAE)
                                                              :
*This Document Relates to Tera Group, Inc., et al. v. Bank*   :        **JURY TRIAL DEMANDED**
*of America Corporation, et al., 16-cv-02858 (PAE)*           :
*(S.D.N.Y.) and Javelin Capital Markets LLC, et al. v.*       :
*Bank of America Corporation, et al., 16-cv-03542 (PAE)*      :
*(S.D.N.Y.)*                                                  :
                                                              :
------------------------------------------------------------- X


**JAVELIN AND TERAEXCHANGE**
**PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ................................................................................1

PARTIES .............................................................................................................9

    A.    Plaintiffs.................................................................................9

    B.    Defendants ............................................................................10

JURISDICTION AND VENUE .............................................................................21

FACTUAL ALLEGATIONS ................................................................................22

I.    THE MARKET FOR INTEREST RATE SWAPS .............................................22

    A.    The Trading of Interest Rate Swaps.................................................22

    B.    The Dodd-Frank Act .................................................................28

II.    PLAINTIFFS' CREATION OF ALL-TO-ALL INTEREST RATE SWAPS
    TRADING PLATFORMS ..............................................................................30

    A.    Javelin's Development of an All-to-All Trading Platform ...................30

    B.    TeraExchange's Development of an All-to-All Trading Platform ........32

III.    DEFENDANTS CONSPIRED TO BOYCOTT JAVELIN, TERAEXCHANGE,
    AND OTHER ALL-TO-ALL TRADING PLATFORMS .................................36

    A.    The Dealer Defendants Boycotted Javelin.........................................42

    B.    The Dealer Defendants Boycotted TeraExchange .................................52

    C.    The Dealer Defendants Similarly Boycotted Other All-to-All Trading
    Platforms .................................................................................62

    D.    The Dealer Defendants Deter Buy-Side Customers From Trading on
    Javelin, TeraExchange, and Other All-to-All Trading Platforms ..........63

        1.    The Dealer Defendants withhold clearing services to buy-side
        firms that attempt to trade on Javelin, TeraExchange, and other all-
        to-all platforms.........................................................................64

        2.    The Dealer Defendants insist on "name give-up" to deter buy-side
        participation on all-to-all platforms ..........................................66

        3.    The Dealer Defendants place transgressors in the "penalty box"..............74

E.     The Dealer Defendants' Conduct Has Chilled Market Progress ..........................77

IV.   DEFENDANTS' OTHER EFFORTS TO BLOCK ALL-TO-ALL TRADING OF INTEREST RATE SWAPS......................................................................................78

A.     The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform......................................78

B.     The Dealer Defendants Utilize Other Forums to Collude .....................................90

C.     The Dealer Defendants Prevent Interdealer Brokers From Opening All-to-All Trading Platforms to the Entire Market............................................................92

D.     The Dealer Defendants Prevent Clearinghouses from Bringing All-to-All Trading to the Market ...............................................................................................99

V.    ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD PREDOMINANTLY TRADE ON JAVELIN, TERAEXCHANGE, AND OTHER ALL-TO-ALL TRADING PLATFORMS .......................................................101

A.     Relevant Market.......................................................................................................101

B.     The Dealer Defendants Have Substantial Market Power ...................................101

C.     Defendants' Conspiracy Robbed Javelin and TeraExchange of  Substantial Profits..........................................................................................................................102

D.     Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes.........................................103

E.     Investigations and Litigation Concerning the Credit Default Swaps Market and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants to Manipulate Various Aspects of the Financial System .....................................105

1.     The Dealer Defendants' Misconduct in the Credit Default Swaps Market...........................................................................................................106

2.     The Dealer Defendants' Manipulation of ISDAfix .................................109

VI.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY .....................................110

CAUSES OF ACTION .......................................................................................................112

FIRST CAUSE OF ACTION (VIOLATION OF SECTION 1 OF THE SHERMAN ACT) .................................................................................................................................112

SECOND CAUSE OF ACTION (VIOLATION OF THE DONNELLY ACT).........................113

THIRD CAUSE OF ACTION (UNJUST ENRICHMENT) .......................................................114

FOURTH CAUSE OF ACTION (TORTIOUS INTERFERENCE WITH BUSINESS
       RELATIONS)...........................................................................................................114

PRAYER FOR RELIEF ......................................................................................................115

JURY DEMAND .................................................................................................................117

Plaintiffs Javelin Capital Markets LLC and Javelin SEF, LLC (together, "Javelin"), and Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC (together, "TeraExchange," and collectively with Javelin, "Plaintiffs"), by and through their undersigned attorneys, allege as follows:

## OVERVIEW OF THE ACTION

1.      This case concerns a conspiracy among major interest rate swaps ("IRS") dealers ("Dealer Defendants") to boycott Plaintiffs in order to undermine increased competition in the IRS market and thereby maintain the Dealer Defendants' massive profits.[1] By boycotting and thus destroying Plaintiffs' trading platforms, all Defendants have succeeded in blocking IRS customers, such as pension funds and municipalities, from enjoying the benefits of greater price transparency and competition. Defendants used a variety of mechanisms, including blocking anonymous trading, to promote their conspiracy and ensure that only the Dealer Defendants had access to competitive and transparent IRS pricing.

2.      An IRS is a type of financial derivative. It is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time. In the most common type of swap — often referred to as a "plain vanilla" swap — one counterparty pays the other a *fixed* interest rate in exchange for receiving a *floating* interest rate. The floating rate is often tied to an industry benchmark (or "reference rate"), such as the London Interbank Offered Rate ("LIBOR"). The counterparty paying a fixed rate is typically referred to as the "buyer," and the counterparty making payments at the floating rate is known as the "seller." The

---

[1] As more fully defined below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

value of the contract to each side moves (in opposite directions) depending on changes in interest rates.

3.       IRS are an important financial tool used by an array of investors to manage risk and protect themselves against fluctuating interest rates. For example, a municipality that issued a floating-rate bond to pay for a clean-water project might later use an IRS to convert floating-rate payments on the bond into fixed payments in order to hedge against interest-rate increases. IRS comprise one of the largest financial markets, with billions of dollars in swaps (in notional value) traded each day. Non-dealers seeking to trade IRS ("buy-side customers") have historically been limited to a dark and inefficient over-the-counter ("OTC") market where they must individually contact one or more of the Dealer Defendants for price quotes.

4.       Plain vanilla IRS have long been viable candidates for electronic trading because of their standardized structure and high level of transaction frequency. Specifically, they have been viable candidates for electronic trading protocols that can facilitate an "all-to-all" environment, which would allow buy-side customers to trade IRS with a larger community of market participants, including smaller dealers and other buy-side customers. On platforms that offer all-to-all trading protocols, a buy-side customer can trade with *any* qualified trading partner and is not artificially limited to trading with just the Dealer Defendants that have historically acted as dealers. "All-to-all" trading yields greater price competition because it increases the number of potential counterparties with whom buy-side customers can trade. The increase in price competition saves these buy-side customers money by lowering their transaction costs.

5.       Yet, despite the buy-side's demand for more efficient and competitive electronic trading of IRS, and despite Plaintiffs' substantial investments to provide all-to-all trading platforms to the buy-side, investors today remain stuck in an inefficient and antiquated market

environment that forces them to trade IRS exclusively through the Dealer Defendants. This state of affairs is the result of a carefully planned and well-orchestrated conspiracy, among the Dealer Defendants, to boycott and destroy the trading platforms developed by Plaintiffs that sought to provide all-to-all trading protocols to the buy-side.

6.      The Dealer Defendants conspired because they "want desperately to preserve the status quo" in order to protect the tremendous information advantage they enjoy in the market, which enables them to make extraordinary profits.[2] As noted, the Dealer Defendants have historically acted as the primary market makers in the OTC market for IRS, meaning one of them was typically on one side of every IRS trade. In this OTC market, trading was typically conducted over the telephone by "voice."

7.      The voice-based, OTC market for IRS conferred tremendous advantages on the dealers at the expense of buy-side customers. Voice-based, OTC trading in IRS forced the buy-side to rely exclusively on dealers for price information because there was little or no price visibility available elsewhere. In order to obtain an actionable price quote, the buy-side entity had to contact one of the dealers and disclose its identity, the intended direction of the trade (pay fixed or receive fixed), and the desired notional amount — critically important information that the dealer could use to its own advantage.

8.      Executing an IRS trade in the voice-based, OTC market was also very restrictive. To complete a transaction, the dealers required buy-side customers to execute trades "on the wire," meaning that executable prices were only available when the buy-side customer was directly engaged with the respective dealer over the phone. As a result, buy-side customers were

---

[2] Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

severely limited in their ability to force multiple dealers to compete directly on price. In short, the voice-based, OTC market for IRS was an opaque form of trading that did not provide an efficient means of competitive price shopping by buy-side customers and denied those customers access to actionable, real-time price information. The deck was stacked in favor of the dealers and against their customers.

9.      As a result, the voice-based OTC market allowed the Dealer Defendants to generate tremendous profits. For every IRS, a Dealer Defendant has a "bid" price, at which it will purchase the IRS, and an "ask" price, at which it will sell the IRS. When the dealer purchases an IRS at a lower bid price, and then sells an IRS with the same terms at a higher ask price, the dealer realizes a profit on the difference between the prices, known as the "spread." In the dealer-to-customer OTC market, these bid/ask spreads are grossly inflated, allowing the dealers to earn huge profits.

10.     But financial markets develop and evolve — or at least they are supposed to. By the 1990s, technological advances were bringing electronic trading to a variety of financial markets. Electronic trading in fixed income securities was introduced in the mid-1990s and began gathering momentum in the IRS market in the early 2000s.

11.     The evolution of the IRS market to electronic trading should have displaced the archaic and inefficient protocols of the voice-based trading regime. Recognizing as much, Congress sought to bring more price transparency and competition to the markets for IRS and other derivatives with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or "Dodd-Frank Act"). Dodd-Frank mandates, for example, that standard IRS move to exchanges or Swap Execution Facilities ("SEFs"), which were envisioned as electronic

all-to-all trading platforms that would allow trading on an all-to-all limit order book.[3] Rules issued pursuant to Dodd-Frank were intended to make the derivatives markets – which were assailed following the financial crisis – safer, more transparent, and more competitive.

12.     Javelin and TeraExchange were founded in 2009 and 2010, respectively, by separate groups of derivative trading and technology professionals to develop the anonymous all-to-all trading platforms demanded by buy-side customers. Javelin and TeraExchange each spent millions of dollars and invested years of effort to develop and implement their electronic all-to-all trading platforms.

13.     What Javelin's and TeraExchange's founders did not realize was that the reason no anonymous all-to-all trading platforms existed was because the Dealer Defendants had conspired to boycott entities offering modern, all-to-all trading to buy-side customers.

14.     The Dealer Defendants conspired for one simple reason: to continue to enjoy an extraordinary profit center. By blocking the entry of Javelin, TeraExchange, and other similar all-to-all trading platforms into the IRS market, the Dealer Defendants force the buy-side to trade with them in an opaque OTC market and thereby extract billions of dollars in monopoly rents, year after year.

15.     Absent collusion, the lack of transparency and limited price competition that pervades the IRS market would have disappeared long ago. Because of the benefits of transparency, competitive pricing, and immediacy, markets for financial products historically have moved to all-to-all trading platforms soon after the products become sufficiently standardized and liquid. Because of its maturity, size, and high-level of standardization, the IRS

---

[3] An "all-to-all limit order book" is an electronic trading platform where participants can submit bids and offers, which are then automatically matched in order to facilitate efficient trading.

market has long been primed for such all-to-all trading. Faced with a variety of threats of evolution to this modern form of trading, the Dealer Defendants banded together via a horizontal conspiracy, joined by co-conspirators ICAP Capital Markets LLC ("ICAP") and Tradeweb Markets LLC ("Tradeweb"), to protect the highly-profitable market structure that they dominated.

16.     In particular, the Dealer Defendants engaged in a group boycott aimed at shutting down Javelin, TeraExchange, and other trading platforms that would allow the buy-side to trade on an all-to-all order book. The Dealer Defendants' efforts to squash Plaintiffs have taken several forms, including refusing to deal with Plaintiffs, using clearing affiliates to refuse clearance of trades on Javelin and TeraExchange, and confronting customers who used or considered using Javelin or TeraExchange with loss of business or services, or increased fees with the Dealer Defendants.

17.     The Dealer Defendants themselves trade IRS *among each other* on efficient, electronic platforms operated by entities known as interdealer brokers ("IDBs"). Under collective pressure from the Dealer Defendants, IDBs allow only *dealer-to-dealer* transactions. If an IDB were to allow buy-side customers access to its platform, the bifurcation of the market desired by the Dealer Defendants would have collapsed long ago. The Dealer Defendants therefore make sure that any IDB that dares to consider opening its platform to the buy-side is put in the "penalty box" and blackballed. Defendant ICAP, the leading IDB for IRS, has agreed with the Dealer Defendants to not open its interdealer platforms to the buy-side in exchange for the dealers' promise of continued liquidity and the primary market share in the interdealer market.

18.     The Dealer Defendants police the threat posed by IDB trading platforms through a practice known as "name give-up."  Name give-up requires disclosure of the identity of each

swap counterparty to the other on every trade. The Dealer Defendants impose this practice on IDBs for the sole purpose of enabling the dealers to ensure that no buy-side customer trades IRS on the IDBs' efficient, electronic platforms. Any SEF that does not implement name give-up, such as Javelin or TeraExchange, is hung out to dry by the Dealer Defendants' cartel.

19.     Thus, even as they enjoy the benefits of exchange trading among themselves, the Dealer Defendants deny those benefits to their buy-side customers. Buy-side customers have been effectively "shut out" of this "paradise of infinite liquidity and tight pricing."[4]

20.     As a result of the Defendants' collusion, Javelin and TeraExchange today effectively facilitate no IRS trading despite years of development and millions of dollars in investment capital. Absent the Dealer Defendants' group boycott, IRS market participants would trade on Javelin's and TeraExchange's platforms. The boycott of Javelin, TeraExchange, and other anonymous all-to-all trading platforms fits a pattern of collusion among the Dealer Defendants and others designed to manipulate various aspects of the financial system, including the market for credit default swaps and interest-rate derivatives.

21.     The Defendants' collusion is responsible for the irrational persistence of antiquated trading practices that deprive the IRS market of the cost savings and transparency associated with all-to-all trading. The only SEFs — including Tradeweb's — that today have any meaningful buy-side customer trading activity in effect require platform participants to trade directly with a Dealer Defendant through a trading method whereby the customer places a "request for quote" ("RFQ") with one or more dealers. This RFQ method prevents the market

---

[4] Joe Rennison, *Meet the new OTC market-makers*, RISK (Feb. 27, 2014), http://www.risk.net/risk-magazine/feature/2331122/meet-the-new-otc-market-makers.

from experiencing the true benefits of all-to-all trading and is the functional equivalent of transacting on the voice-based OTC market.

22.     Defendant Tradeweb acts as the primary forum for Defendants' collusion. In late 2007, the Dealer Defendants began to be concerned about plans by Tradeweb, which was then owned by Thomson Reuters, to introduce more competition to the IRS market, in the form of an all-to-all trading platform. To respond to this threat from Tradeweb, and other entities planning similar initiatives, Goldman Sachs championed a "consortium" strategy. As part of this strategy, Goldman Sachs proposed to work together with other primary dealers in the IRS market (*i.e.*, Goldman Sachs' competitors) to neutralize Tradeweb by jointly investing in the company, taking over its Board of Directors and key committees, and stopping it from moving forward with its plans for an all-to-all trading platform. Goldman Sachs also realized that the Dealer Defendants could use Tradeweb as a vehicle to coordinate their conduct and control of the IRS market going forward.

23.     And that is exactly what the Dealer Defendants did. As part of a coordinated effort they named "Project Fusion," the Dealer Defendants (Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS, later joined by Citigroup, Bank of America and then Barclays) jointly took control of Tradeweb. After doing so, they made sure Tradeweb would not convert its platform to an anonymous order book for the trading of IRS. They also agreed to commit liquidity to Tradeweb and to withhold support from other trading platforms that threatened their privileged position in the market. Against its own economic self-interest, Tradeweb agreed with the Dealer Defendants to shutter the possibility of offering competitive all-to-all IRS trading, and to forego the lucrative brokerage fees that would come from facilitating such transactions.

24.     The Dealer Defendants installed themselves on Tradeweb's Board of Directors and a variety of "committees" that meet to discuss the IRS market, secretly, under the cover of a supposedly legitimate and independent enterprise. Since at least 2008, key strategic personnel from the Dealer Defendants — many identified by name and position below — have used the auspices of Tradeweb to coordinate their conduct to ensure the IRS market does not develop in ways that threaten their collective dominance.

25.     As a result of the Dealer Defendants' collusion, the IRS market has not developed in the manner that financial markets typically do. The Dealer Defendants have instead collectively kept it frozen in time for their own selfish purposes.

26.     Yet, because Defendants' conspiracy to maintain a bifurcated market is not expressly prohibited by the Dodd-Frank Act, the Commodity Futures Trading Commission ("CFTC"), the Dodd Frank Act's primary regulator with respect to the swaps market, is unable to address the anticompetitive harms described herein. Defendants' conspiracy is, however, prohibited by the Sherman Act, whose crucial role in putting a stop to collusive conduct by competitors Congress carefully and expressly preserved.[5]

## PARTIES

### A.     Plaintiffs

27.     Plaintiff Javelin Capital Markets, LLC is a Delaware limited liability company that is registered to do business in New York. Javelin Capital Markets, LLC's principal place of business is in New York, New York.

---

[5] *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."). *See also* 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

28.     Plaintiff Javelin SEF, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Javelin SEF, LLC conducts swap execution activities, and has been granted permanent registration as a SEF by the CFTC. Javelin SEF, LLC is a wholly owned subsidiary of Javelin Capital Markets, LLC.

29.     Plaintiff Tera Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Summit, New Jersey.

30.     Plaintiff TeraExchange, LLC is a Delaware limited liability company with its principal place of business in New York, New York. TeraExchange, LLC conducts swap execution activities, and has been granted temporary registration as a SEF by the CFTC. TeraExchange, LLC is a wholly owned subsidiary of Tera Group, Inc.

31.     Plaintiff Tera Advanced Technologies is a Delaware limited liability company with its principal place of business in Summit, New Jersey. Tera Advanced Technologies creates and provides to TeraExchange, LLC technology utilized to operate its SEF. Tera Advanced Technologies is a wholly owned subsidiary of Tera Group, Inc.

**B.      Defendants**

32.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

33.     Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. BAC was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiffs. Defendant Bank of America, N.A. ("BANA") is a federally

chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York. BANA is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, BANA agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. MLPFS is a wholly owned subsidiary of BAC. In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

34.   As used herein, the term "Bank of America" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that participated in the IRS market.

35.   Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York. Barclays Bank PLC was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiffs. Barclays Bank PLC is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Barclays Bank PLC agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York, and is a

wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned subsidiary of Barclays Bank PLC. In addition, Barclays Capital Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

36.     As used herein, the term "Barclays" includes Defendants Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that participated in the IRS market. Barclays Bank PLC maintains a New York branch.

37.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch. BNPP SA is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, BNPP SA agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

38.     As used herein, the term "BNPP" includes Defendants BNPP SA, BNPP Securities, and their subsidiaries and affiliates that participated in the IRS market. BNPP transacts business in New York, New York.

39.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Citigroup was a shareholder of Tradeweb during the relevant period and was part of the

conspiracy against Plaintiffs. Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York. Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England. Citibank, Citigroup Global Markets Inc., and Citigroup Global Markets Limited are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Citibank, Citigroup Global Markets Inc., and Citigroup Global Markets Limited agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

40.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that participated in the IRS market.

