UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION | MDL No. 2704<br>Master Docket No.<br>16 MD 2704 (PAE) |
| This Document Pertains To:<br><br>*ALL CASES* | |

### DEALER DEFENDANTS' MEMORANDUM IN SUPPORT OF <u>THEIR JOINT MOTION TO DISMISS ALL CLAIMS</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 6

    A.      Interest rate swaps trading ................................................................. 6

    B.      The Dodd-Frank regulatory regime ................................................. 7

          1.      Clearing regulation ................................................................. 8

          2.      Trading regulation ................................................................ 10

    C.      The allegations of the complaints ................................................... 15

          1.      The feasibility of all-to-all trading ...................................... 15

          2.      Pre-2013 allegations ............................................................ 17

          3.      Post-2013 allegations .......................................................... 19

ARGUMENT .................................................................................................................. 23

I.      PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST
      CONSPIRACY. ..................................................................................... 23

    A.      Standards for pleading an antitrust conspiracy. .............................. 23

    B.      Plaintiffs' pre-2013 allegations fail to state a plausible antitrust claim. ............... 25

          1.      The Project Fusion allegations fail to state a plausible claim. .................. 26

          2.      The remaining pre-2013 allegations fail to state a plausible claim. ......... 29

          3.      The pre-2013 allegations rely on impermissible group pleading .............. 31

    C.      Plaintiffs' post-2013 allegations fail to state a plausible antitrust claim. ............. 33

          1.      Plaintiffs do not adequately allege a market-making boycott. .................. 33

          2.      Plaintiffs do not adequately allege a clearing services boycott. ............... 37

          3.      The post-2013 allegations rely on impermissible group pleading. ........... 40

          4.      Plaintiffs' references to other allegations relating to other markets
              do not bolster their claims. ................................................... 43

II.  CLASS PLAINTIFFS LACK ANTITRUST STANDING. ............................................... 45

    A.  Legal standard. ....................................................................................... 46

    B.  Class Plaintiffs' alleged injury is indirect and remote. .......................... 47

        1.  The allegations of the Class Complaint show an attenuated chain of causation between the alleged conduct and Class Plaintiffs' injury. ........ 47

        2.  Second Circuit precedent confirms that Class Plaintiffs' alleged injuries are not legally cognizable. ........................................... 49

        3.  More efficient enforcers exist and have already sought to enforce the antitrust laws. ............................................................. 51

    C.  Class Plaintiffs' damages are highly speculative. ................................... 52

    D.  Apportioning damages would be prohibitively complex. ......................... 54

III.  THE COMMODITY EXCHANGE ACT AND THE DODD-FRANK ACT IMPLICITLY PRECLUDE PLAINTIFFS' POST-DODD-FRANK CLAIMS. .............. 55

    A.  All four *Billing* factors weigh in favor of implied preclusion. ............. 56

        1.  Heartland. ........................................................................ 57

        2.  Agency authority to regulate. .......................................... 58

        3.  Ongoing agency regulation. ............................................. 58

        4.  Conflict. .......................................................................... 59

    B.  Dodd-Frank's savings clause does not apply. ......................................... 66

IV.  CLASS PLAINTIFFS' PRE-2013 CLAIMS FAIL TO ALLEGE INJURY-IN-FACT. ......................................................................................... 68

V.  CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED. ........................... 69

    A.  Class Plaintiffs fail to plead "ignorance" of their claims. ...................... 70

        1.  Class Plaintiffs had actual notice of their claims. ........................ 71

        2.  Class Plaintiffs were on inquiry notice of their claims. ................ 73

    B.  Class Plaintiffs fail to plead due diligence with particularity. ................ 75

    C.  Class Plaintiffs fail to plead concealment with particularity. ................. 77

VI.    PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED. ........................... 79

    A.    Javelin and Tera fail to state a Donnelly Act claim. ............................................. 79

    B.    Javelin and Tera fail to state a tortious interference claim. ................................. 80

    C.    The complaints fail to state an unjust enrichment claim...................................... 82

CONCLUSION ........................................................................................................................... 84

# TABLE OF AUTHORITIES

CASES                                                                                              Page(s)

*131 Maine St. Associates v. Manko*,
   179 F. Supp. 2d 339 (S.D.N.Y. 2002) ............................................................................71, 73

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
   881 F.2d 1396 (7th Cir. 1989) ........................................................................................37

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press*,
   885 F. Supp. 511 (S.D.N.Y. 1995) ................................................................................38

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
   181 F.3d 216 (2d Cir. 1999) ...........................................................................................31

*ADCS Inc. v. Kimbrough, Jr.*,
   30 F. App'x 225 (4th Cir. 2002) ....................................................................................84

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
   2011 WL 3878200 (S.D. Ind. 2011) ..............................................................................67

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
   2016 WL 1241533 (S.D.N.Y. 2016) .........................................................................45, 51

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ...........................................................................................46, 47, 51

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .............................................................................................18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... *passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .......................................................................................................37

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .....................................................................................24, 34

*Butala v. Agashiwala*,
   916 F. Supp. 314 (S.D.N.Y. 1996) ................................................................................78

*Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ...........................................................................................28

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (N.Y. 2004) .............................................................................................81

*Chamilia, LLC v. Pandora Jewelry, LLC*,
   2007 WL 2781246 (S.D.N.Y. 2007)........................................................82

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) ........................................................82, 84

*Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp.*,
   166 F. Supp. 2d 891 (S.D.N.Y. 2001)........................................................80

*Concord Assocs., L.P. v. Entm't Props. Trust*,
   2014 WL 1396524 (S.D.N.Y. 2014)........................................................31

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)........................................................28

*Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)........................................................69

*Credit Suisse Sec. (USA) LLC v. Billing*,
   551 U.S. 264 (2007) ........................................................ *passim*

*de Atucha v. Commodity Exch., Inc.*,
   608 F. Supp. 510 (S.D.N.Y. 1985) ........................................................50

*Diario El Pais, S.L. v. Nielsen Co.*,
   2008 WL 4833012 (S.D.N.Y. 2008)........................................................81

*Discover Grp., Inc. v. Lexmark Int'l, Inc.*,
   333 F. Supp. 2d 78 (E.D.N.Y. 2004) ........................................................80

*Donahue v. Pendleton Woolen Mills*,
   633 F. Supp. 1423 (S.D.N.Y. 1986)........................................................71

*Elec. Trading Grp. v. Banc of Am. Secs. LLC*,
   588 F.3d 128 (2d Cir. 2009)........................................................ *passim*

*Friedman v. Salomon/Smith Barney, Inc.*,
   313 F.3d 796 (2d Cir. 2002)........................................................65

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ........................................................6

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
   711 F.3d 68 (2d Cir. 2013)........................................................ *passim*

*Gelboim v. Bank of America Corp.*,
   823 F.3d 759 (2d Cir. 2016)........................................................ *passim*

v

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
  201 F. Supp. 2d 236 (S.D.N.Y. 2002) ...................................................................79

*Gordon v. N.Y. Stock Exch.*,
  422 U.S. 659 (1975) .............................................................................................68

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
  997 F. Supp. 340 (E.D.N.Y. 1998) ......................................................................79

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ...............................................................................46

*Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*,
  2013 WL 395096 (S.D.N.Y. 2013) ......................................................................81

*GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
  580 F. Supp. 2d 321 (S.D.N.Y. 2008) ..................................................................71

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
  2005 WL 323750 (S.D.N.Y. 2005) ......................................................................79

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...............................................29, 69, 70, 77

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  708 F. Supp. 2d 348 (S.D.N.Y. 2010) ............................................................32, 43

*Hines v. Overstock.com, Inc.*,
  2013 WL 4495667 (E.D.N.Y. 2013) ....................................................................83

*In re Actos End Payor Antitrust Litig.*,
  2015 WL 5610752 (S.D.N.Y. 2015) ...............................................................82, 83

*In re Aftermarket Filters Antitrust Litig.*,
  2009 WL 3754041 (N.D. Ill. 2009) ......................................................................83

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4277510 (S.D.N.Y. 2014) .........................................................28, 31, 50

*In re Aluminum Warehousing Antitrust Litig.*,
  2016 WL 5818585 (S.D.N.Y. 2016) ...............................................................45, 51

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419, 451-52 (S.D.N.Y. 2015) .................................................24, 26

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) .................................................................78

*In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.,*
  2016 WL 5794776 (S.D.N.Y. 2016)................................................................51

*In re Credit Default Swaps Antitrust Litig.,*
  2014 WL 4379112 (S.D.N.Y. 2014)......................................................... *passim*

*In re DDAVP Direct Purchaser Antitrust Litig.,*
  585 F.3d 677 (2d Cir. 2009)................................................................52

*In re Digital Music Antitrust Litig.,*
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)................................................50, 84

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007)................................................................ *passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
  2016 WL 5108131 (S.D.N.Y. 2016)................................................................51

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)................................................................44

*In re Ins. Brokerage Antitrust Litig.,*
  618 F.3d 300 (3d Cir. 2010)................................................4, 25, 34, 35

*In re Iowa Ready-Mix Concrete Antitrust Litig.,*
  768 F. Supp. 2d 961 (N.D. Iowa 2011)................................................................40

*In re JP Morgan Auction Rate Sec. Mktg. Litig.,*
  867 F. Supp. 2d 407 (S.D.N.Y. 2012)................................................................6

*In re London Silver Fixing, Ltd., Antitrust Litig.,*
  2016 WL 5794777 (S.D.N.Y. 2016)................................................................51

*In re Magnesium Oxide Antitrust Litig.,*
  2011 WL 5008090 (D.N.J. 2011) ................................................................77

*In re Merrill Lynch Ltd. P'ship Litig.,*
  154 F.3d 56 (2d Cir. 1998)................................................................76

*In re Musical Instruments & Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015) ......................................................... *passim*

*In re Optical Disk Drive Antitrust Litig.,*
  2011 WL 3894376 (N.D. Cal. 2011) ................................................................40

*In re Processed Egg Prod. Antitrust Litig.,*
  2012 WL 6645533 (E.D. Pa. 2012) ................................................................73

*In re Processed Egg Prod. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................................32

*In re Publ'n Paper Antitrust Litig.*,
   2005 WL 2175139 (D. Conn. 2005) ...........................................................76, 79

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009).......................................................................83

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337, 369-70 (S.D.N.Y. 2016) .......................................29, 31, 32

*Int'l Bus. Mach. Corp. v. Platform Sols., Inc.*,
   658 F. Supp. 2d 603 (S.D.N.Y. 2009)...............................................................49

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...............................................................24, 26, 29

*Kramer v. Pollock-Krasner Found.*,
   890 F. Supp. 250 (S.D.N.Y. 1995) ....................................................................83

*Laydon v. Mizuho Bank, Ltd.*,
   2014 WL 1280464 (S.D.N.Y. 2014).......................................................52, 53, 84

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014).......................................................................................47

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).........................................................................................69

*Masters v. Wilhelmina Model Agency, Inc.*,
   2003 WL 1990262 (S.D.N.Y. 2003)...........................................................75, 76

*Mayor of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).............................................................24, 25, 27, 45

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   676 F. Supp. 486 (S.D.N.Y. 1987) ....................................................................53

*MMC Energy, Inc. v. Miller*,
   2009 WL 2981914 (S.D.N.Y. 2009)..................................................................82

*Moll v. U.S. Life Title Ins. Co. of N.Y.*,
   700 F. Supp. 1284 (S.D.N.Y. 1988)..................................................................78

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   323 F. Supp. 2d 559 (S.D.N.Y. 2004)...............................................................55

*Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*,
  18 A.D.3d 454 (N.Y. App. Div. 2005) ...................................................................82

*Nirvana, Inc. v. Nestle Waters N. Am. Inc.*,
  123 F. Supp. 3d 357, 379 (N.D.N.Y. 2015) ....................................................80, 81

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
  2012 WL 6082387 (S.D.N.Y. 2012) ....................................................................32

*Pa. Employee Benefit Trust Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. 2010) .....................................................................84

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
  467 F.3d 283 (2d Cir. 2006) .....................................................................46, 49, 52

*PKG Grp., LLC v. Gamma Croma, S.p.A.*,
  446 F. Supp. 2d 249 (S.D.N.Y. 2006) .............................................................80, 81

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  2011 WL 7053807 (E.D.N.Y. 2011) .....................................................................69

*Reading Industries, Inc. v. Kennecott Copper Corp.*
  631 F.2d 10 (2d Cir. 1980) ............................................................49, 50, 52, 54

*Ross v. Am. Express Co.*,
  35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) ...........................................................29

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) .............................................................30, 34

*Schenker AG v. Societe Air France*,
  102 F. Supp. 3d 418, 422 (E.D.N.Y. 2015) ...........................................................74

*Shady Records v. Source Enters., Inc.*,
  351 F. Supp. 2d 74 (S.D.N.Y. 2004) ....................................................................84

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
  947 F. Supp. 2d 88 (D.D.C. 2013) .......................................................................29

*Snyder v. Farnam Cos.*,
  792 F. Supp. 2d 712 (D.N.J. 2011) .......................................................................84

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................74

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ................................................................................24

*State of N.Y. v. Hendrickson Bros.*,
  840 F.2d 1065 (2d Cir. 1988)..........................................................................77

*Stephens v. Trump Org. LLC*,
  2016 WL 4702437 (E.D.N.Y. 2016)................................................................81

*Texaco, Inc. v. Dagher*,
  547 U.S. 1 (2006).............................................................................................28

*Travelers Indem. Co. v. Cephalon, Inc.*,
  32 F. Supp. 3d 538 (E.D. Pa. 2014)................................................................83

*United States v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  422 U.S. 694 (1975)................................................................................. *passim*

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).........................................................................................62

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015)...............................................................6

*Westwood v. Cohen*,
  838 F. Supp. 126 (S.D.N.Y. 1993) ...................................................................6

*Williams v. Citigroup, Inc.*,
  2009 WL 3682536 (S.D.N.Y. 2009)..........................................................35, 36

*Woori Bank v. Merrill Lynch*,
  923 F. Supp. 2d 491 (S.D.N.Y. 2013)..............................................................71

**STATUTES AND REGULATIONS**

7 U.S.C. § 1a ................................................................................................10, 14

7 U.S.C. § 2 ....................................................................................................9, 10

7 U.S.C. § 6b-1 ....................................................................................................15

7 U.S.C. § 6d .......................................................................................................10

7 U.S.C. § 6s .............................................................................................. *passim*

7 U.S.C. § 7a-1 ....................................................................................................67

7 U.S.C. § 7b-3 .......................................................................................... *passim*

7 U.S.C. § 7b ........................................................................................................58

7 U.S.C. § 8 ..........................................................................................................58

7 U.S.C. § 9 ............................................................................................................... 15

7 U.S.C. § 12a .......................................................................................................... 58

7 U.S.C. § 13a-1 ...................................................................................................... 58

7 U.S.C. § 13b .......................................................................................................... 58

7 U.S.C. § 19 ..................................................................................................... *passim*

7 U.S.C. § 25 ............................................................................................................ 62

12 U.S.C. § 5303 ..................................................................................................... 67

15 U.S.C. § 77p ....................................................................................................... 68

15 U.S.C. § 15b ....................................................................................................... 69

15 U.S.C. § 8323 ..................................................................................................... 65

Fed. R. Civ. P. 9(b) ...................................................................................... 69, 77, 78

17 C.F.R. § 23.605 ................................................................................................... 62

17 C.F.R. § 37.3 ....................................................................................................... 11

17 C.F.R. § 37.9 ....................................................................................... 11, 27, 37, 59

17 C.F.R. § 37.10 ..................................................................................................... 10

17 C.F.R. § 37.203 ................................................................................................... 59

17 C.F.R. § 37.1100 ................................................................................................. 59

17 C.F.R. § 39.5 ....................................................................................................... 10

17 C.F.R. § 39.12 ..................................................................................................... 10

75 Fed. Reg. 63,732 (Oct. 18, 2010) ................................................................. 7, 59

76 Fed. Reg. 58,186 (Sept. 20, 2011) ...................................................................... 9

76 Fed. Reg. 69,334 (Nov. 8, 2011) ....................................................................... 10

77 Fed. Reg. 2,613 (Jan. 19, 2012) ......................................................................... 14

77 Fed. Reg. 42,560 (July 19, 2012) ........................................................................ 9

77 Fed. Reg. 44,441 (July 30, 2012) ........................................................................ 9

77 Fed. Reg. 74,284 (Dec. 13, 2012) ...........................................................8

78 Fed. Reg. 33,476 (June 4, 2013) ................................................ *passim*

**OTHER AUTHORITIES**

IA Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2013) ............................65

VI Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2010) .............................36

S. Rep. 111-176 (Apr. 30, 2010) .................................................9

The twelve groups of financial institution defendants ("Dealer Defendants" or "Dealers")[1] respectfully submit this memorandum in support of their motion to dismiss the Consolidated Amended Class Action Complaint ("CAC") and the Javelin and TeraExchange Plaintiffs' Consolidated Amended Complaint ("JTC").

## PRELIMINARY STATEMENT

Plaintiffs attempt to allege a massive, nine-year antitrust conspiracy to boycott "all-to-all" exchange-style trading of interest rate swaps ("IRS").  As recounted in the complaints, IRS trading historically occurred in an over-the-counter environment in which parties that wished to trade would seek out bids and offers from IRS dealers.  According to Plaintiffs, this historical trading model favored the Dealer Defendants because it forced their "buy-side" customers to trade exclusively with dealers rather than allowing buy-side firms to trade with each other. Plaintiffs accuse the Dealer Defendants of attempting to preserve this "dealer-oriented" trading model by "conspiring to boycott and destroy trading platforms that sought to provide all-to-all trading protocols to the buy-side."  CAC ¶ 6; JTC ¶ 5.

Plaintiffs' conspiracy allegations fail for three overarching reasons.  *First*, Plaintiffs' own complaints reveal that, in direct conflict with their boycott allegations, many of the Dealers actually supported all-to-all trading platforms.  *Second*, to the extent that several of the Dealers allegedly declined to support all-to-all platforms, the complaints provide an obvious explanation of why those Dealers, acting in their own independent self-interest, would have done so. According to the complaints, new all-to-all platforms were likely to gut the Dealers' trading profits if the platforms proved successful, but the new platforms were unlikely to be successful

---

[1]    The Dealers consist of the undersigned affiliates of Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS.

without the support of numerous Dealers.  *See, e.g.*, CAC ¶¶ 7, 94, 236; JTC ¶¶ 6, 14, 243.

Thus, under the logic of Plaintiffs' own allegations, a Dealer that supported all-to-all trading

platforms would have been strengthening a threat to its trading profits.  *Finally*, whereas most

antitrust plaintiffs attempt to plead a conspiracy based on the *actions* of the defendants, Plaintiffs

here attempt to plead a conspiracy based on the alleged *inaction* of the defendants.  Specifically,

Plaintiffs attempt to conjure a conspiracy from allegations that the Dealers for the most part

simply continued to trade IRS under existing trading conventions, rather than working to replace

those conventions with new and untested "all-to-all trading protocols."  CAC ¶ 6; JTC ¶ 5.  As

numerous courts have recognized, no inference of conspiracy should be drawn from allegations

that defendants merely continued with business as usual.

These deficiencies are compounded by Plaintiffs' failure to come to grips with certain

changes in the IRS market brought about by the implementation of the Dodd-Frank Wall Street

Financial Reform and Consumer Protection Act ("Dodd-Frank").  Congress enacted Dodd-Frank

in 2010 "to establish a comprehensive new regulatory framework for swaps."  *See* 78 Fed. Reg.

33,476, 33,477 (June 4, 2013) ("SEF Rule").  The CFTC then implemented the new framework

through a series of regulations that took effect beginning in 2013.  *See id*.  According to the

record compiled in the CFTC's rulemaking proceedings, buy-side firms generally lacked the

infrastructure to engage in all-to-all IRS trading at least until the Dodd-Frank framework took

effect in 2013.  *See infra* at 9 & n.12.  Plaintiffs nevertheless accuse the Dealers of launching a

conspiracy to boycott all-to-all trading six years earlier, in "late 2007," long before Dodd-Frank

was even enacted.  CAC ¶ 102; JTC ¶ 249.

Plaintiffs also complain that in the aftermath of Dodd-Frank, most IRS trading has

occurred in a request-for-quote or "RFQ" format rather than an all-to-all format.  In RFQ trading,

parties wishing to trade send electronic requests for quotations to several potential counterparties of their choosing.  Plaintiffs assert that the IRS market would be better served by exchange-like all-to-all trading in which offers to trade are immediately transmitted to the entire market. Plaintiffs neglect to mention, however, that the CFTC considered and rejected mandatory all-to-all trading in the course of implementing Dodd-Frank.  Instead, based in part on widespread buy-side support for RFQ trading, the CFTC expressly permitted such trading in its regulations.  *See, e.g.*, SEF Rule at 33,496-97, 33,501.

Without acknowledging the CFTC's explicit provision for RFQ trading or the widespread buy-side support for such trading, Plaintiffs assert that RFQ trading has persisted in the IRS market only because the Dealers conspired to "boycott and destroy" any trading platform that sought to offer all-to-all trading.  *See, e.g.*, CAC ¶ 6; JTC ¶ 5.  Two of the allegedly boycotted platforms—plaintiffs Javelin and TeraExchange ("Tera")—have filed a joint complaint seeking recovery of the profits that they claim they would have earned if not for the alleged conspiracy. Separately, a putative class of buy-side firms (the "Class Plaintiffs") has filed a complaint seeking damages based on higher trading prices that they allegedly paid as a result of the failure of all-to-all platforms.  Both complaints should be dismissed for several reasons.

1.      Neither group of Plaintiffs has pled a plausible antitrust conspiracy under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Although Plaintiffs assert over and over again that the Dealers "agreed" and "conspired" to boycott all-to-all trading, they never identify any direct evidence of a conspiratorial agreement.  Instead, Plaintiffs urge this Court to *infer* such an agreement from allegations that the Dealers declined in parallel to support all-to-all trading platforms and that unilateral decision-making is an unlikely explanation for the alleged parallel behavior.  *See, e.g.*, CAC ¶¶ 3, 168, 308-12; JTC ¶¶ 116, 322-26.

These allegations fall far short of stating a plausible conspiracy claim.  As an initial matter, when Plaintiffs' conclusory allegations are stripped away, their remaining factual allegations do not even allege any meaningful parallel conduct.  To the contrary, the complaints identify numerous instances in which individual Dealers supported the very trading platforms that they supposedly were conspiring to destroy.  In addition, according to Plaintiffs' own allegations, those Dealers that actually *did* decline to deal with all-to-all trading platforms had independent, self-interested reasons to do so:  all-to-all platforms allegedly threatened to destroy those Dealers' trading profits.  *See* CAC ¶¶ 7, 10, 94; JTC ¶¶ 6, 9, 14, 243.  Plaintiffs' claims therefore fail as a matter of law under *Twombly*, which "makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if . . . the facts alleged in the complaint itself show that independent self-interest is an obvious alternative explanation for defendants' common behavior."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010); *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (parallel conduct allegations "do not constitute plausible grounds to infer an agreement" where allegations are "just as much in line with a wide swath of rational and competitive business strategy").[2]

  2. Class Plaintiffs' claims should be dismissed for lack of antitrust standing.  Second Circuit law limits antitrust standing to plaintiffs that are "efficient enforcers" of the antitrust laws.  *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013).  Here, the efficient enforcers of the antitrust laws are firms like Javelin and Tera, because those firms were the *direct* victims of the purported conspiracy to boycott all-to-all trading platforms.  Class Plaintiffs, by contrast, are not efficient enforcers because their alleged injuries are indirect,

---

[2] The non-conspiratorial explanation for the Dealers' conduct that appears on the face of the complaints, together with the absence of any adequate allegations of parallel conduct by the Dealers, easily distinguishes this case from other recent cases in which antitrust claims have survived motions to dismiss.  *See infra* at 43-45.

remote, and speculative.  Indeed, any alleged injuries to Class Plaintiffs would follow only as a collateral consequence of the injuries allegedly suffered by firms like Javelin and Tera.

