**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION<br><br>This Document Relates to:  All Actions | Master Docket No.: 16 MD 2704 (PAE) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TRADEWEB MARKETS LLC'S MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 4

    A.    IRS Trading................................................................................ 4

    B.    Tradeweb's Electronic Platforms Promote Transparency, Efficiency, and Competition in IRS Trading............................................... 6

    C.    The 2007 "Project Fusion" Transaction.................................... 7

    D.    Tradeweb Launches Dealerweb, its Inter-Dealer Platform, in 2009 ..................... 9

    E.    The Dodd-Frank Act and its Clearing Mandate....................... 9

    F.    The Claims ............................................................................ 10

LEGAL STANDARD........................................................................... 11

ARGUMENT ...................................................................................... 13

I.      The Complaints Fail in Their Entirety ............................................ 13

II.     The Complaints Fail To Plausibly Implicate Tradeweb in the Alleged Conspiracy ........ 13

    A.    Tradeweb Not Offering An All-to-All IRS Trading Platform is Rational, Self-Interested Business Behavior .......................... 14

          1.    The Complaints Fail to Allege the Existence of the Necessary Infrastructure for an All-to-All Platform .................................. 14

          2.    Plaintiffs Do Not Allege Sufficient Demand For an All-to-All IRS Trading Platform ............................................ 15

          3.    Tradeweb's Decision Not to Expand Its Product Offerings Is Not Evidence of Conspiratorial Behavior ...................... 17

    B.    Allegations Regarding the Prices Tradeweb Charges for Dealerweb Do Not Give Rise to an Inference of Conspiratorial Intent ........................ 19

    C.    Allegations That Tradeweb Was a "Forum" For the Supposed Conspiracy Do Not Support a Section 1 Claim ...................... 20

    D.    Tradeweb's Joint Venture Ownership and Governance Structure Do Not Support an Inference that Tradeweb Participated in a Conspiracy...................... 22

    E.      Allegations of Parallel Conduct by Tradeweb and ICAP Do Not Give Rise to An Inference of Conspiratorial Intent ............................................................... 23

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ 11, 12, 17, 24

*Bilinski v. Keith Haring Found., Inc.*,
   96 F. Supp. 3d 35 (S.D.N.Y. 2015) ............................................................. 18

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ............................................................................... 19

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .................................................................... 11

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) .................................................................... 20

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ..................................................................... 5

*Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*,
   No. 15-cv-05488 (RJS), 2016 WL 5719790
   (S.D.N.Y. Sept. 29, 2016) ....................................................................... 18

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ............................................................................... 22

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) .................................................. 12, 13, 24

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995) ...................................................................... 8

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) ..................................................................... 18

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................... 20

*In re Late Fee & Over–Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................... 18, 24

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MDL 2262 NRB, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ........... 20, 23

*In re Processed Egg Producers Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................... 21, 24

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................................. 17, 24

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...................................................................................... 21

*Kleinman v. Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013) ...................................................................................... 5, 8

*Mayor of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) .......................................................................... 11, 12, 17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ........................................................................................................ 12

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) ............................................................................ 22

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006) ............................................................................................................ 22

*United States v. Am. Express Co.*,
    No. 15-1672, 2016 WL 5349734 (2d Cir. Sept. 26, 2016) .................................... 15

*United States v. Gen. Elec. Co.*,
    869 F. Supp. 1285 (S.D. Ohio 1994) ......................................................................... 20

*United States v. Taubman*,
    297 F.3d 161 (2d Cir. 2002) ........................................................................................ 20

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007) ............................................................ 17, 18, 24

*Williams v. Citigroup, Inc.*,
    No. 08-cv-9208, 2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009) ......................... 15, 18

## Statutes and Regulations

17 C.F.R. § 37.202(a) .......................................................................................................... 10

17 C.F.R. § 37.701 ............................................................................................................... 15

7 U.S.C. § 2(h)(1) ................................................................................................................ 14

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124
    Stat. 1376 (2010) .............................................................................................................. 8

Defendant Tradeweb Markets LLC ("Tradeweb") submits this Memorandum of Law in support of its motion to dismiss the putative class action complaint filed by three buy-side interest rate swap investors (the "CAC Complaint") and the complaint filed by two firms that own and operate interest rate swap trading platforms (the "JTC Complaint") (collectively, the "Complaints").[1]

## PRELIMINARY STATEMENT

Tradeweb builds and operates electronic fixed-income and derivatives trading platforms, including an electronic trading platform for interest rate swaps ("IRS"). These internet-based marketplaces have revolutionized the way "over-the-counter" financial instruments are traded. Tradeweb's promotion of electronic trading fosters competition among buyers and sellers of financial instruments by providing a more transparent and efficient venue for trading. Tradeweb's platforms are two-sided markets. Thus, Tradeweb generates revenue by attracting traders, on the dealer-side, and investors, on the buy-side, to use its trading platforms over competitors' trading platforms or traditional, telephonic over-the-counter trading. Competition to attract trading volume to its platforms is robust. Traders and buy-side investors use Tradeweb's platforms because they align with how fixed income and derivative securities are actually traded and enhance that experience with greater pre-trade market transparency, increased operational efficiency, increased price competition, and reduced systemic risk.

The Complaints contend that Tradeweb participated in a supposed conspiracy among various derivatives dealers and ICAP, another firm that offers electronic trading platforms, to

---

[1] Plaintiffs in the CAC Complaint are the Public School Teachers' Pension and Retirement Fund of Chicago; the Mayor and City Council of Baltimore; and Genesee County Employees' Retirement System (collectively "Class Plaintiffs"). Plaintiffs in the JTC Complaint are Javelin Capital Markets LLC and Javelin SEF (collectively "Javelin"); and Tera Group, Inc., Tera Advanced Technologies, LLC and TeraExchange, LLC (collectively "Tera") (collectively "SEF Plaintiffs").

forestall the emergence of anonymous, "all-to-all" trading of IRS.  The Complaints fail for the reasons set forth in the Memorandum of Law submitted on behalf of the Dealer Defendants, which Tradeweb joins.  The Complaints also do not state a claim as against Tradeweb given the absence of well-pled facts plausibly alleging Tradeweb's participation in any such conspiracy.

