UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                         :

IN RE:                         :
                         :

INTEREST RATE SWAPS ANTITRUST LITIGATION    :    16-MD-2704 (PAE)
                         :

*This Document Relates to Tera Group, Inc., et al. v.*    :
*Bank of America Corporation, et al., 16-cv-02858 (PAE)*    :
*(S.D.N.Y.) and Javelin Capital Markets, LLC v. Bank of*    :
*America Corporation, et al., 16-cv-03542 (PAE)*    :
*(S.D.N.Y.)*    :
                         :
-------------------------------------------------------------- X

## JAVELIN AND TERAEXCHANGE PLAINTIFFS'<br>CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 3

    I.      THE MARKET FOR INTEREST RATE SWAPS ................................. 3

    II.     PLAINTIFFS CREATE ANONYMOUS ALL-TO-ALL
           TRADING PLATFORMS ................................................................... 5

    III.    DEFENDANTS CONSPIRED TO QUASH PLAINTIFFS'
           PLATFORMS ................................................................................. 6

         A.     The Dealer Defendants Boycotted Plaintiffs' Trading Platforms .............. 7

         B.     The Dealer Defendants Refused to Clear Trades on
                Plaintiffs' Trading Platforms ....................................................... 8

         C.     The Dealer Defendants Penalize Customers Exploring
                Plaintiffs' Trading Platforms ....................................................... 9

    IV.    DEFENDANTS SUCCEEDED IN QUASHING PLAINTIFFS'
           PLATFORMS ............................................................................... 11

ARGUMENT ............................................................................................. 11

    I.      DEFENDANTS' MOTIONS FAIL TO ACCEPT PLAINTIFFS'
           FACTUAL STATEMENTS AS ALLEGED ...................................... 11

    II.     THE COMPLAINT STATES A VALID CONSPIRACY CLAIM
           AGAINST EACH DEFENDANT ..................................................... 13

         A.     The Complaint Alleges That Defendants Conspired to
                Prevent the Adoption of All-To-All Trading ............................... 14

         B.     The Complaint Alleges Abundant Specific Facts to Support
                an Inference of Conspiracy ......................................................... 15

         C.     The Complaint Does Not Violate Any Rule Against
                "Group Pleading" ....................................................................... 20

    III.    DODD-FRANK DOES NOT PRECLUDE PLAINTIFFS'
           ANTIRUST CLAIMS .................................................................... 22

    IV.    DEFENDANTS DO NOT CHALLENGE PLAINTIFFS' ANTITRUST
           STANDING OR THE TIMELINESS OF PLAINTIFFS' CLAIMS ..... 22

V.     THE COMPLAINT STATES VALID CLAIMS UNDER THE DONNELLY ACT AND NEW YORK COMMON LAW ................................. 22

      A.     The Complaint States a Claim under the Donnelly Act ............................ 23

      B.     The Complaint States a Claim for Tortious Interference ......................... 23

      C.     The Complaint States a Claim for Unjust Enrichment ............................ 24

CONCLUSION .................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)........................................................................14, 15, 21

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)........................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................13, 15, 17, 19

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)........................................................................24

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988)........................................................................22

*Concord Assocs., L.P. v. Entm't Properties Trust*,
  817 F.3d 46 (2d Cir. 2016)........................................................................13

*Creative Trading Co. v. Larkin-Pluznick-Larkin, Inc.*,
  136 A.D.2d 461 (1st Dep't 1988) ........................................................................23

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
  No. 16-CV-57, 2016 WL 3773394 (S.D.N.Y. July 8, 2016)........................................11

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)........................................................................13, 14, 16, 17

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010)........................................................................21

*Innovative Biodefense, Inc. v. VSP Techs., Inc.*,
  176 F. Supp. 3d 305 (S.D.N.Y. 2016)........................................................................24

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13-MD-2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)................2, 3, 14, 17

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003)........................................................................17, 18, 19

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)...................................................................23

*In re Electronic Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)...........................................................11, 17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)....................................................................20

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   No. 14-MD-2573 (VEC), 2016 WL 5794777 (Oct. 3, 2016) .................................17

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...................................................................................16

*Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*,
   712 F.3d 705 (2nd Cir. 2013)..................................................................................22

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-CV-42 (JG), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)...........................21

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .................................................................................18

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)..............................................................16, 17, 19, 20, 21

*TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*,
   453 F. App'x 105 (2d Cir. 2011) ...........................................................................22

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011)...................................................................................23

## **Other Authorities**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. 111-203, 124 Stat. 1376-2223 (2010) ..............................................3, 5, 22

Fed. R. Civ. P. 8(a) .......................................................................................................13

N.Y. Gen. Bus. Law § 340.............................................................................................23

Plaintiffs Javelin Capital Markets LLC ("Javelin") and Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC (together, "TeraExchange," and collectively with Javelin, "Plaintiffs") hereby submit this consolidated memorandum of law in opposition to the motions to dismiss filed by (i) the Dealer Defendants (Dkt. No. 159), (ii) Tradeweb (Dkt. No. 169), and (iii) ICAP (Dkt. Nos. 165, 189) (together, "Defendants' Motions").[1]

## PRELIMINARY STATEMENT

Plaintiffs Javelin and TeraExchange each developed an anonymous all-to-all electronic trading platforms for interest rate swaps ("IRS") designed to provide IRS buy-side customers greater price transparency and competition. This case concerns a conspiracy among Defendants to boycott Plaintiffs' trading platforms in order to undermine price competition in the IRS market and maintain the Dealer Defendants' massive profits.

While the Plaintiffs' and Class Plaintiffs' complaints contain numerous factual allegations detailing each Defendant's involvement in this conspiracy, the basic workings of the group boycott are not complicated. The Dealer Defendants control the vast majority of the IRS market. They agreed to starve the Plaintiffs' platforms of trading liquidity and used their dominant position as clearing members to jointly block IRS trades by the buy-side on Plaintiffs' platforms. The Dealer Defendants also threatened buy-side customers who used or considered using Plaintiffs' trading platforms with a loss of business or services, and increased fees. Defendant Tradeweb, a company controlled by the Dealer Defendants, participated in the conspiracy by acting as a central forum

---

[1] The Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS. The full names of these entities and their affiliates, as well as the full names and affiliates of the ICAP and Tradeweb defendants, are provided in Plaintiff's Second Consolidated Complaint. Dkt. No. 145. The Dealer Defendants filed a joint brief in support of their motion, Dkt. No. 160. ("DD Mem."), and HSBC filed a supplemental brief, Dkt. No. 163.

for the Dealer Defendants' collusion and by agreeing not to launch an anonymous all-to-all IRS trading platform that would undermine the Dealer Defendants' profits. Defendant ICAP, an inter-dealer broker ("IDB") that facilitates most of the IRS trading among dealers, participated in the conspiracy by agreeing to prevent the buy-side from accessing its platform and agreeing not to launch an anonymous all-to-all platform.