41.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Credit Suisse Group AG was a shareholder of Tradeweb during the relevant period and was part of the conspiracy against Plaintiffs. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Credit Suisse International is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part

of the conspiracy, Credit Suisse International agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

42.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that participated in the IRS market.

43.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Deutsche Bank AG was a shareholder of Tradeweb during the relevant period and was part of the conspiracy against Plaintiffs. In addition, Deutsche Bank AG is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Deutsche Bank AG agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

44.     As used herein, the term "Deutsche Bank" includes Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that participated in the IRS market. Deutsche Bank maintains a New York branch.

45.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. The Goldman Sachs Group was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiffs. Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs Bank USA is a New York state-chartered bank, with its principal place of business in New York, New York. Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Goldman Sachs & Co.; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Goldman Sachs & Co.; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

46.     As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that participated in the IRS market.

47.     Defendant HSBC Bank PLC is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant HSBC Bank USA, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia, and branch locations in New York, New York. HSBC Bank PLC and HSBC Bank, USA, N.A. are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, HSBC Bank PLC and HSBC Bank, USA, N.A. agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. Defendant HSBC Securities (USA) Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

48.     As used herein, the term "HSBC" includes Defendants HSBC Bank PLC, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., and their subsidiaries and affiliates that participated in the IRS market.

49.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant period, J.P. Morgan Chase & Co. was a shareholder of Tradeweb and was part of the conspiracy against Plaintiffs. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Securities Plc is a corporation

organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co. J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

50.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc, and their subsidiaries and affiliates that participated in the IRS market.

51.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant period, MS was a shareholder of Tradeweb and was part of the conspiracy against Plaintiffs. Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah. Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant

Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is MS. Defendant Morgan Stanley Bank International Limited is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS. Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. In addition, MS&C is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

52.     As used herein, the term "Morgan Stanley" includes Defendants MS; Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and Morgan Stanley Capital Products LLC, that participated in the IRS market.

53.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation

organized and existing under the laws of England and Wales with its principal place of business

in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut.

RBS PLC is registered as a swap dealer with the CFTC, and, during the relevant period, it

entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, RBS

PLC agreed with the other Defendants to, and did, boycott the Plaintiffs' platforms, located in

New York. During the relevant period, RBS Group PLC was a shareholder of Tradeweb and was

part of the conspiracy against Plaintiffs. Defendant RBS Securities Inc. is a corporation

organized and existing under the laws of Delaware, with its principal place of business in

Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC. In addition, RBS

Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and

refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

54.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC,

RBS Securities Inc., and their subsidiaries and affiliates that participated in the IRS market. RBS

PLC maintains a New York branch.

55.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under

the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and

regional offices in New York, New York and Stamford, Connecticut. UBS AG is registered as a

swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with

the buy-side in the United States. As part of the conspiracy, UBS AG agreed with the other

Defendants to, and did, boycott the Plaintiffs' platforms, located in New York. UBS AG was a

shareholder of Tradeweb. Defendant UBS Securities LLC is a corporation organized and existing

under the laws of Delaware, with its principal place of business in New York, New York. UBS

Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC, and refused to clear trades on Plaintiffs' platforms as part of the conspiracy.

56.     As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that participated in the IRS market. UBS maintains a New York branch.

57.     Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey. As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities. In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers.

58.     Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Tradeweb Markets is the successor by merger to Tradeweb New Markets LLC, a financial services company with its principal place of business in New York, New York. As used herein, the term "Tradeweb" includes Tradeweb Markets and its subsidiaries and affiliates that provided trading services for IRS, CDS, and other asset classes. Tradeweb has historically focused on providing electronic trading services in the dealer-to-customer side of the market. Tradeweb is jointly owned by Thomson Reuters and a consortium of Wall Street Dealers (the Dealer Defendants other than BNPP and HSBC).[6] The Dealer Defendants exercise control over Tradeweb.

---

[6] *See* Matthew Leising, *Tradeweb's Bank Owners Said to Consider New Bond-Trading System*, BLOOMBERG (Nov. 23, 2013), http://www.bloomberg.com/news/articles/2013-11-22/tradeweb-s-bank-owners-said-to-consider-new-bond-trading-system.

## JURISDICTION AND VENUE

59.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees,

against Defendants for the injuries to Plaintiffs alleged herein, arising from Defendants'

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

60.     This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331

and 1337(a).

61.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as

pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Plaintiffs resided, transacted business,

were found, or had agents in this District; all the Defendants resided, transacted business, were

found, or had agents in this District; a substantial part of the events or omissions giving rise to

these claims occurred in this District; and a substantial portion of the affected interstate trade and

commerce discussed herein was carried out in this District.

62.     Defendants' activities, and those of their co-conspirators, were within the flow of,

were intended to, and had a substantial effect on interstate commerce.

63.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many

Defendants are subject to personal jurisdiction in the United States because they were formed in

or have their principal places of business in the United States. In addition, all members of the

conspiracy are subject to personal jurisdiction in the United States because the conspiracy was

directed at, carried out in substantial part in, and had the intended effect of, causing injury to

Plaintiffs residing in, located in, or doing business throughout the United States. For example,

the Defendants directly conspired through and with Tradeweb, whose principal place of business

is in New York, New York, and at Tradeweb Board of Directors meetings in Miami and

elsewhere. Further, the Defendants conspired to boycott Javelin and TeraExchange, which are based in New York.

64.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. The IRS at issue in this action often included a contractual clause submitting the parties to jurisdiction in this District. Also, the IRS at issue were regularly traded through the desks of the Dealer Defendants located in New York. The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded IRS swaps in the United States as their agents, and if these agents did not, the Dealer Defendants would have to have made those trades themselves.

**FACTUAL ALLEGATIONS**

I.     **THE MARKET FOR INTEREST RATE SWAPS**

    A.     **The Trading of Interest Rate Swaps**

65.     When the market for IRS began, IRS contracts were not standardized and typically had to be negotiated and documented on a trade-by-trade basis. As a result, IRS trading involved high transaction costs. Nonetheless, because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of investors. Many entities also began to use IRS to speculate on movements in interest rates.

66.     The way in which IRS transactions took place evolved as trading activity increased. The industry adoption of the ISDA Master Agreement — first created in 1987 — drove the standardization of IRS. By no later than 2000, all of the material terms of most IRS — the tenor (i.e., the maturity or term of the swap), the fixed rate, the benchmark rates used to calculate floating payments, and the timing of payments — were standardized, resulting in lower transaction costs and higher volumes.

67.     Consequently, the IRS market has grown exponentially over the last three decades. From 2006 to 2014 alone, the outstanding notional value of IRS grew from $230 trillion to $381 trillion.

*The Dealer-to-Customer Market*

68.     As demand for IRS increased, the Dealer Defendants took on the role of market makers or liquidity providers in the IRS market. As market makers (also called the "sell-side"), these banks became the sellers of IRS, offering fixed and floating-rate cash flows to their customers — the so-called "buy-side."

69.     IRS trading typically works as follows: A buy-side customer asks a dealer for a quote either: (1) to pay the floating rate and receive a fixed rate, or (2) to pay the fixed rate and receive a floating rate. The rate at which the dealer will pay the fixed rate is known as the "bid," and the rate at which it will receive the fixed rate is known as the "offer" or the "ask." For instance, a five-year IRS may be quoted by a dealer at a bid of 1.25 and an ask of 1.27, meaning that the dealer will either make payments based on an annualized rate of 1.25% or receive payments based on an annualized rate of 1.27%. The fixed rate is the primary term that is subject to negotiation when entering into an IRS trade. A buy-side entity that seeks to pay the floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed rate. A buy-side entity seeking to pay the fixed rate and receive the floating rate will pay the "ask" or "offer" price quoted by a dealer for the fixed rate. The floating rate in either case is typically based on LIBOR. In some cases, the terms of trade include an upfront cash payment, in one direction or another.

70.     The Dealer Defendants profit by paying low on fixed rates (*i.e.*, the bid price) and receiving higher fixed rates (*i.e.*, the ask or offer price). This difference is known as the "bid/ask

spread" or the "spread." The wider the spread, the more money the Dealer Defendants make. The mid-point of the spread is generally known as the "mid-market price" or simply the "mid."

### *Voice Trading*

71.     Trading of IRS between dealers and buy-side customers has historically occurred in a voice-based, OTC market environment. In this environment, the trading process is almost exclusively conducted on the telephone, which has several features that limit the trading capabilities of the buy-side, while also providing significant advantages to the Dealer Defendants.

72.     Voice-based trading in IRS forced the buy-side, for example, to rely exclusively on the Dealer Defendants for real-time pricing information because there was very little reliable pre-trade pricing visibility. Logistically, calling all available dealers for price information was not realistic, so often buy-side customers would engage a very small community of dealers. In addition, in order to obtain price information, buy-side entities would have to disclose to each dealer they called their identity, the direction of their trade (pay fixed or receive fixed), and notional amount. This provided a one-way flow of information about upcoming trades to the dealer, which it could in turn use to its own trading advantage.

73.     Executing a trade in the voice-based IRS market was even more restrictive than the price discovery process. To complete a transaction, the Dealer Defendants required buy-side customers to execute trades "on the wire," meaning that executable markets were only available when the buy-side customer was physically engaged with the respective dealer over the phone. As a result, buy-side customers were unable to shop around to as many dealers as they would like, compare all of the dealers' quotes, and force the dealers to compete directly on price.

*Electronic Trading*

74.     Electronic trading in fixed income securities was introduced in the mid 1990s and began gathering momentum in the IRS market in the early 2000s. Technology had the potential to make IRS trading much more efficient, transparent, and competitive for the buy-side, as it did in other financial markets. In the IRS market, however, the dealer-to-dealer and the dealer-to-customer markets took very different paths. Simply put, the former developed, while the latter did not. While the IDB platforms that support dealer-to-dealer trading evolved to become systems that promoted transparency and ease of access, the dealer-to-customer markets adopted protocols that replicated many of the historical voice-based OTC practices.

75.     The differences between the two IRS electronic trading protocols have resulted in material differences that restrict buy-side customers and advantage a small group of IRS market makers — that is, the Dealer Defendants. The protocol differences between the two sides of this bifurcated market, as they exist today, are summarized in the following chart:



76.     While some dealers have launched trading platforms for buy-side customers in the past few years, these platforms do not alter the entrenched market dynamics. As this chart indicates, these trading platforms typically use a "request for quote" ("RFQ") protocol whereby an end user can request quotes from several dealers at once, but not from other end users. It basically amounts to calling dealers to obtain quotes, except using electronic messages instead of the telephone. Accordingly, the RFQ protocol largely replicates the limitations of the voice-based, OTC market.

77.     Whether trading occurs over the telephone, in a Bloomberg chat, or through an RFQ platform, buy-side customers in the IRS market do not have access to the price transparency or competitive pricing found in other modern financial markets that facilitate all-to-all trading.

### The Dealer-to-Dealer Market

78.     In marked contrast, as shown in the chart above, the Dealer Defendants trade with *each other* in a considerably more competitive and transparent marketplace. When dealers want to lay off risk on other dealers, they trade on dealer-only platforms provided by IDBs. These platforms are very different than the inefficient trading mechanism to which the Dealer Defendants relegate their buy-side customers.

79.     When trading with each other on an IDB platform, dealers submit their bid and ask prices to the IDB, which then publicizes the best quotes (known as the "inside market") anonymously to all other dealers on the platform. A dealer can immediately enter into an IRS contract at a quoted price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price. The dealers' interdealer transactions routinely offer immediate execution at or close to the mid-market price. As many IRS products

have been standardized for many years, IDBs use electronic trading platforms akin to "order books," "limit order books," or "central limit order books," which automatically match the best bids and offers.[7] On an IDB platform, the dealers' identities are concealed from one another until they agree to enter into a trade. This prevents any entity on an interdealer platform from being discriminated against in terms of pricing. The price transparency, pre-trade anonymity, and immediate execution available in the interdealer segment of the IRS market results in direct price competition between dealers. And because IDB platforms allow dealers to view and choose from numerous bid and offer prices, in sharp contrast to the OTC "retail" side of the market, dealers trade with each other at or close to mid-market prices.

### The Dealer Defendants Block All-to-All Trading

80.     The competitive structure of the interdealer electronic platforms benefits the Dealer Defendants as long as these platforms remain exclusive to them. By preserving their information advantage over the buy-side, this environment allows the Dealer Defendants to leverage the transparent and accessible pricing available on the IDB platforms when responding to buy-side requests to trade. Armed with exclusive knowledge of buy-side information flow, the Dealer Defendants can, at the expense of the buy-side, time and manipulate execution levels as to systematically guarantee themselves higher profits than they would otherwise be able to make in an all-to-all marketplace.

81.     While only dealers have access to limit order book trading, nothing about the IRS market inherently requires that to be the case. Quite the opposite: because of the standardization of IRS, increased liquidity, and the availability of clearing, much of the IRS market should have

---

[7] Luke Jeffs, *GFI Boss Defends Hedge Funds Access to Platforms*, FIN. NEWS (Oct. 1, 2007) (Mickey Gooch, the founder and Chief Executive of GFI, stated that "[f]or the most liquid, electronic markets, there is little difference between the exchanges and the IDBs.").

moved years ago to all-to-all trading platforms.[8] And there are a number of reasons why the buy-side would welcome all-to-all trading. "A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[9] The introduction of all-to-all trading brings pricing transparency to the marketplace, typically resulting in a narrowing of bid/ask spreads.

82.     The buy-side remains locked in an archaic market as a result of Defendants' conspiracy to block access to the trading tools that the Dealer Defendants have enjoyed for years. The Dealer Defendants have restricted their buy-side clients from entering the interdealer market and relegated them to dealer-to-customer platforms that preserved many of the dealers' inherent advantages (and buy-sides' inherent restrictions) in the voice-based, OTC market.

83.     The Dealer Defendants have also actively blocked the buy-side's use of all-to-all trading platforms, which would give the buy-side access to competitive marketplaces similar to those the Dealer Defendants have enjoyed for years. When insurgent entities, such as Plaintiffs, tried to bring all-to-all trading to the market or open existing IDB platforms to the buy-side, the Dealer Defendants actively preserved the status quo by using their collective market power to prevent such efforts from succeeding.

**B.      The Dodd-Frank Act**

84.     In reaction to the fallout from the 2008 financial crisis, Congress passed the Dodd-Frank Act on July 21, 2010. Among the stated purposes of the legislation was to "promote

---

[8] *See* DARRELL DUFFIE, DARK MARKETS 6-7 (2012) ("[S]imple interest rate swaps . . . seem like natural candidates for exchange-based trade but are normally traded over the counter. At this point, we lack convincing theories that explain why such simple and heavily traded instruments are traded over the counter.").

[9] *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 23 (2016), http://www.bis.org/publ/mktc07.pdf.

the financial stability of the United States by improving accountability and transparency in the financial system" and to "protect consumers from abusive financial services practices."[10]

85.     A key goal of the Dodd-Frank Act was "to bring greater pre-trade and post-trade transparency to the swaps market."[11] As the CFTC noted: "The OTC swaps market is less transparent than exchange-traded futures and securities markets."[12] The CFTC also recognized that "transparency lowers costs for investors, consumers, and businesses; lowers the risks of the swaps market to the economy; and enhances market integrity to protect market participants and the public. . . all market participants will benefit from viewing the prices of available bids and offers and from having access to transparent and competitive trading systems or platforms."[13]

86.     As part of Dodd-Frank, Congress created SEFs, a new type of CFTC-regulated entity defined as "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system."[14]

87.     While the Dodd-Frank Act authorized the CFTC to oversee the swaps market, the Act expressly preserved the operation of the antitrust laws to address collusive conduct such as the Defendants' boycott conspiracy.[15]

---

[10] Dodd-Frank Wall Street Reform and Consumer Protection Act Preamble, PL 111-203, Preamble, 124 Stat 1376, 1376 (2010).

[11] Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33476, 33477 (June 4, 2013) (to be codified at 17 C.F.R. pt. 37).

[12] *Id.* at 33476.

[13] *Id.* at 33477.

[14] 17 C.F.R. § 1.3.

[15] *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."). *See also* 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John

## II.   PLAINTIFFS' CREATION OF ALL-TO-ALL INTEREST RATE SWAPS TRADING PLATFORMS

88.     By at least 2008, the IRS market was primed and ready for the introduction of all-to-all electronic trading. Most IRS were standardized, and volume was growing exponentially. The benefits that all-to-all trading could bring to the IRS market were widely recognized by market participants, regulators, and economists. There was also tremendous demand for modern, electronic trading platforms for IRS.

### A.   Javelin's Development of an All-to-All Trading Platform

89.     Javelin was founded in 2009 by derivative trading and technology professionals seeking to pursue the obvious market demand for a SEF offering all-to-all electronic trading. Javelin's founders strongly supported the goals of the Dodd-Frank Act to enhance pre-trade transparency, market liquidity, and competition in the swaps market.

90.     Javelin developed an all-to-all IRS trading platform that facilitated both an anonymous RFQ and anonymous order book trading. This would have been a major step forward for the buy-side, granting them access to an anonymous all-to-all trading platform similar to the IDB platforms used by the Dealer Defendants.

91.     In developing its SEF, Javelin created a cutting edge technological platform designed to provide IRS traders the market transparency they long demanded. Javelin created a state-of-the-art user interface that keeps traders in touch with all of the market action. Users of Javelin's order book can view the size and depth of either the historical market or just the day's market action, and anonymously execute a trade with a click of a mouse. Javelin's trading

---

Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

platform's screens are highly customizable and any configuration can be saved, thereby empowering market participants to execute, manage, and modify orders efficiently.

92.     Javelin also needed to develop technology to allow customers to use its trading platform. Javelin created options to allow market participants to trade electronically on its SEF either through an application program interface developed by Javelin or an industry standard third party gateway.

93.     The development of Javelin's SEF and technology platform demanded enormous industry knowledge and technological skill, thereby requiring the employment of numerous technology, operations, and sales experts. Javelin also incurred substantial expenses, including office rental, data center fees, licenses for software and financial vendor platforms, and legal and compliance advice. Javelin ultimately spent over $28 million in connection with its all-to-all electronic IRS platform.

94.     By 2011, Javelin's order book was ready for testing. While conducting test trials in December 2011, Javelin became the first platform to execute and clear IRS trades in a nearly instantaneous manner, with an average elapsed time of under two seconds. This near instant execution and clearance of trades was highly enticing to IRS traders long-accustomed to lengthy execution and clearance times for OTC and RFQ transactions. Around this time, investors estimated Javelin's valuation to be approximately $57 million.

95.     Javelin primarily focused on developing an order book with an all-to-all liquidity pool. Javelin's trading platform offered all customers price transparency, firm and anonymous pricing, IDB-type pricing for all customers, and compliance with Dodd-Frank swap trading requirements. In addition, Javelin's platform was clearing agnostic, giving customers a choice of clearinghouse for their swaps business.

96.     On September 19, 2013, the CFTC granted Javelin temporary registration as a SEF. At this point, Javelin's SEF was ready for business and well positioned to meet the large demand by IRS traders for a transparent, anonymous all-to-all trading platform compliant with Dodd-Frank. This was a major step forward for the buy-side customers, granting them access to an all-to-all trading platform similar to those used by the Dealer Defendants. Not surprisingly, many prominent buy-side firms, such as Annaly Capital Management, Inc. ("Annaly"), AQR Capital Management, Blackwell Partners, Carlson Capital, Citadel LLC ("Citadel"), the Duke Endowment, Duke Univesity LTP, Eaton Vance, Flagstar, ING Group, the John D. and Catherine T MacArthur Foundation, Lloyds Bank, Mitusbishi UFJ Financial Group ("Mitsubishi"), Mizuho Securities, the National Bank of Canada, Natixis Global Asset Management ("Natixis"), PIMCO, Scotiabank, and Suntrust, became interested in trading on Javelin's all-to-all platforms and, by late 2014, Javelin had signed up (or "onboarded") approximately 80 entities to trade on its platforms.