3.    The doctrine of implied preclusion requires that all of Plaintiffs' claims relating to post-Dodd-Frank conduct be dismissed.  The Supreme Court has held that the antitrust laws are implicitly precluded when allowing antitrust claims would give rise to potential conflicts with an expert agency's regulatory authority.  *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007).  The potential for such conflicts plainly exists here because Dodd-Frank grants the CFTC broad authority to regulate the very features of the IRS market about which Plaintiffs complain. Allowing Plaintiffs' claims to proceed would deter Defendants and other market participants from engaging in activity that the CFTC permits or encourages.  In addition, the CFTC was given express authority to regulate competition in the swap markets:  it may enforce special antitrust prohibitions that Dodd-Frank imposed on actors in those markets, and it must weigh competition concerns whenever it promulgates new rules.  *See, e.g.*, 7 U.S.C. § 19(b); 7 U.S.C. § 7b-3(f)(11).  Plaintiffs' claims therefore threaten to create precisely the situation about which *Billing* warns:  effectively permitting "different nonexpert judges and different nonexpert juries" to override the "nuanced" judgments of the expert regulatory agency, thereby "threaten[ing] serious harm to the efficient functioning of the [swap] markets."  *Billing*, 551 U.S. at 283.

4.    Class Plaintiffs' claims relating to the pre-2013 period should be dismissed for failure to allege injury-in-fact because their complaint fails to allege that the infrastructure necessary to support all-to-all trading existed before 2013 at the earliest.

5.    Class Plaintiffs' claims relating to the pre-2012 period are time-barred under the Clayton Act's four-year statute of limitations.  Class Plaintiffs' pre-2012 allegations rely mainly on news articles and other publicly available information.  If those allegations satisfy *Twombly*

(and they do not), then Class Plaintiffs were on notice of their pre-2012 claims many years ago and failed timely to assert them.

6.      Finally, the state-law claims asserted in the complaints should be dismissed because Plaintiffs have failed to plead essential elements of those claims.

## BACKGROUND

The following background statement is based on the allegations of the complaints, the materials referenced and relied upon in the complaints, and matters of public record, all of which may be considered in ruling on a motion to dismiss.[3]

### A.      Interest rate swaps trading

Interest rate swaps are financial derivative contracts used by "an array of investors in the United States and worldwide" to "manage risk and protect themselves from changes in interest rates."  CAC ¶ 1.[4]  They consist of any "agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time."  CAC ¶¶ 4, 67. IRS are "almost infinitely variable in their terms" and thus are "far less fungible" than the types of instruments that typically trade on exchanges.[5]

---

[3]      *See, e.g.*, *Twombly*, 550 U.S. at 568 n.13 (holding that "the District Court was entitled to take notice of the full contents of the published articles" quoted in the complaint); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (courts "may consider matters of which judicial notice may be taken," including "press articles and SEC filings"); *Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts can consider "newspaper articles, documents publicly filed with the SEC or FINRA . . . [and] documents filed with governmental entities and available on their official websites"); *In re JP Morgan Auction Rate Sec. Mktg. Litig.*, 867 F. Supp. 2d 407, 413 n.1 (S.D.N.Y. 2012) (taking judicial notice of public disclosures cited and relied on in complaint); *Westwood v. Cohen*, 838 F. Supp. 126, 130 n.8 (S.D.N.Y. 1993) (relying on "other portions of the *Wall Street Journal* article" cited in the complaint).

[4]      Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

[5]      *See* Ex. 18, CFTC Commissioner J. Christopher Giancarlo, *Pro-Reform Reconsideration of the CFTC Swaps Trading Rules: Return to Dodd-Frank*, CFTC, at 7 (Jan. 2015) ("Giancarlo CFTC White Paper").  All references to "Ex." are to the exhibits accompanying the Declaration of John S. Playforth dated November 4, 2016.

IRS dealers like the Dealer Defendants "have historically acted as the primary market makers" for IRS.  CAC ¶¶ 7, 72; JTC ¶¶ 6, 68.  Although the complaints assert that IRS contracts have "long" been ready to move from dealer-oriented trading to exchange-style trading (CAC ¶¶ 5, 23, 92; JTC ¶ 88), a 2012 study by the Federal Reserve Bank of New York found that "the vast majority of IRS contracts traded only once during the three month period studied" and "no single instrument in the IRS data set traded more than 150 times per day."[6]  By contrast, stocks and other financial instruments that typically trade on exchanges "trade several thousand times a day on several venues."[7]  IRS contracts thus occupy the "opposite pole[]" from the types of instruments that trade on exchanges, since they are "less liquid instruments, typically much bigger tickets, and [have] more customized trade terms."[8]  Indeed, the relatively low frequency of IRS trades places those trades much closer to instruments like corporate bonds, which generally trade over-the-counter through dealers.[9]

**B.    The Dodd-Frank regulatory regime**

Congress passed the Dodd-Frank Act in 2010 to "reduce risk, increase transparency, and promote market integrity within the financial system."  *See* 75 Fed. Reg. 63,732, 63,732 (Oct. 18, 2010).  Title VII of Dodd-Frank amended the Commodity Exchange Act ("CEA") to

---

[6]    Ex. 18, Giancarlo CFTC White Paper, *supra* note 5, at 9 & n.23 (citing Michael Fleming et al., *An Analysis of OTC Interest Rate Derivatives Transactions: Implications for Public Reporting*, Federal Reserve Bank of New York, Staff Report No. 557, at 14 (Mar. 2012; revised Oct. 2012)).

[7]    *See* Ex. 1, cited in CAC ¶ 262 n.84 & JTC ¶ 209 n.54 (Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, Risk (Aug. 6, 2015) (noting that a centralized exchange for interest rate swaps "might only see 150 to 200 trades on an average day, while equities and foreign exchange products trade several thousand times a day on several venues")).

[8]    Ex. 2, cited in CAC ¶ 291 n.117 & JTC ¶ 310 n.116 (E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond: The Path to Electronic Markets*, Tabb Group, at 11 (2010) ("Tabb Report")).

[9]    *See* Ex. 3, cited in CAC ¶ 29 n.8 & JTC ¶ 81 n.9 (Bank for International Settlements, *Electronic Trading in Fixed Income Markets*, at 11-13 (2016)); Ex. 2, cited in CAC ¶ 291 n.117 & JTC ¶ 310 n.116 (Tabb Report, *supra* note 8, at 11 (noting that even the most frequently traded IRS contracts "do not get traded back and forth (or opened and closed) like stocks or futures")).

"establish a comprehensive new regulatory framework for swaps," *see* SEF Rule at 33,477, and vested the CFTC with "exclusive jurisdiction" to implement that framework, *see* 7 U.S.C. §§ 2(a)(1)(A), 2(h).  The CFTC has issued—and continues to refine—comprehensive regulations covering the clearing, trading, and reporting of swap transactions.  In crafting these regulations, the CFTC was required to "take into consideration the public interest to be protected by the antitrust laws," and to weigh those concerns against other factors, including the "protection of market participants and the public," "efficiency," and market "integrity."  7 U.S.C. § 19.

### 1.    Clearing regulation

As the complaints acknowledge, all-to-all trading of IRS was effectively impossible before buy-side firms were prepared to "clear" their trades through central clearinghouses.  CAC ¶ 77 n.14; JTC ¶ 101.  In a non-cleared IRS transaction, the parties to the transaction "face each other directly, meaning they bear the full risk of loss if their counterparty defaults."  CAC ¶ 185; JTC ¶ 101.  In a cleared transaction, by contrast, a well-capitalized "central clearinghouse" stands between the parties to the transaction and guarantees each side's performance of its obligations, thus reducing the risk of default.  *See id*.  In the absence of such clearing arrangements, the risk of counterparty defaults ordinarily prevents buy-side firms from trading with each other, and requires them to trade "exclusively" with dealers.  *See* CAC ¶ 77 n.14.

Before Dodd-Frank was enacted, there was no requirement to clear IRS through central counterparties, and buy-side firms generally did not clear their IRS transactions voluntarily.[10] Congress believed that the resulting exposure to the risk of defaults on IRS and other swap

---

[10]    *See, e.g.*, Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284, 74,327 (Dec. 13, 2012) ("Clearing Requirement Rule") (estimating that the vast majority of the new IRS clearing volume mandated by Dodd-Frank would come from the buy-side); *Handbook of Fixed-Income Securities* 329, 356 (Pietro Veronesi ed., 2016) (noting that dealer-to-client transactions accounted for only 4 percent of the volume of IRS cleared by the largest IRS clearinghouse in January 2013).

contracts "played an important role in freezing up credit markets" during the 2008 financial crisis.  S. Rep. 111-176, at 30 (Apr. 30, 2010).  Congress responded in Dodd-Frank by granting broad authority to the CFTC to mandate clearing of swaps.  *See* 7 U.S.C. § 2(a)(1)(A).

The CFTC issued its first set of proposed rules for implementing the Dodd-Frank clearing requirements on September 20, 2011.[11]  That proposal, however, met with heavy objections from buy-side firms that wanted more time to cope with the "overwhelming" burdens that the clearing mandate would impose on them.[12]  For example, the Coalition for Derivatives End-Users—an umbrella group that included the Chamber of Commerce, The Business Roundtable, and the National Association of Corporate Treasurers—warned that much more time would be required to put in place the "technological connections" and the numerous legal agreements necessary to effectuate clearing.[13]  In recognition of these concerns, the CFTC phased in its final clearing rule over a nine-month period that ended in September 2013.[14]  The new rules, moreover, were applied only to a subset of IRS contracts that the CFTC deemed appropriate for clearing.[15]

---

[11]   *See* Swap Transaction Compliance and Implementation Schedule, 76 Fed. Reg. 58,186 (Sept. 20, 2011).

[12]   *See* Futures Indus. Ass'n et al. Comment Letter on 76 Fed. Reg. 58,186; RIN 3038-AD60, at 8-9 (Nov. 4, 2011) (describing the burden on buy-side participants as "overwhelming" and explaining that buy-side entities would have to revise tens of thousands of legal documents to conform to the new clearing mandates); *see also* Inv. Co. Inst. Comment Letter on 76 Fed. Reg. 58,186; RIN 3038-AD60, at 2 (Nov. 4, 2011) (expressing concern that the CFTC's proposed implementation schedule "significantly underestimate[d] the time needed for the swap market to transition to the new framework"); Fin. Servs. Roundtable Comment Letter on 76 Fed. Reg. 58,186; RIN 3038-AD60, at 5 (Nov. 4, 2011) (noting that "establishing clearing arrangements is resource-intensive"); Edison Elec. Inst. et al. Comment Letter on 76 Fed. Reg. 58,186; RIN 3038-AD60, at 5 (Nov. 4, 2011) (describing technology and IT burdens imposed by the clearing mandate).

[13]   Coal. for Derivatives End-Users Comment Letter on 76 Fed. Reg. 58,186; RIN 3038-AD60, at 1, 4 (Nov. 4, 2011).

[14]   *See* Clearing Requirement Rule at 74,320; Swap Transaction Compliance and Implementation Schedule, 77 Fed. Reg. 44,441, 44,456 (July 30, 2012).  The CFTC also granted a broad exemption from the new clearing rules to non-financial "end-users" of swaps.  *See* End-User Exception to the Clearing Requirement for Swaps, 77 Fed. Reg. 42,560, 42,590-91 (July 19, 2012).

[15]   *See* Clearing Requirement Rule at 74,300-14.

The CFTC also adopted rules governing providers of clearing services.  Most buy-side firms that engage in swap transactions are not themselves members of a clearinghouse due in part to the large capital requirements that apply to clearinghouse members.[16]  Instead, buy-side firms ordinarily clear their swaps through Futures Commission Merchants, or "FCMs."  CAC ¶¶ 185-88; JTC ¶¶ 201-02.  FCMs are well-capitalized entities—usually financial institutions—that essentially relay their customers' trades to a clearinghouse and stand surety to the clearinghouse in connection with those trades.  *Id*.  FCMs must register with the CFTC and comply with CFTC regulations regarding the services they provide.  *See* 7 U.S.C. § 6d.

### 2.     Trading regulation

Dodd-Frank also regulates the methods by which IRS and other swaps may trade.  For example, pursuant to its authority under Dodd-Frank, the CFTC requires that certain types of swaps be traded on "swap execution facilities" or "SEFs."  SEFs are trading platforms "in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility."  7 U.S.C. § 1a(50).  Subject to certain exceptions, swaps must trade on SEFs if they (i) are subject to the CFTC's mandatory clearing rules, and (ii) have been "made available to trade," or "MAT," by a registered SEF with the consent of the CFTC.[17] Twenty-three SEFs are currently registered with the CFTC.[18]

---

[16]     Contrary to Plaintiffs' assertion that large capital requirements for clearing members are "unnecessary and . . . one way that the Dealer Defendants block entry and competition" (CAC ¶ 186), the CFTC has recognized that capital requirements for clearing members are necessary to mitigate risk, and has balanced that need against the goal of open access to clearing membership.  *See* Derivatives Clearing Organization General Provisions and Core Principles, 76 Fed. Reg. 69,334, 69,352 (Nov. 8, 2011) (recognizing the "potential tension" between these goals).  In striking this balance, the CFTC permitted clearinghouses to set minimum capital requirements of up to $50 million.  *See* 17 C.F.R. § 39.12(a)(2)(iii).

[17]     *See* 7 U.S.C. § 2(h)(8); 17 C.F.R. § 39.5(b); *see also* 17 C.F.R. § 37.10 (factors to consider for a MAT determination include "[w]hether there are ready and willing buyers and sellers," "[t]he frequency or size of transactions," "[t]he trading volume," "[t]he number and types of market participants," and "[t]he bid/ask spread").  Swaps subject to the SEF mandate may alternatively be

### a)        SEF trading methods

In June 2013, the CFTC issued final rules governing the permissible methods of executing trades on SEFs.  These rules authorize SEFs to offer either an order book or an RFQ system that "operates in conjunction with an order book."  17 C.F.R. § 37.9(a)(2).  In order book trading, offers to buy and sell are entered into an electronic matching system and matched by automated algorithms.  *See generally* 17 C.F.R. § 37.3.  In RFQ trading, by contrast, "a customer can send a price request to a number of counterparties in a particular swap tenor, the prices are relayed back to the customer, and the customer then has a time window in which to execute against the prices quoted."[19]  Customers who engage in RFQ trading must send requests to trade to a minimum of three potential counterparties.  *See* 17 C.F.R. § 37.9(a)(3).

In electing to authorize RFQ trading, the CFTC sided with a large majority of the *buy-side* comments that were submitted on its proposed trading rules.  Although a few comments favored mandatory all-to-all trading—most prominently comments submitted by a group of high-frequency and proprietary trading firms[20]—many more expressed a preference for flexible RFQ

---

traded on designated contract markets ("DCMs"), which are regulated boards of trade or exchange that have many of the same powers and duties as SEFs.  *See* Commodity Futures Trading Comm'n, *Trading Organizations*, http://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm.

[18]    Commodity Futures Trading Comm'n, *Trading Organizations—Swap Execution Facilities*, http://sirt.cftc.gov/SIRT/SIRT.aspx?Topic=SwapExecutionFacilities.

[19]    *See* Dale Brandon, *RFQ vs. CLOB—The Battle So Far,* Tabb Forum (May 27, 2015), *available at* http://tabbforum.com/opinions/rfq-vs-clob-the-battle-so-far-dot.  RFQ trading operates "in conjunction with an order book" because in transmitting any RFQ responses to the buyer, the SEF is also required to transmit any relevant quotes that are lying on the order book.  17 C.F.R. § 37.9(a)(3)(i).

[20]    *See* Comment Letter submitted by Joanna Mallers on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 3-4 (Mar. 21, 2011); *see also* Allston Holdings Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 2 (Feb. 28, 2013) (submitted on behalf of "many of the same firms" as the Mallers letter).  As CFTC Commissioner Giancarlo has explained, a "mandatory continuous CLOB model . . . accommodates and, arguably, rewards algorithmic trading and HFT strategies and methodologies."  Ex. 18, Giancarlo White Paper, *supra* note 5, at 16.  Apart from the letters submitted on behalf of high-frequency trading firms, only one other buy-side comment advocated mandatory order book

trading and, indeed, strenuously objected to a proposed requirement that RFQs be sent to a minimum of five recipients.[21]

For instance, a trade association representing asset management firms explained that buy-side entities often prefer to trade with swap dealers because of the pricing and liquidity advantages they obtain from ongoing relationships with dealers.[22] Another buy-side entity expressed the concern that requiring that RFQs be sent to a minimum of five recipients could "result in a material widening of bid/ask spreads and increase hedging costs."[23] Similarly, a survey of buy-side entities regarding the proposed five-recipient minimum found that 84 percent of respondents expected that such a requirement would result in increased transaction costs, 82 percent expected widened spreads, and 76 percent expected an adverse impact on liquidity.[24]

---

trading. *See* Comment Letter submitted by Indus. Energy Consumers of Am. on Proposed Rule, 76 Fed. Reg. 1,214, RIN 3038-AD18, at 3 (May 24, 2011).

[21]    Out of the eleven buy-side comments that addressed RFQ, eight supported RFQ trading and argued for lowering the five-participant minimum. *See, e.g.*, Am. Benefits Council et al. Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 6 (Mar. 8, 2011) ("ABC Comment Letter") ("[W]e believe it is important that the rules do not force SEFs to operate an Order Book or any system that resembles an Order Book for Required Transactions, as an Order Book system is only well suited for liquid markets."); *id.* at 2 (five-participant minimum may "raise rather than lower transaction costs"); Coal. for Derivatives End-Users Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 5, 7 (Mar. 8, 2011) (stating on behalf of the U.S. Chamber of Commerce, the Business Roundtable, and the National Association of Corporate Treasurers that "[o]verly prescriptive SEF rules" could hamper end-users' access to efficient hedging and that end-users "should be able to determine how many swap dealers should be included in any given request for quote"); Freddie Mac Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 1 (Mar. 8, 2011) (the five-participant minimum may "significantly raise transaction costs, increase market risks, and have other negative consequences for the market as a whole"); Asset Mgmt. Grp. of the Sec. Indus. and Fin. Mkts. Ass'n (SIFMA) Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 5 (Mar. 8, 2011) ("AMG Comment Letter") (arguing that a "minimum five-market participant requirement will result in significantly more expensive hedging to the original counterparty—*i.e.*, end users—due to the signaling of trading strategies to the market, whether or not the trade is a block trade"); BlackRock Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 4 (Mar. 8, 2011); Managed Funds Ass'n Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 2 (Mar. 8, 2011).

[22]    *See* AMG Comment Letter, *supra* note 21, at 4-5 (advocating "highly flexible RFQ systems").

[23]    MetLife Comment Letter on 76 Fed. Reg. 1,214; RIN 3038-AD18, at 3, 4 (Mar. 8, 2011).

[24]    SIFMA Asset Management Group, ISDA, and MFA Joint Survey of Buy-Side Members on Request for Quotes (RFQs) (Mar. 1, 2013), *available at* http://comments.cftc.gov/PublicComments/

After considering these concerns, the CFTC not only authorized RFQ trading in its final rules, but also reduced the minimum number of RFQ recipients from five to three, observing that the lower minimum "appropriately balances the benefits of pre-trade price transparency and the information leakage concerns raised by commenters."  SEF Rule at 33,497-99; *see also id.* at 33,496-97 & n.270 (declining to require the "RFQ-to-all" model found in futures markets); Ex. 2, Tabb Report, *supra* note 8, at 12 ("The RFQ model is currently best suited for IRS" because "it effectively accommodates existing product conventions while respecting the relational dynamics between dealers and end-users.").

### b)      Identity disclosure in SEF trading

Although Plaintiffs suggest that the swap markets would be best served by fully anonymous trading in which the parties to a trade never learn the identity of their counterparties (*e.g.*, CAC ¶ 262), the CFTC has carefully considered whether to mandate anonymous trading and has thus far declined to do so.  For example, with respect to RFQ trading, the CFTC expressly declined to "impos[e] a specific requirement that the identity of the RFQ requester be disclosed or anonymous."  SEF Rule at 33,499.  With respect to order book trading, the CFTC's consideration of identity disclosure appears to be ongoing.  As Plaintiffs note, CFTC Chairman Timothy Massad has at times expressed concerns about the consequences of identity disclosure in order book trading.  CAC ¶ 266.  CFTC Commissioner Christopher Giancarlo, by contrast, has warned of potential adverse effects on "market liquidity and systemic risk" associated with anonymous trading.[25]  Citing these "different views within the Commission," Chairman Massad recently stated that, "[f]or the time being, we're not taking any action."[26]

---

ViewExParte.aspx?id=757&SearchText (submitted to the CFTC during a meeting with PIMCO, SIFMA, Goldman Sachs, and Vanguard).

[25]      Ex. 18, Giancarlo White Paper, *supra* note 5, at 37-39 (discussing potential benefits of name give-up, including that it facilitates dealers' allocation of capital to their customer base and helps stop

### c)   Regulation of SEFs and other market participants

Dodd-Frank requires that SEFs register with the CFTC and abide by fifteen "core principles" in order to maintain their registration.  *See* 7 U.S.C. § 7b-3(f).  Among these principles, Core Principle 11 is a special antitrust prohibition that prohibits SEFs from engaging in conduct that "result[s] in any unreasonable restraint of trade" or imposes a "material anticompetitive burden" on swap trading, "[u]nless necessary or appropriate" to achieve the purposes of the CEA, as amended by Dodd-Frank.  7 U.S.C. § 7b-3(f)(11).  Core Principle 2 complements this antitrust prohibition by requiring that SEFs provide all market participants with "impartial access" to their trading facilities.  *See* 7 U.S.C. § 7b-3(f)(2)(B)(i).  Congress imposed this impartial access requirement "to prevent a SEF's owners or operators from using discriminatory access requirements as a competitive tool" against particular market participants. SEF Rule at 33,508 (noting that SEFs cannot, for example, limit access only to dealers).

Dodd-Frank also provides for the registration and regulation of "swap dealers" and "major swap participants."  7 U.S.C. § 6s(a); *see also* Registration of Swap Dealers and Major Swap Participants Final Rule, 77 Fed. Reg. 2,613 (Jan. 19, 2012).[27]  Dodd-Frank imposes various "duties" on these market participants, including a special antitrust prohibition parallel to the one described above for SEFs.  7 U.S.C. § 6s(j)(6).  The CFTC may bring enforcement

---

market abuses); *id.* at 39 (noting that there are "policy considerations on both sides of the issue that must be carefully considered before taking any action" on name give-up).

[26]   *CFTC Not Planning on Anonymity for Swaps Market*, Financial Times (Oct. 26, 2015), *available at* www.ft.com/fastft/2015/10/26/us-swaps-market; Robert Mackenzie Smith, *CFTC Parks Sef Name Give-up Issue*, Risk (Oct. 27, 2015), *available at* http://www.risk.net/risk-magazine/news/2432073/ cftc-parks-sef-name-give-up-issue.

[27]   A "swap dealer," generally, is an entity that holds itself out as a swap dealer, makes markets in swaps, or regularly enters into swaps as an ordinary course of business for its own account.  7 U.S.C. § 1a(49).  A "major swap participant," generally, is an entity that maintains a substantial position in swaps, but is not a "swap dealer."  *Id.* § 1a(33).