*First*, the Complaints assert that, from January 2008 to the present, Tradeweb acted against its independent self-interest by not making available to "all" market participants "an efficient all-to-all trading platform" for IRS.  This assertion is implausible given the reality, which the Complaints acknowledge, that anonymous, all-to-all trading cannot exist in the absence of centralized clearing, and that buyers and sellers of IRS had not adopted centralized clearing prior to the implementation of Dodd-Frank's mandatory clearing regulations in 2013.  The fact that Tradeweb did not commercially launch an anonymous all-to-all trading platform at a time when anonymous all-to-all trading could not exist given a lack of basic infrastructure is, of course, rational economic conduct.  This assertion is also implausible given the Complaints' failure to plausibly allege that, beginning in 2008, there was sufficient *two-sided* demand from Tradeweb customers — *both* buy-side investors *and* dealers — to sustain an anonymous, all-to-all platform.  To the contrary, the Complaints acknowledge that, even today, with centralized clearing in place and various all-to-all trading platforms in the marketplace, most of the buy-side chooses to trade with dealers bilaterally, either on electronic trading platforms like Tradeweb's or via traditional, voice-based trading.  The Complaints also acknowledge that sell-side traders – the individuals within each dealer who make markets for IRS and other derivatives and fixed-income securities – have a natural economic incentive to continue trading these securities over-the-counter and no reason to encourage anonymous, all-to-all trading.

*Second*, the Complaints vaguely contend that, since 2008, Tradeweb facilitated the alleged conspiracy by charging high rates for use of its "anonymous competitive trading" platform called Dealerweb, which dealers use to trade IRS and other securities with each other. According to Plaintiffs, Dealerweb's rate structure perpetuated buy-side investors' use of traditional over-the-counter, or "dealer-to-customer" trading platforms, which charge investors lower rates. The Dealerweb trading platform, like other inter-dealer platforms offered by Tradeweb's competitors, simply reflects actual trading behavior consistent with the expectations and experience of market participants. As the Complaints acknowledge, dealers have historically traded among themselves under conditions different from those characteristic of trading among dealers and buy-side investors. Inter-dealer trades typically involve much larger notional amounts to offset risk created from the liquidity dealers provide to buy-side customers. And, unlike in the dealer-to-customer marketplace, infrastructure was in place in the inter-dealer market to safeguard against counter-party exposures. The Complaints fail to plausibly allege anything conspiratorial about Tradeweb offering a dealer-to-dealer trading platform that meets market demand or charging commercial rates for use of that platform.

*Third,* the Complaints argue that Tradeweb was a forum for the Dealer Defendants, who purportedly "installed themselves" on Tradeweb's Board of Directors and other committees, after some (but not all) of the Dealer Defendants lawfully obtained governance rights and ownership interests in Tradeweb. According to Plaintiffs, the Dealer Defendants that invested in Tradeweb furthered the alleged conspiracy by holding meetings and conference calls under the guise of a legitimate venture. At most, these allegations amount to a mere "opportunity to conspire" and are insufficient to state Tradeweb's own participation in any supposed conspiracy.

*Fourth*, the Complaints seize upon the fact that, in 2007, Tradeweb sold certain Dealer Defendants an equity stake in Tradeweb to help Tradeweb grow asset classes which it had not offered or had not had significant traction. According to the Complaints, the joint venture structure resulted in the creation of a "shadow company" through which Dealer Defendants were able to prevent Tradeweb from launching an anonymous all-to-all IRS trading platform. The Complaints' allegations about the joint venture are conclusory and flatly contradicted by securities filings transparently disclosing the joint venture's structure.

*Finally*, the Complaints allege that ICAP and Tradeweb agreed to a "détente," whereby Tradeweb would not expand further into the dealer-to-dealer market for IRS trading and, in exchange, ICAP would not launch an all-to-all platform for IRS. Yet, Plaintiffs do not and cannot set forth a single fact from which to reasonably infer any agreement, implied or otherwise, between ICAP and Tradeweb. Moreover, the Complaints themselves contradict this allegation – they acknowledge that Tradeweb did launch a dealer-to-dealer platform, Dealerweb, and it is open to buy-side customers.

## BACKGROUND

### A.    IRS Trading

"An IRS is a type of financial derivative" and reflects an agreement between two parties to "trade interest-rate cash flows." (CAC ¶ 67; JTC ¶ 2.) Typically, IRS are traded between end-users, such as "buy-side" investors like Class Plaintiffs, and "market makers," such as investment banks like the Dealer Defendants.[2]

---

[2]    The Defendants are Bank of America Corporation, Barclays Bank PLC, BNP Paribas, S.A., Citigroup, Inc., Credit Suisse Group AG, Deutsche Bank AG, The Goldman Sachs Group, Inc., HSBC Bank PLC, J.P. Morgan Chase & Co., Morgan Stanley, Royal Bank of Scotland PLC, UBS AG, (collectively, the "Dealer Defendants"), as well as ICAP Capital Markets LLC ("ICAP") and Tradeweb. (CAC ¶¶ 40–66; JTC ¶¶ 33–58). HSBC and BNPP are not, however, alleged to have invested in Tradeweb during the purported class period. (*See, e.g.*, CAC ¶¶ 45–

Historically, buy-side institutions and dealers negotiated and executed IRS over the phone. Under this voice-based approach, an end-user was required to "contact a dealer and disclose its identity, the intended direction of the trade . . . and the desired notional amount." (CAC ¶ 8; JTC ¶ 7.) Executable prices were only available while the client and dealer were on the phone, meaning buy-side customers could only receive a price from one dealer at a time. (CAC ¶ 9; JTC ¶ 8.) Voice-based trading developed before central clearing services, which made anonymous trading impractical: dealers had to know with whom they were trading to assess creditworthiness and manage risk. (*See* CAC ¶ 25 n.6; *see also id.* ¶ 185; JTC ¶ 101 ("In the OTC market counterparties face each other directly, meaning they bear the full risk of loss if their counterparty defaults.").)

Voice-based trading naturally evolved into two different types of trading: buy-side institutions traded with dealers and dealers also traded separately with each other. (Ex. 1 at 9 (Interdealer Brokers Need to Change, Say Critics) (cited at CAC ¶ 268 n.91; JTC ¶ 228 n.79).)[3] Buy-side participants such as asset managers, for example, require functionality to average prices across several pieces of a large trade to properly allocate trades to individual funds. (*Id.*) But "[f]eatures such as average pricing or trade allocation are not relevant to" sell-side participants, who are largely concerned with "wholesale, large-risk-transfer" transactions. (*Id.*) Dealers have

---

46, 55–56; JTC ¶¶ 37–38; 47–48.) This failing further renders implausible the claim that Tradeweb participated in a conspiracy with the "Dealer Defendants."