Defendants have filed consolidated motions to dismiss both Javelin and TeraExchange's Second Consolidated Complaint ("Complaint") and the Second Consolidated Amended Class Action Complaint ("Class Plaintiffs' Complaint," and together with the Complaint, the "Complaints") primarily on the grounds that the Complaints fail to plead a plausible antitrust conspiracy. As discussed below and in the Class Plaintiffs' opposition memorandum, Defendants' arguments are without merit.[2]

<u>First</u>, Defendants repeatedly mischaracterize the well-pled allegations in the Complaint, often egregiously, and assert purported facts that are not alleged in the Complaint.

<u>Second</u>, Defendants' assertion that the Complaint fails to allege a plausible antitrust violation is undermined by the overwhelming weight of legal authority, including *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476 (DLC), 2014 WL 4379112, at *10 (S.D.N.Y. Sept. 4, 2014) ("*CDS*"). The actual allegations in the Complaint set forth a plausible and all too familiar conspiracy among the defendant financial institutions to protect an enormous profit center from competition. The Complaint explains in detail the who, when, where, how, and why of Defendants' conspiracy, the aim of which was to prevent the emergence of all-to-all trading platforms in order to keep bid-ask spreads artificially wide. Plaintiffs have also alleged ample

---

[2] Because Defendants submitted consolidated motions to dismiss both Complaints, Plaintiffs join Class Plaintiffs' opposition memorandum on arguments that apply to both Complaints.

circumstantial evidence and plus factors to support an inference of a conspiracy among Defendants, including specific examples of Defendants' coordinated sabotage of Plaintiffs' platforms.

Third, Defendants' alternative argument that the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376-2223 (2010) ("Dodd-Frank"), shields Defendants from antitrust liability is expressly contradicted by the Act's broadly-worded antitrust savings clause. *See CDS*, 2014 WL 4379112, at *16-17.

Fourth, Plaintiffs have properly alleged claims for relief under the Donnelly Act and New York common law.

Accordingly, Defendants' Motions should be denied in their entirety.

## STATEMENT OF FACTS

## I.    THE MARKET FOR INTEREST RATE SWAPS

An IRS is a financial product whereby two parties agree to trade interest-rate-based cash flows over a fixed period of time. Complaint ¶ 2. Typically, one party to an IRS pays cash flows based on a fixed interest rate while the counterparty pays cash flows based on a floating interest rate, keyed to a benchmark such as LIBOR. *Id.* Buy-side customers, such as Class Plaintiffs, use IRS to manage risk related to fluctuating interest rates. *Id.* ¶ 3. The market for IRS is enormous, with hundreds of trillions of dollars in notional value traded each year. *See id.* ¶ 69.

The Dealer Defendants have positioned themselves as the dominant market makers of IRS, acting as sellers (the "sell-side") to non-dealers seeking to trade IRS (the "buy-side"). *Id.* ¶ 70. The Dealer Defendants collectively control the vast majority of the IRS market in the United States. *Id.* ¶ 362. In a typical IRS trade, a dealer will offer a "bid" price equal to the fixed rate the dealer is willing to receive on the IRS, or an "ask" price equal to the fixed rate the dealer is willing to pay on the IRS. *Id.* ¶ 71. The difference between the bid and ask price is known as the "bid-ask spread"

or the "spread." *Id.* Generally speaking, the wider the spread between the bid and ask prices, the more money the Dealer Defendants make at the expense of the buy-side. *Id.* ¶ 73. IRS represent an extraordinary profit center for the Dealer Defendants, resulting in billions of dollars in profits each year. *Id.* ¶ 14.

In the early days of IRS trading, contracts were not standardized and typically had to be negotiated and documented on a trade-by-trade basis. *Id.* ¶ 67. A buy-side customer seeking to trade IRS would have to contact the Dealer Defendants for price quotes in an over-the-counter ("OTC") market. *Id.* ¶ 3. This outmoded market structure grants the Dealer Defendants an enormous information advantage over their customers, resulting in wider spreads (and greater profits for the Dealer Defendants). *Id.* ¶¶ 6, 9. The Dealer Defendants developed a separate interdealer market in which to trade among themselves on electronic trading platforms akin to order books, resulting in much narrower spreads.[3] *Id.* ¶¶ 81, 82, 85, 129.

As with other financial markets, technological advances and the standardization of IRS trades allowed for the potential for buy-side customers to access more efficient, transparent, and competitive pricing for IRS. *Id.* ¶¶ 10, 68, 77. Specifically, electronic trading protocols could facilitate an "all-to-all" IRS market that would allow buy-side customers to trade with a larger community of market participants, including non-traditional liquidity providers and other buy-side customers. *Id.* ¶ 4. On platforms that offer all-to-all trading, a buy-side customer can trade with *any* qualified trading partner and is not artificially limited to trading with dealers. *Id.* All-to-all trading yields greater price competition because it increases the number of potential counterparties with whom buy-side customers can trade. *Id.* Congress has recognized the benefits of electronic

---

[3] An order-book is a system in which participants submit bids and offers that are then automatically matched in order to facilitate efficient trading.

trading. Dodd-Frank mandates that standard IRS move to exchanges or swap execution facilities ("SEFs"), which were envisioned as electronic trading platforms that would allow trading on an all-to-all limit order-book. *Id.* ¶ 99.

The development of central clearing also supported the adoption of all-to-all anonymous trading. *Id.* ¶ 88. Under central clearing, a clearinghouse stands in the middle of each transaction, meaning that each counterparty enters into an IRS transaction with a central clearinghouse rather than the other counterparty, thereby reducing each counterparty's risk that the other will default on its obligations. *Id.* ¶¶ 88, 92. Like the markets for many other asset classes, the IRS market uses a futures commission merchant ("FCM") clearing model, which places an FCM member of a clearinghouse between the parties and the clearinghouse itself. *Id.* ¶¶ 90, 93, 134, 139. The Dealer Defendants have conspired, however, to effectively make the Dealer Defendant FCMs gatekeepers for IRS clearing by imposing unnecessarily burdensome capital and credit hurdles. *Id.* ¶¶ 100, 133, 139.