97.     Javelin was poised to earn very substantial brokerage fees as the first all-to-all electronic IRS trading platform. Javelin would have earned these fees but for the Defendants' boycott conspiracy.

**B.      TeraExchange's Development of an All-to-All Trading Platform**

98.     TeraExchange was founded in 2010 by trading and technology professionals who recognized that the Dodd-Frank Act provided a unique opportunity to advance the swaps market beyond the bilaterally negotiated OTC process. After raising $7 million in capital on a $27 million valuation, TeraExchange expended immense effort to develop all-to-all electronic trading

platform with anonymous order book and anonymous RFQ functionality for several asset classes, including IRS.[16]

99.     TeraExchange developed a number of necessary technologies for its electronic trading platform, including connectivity with the various clearinghouses, swap data repositories, and other intermediaries. TeraExchange also created a front-end execution management system for traders with order management capabilities, along with advanced analytics and charting, full market depth, and real-time pricing.

100.     In addition, TeraExchange developed a pre-execution credit confirmation tool to facilitate trade clearing, and technology to connect to industry-standard credit hubs, such as Traiana Inc.

101.     A central challenge for all swaps participants is clearing. Clearing serves an important risk-mitigation function. In the OTC market, counterparties face each other directly, meaning they bear the full risk of loss if their counterparty defaults. For IRS with high notional values and long tenors, the effect of a counterparty default can amount to millions of dollars in losses on an individual trade. Clearing resolves this problem. For cleared transactions, a central clearinghouse as an intermediary between the counterparties and effectively guarantees their performance, greatly reducing counterparty risk.

102.     The dealer-owned entities that serve as members of clearinghouses are known as Futures Commission Merchants, or "FCMs." FCMs generate revenues by clearing trades on behalf of firms that are not members of a clearinghouse, such as buy-side customers.

---

[16] TERAEXCHANGE, http://www.teraexchange.com/teraexchange.html (last visited Feb. 25, 2016).

103.    This relationship should be mutually beneficial — the FCMs earn fees on each trade they submit for clearing, and their buy-side customers are able to gain access to clearing without having to comply with onerous capital requirements.

104.    By way of example, suppose X and Y enter into an IRS contract in which X pays a fixed rate and Y pays a floating rate. Without central clearing, X and Y would make these payments directly to each other, and each would bear the full risk of loss in the event its counterparty defaulted.

105.    By contrast, with central clearing, X and Y would each "give up" their sides of the trade to their respective FCMs, which would then submit each side of the trade to the clearinghouse. In the end, X and Y "face" their respective FCMs, which, in turn, face the clearinghouse. Because both X and Y face the clearinghouse (via their FCMs), neither bears counterparty risk with respect to the other. If X defaults on its payments on the swap, X's FCM remains under the duty to satisfy X's obligation, and it will continue to make payments to and receive payments from the clearinghouse under the terms of the swap.[17] The figure below illustrates how two buy-side customers connect through their respective FCMs to a clearinghouse.[18]

---

[17] Importantly, the payments received and paid on the swap are the same regardless of whether or not the trade is cleared — X pays fixed payments and receives floating payments, while Y pays floating payments and receives fixed payments.

[18] Rosali Pretorius & Tom Harkus, *Derivatives after the crash,* INT'L FIN. LAW REVIEW (Mar. 18, 2015), http://www.iflr.com/Article/3437700/Derivatives-after-the-crash.html.



106.    TeraExchange provides users flexibility and choice in accessing TeraExchange's order book, including remote access, local installation, access through established trading networks, and an application program interface to allow access from in-house applications. TeraExchange also allows traders to engage in other IRS trading protocols if needed, including an anonymous all-to-all RFQ, request for market and indication of interest, though TeraExchange's all-to-all order book was its primary platform.

107.    The development of TeraExchange's all-to-all trading platform demanded enormous industry knowledge and technological skill, requiring the employment of many technology, operations, and sales experts. TeraExchange incurred other substantial expenses, including office rental, data center fees, licenses for software and financial vendor platforms, and legal and compliance advice.

108.    In 2011, while waiting on the CFTC to formalize SEF registration rules under Dodd-Frank, TeraExchange began offering access to its electronic trading platform. TeraExchange offered numerous features sought by IRS customers, including a price-time priority order book, anonymity, open all-to-all access, pre- and post-trade transparency,

35

executable bids and offers, pre-trade credit checks, improved pricing, reduced transaction costs, and free access to TeraExchange's trading technology.

109.    The benefits that TeraExchange offered to the derivatives marketplace, and the great amount of time and effort spent to address the needs of the end user, did not go unnoticed by the financial community. The *Wall Street Letter*, a respected source of information on trading technology, nominated TeraExchange for three of its 2013 Institutional Trading Awards. TeraExchange received a "Highly Commended" award for best derivatives trading platform.

110.    Following the CFTC's finalization of SEF registration rules, TeraExchange spent substantial resources to make its platform compliant with the final rules and submitted the necessary materials for SEF registration. TeraExchange received a temporary SEF certification on September 19, 2013 and a full SEF registration on May 26, 2016. One market survey taken in late 2013 indicated that market participants ranked TeraExchange among the top two SEFs that they planned to explore for trading.

111.    By late 2013, investors had increased their estimate of TeraExchange's valuation to over $50 million. TeraExchange was well positioned to earn very substantial brokerage fees as the only all-to-all order book platform to provide a real-time pre-trade credit check on all order submissions, as well as on its all-to-all RFQ. TeraExchange would have earned these brokerage fees but for the Defendants' conspiracy described below.

## III.    DEFENDANTS CONSPIRED TO BOYCOTT JAVELIN, TERAEXCHANGE, AND OTHER ALL-TO-ALL TRADING PLATFORMS

112.    Industry observers noted that SEFs such as Javelin and TeraExchange were "poised to take business from the big banks that have dominated swaps trading" following the

CFTC's preliminary approval of SEFs.[19] Faced with this threat, the Dealer Defendants conspired to prevent all-to-all trading from introducing greater competition and transparency. None of the Dealer Defendants acting alone could stop such trading platforms from succeeding. The Dealer Defendants instead worked together to ensure that Javelin, TeraExchange, and other all-to-all trading platforms would not succeed.

113.    As detailed below in Section IV, the Dealer Defendants coordinated their conspiracy through numerous forums, including their joint involvement with Tradeweb, the International Swaps and Derivatives Association ("ISDA"), and the Futures Industry Association ("FIA").

114.    Personnel from the Dealer Defendants' strategic investment groups, which, as also detailed below in Section IV, are organized for the specific purpose of protecting the dealer community from the growth of all-to-all trading, organized and perpetuated the conspiracy at issue through regular meetings. Besides meeting through the boards of Tradeweb, ISDA, and the FIA, they met in informal settings to carry out an ongoing dialogue concerning the Dealer Defendants' views on, and coordinate their respective Dealer Defendants' strategy with respect to market strategy in furtherance of the conspiracy. They discussed their joint opposition to all-to-all trading platforms, which would result in the compression of bid/ask spreads and lower profits. During these secret discussions, these Dealer Defendants' personnel mapped out strategies for neutralizing the threat posed by anonymous all-to-all trading platforms.

115.    The heads of the Dealer Defendants' IRS trading desks also maintained an ongoing dialogue about their preferred structure of the IRS market. Besides meeting through the

---

[19] Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

boards of Tradeweb, ISDA, and the FIA, these "heads of rates" regularly communicated with each other through email, Bloomberg messages, lunches and dinners, industry conferences, and other similar events. In these discussions, these heads of rates discussed their mutual desire to maintain the status quo and prevent anonymous all-to-all electronic trading.

### *The Dealer Defendants Boycott All-to-All Trading Platforms*

116.    The Dealer Defendants prevented the emergence of all-to-all trading, principally, by boycotting market entrants like Javelin and TeraExchange that dared to try to open up electronic all-to-all IRS trading platforms to the buy-side. These efforts have "been relentless — sometimes buried in SEF rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[20] As a result of these collective steps, Defendants have successfully prevented meaningful change in the market.[21] As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel explained, there remains "a two-tier market today on the S[EF]s — dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."[22]

117.    The IRS market does not have to operate this way. Not long ago, before the Defendants' collusion became apparent, market participants forecasted "that 40 to 50 firms could

---

[20] DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES DEALERS CLUB 12 (Feb. 2016), https://www.bettermarkets.com/sites/default/files/Better%20Markets%20Policy%20Brief%20%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

[21] *See* Matthew Leising, *Swaps Revolution Falling Flat as Brokers Keep Grip on New Market*, BLOOMBERG (Mar. 4, 2014), http://www.bloomberg.com/news/articles/2014-03-05/swaps-revolution-falling-flat-as-brokers-keep-grip-on-new-market ("Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change — and little indication that it's coming. Banks are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another.").

[22] Peter Madigan, *Buy-side firms slam broker Sefs over lack of anonymity*, RISK (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-anonymity.

end up competing for swaps execution business."[23] Today, however, only Javelin,

TeraExchange, and one or two other SEFs offer anything close to anonymous all-to-all trading,

and those few are on their last legs.[24]

118.     When Javelin, TeraExchange, and other all-to-all trading platforms solicited the

participation of the Dealer Defendants, the Dealer Defendants would speak with each other to

ensure collective action with respect to the platform. They used a variety of tools to ensure that

these platforms failed so they could keep the buy-side relegated to trading on dealer-to-customer

platforms that are nothing more than the functional equivalent of the OTC marketplace.

### *The Dealer Defendants Refuse to Clear Trades on All-to-All Trading Platforms*

119.     The Dealer Defendants blocked trading on Javelin, TeraExchange, and other all-

to-all trading platforms by not clearing trades for their clients coming from the platforms.

Because Dodd-Frank requires that any trades occurring on SEFs be cleared, the clearing

subsidiaries of the Dealer Defendants could prevent those trades from occurring simply by

causing their FCMs to refuse to clear.

120.     At the behest of the Dealer Defendants, clearinghouses have insisted on requiring

clearing members to contribute large amounts of capital to the clearinghouse's default (or

"guaranty") fund.[25] This practice of insisting that clearing members must satisfy extremely large

---

[23] Mike Kentz, *SEF start-ups face obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[24] *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

[25] For example, CME requires clearing members to hold $50,000,000 in capital *and* contribute at least $15,000,000 in cash to its guaranty fund in order to clear IRS. *See* CME GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (Feb. 2016), http://www.cmegroup.com/ company/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

capital requirements is unnecessary and is itself one way that the Dealer Defendants block entry and competition. Since large banks like the Dealer Defendants are generally the only entities that can satisfy these large capital requirements, they function as critical waypoints (or potential roadblocks) on the path to clearing.

121.    By regulation, the Dealer Defendant FCMs must operate separately from the Dealer Defendants' trading desks, and the FCMs derive no revenues from IRS trading.[26]  Thus, in a competitive marketplace, FCMs would be agnostic as to which trading platforms their customers use and as to their customers' counterparties. In fact, an FCM operating in its own interest would, subject to credit limits, want to maximize the amount of trades it clears for customers, regardless of where or how the trades were executed. This is because the only risk that FCMs face is the risk that their buy-side clearing clients default, a risk in no way connected to the platform on which a customer conducts an IRS trade.

122.    Determined to stop Javelin, TeraExchange, and other all-to-all SEFs, the Dealer Defendants jointly caused their FCMs to withhold clearing services from any buy-side entity or second-tier dealer seeking to trade on SEFs operating all-to-all anonymous trading platforms open to the buy-side.[27]

---

[26] *See* 17 C.F.R. §23.605(d)(1) ("No swap dealer or major swap participant shall directly or indirectly interfere with or attempt to influence the decision of the clearing unit of any affiliated clearing member of a derivatives clearing organization to provide clearing services and activities to a particular customer"); *id.* §23.605(d)(2) ("Each swap dealer and major swap participant shall create and maintain an appropriate informational partition . . . between business trading units of the swap dealer or major swap participant and clearing units of any affiliated clearing member of a derivatives clearing organization to reasonably ensure compliance with the Act and the prohibitions specified in paragraph (d)(1) of this section.").

[27] *See* KELLEHER, ET AL., *supra* note 20, at 12 (noting that dealers "deny[] their clearing customers the credit limits necessary to trade on SEFs that don't acquiesce to the dealers' demands").

123.    This coordinated misconduct was directly contrary to the economic self-interests of the Dealer Defendant FCMs. The FCMs nonetheless capitulated to the demands of their trading desks and management, who are focused on keeping buy-side entities from trading on anonymous all-to-all platforms.

124.    The Dealer Defendants' agreement not to clear trades conducted on all-to-all anonymous SEFs effectively prevents IRS trades from occurring at all on these platforms. FCMs must confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place, and will not allow the trade to move forward if a customer fails this "pre-trade credit check."[28] To prevent customers from trading on an all-to-all anonymous trading platform, the Dealer Defendant FCMs frequently refuse to conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF. When customers (such as buy-side firms) do attempt to trade on an all-to-all anonymous SEF, the trade cannot occur, because the Dealer Defendant FCMs will not conduct a pre-trade credit check, stopping the trade before it takes place.

125.    At the same time, the Dealer Defendants routinely clear trades executed on co-conspirator Tradeweb's SEF, and other platforms they do not view as threats to the bifurcated market. The Dealer Defendant FCMs thus use their gatekeeping roles to steer business away from all-to-all anonymous SEFs and towards their co-conspirators and other, compliant, dealer-to-customer RFQ-only platforms as a reward for "playing by their rules."

---

[28] A pre-trade credit check can occur via either a "ping" or a "push" system. Under a "ping" system, a SEF will "ping" an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade. Under a "push" system, an FCM will pre-authorize a customer to clear trades up to a certain credit limit, a practice commonly referred to as "pushing limits." As an example, JP Morgan might "push" a limit of $500 million to a SEF for its customer, buy-side customer X, meaning that X could trade and clear up to $500 million of IRS on that SEF without needing to re-obtain approval from JP Morgan before every trade.

126.    The Dealer Defendants' ability to prevent clearing has blocked market entry for all-to-all anonymous trading platforms, including those offered by Javelin and TeraExchange. Without access to clearing, buy-side firms and second-tier dealers cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient dealer-to-customer trading structure of the OTC market.[29]

127.    As a result of the Defendants' conspiracy, Javelin, TeraExchange, and other all-to-all trading platforms here have done little or no IRS trading.

### A.    The Dealer Defendants Boycotted Javelin

128.    As described above, Javelin expended immense resources to develop an anonymous all-to-all trading platform. By 2011, Javelin was actively soliciting support for its platform by demonstrating its utility to many buy-side entities and dealers, including Dealer Defendants such as BNPP, Deutsche Bank, Goldman Sachs, JP Morgan, and RBS. Javelin offered Dealer Defendants, including BNPP, RBS, and HSBC, the opportunity to share in revenue on Javelin's platform in exchange for liquidity commitments to Javelin. Javelin also offered these dealers an opportunity to share in Javelin's success by receiving a portion of Javelin's brokerage fees if the dealers provided liquidity.

129.    For example, in September 2013, Javelin met with Tony Smith (Vice President, Network Engineering) and other Goldman Sachs executives in a meeting arranged by Cassandra

---

[29] The Dealer Defendants have used their "death-grip" on clearing to block startups offering anonymous, exchange-style trading in other markets as well, including the Treasury market.[29]  When Direct Match Holdings Inc. attempted to give more customers access to the same type of anonymous, exchange-style trading that banks have enjoyed for years in the Treasury market, it died without arranging even one trade because no bank would grant Direct Match access to clearing-and-settlement. *See* Matthew Leising & John Detrixhe, *Demise of Direct Match Shows Bank Death-Grip on Treasury Market*, BLOOMBERG (Aug. 29, 2016), http://www.bloomberg.com/news/articles/2016-08-29/demise-of-direct-match-shows-bank-death-grip-on-treasury-market.

Tok (Head of Futures and OTC Clearing Sales). At the meeting, the Goldman Sachs executives grilled Javelin on whether its platform had to allow all-to-all trading and fished for the names of buy-side customers signed up for Javelin's platform in order to later head off those customers from trading on the platform. Mr. Smith was careful not to state outright that Goldman Sachs would not support Javelin, but he demonstrated hostility to Javelin operating as an all-to-all trading platform.

130.    In late 2013, Javelin prepared to launch its platform and arranged a series of mock trading sessions to showcase its all-to-all anonymous trading platform to dealers and buy-side entities. Despite the refusal of some of the Dealer Defendant FCMs to even participate in the mock sessions, many buy-side firms and certain second-tier dealers were impressed by Javelin's platform.[30]

131.    Based on the strength of its technology, Javelin began signing up customers, including Citadel, National Australian Bank, Natixis, Scotiabank, and Suntrust. Even with this limited initial liquidity, immediate price transparency and anonymity resulted in remarkably competitive pricing on the Javelin platform, with bid/ask spreads routinely one-quarter basis point wide, and often as low as one-eighth of a basis point wide.

132.    Despite tentative initial support from RBS and a number of second-tier dealers, the Dealer Defendants uniformly refused to trade on Javelin's platform. They recognized that if Javelin successfully launched an anonymous, all-to-all IRS trading platform, the platform would

---

[30] IRS trades clear through clearinghouses, which transact directly with a limited number of counterparties known as "clearing members," typically FCMs. The Dealer Defendants are generally the only entities that can afford the large amount of capital required of clearing members. Buy-side customers generally work with an FCM to clear their trades for a fee. If an FCM refuses to clear a trade for a customer on a particular platform, the customer is effectively prevented from trading on the platform.

attract liquidity, increase price transparency, and thus imperil their privileged status as market makers in a bifurcated market.

133.    As detailed below, the Defendants' collective efforts to sabotage Javelin took several forms, including rationing liquidity away from Javelin, permanently delaying review of Javelin documents, threatening customers who used Javelin with a loss of liquidity in IRS and other products, and using affiliated FCMs to pressure or cajole customers away from Javelin under the threat of loss of services or increased clearing fees. Some Dealer Defendants used their FCMs to actively refuse pre-trade credit checks to Javelin.

134.    For instance, Mark Millindorf, a Vice President at Deutsche Bank, informed a Javelin employee that the bank would not use the platform and disclosed that Deutsche Bank was holding weekly meetings to discuss its strategy for responding to SEFs like Javelin.

### The Dealer Defendants Refuse to Trade on Javelin

135.    From late 2013 to 2015, Javelin met with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading on or providing liquidity to the Javelin platform. Even when Dealer Defendant employees did not outright shut the door on trading or providing liquidity, they would repeatedly cite the same pretexts for refusing to conduct business with Javelin, such as claiming a need to conduct a never-ending legal review of the Javelin SEF rulebook, a largely standardized document already approved by the CFTC. Regardless of the excuse, the results were always the same: none of the Defendant Banks, except RBS for a limited period of time, offered to trade on or provide liquidity to Javelin. One Javelin employee was informed by an acquaintance who worked for a Dealer Defendant that he should "look for a new job."