14

actions against SEFs, swap dealers, and other market participants for violations of the CEA (as amended by Dodd-Frank) and CFTC regulations.[28]

### C.      The allegations of the complaints

Plaintiffs in the proposed class action are three buy-side entities that allegedly entered into IRS contracts with one or more of the Dealers.  CAC ¶¶ 37-39.  Plaintiffs in the individual action are the owners and operators of the Tera and Javelin SEFs.  JTC ¶¶ 27-31.  Defendants are (i) the twelve Dealer Defendants, (ii) Tradeweb Markets LLC, which owns and operates (among other platforms) the TW SEF, and (iii) ICAP Capital Markets LLC, an inter-dealer broker and SEF operator.  CAC ¶¶ 41-66; JTC ¶¶ 32-58.

Plaintiffs accuse these assorted Defendants of engaging in a vast and ongoing conspiracy "to boycott and destroy trading platforms that sought to provide all-to-all [IRS] trading."  CAC ¶¶ 6, 18, 353; JTC ¶ 5.  Although Plaintiffs allege a single continuous conspiracy running from "late 2007" to the present (CAC ¶¶ 102, 353; JTC ¶ 249), the complaints allege distinct types of conduct before and after 2013, and they fail to specify when and how buy-side firms supposedly acquired the ability to engage in all-to-all trading.

### 1.      The feasibility of all-to-all trading

Plaintiffs' core contention is that, if not for the alleged conspiracy, IRS trading would have shifted as early as 2007 from a dealer-to-client model to an all-to-all model.  *E.g.*, CAC ¶¶ 101-02, 353.  Plaintiffs say remarkably little, however, about the market's practical readiness for all-to-all trading.  To be sure, the complaints assert that certain buy-side firms "want" all-to-all trading and that IRS contracts are sufficiently "standardized" to permit such trading (CAC

---

[28]    *See, e.g.,* 7 U.S.C. §§ 6b-1, 9(4)(A), 13b.

¶¶ 310, 313; JTC ¶ 326), but the complaints are virtually silent about when the infrastructure and the market conditions necessary to support all-to-all trading allegedly came into existence.

The complaints are silent in particular about when the clearing arrangements necessary to support all-to-all trading first became available.  Although Plaintiffs acknowledge that all-to-all trading could not take place until buy-side firms were prepared to clear their trades through clearinghouses (CAC ¶ 77 n.14; JTC ¶ 101), they do not allege that buy-side firms were equipped to clear their trades before the CFTC *mandated* clearing of certain types of IRS effective in 2013.  According to the record compiled in CFTC rulemaking proceedings, moreover, buy-side firms were having enormous difficulty simply in meeting the CFTC's 2013 deadline.  *Supra* at 9 & n.12.  The complaints thus fail to explain how all-to-all trading could have occurred as early as "late 2007" (CAC ¶ 102), many years before buy-side firms were prepared to clear their trades.

The complaints likewise fail to allege that any all-to-all trading platforms were ready to operate before 2013.  Instead, the complaints discuss three specific platforms that allegedly sought to offer all-to-all trading—Tera, Javelin, and TrueEx—and allege that all three platforms launched in 2013 at the earliest:

- Tera allegedly connected to a clearinghouse in June 2013, obtained its temporary registration from the CFTC in September 2013, and executed its first and only IRS trade in June 2014.[29]

- Javelin allegedly obtained its temporary registration in September 2013 and was "nearing launch" of its platform in "late 2013."[30]

---

[29]   *See* JTC ¶ 178; CAC ¶ 202 (first actual trade in June 2014); JTC ¶ 110 (temporary CFTC registration obtained on September 19, 2013); Ex. 4, cited at CAC ¶ 172 n.54 (Press Release, PR Newswire, *TeraExchange Connects to CME Clearing to Provide Margin Relief to Customers Trading Interest Rate Swaps, Eurodollar and Treasury Futures* (June 25, 2013) (announcing that Tera had connected to CME Clearing and would "soon be linked to LCH and ICE")).

[30]   *See* JTC ¶¶ 96, 130; CAC ¶¶ 222, 225.

16

- TrueEx allegedly brought its platform to market "in 2013" and obtained its temporary registration in September 2013.[31]

Moreover, although Bloomberg and Tradeweb offered electronic trading of IRS in earlier periods, those platforms operated solely on a request-for-quotation basis until 2013, when Dodd-Frank required them to offer order books alongside their RFQ platforms. *See* CAC ¶¶ 135, 159 n.44. In any event, "[u]ntil Dodd-Frank, volumes on these platforms were flat to nonexistent."[32]

The complaints thus offer no explanation of how all-to-all trading could have occurred before the Dodd-Frank mandates took effect in 2013. Enormous investments in technology and "thousands" of legal agreements were necessary to position the buy-side for clearing and SEF-trading, but there are no allegations that this infrastructure existed before Dodd-Frank forced its creation.[33] Nor are there any allegations that, even today, IRS contracts trade with the same kind of volume and frequency as instruments that trade on an all-to-all basis. *Supra* at 6-7.

## 2.    Pre-2013 allegations

Although they neglect to allege that all-to-all IRS trading was technically possible before the Dodd-Frank mandates took effect, Plaintiffs nonetheless assert that most, but not all, of the Dealers began conspiring to prevent such trading many years earlier, in "late 2007," in

---

[31]    *See* JTC ¶ 194; *see also* CAC ¶ 241; Press Release, Commodity Futures Trading Comm'n, *CFTC Issues Notices of Temporary Registration as A Swap Execution Facility to TrueEx, LLC and ICE Swap Trade, LLC, available at* http://www.cftc.gov/PressRoom/PressReleases/pr6701-13.

[32]    Ex. 5, cited in CAC ¶ 242 n.69 & JTC ¶ 195 n.38 (Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, Institutional Investor (July 21, 2015)).

[33]    *See supra* at 8-10; *see also* ISDA, *Costs and Benefits of Mandatory Electronic Execution Requirements for Interest Rate Products*, 27-38 (2011), *available at* https://www2.isda.org/attachment/MzczMw==/ISDA%20Mandatory%20Electronic%20Execution%20Discussion%20Paper.pdf (estimating that hundreds of millions of dollars' worth of new infrastructure would be required to support trading on SEFs).

connection with a joint venture between Tradeweb and several of the Dealers.  CAC ¶ 102; JTC ¶ 248.[34]

Tradeweb was originally launched in 1998 as an electronic trading platform for fixed income securities.  CAC ¶¶ 90, 109; JTC ¶ 240.  In late 2007, however, Tradeweb and most of the Dealers—those other than BNPP, HSBC, Barclays, and Citi—entered into a joint venture that expanded Tradeweb's offerings.  CAC ¶¶ 103-12; JTC ¶¶ 248-57.  Under the terms of the joint venture, which came to be known as "Project Fusion," Tradeweb and the participating Dealers agreed to support a multi-asset-class platform for electronic trading of IRS and other new asset classes.  CAC ¶¶ 103-04, 109; JTC ¶¶ 252-55.  Although Plaintiffs allege that the Dealers "concealed" the structure of the joint venture (CAC ¶ 106), the structure of the venture was in fact disclosed in the securities filings of Tradeweb's parent company:

> On October 11, 2007, we announced that we had formed a partnership with a consortium of nine global securities dealers to seek to further expand TradeWeb, our electronic trading unit within Thomson Financial. The partnership will utilize TradeWeb's established market position to create a global multi-asset class execution venue for clients.  Under the terms of the agreement, the dealers will invest approximately $180 million to purchase a 15% stake in an entity that includes TradeWeb's established markets . . . which will be named TradeWeb Markets.  Additionally, Thomson and the dealers will fund additional investment in asset class expansion through a new entity, TradeWeb New Markets. . . . We will own 20% of TradeWeb New Markets and the consortium will own 80%.[35]

On its face, a joint venture that expanded Tradeweb's electronic trading platform should have been good for competition:  electronic trading allegedly "increase[s] competition over price," "reduc[es] search frictions," and "rais[es] competition to fill an order."  CAC ¶ 300; *see*

---

[34]   Plaintiffs do not allege that BNPP or HSBC participated in Project Fusion at any time or that BNPP or HSBC had any involvement in Tradeweb.  Citi and Barclays allegedly invested in the joint venture in 2008 and 2009, respectively.  CAC ¶¶ 111-12 & n.29; JTC ¶ 257 & n.95.

[35]   Ex. 19, The Thomson Corp. Form 6-K, Exhibit 99.1, at 19 (Nov. 9, 2007); *see also infra* at 78.  On a motion to dismiss, the court may consider "legally required public disclosure documents filed with the SEC."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

JTC ¶ 81.  Plaintiffs nevertheless suggest that Project Fusion marked the beginning of a nefarious antitrust conspiracy.  Specifically, Plaintiffs allege that the Dealers that invested in Project Fusion did so only because, "in late 2007, Tradeweb [] was poised to introduce all-to-all trading to the IRS market."  CAC ¶ 101; JTC ¶ 248.  The Dealers allegedly responded by using Project Fusion to "take over" Tradeweb and prevent it from launching all-to-all trading.  *See* CAC ¶¶ 101-04; JTC ¶¶ 243-51.  Plaintiffs also allege that, once formed, the joint venture became a "forum" to "coordinate" the alleged conspiracy.  CAC ¶¶ 18, 21, 101-04, 126; JTC ¶¶ 22-24, 113, 270, 279.

Noticeably missing from these allegations is any explanation of how Tradeweb could have been "poised" to launch all-to-all trading in "late 2007," many years before the infrastructure necessary to support such trading came into existence.  Also missing are any allegations that Project Fusion was an unattractive investment opportunity, or that only an antitrust conspirator would have wanted to invest in such a venture.

### 3. Post-2013 allegations

In the post-2013 period, Plaintiffs shift their focus to allegations that the Dealers conspired to boycott three newly-launched trading platforms—Tera, Javelin, and TrueEx—that "sought to provide all-to-all trading protocols to the buy-side."  CAC ¶ 6; JTC ¶ 5.  Plaintiffs allege that the Dealers boycotted these new platforms both as market-makers and as providers of clearing services.

#### a) Market-making allegations

On the market-making side, Plaintiffs mainly allege that the Dealers refused to make markets (*i.e.*, quote bids and offers) on Tera, Javelin, and TrueEx.  *See, e.g.*, CAC ¶ 23; JTC ¶¶ 16, 23.  According to the complaints, these new platforms threatened to "disintermediate" the Dealers and deprive them of "billions of dollars" in "extraordinary profits" that they were

19

earning on IRS.  CAC ¶¶ 7, 10, 94; JTC ¶¶ 6, 9, 14, 243.  The Dealers allegedly reacted to this

purported threat by "boycotting" and "stonewalling" all three platforms, thereby starving them of

the liquidity that they allegedly needed to survive.  CAC ¶¶ 3, 6, 35, 244; JTC ¶¶ 116, 197.[36]

Although Plaintiffs do their best to imply that all twelve Dealers acted in lockstep with

respect to Tera, Javelin, and TrueEx, the actual *facts* alleged in the complaints are inconsistent

with that conclusion.  For example, with respect to TrueEx, the complaints allege that only six of

the twelve Dealers have "declined to use" the TrueEx platform, implicitly acknowledging that

the other six are supporting the platform.  *See* CAC ¶ 244; JTC ¶ 197.  The complaints also cite

press reports confirming that (i) no less than seventeen dealers are supporting TrueEx,

(ii) JPMorgan supported TrueEx from its launch, and (iii) TrueEx is enjoying "record volumes"

and "on good days it handles as much as 38 percent of trading" in its markets.[37]

Plaintiffs' allegations are even thinner as to Tera.  Although Plaintiffs assert that "not a

single Dealer-Defendant has agreed to provide liquidity to Tera Exchange's platform" (CAC

---

[36]    Although Plaintiffs allege that the Dealers "dominate" IRS trading (CAC ¶ 293; JTC ¶ 315), that allegation is undermined by the cited source.  Plaintiffs cite a 2013 survey that purports to estimate the Dealers' share of the market for all interest rate derivatives, not only IRS; according to that report, multiple non-defendant dealers enjoyed market shares greater than some of the Dealers.  *See* Ex. 6, cited in CAC ¶ 293 n.119 & JTC ¶ 315 n.118 (Greenwich Associates, *2013 Global Interest Rate Derivatives:  Dealer Rankings & Market Trends Report* (identifying the top twelve dealers, four of which are not named as defendants in the complaints)).  Nor do Plaintiffs allege any facts supporting the notion that the alleged profits of every Dealer would have led it to conspire to thwart all-to-all trading.

[37]    *See* Ex. 7, cited in CAC ¶ 245 n.72 & JTC ¶ 198 n.42 (Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, Tabb Forum (Feb. 26, 2015) ("In the last week of February, for example, trueEx captured 22% of the share of the client-facing execution business.")); Ex. 8, cited in CAC ¶ 7 n.2 & JTC ¶ 6 n.2 (Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, Reuters (Mar. 10, 2015) ("JPMorgan Chase & Co, one of the world's top swaps dealing banks, [] has joined trueEX.")); Ex. 5, cited in CAC ¶ 242 n.69 & JTC ¶ 195 n.38 (Timms, *supra* note 32); *see also* Ex. 9, cited in CAC ¶ 242 n.67 & JTC ¶ 195 n.36 (Glen Fest, *TrueEx Takes Early Lead in Building Rate Swaps Exchange*, Am. Banker (Apr. 1, 2013) (UBS is "in talks with trueEx to deliver its client volume to the exchange."); TrueEx Media, *UBS and trueEX form liquidity alliance for Interest Rate Swaps* (Aug. 8, 2013), https://www.trueex.com/media/51 (UBS and TrueEx formed a "liquidity alliance" in which UBS was "providing markets" and "routing client flows" to the platform).

¶ 183; JTC ¶ 164), they elsewhere admit that *Tera* essentially boycotted the *Dealers* rather than vice versa.  According to the complaints, Tera's business plan was to sign up "non-traditional liquidity providers" that it believed would offer superior prices.  CAC ¶¶ 24, 179; JTC ¶ 165.  Tera therefore made a deliberate decision not to "recruit" or "sign up" any traditional IRS dealers.  CAC ¶¶ 173, 179, 181; JTC ¶ 165.  Moreover, when certain dealers allegedly reached out to Tera about the possibility of supporting and investing in the platform, "TeraExchange declined the offers."  CAC ¶¶ 182-83; *see also* JTC ¶ 163.  Tera's strategy of shunning the dealers that allegedly account for "almost all of the liquidity in the IRS market" did not prove successful:  Tera conducted only a single IRS trade before abandoning the IRS business in 2014.  *See* CAC ¶¶ 202, 205, 213, 236; JTC ¶¶ 178, 192.

Finally, as to Javelin, the complaints make clear that at least two Dealers provided substantial support to the platform:  RBS made markets on Javelin from 2013 through 2015, and UBS "partner[ed]" with Javelin, and facilitated the very first trade on that platform, by enabling buy-side firms to trade on Javelin using UBS's Neo price-aggregation service.[38]  Significantly, these Dealers supported Javelin notwithstanding a relatively low level of buy-side interest in Javelin's platform.  Although Plaintiffs allege that a modest number of potential customers had expressed interest in Javelin (CAC ¶ 229; JTC ¶ 152), they do not allege that Javelin's new platform enjoyed anywhere near the level of customer interest as long-established competitors such as Bloomberg and Tradeweb.[39]

---

[38]   CAC ¶¶ 235-37, 239; JTC ¶¶ 135, 142; *see* Ex. 10, cited in CAC ¶ 272 n.97 & JTC ¶ 219 n.66 (Mike Kentz, *New Dawn as Non-Bank Enters Interdealer Order Book*, Int'l Fin. Rev. (July 11, 2014) (announcing first Javelin trade through Neo platform and stating that Javelin is "very excited to have UBS as a partner")).

[39]   *Cf.* CAC ¶ 239 (acknowledging that several Dealers noted the relative lack of customer interest in Javelin).  In fact, according to materials cited in the complaints, Javelin and other new entrants "appear[ed] to be floundering" in their efforts to convince customers to invest in connections to their platforms, in part because customers already had access to Bloomberg and Tradeweb platforms that

In short, the complaints confirm that over a dozen dealers supported TrueEx, that some dealers supported Javelin, and that dealers never even had an opportunity to support Tera, which shunned their business from the outset.  On that tenuous basis, Plaintiffs urge the conclusion that "[o]nly a conspiracy" could explain the Dealers' alleged failure to do enough market-making on TrueEx, Javelin, and Tera.  CAC ¶ 313; JTC ¶ 326.

### b)    Clearing services allegations

On the clearing services side, Plaintiffs allege that the Dealers' clearing affiliates generally declined to clear trades occurring on Tera or Javelin.  CAC ¶¶ 168, 184, 226; JTC ¶¶ 143, 170-71.  Conspicuously absent, however, are any allegations that these clearing affiliates declined to clear trades occurring on any of the *other* IRS platforms that offer all-to-all capabilities, such as TrueEx, Bloomberg, and the Chicago Mercantile Exchange.[40]

---

offered very favorable trading fees.  Ex. 11, cited in CAC ¶ 167 n.49 & JTC ¶ 117 n.23 (Mike Kentz, *SEF Start-ups Face Obstacles*, Int'l Fin. Rev. (July 26, 2013)); Ex. 12, cited in CAC ¶ 279 n.106 (Kim Hunter, *Growing Pains*, Markit, at 33 (Winter 2014)).  Furthermore, Javelin antagonized the entire industry when it prematurely attempted to mandate SEF-trading of the entire interest rate swaps curve, including products with negligible trading liquidity.  *See* Ex. 13, cited in CAC ¶ 238 n.66 (Mike Kentz, *Cawley Exit Signals SEF Troubles*, Int'l Fin. Rev. (May 9, 2014) (noting that "the industry uproar was so powerful" that Javelin retracted its overbroad MAT submission)); Ex. 14, cited in JTC ¶ 137 n.32 (Silla Brush, *CFTC Said Ready to Push Interest-Rate Swaps to Trade Venues*, Bloomberg (Jan. 9, 2014) ("Javelin narrowed its plans after swap *buyers* said the original version would cause too many types of trades to occur on the platforms.")).

[40]    Bloomberg offers an anonymous order book alongside its RFQ platform without any alleged difficulty in clearing its trades.  *See* CAC ¶¶ 159 n.44; JTC ¶ 318 n.121; CTPF 1st Compl., 15-cv-9319, Dkt. 1 ¶ 128 n.77 (original complaint acknowledging that "Bloomberg offers a CLOB without name give-up").  TrueEx likewise offers all-to-all IRS trading (CAC ¶¶ 241-42; JTC ¶¶ 194-95), yet it enjoys the support of at least "12 clearing firms."  Ex. 7, cited in CAC ¶ 245 n.72 & JTC ¶ 198 n.42 (Schmerken, *supra* note 37).  Finally, the Chicago Mercantile Exchange offers exchange trading of both IRS futures and "synthetic" IRS in the form of Eurodollar futures strips.  *See Interest Rate Products*, CME Group, *available at* http://www.cmegroup.com/trading/interest-rates/#swapFutures; Ex. 15, cited in CAC ¶ 296 n.123 (Adam Sussman, *US Interest Rate Swap Futures:  Why Market Participants Would Switch*, Tabb Group (2012)); Galen Burghardt, The Eurodollar Futures and Options Handbook 44 (2003) (explaining how Eurodollar futures can be used to "construct synthetically" forward rate, fixed-income instruments).

As to Tera and Javelin, moreover, the complaints carefully dodge the question of whether and when those platforms were able to support live credit checks on parties attempting to place trades.[41]   Under CFTC regulations, providers of clearing services must "confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place."  CAC ¶ 192; JTC ¶ 124 (emphasis in original).  Although the complaints imply that Tera and Javelin could support live credit checks through a "credit hub" known as Traiana (CAC ¶ 172 n.53; JTC ¶¶ 100, 151, 151 n.34), the complaints fail to identify when Tera and Javelin connected to Traiana, and public sources indicate that they did so only in 2014.[42]   Almost all of the complaints' clearing allegations, by contrast, relate to alleged denials of clearing services *before* 2014, and the few remaining allegations are not even asserted against a majority of the Dealers.[43]

## ARGUMENT

## I.   PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY.

### A.   Standards for pleading an antitrust conspiracy.

A plaintiff attempting to plead an antitrust conspiracy must allege a conspiracy that is not just "conceivable," but "plausible."  *Twombly*, 550 U.S. at 570.  To allege such a conspiracy, a complaint must include more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.* at 555.  Rather, the complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  "The ultimate

---

[41]   Live credit checks are accomplished using a so-called "ping" system, in which a "SEF will 'ping' an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade."  CAC ¶ 192 n.61; JTC ¶ 124 n.28.

[42]   *See TeraExchange Certifies with Traiana for Pre-Trade Credit Checking of Swap Trades*, Traiana (Jan. 28, 2014), http://www.traiana.com/teraexchange-certifies-with-traiana-for-pre-trade-credit-checking-of-swap-trades; *Javelin SEF Goes Live with Traiana's CreditLink for Interest Rate Swaps*, Traiana (Jan. 29, 2014), http://www.traiana.com/javelin-sef-goes-live-with-traianas-creditlink-for-interest-rate-swaps-javelin-sef.

[43]   *See, e.g.*, CAC ¶¶ 196, 200, 220-21, 226-27; JTC ¶¶ 148-49, 176.

existence of an 'agreement' under antitrust law [] is a legal conclusion, not a factual allegation." *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013). Antitrust plaintiffs therefore "must plead evidentiary facts," including "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).[44]

Under Second Circuit law, there are two main ways in which a plaintiff may attempt to satisfy these requirements. First, a plaintiff may allege "direct evidence" of conspiracy. *See Citigroup*, 709 F.3d. at 136. "Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136.

Second, a plaintiff may attempt to plead an antitrust conspiracy on the basis of "conscious parallelism," but only "when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* Allegations of parallel conduct alone are "not enough" because such allegations are merely "consistent" with an inference of conspiracy. *In re Elevator*, 502 F.3d at 50. Thus, to state a claim on the basis of parallel conduct, a plaintiff must allege additional facts and circumstances supporting an inference that the parallel conduct "flowed from a preceding agreement rather than from [defendants'] own business priorities." *Citigroup*, 709 F.3d at 137-38; *see also In re Aluminum Warehousing Antitrust Litig.*, 95 F.

---

[44] In some instances, detailed allegations of parallel conduct can be substituted for allegations of the "specific time, place, or person" involved in an alleged conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323-25 (2d Cir. 2010) (sustaining a highly detailed set of allegations that "all defendants raised wholesale prices" from 65 cents to 70 cents per song in May 2005 and enforced the increase through most-favored-nation clauses); *see also Twombly*, 550 U.S. at 556 n.4. Plaintiffs have not made such allegations here.

Supp. 3d 419, 451-52 (S.D.N.Y. 2015) ("*Aluminum II*") ("[A] complaint merely alleging parallel conduct alone is not sustainable.").

These principles bar any inference of conspiracy when defendants are accused only of parallel conduct that is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Nor can an inference of conspiracy be drawn where the alleged conduct "made perfect business sense," *Citigroup*, 709 F.3d at 138, where "there are obvious alternative explanations for the facts alleged," *In re Ins. Brokerage*, 618 F.3d at 322-23, or where the alleged facts "suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy," *In re Elevator*, 502 F.3d at 51.

Plaintiffs' allegations founder on these principles. None of Plaintiffs' allegations identifies any "direct evidence" of conspiracy, and all of the parallel conduct that Plaintiffs purport to identify is fully consistent with the conclusion that each Dealer acted independently based on "common perceptions of the market." *Twombly*, 550 U.S. at 554.

### B.   Plaintiffs' pre-2013 allegations fail to state a plausible antitrust claim.

As noted above, Plaintiffs do not allege that buy-side firms had the practical ability to engage in all-to-all trading before the Dodd-Frank mandates took effect in 2013; nor do they identify any trading platform that attempted to introduce all-to-all trading before that date. Plaintiffs nevertheless allege that the Dealers began conspiring to boycott all-to-all trading many years earlier, in late 2007. CAC ¶ 102; JTC ¶ 249. In the absence of any other basis for seeking damages all the way back to 2007, Plaintiffs resort to asserting that the Project Fusion joint venture marked the beginning of the alleged conspiracy. Neither these allegations nor any of Plaintiffs' other pre-2013 allegations states a plausible claim.