[3]    Tradeweb herein cites to materials footnoted in Plaintiffs' CAC & JTC. Certain of these exhibits are attached to the Declaration of Michael J. Garvey in Support of Defendant Tradeweb Markets LLC's Motion to Dismiss the Amended Consolidated Complaints ("Garvey Decl."). The Court may consider the full text of such materials as if incorporated by reference into the complaint itself. *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that for purposes of a motion to dismiss the "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference") (quotation marks omitted).

different needs—namely, as the Complaints recognize, to source liquidity to offset "risks accumulated when trading with clients." (Ex. 2 at 3 (Meet the New OTC Market-Markers) (cited at CAC ¶¶ 15 n.3; *see also* 77 n.14.) Buy-side investors and dealers also have different risk profiles. For instance, end-users have different capital and regulatory requirements and do not have ISDA master agreements ("ISDAs") — contracts which lay out basic terms and eliminate the need to negotiate on a trade-by-trade basis — with one another. Dealers, on the other-hand, face fewer risks, most notably, credit risks, when trading IRS among themselves because they are all direct clearing members and have ISDAs with each other.

**B.      Tradeweb's Electronic Platforms Promote Transparency, Efficiency, and Competition in IRS Trading**

Tradeweb is a financial services company that builds and operates electronic trading platforms for fixed-income and derivative products, including IRS. (CAC ¶ 66; JTC ¶ 58.) Tradeweb does not buy or sell IRS or trade IRS with any party, and it does not intermediate between traders. Instead, it facilitates trades—providing a platform that allows buyers and sellers to connect electronically. Since executing its first trade in 1998, Tradeweb has promoted electronic trading, enhancing efficiency and transparency in fixed income trading by moving it away from the traditional, "very restrictive," (CAC ¶ 9; JTC ¶ 8), "voice-based" method. (CAC ¶¶ 7–9; JTC ¶ 7-9.) Initially, Tradeweb's marketplace was focused on a single product: U.S. Treasuries. (CAC ¶ 90; JTC ¶ 240.) It now offers electronic trading in 22 different financial marketplaces. In each, Tradeweb has deployed different trading protocols specifically adapted to the type of instruments and the way those instruments are traded.

Electronic marketplaces, like those provided by Tradeweb, revolutionized IRS trading by providing "rapid price discovery" and allowing customers to simultaneously request liquidity from multiple dealers. (*See* Ex. 3 at 1 (TRADEWEB, Thomson to Acquire TradeWeb) (cited at

CAC ¶ 101 n.26; JTC ¶ 248 n.91).) This allowed end-users to compare dealers' quotes to specific requests and forced dealers to compete directly on price. (*See* CAC ¶¶ 76–77; JTC ¶¶ 72–73.) Tradeweb has fostered competition among buyers and sellers of IRS and other financial instruments by providing a more transparent and efficient venue for trading as compared to voice-based OTC trading. Yet, despite the benefits of electronic trading, many buy-side and sell-side IRS traders were slow to move away from voice-based trading. (*See* Ex. 4 at 3–4 (TrueEx Builds Bridges in the New World of Swaps) (cited at CAC ¶ 242 n.69; JTC ¶ 195 n.38).)

## C. The 2007 "Project Fusion" Transaction

Tradeweb was initially founded by a group of dealers who, in 2004, "sold Tradeweb to Thomson [Corporation]." (CAC ¶ 91; JTC ¶ 241.) In 2007, Tradeweb sought to solidify its customer base in its core fixed income products, and accelerate the adoption of electronic trading in new products, including its existing platform for IRS, in which Tradeweb had not previously had much success. In October 2007, to incentivize faster migration towards electronic trading and to attract greater liquidity to its platforms (not just for IRS but for other products), Thomson Corporation invited certain of the Dealer Defendants to invest in Tradeweb. (*See* Ex. 5 at 1–2 (Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb) (cited at CAC ¶ 19. n.4; JTC 252 ¶ n.94).) With that in mind, the 2007 transaction ("Project Fusion") involved a corporate structure to provide the dealers with a greater upside in the expansion—and ultimately, success—of Tradeweb's new businesses. As publically disclosed by Thomson Reuters in its Form 20-F filing with the SEC for 2007[4] and stated

---

[4]     Thomson Reuters' Form 20-F SEC filing for the fiscal year ending December 31, 2007, states: "In October 2007, Thomson announced that it had agreed to form a partnership with a consortium of nine global securities dealers to seek to further expand Tradeweb. . . . [I]n January 2008, the dealers invested $280 million in TradeWeb, $180 million of which was used to purchase a 15% stake in TradeWeb Markets, an entity that includes TradeWeb's established markets. . . ***Thomson and the dealers have also agreed to fund additional investment in asset***

elsewhere in other public filings and press releases covering Project Fusion, nine of the Dealer Defendants (the "investing Dealer Defendants") invested "approximately $180 million to purchase a minority stake in Tradeweb's established markets" (Tradeweb Markets LLC) and approximately $100 million to purchase an 80% ownership interest in Tradeweb New Markets LLC ("Tradeweb New Markets") (which included assets associated with the new products).[5] (CAC ¶ 105–06; JTC ¶ 252–53.) The investor Dealer Defendants were contributing most of the value and capital for Tradeweb to enter these new markets and therefore received equity commensurate with that commitment. As part of this joint venture, the investing Dealer Defendants were given corporate governance rights and representation on Tradeweb's Board (which was the same for both entities). (*See* Ex. 5 at 1–2; *see also* CAC ¶ 113; JTC ¶ 258.)

Even with the further development and support of Tradeweb's "new" markets, Tradeweb (and other platforms) did not experience a marked increase of IRS trading until after the implementation of the CFTC's 2013 swaps rules (namely, mandatory clearing and mandatory trading) under the Dodd-Frank Act ("Dodd-Frank").[6] (*See* Ex. 4 at 4.) As late as 2014 and to the present, much of the buy-side still relies on traditional voice or RFQ-based trading. (Ex. 11 at 1

*class expansion through a new entity, TradeWeb NewMarkets. . . .Thomson will own 20% of TradeWeb NewMarkets and the consortium will own 80%.*" (*See* Ex. 6 at 87 (Thomson Reuters PLC, Annual Report (Form 20-F) (Apr. 17, 2008) (emphasis added).) In 2010, Tradeweb Markets and Tradeweb NewMarkets merged, which was also disclosed in public filings. (*See* Ex. 7 at 52 (Thomson Reuters PLC, Annual Report (Form 40-F) (Mar. 9, 2011).)