## II.    PLAINTIFFS CREATE ANONYMOUS ALL-TO-ALL TRADING PLATFORMS

Javelin and TeraExchange were founded in 2009 and 2010, respectively, by experienced derivative trading and technology professionals to develop the anonymous all-to-all trading platforms demanded by buy-side customers. *Id.* ¶¶ 104, 115. Javelin and TeraExchange each spent millions of dollars and invested years of effort to develop and implement their electronic all-to-all trading platforms. *Id.* ¶¶ 108, 115. Javelin and TeraExchange granted IRS traders access to various all-to-all trading options, but primarily focused on offering an anonymous order-book trading platform with all-to-all liquidity. *Id.* ¶¶ 105, 110, 117. Javelin and TeraExchange each developed the functionality to execute and clear trades by 2011. *Id.* ¶¶ 109, 119.

Javelin and TeraExchange also developed their own live pre-trade credit check systems to comply with the FCM clearing model. By 2012, TeraExchange had developed a live credit

confirmation tool to facilitate trade clearing, known as TeraCheck, which enabled TeraExchange to perform pre-trade credit checks using customer credit information provided by the customers' FCM. *Id.* ¶ 120. By 2013, Javelin also created its own live credit check system, called the Credit Limit Management System ("CLMS"), so that FCMs could provide pre-trade credit limits for their customers to Javelin, allowing Javelin to confirm whether a customer had sufficient credit to execute and clear a trade. *Id.* ¶ 111. Although Plaintiffs had the functionality to conduct pre-trade credit checks, they also developed technology to connect to later-developed third party credit hubs, such as the hub operated by Traiana. *Id.* ¶¶ 111, 120.

On September 19, 2013, the CFTC granted Javelin and TeraExchange temporary registration as SEFs, at which point both were ready to meet IRS traders' demands for a transparent, anonymous all-to-all trading platform with functionality for live credit checks. *Id.* ¶¶ 112, 122.[4] On October 1, 2013, Javelin successfully executed and cleared its first trade as a SEF, and by late 2014, it had signed up, or "onboarded," approximately 80 buy-side entities to trade on its platform. *Id.* ¶¶ 112-13. TeraExchange also received commitments from dozens of buy-side entities and non-traditional liquidity providers to its platform. *Id.* ¶ 194. Both Javelin and TeraExchange later received full SEF registration. *Id.* ¶¶ 112 n.16, 122.

## III.   DEFENDANTS CONSPIRED TO QUASH PLAINTIFFS' PLATFORMS

The Dealer Defendants engaged in a group boycott to crush the threat that all-to-all trading platforms posed to the Dealer Defendants' massive IRS profits. *Id.* ¶ 16. As detailed below and in the Complaint, the Dealer Defendants' efforts to squash Plaintiffs have taken several forms, including refusing to deal with Plaintiffs, using clearing affiliates to refuse to clear trades executed

---

[4] Javelin conducted its SEF trading activities through a subsidiary, Javelin SEF LLC. In November 2016, that entity was acquired by a third party, at which time Javelin SEF assigned to Javelin all of its claims in this action. Complaint ¶ 29.

on Plaintiffs' platforms, and confronting customers who used or considered using these platforms with a loss of business or services, or increased fees. *Id.* Because no individual Dealer Defendant could prevent Plaintiffs' all-to-all platforms from flourishing, the Dealer Defendants had to collude to prevent the emergence of these platforms and thereby protect their massive IRS profits. *Id.* ¶ 377.

To coordinate this conspiracy, Defendants communicated extensively through a number of forums in which they jointly participated, including the boards of Defendant Tradeweb, the International Swaps and Derivatives Association ("ISDA"), the Futures Industry Association ("FIA"), and OTCDerivNet, as well as in informal settings. *Id.* ¶¶ 126-27, 351. The Dealer Defendants also made use of their respective "strategic investment groups," which focused on protecting the dealer community from the growth of all-to-all trading. *Id.* ¶¶ 275-77, 281. In addition, the heads of the Dealer Defendants' IRS trading desks maintained an ongoing dialogue to better coordinate their efforts to maintain the status quo and prevent the emergence of anonymous all-to-all trading. *Id.* ¶¶ 126-27.

### A. The Dealer Defendants Boycotted Plaintiffs' Trading Platforms

Plaintiffs both sought liquidity from each of the Dealer Defendants for their trading platforms. *Id.* ¶¶ 151, 185, 189. But, in a coordinated response, the Dealer Defendants collectively refused to provide such liquidity, masking their actions with identical pretextual excuses for the refusals, such as the purported need to conduct lengthy legal reviews of the platforms' rulebooks. *Id.* The only Dealer Defendant to "provide liquidity" to either Plaintiff was RBS, which briefly streamed unfavorable prices on Javelin's platform, resulting in no trades with buy-side customers, and with the true intention of keeping tabs on and controlling Javelin. *Id.* ¶¶ 153, 159. While discussing their refusal to permit trades on TeraExchange, representatives of multiple Dealer

Defendants referred to TeraExchange as a "Trojan Horse." *Id.* ¶ 215. In marked contrast, the Dealer Defendants at the same time were streaming liquidity on other trading platforms that complied with the bifurcated IRS market that generates immense profits for the Dealer Defendants. *Id.* ¶¶ 22, 155 n.33, 224, 294.