136.     Under the Dodd-Frank Act, any type of swap transaction that the CFTC certifies as "Made-Available-to-Trade" ("MAT") on a SEF can no longer be traded through an unregulated swaps platform, but must instead be executed on a registered SEF or other CFTC-regulated platform.[31]

137.     On October 18, 2013, Javelin filed a MAT application with the CFTC that, if granted, would have mandated a wide range of cleared IRS to be executed on SEFs. Many participants in the IRS market expected the mandatory trading on SEFs to result in "a real fundamental shift."[32] As stated by Kevin McPartland, head of market structure research at Greenwich Associates: "It's going to impact how the clients interact with the banks on a day-to-day basis."[33]

138.     Javelin's MAT submission infuriated the Dealer Defendants who wished to continue to trade swaps on dark, unregulated platforms where they hold all the advantages. The Dealer Defendants contested Javelin's MAT submission through submissions by Morgan Stanley and trade groups serving the Dealer Defendants' interests, such as the Securities Industry and Financial Markets Association.

139.     A few days after Javelin's MAT submission, RBS abruptly dropped its support for Javelin. Patrick Wegner, a senior IRS trader at RBS called James Cawley, the then-CEO of

---

[31] When forced to trade on a SEF with buy-side customers because a particular IRS has been MAT, the Dealer Defendants – consistent with their conspiracy – will only use SEFs that, like Tradeweb, effectively require buy-side customers to trade through an RFQ trading method.

[32] Silla Brush, *CFTC Said Ready to Push Interest-Rate Swaps to Trade Venues*, BLOOMBERG (Jan. 9, 2014), http://www.bloomberg.com/news/articles/2014-01-09/cftc-said-ready-to-push-interest-rate-swaps-to-trading-platforms.

[33] *Id.*

Javelin, to complain about the MAT submission. The bank immediately withdrew all of its liquidity from the platform.

140.    In the days that followed, RBS mobilized to place enormous pressure on Javelin to retract its MAT submission to the CFTC. RBS enlisted Dawn Newsome, Adam Lister, Rich Volpe, Patrick Wegner, Darren Shames, and its legal counsel to pressure James Cawley to retract Javelin's MAT application. On October 30th, 2013, less than two weeks later, Javelin filed another MAT submission, significantly narrowing the range of IRS instruments that would be mandated to trade on a SEF. Only then did RBS begin again providing Javelin with liquidity.

141.    On January 16, 2014, the CFTC certified Javelin's amended MAT submission. More than three years after Dodd-Frank became law, mandated trading of IRS on SEFs finally began on February 16, 2014, as a result of Javelin's investment in its SEF and its filing of the first MAT with the CFTC.

142.    From that point on, however, RBS distanced themselves from Javelin. Management at Javelin was told to remove RBS from all of its marketing materials. James Cawley was told in no uncertain terms by Volpe, head of IRS trading at RBS, that Javelin was to never again mention to anyone that RBS was a market maker on its platform. Patrick Wegner, the senior trader responsible for providing electronic IRS markets on Javelin, began widening the bid/ask spreads he would stream to Javelin. RBS traders would also not respond to inquiries from the Javelin, even if it meant that RBS would be able to enter into an IRS transaction at a profitable level. Eventually, on April 26, 2015, RBS withdrew as a participant on Javelin's platform.

*The Dealer Defendant FCMs Refused to Clear Trades on Javelin*

143.    The Dealer Defendant FCMs also refused to provide Javelin credit checks necessary to clear trades, effectively preventing buy-side customers from using Javelin's order book. Defendant Deutsche Bank Securities Inc., for instance, refused to clear trades for Javelin even after it had successfully tested Javelin's trading system and told Javelin that it had the "green light." When one of the FCM's customers, Blenheim Capital Management, LLC, attempted to trade on Javelin in May 2014, Deutsche Bank told Paul Tartanella of Blenheim that it had not approved trade clearing on Javelin. Javelin contacted Mark Millindorf, a Vice President of Deutsche Bank, for clarification and was told that, despite the prior successful test, Javelin now had to be approved by the bank's legal department, an obvious pretext for its refusal to clear trades across Javelin. On June 2, 2014, Javelin asked Deutsche Bank for an update and was told by Millindorf: "As of right now our legal team is busy elsewhere (limited resources, various other things in the hopper) – right now it is on hold."

144.    Javelin continued to follow-up with Millindorf regarding the status of Deutsche Bank's review for over six months and was continually told there had been no progress. On December 5, 2014, Javelin again asked if there had been "any movement," and offered to assist with further testing of Javelin if needed. Millindorf responded on December 15th: "No, no movement at the moment…. Will certainly let you know. Right now we are on a status quo. Hope all is well with you, and if I don't speak to you, Happy Holidays to you and your family!"

145.    Deutsche Bank Securities Inc. never completed its purported review of Javelin and never approved clearing on Javelin for any of its customers, effectively preventing any of its customers from using Javelin's platform. Javelin learned in its communications with Millindorf

that Deutsche Bank was holding weekly meetings to discuss its strategy for responding to SEFs like Javelin.

146.     Other Dealer Defendant FCMs, including Morgan Stanley, Barclays, and Goldman Sachs, made nearly identical claims as to the need to conduct reviews of Javelin. These drawn-out reviews were unnecessary and plainly pretextual given that FCMs do not enter into any agreements with Javelin and are not required to abide by Javelin's rulebook in clearing their customers' trades on Javelin. The sole issue for an FCM clearing a trade on Javelin is whether the FCM's customer (not Javelin) has sufficient credit for the trade. Because of the Dealer Defendant FCMs' conduct, many potential customers of Javelin simply could not clear trades on Javelin.

147.     Some Dealer Defendant FCMs went even further and actively pressured their customers not to trade on Javelin. For example, buy-side customer Citadel Fixed Income Master Fund executed a series of trades on Javelin between January 7, 2014 and February 26, 2014, but then suddenly stopped trading on Javelin. Javelin later learned that Citadel's COO had said that Citadel stopped trading on Javelin because he had received calls from representatives of the Dealer Defendants pressing him to do so.

148.     Similarly, in August 2013, NISA Investment Advisors LLC ("NISA"), a large buy-side firm, was eager to trade on Javelin. When Goldman Sachs, NISA's FCM, learned of this, Cassandra Tok of Goldman Sachs contacted John Choe of NISA and informed him that if NISA traded on Javelin, Goldman Sachs would withdraw all clearing services for the buy-side entity in any trading venue. Tok later informed Javelin that she and Choe jointly decided that NISA would no longer utilize Javelin's platform. Choe, however, later informed Javelin officials that he had been strongly encouraged by Goldman Sachs to step away from Javelin.

48

149.    Subsequently, Javelin employees spoke to Mr. Smith of Goldman Sachs, and confronted him with Goldman Sachs' inappropriate refusal to clear trades for Javelin. Smith stated that if Goldman Sachs were somehow forced to clear trades for Javelin, it would simply set the credit limits for all of its customers who attempted to trade on Javelin at "zero," thereby preventing any of their trades from clearing. That is, Goldman Sachs' FCM was willing to forego clearing revenues and damage customer relationships in order to shut Javelin out of the market. Goldman Sachs also refused to clear trades on Javelin for its customer Babson Capital.

150.    Morgan Stanley also refused to approve credit to customers who attempted to trade on Javelin unless Javelin agreed to pay the untenably high cost of laying a direct data connection to Morgan Stanley. JP Morgan also used the pre-trade credit checks requirement to hinder customers, including Mitsubishi and Natixis, from trading on Javelin.

151.    The Dealer Defendants' refusal to provide credit checks to Javelin was not based on reasonable commercial concerns. For example, Deutsche Bank, Goldman Sachs, and Javelin were all connected to Traiana, a third-party pre-trade credit system owned by ICAP and many of the Dealer Defendants, and there was no additional risk to Deutsche Bank or Goldman Sachs in providing credit checks for Javelin through Traiana, just as Deutsche Bank and Goldman Sachs did with other trading platforms that did not offer meaningful all-to-all trading. [34]

152.    Despite these formidable obstacles, Javelin was able to generate some trading volume and by September 2014 had signed up nearly 80 entities to trade on its platform.

---

[34] Traiana, is jointly owned by ICAP and Dealer Defendants Bank of America, Barclays, Citigroup, Deutsche Bank, JP Morgan, and RBS. Luke Jeffs, *ICAP sells stake in Traiana to seven investment banks*, REUTERS (Jan. 14, 2013), http://www.reuters.com/article/icap-banks-traiana-idUSL6N0AJAEU20130114. The Dealer Defendant FCMs used their control over Traiana to discriminate against all-to-all SEFs, such as TeraExchange, by posting high credit limits for client trades on dealer-friendly SEFs, such as Tradeweb, while posting a credit limit of zero for all-to-all platforms. This effectively prevented the FCMs' clients from trading on the all-to-all platforms.

However, as a result of FCM obstruction and Dealer Defendant threats, few customers were able actually to execute trades on the platform.

153.     Even those customers that did execute trades eventually abandoned Javelin's platform due to the Dealer Defendants' actions. Mitsubishi, for example, repeatedly attempted to trade on Javelin, but ultimately ceased all activity. When asked why they had stopped trading on Javelin, a Mitsubishi trader informed Javelin that they had been pressed by JP Morgan, their FCM, against using Javelin.

### Buy-Side Customers Fear Name Give-Up

154.     In October 2014, buy-side interest in Javelin and other all-to-all trading platforms collapsed as buy-side customers learned that all-to-all trades were not sure to be anonymous. Many buy-side firms initially explored all-to-all trading through aggregator platforms that streamed all-to-all quotes from multiple SEFs, including IDBs and Javelin. The buy-side found aggregators useful because they provided a consolidated view of the market and access to greater all-to-all liquidity. However, this interest in aggregator use quickly subsided when buy-side entities realized that aggregators were far from anonymous. This truth became clear as news spread that Compagnie Financière Tradition, SA ("Tradition"), a dealer-friendly IDB, had contacted Mitsubishi to complain about Mitsubishi's use of Tradition's order-book platform, Trad-X, after an aggregator had routed a Mitsubishi trade to that platform

### The Dealer Defendants' Boycott Effectively Shut Down Javelin

155.     Meanwhile, the Dealer Defendants continued pressuring Javelin. In the fall of 2014, Javelin contemplated submitting a second MAT filing to increase the number of IRS products required to be traded on SEFs like Javelin. As industry studies noted, the Dealer Defendants increasingly avoided trading IRS on SEFs by shifting from standard IRS trades that

had been MAT and were required to be traded on SEFs to roughly equivalent non-standard IRS that had not been MAT and were not required to be traded on SEFs.[35] For example, a standard five-year IRS trade that had been MAT could be switched to a 61-month trade to avoid a SEF. Javelin's contemplated MAT filing sought to limit this practice.

156.    A Javelin executive met with executives from many of the Dealer Defendants to discuss the proposed submission. The Dealer Defendants all responded coldly. For instance, when the Javelin executive went to meet with Deutsche Bank regarding the submission, he was met by a Deutsche Bank executive on the sidewalk in front of the bank's New York office building. The Deutsche Bank executive suggested that they go for a walk instead of meeting in his office. During the walk, the Deutsche Bank executive told the Javelin executive to drop the new MAT submission and advised the Javelin executive that he would "never work" on Wall Street again if Javelin went through with the filing.

157.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no revenues and facilitates no IRS trading. Despite years of development and millions of dollars in investment capital, Javelin has executed less than 180 trades since its launch.

158.    The Dealer Defendants' joint opposition to Javelin was coordinated. For example, Javelin employees had numerous conversations with representatives of the Dealer Defendants in which the representatives proffered nearly identical excuses for their refusal to deal, pointing in particular to a supposed lack of customers on the Javelin platform.

159.    In fact, these excuses were entirely pretextual, given that the Dealer Defendants had gone to great lengths to ensure that potential customers did not trade on Javelin. As noted

---

[35] *See* Mike Kentz, *Buysiders avoid SEFs with non-standard swaps*, INT'L FIN. REVIEW (Sept. 5, 2014), http://www.ifre.com/buysiders-avoid-sefs-with-non-standard-swaps/21161979.fullarticle; Tod Skarecky, *Forward Start and Backward Start Swaps?*, CLARUS FIN. TECH. (July 29, 2014), https://www.clarusft.com/forward-start-and-backward-start-swaps/.

above, Javelin had committed liquidity providers by September 2013, guaranteeing that the

Dealer Defendants would have counterparties to trade with, and Javelin's platform frequently

featured IRS prices that were competitive with or better than, those of rival platforms like

Tradeweb. The real reason for the Dealer Defendants' collective refusal to deal was their

unlawful agreement to boycott any platform that threatens to open an all-to-all trading platform

to the buy-side.

### B.      The Dealer Defendants Boycotted TeraExchange

160.    Much like Javelin, TeraExchange expended immense resources to develop an

anonymous all-to-all electronic trading platform. By 2011, TeraExchange was actively soliciting

support for its platform by demonstrating its utility to many buy-side entities and dealers,

including Dealer Defendants. But the Dealer Defendants effectively destroyed TeraExchange in

a well-orchestrated and effective campaign to drive it from the marketplace. In their own words,

the Dealer Defendants viewed TeraExchange as a "Trojan Horse" — if its platform was able to

succeed, the Dealer Defendants' privileged position in the marketplace would be severely

threatened.

### *The Dealer Defendants Seek to Take Over TeraExchange and Shut it Down*

161.    After learning of TeraExchange's plans for its SEF, the Dealer Defendants

conducted secret meetings, including under the cover of Tradeweb, to discuss how to neutralize

this threat. One tactic they agreed upon was to replicate what they had done with Tradeweb —

the Dealer Defendants would jointly "invest" in TeraExchange, under the pretense of offering it

more capital, but with the real goal of taking it over and shutting it down.

162.    Several of the Dealer Defendants sought meetings with TeraExchange under the

guise of exploring trading on TeraExchange. At a series of meetings in early 2013,

TeraExchange had strikingly similar experiences with these banks: TeraExchange would walk

into a meeting expecting to meet with the head of IRS trading to discuss the bank signing up for the TeraExchange platform, but instead would be met by personnel from the Dealer Defendants' strategic investment groups offering to take stakes in TeraExchange itself.

163.     For example, TeraExchange executives visited Goldman Sachs having been led to believe they would be meeting with members of the bank's IRS trading desk. Upon arrival, however, the TeraExchange personnel were brought to meet with Brad Levy and Kimberly Trautmann of Goldman Sachs' Principal Strategic Investments group, a group within Goldman (discussed in further detail below) focused on controlling market evolution for the benefit of the Dealer Defendants. They claimed that Goldman Sachs wanted to invest in TeraExchange and asked to learn more about its platform. In fact, Goldman Sachs had no real intention of supporting TeraExchange. Instead, Goldman Sachs was attempting to buy control of TeraExchange to ultimately shut down its platform in order to maintain the bifurcated IRS market desired by the Dealer Defendants. Similar bait and switch tactics were pulled by the strategic investment groups of Barclays, Bank of America (Shea Wallon attended), Credit Suisse, Citi (William Hartnett attended), Deutsche Bank, and Morgan Stanley.

### *The Dealer Defendants Refuse to Trade on TeraExchange*

164.     While the Dealer Defendants claimed an interest in supporting TeraExchange in these meetings, in fact not one of them agreed to sign up for TeraExchange's platform. TeraExchange talked with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading or providing liquidity to the TeraExchange platform, but none offered to trade on, or provide liquidity to, TeraExchange.

165.     TeraExchange's business plan did not, however, depend on signing up the Dealer Defendants as liquidity providers in the first instance. Instead, TeraExchange focused on

attracting non-traditional liquidity providers to make markets on its platform, including large proprietary trading firms eager to serve as liquidity providers for IRS, including entities that were members of the FIA Principal Traders Group (such as Allston Trading; Chicago Trading Company; Chopper Trading LLC; DRW Holdings, LLC; Geneva Trading USA, LLC; HTG Capital Partners; IMC Chicago LLC; Jump Trading LLC; KCG Holdings; Liquid Capital; Marquette Partners, LP; Optiver US LLC; Spot Trading LLC; Sun Trading, LLC; Teza Technologies; Tower Research Capital, LLC) and other large trading institutions.

166.    While many of these entities were historically considered to be on the buy-side, they were increasingly serving as liquidity providers in various other asset classes and trading at large volumes. TeraExchange recognized that members of the Principal Traders Group were natural early adopters of its platform because they understood its value proposition and represented large portions of the volume in equity, currency, and futures trading at the time. These entities were ready, willing, and able to provide the liquidity to the TeraExchange platform that would allow the platform to thrive.

167.    TeraExchange recognized that these non-traditional liquidity providers had different trading strategies from those of the Dealer Defendants. They usually engaged in high-volume trading strategies involving little warehousing of risk, which made them largely risk neutral. These entities were more eager than traditional dealers to trade IRS more quickly and were willing to quote bid/ask spreads at levels that were designed to be immediately executable. As a result, these entities were generally willing to trade IRS at tighter bid/ask spreads than traditional dealers — something which would greatly benefit the buy-side by lowering the price of IRS trades.

168.     TeraExchange understood that once tighter bid/ask spreads became available on its platform, other market participants would join the platform to take advantage of the spreads and the ease of execution on an all-to-all order book. TeraExchange was confident that market participants, seeing the many advantages of trading on its all-to-all platforms, would demand that swap dealers trade with them on the platform to achieve the same tight bid/ask spreads. This is because most customers demand that their dealers engage in a practice known as "best execution," which refers to a trading entity's duty to secure the best price available when executing a trade as the agent of a customer. Best execution typically requires a dealer to take all reasonable steps to obtain the best possible result for customers when executing orders. TeraExchange believed that swap dealers, including the Dealer Defendants, would follow client demand for best execution and bring their own liquidity to the platform. Indeed, this is what would have occurred in a competitive market.

169.     TeraExchange met with hundreds of market participants, many of which committed to using the platform. These included, Susquehanna International Group, LLP; Annaly; Mizuho Bank, Ltd.; DRW Holdings, LLC; and AQR Funds, among others. These entities carried out successful tests of TeraExchange's technology on their trading interfaces.

### *The Dealer Defendant FCMs Refused to Clear Trades on TeraExchange*

170.     The Dealer Defendants became increasingly concerned as market participants committed to TeraExchange's platform. They recognized that if the platform succeeded, their privileged status as market makers in a bifurcated market would be imperiled. Accordingly, they took additional steps to collectively sabotage TeraExchange, including using Dealer Defendant FCMs to block trades on TeraExchange and threatening customers who used TeraExchange with

the loss of liquidity in IRS or in other products. As this occurred, representatives from numerous Dealer Defendants informed personnel at TeraExchange that its platform would never succeed.

171.    As they did with Javelin, the Dealer Defendants used their FCMs to block trades on TeraExchange by refusing to clear the trades or quoting outrageously high fees that would make the transactions uneconomic, despite clearing similar trades for the same customers on other IRS platforms for reasonable fees.

172.    Senior personnel from TeraExchange attempted to convince the FCMs to stop this abuse, but they ran into numerous brick walls. When, for instance, TeraExchange met with Bob Burke, the head of clearing for Bank of America, Burke said: "My bosses are never going to let me [clear trades for TeraExchange]."

173.    HSBC's FCM similarly gave TeraExchange the runaround for over a year before finally refusing to clear for the platform. During this time, Julianna Salazar, Vice President of Futures & OTC Clearing for HSBC's FCM, required approximately half a dozen demonstrations of TeraExchange's trading platform and its connectivity to HSBC's FCM. Despite repeated successful demonstrations, Ms. Salazar refused to give a direct answer on whether HSBC would clear its customers' trades on the platform. At the end of nearly eighteen months, Ms. Salazar finally told TeraExchange that HSBC would not sign on as a clearing member without approval from the IRS trading desk — approval that was never given.