### 1.    The Project Fusion allegations fail to state a plausible claim.

Although Plaintiffs center their pre-2013 allegations on the Project Fusion joint venture, the Project Fusion allegations plainly fail to allege a plausible antitrust claim.  As an initial matter, BNPP and HSBC never even participated in Project Fusion or otherwise invested in Tradeweb (CAC ¶ 111 & n.29), thus leaving Plaintiffs without any basis for attempting to tie those Dealers to a pre-2013 conspiracy.  And, more fundamentally, it was only through Project Fusion that Tradeweb first became a viable platform for trading IRS and other new asset classes. *Supra* at 18-19.  Plaintiffs nevertheless assert that the Dealers that participated in Project Fusion did so solely because, "[b]y late 2007, Tradeweb [] was poised to introduce all-to-all trading to the IRS market."  CAC ¶¶ 101-02; JTC ¶¶ 248-49.  Project Fusion allegedly enabled the Dealers to prevent Tradeweb from launching all-to-all trading (CAC ¶ 102; JTC ¶ 23), and to use Tradeweb as the "host" of the purported conspiracy (CAC ¶ 107; JTC ¶ 254).  For three main reasons, these allegations lend no support to Plaintiffs' claims.

*First*, Plaintiffs fail to plead "evidentiary facts" that support their conclusory assertion that the joint venture was the product of an antitrust conspiracy.  *Kendall*, 518 F.3d at 1047-48. For example, Plaintiffs fail to allege any *facts* supporting their extraordinary assertion that Tradeweb was "poised" to launch all-to-all trading in 2007, six full years before the infrastructure necessary to support such trading first came into existence.  *Supra* at 16-17.  Nor do Plaintiffs allege any *facts* supporting their suggestion that the Dealers that invested in Project Fusion acted out of an irrational fear that Tradeweb was poised to launch a form of trading for which there was no infrastructure.  Plaintiffs' "conclusory assertions dressed up as facts" are therefore insufficient to plead an antitrust conspiracy.  *See Aluminum II*, 95 F. Supp. 3d at 437.

*Second*, all of Plaintiffs' well-pled factual allegations are fully consistent with the conclusion that the participants in Project Fusion simply made a non-conspiratorial decision to

invest in a promising joint venture.  Plaintiffs never allege that Project Fusion was an unattractive investment, or that only a participant in an antitrust conspiracy would have wanted to invest.  Quite the contrary, Plaintiffs expressly allege that rational IRS dealers would have been looking for opportunities to "obtain[] an equity share" in electronic trading platforms.  CAC ¶¶ 310-11; *see* JTC ¶¶ 324-26.  That is exactly what occurred in Project Fusion:  several leading securities dealers invested in a cutting-edge electronic trading platform and obtained an equity share in exchange.  CAC ¶¶ 106, 110; JTC ¶¶ 255-56.  Such investments are at least as consistent with "rational and competitive business strategy" as with a far-flung antitrust conspiracy. *Twombly*, 550 U.S. at 554; *see also Citigroup*, 709 F.3d at 138 (declining to infer a conspiracy from parallel conduct that "made perfect business sense").

*Third*, although Plaintiffs criticize Tradeweb for waiting until 2013 to launch an all-to-all trading capability (CAC ¶¶ 20, 132; JTC ¶ 23), that decision likewise "made perfect business sense." *Citigroup*, 709 F.3d at 138.  As the complaints acknowledge, Tradeweb added an all-to-all order book to its trading platform in 2013, as mandated by Dodd-Frank.[45]  *See* CAC ¶ 135; JTC ¶ 277; 17 C.F.R. § 37.9(a)(2).  That is precisely when Tera, Javelin, and TrueEx launched *their* all-to-all capabilities, *supra* at 16-17, and Plaintiffs nowhere allege that the buy-side had the technical ability to *use* all-to-all platforms any earlier.  *Supra* at 9, 16.  Furthermore, even if Plaintiffs had adequately alleged that all-to-all trading was feasible before 2013, a mere allegation that Tradeweb declined to expand more aggressively into all-to-all trading would not support an inference of conspiracy.  Rather, as the Supreme Court has explained, "[f]irms do not

---

[45]   In a strained attempt to minimize the significance of the Tradeweb order book, Plaintiffs assert that the Dealers are "actively discourag[ing] their clients from using it."  CAC ¶ 135; *see also* JTC ¶ 277.  That conclusory assertion deserves no weight because it fails to identify a single client that allegedly was discouraged, a single defendant that engaged in discouraging conduct, or when, where, or how such discouragement supposedly took place.  *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1194 n.6 (requiring pleading of "evidentiary facts").

expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." *Twombly*, 550 U.S. at 551, 569 (declining to infer an antitrust conspiracy from allegations that defendants declined to pursue "attractive business opportunities").[46]

Plaintiffs' remaining allegations regarding Project Fusion are even less substantial. Although Plaintiffs suggest that there was something "secret" and "shadowy" about the corporate structure of the joint venture (CAC ¶¶ 104, 109; JTC ¶ 253), those allegations are belied by public securities filings that fully disclosed the venture's structure. *Supra* at 18. Plaintiffs also allege that meetings of the joint venture's board of directors provided a potential "forum" for conspiring (CAC ¶ 21; JTC ¶ 22), but it is well settled that a "mere opportunity to conspire" at legitimate meetings will not support an inference that "an illegal combination actually occurred." *Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); *see also In re Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *33 (S.D.N.Y. 2014) ("*Aluminum I*") (allegation that defendants met and communicated at committee meetings were "no more than suggestive of potential opportunity to communicate"), *aff'd on other grounds*, 2016 WL 4191132 (2d Cir. 2016).[47]

---

[46]    Plaintiffs do not allege that the decisions of the joint venture itself give rise to antitrust violations; nor could they. *See, e.g.*, *Texaco, Inc. v. Dagher*, 547 U.S. 1, 6-7 (2006) ("As a single entity, a joint venture, like any other firm, must have the discretion" to make decisions regarding the venture's conduct); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 772 n.18, 776 (1984) (holding that the conduct of a "single economic unit" "falls outside the reach of" Section 1 of the Sherman Act); *id.* at 768 (joint ventures are not judged under the antitrust "per se" rule).

[47]    For similar reasons, Plaintiffs' assertions that the Dealers had opportunities to conspire in trade association and industry group meetings (CAC ¶¶ 136-38; JTC ¶¶ 279-82) lend no support to their claims. *See, e.g.*, *Twombly*, 550 U.S. at 567 n.12 (merely "belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Hinds Cnty., Miss. v. Wachovia Bank*

At bottom, all that Plaintiffs have concretely alleged regarding Project Fusion is that several leading securities dealers invested in a promising joint venture and received an equity stake in exchange for their investments.  These allegations of participation in a narrow and lawful joint venture provide no basis for inferring the existence of a broad and unlawful antitrust conspiracy.  *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369-70 (S.D.N.Y. 2016) (allegations that defendants participated in a narrow and lawful agreement "cannot support the broad [antitrust conspiracy] alleged"); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement"), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 Fed. App'x 79 (2d Cir. 2015).

### 2.      The remaining pre-2013 allegations fail to state a plausible claim.

Plaintiffs also allege that the Dealers conspired with inter-dealer brokers, or "IDBs," to maintain an alleged separation between a "wholesale" dealer-to-dealer segment of the IRS market and a distinct "retail" dealer-to-client segment.  *See* CAC ¶¶ 30 n.12, 147-56; JTC ¶ 17. The only IDB specifically identified, however, is defendant ICAP, an IDB that launched an IRS trading platform in Europe in 2010 and in the United States in 2013.  CAC ¶¶ 149 & n.40, 152; JTC ¶¶ 292 & n.106, 295.  According to the complaints, ICAP entered into a vaguely-described "détente agreement" under which it agreed to limit its platforms to dealer-to-dealer trading in exchange for a commitment that Tradeweb would remain focused on dealer-to-client trading:

> ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer-Defendants would not further expand [through a Tradeweb affiliate] into the IDB space in exchange for ICAP not expanding into the dealer-to-client space.

---

*N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (mere allegations of "participation in trade associations or conferences cannot support . . . allegations of a conspiracy"); *see also Kendall*, 518 F.3d at 1048 (participation in joint venture's board of directors does not establish a conspiratorial agreement); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013) ("merely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1").

CAC ¶ 150; JTC ¶ 293.  These thinly-pled "détente" allegations fall far short of stating a

plausible antitrust claim, and Plaintiffs' remaining allegations regarding IDBs are even thinner.

In the first place, Plaintiffs once again fail to plead sufficient facts to support their

conclusory assertions of "agreement."  For example, the complaints "mention[] no specific time,

place, or person involved" in the alleged détente agreement.  *Twombly*, 550 U.S. at 565 & n.10.

Furthermore, the purported agreement is not alleged to extend to *any* of ICAP or Tradeweb's key

competitors, including Bloomberg, Tradition, Tullett, or BGC.  *See* CAC ¶¶ 150, 159-60; JTC

¶¶ 293, 301-02.  An alleged "détente" that would have limited the conduct of ICAP and

Tradeweb without limiting the conduct of their key competitors would make no economic sense

and "stops short of the line between possibility and plausibility."  *Twombly*, 550 U.S. at 557.

Even more importantly, Plaintiffs' détente allegations are fully consistent with the

conclusion that Tradeweb and ICAP each made independent decisions to continue to serve their

historical market segments.  According to the complaints, "Tradeweb's historical focus has been

on providing electronic trading services in the *dealer-to-client* side of the market," whereas

ICAP has always acted as an inter-dealer broker, "brokering IRS trades *between dealers*."  CAC

¶¶ 65-66; JTC ¶¶ 57-58.  "Hence, a natural explanation for the noncompetition alleged" is that

each firm simply "liked the world the way it was," and preferred to stand pat rather than pursuing

aggressive expansion.  *Twombly*, 550 U.S. at 568.  This "natural explanation" bars any inference

of conspiracy from mere allegations that the two firms each remained focused on their historical

market segments.  *See id*. at 551, 568-69 (declining to infer conspiracy from "common failure

meaningfully to pursue attractive business opportunities"); *RxUSA Wholesale, Inc. v. Alcon

Labs., Inc*., 661 F. Supp. 2d 218, 231-32 (E.D.N.Y. 2009) (declining to infer conspiracy where

plaintiff alleged "nothing more than the continuation of preexisting [business] patterns"), *aff'd*,

391 F. App'x 59 (2d Cir. 2010); *In re Zinc*, 155 F. Supp. 3d at 375 (rejecting allegations that competitors had stayed out of each other's market segments as "indicative of no more than a natural and independent desire to avoid a turf war").

Finally, although Plaintiffs assert that ICAP carried out the alleged détente agreement by refusing to allow buy-side firms to trade on its U.S. platform (CAC ¶ 152; JTC ¶ 295), CFTC regulations flatly prohibit ICAP from excluding the buy-side. *Supra* at 14. Plaintiffs' conclusory assertion that ICAP is violating these regulations is contradicted by the materials cited in their own complaints, which confirm that "dozens of non-banks" are accessing ICAP's platform.[48] For all these reasons, Plaintiffs fail to plead a plausible "détente agreement." *See Aluminum I*, 2014 WL 4277510, at *31 (requiring "more than generalized statements that a conspiracy existed or that the defendants agreed to engage in it").[49]

### 3. The pre-2013 allegations rely on impermissible group pleading.

The complaints also fail to plead sufficient facts to connect any individual Dealer to a pre-2013 conspiracy. Plaintiffs bear the burden of showing that each of the separate defendants in this action, "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999). Collective allegations that generalize about "defendants" as a group are therefore "insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P. v. Entm't Props. Trust*, 2014 WL 1396524, at *24 (S.D.N.Y. 2014).

---

[48]    Ex. 16, cited in CAC ¶ 268 n.91 & JTC ¶ 228 n.79 (Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, Risk (Sept. 14, 2015)).

[49]    Plaintiffs also make a cursory assertion that the Dealers conspired in 2008 to boycott a CME-owned platform known as Swapstream (CAC ¶¶ 289-91; JTC ¶¶ 309-11), but they ultimately admit that Swapstream never even launched in the United States (CAC ¶ 291; JTC ¶ 311), and they fail to support their conclusory assertions of "conspiracy" with the necessary factual allegations.

Instead, the complaints must notify each individual defendant of "how he is alleged to have conspired, with whom and for what purpose." *In re Zinc*, 155 F. Supp. 3d at 384.[50]

Plaintiffs' pre-2013 allegations do not meet these basic pleading standards. *First*, the complaints fail to identify *any* substantive conduct that purportedly ties BNPP or HSBC to a pre-2013 antitrust conspiracy. Neither of those Dealers allegedly participated in Project Fusion and neither allegedly had a "strategic investment group." *See* CAC ¶¶ 94-97, 111; JTC ¶¶ 243-45, 257. Plaintiffs' failure to allege that either of those Dealers participated in Project Fusion—the purported "host" of the conspiracy (CAC ¶¶ 18, 107)—leaves them without any allegations whatsoever to connect those Dealers to an anticompetitive agreement.

*Second*, even as to the Dealers that invested in Project Fusion, Plaintiffs' allegations of conspiratorial "agreements" consist entirely of conclusory generalizations about the "Dealer-Defendants" as a whole. *See, e.g.*, CAC ¶¶ 135, 145, 147, 150. The only pre-2013 allegations of any substance that identify individual Dealers assert that (i) three specific Dealers allegedly led the Project Fusion joint venture (CAC ¶¶ 102-04), and (ii) each participating Dealer nominated individuals to serve on the venture's boards and committees (CAC ¶¶ 113-29). As discussed above, however, a Dealer's mere participation in a lawful joint venture provides no basis for inferring its participation in an unlawful antitrust conspiracy. *Supra* at 29.

---

[50]   *See also In re Elevator*, 502 F.3d at 50-51 (allegations describing a conspiracy in "general terms without any specification of any particular activities by any particular defendant" are inadequate); *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. 2012) (complaint must "provide a plausible factual basis to distinguish the conduct of each of the defendants"); *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) ("[c]onclusory, collective language is too convenient, too undisciplined, and too unfocused" to state an antitrust claim); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (plaintiffs must allege "a factual connection between *each* Defendant and the alleged conspiracy").

### C.      Plaintiffs' post-2013 allegations fail to state a plausible antitrust claim.

In the post-2013 period, Plaintiffs shift their focus to allegations that the Dealers conspired to boycott three new trading platforms—TrueEx, Javelin, and Tera—that attempted to introduce all-to-all trading to the IRS market.  Plaintiffs allege that the Dealers obstructed these new trading platforms both by declining to make markets on the platforms and by refusing to provide clearing services for them.  As shown below, Plaintiffs have failed to allege parallel conduct by the Dealers, and such conduct as they do allege is fully consistent with independent decision-making.

### 1.      Plaintiffs do not adequately allege a market-making boycott.

Plaintiffs allege that some but not all of the Dealers engaged in a parallel refusal to make markets on all-to-all trading platforms.  *See, e.g.*, CAC ¶¶ 23, 168, 183, 223; JTC ¶¶ 16, 135, 164, 193.  These allegations fail to state a plausible antitrust claim for two independent reasons.

*First*, Plaintiffs have not adequately alleged parallel conduct by the Dealers, much less parallel conduct inconsistent with unilateral decision-making.  Although Plaintiffs suggest that the Dealers acted in lockstep to "boycott and destroy" any platform that introduced all-to-all trading (CAC ¶ 6; JTC ¶ 5), the complaints ultimately reveal that, to the contrary:

- at least seventeen dealers are supporting TrueEx, and JPMorgan continuously supported TrueEx from its inception;

- *Tera* refused to deal with the *Dealers* rather than the other way around;

- at least two Dealers provided substantial support to Javelin notwithstanding the low level of interest in that platform;

- Bloomberg offers anonymous all-to-all IRS trading, yet encountered no alleged difficulties in obtaining liquidity from the dealer community; and

- the Chicago Mercantile Exchange offers all-to-all trading of IRS futures, and likewise encountered no alleged difficulties with dealers.

*Supra* at 20-22 & n.40.

33

Far from alleging the type of "uniformity and simultaneity" required to plead parallel conduct, these allegations show *divergent* conduct in which a majority of the Dealers actually *supported* at least one all-to-all platform.  *See In re Musical Instruments*, 798 F.3d at 1195-97 & n.14.  Plaintiffs' claims should be dismissed for this reason alone.  *See id.* (declining to infer an antitrust conspiracy from allegations of non-uniform and non-simultaneous parallel conduct); *Burtch*, 662 F.3d at 228 (allegations that various competitors "were choosing to decline, decrease, and even increase credit to [the plaintiff]" fell "far short of demonstrating parallel behavior"); *RxUSA Wholesale*, 661 F. Supp. 2d at 237 (dismissing claim where it was "questionable whether Plaintiff's allegations even establish a pattern of parallel conduct").

*Second*, even if Plaintiffs had adequately alleged a parallel refusal to deal with all-to-all trading platforms, such conduct would be fully consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554.  According to the complaints, new trading platforms like Tera and Javelin were threatening to deprive the Dealers of "billions of dollars" in profits, but the new platforms were likely to fail without the active support of the Dealers.[51]  Assuming *arguendo* that those allegations are true, they provide a strong unilateral reason for the alleged refusals to deal:  any Dealer that supported the new platforms would have been sowing the seeds of its own destruction.  Because Plaintiffs' own complaints "show that independent self-interest is an obvious alternative explanation for defendants' common behavior," their claims should be dismissed.  *See In re Ins. Brokerage*, 618 F.3d at 326.

---

[51]   *See, e.g.*, CAC ¶ 236 (alleging that the Dealers "control almost all of the liquidity in the IRS market"); *id.* ¶ 183 (alleging that Defendants "starve[d] TeraExchange of liquidity"); *id.* ¶ 294 ("Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."); JTC ¶ 14 (alleging that all-to-all trading threatened to cost the Dealers "billions of dollars"); *id.* ¶ 210 ("And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform.").

The Supreme Court's decision in *Twombly* reinforces this conclusion.  In *Twombly*, the plaintiff alleged a conspiracy among regional telephone companies to refrain from competing for business in each other's historical territories.  *See* 550 U.S. at 551.  Although the Court acknowledged that each defendant had declined in parallel to compete in the territories of its rivals, the Court declined to infer an antitrust conspiracy, cautioning that defendants:

> were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword.  Hence, a natural explanation for the noncompetition alleged is that the [defendants] were sitting tight, expecting their neighbors to do the same thing.

*Id.* at 568.  Likewise here, a "natural explanation" for the Dealers' alleged refusals to support all-to-all trading is that they "were born in" a world of dealer-to-client trading, "liked the world the way it was," and thus were "sitting tight, expecting their neighbors to do the same thing."  *Id.*

*Williams v. Citigroup, Inc.*, 2009 WL 3682536 (S.D.N.Y. 2009), *aff'd in relevant part*, 433 F. App'x 36 (2d Cir. 2011), is equally on point.  There, the plaintiff alleged a conspiracy among several investment banks to boycott a new financing structure that "threaten[ed] Defendants' and their co-conspirators' positions in the . . . derivative markets."  *Id.* at *4.  The court dismissed the claim under *Twombly*, reasoning that the alleged threat to the investment banks "does not suggest a wide-ranging conspiracy but rather unilateral action among the [defendants], each of whom wants to preserve its own market position."  *Id.*  So too here, the Dealers' alleged refusal to support all-to-all platforms merely suggests unilateral action by each Dealer, "each of whom wants to preserve its own market position."  *Id.*; *see also In re Ins. Brokerage*, 618 F.3d at 349 (where defendants are "[r]eaping enormous profits," it is natural for them to have "no desire to upset the apple cart").[52]

---

[52]   Similarly, if Plaintiffs are correct that name give-up provided Dealers with "an overwhelming information advantage," then their allegation that the Dealers chose to provide liquidity through

In a strained attempt to overcome these obstacles, Plaintiffs assert that in the absence of a conspiracy, it would have been profitable for individual Dealers to support Tera or Javelin in order to "gain a first mover advantage."  *See* CAC ¶¶ 310-13; JTC ¶¶ 324-26.  But it is sheer speculation to assert that the profits available from supporting these risky new platforms would have outweighed the "billions of dollars" that the Dealers allegedly stood to lose if the market moved to all-to-all trading.  JTC ¶ 14.  Furthermore, the Dealers may have viewed Tradeweb, Bloomberg, or even TrueEx—each of which had all-to-all capabilities as well as substantial dealer support—as the true "first movers" in the market.  *See supra* at 22, 27 & n.40.  Plaintiffs' speculation about a theoretical "first-mover advantage" therefore fails to demonstrate that any of the Dealers acted inconsistently with their own self-interest.  *See* VI Areeda & Hovenkamp, *Antitrust Law* ¶ 1414 (3d ed. 2010) ("[A]n action contrary to self-interest is not merely a different judgment than an armchair observer would have made looking at the same factors. . . . [I]t must be an action that is so irrational that no firm would have engaged in it except on the understanding that others were in agreement."); *Williams*, 2009 WL 3682536, at *4 ("not pursu[ing] one avenue of profit . . . does not plausibly suggest an agreement").

Plaintiffs fare no better with their conclusory assertion that "[o]nly a conspiracy" could explain why all-to-all trading has not come to dominate the IRS market.  CAC ¶ 313; JTC ¶ 326.  As noted above, even most of the *buy-side* comments on the CFTC's proposed trading rules expressed a strong preference for RFQ trading over all-to-all trading.  *Supra* at 11-12.  Moreover, the CFTC expressly permitted RFQ trading—and rejected calls for mandatory all-to-all trading—based on its conclusion that trading rules must "provide appropriate flexibility for

---

platforms that utilized name give-up is self-defeating because it describes conduct that would be in any individual Dealer's self-interest.  *See* CAC ¶¶ 258, 268; JTC ¶¶ 6, 80, 206, 214.

market participants trading swaps."[53]  Finally, Plaintiffs do not offer a *single* allegation that IRS contracts trade in the same kind of volumes as products that trade successfully on an all-to-all basis.  *See supra* at 6-7.  It should therefore come as no surprise that RFQ trading has attracted the most support from participants in the IRS market.

### 2. Plaintiffs do not adequately allege a clearing services boycott.

Plaintiffs also allege that the Dealers' clearing affiliates obstructed all-to-all trading platforms by refusing to clear trades for such platforms and/or raising fees for customers that attempted to trade on the platforms.  *See, e.g.*, CAC ¶¶ 25, 168, 191, 203, 205.  The clearing affiliates allegedly did so because they "capitulated to the demands of their respective trading desks," which "want[ed] desperately to preserve the status quo."  CAC ¶¶ 7, 191; JTC ¶¶ 6, 123. These allegations fail to state a plausible claim for the same reasons as Plaintiffs' market-making allegations:  Plaintiffs do not adequately allege parallel conduct, and the conduct they allege is wholly consistent with independent decision-making.

Even if it were true that the Dealers' clearing affiliates obstructed all-to-all trading platforms at the behest of their respective trading desks (and it is not), such conduct would be fully in line with unilateral efforts to resist a competitive threat.  Antitrust law does not expect that incumbent firms will make life easy for new entrants that threaten their profits.  Rather, "[f]irms need not like [such] competitors; they need not cheer them on to success; a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition."  *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) (Easterbrook, J.); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)

---

[53]   17 C.F.R. § 37.9(a)(2); SEF Rule at 33,497 n.270.

("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws . . . .").