[5]   (*See* Ex. 8 at 4–5 (The Thomson Corp. Q3 2007 Earnings Call Transcript (Oct. 25, 2007)); Ex. 9 at Exhibit 99.1, 19 (The Thomson Corp., Foreign Private Issuer Report (Form 6-K) (Nov. 9, 2007)); Ex. 10 at 22–23 (Thomson Reuters Corp., Foreign Private Issuer Report (Form 6-K) (Nov. 1, 2010).) On a motion to dismiss, the court may consider "public disclosure documents filed with the SEC." *Kleinman*, 706 F.3d at 152. Although the Court is required to accept the allegations of the CAC as true on this motion to dismiss, it need not accept as true any allegations contradicted by documents of which it may take judicial notice. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092, 1096 (2d Cir. 1995).

[6]   Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

(SEF NY Interview: Michael Koegler, Managing Director, Javelin Capital Markets) (cited at CAC ¶ 29 n.10) ("Much of the buy-side is still trading the same way they always have.").)

### D. Tradeweb Launches Dealerweb, its Inter-Dealer Platform, in 2009

In 2009, following an acquisition of the inter-dealer broker Hilliard Farber & Co., Inc., Tradeweb enhanced its offerings by launching a dealer-to-dealer ("DTD") electronic central limit order book ("CLOB") trading platform called Dealerweb.[7] (Ex. 12 at 1 (Icap Hurt by Banks' Platform) (cited at CAC ¶ 148 n.38; JTC ¶ 291 n.104).) The first product Dealerweb offered was mortgage backed securities ("MBS") because Hilliard Farber specialized in this product and Tradeweb had historical expertise with MBS on its dealer-to-customer platform. MBS were also standardized products that were already centrally cleared by direct member dealers at the Fixed Income Clearing Corporation and thus amenable to anonymous electronic CLOB trading. (*See, e.g.*, Ex. 13 at 1–2 (Fixed Income Clearing Corp., SEC No-Action Letter, IM Ref. No. 20033131032 (March 13, 2003), *available at* https://www.sec.gov/divisions/investment/ noaction/ficc031303.htm).) Dealerweb expanded to IRS in 2013 in launching the DW SEF consistent with the Dodd Frank SEF rules. (CAC ¶¶ 150, 160–61; JTC ¶ 293, 302–03.)

### E. The Dodd-Frank Act and its Clearing Mandate

In 2010, Congress passed the Dodd-Frank Act as a response to the turmoil of the 2008 global financial crisis. (CAC ¶ 163; JTC ¶ 84.) Dodd-Frank introduced significant regulatory change to swaps and derivatives trading, including by mandating that certain IRS "be centrally cleared and traded on exchanges or SEFs." (CAC ¶ 163.) Notably, this substantial regulatory overhaul, designed to "bring increased transparency and competition to swaps and other

---

[7] As noted above, dealers are able to trade on an all-to-all basis because they have ISDAs with one another. Buyside traders do not all have ISDAs with each other, or even with all dealers. Until such agreements are in place, all-to-all trading for the buyside is not possible.

derivatives markets," (CAC ¶ 163), did not require that IRS only be traded via an all-to-all trading platform.

In March 2013, the Commodities Futures Trading Commission enacted regulations under Dodd-Frank, requiring that many IRS trades be centrally cleared.  As Plaintiffs acknowledge, "[c]learing serves an important risk-mitigation function"—"[f]or cleared transactions, the clearinghouse centralizes counterparty risk and mutualizes the exposure if a clearing member defaults."  (CAC ¶ 185; JTC ¶ 101.)  Clearing is "the first step leading to exchange/SEF trading for OTC products," making it a critical prerequisite to the operation of an all-to-all platform. (CAC ¶ 286; JTC ¶ 305.)[8]

### F.      The Claims

The CAC asserts two causes of action:  (i) a conspiracy to restrain trade in violation of Section 1 of the Sherman Act (CAC ¶¶ 363–69), and (ii) unjust enrichment in violation of state law (*id.* ¶¶ 370–72.)  The JTC asserts the same two causes of action, (JTC ¶¶ 348–52; 358–60), along with two additional claims: (i) a conspiracy to restrain trade in violation of New York State's Donnelly Act (*id.* ¶¶ 353–57), and (ii) tortious interference with business relations in violation of state law (*id.* ¶¶ 361–63.)

The Complaints allege that Defendants violated federal antitrust law by "conspiring to boycott and destroy trading platforms that sought to provide all-to-all trading protocols to the buy-side."  (CAC ¶ 6; *see also* JTC ¶ 5.)  Plaintiffs claim that the alleged conspiracy was aimed at preserving a bifurcated market where the Dealer Defendants enjoyed a "tremendous

---

[8]      The CFTC has reviewed and expressly approved the rulebooks for TW SEF and DW SEF.  As required by the CFTC's regulations, the TW SEF and DW SEF rulebooks provide for impartial access, specifying that TW SEF and DW SEF are open to both buy- and sell-side participants.  (*See* 17 C.F.R. § 37.202(a); Ex. 14 (TW SEF LLC, Swap Execution Facility Rules, at 24, http://www.cftc.gov/stellent/groups/public/@otherif/documents/ifdocs/twse fllcexhibitm1.pdf); Ex. 15 (DW SEF LLC, Swap Execution Facility Rules, at 23, http://www.cftc.gov/stellent/groups/public/@otherif/documents/ifdocs/exhibitm1dwsefllc.pdf).)

information advantage . . . which enable[d] them to make extraordinary profits." (CAC ¶ 7; JTC ¶ 6.)  The Complaints contend that the Dealer-Defendants effectuated their alleged conspiracy by, among other things, "co-opt[ing] Tradeweb by jointly investing in the company, taking over its Board of Directors and other key committees, and preventing it from moving forward with its plans for a new trading platform" that would support anonymous all-to-all trading for the buy-side.  (CAC ¶ 18; *see also* JTC ¶ 22.)  The CAC claims that ICAP participated in the conspiracy by agreeing with the Dealer Defendants not to expand its offerings into "the dealer-to-client space by establishing an all-to-all anonymous IRS trading platform."  (CAC ¶ 150; *see also* JTC ¶ 293.)  The purported conspiracy is alleged to have started on January 1, 2008 and continues "to the present."  (*See* CAC ¶ 21; JTC ¶ 24.)