Rather than explore trading on Plaintiffs' platforms, the Dealer Defendants used meetings with Javelin and TeraExchange to explore ways to undermine the platforms. *Id.* ¶¶ 144-45, 149, 151-54, 186-88. Executives from Goldman Sachs, for example, used a meeting with Javelin in September 2013 to fish for the names of buy-side customers signed up for Javelin's platform in order to later discourage those customers from trading on the platform. *Id.* ¶ 144. Goldman Sachs, Barclays, Bank of America, Credit Suisse, Citi, Deutsche Bank, and Morgan Stanley coordinated with one another and arranged meetings with TeraExchange under the guise of exploring trading on TeraExchange's platform, but with the real goal of taking the platform over and shutting it down. *Id.* ¶¶ 186-88. TeraExchange personnel arrived at these meetings expecting to discuss Defendants' potential use of the platform, but were instead met by personnel from each bank's strategic investment group who attempted to take over TeraExchange. *Id.*

## B.   The Dealer Defendants Refused to Clear Trades on Plaintiffs' Trading Platforms

Despite the Dealer Defendants' refusal to trade on Plaintiffs platforms, both were able to secure the participation of dozens of buy-side customers and non-traditional liquidity providers. *Id.* ¶¶ 113, 194. Determined to stop this threat, the Dealer Defendants effectively prevented the buy-side from trading on Plaintiffs' platforms by directing their affiliated FCMs to withhold clearing services on the platforms. *Id.* ¶ 137. This coordinated misconduct was directly contrary to the economic self-interests of the FCMs, which earn fees per trade submitted for clearing and, absent a conspiracy, would want to maximize the number of trades cleared, regardless of where or

how the trades were executed. *Id.* ¶¶ 135-38.

Among other tactics, the FCMs prevented customers from trading on Plaintiffs' platforms by refusing to provide customers pre-trade credit checks to Plaintiffs' platforms, despite routinely providing such credit checks to other platforms that did not offer meaningful anonymous all-to-all trading, such as Tradeweb and Bloomberg. *Id.* ¶ 140. This refusal to provide credit checks to Plaintiffs' trading platforms had no proper justification, as the risk that FCMs face is the risk that their buy-side clearing clients default, a risk in no way connected to the platform on which those customers trade. *Id.* ¶ 136. When Javelin employees pressed a representative of the Goldman Sachs FCM about its refusal to provide pre-trade credit limits for a customer seeking to trade on Javelin, the representative stated that if Goldman Sachs were somehow forced to provide credit checks for Javelin, it would simply set the credit limits for all of its customers who attempted to trade on Javelin to "zero," thereby preventing any of their trades from clearing. *Id.* ¶ 174.

The Dealer Defendants also blocked clearing on TeraExchange for purported rulebook reviews that have never been completed. *Id.* ¶ 205. The next business day after TeraExchange completed its first IRS trade, BNPP, Citi, JP Morgan, and UBS all notified TeraExchange that they would not clear trades on its platform until they conducted an audit of the firm's rulebook. *Id.* Other Dealer Defendants later blocked trading on TeraExchange for purported rulebook reviews that were also never completed. *Id.* Dealer Defendant FCMs also denied clearing services to Javelin pending rulebook reviews that were severely delayed or never completed. *Id.* ¶¶ 162, 169-70.

## C. The Dealer Defendants Penalize Customers Exploring Plaintiffs' Trading Platforms

In addition, the Dealer Defendants directly pressured their existing customers not to trade on Javelin or TeraExchange, and penalized any buy-side entity caught trading on either platform.

*Id.* ¶¶ 173-75, 195, 213-16, 267. When, for example, Goldman Sachs learned in August 2013 that NISA Investment Advisors LLC ("NISA"), a buy-side entity, wanted to trade on Javelin, a bank executive informed NISA that Goldman Sachs would withdraw all clearing services in any trading venue if NISA traded on Javelin, ultimately resulting in NISA abandoning the Javelin platform. *Id.* ¶ 173. The Dealer Defendants were also successful in blocking TeraExchange from providing smaller IDBs with access to SEF services. *Id.* ¶¶ 213-16. Despite TeraExchange's agreements with nearly a dozen smaller IDBs, the Dealer Defendants refused to consent to the IDBs' use of TeraExchange. *Id.* ¶ 213-14.

The Dealer Defendants police the threat of buy-side customers trading on platforms reserved for dealers through a practice known as "name give-up." *Id.* ¶ 19. Name give-up requires disclosure of each swap counterparty's identity to the other on every trade. The Dealer Defendants impose this practice on IDBs for the sole purpose of enabling dealers to prevent buy-side customers from trading on the IDBs' efficient, electronic platforms. Any platform that does not comply, such as Javelin or TeraExchange, is boycotted by the Dealer Defendants' cartel. *Id.*

The Dealer Defendants' requirement for name give-up effectively sabotaged the adoption of Plaintiffs' platforms. Many buy-side firms initially explored all-to-all trading through aggregator platforms that streamed quotes from multiple SEFs, including IDBs and Javelin.[5] *Id.* ¶ 179. The buy-side found aggregators useful because they provided a consolidated view of the market and greater access to all-to-all liquidity. However, interest in aggregator use quickly subsided when news spread that a dealer-friendly IDB had contacted buy-side customers using an aggregator about a trade that had been routed to the IDB through the aggregator, thereby revealing

---

[5] A group within UBS developed one of the aggregator platforms. UBS's trading desk and clearing group nonetheless continued to participate in the conspiracy to boycott all-to-all trading platforms, including Plaintiffs' platforms. *See, e.g.*, Complaint ¶¶ 127, 179 n.37, 205, 294, 306, 321.

that aggregators were far from anonymous. *Id.*

The Dealer Defendants also used their joint control over Tradeweb to cause that firm to agree not to launch an anonymous all-to-all electronic trading platform. *Id.* ¶¶ 23, 313. Defendant ICAP agreed with the Dealer Defendants to prevent the buy-side from accessing its platform and not to launch an anonymous all-to-all IRS trading platform in exchange for the Dealer Defendants agreeing not to expand Tradeweb's affiliate, Dealerweb, into the IDB space. *Id.* ¶¶ 335, 337.

## IV.  DEFENDANTS SUCCEEDED IN QUASHING PLAINTIFFS' PLATFORMS

Defendants ultimately succeeded in shutting down Javelin and TeraExchange's SEF platforms. *Id.* ¶¶ 182-84, 217-18. As a result of Defendants' collusion, Javelin and TeraExchange today effectively facilitate no IRS trading despite years of development and the investment of millions of dollars in capital. *Id.* Absent the Dealer Defendants' group boycott, IRS market participants would trade on Javelin's and TeraExchange's platforms in substantial volumes. *See id.* ¶¶ 96, 113, 194. Defendants' conspiracy has succeeded in keeping the IRS market bifurcated and in limiting buy-side customers to IRS trading platforms that use a request for quote ("RFQ") protocol, whereby an investor requests quotes from several dealers, which is substantially the same lopsided trading environment the buy-side has faced with the Dealer Defendants for decades. *Id.* ¶¶ 22, 233