174.    Ray Kahn, Global Head of Futures Clearing & Americas Head of Agency Derivative Services at Barclays, told TeraExchange that Barclays could not establish trade clearing for TeraExchange because it was "resource constrained." This excuse was an obvious pretext, since clearing trades from TeraExchange required minimal resources, and Barclays performed similar services for customers using other SEFs. Many other Dealer Defendants used

the same "resource constrained" pretext to avoid setting up clearing on TeraExchange, including Deutsche Bank, Morgan Stanley, and Credit Suisse.

175.    The FCMs of other Dealer Defendants also refused to clear trades for TeraExchange. For instance, ANZ Bank cleared its trades through FCMs at Citi and Bank of America. When ANZ asked Citi to clear trades on TeraExchange, Chris Perkins, the head of clearing at Citi, informed ANZ that it would not clear trades executed on TeraExchange's platform. Perkins said that Citi would only clear ANZ trades executed directly with Citi's trading desk (which refused to use TeraExchange). The Citi FCM would normally have feared losing business by denying a customer in this way, since Citi knew that ANZ could clear through the Bank of America FCM. But due to the Dealer Defendants' boycott conspiracy, Citi had nothing to fear since no FCM would clear TeraExchange trades. In fact, ANZ was never cleared to trade on TeraExchange by any Dealer Defendant FCM.

176.    The FCMs took steps to obscure the true nature of their boycott. For example, at times, they would not refuse to clear any trades on TeraExchange outright. Instead, they would quote extremely high clearing fees for trades on TeraExchange, while quoting far lower fees for clearing trades on other Dealer Defendant-friendly platforms. For example, when Knight Capital Group tried to trade on TeraExchange's platform, executives at the Bank of America FCM told Knight Capital and TeraExchange that Bank of America would only clear trades on TeraExchange at an excessive fee far above what the FCM charged customers to clear trades on dealer-to-customer OTC or RFQ platforms, thus effectively precluding Knight Capital from trading on TeraExchange.

177.    Observing the barriers that the Dealer Defendants had put into place, other market participants began to waver in their support for TeraExchange's platform. Susquehanna International Group, LLP, for instance, withdrew its commitment to the platform.

178.    Despite these formidable obstacles, TeraExchange executed and cleared the first IRS trade on its platform on June 13, 2014. The transaction was between Annaly and Mitsubishi for a notional amount of $10 million. The trade was cleared through the CME clearinghouse by BNPP's FCM affiliate.

179.    The collective response from the Dealer Defendants to the first IRS trade on TeraExchange was immediate. Upon observing that buy-side entities were trading on TeraExchange's order book, BNPP's FCM notified the bank's trading desk of the transgression. The desk then contacted the parties to the transaction and threatened them with a loss of access to clearing and other banking services if they continued to trade on TeraExchange. Indeed, BNPP threatened not only loss of access to clearing, but also execution services in other asset classes and general market research. Word of BNPP's threat spread to other buy-side firms and led those firms to avoid TeraExchange.

180.    The day after the trade, BNPP, Citi, JPM, and UBS all told TeraExchange that they would not clear any trades on TeraExchange until they conducted an audit of TeraExchange's rulebook, like Javelin's, a largely standardized document already approved by the CFTC. Other Dealer Defendants later similarly blocked trading on TeraExchange for purported rulebook reviews. These reviews have never been completed. Because all of the Dealer Defendant FCMs refuse to clear trades on TeraExchange, all of those FCMs' customers, including the non-traditional liquidity providers sought by TeraExchange, cannot clear trades on

TeraExchange. Consequently, the June 13, 2014 trade between Annaly and Mitsubishi was the last IRS trade to be executed and cleared on TeraExchange's platform.

181.    In July 2014, BNPP reached out to Annaly asking that Annaly "abstain from executing on Tera while they resolve some operational issues on their end related to trades executed on Tera." However, there were no operational issues, and BNPP provided no additional information.

182.    Throughout this period, the Dealer Defendant FCMs were clearing trades for those same buy-side firms executed on Bloomberg's and Tradeweb's dealer-to-customer RFQ platforms. But, as described above, there is no legitimate reason for an FCM to discriminate among SEFs because the FCM's risk comes from the trading customer itself, not the platform on which the trade is executed.

183.    The Dealer Defendants also became even more vocal in their opposition to TeraExchange following the June 13, 2014 trade on TeraExchange. As a result, many buy-side entities became concerned about meeting with TeraExchange for fear of reprisal from their FCMs. One buy-side entity, for instance, expressed a fear that "JP Morgan knew" it was meeting with TeraExchange.

184.    The Dealer Defendants' collective boycott of TeraExchange starved it of the liquidity it needed to succeed. Absent the Dealer Defendants' boycott, buy-side firms and other liquidity providers would have traded on TeraExchange's platform.

*The Dealer Defendants' Refuse to Let TeraExchange "Off the Mat"*

185.    As it became evident that the Dealer Defendants were collectively squashing TeraExchange's all-to-all platform, TeraExchange explored an alternative business strategy

focused on providing smaller IDBs with access to its SEF to meet Dodd-Frank requirements for SEF trading of certain instruments traditionally traded through smaller IDBs.

186.    From its own experience, TeraExchange realized that building and gaining approval of a SEF was a difficult and expensive proposition for many of these IDBs. TeraExchange offered these smaller IDBs the opportunity to execute their trades through the TeraExchange SEF for a fee, rather than expending the resources to register themselves as SEFs. TeraExchange hoped this alternative business plan would provide it with sufficient revenue to continue developing its primary all-to-all trading business.

187.    Several smaller IDBs responded positively to the proposal, recognizing that the use of TeraExchange's platform was necessary to their survival. Nearly a dozen smaller IDBs entered into agreements with TeraExchange, including RP Martin, OTCex, Cloud9, GMG Brokers, Sunrise Brokers, LLC, and Continental Capital Markets. If TeraExchange had been able to move forward with these IDBs, then it would have been able to grow its business and eventually expand offerings to the buy-side.

188.    The IDBs, however, had, as a practical matter, to obtain the consent of the dealers using their platforms, including the Dealer Defendants. In striking parallel, the Dealer Defendants universally refused to give such consent. For example, in February 2014, Laura Martin of Citi informed OTCex that "per internal policy" Citi would not allow OTCex to use TeraExchange, claiming that "Citi is not currently signed onto the Tera SEF Rulebook." After OTCex pointed out that Citi did not need to join TeraExchange or sign onto its rulebook (which was, in any event, approved by the CFTC), Ms. Martin responded by saying that Citi's refusal to allow IDBs to execute trades on TeraExchange was "more of an internal policy rather than a

regulatory one," essentially confirming that there was no valid basis for Citi's refusal. And she informed OTCex that co-conspirator ICAP was Citi's "preferred solution."

189.    As a whole, the Dealer Defendants took a uniform position that they would not allow IDBs to execute trades on TeraExchange. The reason became clear when multiple Dealer Defendants in various communications informed the IDBs and even TeraExchange personnel that they saw the TeraExchange program as a "Trojan Horse," and that they did not want to let TeraExchange "off the mat." As this terminology used by separate Dealer Defendants in separate communications demonstrates, the Dealer Defendants collectively saw TeraExchange (as well as Javelin and other electronic all-to-all trading platforms) as a threat to their privileged position in the marketplace. They were determined to stop this threat and, through their aggressive joint actions, have effectively done so.

190.    As Peter McCarthy, the CEO of ED&F Man Capital Markets, one of the smaller IDBs that hoped to work with TeraExchange, informed TeraExchange's CEO during a lunch in midtown Manhattan, the Dealer Defendants would simply not allow ED&F Man to sign up with TeraExchange.

191.    As a result, no IDB has been able to process a trade through TeraExchange's order book, and some, including ED&F Man Capital Markets, have since left the IRS business. Despite this universal boycott, smaller IDBs have continued to express interest in processing trades through the TeraExchange platform.

192.    Faced with the Dealer Defendants' boycott, TeraExchange has effectively left the IRS market. Despite years of development and millions of dollars in investment capital, only one IRS trade has been executed on TeraExchange since its launch.

C.     **The Dealer Defendants Similarly Boycotted Other All-to-All Trading Platforms**

193.    There are striking similarities between the Dealer Defendants' conduct in jointly boycotting Javelin and TeraExchange, and their conduct in jointly boycotting other trading platforms seeking to offer all-to-all trading platforms, such as trueEX.

194.    In 2013, trueEX sought to bring to market a SEF offering an IRS electronic all-to-all trading platform open to both buy- and sell-side entities. TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for CDS for an IDB called Creditex.

195.    TrueEX was among the first swaps all-to-all platforms to be approved by the CFTC.[36] It offered "trading features, such as anonymous trading, that regulators and traders at funds say will encourage smaller banks and other players, such as hedge funds, to enter the market as dealers[, which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[37] TrueEX "took a very old way of executing and brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[38]

196.    With these attractive features and Mr. Hirani's background in electronic CDS trading, trueEX was ready and able to become a successful all-to-all trading platform for IRS.

---

[36] Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER (Apr. 1, 2013), http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-1057473-1.html.

[37] Levinson, *supra* note 2.

[38] Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INVESTOR. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

Hirani publicly stated that the platform had signed up 62 buy-side participants, explaining that "[c]learly the buyside demand is there."[39]

197.     But "[m]any of the top derivatives dealers, including Goldman Sachs, Deutsche Bank, Citigroup, Barclays, Bank of America Corp, and Morgan Stanley, have declined to use trueEX," stonewalling the trading platform.[40] The Dealer Defendants collectively blocked trueEX from becoming a successful all-to-all trading platform for IRS.

198.     Today, trueEX, like Javelin and TeraExchange, facilitates few trades in the IRS market.[41] And the vast majority of trueEX trades are conducted only on its RFQ platform, on a name-disclosed basis.[42] Most of those trades are actually "compression" trades — which merely consolidate multiple offsetting trades into one position — done to reduce the overall number of trades in a firm's portfolio and to simplify its balance sheet. No bid/ask spread is associated with "compression" trades, so trueEX's execution of those trades does not threaten the Dealer Defendants. In sum, the Dealer Defendants have successfully neutralized trueEX from becoming a competitive threat.

### D.     The Dealer Defendants Deter Buy-Side Customers From Trading on Javelin, TeraExchange, and Other All-to-All Trading Platforms

199.     The Dealer Defendants also conspired to block all-to-all trading of IRS by discouraging their customers from using all-to-all trading platforms such as Javelin and TeraExchange. The Dealer Defendants discourage their customers by withholding all clearing

---

[39] Levinson, *supra* note 2.

[40] *Id.*

[41] Timms, *supra* note 38.

[42] *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, TABB FORUM (Feb. 26, 2015), http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print_preview=true&single=true.

services to their customers who attempt to trade on anonymous all-to-all platforms, insisting on post-trade disclosure practices to discourage anonymous all-to-all trading, and even putting their customers in a "penalty box" in an attempt to discourage future transgressions.

200.     These acts, which the Dealer Defendants did in concert, are designed to make all-to-all trading unattractive to customers and, in some cases, to scare them from attempting to disrupt the OTC market. "[T]his meaningfully disincentivizes [dealer-to-customer] SEFs from making any changes that may receive retaliation from the biggest dealer banks. As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[43]

      1.     *The Dealer Defendants withhold clearing services to buy-side firms that attempt to trade on Javelin, TeraExchange, and other all-to-all platforms*

201.     The Dealer Defendants conspired to dissuade firms from trading on Javelin, TeraExchange, and other all-to-all SEFs by threatening them with the complete withdrawal of clearing services or across-the-board increases in clearing fees that make IRS trading cost prohibitive.

202.     Because clearing performs an important risk mitigation function for many IRS, denial of clearing services effectively hamstrings the buy-side's ability to trade IRS. Therefore, the mere possibility that the Dealer Defendants can, through their FCMs, cut off access to clearing is sufficient to deter many buy-side customers from even attempting to trade on all-to-all platforms.

203.     The Dealer Defendant FCMs are able to coordinate their activities because, among other things, their clearing operations communicate regularly with each other. For

---

[43] KELLEHER, ET AL., *supra* note 20, at 12.

example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan.[44] Mr. Murray regularly communicates with his counterparts at other Dealer Defendants, such as Bob Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services, and Michael Dawley, the head of Goldman Sachs' FCM.

204.    For example, in July 2015, certain of the Dealer Defendant FCMs, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began collectively penalizing certain transgressor buy-side firms by hiking their clearing fees "by as much as ten-fold," while obedient buy-side entities "have been protected."[45] In a competitive market, the Dealer Defendant FCMs would compete with each other to provide clearing services to their customers. Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others collectively threatened to raise or actually raised clearing fees for certain buy-side firms in retaliation for their attempts to trade on Javelin, TeraExchange, and other all-to-all anonymous SEFs. Absent collusion, the FCMs would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants.

205.    The Dealer Defendants' conduct is strikingly consistent. For example, an interest rates head at a high-frequency trading firm "noticed … indirect push-back," including that "one dealer … put the brakes on talks to clear for the firm."[46] The clearing talks "just stalled" after the

---

[44] Matt Cameron, *Deutsche snares JP Morgan's Murray for clearing role*, RISK (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

[45] Peter Madigan, *FCMs try to "off-board" credit and commodity funds*, RISK (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

[46] *Id.*

dealer learned that the buy-side firm "wanted to start acting as a market-maker on Sefs."[47] "A number of other sources at hedge funds and proprietary trading firms" encountered similar "resistance from their dealers."[48] Several buy-side firms have told "similar stories."[49]

2. *The Dealer Defendants insist on "name give-up" to deter buy-side participation on all-to-all platforms*

206. The Dealer Defendants have agreed to insist on "name give-up" in order to discourage buy-side participation on all-to-all trading platforms. Name give-up refers to the practice of identifying the names of each counterparty to an IRS to the other. Buy-side firms and independent SEFs have widely decried this practice because, "[i]n practice, in a SEF environment, this unnecessary disclosure of swap counterparties only serves to inform the dealers of the non-dealer firms [or] banks that are attempting to trade on their platforms, and invit[es] retaliation." Name give-up thus serves as a policing mechanism because it allows the Dealer Defendants to determine which trading platforms abide by the Dealer Defendants' unwritten rules.

207. The Dealer Defendants know that name give-up effectively deters end users from utilizing all-to-all trading platforms. Specifically, name give-up causes uncontrolled "information leakage" in that end users must reveal their trading positions, and thus elements of their trading strategies, to both dealers and other end users, who may be able to exploit that information against them.

---

[47] *Id.*

[48] *Id.*

[49] Rennison, *supra* note 4.

208.     Many end users go to great lengths to keep their trading strategies confidential. As

Ken Griffin, founder of Citadel, has explained, name give-up allows dealers unfairly to "position

their book by taking advantage of their trading counterparties' market insights."[50] Michael

O'Brien, Director of Global Trading at Eaton Vance, has stated: "I don't want to show the size of

my trades, I don't want people to know how I'm trading. Information is the most valuable asset

we have."[51] Similarly, Richard Mazzella, Chief Operating Officer for Global Fixed Income at

Citadel has stated: "Forcing end-users to disclose themselves if they are in a [order book] is a

means to discourage alternative market participants from participating in what were historically

interdealer [order books.]"[52]

209.     There is great demand from the buy-side for all-to-all, anonymous trading.[53] As a

result, "[s]ome asset managers have claimed their use of [order books] will increase if they are

allowed to trade anonymously."[54] Richard Mazzella explained that "removing these barriers is

---

[50] Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

[51] Levinson, *supra* note 2.

[52] Madigan, *supra* note 22 (O'Brien: "I would like my desk to be executing any trades possible on central limit order books").

[53] *See* Rennison, *supra* note 4 (quoting Sam Priyadarshi, head of fixed income derivatives at Vanguard Asset Management, as stating "[w]e have a deep desire to be able to access these markets"); *id.* (quoting Marc Vesecky, Chief Risk Officer for Tower Research Capital, as stating "Tower is definitely supportive of swap trading moving toward open, efficient electronic trading"); *id.* (quoting the Chief Risk Officer of a large hedge fund as stating: "I might have an interest in being a liquidity provider. We already have people on our team who can do that and we are interested in showing bids and offers to the market both for our own portfolio and to take advantage of pricing discrepancies").

[54] Peter Madigan, *Massad: Sefs fear retaliation if they end name give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, RISK (Aug. 6, 2015), http://www.risk.net/risk-magazine/ feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading

---

important in allowing" a true order book to come to market.[55] Ken Griffin noted that "anonymous markets foster competition," adding that "[i]t should not matter who provides the best price."[56] And George Harrington, CFA, Global Head of Fixed Income, Currency, and Commodity Execution at Bloomberg LP stated during a panel discussion at SEFCON on October 26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

210.    For instance, if an order book transaction closes with a dealer on one side, that dealer is able immediately to see if a buy-side participant (a) was allowed access to the order book, and (b) had the audacity to try to capitalize on that access by entering into a transaction over the order book rather than in the dealer-to-customer OTC (or, more recently, dealer-to-customer RFQ) systems. And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform, meaning that they are able to quickly identify any buy-side entity trading on such a platform.

211.    Name give-up should not continue to exist in the IRS market. Name give-up is a historical artifact, and, because IRS trades conducted on SEFs are now centrally cleared, there is no legitimate justification for maintaining the practice on SEFs. Neutral commentators, regulators, and even the Dealer Defendants' employees agree as much.

212.    For instance, Declan Graham of UBS admitted as much during a panel discussion at SEFCON on October 26, 2015, noting that name give-up on order books is pointless for

---

firm as stating: "If volume moves more towards Clobs,[order books], then that's where we'll get more engaged").

[55] Madigan, *supra* note 22.

[56] Devasabai, *supra* note 50.

cleared swaps. During a prior SEFCON panel, Rana Chammaa, executive director of FRC Execution Sales at UBS, acknowledged that customers are "sitting on the sidelines because they [IRS platforms] still maintain post-trade order give-up."[57]

213.   CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling justification" for the practice of name give-up in today's IRS market.[58] Mr. Massad explained that the CFTC had "heard market participants express concern about potential negative consequences of this practice with respect to its effects on liquidity and participation" and he had "not heard a compelling justification" for the practice of name give-up in today's IRS market.[59] Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you should also be post-trade anonymous . . . . [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[60] And former CFTC Commissioner Mark Wetjen has stated

---

[57] Ivy Schmerken, *Swap Markets Debate Anonymous Trading in SEFs*, WALL ST. & TECH. (Jan. 5, 2015), http://www.wallstreetandtech.com/trading-technology/swap-markets-debate-anonymous-trading-in-sefs/d/d-id/1318257.

[58] Madigan, *supra* note 54. The CFTC does not police secret, horizontal collusion between direct competitors in the IRS or any other market. Moreover, the CFTC Chairman has recently stated that the CFTC has no plans to combat name give-up. *See CFTC not planning on anonymity for swaps market*, FIN. TIMES (Oct. 26, 2015), http://www.ft.com/fastft/414101/us-swaps-market.

[59] Remarks of Chairman Timothy Massad Before the ISDA 30th Annual General Meeting (Apr. 23, 2015), http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-17

[60] Madigan, *supra* note 22.

publicly that it is "difficult to rationalize trading protocols that reveal the identities of counterparties on an anonymous, central limit order book."[61]

214.    Although central clearing eliminated all legitimate reasons for requiring name give-up, the Dealer Defendants recognized its importance in maintaining market bifurcation. Specifically, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Barclays and Morgan Stanley, among others, conspired to keep the practice in place by making their Defendant Dealers' provision of liquidity to a trading platform conditional on the use of the practice. The remainder of the Dealer Defendants thereafter joined the agreement.

215.    Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform, including Javelin and TeraExchange, that refused to include name give-up as a feature. In fact, executives from the Dealer Defendants expressly said they would consider Javelin's order book, but only if it included name give-up.