It is therefore entirely predictable that firms will resist the entry of new competitors that threaten their market position:  "resisting competition is routine market conduct."  *Twombly*, 550 U.S. at 566.  As a result, a plaintiff cannot state an antitrust claim where, as here, the complaint alleges only that the defendants acted in parallel to resist new market entrants, since there would be no basis for concluding that "resistance to the upstarts was anything more than the natural, unilateral reaction of each [incumbent] intent on keeping its [] dominance."  *Id.*  These principles easily dispose of Plaintiffs' clearing allegations:  the alleged resistance to all-to-all platforms is readily explainable as the "natural, unilateral reaction" of incumbent firms attempting to preserve their profits.  *Id.*  Indeed, "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing."  *Id.*; *see also AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 885 F. Supp. 511, 520 (S.D.N.Y. 1995) (holding that "the various motives each individual defendant may or may not have had to be rid of [plaintiff]" do not "give[] rise to an inference that the defendants *conspired* to boycott [plaintiff] in violation of the antitrust laws." (emphasis in original)).

Plaintiffs' claims are even further diminished by the fact that their clearing allegations, like their market-making allegations, fall far short of alleging a consistent course of parallel conduct.  Plaintiffs' factual allegations focus solely on Tera and Javelin; there are *no* allegations of refusals to clear on TrueEx, Bloomberg, or any other all-to-all platform apart from Tera and Javelin.  *Supra* at 22 & n.40.  The complaints also make clear what distinguishes Tera and Javelin from other trading platforms:  there are no allegations that Tera and Javelin had

38

anywhere near as much customer support as their rivals, and no allegations that they were capable of conducting live credit checks before 2014.  *Supra* at 20-23.

Even more importantly, almost all of Plaintiffs' clearing allegations involve one-off instances of conduct by individual defendants as opposed to parallel conduct by multiple defendants.  *See, e.g.*, CAC ¶¶ 196-200, 203, 205, 218-21, 226-28.  Moreover, although two allegations do involve conduct by multiple defendants, neither of those allegations involves a majority of the defendants, and neither supports an inference of conspiracy.  First, citing a 2015 magazine article, Plaintiffs allege that four of the Dealers' clearing affiliates raised their clearing fees in an attempt to "penaliz[e]" unnamed buy-side firms.  CAC ¶ 256; JTC ¶ 204.  That vague and conclusory allegation, however, is refuted by the very article cited to support it, which attributes the increased clearing fees solely to increased capital costs arising from new banking regulations.[54]

Second, Plaintiffs assert that the day after Tera conducted its first and only IRS trade, four Defendants contacted Tera and asked to review its rulebook.  CAC ¶¶ 25-26, 202-04; JTC ¶¶ 179-80.  Plaintiffs assert that this request was pretextual because "TeraExchange's rule book had been approved by the CFTC" (CAC ¶ 204; JTC ¶ 180), but that assertion is demonstrably false.  At the time in question—June 2014—Tera had obtained only a *temporary* registration with the CFTC (JTC ¶ 110), and the CFTC does "not conduct any substantive review" of temporary registration applications.[55]  Plaintiffs are thus left with a mere allegation that four out

---

[54]    Ex. 17, cited in CAC ¶ 256 n.75 & JTC ¶ 204 n.45 (citing Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Risk (July 30, 2015)).

[55]    *See* SEF Rule at 33487 ("a grant of temporary registration does not mean that the Commission has determined that a SEF applicant is fully compliant with the Act").  Moreover, the alleged concerns with Tera's test trade were far from frivolous.  Soon after Tera completed its first IRS trade, it announced that it had completed the first-ever "Bitcoin swap," but the CFTC later determined that this swap "constitute[d] both wash trading and prearranged trading," in violation of the Commodity Exchange Act.  *TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015).

of twelve Defendants deferred the task of reviewing Tera's rulebook until someone actually traded on that platform.[56]   That narrow and unremarkable allegation cannot possibly support an inference that Defendants engaged in a massive, nine-year antitrust conspiracy.  *See, e.g.*, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (dismissing claim where plaintiffs failed to allege facts "that could tie together the specific, discrete incidents of admitted misconduct and the overarching all-defendant four-plus-year conspiracy that the plaintiffs wish to prosecute"); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. 2011) (dismissing claim where allegations of sporadic misconduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants").

### 3.    The post-2013 allegations rely on impermissible group pleading.

The large majority of Plaintiffs' post-2013 allegations are pled collectively against the "Dealer-Defendants" as a group.  *See, e.g.*, CAC ¶¶ 180, 192, 211, 240, 244; JTC ¶¶ 119, 124, 161, 171, 197, 270.  These blunderbuss allegations wholly lack the "specification of any particular activities by any particular defendant" that is necessary to state an antitrust claim.  *See In re Elevator*, 502 F.3d at 50-51.

Even in the limited instances in which the complaints purport to identify specific conduct by specific Dealers, the allegations fail to connect any Dealer to a post-2013 antitrust conspiracy.

---

[56]    The Tera rulebook that applied at the time illustrates why no responsible clearing firm would agree to clear trades on a platform without reviewing its rulebook.  That rulebook was not only binding on any party that accessed the platform (Preamble), it addressed, among other issues, conflicts between Tera rules and clearinghouse rules (Rule 603), the ability of clearing firms to enforce obligations against participants (Rule 606(a)(ii)), dispute resolution (Rule 906), and limits on Tera's liability (Rule 907).  *See* TeraExchange § 40.6 Submission to the CFTC (Apr. 15, 2014), *available at* http://teraexchange.com/style/images/rnd/Tera%2040.6%20Filing%2014-21%20-%20Rulebook%20Amendments.pdf.

In fact, in the case of several of the Dealers, the post-2013 allegations do far more to exonerate the Dealers in question than to implicate them in a conspiracy:

- **Bank of America.**  The most substantive allegation against Bank of America asserts that it was resistant to clearing trades for Tera in 2012 (CAC ¶¶ 196-97), but that was long before Tera launched its platform, connected to a clearinghouse, or acquired the ability to conduct live credit checks.  *Supra* at 16, 23.  In any event, declining to clear for Tera is fully consistent with unilateral, self-interested conduct and therefore fails to support a conspiracy claim.

- **Barclays.**  The material allegations specific to Barclays assert that it (i) was the first dealer to offer electronic IRS trading (CAC ¶¶ 283-84) and (ii) told Tera on an unidentified date that it was too "resource constrained" to support clearing on Tera. [57]  The first of those allegations tends to exonerate Barclays, and the second fails to identify any conduct inconsistent with Barclays' unilateral self-interest.

- **BNPP.**  As set forth above BNPP is not alleged to have been a part of Tradeweb—the alleged "host" and "principal consortium" of the alleged conspiracy.  Moreover, there are no allegations that BNPP had any communications with any other defendant with respect to Tradeweb or that BNPP had any dealings with Tradeweb that could connect BNPP to any defendant.  After 2013, the complaints merely allege that BNPP *unilaterally* asked a customer to "'abstain from executing on Tera while they resolve some operational issues on their end related to trades executed on Tera,'" (JTC ¶ 181; *see also id.* ¶ 179; CAC ¶¶ 203-204), and that a BNPP employee "touted the benefits" of order book trading (CAC ¶ 274).  At best, these allegations plead unilateral action, which courts in this district have found to be insufficient to state a valid claim under Section 1.  *See supra* at 23-25.

- **Citi.**  Other than the Tera rulebook allegation addressed above, the only meaningful allegations against Citi are that Citi declined to set up clearing services for Tera in 2012 (well before Tera even connected to a clearinghouse, CAC ¶ 172) and declined to clear a trade on Tera in February 2014.  CAC ¶¶ 200, 209; JTC ¶ 175.  These allegations, once again, are thin and consistent with unilateral conduct, and insufficient to state a claim against Citi.

---

[57]     CAC ¶ 198; JTC ¶ 174.  Plaintiffs assert this same allegation as to Credit Suisse and Morgan Stanley, and suggest that they provided "strikingly similar excuses [that] were plainly coordinated and pretextual," but they do not adequately plead facts supporting that conclusion.  For example, Plaintiffs assert that "personnel at Morgan Stanley" informed Tera that it was "resource constrained," but they fail to identify the persons who made that statement or when they or the other dealers did so.  Such conclusory accusations do not establish coordination.  *In re Musical Instruments*, 798 F.3d at 1194 n.6 (requiring the "who, did what, to whom (or with whom), where, and when").  The same conclusion also applies as to Plaintiffs' allegation that Deutsche Bank failed to complete a "legal" review of the Javelin platform.  CAC ¶¶ 215, 218-19, 226; *see also* JTC ¶¶ 128, 134.

- **Credit Suisse.** Beyond the allegations discussed elsewhere, the complaints allege only that Credit Suisse had a "heated" discussion with an interdealer broker (CAC ¶ 280; JTC ¶ 227) *that served the credit default swap market rather than the IRS market* (CAC ¶ 147 n.37; JTC ¶ 290 n.103). That wholly irrelevant allegation fails to connect Credit Suisse to the alleged conspiracy.

- **Deutsche Bank.** The specific allegations against Deutsche Bank relate almost entirely to its alleged refusal to clear trades on Javelin (CAC ¶ 218-219, 224, 226), but those narrow allegations cannot support an inference of conspiracy for the reasons set forth above.

- **Goldman Sachs.** Plaintiffs allege that Goldman Sachs inquired about the possibility of investing in Tera's platform (CAC ¶ 182), but they also assert that the Dealers *should* have been pursuing "equity share[s] in [] trading platform[s]" (CAC ¶ 311).[58] Plaintiffs also accuse Goldman of various one-off instances of uncooperative conduct with respect to Tera and Javelin, but as explained above, any such conduct would be fully consistent with Goldman's unilateral interest in protecting its trading profits.

- **HSBC.** The only material allegation relating to HSBC asserts that it declined clear trades on Tera because its trading desk did not approve (CAC ¶ 199; JTC ¶ 173), an allegation that falls far short of identifying any conduct inconsistent with HSBC's self-interest.

- **JPMorgan.** Apart from the allegations addressed *supra* at 39-40, the complaints distinguish JPMorgan only by indicating that it (i) supported TrueEx from the outset, (ii) agreed to test the Javelin platform, (iii) supported two of its clearing customers on Javelin for nine months, and (iv) allegedly gave unspecified "static" to those customers while clearing their trades. *See* CAC ¶¶ 215, 224, 226, 230; JTC ¶¶ 128, 150, 153. These allegations do much more to exonerate JPMorgan than to connect it to an antitrust conspiracy.

- **Morgan Stanley.** Plaintiffs allege that Morgan Stanley provided liquidity only to SEFs that required name give-up,[59] but this allegation is entirely consistent with independent decision-making, especially given Plaintiffs' allegations that name give-up provided valuable information to dealers. *Supra* at 35 n.52. Plaintiffs also allege that Morgan Stanley declined to provide pre-trade credit checks for trades on Javelin (CAC ¶ 229), but they plead no facts demonstrating that Javelin was capable of supporting such credit checks at the unidentified time when Morgan Stanley allegedly made this decision. *Supra* at 23.

- **RBS.** The only material allegations directed specifically at RBS confirm that RBS had nothing to do with a post-2013 conspiracy: Plaintiffs allege that RBS *supported* Javelin from 2013 to 2015. CAC ¶¶ 223, 233-37, 239; JTC ¶¶ 135, 139-42. That RBS

---

[58]   The same irrelevant allegation regarding a possible investment is made in even more vague and cryptic terms against several other Dealers. *Id.* ¶ 182.

[59]   CAC ¶ 267; JTC ¶ 214. Plaintiffs make the same allegation as to Barclays, Deutsche Bank, and Goldman Sachs, and the allegation fails as to each of them for the same reason.

communicated to Javelin its concerns about Javelin's overbroad MAT submissions—which caused an "uproar" even on the buy-side, *supra* at 21 n.39—does not support an alleged conspiracy.  CAC ¶¶ 234-35; JTC ¶¶ 139-40.  Nor does the allegation that RBS had a minority interest in Traiana.[60]

- **UBS.**  Setting aside the Tera rulebook allegation discussed above, the complaints make clear that UBS (i) "partner[ed]" with Javelin to enable trading on its platform by customers using UBS's Neo service and (ii) opposed the "name give-up" practice that the Dealers allegedly conspired to impose and used as a "policing mechanism."  CAC ¶¶ 258, 265, 277; JTC ¶¶ 206, 211-12, 224.[61]  Putting aside the merits of the name give-up debate—which as noted is before the CFTC—that an alleged co-conspirator publicly opposed the alleged "policing mechanism" demonstrates that the Defendants—and UBS in particular—did not even act in parallel, much less conspire to impose that practice on the market.  The complaints thus defeat any inference that UBS participated in the alleged conspiracy.

In short, because Plaintiffs have failed to allege "a factual connection between each [Dealer] and the alleged conspiracy," they fail to state a claim against any of the Dealers.  *See Hinds Cnty.*, 708 F. Supp. 2d at 362.

### 4.    Plaintiffs' references to other allegations relating to other markets do not bolster their claims.

Plaintiffs' claims are not improved by their gratuitous reference to a prior class action and a pair of related investigations of the credit default swap market (the "CDS" market).  CAC ¶¶ 316-25; JTC ¶¶ 329-37.  To start, there were never any findings or admissions of liability in those matters.  Rather, the European Commission closed its investigation after finding no anticompetitive conduct by any of the CDS dealers, and the Department of Justice likewise closed its investigation without any suggestion of wrongdoing.[62]  Moreover, although the CDS action survived an initial motion to dismiss, the allegations it sustained were markedly different

---

[60]    CAC ¶ 172; JTC ¶ 151.  This irrelevant allegation also is asserted against five other Dealers.

[61]    *See also* CFTC Market Adv. Risk Comm. Tr. (Apr. 2, 2015), *available at* http://www.cftc.gov/idc/groups/public/@aboutcftc/documents/file/mrac_040215_transcript.pdf (UBS's criticisms of name give-up as expressed by Rana Chamma, a UBS employee quoted in the JTC).

[62]    *See* European Commission Press Release, *Commission Closes Proceedings Against 13 Investment Banks in Credit Default Swaps Case* (Dec. 4, 2015), *available at* http://ec.europa.eu/competition/antitrust/cases/dec_docs/39745/39745_13719_14.pdf.

from those at issue here.  In the CDS case, the plaintiffs accused the defendants of conspiring to block the launch of a CDS trading platform by, among other things, collectively refusing to license certain indispensable intellectual property to the platform.  *See In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *10 (S.D.N.Y. 2014).  The CDS plaintiffs also asserted that the defendants had "abruptly and simultaneously" reversed position and refused to deal with the platform in question during a discrete time period, and the CDS complaint purported to describe "the who, when, and where" of the alleged conspiratorial agreement among the CDS "dealer defendants."  *Id.*  This case, by contrast, involves allegations of a sprawling and amorphous nine-year conspiracy without any comparable allegations of the "who, when, and where" of an "abrupt and simultaneous" about-face by Defendants, much less a collective refusal to license specific intellectual property allegedly essential to a particular trading platform. "[A]verments of agreements made at some unidentified place and time" among defendants as an undifferentiated group are "insufficient to establish a plausible inference of agreement, and therefore to state a claim."  *In re Elevator*, 502 F.3d at 50.

Tera and Javelin's reference to a CFTC investigation of alleged manipulation of the ISDAfix interest rate is even further afield.  *See* JTC ¶¶ 338-39.  The ISDAfix matter, and certain other recent matters involving alleged manipulation of benchmark rates, have nothing to do with the purported boycott of all-to-all trading platforms in the IRS market alleged here.  The benchmark cases involved significantly different markets and products, and survived motions to dismiss based on the courts' crediting allegations of "direct evidence" of collusion and/or "extensive allegations of parallel conduct" that were inconsistent with unilateral action.[63]  The

---

[63]   The opinion in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015), emphasized that the complaint there "offer[ed] direct evidence akin to the 'recorded phone calls in which two competitors agreed to fix prices at certain levels'—the Second Circuit's paradigmatic example of direct proof of a Section 1 violation."  *Id.* at 591 (quoting

complaints now before the Court lack such allegations.  Plaintiffs' allusion to such cases is thus misplaced on the merits and under Second Circuit precedent, which squarely rejects attempts to use conspiracy claims in one case to shore up allegations in another on the theory that, "if it [allegedly] happened there, it could have happened here."  *In re Elevator*, 502 F.3d at 52.

## II.  CLASS PLAINTIFFS LACK ANTITRUST STANDING.

Even if Class Plaintiffs had alleged plausible antitrust claims, they would not be the right parties to advance them.  The central premise of this case is that Defendants engaged in conduct that was intended to, and did, prevent the development of certain IRS trading platforms.  Thus, the private antitrust plaintiffs that are "proper part[ies] to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement," *Gatt*, 711 F.3d at 80, are the allegedly boycotted trading platforms, not entities like Class Plaintiffs that must cobble together a series of "what ifs" in order to get from the purported conduct to their alleged injury.  And here, two of the allegedly boycotted platforms—Javelin and Tera—have brought their own antitrust actions, thereby ensuring that any alleged antitrust violation will be efficiently enforced.

Class Plaintiffs confuse the issue by alleging that they "directly" entered into IRS transactions with the Dealers.  CAC ¶¶ 37-38.  Directly transacting with the Dealers does not make the alleged *injuries* direct.  The harm that Class Plaintiffs allege arises from the Dealers' conduct directed at the trading platforms, not from Class Plaintiffs' transactions with the Dealers. *Cf. In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 5818585, at *1 (S.D.N.Y. 2016)

---

*Citigroup*, 709 F.3d at 36).  The decision in *Alaska Electrical Pension Fund v. Bank of America Corp.*, 2016 WL 1241533 (S.D.N.Y. Mar. 28, 2016), similarly underscored that "the Amended Complaint contains extensive allegations of parallel conduct" that "required [defendants] to act against their own economic self-interest."  *Id.* at *5.  And, in *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781-82 & nn.19-20 (2d Cir. 2016), *petition for cert. filed* __ U.S.L.W. __ (U.S. Oct. 20, 2016) (No. 16-545), the court found that certain complaints contained "numerous allegations that clear the bar of plausibility," including one bank's purported advance knowledge of other banks' confidential individual LIBOR submissions, and that the economic evidence alleged by plaintiffs was probative of conspiracy and plus factors.  No comparable allegations are made here.

("*Aluminum IV*") ("[T]he fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred . . . or the market(s) intended to be most directly affected").  "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*")).

### A.    Legal standard.

To bring a private antitrust claim under Sections 4 or 16 of the Clayton Act, a plaintiff "must show both constitutional standing and antitrust standing."  *Gelboim*, 823 F.3d at 770 (citing *AGC*, 459 U.S. at 535 n.31).  The doctrine of antitrust standing "prevents private plaintiffs from recover[ing] damages . . . merely by showing injury causally linked to an illegal presence in the market."  *Gatt*, 711 F.3d at 76.  Standing limitations are necessary because "an over-broad reading of § 4 could result in overdeterrence, imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior."  *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993).  Antitrust standing is a "threshold question," and its absence requires dismissal.  *See Gatt*, 711 F.3d at 75.

To establish antitrust standing, a plaintiff must plausibly allege both (i) that he or she suffered an antitrust injury, and (ii) facts that support his or her suitability as a plaintiff to pursue the alleged violation—that he or she would be an "efficient enforcer" of the antitrust laws.  *See, e.g.*, *Gelboim*, 823 F.3d at 772, 777-78; *Gatt*, 711 F.3d at 76; *Paycom*, 467 F.3d at 290-91.

The Second Circuit considers four factors when determining whether a plaintiff is an efficient enforcer:  "(1) the 'directness or indirectness of the asserted injury,' which requires

evaluation of the 'chain of causation' linking appellants' asserted injury and the [challenged conduct]; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which appellants' damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540-45).

Although the Second Circuit has instructed that the weight given to each factor "will necessarily vary with the circumstances of particular cases," *Gatt*, 711 F.3d at 78, the Supreme Court has directed that the first and second factors are "requirements, which must be met in every case" and not "mere factors to be weighed in the balance," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014).[64]  Where, as here, the alleged injury is indirect and plaintiffs themselves are not directly connected to the purported violations, plaintiffs lack antitrust standing regardless of the other two factors.  In any event, all four factors weigh against finding that Class Plaintiffs would be efficient enforcers of the antitrust laws.

> **B.    Class Plaintiffs' alleged injury is indirect and remote.**
>
> **1.    The allegations of the Class Complaint show an attenuated chain of causation between the alleged conduct and Class Plaintiffs' injury.**

Class Plaintiffs claim that the Dealers "conspired to ensure their continued dominance of the IRS market by preventing the buy side from trading IRS on modern, open, and competitive trading platforms."  CAC ¶ 2.  To do so, the Dealers purportedly agreed to "boycott and destroy" all-to-all trading platforms, including the Javelin, Tera, and TrueEx platforms in particular.  CAC ¶¶ 6, 23-27, 168-245, 364.  The Dealers also allegedly co-opted co-defendant Tradeweb to prevent it from developing an all-to-all IRS trading platform (CAC ¶¶ 18-21, 66, 90-135), and

---

[64]    In *Lexmark*, the Supreme Court referred to the second efficient enforcer factor as "[t]he proximity or remoteness of the party to the alleged injurious conduct."  134 S. Ct. at 1392.

coerced ICAP and some unidentified and unknown number of IDBs not to open their platforms to the buy side (CAC ¶¶ 65, 145-61).

As to their injury, Class Plaintiffs allege that they paid "artificially inflated bid/ask spreads on every IRS they purchased or sold during the Class Period."  CAC ¶ 369.  The supposedly inflated spreads caused Class Plaintiffs to "pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when they were on the other side of a swap."  CAC ¶ 355.

Examining these allegations together, Class Plaintiffs' alleged injury is too indirect and too remote from Defendants' purported conduct.  Indeed, to travel from the alleged conduct to the alleged injury, the following leaps are necessary:  (i) in the absence of a conspiracy, the Dealers would have supported the SEFs as well as other entities that sought to create all-to-all IRS exchanges (which no entity was then using); (ii) these entities would have developed and launched the new trading exchanges, or expanded existing exchanges; (iii) these exchanges would have attained sufficient liquidity to become viable trading platforms; (iv) these exchanges would have connected to clearing facilities; (v) with the introduction of these new or expanded exchanges, traders would have abandoned their current RFQ trading model to trade on the new exchanges; (vi) additional liquidity providers would sign on to trade IRS on the new exchanges; and (vii) that incremental liquidity would have narrowed bid/ask spreads across the entire IRS market from what investors could attain through the RFQ model.

In addition, Class Plaintiffs' purported injury is entirely derivative of the alleged injury suffered by the boycotted entities.  Indisputably, Class Plaintiffs cannot claim any injury if Defendants did not harm the trading platforms first.

## 2. Second Circuit precedent confirms that Class Plaintiffs' alleged injuries are not legally cognizable.

Second Circuit law supports the finding that Class Plaintiffs' injuries here are too derivative and attenuated to establish antitrust standing. In *Paycom*, an internet merchant claimed that Mastercard's policy of prohibiting its member banks from working with competing payment-card networks reduced competition in the market for network services, which in turn reduced the number of payment options available to the merchant and caused the adoption of policies unfavorable to the merchant. 467 F.3d at 288, 293. Despite the fact that the merchant did business directly with Mastercard, the Second Circuit held that the merchant's alleged injuries were indirect because Mastercard's competitors in the network services market "were the entities directly harmed by [the policy]," having "los[t] the substantial business" they otherwise would have enjoyed. *Id.* at 293. The merchant's alleged injuries "flowed from the injuries suffered by [the competing payment-card networks]." *Id.* Likewise here, the alleged injuries to Class Plaintiffs are indirect because those injuries flow from the alleged injuries to trading platforms like Javelin and Tera. *See id.*; *see also Int'l Bus. Mach. Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 608 (S.D.N.Y. 2009) (holding that reseller's inability to sell licensees' IBM-compatible servers resulted entirely from IBM's refusal to license to licensee, and any injury to reseller was derivative of licensee's injury).