## LEGAL STANDARD

To plead a Section 1 conspiracy, plaintiffs have two options:  plead it directly or indirectly.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Mayor of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Pleading an antitrust conspiracy directly requires a showing of "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 225 (3d Cir. 2011) (internal quotation marks omitted).  This type of "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level," eye witness testimony, or evidence directly showing the existence of a conspiracy.  *Citigroup*, 709 F.3d at 136.  The Complaints here lack any such allegations.  Conclusory statements using legally-charged words such as "conspiracy," "secret" and "collude" (*See e.g.*, CAC ¶¶ 18, 21, 102, 116, 129; JTC ¶¶ 22, 24, 249, 260, 273) are mere "labels and conclusions" and do not plead an "actual agreement."  *Twombly*, 550 U.S. at 555, 564.

Alternatively, Plaintiffs may "indirectly" allege a conspiracy "on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Citigroup*, 709 F.3d at 136. This requires well-pled allegations of *facts*, not "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action," sufficient to show that an antitrust conspiracy is not just *possible* but is "*plausible.*" *Twombly*, 550 U.S. at 555–56 (emphasis added). To withstand a motion to dismiss, the Complaints must set forth allegations suggesting a given defendant did more than just act consistent with its own, independent interest. *See Twombly*, 550 U.S. at 566 (finding that "nothing in the complaint intimates" that parallel behavior by alleged conspirators, including not competing within certain geographic territories, was "anything more than the natural, unilateral reaction" of each defendant).

Finally, in a conspiracy case, the Complaints must allege facts to "plausibly suggest that *each* Defendant participated in the alleged conspiracy." *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (emphasis added) (internal quotation marks omitted). A defendant is only liable if it made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted). Accordingly, absent well-pled facts of a conscious commitment or "meeting of the minds," the claim as against that defendant must be dismissed. *Hinds*, 620 F. Supp. 2d at 513.

## ARGUMENT

### I.     The Complaints Fail in Their Entirety

For the reasons articulated in the Motion to Dismiss filed by the Dealer Defendants, the Complaints should be dismissed in their entirety.  Tradeweb expressly incorporates herein all such arguments.[9]

### II.    The Complaints Fail To Plausibly Implicate Tradeweb in the Alleged Conspiracy

The Complaints advance five arguments in an effort to implicate Tradeweb's participation in the supposed conspiracy.  According to the Complaints, (1) Tradeweb acted against its self-interest by declining to create an all-to-all IRS trading platform; (2) Tradeweb maintains Dealerweb, an all-to-all platform, but charges prohibitively high rates for use of Dealerweb in order to discourage buy-side participation; (3) Tradeweb served as a forum for the conspiracy; (4) Dealer Defendants that own an equity stake in Tradeweb formed the joint venture with Tradeweb in order to create a "shadow company" to "host the conspiracy"; and (5) Tradeweb agreed to a "detente" with ICAP, whereby it would not expand into the dealer-to-dealer IRS space.  Whether taken individually or in the aggregate, none of these allegations plausibly alleges Tradeweb's conscious commitment toward any supposed conspiracy to frustrate all-to-all trading of IRS.  *Hinds*, 620 F. Supp. 2d at 513.

---

[9]     None of the named Class Plaintiffs alleges that it was a participant, or has even applied for membership, with TW SEF or DW SEF.  Moreover, none of the named Class Plaintiffs alleges it ever attempted to execute IRS trades on any Tradeweb platform.  Nevertheless, Tradeweb expressly preserves the right to move to dismiss any of Plaintiffs' claims to the extent any such claims must be arbitrated pursuant to Rule 413(g) of the TW SEF LLC Swap Execution Facility Rules or the equivalent rule in the DW SEF rules, both of which requires arbitration of all disputes arising out of the use of the TW SEF.  (Ex. 14 at 36, 59; Ex. 15 at 35, 58.)  Thus, to the extent any Plaintiff is a member of either the TW SEF or the DW SEF or arises out of trades executed on the TW SEF or the DW SEF, that Plaintiff's claims would be subject to arbitration.

### A. Tradeweb Not Offering An All-to-All IRS Trading Platform is Rational, Self-Interested Business Behavior

The Complaints contend that to further the alleged conspiracy, Tradeweb, at some point after early 2007, declined to launch an all-to-all IRS trading platform, which the Complaints claim was inconsistent with Tradeweb's economic self-interest. (CAC ¶¶ 101, 20, 132; JTC ¶¶ 248, 23, 276.) According to the CAC, "[m]aking an efficient, all-to-all trading platform available to all market participants would have increased the number of trades on Tradeweb and thus the fees it obtained." (CAC ¶ 132; *see also* JTC ¶ 276.) To the contrary, the Complaints' allegations reflect independent commercial self-interested behavior since launching such a platform would have been an exercise in futility. Indeed, the vast majority of Tradeweb's competitors — who are not alleged co-conspirators here — arrived at the same conclusion. The Complaints concede that the requisite infrastructure was not in place to trade in this way. The Complaints do not and cannot allege there was sufficient demand for such a platform from either dealers or buy-side investors, let alone both. Nor do the Complaints allege facts that plausibly suggest Tradeweb possessed the infrastructure and experience to operate an all-to-all type of electronic platform they seem to prefer.