## ARGUMENT

## I.  DEFENDANTS' MOTIONS FAIL TO ACCEPT PLAINTIFFS' FACTUAL STATEMENTS AS ALLEGED

In assessing a motion to dismiss, a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) ("*eBooks*") (citation omitted); *see also Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, No. 16-CV-57,

2016 WL 3773394, at *3 (S.D.N.Y. July 8, 2016) (Engelmayer, J.) (same). As noted in Class Plaintiffs' brief, Defendants disregard this basic legal principle by systematically mischaracterizing, ignoring, or contradicting the factual allegations in the Complaint in an effort to construct a self-serving counter-narrative, and improperly attempt to introduce extrinsic materials that should be disregarded by the Court. Examples of Defendants' mischaracterizations of Plaintiffs' allegations include:

- **"[M]any of the Dealers actually *supported* one or more all-to-all trading platforms." DD Mem. at 2; *see also id.* at 32.** The Complaint clearly alleges that "none of the Defendant Banks, except RBS for a limited period of time, offered to trade on or provide liquidity to Javelin," and "none offered to trade on, or provide liquidity to, TeraExchange" Complaint ¶¶ 151, 189. Some Dealer Defendants trade on non-party trueEX, but this activity is limited to "trueEX's non-anonymous, dealer-to-customer RFQ platform, which uses protocols that effectively replicate OTC trading." *Id.* ¶¶ 223-24.

- **"[A]t least two Dealers supported Javelin notwithstanding a relatively low level of interest in that platform." DD Mem. at 32.** While one Dealer Defendant, RBS, "briefly provide[d] liquidity to Javelin," RBS "did not do so in a meaningful way" as it "primarily streamed prices at unfavorable bid/ask spreads that resulted in two trades with buy-side customers." Complaint ¶ 153. Defendants' assertion that UBS supported Javelin is likewise misleading. DD Mem. at 20. As alleged in the Complaint, UBS's trading and clearing desks joined the other Dealer Defendants in refusing to provide liquidity to Javelin and blocking trade clearing on the platform, rendering UBS's aggregator useless. Complaint ¶ 179 n.37.

- **"Tera elected not to recruit any Dealers to its platform based on a deliberate strategy of recruiting 'alternative liquidity providers' instead of traditional dealers." DD Mem. at 32.** In fact, "TeraExchange readily agreed [to meetings with the Dealer Defendants] as it hoped to secure Dealer Defendants' support," and "TeraExchange talked with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading or providing liquidity to the TeraExchange platform." Complaint ¶¶ 187, 189. In the face of the Dealer Defendants' boycott, TeraExchange tried to keep its business afloat by targeting non-traditional liquidity providers and opening its platform to smaller IDBs. *Id.* ¶¶ 190-94, 211-17.

- **"Bloomberg and Tradeweb offered anonymous all-to-all IRS trading beginning in 2013, yet encountered no alleged difficulties with the Dealers." DD Mem. at 32; *see also id.* at 36.** The Complaint actually alleges that "due to the Dealer Defendants' conspiracy *not a single SEF offering all-to-all anonymous trading currently does any meaningful business in the IRS market.*" Complaint ¶ 371. All or virtually all of the trades on Bloomberg, Tradeweb, and trueEX are dealer-to-customer trades using the RFQ trading platform that is consistent with Defendants' conspiracy. *See id.* ¶¶ 155 n.33, 224, 253.

Bloomberg's order-book platform sees virtually no IRS activity, as it is not promoted by Bloomberg, the Dealer Defendants refuse to trade on it, and buy-side firms fear they will face retaliation from the Dealer Defendants if they use it. *Id.* ¶ 254.

- **"Before Tera and Javelin connected to the Traiana credit hub, the Dealers' FCMs would have had to build costly direct data connections to Tera and Javelin to interact with those platforms." DD Mem. at 21 n.40.** In fact, by 2013 Javelin and TeraExchange had developed pre-trade credit confirmation tools, TeraCheck and CLMS, and successfully tested and used those systems.[6] Complaint ¶¶ 111, 120. To the extent Defendants wish to argue, however meritless, that "push" credit check systems have limitations or that direct data connections are necessary, such issues raise questions of fact that are not appropriate for consideration on a motion to dismiss.

## II.   THE COMPLAINT STATES A VALID CONSPIRACY CLAIM AGAINST EACH DEFENDANT

On a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, *Twombly*, 550 U.S. at 556. There is "is no heightened pleading standard in antitrust cases," and a plaintiff need only set forth "a 'short plain statement' of facts supporting a plausible claim." *Concord Assocs., L.P. v. Entm't Properties Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting Fed. R. Civ. P. 8(a)).

To withstand dismissal, an antitrust plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action," and the "choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Gelboim v. Bank*

---

[6] Dealer Defendants claim that the Complaint lacks "allegations that clearing on Tera and Javelin was unavailable through non-defendant FCMs." DD Mem. at 36. All or substantially all buy-side customers use the Dealer Defendant FCMs for trade clearing, so the conspiracy among their FCMs essentially blocked all trading on Plaintiffs' platforms. Complaint ¶ 100 n.14. The few trades that did clear on Plaintiffs' platforms predominantly involved financial institutions that self-cleared their own trades. *See id.* ¶ 153 (RBS did not conduct any trades with buy-side customers).

of Am. Corp., 823 F.3d 759, 781 (2d Cir. 2016) (quoting Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184-85 (2d Cir. 2012)). A plaintiff adequately pleads an antitrust conspiracy by alleging (i) an "actual agreement" by providing the "various dates" on which defendants "met or communicated" to "plan[] a concerted boycott" along with other circumstantial details, see Anderson News, 680 F.3d at 187, or (ii) facts that support an inference of unlawful agreement. Gelboim, 823 F.3d at 781. The Complaint more than adequately states an antitrust conspiracy under these tests.

### A.    The Complaint Alleges That Defendants Conspired to Prevent the Adoption of All-To-All Trading

A complaint alleges an actual agreement if it alleges not only that defendants' actions were coordinated, "but also includes dates of meetings and specifies the names or positions of defendants' representatives who attended."  CDS, 2014 WL 4379112, at *10 (citing Anderson News, 680 F.3d at 187).