216.    The Dealer Defendants also ensure that name give-up persists through a service known as MarkitWire, which is operated by MarkitSERV. MarkitSERV is dominated by the Dealer Defendants: Brad Levy (formerly of Goldman Sachs' Principal Strategic Investments group) is currently the CEO of MarkitSERV, and Stephen Wolff (formerly the Head of Interest Rate Trading at Deutsche Bank) is the Head of Group Corporate Strategy at MarkitSERV. MarkitWIRE itself is run by Chip Carver, who previously managed fixed income derivatives trading for Goldman Sachs and was responsible for the bank's ecommerce for global interest rate products.

---

[61] *See Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit*, CFTC (Nov. 14, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/opawetjen-10.

217.     MarkitWire is a trade processing service for IRS and other asset classes offered by MarkitSERV, meaning it delivers trades to clearinghouses once they have been executed by counterparties. While it is possible to design IRS trading platforms to feature "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed — the Dealer Defendants force IDBs to send trades to MarkitWire *before* they are cleared.[62] MarkitWire then offers the counterparties to an IRS transaction a "last look" at the trade, where they learn each other's identities and have the option to terminate the transaction. This process is inefficient and more cumbersome than electronic all-to-all trading, and it subjects the parties to unnecessary post-trade name give-up.[63] Javelin's platform, for instance, has the capability to execute trades and send them to the clearinghouse directly while maintaining full anonymity.

218.     The IDBs only use MarkitWire, and disclose the names of the parties to an IRS transaction post-trade, because the Dealer Defendants collectively insist that they do so. Buy-side firms have complained that this practice "is applied to please dealers and that it discourages non-banks from trading, helping to preserve the traditional market structure in which dealer-to-client and interdealer markets were separate."[64]

219.     As a result of collective pressure from the Dealer Defendants, numerous SEFs agreed to impose name give-up on their platforms. Today, the largest IDB SEFs — BGC, DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up,

---

[62] *See* Peter Madigan, *CFTC to clamp down on delays in swap clearing*, RISK (Aug. 5, 2015), http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[63] *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire"). During a recent SEFCON panel discussion, Declan Graham of UBS stated that the lack of straight-through processing delays trade processing and clearing by up to six hours.

[64] *Id.*

thereby effectively preventing buy-side entities from trading on them.[65] These entities recognize the collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are careful about "not biting the hand that feeds you."[66]

220.    When Tradition launched its IDB order book platform, Trad-X, in 2011, it made sure to include name give-up. As a result, the Dealer Defendants supported the platform, meaning that while they boycotted the anonymous all-to-all SEF order books open to the buy-side, they jointly supported an order book open only to themselves.

221.    The Dealer Defendants even touted the benefits of order book trading of IRS, while neglecting to note that they had conspired to save those benefits for themselves alone. Christian Mundigo, Global Head of Rates Trading and Co-Head of Americas Fixed Income at BNPP, for instance, stated that "BNP Paribas believes Trad-X will provide the USD swap market with an efficient electronic execution venue for trading interest rate swaps. We are pleased to support the expansion of this market leading platform across both the Euro and USD markets, where we are committed to be strongly engaged with both the dealer community and our clients."[67] Elie El Hayek, Managing Director, Global Head of Rates Global Banking and Markets at HSBC stated "HSBC is very pleased to support the launch of Trad-X in USD interest rate swaps. Trad-X has proved the concept of a hybrid solution with deep liquidity in EUR swaps and

---

[65] *See Top of the Swaps*, RISK (Nov. 2014), https://www.citadelsecurities.com/_files/uploads/sites/2/2014/12/Ken-Griffin-Risk-Magazine-Top-Of-The-Swaps-November-2014.pdf (noting that dealer-run platforms feature name give-up).

[66] Mike Kentz, *New dawn as non-bank enters interdealer order book*, INT'L FIN. REV. (July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-book/21154986.article.

[67] TRADITION, *Trad-X launches USD Interest Rate Swaps*, http://www.trad-x.com/media/2939/trad-x_launches_usd_interest_rate_swaps.pdf (last visited Feb. 25, 2016).

we look forward to continue to be a key player in an industry initiative in the US that brings transparency and trade certainty to the market."[68]

222.    Ciaran O'Flynn, Managing Director Global Head of Rates eTrading at Morgan Stanley, commented that "Morgan Stanley is committed to supporting execution of swaps trading on electronic venues like Trad-X. These venues increase the transparency of the swaps market and facilitate the move towards mandatory clearing."[69] Christopher Murphy, Global Head of Rates & Credit at UBS, added: "UBS is very pleased to be supporting the launch of Trad-X in USD interest rate swaps. We believe that Trad-X brings a compliant, transparent solution for interest rate swap trading along with deep and firm liquidity. We hope that the launch in USD will build on the success of Euro interest rate swaps."[70]

223.    Name give-up is an effective deterrent to the buy-side's use of all-to-all platforms. As described above, when Mitsubishi traded IRS on Trad-X via an aggregator, its identity was disclosed and it immediately received a phone call from Tradition complaining about Mitsubishi's use of the Trad-X platform. The IDBs and Dealer Defendants thus work together to ensure that buy-side firms are not trading on IDB platforms. As a direct consequence of maintaining name give-up, "[t]o date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[71]

224.    Paul Hamill, formerly employed by UBS and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment,

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] Timms, *supra* note 50.

stating that electronic trading platforms without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[72] CFTC Chairman Timothy Massad has said that numerous "[i]nvestors have complained that they are unable to break into the interdealer markets because they are not anonymous — with names given up after trading."[73] Indeed, one U.S.-based hedge fund manager stated that "[e]nding name give-up on broker Sefs [would] remove[] the ability for dealers to effect retribution on their clients."[74]

### 3. *The Dealer Defendants place transgressors in the "penalty box"*

225.    At the same time the Dealer Defendants collectively prevent all-to-all SEFs from succeeding, they themselves use identical platforms. Tradeweb and a number of IDBs, including ICAP, operate such SEF trading platforms with order book functionality, but they are open only to dealers.

226.    There is no technical reason why these entities could not allow buy-side entities to trade on their platforms as well, but the Dealer Defendants pressure them not to allow this. In fact, the Dealer Defendants have "threaten[ed] to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[75] Such a practice is commonly referred to as being placed in "the penalty box."

227.    The Dealer Defendants pull liquidity from platforms that allow anonymous trading. For example, when an interdealer SEF "run by GFI Group said it would allow

---

[72] *SEFs Win Qualified Praise*, MARKETS MEDIA (Oct. 8, 2013), http://marketsmedia.com/sefs-win-qualified-praise/.

[73] *CFTC not planning on anonymity for swaps market*, *supra* note 58.

[74] Rennison, *supra* note 4.

[75] Madigan, *supra* note 54.

anonymous trading, several banks threatened to pull their business off the platform."[76] In particular, GFI "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity.[77] The complaining banks, which had planned to use GFI to trade with other banks, "contended that allowing *nonbanks* to trade anonymously could hurt their ability as swaps providers."[78] In the face of this pressure, GFI promptly reversed course and implemented name give-up. GFI's story is a well-known example of what happens to brokers that try to implement anonymous trading.

228.    As a former IDB employee explained, when the IDB attempted to bring buy-side customers onto its trading platform in a different asset class, the Dealer Defendants discovered this through name give-up and responded with collective threats "to simply move their business to another broker."[79] He stated that, as a result, the IDB relented, limiting its platform to dealers. The employee added: "We didn't have much choice but to shut it down."[80]

229.    When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition's SEF, bluntly explained that IDB SEFs were not willing to stand up to dealers and go anonymous because of the risk of a loss of liquidity.

---

[76] Levinson, *supra* note 2.

[77] Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[78] *Id*. (emphasis added).

[79] Robert Mackenzie Smith, *Interdealer brokers need to change, say critics*, RISK (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

[80] *Id.*

230.     The Dealer Defendants similarly threaten any buy-side customer with being put in the "penalty box" if it attempts to trade on an all-to-all trading platform, whether it is operated by an IDB or an independent SEF like Javelin or TeraExchange.[81] In such instances, the Dealer Defendants often refuse to trade with the buy-side customer in any venue. Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the buy-side customer from trading IRS as long as it is in the penalty box. In even more egregious circumstances, the Dealer Defendants collectively threaten a transgressing customer with withdrawal of key banking services and refusal to trade other products. This intimidation is very effective at maintaining the status quo, in which every buy-side trade must be executed on an inefficient retail market, ensuring that the Dealer Defendants take a hefty toll on every transaction.

231.     The Dealer Defendants also use the "penalty box" to prevent any non-compliant dealer from breaking ranks, and will refuse to trade with anyone who is suspected of supporting all-to-all trading.

232.     For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.[82] The other Dealer Defendants promptly put Barclays in the "penalty box" and refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.

---

[81] *See* Rennison, *supra* note 4 (quoting a U.S.-based hedge fund manager: "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

[82] *See Bloomberg and Barclays Capital launch interest rate swaps trading*, FINEXTRA (July 21, 2003), https://www.finextra.com/news/fullstory.aspx?newsitemid=9515.

233.    BARX eventually ended its IRS business and became devoted mainly to foreign

exchange ("FX") trading. Even then, Barclays was only allowed out of the "penalty box" and

into the Dealer Defendants' clubhouse in 2008, when Barclays acquired the assets and personnel

of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep

connections with the other Dealer Defendants and went on to bring those relationships and that

network to Morgan Stanley in 2010. This acquisition significantly bolstered Barclays' share of

the IRS market, and Mr. Senft used his connections to help Barclays ingratiate itself with the

other Dealer Defendants, including by taking a stake in Tradeweb.[83] Senft similarly used his

connections to maintain Morgan Stanley's involvement in the conspiracy after he joined in 2010.

E.    **The Dealer Defendants' Conduct Has Chilled Market Progress**

234.    The Dealer Defendants' boycotts have sent a message to the industry that *any*

SEF platform attempting to offer the buy-side access to an anonymous all-to-all trading platform

would be collectively boycotted and crushed, and any buy-side partners would be punished

through a denial of trading services and an imposition of excessive clearing fees.

235.    As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side

entity, stated during a recent SEFCON panel discussion: "No one wants to do anything because

no one wants to be the next person to piss everyone off."

236.    SEFs are afraid even to apply to make IRS "available to trade" (and buy-side

firms are afraid to trade IRS on all-to-all trading platforms) because of the risk of collective

retaliation by the Dealer Defendants as happened to Javelin.

---

[83] TRADEWEB, *Barclays Capital Takes Equity Stake in Tradeweb* (Sept. 10, 2009),
http://www.tradeweb.com/news/news-releases/barclays-capital-takes-equity-stake-in-tradeweb/.

237.     Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background." Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs, make direct threats to SEFs in order to enforce market discipline. In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

238.     As a result, the Dealer Defendants have effectively deterred any entities from offering anonymous all-to-all trading to the buy-side.

## IV.     DEFENDANTS' OTHER EFFORTS TO BLOCK ALL-TO-ALL TRADING OF INTEREST RATE SWAPS

### A.     The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform

239.     Javelin and TeraExchange were not the very first trading platforms for IRS. By early 2008, Tradeweb was poised to introduce an electronic all-to-all trading platform to the IRS market — a development that the marketplace should have embraced. Instead, the Dealer Defendants acted in concert to neutralize the threat Tradeweb posed.

240.     Tradeweb was founded 1998 as a private, dealer-backed firm that focused on creating an online marketplace for fixed-income products, such as U.S. Treasuries. Tradeweb subsequently offered a dealer-to-customer RFQ platform for IRS that lacked anonymous trading. On that platform, buy-side customers could request non-executable and non-binding quotes from multiple dealers, but not from other buy-side end users. Tradeweb's platform facilitated the Dealer Defendants' roles as the sole market makers for IRS and streamlined trades with customers. Because Tradeweb's platform relied on the dealers to make markets, its success was dependent on the dealers providing liquidity to meet buy-side trading requests.

78

241.     In 2004, the dealers sold Tradeweb to Thomson Reuters, confident its dependency on the dealers' liquidity would effectively keep it within their control. IRS trading volumes thereafter continued to grow.

242.     Soon after 2004, due to increased trading volumes and standardization, IRS had evolved to the point where many swaps products fully supported the introduction of all-to-all trading. By well before 2007, hundreds of trillions of IRS were traded in standard forms. There was no need to maintain a privileged set of dealers to provide liquidity in the market. OTC dealers are sometimes useful sources of immediacy for infrequently traded financial instruments where it would be rare for any two buy-side firms to have reasons to trade at or around the same time. But that does not describe the majority of the IRS market and has not for many years. The benefits that central clearing and all-to-all trading could bring to the IRS market were widely recognized by market participants, regulators, and economists. There was no procompetitive reason for the OTC system to continue to dominate IRS trading.

243.     Recognizing the threat this impending market evolution posed to the Dealer Defendants' collectively privileged position as the primary market makers, Goldman Sachs' Principal Strategic Investments group devised a "dealer consortium" strategy to work with its biggest competitors, *i.e.*, the other Dealer Defendants, to control how key markets in which Goldman Sachs operated as a dealer would evolve.[84] The Goldman Sachs group was organized principally for the specific purpose of controlling market evolution to protect the "dealer community" from the emergence of all-to-all trading that would, in the banks' internal terminology, "disintermediate" them as dealers.

---

[84] Liz Moyer, *Goldman Group Takes Stakes in Market Evolution*, MARKETWATCH (Jan. 23, 2012), http://www.marketwatch.com/story/goldman-group-takes-stakes-in-market-evolution-2012-01-23.

244.     Many of the other Dealer Defendants employ similar "market strategy" groups to coordinate with competitors to control market structures.[85] For example, JP Morgan's Strategic Investments group "co-invest[s] with other strategic investors, including banks and market structure firms to gain and sustain competitive advantage by developing and executing principal strategic investments."[86] Bank of America's group, Global Strategic Capital Initiatives, was headed by Mary Harman from 2006 to 2015. Credit Suisse's practice is known as the Strategic Principal Investments Group, and it has been run by Theofilos Kotridis since 2004.

245.     Deutsche Bank utilizes a group referred to as Strategic Investments, which was headed by Stephen Wolff from 2004 until 2014. Morgan Stanley's group is also called the Strategic Principal Investments group; it has been led by Gary Offner since 2005. Citi also has a specific strategic investments group, which is headed by William Hartnett. Those Dealer Defendants without distinct market strategy groups, including Barclays and BNPP, conduct similar strategic activities through their trading businesses. As discussed in more detail below, personnel in these divisions regularly communicate with their counterparts at other Dealer Defendants to ensure that the dealers are acting in a coordinated fashion.

246.     The Dealer Defendants' strategic investment units are "intensely secretive."[87] The banks purposely keep the operations of these groups hidden from public scrutiny, and very little

---

[85] Philip Georgiadis & Tim Cave, *Strategic investment units driving the evolution of trading*, FIN. NEWS (Mar. 31, 2015), http://m.efinancialnews.com/story/2015-03-31/banks-strategic-investment-units-drive-the-evolution-of-trading ("While most bulge-bracket banks have principal strategic investment units, US investment banking giants dominate the space and Goldman Sachs, in particular, is widely viewed as one of the largest and most organised.").

[86] *Id.* (quotation marks omitted).

[87] *Id.*

has ever been disclosed about them publicly.[88] When one publication attempted to research these groups in 2015, for example, all ten banks that were approached refused to discuss their groups on the record.[89]

247.    The members of these groups understand themselves to constitute a so-called "dealer community" that controls how markets evolve. The heads of these groups met with each other regularly, and secretly, in person and by telephone and through electronic communications, to develop and implement strategies to protect the Dealer Defendants' role in a bifurcated IRS market. They also collaborated closely with the respective heads of their IRS trading desks.[90]

248.    By late 2007, Tradeweb itself was poised to introduce electronic all-to-all trading to the IRS market — a development in high demand by the IRS market. The Dealer Defendants realized that a modern all-to-all electronic trading platform would be favorable to the buy-side and disruptive to the established order of the OTC market. Tradeweb touted itself as a "real-time trading platform" and boasted it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[91]

249.    In response, the Dealer Defendants resolved to regain control of Tradeweb. In late 2007, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Lehman Brothers (later of Barclays and Morgan Stanley), all members of their respective dealers' market strategy groups, devised and, with the help of the other Dealer Defendants, put in

---

[88] Moyer, *supra* note 84.

[89] *See id.*

[90] *Id.*

[91] *See* TRADEWEB, *Thomson to Acquire TradeWeb* (Apr. 8, 2004), http://www.tradeweb .com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

place a conspiracy to eliminate the threat from Tradeweb and to organize themselves to secretly control the future development of the IRS market.

250.    Messrs. Levy, Senft, and Wolff recognized that Tradeweb's liquidity contracts with the Dealer Defendants — which Tradeweb needed in order to drive volume to its RFQ platform — were expiring. As a result, Tradeweb began to worry that the banks would steer liquidity to alternate trading platforms, starving it of necessary trading volume and revenue. According to one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[92]

251.    Levy, Senft, and Wolff thus recruited other Dealer Defendants — through contact with members of their market strategy groups — to join an initiative they called "Project Fusion," which was designed for the Dealer Defendants to capitalize on Tradeweb's vulnerability and take back effective control of the company.[93]

252.    Part of the plan was a publicity strategy designed to shape press coverage in a way that obscured the Dealer Defendants' true intentions. In October 2007, Tradeweb and the Dealer Defendants issued a press release announcing that "the dealers will invest approximately $180 million to purchase a minority stake in TradeWeb's established markets."[94] This press release was intended to lead numerous journalists to relay the same tale, repeating virtually

---

[92] Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

[93] Georgiadis & Cave, *supra* note 85 ("electronic fixed income platform Tradeweb" is an "example[] of companies spawned by the [Dealer Defendants' strategic investment] divisions.").

[94] TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007), http://www.tradeweb.com/MediaCenterTwoColPage.aspx?Pageid=1124&id=1881&LangType=1033&&LangType=1033&ekfxmen_noscript=1&ekfxmensel=ef6f32368_6_84.

verbatim the conspirators' description of the banks' "minority" investment. "NINE BANKS TO BUY MINORITY STAKE IN TRADEWEB," read a typical headline.

253.    But the Dealer Defendants' press releases concealed the true nature of the transaction. Nowhere was it revealed that the Dealer Defendants had simultaneously created a shadow company, called Tradeweb New Markets LLC, of which they would own an overwhelming majority (80%) purchased from Thompson at an additional cost of $280 million. Only a single passing reference in the press releases to vague, otherwise unspecified investments pointed to the real program: "Separately," the press releases mentioned, "Thomson and the dealers will fund additional investment in asset class expansion."

254.    Tradeweb Markets LLC and Tradeweb New Markets LLC were formed within 24 hours of each other between October 1 and 2 of 2007. Tradeweb Markets LLC was technically the first to be born, and was the entity designed by the Dealer Defendants to be the public face of the transaction — the receiver of the "minority" interest and $180 million investment. Next came Tradeweb New Markets LLC, which was conceived and created with one central purpose:  to host the conspiracy.

255.    The Dealer Defendants also hid their true purpose by making the misleading statement in the press release that the second (unnamed) investment was limited to "asset-class expansion."  The "old" parent Tradeweb platform had largely provided OTC bond trading services. The new publicized, headline platform would take on the "old" asset classes. In particular, the Thomson-majority owned Tradeweb Markets LLC would absorb its equities "indication of interest" system, AutEx, as well as its FIX connectivity platform. Its main mission, however, was to lease itself to the platform that Dealer Defendants controlled with an 80% majority:  the new derivatives and future IRS platform of Tradeweb New Markets LLC.

256.    Dealer Defendants structured the transaction in this way so they could control the incipient IRS trading platform without *being seen* as controlling it. By proclaiming to have only a small stake in the platform that in reality held assets they regarded as unimportant, Dealer Defendants hid their greatest asset.