In *Reading Industries, Inc. v. Kennecott Copper Corp.*, a refiner of copper scrap claimed that a conspiracy to fix the price of refined copper caused it to pay higher prices in the copper scrap market. 631 F.2d 10, 11-13 (2d Cir. 1980). The Second Circuit held that the plaintiff did not have standing to assert its claims because its theory of injury "depend[ed] upon a complicated series of market interactions between two sources of copper: the refined copper market in which defendants acted and the copper scrap market in which [plaintiff] allegedly

sustained injuries." *Id.* at 13.  As with Class Plaintiffs here, the alleged injury in *Reading* was remote because there were too many steps in the "attenuated economic causality" chain, and "other market variables could have intervened to affect [the] pricing decisions" that resulted in the price that the copper scrap refiner paid.  *Id.* at 12; *see also de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 511-13, 515-18 (S.D.N.Y. 1985) (plaintiff was not efficient enforcer because plaintiff's theory depended on complicated series of interactions between market where challenged conduct occurred—the United States silver futures market—and market where plaintiff allegedly suffered injury—an international exchange).

Here, as in those cases, there is a critical gap between the conduct, which allegedly involved the Dealers' conspiratorial refusal to support certain nascent trading platforms, and the harm Class Plaintiffs allegedly suffered, which involved IRS transactions on existing platforms. The farther down the chain the alleged damages are from the conduct, the more difficulty there is in "isolating [Class Plaintiffs'] particular damage from other potential causal factors."  *Aluminum I*, 2014 WL 4277510, at *22.  Class Plaintiffs seek to confuse the issue by alleging that they entered into IRS "directly" with the Dealers (CAC ¶¶ 37-38), but the fact that Class Plaintiffs transacted with the Dealers as opposed to other parties is not sufficient to make Class Plaintiffs efficient enforcers of the antitrust laws.  Plaintiffs also must allege that their injuries flow *directly* from the challenged conduct.[65]  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d

---

[65]    The analysis of this factor in *In re Credit Default Swaps Antitrust Litigation* is erroneous.  The *In re CDS* court found that the "directness of injury" factor supported plaintiffs because they had transacted directly with defendants, even though the alleged anticompetitive conduct occurred outside of those transactions and did not have a direct effect on those transactions.  2014 WL 4379112, at *8.  As the cases cited above teach, the proper focus with respect to this factor is how direct a connection there is between the *alleged anticompetitive conduct* and the *alleged injury*.  The mere fact that plaintiffs transacted directly with defendants does not establish that the alleged injury was direct.  The *anticompetitive conduct* alleged here did not occur in the course of the Class Plaintiffs' transactions with Defendants, but rather in connection with Defendants' dealings with SEFs such as plaintiffs Javelin and Tera.

390, 403-05 (S.D.N.Y. 2011) (denying antitrust standing because alleged injury in compact disc market was too attenuated from alleged misconduct in internet music market); *cf. Aluminum IV*, 2016 WL 5818585, at *1 (dismissing complaint because "core allegations assume anticompetitive conduct and effects as occurring first and foremost elsewhere" in another market).

### 3.       More efficient enforcers exist and have already sought to enforce the antitrust laws.

Class Plaintiffs also lack standing for the independent reason that there is an identifiable group of more direct alleged victims whose self-interest motivates them to vindicate the public interest in antitrust enforcement, and who thus are more efficient enforcers of the antitrust laws. *AGC*, 459 U.S. at 542; *Gatt*, 711 F.3d at 79.   "Implicit in [this] inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779.[66]

Here, the alleged victims whose injuries would be direct, and would thus be more efficient enforcers, are the SEFs and other entities that supposedly would have otherwise created successful all-to-all IRS platforms.  CAC ¶¶ 2, 6, 18-27, 364.  Indeed, two of the SEFs that the Dealers allegedly boycotted, Javelin and Tera, have brought claims based on allegations identical to those made by Class Plaintiffs.  *Compare* CAC ¶ 364, *with* JTC ¶ 349.  This distinguishes this

---

[66]   This factor again distinguishes this case from other recent actions in which "efficient enforcer" standing has been found.  *Cf., e.g., In re London Silver Fixing, Ltd., Antitrust Litig.*, 2016 WL 5794777, at *12 (S.D.N.Y. 2016) ("[A] rigid rule requiring Plaintiffs to have transacted 'at' the Fix Price would effectively eliminate private enforcement with respect to all claims brought by futures sellers . . . .); *In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, 2016 WL 5794776, at *13 (S.D.N.Y. 2016) (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *11 (S.D.N.Y. 2016) ("With respect to the FX futures market, there are no other alternative enforcers."); *Alaska Elec.*, 2016 WL 1241533, at *8 ("[T]he Court has no reason to believe that the non-defendant banks suffered any financial injury at all from Defendants' manipulation of that market, and therefore cannot conclude that those banks could serve as more 'efficient enforcers' than Plaintiffs.").

case from *In re CDS*, where the owners of the allegedly boycotted platforms had not sued. Unlike *In re CDS*, denying Class Plaintiffs standing will not "'leave a significant antitrust violation . . . unremedied.'"  *In re Credit Default Swaps*, 2014 WL 4379112, at *9 (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009)).

### C.   Class Plaintiffs' damages are highly speculative.

Yet another reason the Class Plaintiffs are inefficient enforcers is that their alleged damages are highly speculative and would not be susceptible to "a just and reasonable estimate . . . even with the aid of expert testimony." *Gelboim*, 823 F.3d at 779-80.  The fact that Class Plaintiffs' damages are highly speculative is a "sign" that Class Plaintiffs are "inefficient engine[s] of enforcement." *Id.*

"Where the 'theory of antitrust injury depends upon a complicated series of market interactions,' the damages are speculative." *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *8 (S.D.N.Y. 2014) (quoting *Reading*, 631 F.2d at 13).  As detailed above, the indirect path from the alleged conduct to Class Plaintiffs' purported injury is based on a lengthy chain of uncertain events, involving numerous independent entities.  A break in the chain at any point would make Class Plaintiffs' supposed injury a logical impossibility.  That is precisely the kind of uncertainty that the Second Circuit has found renders a plaintiff's alleged injury impermissibly speculative. *See, e.g.*, *Paycom*, 467 F.3d at 293 ("No one can state that, absent [Mastercard's policy to its member banks], increased competition from [other payment card companies] would have forced [Mastercard] to adopt policies more favorable to [plaintiff].").

Moreover, even if the chain of causation were unbroken, setting damages would be an exercise in conjecture.  First, the Court would have to hypothesize about whether alternative trading platforms like Javelin, Tera, and TrueEx would have succeeded at all in the "but-for world."  Then the Court would have to hypothesize about which specific entities would have

succeeded and how successful they would have been.  That means speculating about how many

swaps would have moved from the OTC market to SEFs, and when.  Additionally, consistent

with Class Plaintiffs' theory, the Court would have to determine in the but-for world which

"alternative providers of liquidity [would] enter the market."  CAC ¶ 297.  Then, the Court

would have to determine the impact that all-to-all trading would have had on the Dealers'

participation in IRS transactions.[67]

Even if such an alternative universe could be constructed, the Court then would have to

quantify the impact of all these various but-for-world differences on bid/ask spreads for each and

every IRS transaction with the Dealers from January 1, 2008 through the present.  *See, e.g.*,

*Laydon*, 2014 WL 1280464, at *10 ("Analysis of Plaintiff's injury would require the

reconstruction of hypothetical but-for Euroyen TIBOR and Yen–LIBOR benchmark rates during

the period Plaintiff held his positions.").  And, in that process, even if the Court could reconstruct

the but-for IRS bid and ask for every transaction (which would be impossible given the

individual negotiations involved in many IRS transactions), the Court still would need to

determine the costs associated with accessing the various exchanges, and whether and to what

extent each Plaintiff suffered a net injury across all of its IRS transactions.  *See Minpeco, S.A. v.*

*Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("An antitrust plaintiff may

recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust

violation, those benefits must be deducted from the gross damages caused by the illegal

---

[67]    The gravamen of Class Plaintiffs' claims is that "the Dealer Defendants unlawfully conspired to ensure their continued dominance of the IRS market . . . a position that generated enormous profits." CAC ¶ 2.  Accordingly, in a but-for world where new trading platforms erode the profitability of the Dealers' participation in the IRS market, presumably the Dealers would adjust their participation level.

conduct." (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986))).[68]

Accordingly, "to find antitrust damages . . . would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy . . . on the price of [IRS transactions], where countless other market variables could have intervened to affect those pricing decisions." *Reading*, 631 F.2d at 13-14.  Claims requiring such "intricate efforts to recreate the possible permutations in the causes and effects of a price change," *id.* at 14, are not contemplated by the antitrust laws, and Class Plaintiffs therefore lack antitrust standing.

### D.    Apportioning damages would be prohibitively complex.

Finally, the difficulty of identifying damages and apportioning them between Class Plaintiffs on the one hand and the allegedly boycotted entities on the other weighs heavily against finding Class Plaintiffs to be efficient enforcers.  *Gatt*, 711 F.3d at 78.  As noted above, assessing damages supposedly suffered by the Class Plaintiffs necessarily involves examining the effects of the alleged activity on alternative trading platforms that could have developed. Javelin and Tera seek to recover the capital that they invested in their failed exchanges and the brokerage fees they purportedly would have earned had the exchanges succeeded.  JTC ¶¶ 97, 111, 357.  Class plaintiffs seek to recover the "artificially inflated bid/ask spreads" that they supposedly paid because the exchanges did not succeed.  CAC ¶ 369.  But if SEFs like Javelin and Tera succeeded, and the Dealers made less money on IRS transactions, they presumably would have decreased the number of IRS transactions in which they engaged with Class

---

[68]    This factor also distinguishes this action from *In re CDS*.  In that case, the court concluded that "[p]laintiffs' alleged injuries [were] not speculative" because the complaint there referenced "several sources" that supported plaintiffs' claim of injury:  "modeling by [the owners of the boycotted platform], research performed by some Dealer-Defendants, statements of SEC employees, and an economic analysis commissioned by plaintiffs."  *In re Credit Default Swaps*, 2014 WL 4379112, at *9.  By contrast, the Class Complaint here is devoid of any allegations whatsoever to develop the necessary alternative universe.

Plaintiffs.  These inherent tensions between the two sets of claims makes apportioning damages between Class Plaintiffs and Javelin and TeraExchange prohibitively difficult.

### III.   THE COMMODITY EXCHANGE ACT AND THE DODD-FRANK ACT IMPLICITLY PRECLUDE PLAINTIFFS' POST-DODD-FRANK CLAIMS.

Over the last several years, the CFTC has exercised its authority under the CEA, as amended by Dodd-Frank, to overhaul and comprehensively regulate IRS and other swap trading. This regulatory activity, which remains in progress, addresses the very features of IRS trading targeted by Plaintiffs' claims, including the manner in which IRS are traded on SEFs, the anonymity of such trading, and dealer ownership of SEFs.  In exercising its authority, the CFTC takes into account competition concerns and balances them against other statutory goals.  *See* 7 U.S.C. § 19(a)(2); *see also N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 570 (S.D.N.Y. 2004) (CFTC is "charged with making rules and regulations that take into consideration the interests of the antitrust laws").  The CFTC also has authority to enforce this regulatory regime, including enforcement of the special antitrust prohibitions that apply in the swap markets, which sweep more broadly than the Sherman Act but contain exceptions for conduct that is "necessary or appropriate" to achieve the purposes of the CEA. *See, e.g.*, 7 U.S.C. § 6s(j)(6); § 7b-3(f)(11).

Plaintiffs' antitrust claims, if permitted to proceed, would allow the blunt instrument of the general antitrust laws to supplant the CFTC's use of its expert authority to calibrate competition in the IRS market and balance competing statutory goals.  By casting the existing features of the IRS market as evidence of a broad antitrust conspiracy, Plaintiffs' claims would deter market participants from engaging in activity that the CFTC permits or encourages, which would not only disrupt the CFTC's regulatory scheme but also risk great harm to buyers and sellers of IRS.  In the face of this conflict between agency regulation and the general antitrust

laws, the latter must give way under *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007).  All claims relating to post-Dodd-Frank conduct should therefore be dismissed.

> ### A.       All four *Billing* factors weigh in favor of implied preclusion.

In *Billing*, the Supreme Court recognized that the antitrust laws are sometimes precluded by another regulatory regime—even where the plaintiffs allege naked conspiracy under the Sherman Act.  *See Billing*, 551 U.S. at 267.  The Court focused on the practical risks of antitrust plaintiffs seeking redress for an alleged conspiracy in the context of highly regulated activity. The Court noted that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical" and that antitrust suits and the "risk of treble damages" could cause market participants to avoid conduct that "securities law permits or encourages."  *Id.* at 281-82.  Engaging in a pragmatic analysis focused on "context and likely consequences," *id.* at 275, the Court found that the "threat of antitrust lawsuits, through error and disincentive, could seriously alter . . . conduct in undesirable ways" and that "to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets."  *Id.* at 283; *see also Elec. Trading Grp. v. Banc of Am. Secs. LLC*, 588 F.3d 128 (2d Cir. 2009) (finding that securities regulation impliedly precluded price-fixing claims regarding securities lending).

The Court in *Billing* identified four factors that determine when the antitrust laws are implicitly precluded, all of which strongly support the conclusion that the antitrust laws are precluded in these actions.  These actions involve "(1) an area of conduct squarely within the heartland of [the relevant substantive] regulation; (2) clear and adequate [federal agency] authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes."  *Billing*, 551 U.S. at 285.  In fact, the CFTC designed and continues to refine the very market structure targeted by Plaintiffs' allegations, and,

56

as in *Billing*, the CFTC actively regulates the features of that market.  Permitting Plaintiffs'
claims to proceed would not only disrupt the CFTC's ability to regulate IRS trading through its
various regulatory tools—including its antitrust enforcement authority—but would also create a
disincentive for market participants to continue to engage in activity that the CFTC "permits or
encourages."  *Id.* at 282.  And, even more so than in *Billing*, "any enforcement-related need for
an antitrust lawsuit is unusually small."  551 U.S. at 283.  Not only does the CFTC consider
competition concerns in its regulatory activity (as was the case in *Billing*), but the CFTC also
enforces antitrust prohibitions that were specially prescribed by Dodd-Frank for the swap
markets.

   **1. Heartland.**

   This case satisfies the first *Billing* factor because the conduct at issue—IRS trading—is
"central to the proper functioning of well-regulated" swap markets, and also "lie[s] squarely
within an area of financial market activity" that federal law—here, the CEA and Dodd-Frank—
seeks to regulate.  *Id.* at 276.  Under this factor, courts broadly consider "the underlying market
activity," not "the alleged anticompetitive conduct."  *Elec. Trading Grp.*, 588 F.3d at 134 (noting
that, in *Billing*, the "underlying market activity" was defined as "the IPO process").  IRS trading
is clearly "within the heartland of the [swaps] business" and the "'heartland of [swaps]
regulation.'"  *Id.* at 134.  As Plaintiffs state, IRS "comprise one of the largest financial markets,"
and a "vibrant IRS market provides benefits to both the buy side and to the U.S. economy as a
whole."  CAC ¶¶ 1, 68.  As the CFTC made clear, "Title VII of the Dodd-Frank Act amended the
CEA to establish a comprehensive new regulatory framework for swaps and security-based
swaps."  SEF Rule at 33,477.

### 2.       Agency authority to regulate.

The second factor—authority to regulate—follows swiftly from the first:  "the law grants the [agency] authority to supervise all of the activities here in question."  *Billing*, 551 U.S. at 276.  The CFTC has broad authority to "promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of [the statutory] chapter."  7 U.S.C. § 12a(5).  The CFTC also has authority to regulate IRS market actors and market structure, including the manner in which IRS are traded, the anonymity of such trading, and dealer ownership of SEFs.  *Supra* at 7-15.

Moreover, Congress has granted the CFTC authority to regulate the antitrust dimensions of swaps trading, including by enforcing the special antitrust prohibitions that apply in this market.  *See* 7 U.S.C. § 6s(j)(6) ("Unless necessary or appropriate to achieve the purpose of [the CEA, as amended by Dodd-Frank], a swap dealer or major swap participant shall not—(A) adopt any process or take any action that results in any unreasonable restraint of trade; or (B) impose any material anticompetitive burden on trading or clearing."); *see also id.* § 7b-3(f)(11) (imposing same prohibition on SEFs).  Among other things, the CFTC has the power to impose monetary penalties and to bar actors temporarily or permanently from swaps trading.  *See, e.g.*, 7 U.S.C. §§ 7b, 8(b), 13a-1(d)(1).

### 3.       Ongoing agency regulation.

The CFTC has made use of its authority to regulate the IRS market.  In this Circuit, even an agency roundtable can "indicate[] active [agency] monitoring."  *Elec. Trading Grp.*, 588 F.3d at 136.  The CFTC has far exceeded that bar by issuing dozens of regulations and taking other

actions relating to the IRS market.[69]  Among many examples:  the CFTC regulates the manner in which trades may occur on SEFs.  *See* 17 C.F.R. § 37.9(a)(2) (2016).  It regulates access to SEFs.  *See id.* § 37.200(b).  It regulates the ownership of SEFs and clearinghouses.  *See* Requirements for Derivatives Clearing Organizations, Designated Contract Markets, and Swap Execution Facilities Regarding the Mitigation of Conflicts of Interest ("Proposed Conflicts Rule"), 75 Fed. Reg. 63,732, 63,743, 63,745 (Oct. 18, 2010).  And it has implemented the special antitrust prohibitions provided in Dodd-Frank.  *See, e.g.*, 17 C.F.R. § 37.1100.  Moreover, after the complaints were filed, the CFTC began an investigation into the alleged conduct,[70] and the CFTC has in the past brought numerous enforcement actions for violations of its swap regulations.[71]

### 4.    Conflict.

As to the final factor, courts must consider whether there would be a "risk that the [regulatory] and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  *Billing*, 551 U.S. at 275-76.  In *Billing*, the Supreme Court engaged in a practical analysis of the "likely consequences" of allowing antitrust litigation in heavily regulated areas, including whether evidence put forward to

---

[69]    *See Dodd-Frank Final Rules, Final Guidance, Final Exemptive Orders, and Other Final Actions*, U.S. Commodity Futures Trading Commission, http://www.cftc.gov/LawRegulation/ DoddFrankAct/Dodd-FrankFinalRules/index.htm.

[70]    *See, e.g.*, Christina Rexrode, *Citigroup Says CFTC Investigating Banks' Interest-Rate Swaps*, Wall St. J. (Oct. 31, 2016), http://www.wsj.com/articles/citigroup-says-cftc-investigating-banks-interest-rate-swaps-1477921515 (noting that the CFTC is currently investigating "the trading and clearing of interest rate swaps by investment banks").

[71]    *See, e.g.*, *In re TeraExchange LLC*, CFTC Docket No. 15-33 (Sept. 24, 2015) (alleging violations of SEF Core Principle 2 under 7 U.S.C. § 7b-3(f)(2)(B) and 17 C.F.R. § 37.203(a)); *In re Coinflip, Inc.*, CFTC Docket No. 15-29 (Sept. 17, 2015) (finding that respondents improperly "operat[ed] a facility for the trading or processing of swaps without being registered as a swap execution facility or designated contract market"); *In re Australia and New Zealand Banking Grp. Ltd.*, CFTC Docket No. 15-31 (Sept. 17, 2015); *In re INTL FCStone Markets, LLC*, CFTC Docket No. 15-27 (Aug. 19, 2015).

support claims of conspiracy would also "overlap" or "prove identical" with evidence showing agency-permitted conduct.  *Id.* at 275, 281.  In such circumstances, the "risk of treble damages" could disrupt the regulatory scheme, leading market participants to avoid conduct that the agency "permits or encourages."  *Id.* at 282-83 (noting conflict created by "disincentive" and "chilling effect" on market participants).  The Court also recognized the potential for conflict between generalist judges and juries and agency expertise in drawing "fine, complex, detailed" lines separating "activity that the [agency] permits or encourages (for which [plaintiffs] must concede antitrust immunity)" and conduct that the agency "forbid[s]."  *Id.* at 279.

In considering the fourth factor, "actual and immediate" conflict is not required; "potential conflict" is sufficient to warrant implied preclusion.  *See Elec. Trading Grp.*, 588 F.3d at 138 (stating with respect to potential conflict that the "proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit").  As described below, Plaintiffs' claims would involve both actual and potential conflict between antitrust laws and the CFTC's carefully calibrated regulatory regime.

> **a)**     **Conflict with the CFTC's antitrust and other enforcement authorities.**

Permitting Plaintiff's antitrust claims would conflict with the CFTC's specialized antitrust authority over swaps, which requires the agency to use its expertise to balance antitrust and competition concerns against other statutory goals.  As noted, the CFTC is charged with enforcing the special antitrust prohibitions that Dodd-Frank placed on swaps dealers, major swaps participants, and SEFs.  These prohibitions sweep more broadly than the Sherman Act in reaching "unreasonable restraint[s] of trade" and "material anticompetitive burden[s]," but they also contain an exception for conduct "necessary" or "appropriate" to achieve the purposes of the

CEA, as amended by Dodd-Frank.[72]  *See supra* at 55.  Plaintiffs' complaints are replete with

allegations (however conclusory) that might qualify as "unreasonable restraint[s] of trade" and

"material anticompetitive burden[s]," but applying both the Dodd-Frank antitrust prohibitions

and the Sherman Act to the same conduct by Defendants would risk "conflicting guidance,

requirements, duties, privileges, [and] standards of conduct."  *Billing*, 551 U.S. at 275-76; *see

also United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 734 (1975) ("NASD")

(implied preclusion ensures that agency regulation is "free from the disruption of conflicting

judgments that might be voiced by courts exercising jurisdiction under the antitrust laws.").

And, as in *Billing*, attempting to avoid the conflict by targeting only that conduct that is

prohibited by both sets of antitrust prohibitions would involve the drawing of "complex, sinuous

line[s]" that requires "[swaps]-related expertise," *Billing*, 551 U.S. at 285, particularly with

respect to what conduct is "necessary" or "appropriate" to achieve the purposes of the CEA, as

amended by Dodd-Frank.  This would entail the "serious risk that antitrust courts will produce

inconsistent results," *id.*, or "unusually serious mistakes," *id.* at 282, which, in turn, would

"overly deter" beneficial market practices, *id.* at 285.

     The CFTC has authority to enforce other prohibitions that are relevant to specific

allegations in Plaintiffs' complaints, such as the requirement that SEFs provide "impartial

access" to market participants, 7 U.S.C. § 7b-3(f)(2)(B)(i); SEF Rule at 33,507,[73] and regulations

prohibiting swap dealers from "directly or indirectly" interfering with or influencing the decision

---

[72]    Further compounding the risk of conflict is that the CFTC is also required to consider
competition concerns in its rulemaking efforts and balance these concerns against other factors.  *See*
7 U.S.C. § 19(a)(2) (requiring consideration of, *inter alia*, the "protection of market participants and
the public"; the "efficiency, competitiveness, and financial integrity" of the markets; and "price
discovery"); *see also* 7 U.S.C. § 19(b) (CFTC must "take into consideration the public interest to be
protected by the antitrust laws").