### 1. The Complaints Fail to Allege the Existence of the Necessary Infrastructure for an All-to-All Platform

Until 2013, Tradeweb could not have offered an all-to-all trading platform for the simple reason that centralized clearing had not been adopted by buy-side customers in IRS. *See infra* at 20–21. As Plaintiffs' acknowledge, clearing is a necessary prerequisite to all-to-all trading. (CAC ¶ 286; JTC ¶ 305 ("*clearing is the first step leading to exchange*/SEF trading for OTC products.); CAC ¶ 185; JTC ¶ 101 (stating that without clearing, all-to-all anonymous trading platforms cannot come to market); *see also* CAC ¶ 77 n.14.) But clearing for electronic trading of IRS was not mandated until the March 2013 Dodd-Frank regulations. *See* 7 U.S.C. § 2(h)(1);

17 C.F.R. § 37.701.  The Complaints do not and cannot plausibly allege that centralized clearing

for IRS was available in the marketplace before that time.  As the Complaints concede, all-to-all

platforms operated by Javelin, TeraExchange, and TrueEx did not become operational until

2013—six years into the alleged class period, after the passage of Dodd-Frank.  (*See* CAC ¶¶

222, 202, 241; JTC ¶ 194.)  The only way Tradeweb could have implemented an anonymous all-

to-all trading platform is if it intermediated and cleared every trade itself (a role Tradeweb had

never occupied).  Nowhere do Plaintiffs allege that Tradeweb had either the experience,

technology or capitalization necessary to assume the role of intermediary.  *Williams v. Citigroup,

Inc.*, No. 08-cv-9208, 2009 WL 3682536, at *4 (S.D.N.Y. Nov. 2, 2009), *aff'd in pertinent part*,

433 Fed. Appx. 36 (2d Cir. 2011) ("That this 'prominent investment bank' did not pursue one

avenue of profit . . . does not plausibly suggest an agreement.").  For these reasons, the fact that

Tradeweb was not offering an anonymous, all-to-all trading platform for IRS was consistent with

rational commercial conduct and cannot be spun as in furtherance of any conspiracy.

### 2. Plaintiffs Do Not Allege Sufficient Demand For an All-to-All IRS Trading Platform

The Complaints also lack any well-pled facts plausibly suggesting there was adequate

demand from both buy- and sell-side customers for an all-to-all IRS trading platform.

Importantly, in *United States v. American Express Co.*, the Second Circuit recently emphasized

that, in an antitrust case, it is critical to consider the dynamics on *both* sides of a two-sided

"market."  No. 15-1672, 2016 WL 5349734, at *16 (2d Cir. Sept. 26, 2016).  In that case, the

Second Circuit overturned the district court's ruling in favor of plaintiffs because the court erred

by relying only on conduct and effects on one side of the two-sided market at issue.  *Id.* at *12–

13.  The appellate court explained that, "[s]eparating the two markets here . . . ignores the two

markets' interdependence" and instructed that "the two sides of a platform cannot be considered in isolation." *Id.* at \*13.

Here, Plaintiffs focus almost exclusively on demand by buy-side institutions (liquidity takers), thereby inviting the court to erroneously consider only one side of a two-sided platform—precisely the approach the Second Circuit rejected in *American Express*. Plaintiffs claim in conclusory terms that there is demand by the buy-side, but fail to allege any demand whatsoever by the sell-side liquidity providers. Instead, Plaintiffs only speculate about the potential profits for any "dealer that would have acted to provide [an all-to-all IRS] platform." (CAC ¶ 93.) This type of speculative pleading does not support an inference of conspiratorial intent. That is especially true when the Complaints acknowledge that each Dealer Defendant had a natural reason not to demand an all-to-all platform: such a platform allegedly could "disintermediate" each individual. (CAC ¶ 94; JTC ¶ 243.) Thus, the Complaints not only lack well-plead allegations that dealers are demanding an all-to-all platform, the Complaints actually allege why there is no such demand from dealers.

Moreover, while the Complaints assume that buy-side demand for an all-to-all platform is high, they also cite multiple sources that cut against these assumptions. For example, one article cited by Plaintiffs from January 2010 states:

> If the IRS market were migrated to an all-to-all model – all else being equal – instead of the D2C version we have today, there would be immense challenges to locating liquidity. There are simply not enough natural buyers and sellers for matching IRS contracts to sustain this model without the dealers providing back-up liquidity.

(Ex. 16 at 12 (OTC Interest Rate Swaps and Beyond: The Path to Electronic Markets) (cited at CAC ¶ 291 n.117; JTC ¶ 310 n.116).) If anything, the sources Plaintiffs rely upon to state their case reflect that Tradeweb's decisions to continue supporting its current business model make

perfect business sense, and are therefore not conspiratorial.  *See Twombly*, 550 U.S. at 564; *see also Citigroup*, 709 F.3d at 138 (stating no inference of a conspiracy can be drawn from alleged conduct that "made perfect business sense").

Multiple other electronic platforms have, like Tradeweb, opted not to offer anonymous all-to-all, electronic trading platforms for IRS, including BGC, Tullet Prebon and Tradition. (CAC ¶ 272; JTC ¶ 219.)  Bloomberg, which accounts for approximately 54 percent of the market in dealer-to-customer SEF trading, operates both an RFQ and a CLOB platform, reflecting that even today buy-side investors continue to demand RFQ trading of IRS.  (CAC ¶ 159; JTC ¶ 301.)  None of these platforms, with the exception of ICAP, are alleged co-conspirators here.  Plaintiffs provide no explanation as to why Tradeweb's decision not to launch an all-to-all platform is allegedly against its own economic self-interest and yet, the same decision by competing electronic platforms is rational, legitimate business behavior.

### 3. Tradeweb's Decision Not to Expand Its Product Offerings Is Not Evidence of Conspiratorial Behavior

Even if the Complaints could plausibly allege infrastructure to support an all-to-all IRS trading platform and sufficient demand for such a product during the class period, a decision by Tradeweb to focus on its existing, core platforms would not constitute evidence of conspiratorial behavior.  Indeed, the law does not require firms to "expand without limit" and thus courts routinely refuse to infer a conspiracy where a company decides not to "enter[] every market that an outside observer might regard as profitable."  *Twombly*, 550 U.S. at 569; *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 375 (S.D.N.Y. 2016).

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, is instructive.  516 F. Supp. 2d 270 (S.D.N.Y. 2007).  There, a plaintiff dietary supplement company alleged that one of its competitors conspired with publishers of bodybuilding periodicals to cancel or reject its

advertisements.  *Id.* at 280–81.  The plaintiff alleged that the publishers acted against their own

self-interest by refusing the plaintiff's business "because it caused them to reject valid offers for

advertising space," which would have led to additional revenue.  *Id.* at 291.  In dismissing

plaintiff's claims, the court held that this allegation reflected nothing more than that "each

publisher was presented with a choice between losing either [plaintiff] or [defendant] as an

advertising customer," and this does not support an inference of conspiratorial behavior.  *Id.*  The

same is true here:  Tradeweb is alleged to have had "a choice between either" Plaintiffs'

preferred trading model (an all-to-all, anonymous trading platform) and the platforms that

Tradeweb had historically offered and developed, had an expertise in, and found profitable.  The

fact that Tradeweb chose not to reject a proven business model in favor of an unproven venture,

does not create an inference of conspiratorial intent.  *See Williams*, 2009 WL 3682536, at *4