As alleged in the Complaint, the Dealer Defendants' "strategic investment groups" coordinated with each other to form a "dealer consortium" strategy whereby the Dealer Defendants jointly controlled the IRS market to protect their common interests. Complaint ¶ 275. The Complaint alleges that many Defendants employ "similar 'strategic investment' groups to coordinate with their competitors to control market structures," and identifies the groups' leaders by name. Id. ¶¶ 277-78. Pursuant to their dealer consortium strategy, the Dealer Defendants took joint majority control of Tradeweb's IRS business to block it from threatening the Dealers' IRS profits, and they then used Tradeweb as a forum for continuing their conspiracy to block all-to-all trading platforms, including those offered by Plaintiffs. Id. ¶¶ 283-86, 295, 307-10. The Complaint further explains that the Dealer Defendants "met and colluded under the auspices" of the FIA, as well as the ISDA. Id. ¶¶ 320-322. In addition, the Dealer Defendants' respective heads of IRS

trading met at monthly meetings in New York City from 2013 to 2015 to "coordinate their positions regarding the IRS market and to ensure none of them broke ranks to support electronic trading platforms that would threaten the Dealer Defendants' control of the market," *id.* ¶ 327, and they communicated regarding the conspiracy via telephone, email, and Bloomberg messages, as well as at "lunches, dinners, industry conferences, and other events." *Id.* ¶ 127, 280.

The Complaint thus alleges in detail the existence of an agreement, its membership, the time of its formation, its anticompetitive purpose, the name of the strategy that gave rise to it, and how it was hidden from public view. These allegations are more than sufficient to state a plausible claim under any accepted standard. *See Anderson News*, 680 F.3d at 187-89.

### B. The Complaint Alleges Abundant Specific Facts to Support an Inference of Conspiracy

The Complaint is replete with examples of individual Dealer Defendants using similar tactics at the same time to sabotage Plaintiffs' trading platforms. *See Anderson News*, 680 F.3d at 182 (antitrust conspiracy claim may be pled by alleging "circumstances, occurrences, and events" that plausibly suggest agreement (quoting *Twombly*, 550 U.S. at 555 n.3)). One business day after TeraExchange completed the first IRS trade on its platform, BNPP, Citi, JPM, and UBS all told TeraExchange that they would not clear any trades executed on TeraExchange until they conducted an audit of the platform's rulebook. Complaint ¶¶ 204-05. Soon afterwards, other Dealer Defendants asserted similar purported needs to audit TeraExchange's rulebook, none of which were ever completed. *Id.* ¶ 205. Barclays, Goldman Sachs, and Morgan Stanley asserted similar purported needs to review Javelin's rulebook, *id.* ¶ 170, and Deutsche Bank strung Javelin along for fifteen months for a legal review that was never completed despite interest in trading on Javelin from Deutsche Bank's clearing customers and Deutsche Bank's successful testing of Javelin's platform. *Id.* ¶¶ 162-69. Defendants also quoted different clearing fees for customers who sought

to trade on Plaintiffs' platforms. *Id.* ¶ 201.

When TeraExchange initially tried to meet with the Dealer Defendants regarding their participation on TeraExchange's platform, seven of the Dealer Defendants separately had their strategic investment groups offer to invest in the platform with the goal of taking it over and shutting it down. *Id.* ¶¶ 186-88. Multiple representatives of the Dealer Defendants later referred to TeraExchange as a "Trojan Horse" while explaining their refusal to permit trades on TeraExchange. *Id.* ¶ 215.

The Complaint alleges that a named Morgan Stanley executive secured a modification to Javelin's standard NDA so he could "discuss Javelin," as well as the 80 investor firms that had expressed interest in it, "with other Dealer Defendants." *Id.* ¶ 149. And the Complaint details how the Dealer Defendants utilized "name give-up" as a policing mechanism to enforce compliance with their scheme. *See, e.g.*, *id.* ¶¶ 234-35, 242-43.

When assessing whether a conspiracy may be inferred from the actions of defendants, courts consider "allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors." *Gelboim*, 823 F.3d at 781 (internal quotations omitted). The plus factors include (1) "a common motive to conspire"; (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators"; and (3) "evidence of a high level of interfirm communications." *Id*. Defendants rely heavily on *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013), but the circumstantial evidence and plus factors alleged in the Complaint surpass those in *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010), which the *Citigroup* court cites as an example of a well-pled complaint. Like *Starr*, Plaintiffs have clearly alleged sufficient circumstantial evidence and plus factors to meet this pleading standard:

***Common motive to conspire****:* Courts recognize that a conspiracy may be inferred where common motive to conspire is alleged. *See, e.g.*, *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-MD-2573 (VEC), 2016 WL 5794777, at *15 (S.D.N.Y. Oct. 3, 2016); *Gelboim*, 823 F.3d at 781; *CDS*, 2014 WL 4379112 at *10 ("no single [Defendant] could prevent exchanges from emerging, but all [Defendants] would profit from such prevention"). Plaintiffs have alleged such a common motive among Dealer Defendants to maintain their "extraordinary profit center" and continue to "extract billions of dollars in monopoly rents, year after year." *See, e.g.*, Complaint ¶ 14. The Complaint also alleges that the Dealer Defendants needed to coordinate their boycott of Plaintiffs' platforms, as meaningful participation by even a handful of Dealer Defendants would have easily provided sufficient liquidity. *Id.* ¶ 377.

***Action taken against self-interest****:* Another plus factor is action taken by conspirators that would be against their own business interests in the absence of an illegal agreement. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 419 (S.D.N.Y. 2003); *eBooks*, 859 F. Supp. 2d at 681-82 (allegations state a claim if context is suggestive of agreement, including where conduct is unlikely to result from chance or plausibly contravenes each defendant's self-interest (citing *Twombly*, 550 U.S. at 556 n.4; *Starr*, 592 F.3d at 322)). Plaintiffs have clearly alleged actions taken by Defendants that would be against their own self-interest, absent the existence of a conspiracy. For example, Plaintiffs allege that the Dealer Defendants caused their FCM affiliates to refuse to clear trades on Plaintiffs' trading platforms. *See, e.g.*, Complaint ¶ 137. Absent a conspiracy, the FCMs would have wanted to maximize the number of trades cleared for customers on Plaintiffs' platforms, thereby maximizing fees earned for clearing services. *See id.* ¶ 135.