257.    As part of their joint agreement, the Dealer Defendants that invested in Tradeweb (Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS[95]) secretly agreed with each other that they would not support other trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all trading. Barclays was initially not allowed to participate in Tradeweb because, as explained above, the other Dealer Defendants had placed it in the "penalty box" for attempting to launch an IRS electronic trading platform. Barclays later was allowed to become an investor in Tradeweb in 2009 (after its penalty had expired).

258.    Dealer Defendants installed their senior personnel, many of which came from their strategic investment groups, on the boards of directors of both Tradeweb Markets and Tradeweb New Markets. The Dealer Defendants' personnel occupied sixteen of the twenty-six seats on the Tradeweb Markets Board of Directors and sixteen of the twenty-four seats on the Tradeweb New Markets Board of Directors. By holding a collective majority vote on each board, Dealer Defendants effectively controlled both Tradeweb entities.

259.    The Dealer Defendants selected Lee Olesky, the former Chief Operating Officer for Fixed Income at Credit Suisse, to serve as CEO of both entities. And they installed one of the chief architects of their consortium strategy, Vic Simone, a Managing Director and then-Global

---

[95] Bank of America became an investor in 2008, after it acquired Merrill Lynch. Citi also became an investor in 2008. TRADEWEB, *Citi Takes Equity Stake in Tradeweb* (Apr. 8, 2008), http://www.tradeweb.com/News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb/.

Head of Principal Strategic Investments at Goldman Sachs, as Chairman of the Board of Directors of Tradeweb Markets.[96] Brad Levy, a chief architect of the Dealer Defendants' takeover of Tradeweb, served as a board member of both Tradeweb Markets and Tradeweb New Markets. In 2011, Mr. Levy took over as Global Head of Principal Strategic Investments at Goldman Sachs and, at the same time, became the Chairman of the Board of Directors of Tradeweb Markets. In addition to Messrs. Simone and Levy, Goldman Sachs installed Colin Corgan, a partner on its Rates Desk, on the boards of both Tradeweb Markets and Tradeweb New Markets.

260.    The Dealer Defendants also installed key strategic personnel on the governance committees of both entities, so they could control Tradeweb's IRS business strategy and use the entities to collude in secret.

261.    Bank of America installed Shea Wallon, a Managing Director in the bank's Global Strategic Capital Initiatives group, on the Boards of both Tradeweb Markets and Tradeweb New Markets. Other Bank of America personnel on the Tradeweb New Markets Board included Luke Halestrap, the Head of Emerging Markets Interest Rates, and David Moore, the Head of North America Rates Trading.

262.    Barclays personnel on the Tradeweb Markets Board of Directors included Dexter Senft, who subsequently headed Morgan Stanley's Fixed Income E-Commerce division, and Andrew Challis, the Head of eFICC Distribution and Market Strategic Investments. Barclays personnel on the Tradeweb New Markets Board of Directors included Christopher Mosher.

---

[96] *See* TRADEWEB, *Tradeweb Appoints New CEO* (Sept. 9, 2008), http://www.tradeweb.com/News/News-Releases/Tradeweb-Appoints-New-CEO/.

263.     Citi installed Sandeep Arora, the Chief Operating Officer, and Nicholas Brophy, the Head of Rates Trading in the Americas, on the boards of both Tradeweb Markets and Tradeweb New Markets.

264.     Credit Suisse installed Sean Flynn, the Global Head of Investment Banking Strategy, and Timothy Blake, the Head of Interest Rates Trading in the United States, on the boards of both Tradeweb Markets and Tradeweb New Markets.

265.     Deutsche Bank filled the boards of Tradeweb Markets and Tradeweb New Markets with Michele Faissola, the Head of Global Rates, and Stephen Wolff, the Head of Strategic Investments, Head of Fixed Income e-Commerce, and Head of Interest Rates Trading.

266.     JP Morgan installed Simon Maisey on the Tradeweb Markets Board of Directors (and he joined Tradeweb as a Managing Director in 2014), and Christopher Paul Willcox, the Global Head of Rates Trading and the Head of Global Rates Strategic Investments, on the Tradeweb New Markets Board of Directors. In addition, Kemal Askar, JP Morgan's Head of Rates Trading in the United States, served on the boards of both Tradeweb Markets and Tradeweb New Markets.

267.     Morgan Stanley installed Dexter Senft, the Global Head of Fixed Income E-Commerce, on the Tradeweb Markets Board of Directors and David Moore, the Global Head of Structured Interest Rates, on the Tradeweb New Markets Board of Directors.

268.     RBS placed Richard Volpe, the Global Head of Dollar Interest Rates, on the Tradeweb Markets Board of Directors, and Michelle Neal, the Global Head of Electronic Markets and co-head of FICC Prime Services, on the Tradeweb New Markets Board of Directors.

269.     UBS personnel on the Tradeweb Markets Board of Directors included Joan Lavis, Global Head of Strategic Investments, and Paolo Croce, Head of European Rates. UBS placed Stuart Taylor, the Head Global eBusiness in Fixed Income, on the Tradeweb New Markets Board of Directors. [97]

270.     These personnel are many of the primary architects of the conspiracy. The Dealer Defendants used and continue to use the cover of Tradeweb to meet in private to conspire to control the IRS market. The aforementioned individuals, and others, met regularly under the cover of Tradeweb's Board and informally, outside of formal Board duties, to coordinate their joint efforts to prevent the buy-side from being able to trade IRS in an all-to-all, limit order book model.

271.     In addition to routine conference calls, which take place as often as every week, the Board meets annually in person in Miami, Florida. The Dealer Defendants used these meetings to discuss and coordinate their strategy and to further their conspiracy to maintain a bifurcated IRS market.

272.     These personnel also regularly discussed market structure issues outside of the board or committee meetings. Chris D'Annibale, the Head of Interest Rate Swaps for Tradeweb's interdealer SEF, Dealerweb, regularly hosted dinners at his home on Long Island and at restaurants in New York City that were attended by representatives of the Dealer Defendants. At these dinners, the Dealer Defendants coordinated their strategies for the IRS market. In such formal and informal communications and meetings, the Dealer Defendants

---

[97] Tradeweb New Markets LLC merged into Tradeweb Markets LLC in 2010, leaving Tradeweb Markets LLC as the sole company. The Dealer Defendants have continued to hold a controlling majority of seats on the Board of Directors of Tradeweb Markets LLC ever since the merger, giving them continuing control over Tradeweb Markets LLC.

regularly discussed their plans for keeping the market bifurcated and preventing the transition to all-to-all trading.

273. The Dealer Defendants also control Tradeweb via its governance committees. Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[98] Acting through these committees, the Dealer Defendants met and agreed to coordinate their conduct to ensure no threat to their collective dominance of the OTC market would succeed. To facilitate the conspiracy, Tradeweb keeps these committees and the identities of their members hidden from the public.

274. Tradeweb holds itself out as an independent company, pursuing its own objectives in the market. The Dealer Defendants, however, pressured Tradeweb to agree to take actions against its own individual interest. For instance, the independent (*i.e.*, non-bank) managers of Tradeweb recognized it would be in Tradeweb's interest to launch an all-to-all anonymous electronic trading platform, and took steps to implement such a platform. But upon learning of these attempts by Tradeweb's personnel, the Dealer Defendants quickly pressured them to change course. In turn, the Tradeweb managers agreed with the Dealer Defendants that Tradeweb would not implement pro-competitive changes to its trading platform.

275. The Dealer Defendants publicly tout Tradeweb as a modern, efficient trading platform that can provide "accurate pricing information" and "greater market transparency."[99]

---

[98] *See* TRADEWEB, *DW SEF LLC: SEF Participation Committee Charter*, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Participation%20Committee%20Charter.pdf (last visited Feb. 24, 2016); TRADEWEB, *TW SEF LLC: SEF Participation Committee Charter*, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/TW%20SEF%20Participation%20Committee%20Charter.pdf (last visited Feb. 24, 2016).

[99] TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007), http://www.tradeweb.com/MediaCenterTwoColPage.aspx?

But these "benefits" are a sham, and serve only to placate the buy-side's increasing demands for all-to-all trading. Pursuant to its agreement with the Dealer Defendants, Tradeweb merely put a new sheen on the OTC market structure — it facilitated *only* dealer-to-customer trades on an RFQ platform, rather than through an order book, and did not allow buy-side customers to trade directly with one another.

276.    As a result, the Dealer Defendants use Tradeweb to extract the same supracompetitive profits on dealer-to-customer trades that they had historically realized in the OTC market. Absent a conspiracy, this would be against Tradeweb's independent interest. Making an efficient, hotly demanded trading platform available to all market participants would increase the number of trades on Tradeweb and thus increase the fees that it obtained. Tradeweb's conduct only makes sense as an instrument of the conspiracy.

277.    Today, pursuant to its agreement with the Dealer Defendants, Tradeweb plays an active role in maintaining a two-tiered market structure. Tradeweb currently operates two different SEFs: Dealerweb, which is "designed exclusively for dealers" and allows anonymous trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[100] Tradeweb charges approximately $50,000 per month to trade on Dealerweb, but only approximately $100 per month to trade on Tradeweb. It is "challenging to find a legitimate rationale for this enormous cost differential between these two platforms operated by the same company."[101] That is because the real reason for this cost

---

Pageid=1124&id=1881&LangType=1033&&LangType=1033&ekfxmen_noscript=1&ekfxmensel=ef6f3 2368_6_84.

[100] KELLEHER, ET AL., *supra* note 20, at 12.

[101] *Id.*

structure — which the Dealer Defendants jointly set up — is that it "effectively establishes and entrenches a bifurcated dealer-to-dealer and dealer-to-customer marketplace" in furtherance of Defendants' conspiracy.[102] In fact, Tradeweb is so committed to denying buy-side access to all-to-all trading platforms that while Tradeweb SEF technically offers an "order book," this platform is not available to users in any meaningful sense, and those in the industry do not even view it as an active trading platform.

278.     As Jon Williams, Managing Director and Head of U.S. Institutional Market Operations at Tradeweb, stated during a recent panel discussion at SEFCON in New York City: "we don't have buy-side participants" on Dealerweb. Again, this results from Tradeweb's agreement with the Dealer Defendants, and from their agreement with each other.

### B.     The Dealer Defendants Utilize Other Forums to Collude

279.     While Tradeweb is the principal consortium through which the Dealer Defendants secretly work together to control the IRS market, the Dealer Defendants coordinate their conspiracy through other forums as well.

280.     One of these is the International Swaps and Derivatives Association ("ISDA"). ISDA is nominally an industry trade group, but in reality, it served the interests of the Dealer Defendants.

281.     From 2008 to the present, the Dealer Defendants controlled ISDA's Board of Directors and used those roles to discuss the IRS market and their conspiracy. The following employees of the Dealer Defendants hold positions on the ISDA Board of Directors, and use ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-all electronic platforms for IRS trading: Stephen O'Connor (Morgan Stanley: Chairman), Ciaran

---

[102] *Id.* at 12-13.

O'Flynn (Morgan Stanley: Director), Keith Bailey (Barclays: Secretary), Diane Genova (JP Morgan: Treasurer), Biswarup Chatterjee (Citigroup: Director), Kieran Higgins (RBS: Director), Thibaut de Roux (HSBC: Director), Elie El Hayek (HSBC: Director), Christopher Murphy (UBS: Director), Will Roberts (Bank of America: Director), and Eraj Shirvani (Credit Suisse: Director).

282.    In addition, the Dealer Defendants meet and collude under the auspices of meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of various FIA "working groups." The following employees of the Dealer Defendants currently hold positions on the Board of Directors of FIA America (FIA's American division): M. Clark Hutchison (Deutsche Bank), Emily Portney (JP Morgan), Michael Dawley (head of Goldman Sachs' FCM), Craig Abruzzo (Morgan Stanley), Jeffrey Jennings (Credit Suisse), Raymond Kahn (Barclays), Jerome Kemp (Citi), Najib Lamhaouar (HSBC), Edward Pia (UBS), and George Simonetti (Merrill Lynch, Pierce, Fenner & Smith).

283.    ISDA and FIA often coordinate to create "working groups" that provide a forum for collusion. One such working group was devoted to the drafting of the "Cleared Derivatives Execution Agreement" ("CDEA") — a standard form contract intended to govern the relationship between FCMs and their customers. The "CDEA Drafting Committee" was chaired by Maria Chiodi, a Director and In-House Counsel at Credit Suisse.

284.    The CDEA Drafting Committee held numerous meetings throughout 2010 and 2011. One such meeting was held on April 8, 2011 at the offices of Credit Suisse in New York City. Jamie Cawley, Javelin's former CEO, and Suellen Galish, Javelin's General Counsel, learned of the meeting in advance, and requested an invitation because they were concerned that

the CDEA Drafting Committee was being used to prevent or limit trading on all-to-all anonymous trading platforms.

285.    At the meeting, Ms. Galish asked how the CDEA — which appeared to have been drafted solely for OTC transactions, and did not seem to cover IRS trades executed on a SEF — would work for trades executed on a SEF. Athanassios Diplas, then a Managing Director at Deutsche Bank and Co-Chair of ISDA's Industry Governance Committee, immediately asked for Ms. Galish's name and who she worked for, and refused to answer her question.

286.    After the meeting, Ms. Chiodi told Mr. Cawley by email that it was inappropriate for any representatives of SEFs to attend future CDEA Drafting Committee meetings. Thereafter, Javelin was prevented from attending any further Drafting Committee meetings. Although the drafting of the CDEAs was purportedly an industry wide process, all-to-all SEFs including Javelin and TeraExchange were shut out of the process, though co-conspirators Tradeweb and ICAP had a voice through their conspiracy with the Dealer Defendants.

287.    The Dealer Defendants also met and conspired through the IDB Tradition. From 2013 to 2015, Tradition personnel hosted monthly meetings in New York with the collective heads of the Dealer Defendants' IRS trading desks to discuss issues relating to SEFs. The Dealer Defendants used these meetings to coordinate their positions regarding the IRS market and to ensure that none of them broke ranks from each other to support electronic trading platforms that would threaten the Dealer Defendants' control of the market.

**C.    The Dealer Defendants Prevent Interdealer Brokers From Opening All-to-All Trading Platforms to the Entire Market**

288.    In addition to taking control of Tradeweb and preventing it from offering more competitive trading, the Dealer Defendants conspired to prevent other market actors from

opening all-to-all trading platforms. In particular, the Dealer Defendants identified IDBs as a potential platform for facilitating all-to-all trading, and moved decisively to quash that threat.

289.    By 2008, a number of IDBs were well-positioned to bring to the entire market all-to-all IRS trading platforms. Many already operated such platforms in the interdealer market, and opening access to others would not have imposed any additional technological burden. Since IDBs earned brokerage fees on each trade on their platforms, they had strong financial incentives to open their platforms. Great demand existed for this to happen.

290.    The Dealer Defendants, however, jointly used a carrot and stick approach to prevent IDBs, including ICAP, from opening their platforms. As a carrot, the Dealer Defendants agreed with ICAP and other IDBs that the dealers would direct IRS transactions between themselves onto IDB platforms and that, in exchange for this dependable revenue stream, the IDBs would not allow all market participants to trade on their platforms. As part of this arrangement, the Dealer Defendants committed to the IDBs that they would prevent any customer-facing platforms from expanding into the interdealer space, including into the IRS interdealer market. At the same time, the Dealer Defendants also threatened the IDBs with collective boycotts if they allowed all market participants access to their platforms.[103]

291.    In 2009, ICAP, the leading IDB in IRS, was poised to break from this arrangement and begin offering all-to-all trading of IRS. In April 2009, one of ICAP's competitors, Tradeweb (which was at this point owned by the Dealer Defendants), decided to enter the mortgage bond market, offering a trading platform through a division known as

---

[103] *See, e.g.*, Levinson, *supra* note 2 (noting that when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform"). GFI's platform was targeted at the CDS market, but industry sources have confirmed that similar behavior has occurred in the IRS market.

Dealerweb.[104] The result was that ICAP "lost 85 percent of its business over six weeks" in the mortgage bond market after Dealerweb "basically walked away with the market."[105] Tradeweb's move left ICAP and other IDBs concerned about whether Tradeweb would launch a similar platform in other asset classes, including IRS — a move that clearly would be in Tradeweb's self-interest.

292.    In retaliation for capturing the mortgage bond market, ICAP threatened the Dealer Defendants with an all-to-all platform for IRS. ICAP was already developing an electronic-trading platform for the European IDB IRS market called i-Swap that it could have launched as an all-to-all fully anonymous IRS trading platform in the United States and that could have included the buy-side.[106] This threatened to collapse the bifurcated IRS market the Dealer Defendants were working together to maintain.

293.    But ICAP never launched the platform. To avoid damaging each other's business, ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer Defendants would not further expand (through Dealerweb) into the IDB space in exchange for ICAP not expanding into the dealer-to-customer space by establishing an all-to-all anonymous IRS trading platform. In addition to their economic leverage over ICAP, the Dealer Defendants were able to broker and maintain this agreement because they maintain close relationships with ICAP's CEO, Michael Spencer.

---

[104] *See* Bryce Elder & Neil Hume, *Icap hurt by banks' platform*, FIN. TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz419KBvtLz.

[105] Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009).

[106] *See* Michael McKenzie, *Rate swap traders wait for no man*, FIN. TIMES (Oct. 19, 2010), http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html#axzz3p2lJ0933 (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market").

294.     Despite it being in Tradeweb's economic self-interest to repeat its rapid success in the mortgage bond interdealer market in other markets, Dealerweb did not expand into IRS or any other market, pursuant to its agreement with the Dealer Defendants, though Dealerweb maintains the capabilities to execute IRS trades as a threat to non-compliant IDBs. Similarly, pursuant to its agreement with the Dealer Defendants, and against its own economic self-interest, ICAP limited to dealers the ICAP's i-Swap platform.[107]

295.     In February 2013, ICAP expanded i-Swap to the United States, but again limited participation to the dealers.[108] Although ICAP publicly promoted that its platforms were open to all entities in order to comply with certain provisions of Dodd-Frank, its brokers in actuality prevented non-dealer access to i-Swap by refusing to accept bids or offers from non-dealer entities for voice-brokered trades or for inclusion on the order book platform. ICAP refused such access as a result of an agreement with the Dealer Defendants.

296.     In return, the Dealer Defendants supported i-Swap by directing their business to it, a strategy designed to keep ICAP happy by prolonging its status as the lead IRS IDB and ensure that it saw no need to open up the platform to the buy-side. Certain of the Dealer Defendants also entered into written agreements covenanting they would not support other electronic IDB platforms, and would inform each other if they were approached by such a platform.

---

[107] *See* ICAP, *i-Swap*, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Feb. 24, 2016) (noting that upon launch, i-Swap was not open to buy-side participants, that i-Swap "has a number of features that are specifically developed to reflect the trading strategies of the banks" and that, even today, i-Swap is not directly open to the buy-side).

[108] *See* ICAP, *ICAP Launches i-Swap in the US* (Feb. 19, 2013), http://newsroom.icap.com/icap-launches-i-swap-in-the-us.

297.     ICAP's restriction on the use of i-Swap was the result of the agreement between ICAP and the Dealer Defendants to maintain the bifurcation of the market for IRS. Absent Defendants' conspiracy, it would have been in ICAP's interest to launch i-Swap as an all-to-all anonymous trading platform where all the market participants could trade directly with each other without going through a dealer.