[73]    Plaintiffs allege that certain SEFs exclude buy-side entities from the ability to trade on inter-
dealer platforms.  CAC ¶ 28.

of an affiliated clearing unit to provide clearing services to a particular customer.  *See* 17 C.F.R. § 23.605(d)(1).[74]

The CFTC's authority to enforce these prohibitions not only creates the risk of conflict with the antitrust laws, s*ee Billing*, 551 U.S. at 275; *NASD*, 422 U.S. at 734, but also demonstrates why "any enforcement-related need for an antitrust lawsuit is unusually small," *Billing*, 551 U.S. at 283 (noting both the SEC's enforcement authority and the requirement that SEC take competitive considerations into account as reasons that antitrust actions are not required to address alleged anticompetitive behavior);[75] *see also Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (stating that where there exists a "regulatory structure designed to deter and remedy anticompetitive harm," the "additional benefit to competition provided by antitrust enforcement will tend to be small").

### b)      Conflict with the CFTC's judgment on RFQ trading.

Plaintiffs' complaints indict RFQ trading and treat the prominence of this form of trading as evidence of an antitrust conspiracy.  *See* CAC ¶¶ 3, 27, 304.  Allowing Plaintiffs' claims to proceed would therefore conflict with the CFTC's considered judgment about the benefits of RFQ trading to the swap markets.

As described in detail in the Background section, the CFTC issued its regulation on swaps trading methods after considering comments from dozens of market constituencies.  The large majority of buy-side comments that addressed RFQ trading—including comments on

---

[74]    Plaintiffs allege that the Dealers have enforced their supposed conspiracy by directing their clearing units to raise clearing fees for, or withdraw clearing services from, buy-side entities that attempt to trade on all-to-all platforms.  *See* CAC ¶¶ 253-57.

[75]    As in *Billing*, *see* 551 U.S. at 283, another factor that diminishes the need for private antitrust enforcement is that market participants may bring lawsuits under the CEA to obtain damages for statutory or regulatory violations.  *See* 7 U.S.C. § 25(a)-(c) (actions are limited to actual damages and a two-year statute of limitations).

behalf of asset managers, pension plans, and non-financial companies that use swaps to hedge risk—strongly supported this form of trading.[76]  For instance, the Committee on Investment of Employee Benefit Assets, an association representing more than 100 of the country's largest pension funds, wrote that "[W]e believe it is important that the rules do not force SEFs to operate an Order Book or any system that resembles an Order Book for Required Transactions," noting that "[p]ension plan fiduciaries currently effectively use RFQ systems to obtain favorable pricing for pension plans."[77]  The CFTC ultimately decided to permit RFQ trading in conjunction with an order book to provide SEFs with "additional flexibility in the execution methods for Required Transactions."  SEF Rule at 33,484.  In doing so, the CFTC rejected the suggestion by a group of high frequency traders that only central limit order book trading and RFQ-to-all trading be permitted.  *See* SEF Rule at 33,497 n.270 (declining to require the "RFQ-to-all" model found in the futures market).  The CFTC also lowered the minimum number of RFQ participants from five to three in response to buy-side concerns about the potential for wider bid/ask spreads.  *Id.* at 33,497-98; *see also id.* at 33,476 n.2 (recognizing that the "benefits of enhanced market transparency are not boundless, particularly in swap markets with limited liquidity").[78]

Against the backdrop of the CFTC's careful calibration of IRS trading methods, the risk of conflict with Plaintiffs' antitrust claims is clear.  Plaintiffs posit the existence of RFQ trading itself as evidence of a broad conspiracy that has held back all-to-all trading.  Thus, SEFs that

---

[76]   *See supra* at 12 n.21, describing comments from the Coalition of Derivatives End-Users (which includes the Business Roundtable, the National Association of Corporate Treasurers, and the U.S. Chamber of Commerce); the American Benefits Council; the SIFMA Asset Managers Group; Freddie Mac; BlackRock; MetLife; and the Managed Funds Association.

[77]   ABC Comment Letter, *supra* n.21, at 6, 11.

[78]   The CFTC determined that its final regulations "will improve the efficiency, competitiveness, and financial integrity of the swaps market by providing a SEF with the flexibility to offer several execution methods for Required Transactions to meet the needs of market participants, including RFQ Systems."  SEF Rule at 33,567.

provide RFQs to a minimum of three recipients rather than *all* participants—and dealers that

prefer platforms offering RFQ trading—may find themselves targets of a multi-billion dollar

antitrust suit, despite the CFTC's express provision for such trading.  The "likely consequences"

of permitting such suits are to "seriously alter [market participant] conduct in undesirable ways,"

*Billing*, 551 U.S. at 275, 283, as by discouraging SEFs and dealers from offering or engaging in

forms of RFQ trading expressly authorized by the CFTC.[79]  This in turn would "threaten serious

harm to the efficient functioning of the [swaps] markets."  *Billing*, 551 U.S. at 283; *Elec.*

*Trading Grp.*, 588 F.3d at 136 ("allowing antitrust liability . . . would inhibit permissible (and

even beneficial) market behavior").

<blockquote>

**c)**      **Conflict with the CFTC's regulation of anonymity in trading.**

</blockquote>

Plaintiffs further allege that Dealers have pressured SEFs to require identity disclosure,

often referred to as "name give-up," as a mechanism for policing the conspiracy; Plaintiffs claim

that there is no procompetitive rationale for this practice.  *See* CAC ¶¶ 258-77.  But, as noted, the

CFTC has already rejected the idea of "imposing a specific requirement that the identity of the

RFQ requester be disclosed or anonymous."  SEF Rule at 33,499.  And as to order book trading,

where name give-up generally occurs post-trade, the agency has indicated that this question

remains the subject of ongoing consideration.  *See supra* at 13.  This ongoing debate within the

CFTC is hardly surprising, given the various pro-competitive reasons that have been cited in

favor of name give-up, including improving liquidity, reducing prices, and facilitating

monitoring for abusive conduct.  *Id.* at 13 & n.25.

---

[79]    The CFTC's consideration of trading methods is ongoing.  As directed by the Commission, by
August 2017, CFTC staff will complete a review of trading methods to determine whether any
adjustments are warranted.  *See* SEF Rule at 33,504.

Plaintiffs' antitrust claims, if allowed to proceed, would discourage SEFs from requiring, and dealers from preferring, this practice that the CFTC presently permits.  This is a sufficient conflict to require implied preclusion.  *See Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 801 (2d Cir. 2002) ("Conflict also can exist where the [agency] has jurisdiction over the challenged activity and deliberately has chosen not to regulate it."); *see also Elec. Trading Grp.*, 588 F.3d at 138 (explaining that because the agency "could move quickly to regulate" the activity in a different manner should it become necessary, the "potential conflict weighs in favor of implied preclusion."); IA Areeda & Hovenkamp, *Antitrust Law* ¶ 243gl (4th ed. 2013) ("Even if the agency has not approved certain conduct but is aware of it and has acquiesced or has it under review, the same conflicts can arise.").

### d) Conflict with the CFTC's regulation of dealer ownership of SEFs.

Plaintiffs allege that several Dealers took ownership interests in a Tradeweb SEF to prevent the introduction of all-to-all trading and use Tradeweb meetings to perpetuate the conspiracy.  *See* CAC ¶¶ 90-135, 285-92.  But here, too, permitting antitrust litigation targeting dealer ownership of SEFs—and the dealer interaction that accompanies such joint ventures— would conflict with the CFTC's ongoing regulatory activity.  Pursuant to a specific Dodd-Frank provision that requires the CFTC to weigh competition concerns against others,[80] the CFTC has issued a proposed regulation that would limit an individual dealer or other "enumerated entity" from individually owning more than 20 percent of the equity in a SEF.  *See* Proposed Conflicts

---

[80]   Dodd-Frank provides that, "[i]n order to mitigate conflicts of interest," the CFTC "shall adopt rules which may include numerical limits on the control of, or the voting rights with respect to," any SEF by, *inter alia*, swap dealers, major swap participants, and large banks, 15 U.S.C. § 8323(a), and requires the CFTC to balance various considerations, including improving governance, mitigating systemic risk, promoting competition, and mitigating conflicts of interest, *id.* § 8323(b).  Plaintiffs make similar allegations regarding Dealers' ownership of LCH.Clearnet, a clearinghouse.  CAC ¶ 291.  Clearinghouse ownership is also addressed by the CFTC's rulemaking.  15 U.S.C. § 8323(a).

Rule at 63,743, 63,745.  But the CFTC chose *not* to limit the aggregate equity that enumerated

entities may own in a SEF.  Rather, the CFTC noted that Dodd-Frank intended to encourage

sustained competition between multiple SEFs and that dealers and other enumerated entities

"would be the most likely source of a funding" for new SEF entrants.  *Id.* at 63,745.  The CFTC

found that the benefits of competition between new SEFs "outweigh the incremental benefit of

better governance through limitations on the aggregate influence of the enumerated entities."

*Id.*[81]

The CFTC thus has weighed the benefits and risks of dealer ownership of SEFs and has

thus far recognized the benefits to the swap markets of such ownership.  Permitting antitrust

claims that treat dealer investments in SEFs as evidence of collusion—or an independent

antitrust violation—would discourage investment in new SEFs and disrupt the CFTC's ongoing

deliberations on this issue.  *See Elec. Trading Grp.*, 588 F.3d at 138.

### B.    Dodd-Frank's savings clause does not apply.

As the *Billing* analysis demonstrates, Congress's entrustment of regulation to an expert

agency sometimes creates conflicts with private enforcement of the antitrust laws.  Although

Dodd-Frank does contain an antitrust savings clause that applies across the various titles of the

Act, it is not universal and it does not apply here.  It provides that "[n]othing in this Act, or any

amendment made by this Act, shall be construed to modify, impair, or supersede the operation of

any of the antitrust laws, *unless otherwise specified*."  12 U.S.C. § 5303.

---

[81]    The Justice Department's Antitrust Division submitted comments on the CFTC proposal, objecting to the CFTC's permission of aggregate ownership of SEFs by dealers and other enumerated entities and stating that this "may not sufficiently protect and promote competition in the industry." *See* United States Department of Justice, Comments on Proposed Rules Limiting Ownership and Regulating Governance for Derivatives Clearing Organizations, Designated Contracts Markets, and Swap Execution Facilities (Dec. 28, 2010), https://www.justice.gov/atr/comments-proposed-rules-limiting-ownership-and-regulating-governance-derivatives-clearing.  This contrary view, however, only underscores the ways in which different regulatory regimes approach issues in light of each regime's policy goals.

Both the text and structure of Dodd-Frank demonstrate that Congress has "otherwise specified." Throughout Title VII, Congress included special antitrust prohibitions applicable to actors in the swap market. As noted earlier, these provisions, titled "Antitrust considerations," state that "[u]nless necessary or appropriate to achieve the purposes of [the CEA, as amended by Dodd-Frank], a swap dealer or major swap participant shall not—(A) adopt any process or take any action that results in any unreasonable restraint of trade; or (B) impose any material anticompetitive burden on trading or clearing." 7 U.S.C. § 6s(j)(6).[82] The phrase "restraint of trade" is a term of art plucked from—and clearly specifying—the Sherman Act. *See* 15 U.S.C. § 1; *see also, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 2011 WL 3878200, at *6 (S.D. Ind. 2011) (referring to "restraint of trade" as an antitrust term of art).

In crafting these special antitrust prohibitions, Congress modified the Sherman Act standard by sweeping more broadly to cover more conduct. But at the same time, these provisions include an exception for situations in which particular conduct is "necessary or appropriate to achieve the purposes of [the CEA, as amended by Dodd-Frank]." *E.g.*, 7 U.S.C. § 6s(j)(6). Congress delegated the authority to scrutinize that conduct to the CFTC, the entity best positioned to consider the proper functioning of the swap markets and the purposes of Title VII. Some entity must balance antitrust considerations with other statutory goals. "And who but the [CFTC] itself could do so with confidence?" *Billing*, 551 U.S. at 281.

These antitrust provisions, coupled with the other elements of the CEA and Title VII's pervasive regulation of the swap markets, are sufficient under *Billing* to demonstrate Congress's

---

[82]   *See also* 7 U.S.C. § 7a-1(c)(2)(N) (same for clearinghouses); *id.* § 7b-3(f)(11) (same for SEFs). Likewise, as noted, the CEA requires that the CFTC consider "competitiveness," among other factors, in its regulatory actions, 7 U.S.C. § 19(a)(2), and requires that the CFTC "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives" of the CEA, 7 U.S.C. § 19(b).

intent to modify the application of the Sherman Act in these circumstances.  Indeed, in *Billing* itself*, the Court found that the securities laws implicitly precluded the plaintiffs' antitrust claims despite the existence of a savings clause providing that "the rights and remedies provided by [the securities laws] shall be in addition to any and all other rights and remedies that may exist at law or in equity."  15 U.S.C. § 77p(a); *see Billing*, 551 U.S. at 275.  As is the case here, the *Billing* Court found that the savings clause at issue was not "so broad as to preserve all antitrust actions."  551 U.S. at 275 (noting that that the Court had "necessarily rejected" savings-clause arguments by finding immunity in *Gordon v. N.Y. Stock Exch.*, 422 U.S. 659 (1975), and *NASD*, 422 U.S. 694).  As in *Billing*, the conflict here between the CFTC's regulation under the CEA and Dodd-Frank and the antitrust laws means that the latter must give way.[83]

## IV.   CLASS PLAINTIFFS' PRE-2013 CLAIMS FAIL TO ALLEGE INJURY-IN-FACT.

Although Class Plaintiffs purport to sue over alleged antitrust violations dating back at least to January 1, 2008 (CAC ¶¶ 88-89, 353, 369), they fail to allege injury-in-fact in the pre-2013 period.  Class Plaintiffs' theory of injury is that, in the absence of the alleged conspiracy, all-to-all trading on platforms such as Tera, Javelin, and TrueEx would have "result[ed] in the compression of bid/ask spreads" for IRS.  *See, e.g.*, CAC ¶¶ 165, 171, 222.  Class Plaintiffs do not adequately allege, however, that any of these platforms even attempted to launch all-to-all trading before 2013, or that the infrastructure for such trading existed before that date.  *Supra* at 15-17.  To the contrary, the complaints make clear that Tera, Javelin and TrueEx were ready for operation only in 2013 at the earliest.  *Id.* at 16-17.  Furthermore, the three proposed class

---

[83]   In the *CDS* litigation, the district court found that "the antitrust-considerations provisions impose on dealers obligations above and beyond what the antitrust laws themselves require."  *In re Credit Default Swaps*, 2014 WL 4379112, at *17 (finding that Dodd-Frank's antitrust savings clause applied).  With all respect, this conclusion begs the question.  Determining whether these special antitrust provisions displace or supplement the Sherman Act requires a *Billing* analysis, which the court in *In re CDS* did not undertake.

representatives have not alleged that *they* were prepared to engage in all-to-all trading before 2013, or even that the types of IRS that *they* entered into were sufficiently liquid and standardized to trade on all-to-all platforms.  *See* CAC ¶¶ 37-39.  Plaintiffs' pre-2013 claims should therefore be dismissed for failure to allege injury-in-fact.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (the "irreducible constitutional minimum of standing" requires an "injury in fact"); *Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106-08 (2d Cir. 2007) ("injury-in-fact" is an element of an antitrust claim); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *8-13 (E.D.N.Y. 2011) (plaintiffs did not sufficiently allege injury-in-fact where they "provide[d] precious little" to connect defendants' alleged antitrust violations to their alleged harm).

## V.    CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED.[84]

A Sherman Act claim is subject to a four-year statute of limitations that runs from the date of injury.  *See* 15 U.S.C. § 15b; *Hinds Cnty.*, 620 F. Supp. 2d at 519.  Because Class Plaintiffs filed their initial complaint on November 25, 2015, their claims based on alleged injuries incurred before November 25, 2011 (hereinafter "pre-2012 claims") are time-barred absent tolling.[85]

Class Plaintiffs assert that the statute of limitations should be equitably tolled due to fraudulent concealment.  CAC ¶ 351.  This assertion is unavailing.  To plead fraudulent concealment, a plaintiff must allege, with particularity under Fed. R. Civ. P. 9(b), that they "remained in ignorance of the violation until sometime within the four-year antitrust statute of

---

[84]    This section addresses the putative Class Complaint.  The Individual Plaintiffs do not allege that they were ready for business before September 2013 and therefore cannot plausibly seek damages prior to this time, nor does the Complaint assert any damages prior to that date.

[85]    Plaintiffs did not sue HSBC or Morgan Stanley until February 25, 2016, and claims based on alleged injuries incurred before February 25, 2012 are therefore barred as to those Defendants.

limitations," "that [t]his continuing ignorance was not the result of lack of diligence," and "that the defendant concealed the existence of the antitrust violation." *Hinds Cnty.*, 620 F. Supp. 2d at 520.

In the first instance, Class Plaintiffs' fraudulent concealment claim fails because, according to their own allegations, Class Plaintiffs had notice of their pre-2012 claims and thus were not ignorant of Defendants' supposed violations. The allegations in the CAC that support Class Plaintiffs pre-2012 claims are drawn from information that was publicly available before 2012. To the extent that these pre-2012 allegations satisfy *Twombly* (which they do not, for the reasons explained above), they are necessarily ripe for dismissal because they demonstrate that Class Plaintiffs were on actual notice of their claims. In any event, the extensive, publicly available information cited in Class Plaintiffs' complaint, along with other news reports related to the derivatives industry, was enough to put Class Plaintiffs on inquiry notice.

Nor do Class Plaintiffs satisfy the other elements of fraudulent concealment. Far from pleading their "diligence" with particularity, Class Plaintiffs fail to plead that they took *any* steps prior to June 2014 to investigate the wealth of publicly-available information they cite in their complaint. Instead, Class Plaintiffs assert *ipse dixit* that they could not have discovered their pre-2012 claims until after "June 2014" (CAC ¶ 326), without explaining what event took place—or what information was then discovered—that supposedly put them on notice of their claims. Class Plaintiffs' attempt to plead that Defendants fraudulently concealed facts relevant to their pre-2012 claims is similarly unavailing, as detailed below. Accordingly, Class Plaintiffs' pre-2012 claims should be dismissed.

### A.    Class Plaintiffs fail to plead "ignorance" of their claims.

Under the complaint's allegations, the Class Plaintiffs had notice of their pre-2012 claims, which alone establishes that they cannot plead the necessary "ignorance." *See, e.g., 131*

*Maine St. Associates v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002) ("[T]he plaintiff must

be ignorant of the cause of action.  Knowledge of the cause of action is not necessary.  Notice of

a potential claim is all that is necessary."), *aff'd*, 54 F. App'x 507 (2d Cir. 2002); *Donahue v.

Pendleton Woolen Mills*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) (when analyzing fraudulent

concealment, "[f]acts that should arouse suspicion . . . are equated with actual knowledge").

### 1. Class Plaintiffs had actual notice of their claims.

Class Plaintiffs should not be permitted to have it both ways.  Lacking direct evidence of

conspiracy, Class Plaintiffs base their pre-2012 allegations on circumstantial evidence taken

from news articles and other publicly available sources.  If these vague allegations were found to

be sufficient to state an antitrust claim (which they are not), then they necessarily must be found

to have put Class Plaintiffs on notice of their claims.  Indeed, a plaintiff may not "simultaneously

claim that the generalized evidence cited as the basis of its complaint—the vast majority of

which involves factual allegations published prior to [the statute of limitations period]—is

sufficiently detailed to state a cognizable claim for relief, and that, nevertheless, these facts were

somehow insufficiently particular to cause the statute of limitations to run."  *Woori Bank v.

Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y. 2013) (dismissing complaint as time-

barred where the complaint cited "extensive publicly available information" that plaintiff

maintained supported its claims), *aff'd*, 542 F. App'x 81 (2d Cir. 2013); *see also GVA Market

Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329

(S.D.N.Y. 2008).

Class Plaintiffs draw all of their key pre-2012 allegations from news articles and other

industry materials that were published before November 25, 2011.  The crux of Class Plaintiffs'

pre-2012 claims is that, "[s]oon after 2004, IRS had evolved to the point where it was ready for

the introduction of all-to-all trading."  CAC ¶ 92.  Class Plaintiffs pointedly contend that "[t]he

benefits that central clearing [ ] and all-to-all trading could bring to the IRS market were *widely recognized by market participants, regulators, and economists*." *Id.* Class Plaintiffs allege that such benefits were never brought to the IRS market because, according to a January 2010 article, "major dealers are often opposed to the use of exchange-like mechanisms since they can make higher profits by maintaining a 'voice' market."[86] Indeed, Class Plaintiffs allege that there "was no procompetitive reason for the OTC system to continue to dominate IRS trading." CAC ¶ 92.

The complaint also alleges that, by late 2007, Tradeweb was "poised to introduce electronic all-to-all trading to the IRS market," CAC ¶ 101, but failed to do so after several Dealers entered into a well-publicized joint venture with Tradeweb. *See id.* ¶¶ 105, 131 (citing Tradeweb, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007) ("[T]he dealers will invest approximately $180 million to purchase a minority stake in TradeWeb's established markets.  Separately, Thomson and the dealers will fund additional investment in asset class expansion.")).  Similarly, the complaint urges an inference of conspiracy from the fact that ICAP launched an IRS trading platform in Europe in 2010, but declined to launch a U.S. trading platform at that time.  CAC ¶ 149 (citing Michael McKenzie, *Rate Swap Traders Wait For No Man*, Fin. Times (Oct. 19, 2010) (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market")).

Class Plaintiffs also allege—albeit in a conclusory fashion—that "[b]y 2008 a number of IDBs were well-positioned to bring to market all-to-all IRS trading platforms" (CAC ¶ 146) but that "Dealer Defendants . . . prevented buy-side investors from entering the interdealer market and relegated them to dealer-to-client platforms."  CAC ¶ 88.  Class Plaintiffs also describe how when the Chicago Mercantile Exchange ("CME") acquired Swapstream in 2006, it proposed

---

[86]   Ex. 2, cited in CAC ¶ 291 n.117 & JTC ¶ 310 n.116 (Tabb Report, *supra* note 8, at 14).

offering "integrated exchange trading and central clearing of IRS," *id.* ¶ 287-89 (citing CME Group, *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants* (July 17, 2007)), but that this effort, as well, did not receive support from the Dealers.[87]

As evidenced by the very articles Class Plaintiffs reference in their complaint, each of these events happened in plain sight. Class Plaintiffs could just as well have inferred an antitrust conspiracy from these events in 2011 as they did more than four years later when they filed suit. Nowhere do Class Plaintiffs explain what occurred years later that supposedly allowed them to recognize their pre-2012 claims. They simply state that they "did not discover and could not have discovered" the alleged conspiracy "until sometime after June 2014, when the Dealer Defendants' campaign to squash SEFs from offering anonymous all-to-all trading to the buy side became apparent." CAC ¶ 326. No indication is given of what event after June 2014 made the alleged conspiracy "apparent," much less what this event had to do with any pre-2012 claims. Such conclusory assertions are plainly insufficient to meet Class Plaintiffs' pleading burden.

### 2.      Class Plaintiffs were on inquiry notice of their claims.

Even if Class Plaintiffs did not have actual notice of their pre-2012 claims, they surely had enough information to be on inquiry notice. "'[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing.'" *131 Maine St. Assocs.*, 179 F. Supp. 2d at 348; *see also id.* (citing case law for the propositions that courts "equat[e] suspicion with knowledge in the context of fraudulent concealment" and that "only inquiry notice is necessary"); *In re Processed Egg Prod. Antitrust Litig.*, 2012 WL 6645533, at *3 (E.D. Pa. 2012) ("[I]n pleading fraudulent concealment,

---

[87]    Ex. 2, cited in CAC ¶ 291 n.117 & JTC ¶ 310 n.116 (Tabb Report, *supra* note 8, at 20).

plaintiffs must plausibly suggest[] that they did not have knowledge or did not possess any information about the conspiracy that would have given rise to inquiry notice.").  The allegations described above—that, soon after 2004, the IRS market should have shifted to all-to-all trading; that dealers had an economic incentive to resist the shift to all-to-all trading; that dealers prevented buy-side entities from entering the IDB market; and that dealers took ownership interests in Tradeweb that derailed it from launching an all-to-all platform and declined to support other all-to-all platforms—should have at least, on Class Plaintiffs' logic, provided a "suspicion" of a claim.