("That this 'prominent investment bank' did not pursue one avenue of profit . . . does not

plausibly suggest an agreement."); *Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, No. 15-cv-

05488 (RJS), 2016 WL 5719790, at *3 (S.D.N.Y. Sept. 29, 2016) (finding that allegations of

unlawful agreement between defendant movie theater and film distributors did not create an

inference of conspiracy as a matter of "common sense" because defendant movie theater "could

have made the unremarkable business decision to devote its screens to films that do not play

simultaneously at a nearby theater" and the distributor "might reasonably have elected to license

films" to the defendant theater rather than the plaintiff theater); *accord Bilinski v. Keith Haring

Found., Inc.*, 96 F. Supp. 3d 35, 44 (S.D.N.Y. 2015); *In re Chocolate Confectionary Antitrust

Litig.*, 801 F.3d 383, 401 (3d Cir. 2015); *In re Late Fee & Over–Limit Fee Litig.*, 528 F. Supp. 2d

953, 962–63 (N.D. Cal. 2007).

That is particularly true here, given Plaintiffs' recognition that developing and launching an all-to-all platform is a "large investment" requiring "millions" of dollars from investors. (CAC ¶ 329; JTC ¶ 20.)  Tradeweb was under no obligation to advance a product for which there was no apparent demand and for which it had no experience or expertise.  The Tradeweb RFQ platform for IRS has provided a more transparent and efficient venue for trading as compared to voice-based OTC trading, achieving precisely the improvements that Plaintiffs claim to seek through an all-to-all platform.  That Plaintiffs might have preferred a different approach is of no moment, and cannot form the basis of an antitrust claim.

B.      **Allegations Regarding the Prices Tradeweb Charges for Dealerweb Do Not Give Rise to an Inference of Conspiratorial Intent**

Nor do the Complaints adequately allege that the differences in pricing between Dealerweb and Tradeweb are the result of any conspiratorial conduct.  (CAC ¶ 134; JTC ¶ 277.)  As discussed above, Tradeweb's platforms mirror and reflect the actual experiences and expectations of market participants.  Dealers historically traded among themselves for entirely different purposes.  (*See* Ex. 1 at 9.)  Moreover, the Dealerweb platform is offered on a platform entirely different from Tradeweb's RFQ platform and based on a newer technology (which required additional investment by Tradeweb).  Accordingly, it is not surprising that Dealerweb prices are different, as one would expect from differentiated products.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (explaining that price differentials are reflective of differentiated products).  The Complaints offer no allegations, other than their own speculation, to suggest that the alleged price difference serves a conspiratorial purpose or is the result of a conspiracy.  As discussed above, there is simply no basis to infer that Tradeweb participated in any conspiracy, and thus no basis to infer that the alleged price difference is a result of conspiratorial conduct.

**C.     Allegations That Tradeweb Was a "Forum" For the Supposed Conspiracy Do Not Support a Section 1 Claim**

The Complaints contend that the Dealer Defendants used the Tradeweb joint venture as a forum to hold "secret meetings" to coordinate the alleged conspiracy under the guise of a lawful enterprise.  (CAC ¶¶ 21, 116; JTC ¶¶ 24, 260.)  These allegations fail to support an inference of conspiratorial conduct by Tradeweb.

*First*, the law is clear: "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).  This is true even where the meetings are "between persons engaged in competing businesses."  *United States v. Taubman*, 297 F.3d 161, 166 (2d Cir. 2002) (affirming that participation in an antitrust conspiracy cannot be inferred "from the fact of meetings between persons engaged in competing businesses"); *see also United States v. Gen. Elec. Co.*, 869 F. Supp. 1285, 1291–92 (S.D. Ohio 1994) (refusing to find that a director acted on behalf of his employer's co-venturer merely because he and co-venturer employees attended board of directors' meetings together).

*Second*, allegations that Tradeweb's meetings or conference calls, or even meals, were confidential does not somehow make them conspiratorial.  (CAC ¶¶ 126, 128–29; JTC ¶¶ 270–73.)  Confidentiality is commonplace and necessary in business, especially in highly competitive, evolving industries where innovative business strategies and technological developments are crucial to remaining competitive.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023–24 (N.D. Cal. 2007); *see also In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *43 (S.D.N.Y. Aug. 4, 2015) ("It is . . . not unreasonable for a trade organization to keep legitimate meetings among its members private.").

*Third*, allegations that Tradeweb served as a forum for the supposed conspiracy fail because they do not implicate Tradeweb *itself*. Instead, they focus on certain of the Dealer Defendants' communications. Plaintiffs contend that the investor Dealer Defendants "installed themselves on Tradeweb's Board of Directors and a variety of 'committees,'" (CAC ¶ 21; JTC ¶ 24), to "control Tradeweb's IRS business strategy." (CAC ¶ 116; JTC ¶ 260.) Plaintiffs also allege, without any specifics whatsoever, that as "part of their joint agreement, the Dealer Defendants that invested in Tradeweb . . . secretly agreed with each other that they would not support other trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all trading." (CAC ¶ 111; JTC ¶ 257.) While these allegations reference Tradeweb, they do not point to actions of Tradeweb or otherwise implicate Tradeweb in the alleged conspiracy. Furthermore, the investor Dealer Defendants had strong unilateral reasons not to do things that "threatened their investment in Tradeweb." (*Id.*)

The decision in *In re Processed Egg Producers Antitrust Litigation*, 821 F. Supp. 2d 709, 715 (E.D. Pa. 2011), is instructive. There, the plaintiffs alleged that certain egg producers and trade associations conspired to raise egg prices and accomplished this, in part, via meetings of the defendant associations, in which certain employees of the producers held leadership positions. The court dismissed the Sherman Act Section 1 claim against one of the associations, the UEA, finding that it "can only sustain § 1 liability when it acted *as an entity*." *Id.* at 754 (emphasis added). Because it is improper to "'impute the activities of [an] organization's members to the organization itself,'" the court held that it could not "impute the conduct of UEA leadership or staff to UEA." *Id.* at 753; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (affirming dismissal of a complaint against certain member banks and MasterCard and Visa because "adopting or following the [rules] set by a Consortium is

insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013).