Plaintiffs also allege that Tradeweb has taken actions against its own interest as a result of its conspiracy with the Dealer Defendants. *See id.* ¶¶ 312-15. For example, when Tradeweb's non-bank managers recognized it would be in Tradeweb's best interest to launch an anonymous all-to-all electronic trading platform and took steps to do so, the Dealer Defendants who controlled Tradeweb successfully pressured the managers to change course. *Id.* ¶ 313. As a result, Tradeweb currently limits its platform to dealer-to-customer trading using the RFQ protocol with post-trade name give-up. *Id.* ¶¶ 314, 319. Absent a conspiracy, this limitation would not be in Tradeweb's best interest, as expansion to all-to-all trading would without question generate high demand for Tradeweb's products, as recognized initially by Tradeweb's non-bank managers. *Id.* ¶ 313, 315.

ICAP similarly took actions that were against its own best interest. For example, when ICAP's all-to-all platform i-Swap was launched in Europe, it was highly successful, with 30% of ICAP's trade volumes moving onto the i-Swap order-book within months of its 2010 launch. *Id.* ¶ 338. Given this high demand in Europe, it would have been in ICAP's best interest to open its i-Swap platform in the U.S. market. ICAP, however never opened i-Swap to the buy-side in the U.S. *Id.* Absent a conspiracy, this behavior would have been entirely inconsistent with ICAP's economic self-interest. *Id.* ¶ 340.

***Extensive interfirm communications***: Another plus factor that can suggest an unlawful agreement is a high level of interfirm communications. *Currency Conversion*, 265 F. Supp. 2d at 418; *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) ("a high level of interfirm communications" supports inference of a conspiracy); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) (interfirm communications "can support an inference of agreement because they provide the means and opportunity to conspire"). Plaintiffs have alleged evidence to suggest that such high levels of communication took place between Defendants.

Plaintiffs cite Defendants' membership in (and domination of) of the ISDA and FIA, Complaint ¶¶ 321-22, as well as the board of Tradeweb, which had routine conference calls and annual meetings in Miami, Florida. *Id.* ¶¶ 295-310. The heads of the Dealer Defendant IRS trading desks also participated in monthly meetings. *Id.* ¶¶ 127, 327.

*Industry insiders state that the market has not developed as expected:* The Complaint also cites numerous industry sources pointing out that the IRS market has not developed in the manner that economic theory, investor demand, technological feasibility, and the historical experience of comparable financial markets would predict. *See, e.g.*, Complaint ¶¶ 129, 130, 237, 241. Such industry insight also serves as a "plus factor" for purposes of pleading an antitrust conspiracy. *See Starr*, 592 F.3d at 324.

*The Dealer Defendants' control of the IRS market:* An additional plus factor is Defendants' control over the relevant market. *Starr*, 592 F.3d at 323 (defendants' control of over 80% of digital music market a plus factor that helped to "place the parallel conduct 'in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" (citing *Twombly*, 550 U.S. at 557)). Javelin and TeraExchange have alleged such control over the IRS market. *See, e.g.*, Complaint ¶¶ 70, 100 n.14, 362.

*Coercive behavior against customers and conspiracy participants:* Plaintiffs have also pled ample evidence of coercion on the part of Defendants in furtherance of their conspiracy—yet another plus factor. *See Currency Conversion*, 265 F. Supp. 2d at 418. For example, Plaintiffs allege that the Dealer Defendants threatened customers considering trading on Javelin, TeraExchange, and other all-to-all SEFs with a "complete withdrawal of clearing services or across-the-board increases in clearing fees." *See, e.g.*, Complaint ¶¶ 228, 231. One example of this took place in August 2013 when, after learning that NISA was interested in trading on Javelin, a

named Goldman Sachs executive convinced NISA not to trade on the platform by threatening to withdraw all of NISA's clearing services. *Id.* ¶ 173. In yet another example, in 2014, another named Goldman Sachs executive made at least one threatening phone call to an IDB SEF after the SEF hired an employee who was perceived to be hostile to the Dealer Defendants. *Id.* ¶ 270.

Plaintiffs also allege instances in which the Dealer Defendants coerced fellow banks into fully complying with the conspiracy by placing those transgressor banks in the "penalty box." Specifically, Plaintiffs allege that after Barclays attempted to launch its own IRS trading platform, the other Dealer Defendants collectively refused to allow Barclays to participate in multi-dealer consortia such as Tradeweb. *Id.* ¶¶ 265-66.

***Government investigation into Defendants' conduct***: Courts also consider governmental investigation of the alleged wrongful conduct as a plus factor. *See, e.g.*, *Starr*, 592 F.3d at 319. The Dealer Defendants have acknowledged in their own motion to dismiss that the CFTC initiated an investigation after the filing of the initial complaints in these consolidated proceedings. DD Mem. at 61.

### C.    The Complaint Does Not Violate Any Rule Against "Group Pleading"

Defendants' motions, and HSBC's supplemental motion in particular, claim that the Complaint engages in impermissible "group pleading." However, allegations of a group of defendants' participation in a collective boycott are often necessarily "group" allegations and courts have repeatedly recognized the commonsense principle that a complaint may make collective allegations that apply to defendants as a whole. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 594 (S.D.N.Y. 2015) ("Even in the absence of specific allegations identifying the exact date and time of each illicit act, the U.S. Complaint gives 'defendant[s] fair notice of what the claim is and the grounds upon which it rests.'" (quoting

*Anderson News*, 680 F.3d at 182)).[7] Furthermore, for pleading purposes, "a plaintiff must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy, but . . . an overt [] act need not be pleaded against each defendant." *Hinds Cnty.*, 700 F. Supp. 2d at 395 (internal quotations and citation omitted). Plaintiffs "need not necessarily provide any particular details about conduct undertaken by [any one defendant] in furtherance of the conspiracy." *Id.* (citing *Starr*, 592 F.3d at 325).

As set forth in detail in Class Plaintiffs' brief, the Complaints are replete with allegations of conduct by specific Dealer Defendants that identify specific individuals from *each* Defendant that participated in the conspiracy, and explain what each of them did as part of the conspiracy and when. *See* Class Plaintiffs' Opposition Memo at p. 57; *see also* Complaint ¶¶ 144-45, 152, 154, 159, 169-71, 174, 188, 197-201, 204-05, 214, 231, 260, 275, 277-78, 284, 294.