298.     ICAP also acted as a key coordinator of the Defendants' conspiracy through regular meetings with senior employees of the Dealer Defendants. For example, a senior ICAP executive regularly met and golfed with the head of Goldman Sachs' IRS business until November 2013, when the senior ICAP executive changed positions at ICAP. During these meetings, the senior ICAP executive and the head of Goldman Sachs' IRS business coordinated their positions regarding ISDAfix, a key benchmark interest rate for a range of financial derivative instruments, and maintaining the status quo in the IRS market. During this time, the senior ICAP executive also met monthly with executives from the other Dealer Defendants to coordinate their positions regarding ISDAfix and maintaining the status quo in the IRS market.

299.     In exchange for ICAP's agreement not to open all-to-all trading to the buy-side, the Dealer Defendants continue to direct liquidity only to SEF operators, such as co-conspirators ICAP and Tradeweb, that play by the agreed-upon rules of the market. Trading platforms that comply with the rules of the conspiracy receive the vast majority of the trading volume of the Dealer Defendants, resulting in high revenues.

300.     Industry data demonstrates the market bifurcation resulting from Defendants' conspiracy.[109] Clarus reports daily trading volume for each SEF, and each SEF is categorized as either a "D2C" (Dealer-to-Client) or "D2D" (Dealer-to-Dealer) SEF.

---

[109] The data below comes from Clarus SEFView, *Data for 02/16/2016 – 02/22/2016*.

301.    As shown in the figure below, approximately 98% of what Clarus considers Dealer-to-Client trading volume occurs on Tradeweb and Bloomberg. Trading on these two platforms occurs exclusively through the RFQ protocol with post-trade "name give-up." These trading features are at the core of the conspiracy, and any buy-side-facing SEF that breaks these rules is left de minimis (or no) trading volume.



302.    The D2D side of the market is made up of SEFs that have agreed to play by the rules of the conspiracy. *None* of the D2D SEFs shown below allow buy-side customers to trade on their platforms.



303.    Notably, the Dealer Defendants have maintained the market share of Dealerweb,

the interdealer SEF owned and operated by Tradeweb, at a mere 2%. This reflects the fact that

the Dealer Defendants are — *jointly* — rewarding the IDBs for complying with their demands

that IDB platforms remain off-limits to non-dealers. At the same time, the Dealer Defendants —

*jointly* — maintain Dealerweb as a nascent threat to those IDBs, by providing it with minimal

liquidity. The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their

liquidity to Dealerweb, as they had done before, for example, in the mortgage-bond market,

when the Dealer Defendants abruptly shifted 85% of trading volume to Dealerweb, "walking

away with the market."[110]

---

[110] Leising & Shenn, *supra* note 105.

### D.   The Dealer Defendants Prevent Clearinghouses from Bringing All-to-All Trading to the Market

304.   Defendants' collusion thus squashed the most imminent threat to their IRS trading profits — all-to-all trading. Yet, the Dealer Defendants were not satisfied. They also coordinated on their preferred IRS clearinghouse and boycotted any clearinghouse that might open the door to all-to-all trading.

305.   Because a clearinghouse could easily evolve into an all-to-all trading platform, and thereby threaten disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse they saw as a threat to their bifurcation of the IRS market. As a JP Morgan report stated, "the main concern for the Investment Banking industry is that *clearing is the first step leading to exchange*/SEF trading for OTC products."[111] The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[112]

306.   On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS. At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IRS contracts. CME publicly announced that "the first order of business . . . is to broaden the product base. The CME plans to roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[113]

---

[111] J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks: Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, GLOBAL EQUITY RESEARCH (Sept. 8, 2010) (emphasis added).

[112] PETER NORMAN, THE RISK CONTROLLERS: CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS 302 (2011).

[113] Daniel P. Collins, *CME acquires Swapstream*, FUTURES MAGAZINE (July 24, 2006), http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

307.    In July 2007, CME announced its plans to offer the market a cleared IRS product, including IRS denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

308.    CME is a threat to the Dealer Defendants because, as an established exchange, it had the potential to offer an all-to-all trading platform and central clearing of IRS. In fact, CME stated in July 2007 that "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[114]

309.    The threat to the Dealer Defendants was compounded on February 4, 2008, when CME announced that thirty three buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[115] The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

310.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream. They instead jointly committed to clear IRS transactions only through the clearinghouse they knew they could control — LCH.Clearnet. They also used their market power and influence to prevent other sell-side banks and IDBs from

---

[114] CME GROUP, *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants* (July 17, 2007), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[115] *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap*, PR NEWSWIRE (Feb. 4, 2008), http://www.prnewswire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

dealing with Swapstream.[116] Because, unbeknownst to Plaintiff, the Dealer Defendants jointly agreed to refuse to deal with Swapstream, the platform never launched.[117]

311.    As a result of the Dealer Defendants' concerted action and agreements to refuse to deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked the emergence of electronic order book trading of IRS.

## V.    ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD PREDOMINANTLY TRADE ON JAVELIN, TERAEXCHANGE, AND OTHER ALL-TO-ALL TRADING PLATFORMS

### A.    Relevant Market

312.    The relevant market is the market for IRS in the United States. IRS are, and are widely perceived by those in the industry to be, a unique financial product. The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

313.    Other derivative products are not substitutable for IRS. The rapid rise in IRS volume following their inception in the mid-1980s demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

### B.    The Dealer Defendants Have Substantial Market Power

314.    Currently, the Dealer Defendants continue to account for most IRS dealing, and they continue to earn extraordinary profits from their dealer-to-dealer OTC-like trading.

315.    Each Dealer Defendant possesses a significant share of the IRS market, and they collectively dominate the market. Based on available market-share information, the Dealer

---

[116] E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond: The Path to Electronic Markets*, DERIVALERT (Jan. 2010).

[117] *Id.*

Defendants collectively control at least 70% of the market. Indeed, in 2014, five of the ten Dealer Defendants collectively controlled over 50% of the IRS market by themselves while the remaining five Dealer Defendants controlled at least an additional 20% of the IRS market.[118]

316.     The Dealer Defendants' market power is well-recognized. As Paul Rowady of the TABB Group stated: "Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."[119] Mr. Rowady also stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the moves, as they are counterparty to every trade."[120]

317.     The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

### C.     Defendants' Conspiracy Robbed Javelin and TeraExchange of Substantial Profits

318.     As a result of the Dealer Defendants' joint boycott of Javelin, TeraExchange, and other anonymous all-to-all trading platforms, the SEFs that have succeeded are either controlled by the Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have

---

[118] In 2014, Bank of America was reported to control 12.6% of the IRS market, JP Morgan 11.4%, Deutsche Bank 9.5%, Citigroup 9.2%, and Barclays 8.2%. In 2012, Goldman Sachs was reported to control 6.9% of the IRS market, HSBC 5.0%, BNPP 4.9%, and Morgan Stanley 3.2%. The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012. *See* GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES: DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

[119] Michael Mackenzie & Gillian Tett, *Markets: Frozen in time*, FIN. TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0.html#axzz 3sFYwvyw0.

[120] *Id.*

recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing a dealer-to-customer RFQ platform (Bloomberg).[121]

319.    Javelin, TeraExchange, and other SEFs that attempted to abolish name give-up have seen their customers threatened and their businesses hobbled by coordinated refusals to deal.[122] As described above, due to the Dealer Defendants' conspiracy *not a single SEF offering all-to-all anonymous trading currently does any meaningful business in the IRS market*.

320.    But for Defendants' anticompetitive acts, the IRS market would have gravitated to Javelin, TeraExchange, and other all-to-all trading platforms, thereby generating immense profits for those all-to-all SEFs that, like Plaintiffs, stood ready, willing, and able to onboard customers and execute transactions.

321.    In sum, if Plaintiffs had not been jointly boycotted by the Dealer Defendants there would have been a rapid migration of IRS onto Javelin and TeraExchange.

## D.    **Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes**

322.    Absent a conspiracy to punish them for doing so, buy-side customers would have supported, and flocked to, all-to-all platforms like Javelin and TeraExchange that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency.

---

[121] While Bloomberg offers a nominal "order book," the platform sees little IRS activity because, among other things, the Dealer Defendants refuse to trade on the platform and buy-side firms fear Dealer Defendants retaliation if they do so.

[122] *See also, e.g.*, Karen Brettell, *Banks' pressure stalls opening of U.S. derivatives trading platform*, REUTERS (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

323.    Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solutions to the buy-side. Instead, because of Defendants' conspiracy, Javelin, TeraExchange, and other SEFs that *have* tried to offer such platforms have been put out of business, while SEFs like Tradeweb that replicate the structure of the OTC market have remained successful. Without the Defendants' collusion, offerings such as those by Javelin and TeraExchange would have generated large new revenue streams through increased volume and market share.

324.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well. Absent a conspiracy, evolution to all-to-all trading would have been inevitable — it is the natural progression when financial products become, as most IRS have long been, highly standardized, high-volume products. This is particularly true where, as here, Javelin, TeraExchange, and other solution providers were actively entering the market to make this happen in response to strong demand. Each Dealer Defendant, absent coordination, should have been looking out for its own self-interest — which would have been furthered by partnering with Javelin, TeraExchange, or some other all-to-all platform in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.

325.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to customers in the form of fully anonymous order-book trading. Even leaving aside the potential to be an industry leader and gain first-mover advantage, each Dealer Defendant would have an independent interest in trading on the new platforms and providing clearing services, all of which could have been a profitable

source of income. Because no individual Dealer Defendant could prevent all-to-all trading platforms from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of all-to-all trading platforms.

326.    An electronic all-to-all platform has not emerged. Not because IRS are not ready for all-to-all trading. Not because the buy-side does not want all-to-all trading. Not because Javelin, TeraExchange, and other solution providers were not ready, willing, and able to offer all-to-all trading. Instead, we have this world because the Dealer Defendants collectively blocked the market's evolution. Only a conspiracy that assured each Dealer Defendant that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

327.    Defendants' agreement was a per se illegal agreement among horizontal competitors to collectively boycott Javelin and TeraExchange and thwart competition. The Dealer Defendants' collective refusals to deal with Javelin, TeraExchange, and other all-to-all trading platforms that would not play ball comprised a group boycott that is per se illegal under the antitrust laws.

> **E.    Investigations and Litigation Concerning the Credit Default Swaps Market and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants to Manipulate Various Aspects of the Financial System**

328.    This is not the first time the Dealer Defendants abused their collective influence over the market's infrastructure to obtain extraordinary profits with respect to a derivatives product. To the contrary, the Dealer Defendants' strategy here parallels their alleged misbehavior in the CDS market and in their manipulation of ISDAfix.

1.   *The Dealer Defendants' Misconduct in the Credit Default Swaps Market*

329.   The Dealer Defendants' misconduct in the CDS market has been the subject of two separate investigations by the United States Department of Justice ("DOJ") and the European Commission ("EC"). The DOJ and EC investigations were spurred by complaints by market participants that the Dealer Defendants, who were the major CDS dealers, were abusing their control of the market to limit price transparency and competition.[123] In one widely reported email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain, lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[124]

330.   The concerns expressed by the DOJ and EC are similar to present-day complaints about anticompetitive behavior in the IRS market. For example, the EC stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[125] The EC believed that "the investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[126]

---

[123] *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL ST. J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

[124] Serena Ng, *Friction on Swaps Response*, WALL ST. J. (June 3, 2009), http://www.wsj.com/news/articles/SB124390301244674747.

[125] EUROPEAN COMMISSION, *Antitrust: Commission sends statement of objections to 13 investment banks, ISDA and Markit in credit default swaps investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[126] *Id.*

331.     The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group boycotts. For instance, CME backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through an order book.

332.     In June 2008, CMDX was presented to the market. Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.

333.     CMDX was operationally ready by the fall of 2008[127] and was initially backed by several dealers.[128] CMDX ran into a brick wall, however, once the CDS dealers, including the Dealer Defendants, were able to circle the wagons. Further, as here, the dealers enjoyed the benefit of being on the boards of entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

334.     The government investigations indicated that the dealers used their control over Markit and ISDA to prevent CMDX from launching with exchange-like features — instead insisting that a dealer stand on one side of every transaction, just like they did in the IRS market.[129]

---

[127] Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

[128] *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

[129] EUROPEAN COMMISSION, *supra* note 125.

335.    A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS. The cases were consolidated into a single action. Though the defendants continue to deny liability, a class-action settlement was recently approved, whereby the defendants will collectively pay over $1.86 billion, and have agreed to injunctive relief that would help clear the way for exchange trading of CDS.[130]

336.    It is telling that today IRS SEF operators and customers lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants. While the markets at issue are different, today's complaints by SEF operators — that the Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

337.    As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[131] As a trader at one buy-side firm noted regarding the challenges that independent SEFs face, "[i]t's been a really tough environment for the start-up SEFs, [because] the market is designed not to allow new entrants."[132] Similar to how the major

---

[130] *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL ST. J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

[131] Levinson, *supra* note 2.

[132] *See* Mike Kentz, *Make or break time for SEFs*, INT'L FIN. REV. (May 2014), http://www.ifre.com/make-or-break-time-for-sefs/21146200.fullarticle.

CDS dealers allegedly used their control over the CDS market to block new entrants and artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

> 2.    *The Dealer Defendants' Manipulation of ISDAfix*

338.    The Dealer Defendants have also allegedly manipulated ISDAfix, a key benchmark interest rate for a range of financial derivatives. Beginning in November 2012, the CFTC sent subpoenas to the world's largest banks — including all or nearly all of the Dealer Defendants — and ICAP to determine whether the banks and ICAP were colluding to rig ISDAfix.[133] In September 2014, the CFTC reportedly told the U.S. Department of Justice that its investigation had found "evidence of criminal behavior" involving manipulation of ISDAfix.[134]

339.    A series of private class actions were subsequently filed against fourteen banks that dominate the market for interest-rate derivatives and set ISDAfix, including each of the Dealer Defendants, as well as ICAP. Similar to the allegations of the Complaint, the allegations of the ISDAfix class actions detailed how large banks shared information and worked together to manipulate the market for interest-rate derivatives for their own financial gain. Though all defendant banks continue to deny liability, seven of them, including Dealer Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, JP Morgan, and RBS, have agreed both

---

[133] Matthew Leising, *CFTC Said to Subpoena ICAP Brokers, Dealers on Swap Prices*, BLOOMBERG (April 8, 2013), http://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to-probe-icap-treasure-island-brokers-on-swap-prices.

[134] Matthew Leising and Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, BLOOMBERG (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.

to pay a total of $324 million to settle class action litigation, and to cooperate with counsel for

the plaintiffs in further investigation of the manipulation of ISDAfix.[135]

## VI.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

340.    Javelin did not discover and could not have discovered through the exercise of

reasonable due diligence that they were injured by Defendants' conspiracy to boycott Javelin and

other all-to-all IRS platforms, much less who caused that injury, until the fall of 2014, when

Javelin learned that the Dealer Defendants and IDBs had agreed to continue name give-up in

order to frighten the buy-side away from all-to-all trading

341.    TeraExchange did not discover and could not have discovered through the

exercise of reasonable due diligence that they were injured by Defendants' conspiracy to boycott

TeraExchange until at the earliest on June 14, 2014, when Dealer Defendants collectively

refused to clear IRS trades on TeraExchange's IRS platform despite clearing such trades on other

IRS trading platforms that did not offer meaningful all-to-all trading.

342.    By its very nature, Defendants' conspiracy to boycott all-to-all trading of IRS and

refuse to deal with any entity that could facilitate such trading was self-concealing. Defendants

executed their conspiracy, in large part, through secret meetings and discussions. These meetings

were often, although not exclusively, carefully held under the cover of meetings connected with

ostensibly independent market actors, like Tradeweb or ISDA. Defendants used their positions in

other industry consortia to meet regularly. These meetings provided a seemingly legitimate front

---

[135] Bob Van Voris, *Seven Banks to Pay $324 Million to Resolve ISDAfix Claims*, BLOOMBERG (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2016-05-03/seven-banks-to-pay-324-million-to-resolve-isdafix-claims.

for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities.

343.    Defendants also met secretly at the homes of their senior executives and at restaurants in New York City. The details of these meetings were secret, as were the identities of the individuals attending the meetings. Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a whole. Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging. Plaintiffs had no way to access such communications.

344.    The Dealer Defendants' boycott of all-to-all trading platforms was, by necessity, secretive — the boycotts would have been rendered ineffective, and likely broken down, if their existence was made public.

345.    As a result of the self-concealing nature of the Defendants' collusive scheme, no reasonable person would have discovered Defendants' conspiracy to block the emergence of all-to-all trading of IRS before 2015 and later.

346.    In addition, Defendants repeatedly made false and misleading statements about the reasons for their collusive actions, in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of market evolution, and they represented that their actions were beneficial to the market. Because of Defendants' affirmative efforts to mislead, Plaintiffs' continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

347.     Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the IRS market. Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation. Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

348.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

349.     As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-customer IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott Javelin, TeraExchange, and other entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Such contract, combination, or conspiracy constitutes a naked, per se violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

350.     Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

351.     Defendants and their co-conspirators' conduct in boycotting Plaintiffs cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things,

Defendants' conduct leads to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all trading platforms like Javelin and TeraExchange.

352.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Javelin and TeraExchange have been injured and financially damaged in their respective businesses and properties, including by having lost capital, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with elimination, in amounts that are presently undetermined. Plaintiffs' damages are directly attributable to Defendants' illegal boycott of Plaintiffs' business and their allocation of the IRS market among themselves. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act)

353.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

354.    Defendants' combination, conspiracy and arrangements alleged above, violate the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

355.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-customer IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott Javelin, TeraExchange, and other entities that would introduce competition on IRS bid/ask spreads in the market for IRS in the United States.

356.    Defendants and their co-conspirators' conduct in boycotting Plaintiffs cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things,

Defendants' conduct leads to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all trading platform like Javelin and TeraExchange.

357.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Javelin and TeraExchange have been injured and financially damaged in their businesses and properties, including by having lost capital, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with elimination, in amounts that are presently undetermined. Plaintiffs' damages are directly attributable to Defendants' illegal boycott of Plaintiffs' business and their allocation of the IRS market among themselves. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

358.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

359.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs.

360.    Plaintiffs seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

### FOURTH CAUSE OF ACTION
### (Tortious Interference with Business Relations)

361.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

362.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants injured prospective business relations Plaintiffs had with their customers.

114

363.    Plaintiffs seeks restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

364.    WHEREFORE, Plaintiffs, respectfully request that the Court:

    a.    Find Defendants jointly and severally liable for the damages incurred by Plaintiffs;

    b.    Award Plaintiffs treble damages;

    c.    Award reasonable attorneys' fees and costs;

    d.    Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

    e.    Decree that Defendants and their co-conspirators have unlawfully conspired to boycott Javelin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

    f.    Decree that Defendants and their co-conspirators have unlawfully conspired to boycott TeraExchange in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

    g.    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

    h.    Decree that Defendants have tortuously interfered with Plaintiffs' prospective business relations with its customers;

    i.    Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market

valuable to not only Plaintiffs but also to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

j.      Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.


Dated: September 9, 2016

Respectfully submitted,

/s/ Thomas P. Ogden
David H. Wollmuth
Thomas P. Ogden
Ryan A. Kane
James J. Brennan
Nicholas G.O. Veliky
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
togden@wmd-law.com
rkane@wmd-law.com
jbrennan@wmd-law.com
nveliky@wmd-law.com

*Attorney for Plaintiffs Javelin Capital Markets LLC, Javelin SEF, LLC, Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC*

Robert P. Cummins (*pro hac vice*)
NORMAN, HANSON & DETROY LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
Phone: (207) 553-4712
Fax: (207) 775-0806
rcummins@nhdlaw.com

*Attorney for Plaintiffs Javelin Capital Markets LLC and Javelin SEF, LLC*