In addition to the numerous public sources that Class Plaintiffs themselves cite in the complaint, there is additional public material that reinforces the conclusion that Class Plaintiffs were on inquiry notice.[88]  Notably, Class Plaintiffs wholly ignore a December 2010 *New York Times* article that their own counsel used as the basis for filing a 2013 complaint alleging dealer collusion in the credit default swap market.  That article, entitled "A Secretive Banking Elite Rules Trading in Derivatives," recounted secret meetings of "nine members of an elite Wall Street society" drawn from various banks with the "common goal" to "protect the interests of big banks in the vast market for derivatives," "defend[] the dominance of the big banks," "block other banks from entering the market," and "thwart efforts to make full information on prices and fees freely available."[89]  The article stated that "[b]anks collect many billions of dollars in undisclosed fees associated with [derivatives]—an amount that almost certainly would be lower

---

[88]   *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information . . . in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice" (emphasis in original)); *Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 422 (E.D.N.Y. 2015) ("[A] district court may consider publicly available documents that are offered solely for purpose of showing that the alleged information was publicly available.").

[89]   Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. Times (Dec. 11, 2010), *available at* http://www.nytimes.com/2010/12/12/business/12advantage.html.

if there were more competition and transparent prices."  The article also discussed an ongoing Department of Justice investigation into "the possibility of anticompetitive practices in the credit derivatives clearing, trading and information services industries."

The district court in *In re Credit Default Swaps Antitrust Litigation*—a case on which Class Plaintiffs rely in their complaint—found that this *New York Times* article gave the plaintiffs there notice of a purported conspiracy.  *See* 2014 WL 4379112, at *6.  Here, Class Plaintiffs boast that that their allegations are "reminiscent of the complaints that prompted the [Department of Justice and European Commission] CDS investigations in 2008 and 2009," and allege similarities between the CDS and IRS markets involving the manner in which "Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors."  CAC ¶ 324.  Although such a comparison is unwarranted, if Class Plaintiffs truly believe their complaint is "reminiscent" of the allegations in the CDS market, then they were at least on inquiry notice before 2012.

Based on Class Plaintiffs' own allegations and other publicly available information, there can be no genuine dispute that they were on inquiry notice of their pre-2012 claims.

### B.      Class Plaintiffs fail to plead due diligence with particularity.

Class Plaintiffs also fail to plead with particularity that they exercised the requisite due diligence in response to the publicly-available information described above.  To invoke fraudulent concealment, plaintiffs must describe "the inquiries, if any, they made, when such inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained."  *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *2 (S.D.N.Y. 2003).

Class Plaintiffs fall far short, offering only boilerplate recitals that they "monitored news reports" and "monitored prices" through electronic databases during the class period (CAC

75

¶ 346) and "relied on the advice, monitoring, and diligence of their investment managers." *Id.*

¶ 349.  Class Plaintiffs tellingly fail to describe any inquiries they made and "what response was

obtained." *Masters*, 2003 WL 1990262, at *2.  For example, Class Plaintiffs do not indicate

whether they inquired of their (unidentified) investment managers, the Defendants, or anyone

else:  (i) why the IRS market had not shifted to all-to-all trading as Class Plaintiffs claim they

would have expected in the absence of collusion; (ii) whether the Dealers were actively resisting

such a shift; (iii) whether a "secretive banking elite" was blocking competition and transparency

in the derivatives market as implied by the *New York Times*; and (iv) why Tradeweb, ICAP, and

Swapstream failed to launch or support all-to-all trading.

In short, there is no allegation—concrete or otherwise—that Class Plaintiffs specifically

inquired of *anyone* about *any* of the pre-2012 allegations made in their complaint or reflected in

public sources.[90]  *See In re Merrill Lynch Ltd. P'ship Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)

(upholding dismissal of complaint where plaintiffs "make no allegation of any specific inquiries

of [defendant], let alone detail when such inquiries were made, to whom, regarding what, and

with what response"); *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139 at *6 (D. Conn.

2005) ("[B]ecause the plaintiffs have not alleged anything regarding inquiries made into the

activities alleged in the complaint or why such inquiries were not made, they have not satisfied

their burden of pleading reasonable diligence.").

---

[90]   Class Plaintiffs allege that "[m]arket participants are well aware that, even if they were to make
tentative suggestions that the Dealer Defendants may be engaging in anticompetitive behavior, such
suggestions could be met with retaliation that could cause severe financial harm."  CAC ¶ 342.  This
allegation is a makeweight:  Class Plaintiffs nowhere claim that they wanted to inquire of any
Defendants—or anyone else—regarding any of the pre-2012 allegations, much less that they felt
deterred in doing so.  And, in any event, such allegations would not serve to discharge Class
Plaintiffs' duty to promptly investigate, with due diligence, any claims of which they had inquiry
notice.

Finally, Class Plaintiffs provide no specificity regarding how they (supposedly) discovered the alleged pre-2012 conspiracy years later.  Class Plaintiffs simply state that they "did not discover and could not have discovered" the alleged conspiracy "until sometime after June 2014, when the Dealer Defendants' campaign to squash SEFs from offering anonymous all-to-all trading to the buy side became apparent."  CAC ¶ 326.  This is plainly insufficient to meet their burden.  *See In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at \*25 (D.N.J. 2011) (allegation does not satisfy Rule 9(b) where "it fails to encompass when and how Plaintiffs ultimately discovered the alleged . . . conspiracy—information that is certainly with[in] Plaintiffs' control.  Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period."); *see also Hinds Cnty.*, 620 F. Supp. 2d at 520 (dismissal where complaint did not "specify when any Named Plaintiffs or Class members became aware of the antitrust violations").

### C.      Class Plaintiffs fail to plead concealment with particularity.

Class Plaintiffs also fail adequately to plead concealment.  Plaintiffs may plead concealment "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury" or that the conspiracy was "self-concealing."  *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Class Plaintiffs' claim of affirmative concealment focuses on a 2007 press release about certain Dealers' acquisition of a minority stake in Tradeweb.  Class Plaintiffs call the press release "misleading" because it fails to state that certain Dealers also planned to acquire an 80 percent stake in Tradeweb New Markets LLC, a "second, secret company" that housed Tradeweb's IRS business.  CAC ¶¶ 334-35.  But alleging "[c]oncealment by mere silence is not

enough" to satisfy Rule 9(b)'s particularity requirement.  *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988).

In any event, Class Plaintiffs' assertions of fraudulent concealment are belied by the public record:  the dealer's 80 percent investment in Tradeweb New Markets LLC was in fact *publicly disclosed* in an October 25, 2007 Thomson earnings call,[91] an SEC filing made on November 9, 2007,[92] an annual SEC filing made on April 18, 2008,[93] and in subsequent SEC filings up to and including filings disclosing that Tradeweb Markets LLC and Tradeweb New Markets LLC had merged in 2010.[94]  *See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 223 (E.D.N.Y. 2003) (dismissing claims as time-barred where "not only were the material terms of the [allegedly anticompetitive] settlement not concealed, defendants affirmatively disclosed these terms to the public" in an SEC filing).  The more pertinent issue is why, if certain Dealers' investments in this company were suspicious, did Class Plaintiffs not show diligence by inquiring further?

Finally, the complaint's recital that the alleged conspiracy was "self-concealing . . . [b]y its very nature" (CAC ¶ 330) does not satisfy Rule 9(b).  *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) (complaint time-barred where "plaintiffs merely state in a conclusory fashion that the defendants' fraud was self-concealing").  To plead a self-concealing conspiracy, Class Plaintiffs must allege why the absence of all-to-all trading in IRS "would necessarily be assumed" to be "the result of legitimate market forces," such that Class Plaintiffs would not

---

[91]    The Thomson Corp. Q3 2007 Earnings Call Transcript, Seeking Alpha (Oct. 25, 2007), http://seekingalpha.com/article/51485-the-thomson-corp-q3-2007-earnings-call-transcript.

[92]    Ex. 19, The Thomson Corp. Form 6-K, Exhibit 99.1, *supra* note 35.

[93]    Thomson Reuters PLC Form 20-F for 2007 (Apr. 18, 2008), http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=76540&fid=5561188.

[94]    *See, e.g.*, Thomson Reuters Corp. Form 6-K (Nov. 1, 2010), http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=76540&fid=7191049.

suspect that the absence of all-to-all trading in IRS resulted from anticompetitive conduct.  *In re Publ'n Paper*, 2005 WL 2175139, at *4.  But Class Plaintiffs here allege the opposite:  they plead that "[a]bsent a conspiracy . . . [e]volution to all-to-all trading open to the entire market would have been inevitable."  CAC ¶ 310; *see In re Publ'n Paper*, 2005 WL 2175139, at *4 ("[T]he circumstances that are alleged . . . point to the opposite conclusion.  The plaintiffs allege that the price increases were *not* explainable by ordinary market forces, an allegation that potentially indicates that the announcements . . . were not misleading.").

## VI.   PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED.

### A.   Javelin and Tera fail to state a Donnelly Act claim.

The Donnelly Act claim—brought only by Javelin and Tera—should be dismissed for the reasons articulated above.  "The Donnelly Act is patterned after the Sherman Anti-Trust Act and is generally construed in light of federal precedent."  *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998).  Because Javelin and Tera "simply reallege[] the federal antitrust claim[] under the Donnelly Act," the claim "fails for the same reasons it does under federal law."  *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 279 (S.D.N.Y. 2002), *aff'd in part and rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004).

Alternatively, the Donnelly Act does not apply where, as here, "'the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce.'"  *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. 2005) (quoting *Two Queens, Inc. v. Scoza*, 745 N.Y.S.2d 517, 519 (1st Dep't 2002)).  Javelin and Tera allege that the defendants' conduct "had a substantial effect on *interstate* commerce" (JTC ¶¶ 62, 312), and they fail to mention *intrastate* commerce at all.  *See, e.g.*, *H-Quotient*, 2005 WL 323750, at *5 (holding that, because "[d]efendants are unquestionably engaged in interstate

79

commerce, those who are damaged from an alleged restraint of trade find a remedy in the federal, not the state antitrust laws.").

**B.    Javelin and Tera fail to state a tortious interference claim.**

Javelin and Tera fail to state a claim of tortious interference with business relations.[95] "This tort is a difficult one to sustain, with requirements more demanding than those for interference with [the] performance of an existing contract." *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (alteration in original). Specifically, "the plaintiff must allege: (1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship." *Nirvana, Inc. v. Nestle Waters N. Am. Inc.*, 123 F. Supp. 3d 357, 379 (N.D.N.Y. 2015). Javelin and Tera's tortious interference claim should be dismissed for two main reasons.

*First*, Javelin and Tera fail to satisfy their pleading burden with respect to any of the elements of the claim. Their entire claim consists of three generic, boilerplate sentences, JTC ¶¶ 361-63, which fail to identify: (1) the identities of the "customers" or the nature of the "prospective business relations"; (2) the "acts of Defendants" that constituted interference or which of the many Defendants interfered with which relationship; (3) any "dishonest, unfair, or improper" conduct; or (4) facts supporting an inference that Tera and Javelin would have entered into particular contracts but for any interference. *See Nirvana*, 123 F. Supp. 3d at 379. Their complaint thus is insufficient even to put Defendants on notice of the basis for this claim, much less establish a plausible entitlement to relief. *See, e.g., Commercial Data Servers, Inc. v. Int'l*

---

[95]    The Individual Plaintiffs do not allege which state's law applies to this claim. However, since the Individual Plaintiffs "are based in New York" (JTC ¶ 63) and primarily allege conduct in New York (*e.g., id.* ¶¶ 61, 64), New York law appears to govern. *See, e.g., Discover Grp., Inc. v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 85 (E.D.N.Y. 2004) ("[C]ontrolling effect is given to the law of the jurisdiction which . . . has the greatest concern with the specific issue raised in the litigation.").

*Bus. Mach. Corp.*, 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001) ("Plaintiff must specify some

particular, existing relationship through which plaintiff would have done business but for the

allegedly tortious behavior.  A general allegation of interference with customers without any

sufficiently particular allegation of interference with a specific contract or business relationship

does not state a claim.").[96]

*Second*, the claim also fails because Tera and Javelin do not adequately allege that

Defendants "acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or

improper means."  *Nirvana*, 123 F. Supp. 3d at 379.  They identify no "dishonest, unfair, or

improper means" other than their claims that certain conduct violated the antitrust laws.  *See id.*

Tera and Javelin's failure to plead a plausible antitrust claim thus forecloses a finding of

"dishonest, unfair, or improper means."  *See, e.g.*, *Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil

Oil Corp.*, 2013 WL 395096, at *16 (S.D.N.Y. 2013) (to satisfy this requirement, "'as a general

rule, the defendant's conduct must amount to a crime or an independent tort'" (quoting *Carvel

Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004))); *PKG*, 446 F. Supp. 2d at 251 ("In all but the

most egregious circumstances, dishonest, unfair, or improper means must amount to misconduct

that constitutes either a crime or an independent tort.").

Nor have Javelin and Tera pled that Defendants "acted with the sole purpose of harming"

them, as required to state a claim where a plaintiff has not pled "dishonest, unfair, or improper

means."  *See, e.g.*, *Carvel*, 3 N.Y.3d at 190 ("Since the franchisees have not shown that [the

defendant]'s conduct was criminal or independently tortious, they cannot recover unless . . . [the]

---

[96]    *See also Diario El Pais, S.L. v. Nielsen Co.*, 2008 WL 4833012, at *7 (S.D.N.Y. 2008) ("To
render Plaintiffs' tortious interference claim 'plausible,' Plaintiffs must provide some factual
allegations that but-for Defendant's alleged acts, Plaintiffs would have entered into contracts with
specific prospective advertisers"); *Stephens v. Trump Org. LLC*, 2016 WL 4702437, at *4 (E.D.N.Y.
2016) ("[t]he failure to identify a specific business relationship with a third party is fatal").

defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs").

To the contrary, they allege that there was "one simple reason" for the Dealers' alleged conduct:

economic self-interest.  *E.g.*, JTC ¶ 14 ("The Dealer Defendants conspired for one simple reason:

to continue to enjoy an extraordinary profit center.").  Such allegations of economic self-interest

foreclose a finding that a defendant "acted with the sole purpose of harming the plaintiff," and

this requires dismissal of the tortious interference claim.  *See, e.g.*, *MMC Energy, Inc. v. Miller*,

2009 WL 2981914, at *8 (S.D.N.Y. 2009) (finding the "sole purpose" element not satisfied and

dismissing a tortious interference claim "[b]ecause Plaintiff . . . has conceded that Defendant's

actions were taken out of profit motive, rather than maliciousness").[97]

## C.    The complaints fail to state an unjust enrichment claim.

The unjust enrichment claims in both complaints fail for three independent reasons.

*First*, Plaintiffs' unjust enrichment claims fail because their antitrust claims fail.

Plaintiffs have failed to allege any independent facts to support their unjust enrichment claims

and instead rely solely on the allegations that support their flawed antitrust claims.  Where an

unjust enrichment claim "rests on the same improper conduct alleged in another claim," the

unjust enrichment claim "will stand or fall with the related claim."  *Cleary v. Philip Morris Inc.*,

656 F.3d 511, 516-18 (7th Cir. 2011); *accord In re Actos End Payor Antitrust Litig.*, 2015 WL

5610752, at *28 (S.D.N.Y. 2015) ("because no antitrust claim survives, the parasitic unjust

---

[97]    *See also Chamilia, LLC v. Pandora Jewelry, LLC*, 2007 WL 2781246, at *18 (S.D.N.Y. 2007)
("To meet this requirement, 'defendant's conduct [must be] motivated solely by malice or to inflict
injury by unlawful means, beyond mere self-interest or other economic considerations.'  Here, there
is not even an allegation that non-economic considerations motivated Defendant's [alleged
interference], let alone that they were the sole type of motive."); *Newport Serv. & Leasing, Inc. v.
Meadowbrook Distrib. Corp.*, 18 A.D.3d 454, 455 (N.Y. App. Div. 2005) (ruling that defendants
were "entitle[d] to judgment as a matter of law" on plaintiff's tortious interference claim because, "to
the extent that any of their conduct interfered with the plaintiff's prospective business relationship
with the distributors, they were acting to protect [their] economic interests, and not 'for the sole
purpose of harming the plaintiff'").

enrichment claims must be dismissed as well"); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) ("because the allegations of illegality in the complaint fail, the unjust enrichment claim must be dismissed").

Second, the complaints fail to plead which state's law applies.  Unjust enrichment "is not a catch-all claim existing within the narrow scope of federal common law, but rather a state-specific remedy."  *In re Actos*, 2015 WL 5610752, at *28.  Thus, where, as here, a plaintiff fails to specify which state's law governs an unjust enrichment claim, the plaintiff fails to state a valid claim for relief.  *See id*. (dismissing claim); *Hines v. Overstock.com, Inc.*, 2013 WL 4495667, at *12 (E.D.N.Y. 2013) (dismissing claim and finding failure to specify governing state law violated "Rule 8(a)'s notice pleading standard"); *Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 550 n.15 (E.D. Pa. 2014) ("fail[ure] to identify under which state's law the plaintiffs assert their claim[] for . . . unjust enrichment . . . alone is reason to dismiss"); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009) (dismissal appropriate where "plaintiffs fail to link their [unjust enrichment] claim to the law of any particular state."); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *11 (N.D. Ill. 2009) (dismissing unjust enrichment claim because "complaint fails to plead the required factual basis of an unjust enrichment claim on a state by state basis").[98]

Third, the complaints fail to plead a cognizable claim of unjust enrichment under any state's law.  "Although the requirements to plead unjust enrichment vary by state, almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon [a]

---

[98]   Defendants reserve their rights to argue that the claims are time-barred under the law of the relevant states.

defendant." *In re Digital Music*, 812 F. Supp. 2d at 411.[99]  Here, the complaints make no such

factual allegations, but instead simply assert that defendants were "unjustly enriched."  *See, e.g.*,

CAC ¶ 371 ("Because of the acts of Defendants and their co-conspirators as alleged herein,

Defendants have been unjustly enriched at the expense of Plaintiffs."); JTC ¶ 359 (same).  That

is not enough to state a claim, especially when Plaintiffs do not even identify the specific Dealers

with which they allegedly dealt.  *See Laydon*, 2014 WL 1280464, at *13 (conclusory assertions

that defendants "financially benefited" and caused Plaintiff "to suffer injury" insufficient "to

satisfy Plaintiff's pleading burden"); *Shady Records v. Source Enters., Inc.*, 351 F. Supp. 2d 74,

78 (S.D.N.Y. 2004) (dismissing claim where complaint failed to identify the benefits conferred).

## CONCLUSION

For the foregoing reasons, all claims should be dismissed with prejudice.[100]

---

[99]    *See, e.g., Cleary*, 656 F.3d at 518 ("a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment" (Illinois law)); *ADCS Inc. v. Kimbrough, Jr.*, 30 F. App'x 225, 228 (4th Cir. 2002) (plaintiff must allege "a benefit conferred upon the defendant by the plaintiff" (Maryland law)); *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011) ("a plaintiff must confer a benefit on the defendant to support an unjust enrichment claim" (New Jersey law)); *Pa. Employee Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010) (unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience" (Delaware law)).

[100]    Defendants reserve their rights to seek arbitration of Plaintiffs' claims pursuant to any applicable agreements or SEF rules, as well as any other applicable rights under such agreements or rules such as shortened limitations periods.

November 4, 2016

Respectfully submitted,

s/  Robert D. Wick

Robert D. Wick
Andrew D. Lazerow
John S. Playforth
Katharine Mitchell-Tombras
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
rwick@cov.com
alazerow@cov.com
jplayforth@cov.com
kmitchelltombras@cov.com

*Attorneys for Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities plc*

s/  Kenneth A. Gallo (on consent) [101]
Brad S. Karp
Julia Tarver-Mason Wood
William A. Clareman
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bkarp@paulweiss.com
jwood@paulweiss.com
wclareman@paulweiss.com

Kenneth A. Gallo
Roberto J. Gonzalez
Ravi Romel Sharma
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
kgallo@paulweiss.com
rgonzalez@paulweiss.com
rsharma@paulweiss.com

*Attorneys for Defendants Citigroup Inc.;
Citibank, N.A.; Citigroup Global Markets Inc.;
and Citigroup Global Markets Limited*

---

[101]   Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's
ECF Rules and Instructions.

s/  Margaret M. Zwisler (on consent)
James E. Brandt
Christopher J. Clark
Lawrence E. Buterman
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
james.brandt@lw.com
chris.clark@lw.com
lawrence.buterman@lw.com

Margaret M. Zwisler
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
margaret.zwisler@lw.com

*Attorneys for Defendants Barclays PLC;*
*Barclays Bank plc; and Barclays Capital Inc.*

s/  Adam S. Hakki (on consent)
Adam S. Hakki
Richard F. Schwed
Keith R. Palfin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4000
ahakki@shearman.com
rschwed@shearman.com
kpalfin@shearman.com

*Attorneys for Defendants Bank of America*
*Corporation, Bank of America, N.A., and*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

s/  Marshall H. Fishman (on consent)
Marshall H. Fishman
Elizabeth Zito
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 277-4000
Facsimile:  (212) 277-4001
marshall.fishman@freshfields.com
elizabeth.zito@freshfields.com

*Attorneys for Defendants BNP Paribas, S.A.*
*and BNP Paribas Securities Corp.*


s/  David G. Januszewski (on consent)
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse AG;*
*Credit Suisse Group AG; Credit Suisse*
*Securities (USA) LLC; and Credit Suisse*
*International*

s/  Tracy V. Schaffer (on consent)
Tracy V. Schaffer
Eric P. Stephens
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
tschaffer@jonesday.com
epstephens@jonesday.com

Paula W. Render
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
prender@jonesday.com

*Attorneys for Defendants Deutsche Bank AG
and Deutsche Bank Securities Inc.*

<u>s/  Robert Y. Sperling (on consent)</u>
Robert Y. Sperling
Joseph L. Motto
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 558-7941
Facsimile:  (312) 558-5700
rsperling@winston.com
jmotto@winston.com

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100
epapez@winston.com

Richard C. Pepperman II
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
geigerm@sullcrom.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc.; Goldman, Sachs & Co.; Goldman
Sachs Bank USA; Goldman Sachs Financial
Markets, LP; and Goldman Sachs International*

s/  Andrew S. Marovitz (on consent)
Andrew S. Marovitz
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 701-7116
Fax: (312) 706-8651
amarovitz@mayerbrown.com

*Attorneys for Defendants HSBC Bank plc;
HSBC Bank USA, N.A.; HSBC Securities (USA)
Inc.*


s/  Daniel Slifkin (on consent)
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
dslifkin@cravath.com
mpaskin@cravath.com

*Attorney for Defendants Morgan Stanley;
Morgan Stanley Bank, N.A.; Morgan Stanley &
Co. LLC; Morgan Stanley Capital Services
LLC; Morgan Stanley Derivative Products Inc.;
Morgan Stanley & Co. International plc; and
Morgan Stanley Bank International Limited*

s/  Arthur J. Burke (on consent)
Arthur J. Burke
James I. McClammy
Rebecca L. Martin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
arthur.burke@davispolk.com
james.mcclammy@davispolk.com
rebecca.martin@davispolk.com

*Attorneys for Defendants The Royal Bank of
Scotland Group plc; Royal Bank of Scotland
plc; and RBS Securities Inc.*


s/  David C. Bohan (on consent)
David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
david.bohan@kattenlaw.com

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
dswanson@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS
Securities LLC*