*Fourth*, to the extent the complaints are challenging legitimate joint venture decisions by Tradeweb, such decisions are immune from *per se* scrutiny under the antitrust laws. *See Texaco, Inc. v. Dagher*, 547 U.S. 1, 6–7 (2006) ("Per se liability is reserved for 'plainly anticompetitive' agreements" and the decisions of a legitimate joint venture are not plainly anticompetitive); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 772 n.18, 776 (1984) (holding that the conduct of a "single economic unit" "falls outside the reach of" Section 1 of the Sherman Act); *id.* at 768 (joint ventures are not judged under the antitrust "per se" rule).

### D. Tradeweb's Joint Venture Ownership and Governance Structure Do Not Support an Inference that Tradeweb Participated in a Conspiracy

The Complaints also attempt to link Tradeweb to the supposed conspiracy by alleging that "Project Fusion" was orchestrated by the Dealer Defendants to prevent Tradeweb from developing an all-to-all IRS platform. (*See* CAC ¶ 19; JTC ¶ 23.) In an effort to turn Project Fusion into something suggestive of a conspiracy, Plaintiffs allege that Project Fusion involved an underhanded, secret agreement to create a "shadow company" solely "to host the conspiracy." (CAC ¶¶ 106–07; JTC ¶¶ 253–54.) Plaintiffs maintain that "[n]owhere was it revealed that" this new entity, Tradeweb New Markets, was created or that the "Dealer Defendants would own an overwhelming majority (80%)" of it. (CAC ¶ 106; JTC ¶ 253.) Plaintiffs are wrong. In fact, all of this information is and has been public for eight years: Thomson disclosed the creation of Tradeweb New Markets and its ownership in the Form 20-F it filed with the SEC for the fiscal year ending December 31, 2007, as well as in other public filings. (*See, e.g.*, Ex. 6 at 87.)

Even if Tradeweb or Thomson had not disclosed this information—they did—Plaintiffs fail to articulate why this would matter. Any decision by Tradeweb to keep certain information

about its corporate organization confidential is not evidence of conspiratorial intent. *See, e.g.*, *In re Libor*, 2015 WL 4634541, at *43 ("[T]here is nothing inherently wrong or . . . unreasonable for a trade organization to keep legitimate meetings among its members private"). More to the point, rhetoric about a "shadowy" Tradeweb New Markets entity has no effect on Plaintiffs' claims. The press releases cited in the CAC plainly state that the 2007 deal was creating "a partnership" whereby *some* Dealer Defendants would provide liquidity to Tradeweb's platforms and be actively involved in developing and maintaining Tradeweb's online marketplaces.[10] (*See* Ex. 5 at 1–2.) The fact that some but not all of the Dealer Defendants owned a larger stake in one Tradeweb subsidiary than in another is immaterial to Plaintiffs' claims. In all, Plaintiffs allegations describe nothing more than the normal operations of a legitimate joint venture and its investors, which necessarily involves customary and — occasionally — confidential meetings about the venture's business.

E.     **Allegations of Parallel Conduct by Tradeweb and ICAP Do Not Give Rise to An Inference of Conspiratorial Intent**

Finally, Plaintiffs summarily argue that Tradeweb and ICAP "agreed to a détente whereby the Dealer Defendants would not further expand (through Dealerweb) into the IDB space in exchange for ICAP not expanding into the dealer-to-client space." (CAC ¶ 150; JTC ¶ 293.) This claim fails for at least four reasons.

*First*, Tradeweb did launch a dealer-to-dealer platform: Dealerweb. It is open to the buy-side, as are ICAP's platforms. (*See* Ex. 1 at 8 (quoting an ICAP executive as saying the firm has "dozens of non-banks registered with our SEF – asset managers, pension funds, state treasuries, hedge funds").)

---

[10]     For this reason, Tradeweb expressly incorporates the arguments advanced by the Dealer Defendants and ICAP that Plaintiffs' claims are both time-barred and fail to establish any antitrust injury. (Dealer Defs.' Mem. 47–54, 69–80.)

*Second,* allegations that neither ICAP nor Tradeweb offered an all-to-all platform for IRS trading is, at most, no more than "parallel conduct," routinely rejected as insufficient on its own to state a plausible Section 1 claim. *Id.* at 554, 557 (explaining that parallel conduct is "in line with a wide swath of rational and competitive business strategy" and therefore cannot create an inference of conspiracy); *see also In re Zinc*, 155 F. Supp. 3d at 366, 367 n.25; *Wellnx*, 516 F. Supp. 2d. at 291.

*Third*, Plaintiffs do not allege *any* communications between Tradeweb and ICAP to suggest Tradeweb knew *anything* about ICAP's strategy for its platforms. And there are no other "plus factors" connecting Tradeweb to ICAP. Simply, there are no allegations "pointing toward a meeting of the minds."[11] *Twombly*, 550 U.S. at 557.

*Fourth,* as discussed above, Plaintiffs' conclusory pleadings fail to show that the alleged conduct by Tradeweb is inconsistent with independent, self-interested action. Plaintiffs speculate that Tradeweb's successful introduction of Dealerweb in the MBS inter-dealer business is somehow indicative of Tradeweb threatening ICAP. (CAC ¶ 148; JTC ¶ 291.) And that, in turn, ICAP chose not to open its own inter-dealer platform to end-users. (CAC ¶ 150; JTC ¶ 293.) This unabashed speculation is not backed up by any facts. Indeed, the "facts" are simple: Tradeweb was successful in some of its products but not others. There is no basis to infer conspiratorial conduct from such allegations.

---

[11]     Moreover, any allegations concerning an agreement or understanding that the Dealer Defendants reached with ICAP cannot sustain an alleged agreement between ICAP and Tradeweb. *In re Processed Egg*, 821 F. Supp. 2d at 746–47 (declining to impute liability to a group of defendants where plaintiffs did not plead allegations connecting each defendant directly to the conspiracy); *see Hinds*, 620 F. Supp. 2d at 513 (finding that at the pleading stage, each defendant is entitled to know how it is alleged to have conspired, with whom and for what purpose).

## CONCLUSION

For the foregoing reasons, all claims against Tradeweb should be dismissed with

prejudice.

Dated: New York, NY
       November 4, 2016

Respectfully submitted,


  /s/ Michael J. Garvey
Michael J. Garvey
Peter Guryan
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
mgarvey@stblaw.com
peter.guryan@stblaw.com

Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
900 G Street NW
Washington, D.C. 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502
aellis@stblaw.com

*Attorneys for Tradeweb Markets LLC*