Similar to Defendants' claims as to group pleading, Defendants complain that Plaintiffs do not provide specific examples of each Defendant's use of each boycott tactic against each Plaintiff. Thus, for example, Defendants argue that the Complaint does not set forth specific allegations of clearing problems with eight of the Dealer Defendants' FCMs on Javelin's platform. DD Mem. at 36. But the Complaint does in fact allege that all of the Dealer Defendants conspired to withhold clearing to Javelin's platform, Complaint ¶¶ 132, 137, 162, 173, and it then goes on to detail illustrative examples of the common tactics the Dealer Defendants' FCMs used to block clearing on Javelin's trading platform, *see, e.g.*, *id.* ¶¶ 169, 173, 214. To be clear, Plaintiffs allege that the

---

[7] *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG), 2011 WL 7053807, at *13 (E.D.N.Y. Jan. 4, 2011) (rejecting defendants' objection "to the use of the term 'defendants' or to defined groups of defendants in the individual claims"); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant.").

"Dealer Defendants blocked trading on Javelin, TeraExchange, and other all-to-all trading platforms by not clearing trades coming from the platforms," *id.* ¶¶ 132, and, as noted above, Plaintiffs have alleged specific factual allegations concerning each Defendant's involvement in the alleged conspiracy, including the withholding of clearing services. *Id.* ¶¶ 162, 170-71, 174, 176 n.36, 197-201, 204-05.

## III.   DODD-FRANK DOES NOT PRECLUDE PLAINTIFFS' ANTITRUST CLAIMS

Plaintiffs join Class Plaintiffs' arguments demonstrating that Defendants' assertion that the Dodd-Frank Act precludes Plaintiffs' antitrust claims are without merit, and are completely inconsistent with the intent of Dodd-Frank to promote transparency, price competition, and "protect consumers from abusive financial services practices." *See, e.g.*, *Id.* ¶¶ 97-98.

## IV.   DEFENDANTS DO NOT CHALLENGE PLAINTIFFS' ANTITRUST STANDING OR THE TIMELINESS OF PLAINTIFFS' CLAIMS

Defendants do not challenge Plaintiffs' antitrust standing or assert that Plaintiffs' claims fail to allege injury-in-fact or are time-barred. While Plaintiffs agree with Class Plaintiffs that they also have antitrust standing, Plaintiffs' claims would survive even if the Court found otherwise.

## V.   THE COMPLAINT STATES VALID CLAIMS UNDER THE DONNELLY ACT AND NEW YORK COMMON LAW

Plaintiffs have sufficiently alleged claims for relief under the Donnelly Act and New York common law.[8]

---

[8] If the Court were to accept Defendants' flawed arguments for dismissal of Plaintiffs' federal claims, then the Court should decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 716 (2nd Cir. 2013) (same); *see also TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*, 453 F. App'x 105, 107 (2d Cir. 2011) (trial court abused its discretion in exercising supplemental jurisdiction to dismiss state law claims). With regard to Donnelly Act claims, the Second Circuit

### A.     The Complaint States a Claim under the Donnelly Act

Plaintiffs have alleged a claim under the Donnelly Act, the New York antitrust statute. N.Y. Gen. Bus. Law § 340, *et seq.* Plaintiffs' allegations clearly meet the standards under New York law as they have identified the relevant product market, described the nature and effects of the purported conspiracy, alleged how the economic impact of the conspiracy is to restrain trade in the market in question, and have shown a conspiracy or reciprocal relationship between two or more entities. *See Creative Trading Co. v. Larkin-Pluznick-Larkin, Inc.*, 136 A.D.2d 461, 462 (1st Dep't 1988).

Plaintiffs have also alleged that the Defendants' illegal conduct affects commerce in the state of New York. For example, Plaintiffs have alleged that Defendants regularly transact or solicit business in New York, that a substantial part of the events at issue occurred in New York, and that Plaintiffs' principal places of business are in New York. *E.g.*, Complaint ¶¶ 29-66, 181, 310, 324, 327, 395, 410; *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) (impact on intrastate commerce adequately alleged where "many of the Defendants are headquartered in New York City and/or incorporated in New York, and they clearly conduct significant business in New York").

### B.     The Complaint States a Claim for Tortious Interference

To state a claim for tortious interference with prospective economic advantage, a plaintiff must show: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *See, e.g.*,

---

has specifically questioned whether a federal court should exercise supplemental jurisdiction over such a claim and consequently deny a plaintiff New York's "more lenient" pleading standard over "the 'plausibility' standard applicable in federal court." *Williams v. Citigroup Inc.*, 659 F.3d 208, 215 n.4 (2d Cir. 2011).

*Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 328 (S.D.N.Y. 2016). Plaintiffs have clearly pled each of these elements. First, Plaintiffs clearly allege business relations with third parties. Complaint ¶¶ 113, 194. Second, Plaintiffs allege numerous acts by Defendants seeking to coerce those potential customers into cutting ties with Plaintiffs. *See, e.g., id.* ¶¶ 173, 228, 231, 270. Third, Plaintiffs allege that these acts were dishonest, unfair, and improper, as they were violations of federal and state antitrust laws. *Id.* ¶¶ 1, 400-10. Fourth, Plaintiffs allege that Defendants' acts injured the relationship with between Plaintiffs and these entities, as they all eventually severed ties with Plaintiffs and ceased to try to use their IRS trading platforms. *See, e.g., id.* ¶¶ 173-75, 182, 202, 214, 216, 218.

### C.    The Complaint States a Claim for Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege: (1) defendant was enriched, (2) at plaintiff's expense, and (3) the circumstances are such that, in equity and good conscience, defendants should compensate plaintiffs. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). As discussed above, Plaintiffs have alleged that Defendants were enriched at the Plaintiffs' expense, as Defendants were only able to maintain their outsized profits at the expense of the Plaintiffs, who were not allowed to compete or survive in the IRS marketplace. Accordingly, equity does not permit Defendants to retain these ill-gotten gains.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss the Javelin and TeraExchange's Second Consolidated Complaint.

Dated:      February 17, 2017

/s/ Thomas P. Ogden
David H. Wollmuth
Thomas P. Ogden
James J. Brennan
Nicholas G.O. Veliky
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
togden@wmd-law.com
jbrennan@wmd-law.com
nveliky@wmd-law.com

*Attorneys for Plaintiffs Javelin Capital Markets,
LLC, Tera Group, Inc., Tera Advanced
Technologies, LLC, and TeraExchange, LLC*

Robert P. Cummins (*pro hac vice*)
NORMAN, HANSON & DETROY LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
Phone: (207) 553-4712
Fax: (207) 775-0806
rcummins@nhdlaw.com

*Attorneys for Plaintiff Javelin Capital Markets, LLC*