UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION | MDL No. 2704 Master Docket No. 16 MD 2704 (PAE) |
| This Document Pertains To: *ALL CASES* | |

## DEALER DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED JOINT MOTION TO DISMISS ALL CLAIMS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.  PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE ANTITRUST CLAIM ....................... 3

    A.  Plaintiffs misstate the pleading standard ................................................................ 3

    B.  Plaintiffs have not pled conduct inconsistent with rational and competitive
        business strategy. .................................................................................................. 6

    C.  Plaintiffs have not pled a plausible pre-2013 claim ............................................... 9

        1.  The Oppositions confirm that essential prerequisites to all-to-all
            trading were absent in the pre-2013 period .............................................. 10

        2.  Plaintiffs' Project Fusion and Tradeweb allegations do not support
            their pre-2013 claims. ............................................................................ 14

        3.  Plaintiffs' détente allegations do not support their pre-2013 claims. ....... 19

    D.  Plaintiffs have not pled a plausible post-2013 claim. .......................................... 20

        1.  Plaintiffs' "parallel conduct" allegations do not support their
            claims. .................................................................................................. 20

        2.  Plaintiffs' "bifurcation" and "plus factor" allegations do not
            support their claims ............................................................................... 27

    E.  Plaintiffs continue to rely on impermissible group-pleading ................................ 31

    F.  The Dealers appropriately cite judicially noticeable information ......................... 33

II.  CLASS PLAINTIFFS LACK ANTITRUST STANDING. ........................................... 35

    A.  Class Plaintiffs' alleged injuries are indirect and remote. .................................... 37

    B.  More efficient enforcers exist and have already sought to enforce the
        antitrust laws. ...................................................................................................... 39

    C.  Class Plaintiffs' damages are highly speculative .................................................. 39

    D.  Apportioning damages would be prohibitively complex ....................................... 40

III.  THE COMMODITY EXCHANGE ACT, AS AMENDED BY DODD-FRANK, IMPLICITLY PRECLUDES PLAINTIFFS' POST-DODD-FRANK CLAIMS............ 41

    A.  Dodd-Frank's savings clause does not bar the application of the implied preclusion doctrine to Plaintiffs' claims. ................................................................ 41

    B.  Plaintiffs' claims satisfy the four *Billing* factors. ................................................. 45

IV.  CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED. ............................ 48

    A.  Class Plaintiffs fail to plead "ignorance" of their pre-2012 claims. .................... 48

    B.  Class Plaintiffs fail to plead diligence. ................................................................. 49

    C.  Class Plaintiffs fail to plead concealment. ............................................................ 52

V.  PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED. ............................ 55

CONCLUSION ................................................................................................................................ 55

## TABLE OF AUTHORITIES

CASES                                                                                                Page(s)

*131 Maine St. Assocs. v. Manko*,
  179 F. Supp. 2d 339 (S.D.N.Y. 2002)...................................................................48

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
  881 F.2d 1396 (7th Cir. 1989) ......................................................................29

*In re Actos End-Payor Antitrust Litig.*,
  848 F.3d 89 (2d Cir. 2017)...........................................................................12

*Alaska Elec. Pension Fund v. Bank of Am., Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016)........................................................50, 54

*Anderson News, LLC v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)........................................................................5, 24

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987).........................................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................23

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)....................................................................................37

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006).........................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................18

*Barnhart v. Sigmon Coal Co., Inc.*,
  534 U.S. 438 (2002)....................................................................................44

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................*passim*

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982)....................................................................................35

*Boyd v. AWB Ltd.*,
  544 F. Supp. 2d 236 (S.D.N.Y. 2008)..........................................................38

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)....................................................................................29

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...................................................................................36

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...................................................................................36

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)...................................................................6, 30

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    261 F. Supp. 2d 188 (S.D.N.Y. 2003).........................................................49

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
    2016 WL 5794776 (S.D.N.Y. 2016)....................................................13, 50

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)...................................................................................16

*Corley v. United States*,
    556 U.S. 303 (2009)...................................................................................44

*Credit Bureau Servs., Inc. v. Experian Info., Inc.*,
    2013 WL 3337676 (C.D. Cal. 2013).............................................................8

*In re Credit Default Swaps Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. 2014)................................................. *passim*

*Credit Suisse Securities (USA) LLC v. Billing*,
    551 U.S. 264 (2007).................................................................43, 44, 46, 47

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)...................................................................................44

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)................................................................35, 39

*Donahue v. Pendleton Woolen Mills, Inc.*,
    633 F. Supp. 1423 (S.D.N.Y. 1986).............................................................52

*Elec. Trading Grp., LLC v. Banc of Am. Secs. LLC*,
    588 F.3d 128 (2d Cir. 2009).......................................................................46

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)................................................................31, 32

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    720 F.3d 33 (1st Cir. 2013)........................................................................24

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)................................................................................45

*Finz v. Schlesinger*,
    957 F.2d 78 (2d Cir. 1992)........................................................................55

*In re Fla. Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...................................................14

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015).....................................................5, 32

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ...........................................................18, 34

*Garcia-Villeda v. Mukasey*,
    531 F.3d 141 (2d Cir. 2008)......................................................................42

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
    711 F.3d 68 (2d Cir. 2013)........................................................................36

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016).........................................................37, 39, 40

*Ginx v. Soho*,
    720 F. Supp. 2d 342 (S.D.N.Y. 2010).....................................................34

*Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................31

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009).........................................31, 48, 50

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 121 (S.D.N.Y. 2011).....................................................48

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)......................................................................23

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..........................................................4, 6, 7, 15

*Jackson v. Eddy's LI RV Ctr., Inc.*,
    845 F. Supp. 2d 523 (E.D.N.Y. 2012) .....................................................53

*Kavowras v. N.Y. Times Co.*,
    328 F.3d 50 (2d Cir. 2003)........................................................................34

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...................................................................15, 16

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...............................................................4

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................................29

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. 2014) ................................................................39

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................42

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. 2014) ............................................................14, 33

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    2016 WL 5794777 (S.D.N.Y. 2016) ................................................................54

*Long v. Abbott Mortg. Corp.*,
    459 F. Supp. 108 (D. Conn. 1978) ...................................................................53

*Masters v. Wilhelmina Model Agency, Inc.*,
    2003 WL 1990262 (S.D.N.Y. 2003) ................................................................51

*Mayor of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ...................................................................*passim*

*MedioStream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ...........................................................31

*Merced Irrigation Dist. v. Barclays Bank PLC*,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016) ..............................................................50

*Moll v. U.S. Life Title Ins. Co. of N.Y.*,
    700 F. Supp. 1284 (S.D.N.Y. 1988) .................................................................52

*Muhammad v. Oliver*,
    547 F.3d 874 (7th Cir. 2008) .............................................................12, 23, 28

*Murphy v. Capella Educ. Co.*,
    589 F. App'x 646 (4th Cir. 2014) ...............................................................28, 34

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...............................................................5, 8, 29

*New York v. Cedar Park Concrete Corp.*,
   684 F. Supp. 1229 (S.D.N.Y. 1988)....................................................................48, 50

*New York v. Hendrickson Bros.*,
   840 F.2d 1065 (2d Cir. 1988).........................................................................53

*Nowell v. Conner*,
   2006 WL 36860 (N.D. Tex. 2006)...................................................................26

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006)................................................................... *passim*

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
   948 F. Supp. 2d 416 (M.D. Pa. 2013) ...........................................................25, 26

*Perry v. NYSARC, Inc.*,
   424 F. App'x 23 (2d Cir. 2011) .....................................................................34

*Philip Morris Inc. v. Heinrich*,
   1996 WL 363156 (S.D.N.Y. 1996)................................................................51

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
   828 F.2d 211 (4th Cir. 1987) ........................................................................52

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   2011 WL 7053807 (E.D.N.Y. 2011)...........................................................32, 53

*In re Publ'n Paper Antitrust Litig.*,
   2005 WL 2175139 (D. Conn. 2005) .........................................................49, 50, 54

*Puente v. Ridge*,
   324 F. App'x 423 (5th Cir. 2009) ..................................................................26

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980)..........................................................................39, 40

*Robb v. Conn. Bd. of Veterinary Med.*,
   157 F. Supp. 3d 130 (D. Conn. 2016).............................................................4

*Ross v. Am. Exp. Co.*,
   35 F. Supp. 3d 407 (S.D.N.Y. 2014)..............................................................15

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...........................................................24

*S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins. Co.*,
   173 F. Supp. 3d 1293 (M.D. Fla. 2016)..........................................................30

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
 801 F.3d 412 (4th Cir. 2015) ......................................................................5, 24

*Starr v. Sony BMG Music Entm't*,
 592 F.3d 314 (2d Cir. 2010).................................................................................30

*Stratte-McClure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015)....................................................................................34

*Sullivan v. Barclays PLC*,
 2017 WL 685570 (S.D.N.Y. 2017)........................................................................55

*Tavares v. N.Y. City Health & Hosps. Corp.*,
 2015 WL 158863 (S.D.N.Y. 2015)........................................................................34

*In re Term Commodities Cotton Futures Litig.*,
 2013 WL 9815198 (S.D.N.Y. 2013)........................................................................5

*Texaco, Inc. v. Dagher*,
 547 U.S. 1 (2006).............................................................................................16, 17

*In re Travel Agent Comm'n Antitrust Litig.*,
 583 F.3d 896 (6th Cir. 2009) ...................................................................................4

*United States v. Huezo*,
 546 F.3d 174 (2d Cir. 2008)...................................................................................33

*United States v. Taubman*,
 297 F.3d 161 (2d Cir. 2002)...................................................................................30

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
 540 U.S. 398 (2004).................................................................................................41

*Volk v. D.A. Davidson & Co.*,
 816 F.2d 1406 (9th Cir. 1987) ...............................................................................52

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co.*,
 641 F.2d 457 (7th Cir. 1981) .................................................................................30

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*,
 127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................................................................34

*Williams v. Citigroup Inc.*,
 659 F.3d 208 (2d Cir. 2011)...................................................................................55

*Woori Bank v. Merrill Lynch*,
 923 F. Supp. 2d 491 (S.D.N.Y. 2013)....................................................................48

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...................................................... 15

*Zuber v. Allen*,
    396 U.S. 168 (1969) ...................................................................................... 44

**STATUTES AND REGULATIONS**

7 U.S.C. § 6s .......................................................................................................... 42

7 U.S.C. § 6b-1 ...................................................................................................... 42

7 U.S.C. § 9 ............................................................................................................ 42

7 U.S.C. § 13b ........................................................................................................ 42

7 U.S.C. § 12a ........................................................................................................ 42

8 U.S.C. § 1229a .................................................................................................... 42

8 U.S.C. § 1231 ...................................................................................................... 42

12 U.S.C. § 5303 .............................................................................................. 41, 42

15 U.S.C. § 1 .......................................................................................................... 42

15 U.S.C. § 8231 .................................................................................................... 43

47 U.S.C. § 152 ...................................................................................................... 43

77 Fed. Reg. 74,284 (Dec. 13, 2012) ................................................................... 11

**OTHER AUTHORITIES**

H.R. 4173 (Dec. 2, 2009) ....................................................................................... 45

H.R. 4173 (Dec. 11, 2009) ..................................................................................... 45

H.R. 4173 (July 15, 2010) ...................................................................................... 45

155 Cong. Rec. E3013-02,
    2009 WL 4824238 (daily ed. Dec. 9, 2009) ..................................................... 45

Areeda & Hovenkamp, *Antitrust Law* ...................................................... 8, 19, 21, 36

# INTRODUCTION

Plaintiffs' Oppositions fail to overcome the numerous flaws in their complaints, including the most central defect:  Plaintiffs are attempting to infer an antitrust conspiracy from conduct that is fully consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Plaintiffs assert that the Dealers had a "good thing going" in the traditional world of dealer-to-client IRS trading.  Opp. 1.[1]  They further assert that when new all-to-all trading platforms came onto the scene, the Dealers continued to engage in traditional dealer-to-client trading rather than trading on the new all-to-all platforms.  *See id*. at 38-40.  Plaintiffs urge this Court to infer that these alleged "refusals to deal" with the new startup platforms are the product of an unlawful conspiracy.  According to their own allegations, however, each Dealer had strong *unilateral* reasons for declining to deal with the startups:  any Dealer that did so would have been destroying its own trading profits.  Moreover, there are no well-pled allegations that a Dealer would pay any significant price if it declined to deal with the startups and simply continued with business as usual.  Thus, under the logic of Plaintiffs' own allegations, the alleged refusals to deal with the new platforms "made perfect business sense" and support no inference of conspiracy.  *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013).

Plaintiffs try to overcome this fundamental problem in different ways with respect to the pre-2013 period and the post-2013 period, but these efforts are unsuccessful.

With respect to the post-2013 period, Plaintiffs argue that they have pled enough parallel conduct and supporting circumstances to sustain a plausible inference of conspiracy, but those

---

[1]    Class Plaintiffs' Opposition is cited herein as "Opp.," and the Javelin and TeraExchange Opposition is cited as "JT Opp."  Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

arguments are unavailing for three main reasons.  *First*, the complaints do not allege that the Dealers' trading desks suddenly *stopped* dealing with all-to-all IRS platforms, but only that they never *started*.  Thus, at best, Plaintiffs allege mere parallel *inaction* by the trading desks that was consistent with each Dealer's unilateral interest in preserving its profits.  Such parallel inaction fails as a matter of law to state a plausible conspiracy claim.  *Second*, Plaintiffs' allegations regarding the Dealers' FCM affiliates suffer from the additional problem that the alleged conduct is more divergent than parallel.  Indeed, the complaints' well-pled factual allegations confirm that, more often than not, new all-to-all platforms had no alleged difficulties with the Dealers' FCMs.  *Third*, all of Plaintiffs' remaining allegations are entirely in line with independent decision-making.  Those allegations generally accuse the Dealers of engaging in unilateral acts of "resisting competition" from new market entrants, which the Supreme Court has aptly described as "routine market conduct."  *Twombly*, 550 U.S. at 566.

Plaintiffs are no more successful in defending their pre-2013 allegations.  Plaintiffs acknowledge in their Oppositions that necessary prerequisites to all-to-all IRS trading were missing until at least 2013.  *See infra* at 10.  In particular, the Oppositions acknowledge that buy-side firms only began clearing their trades through clearinghouses when Dodd-Frank forced them to do so in 2013, and that no one in the market even began *offering* electronic all-to-all IRS trading until that date.  *See id.*  Plaintiffs nevertheless assert that several of the Dealers—in an act of remarkable foresight—began conspiring to block all-to-all trading in 2007 through the Project Fusion joint venture.  These allegations, however, are unaccompanied by *factual* allegations indicating that Project Fusion was anything other than a lawful joint venture.  More broadly, neither the Project Fusion allegations nor any other allegations succeed in identifying any pre-2013 conduct that was inconsistent with "rational and competitive business strategy,"

particularly amidst the global economic downturn.  *Twombly*, 550 U.S. at 554.  For all these reasons, Plaintiffs' claims should be dismissed under *Twombly*.

Plaintiffs also fail to overcome the Dealers' remaining arguments for dismissal—antitrust standing, implied preclusion, the statute of limitations, and failure to plead the elements of the various state law claims.  With respect to antitrust standing, Class Plaintiffs do not deny that the trading platforms that the Dealers allegedly boycotted are the parties who allege that they were *directly* injured by the purported conspiracy, and that two such platforms have brought suit in this very action.  Class Plaintiffs, in contrast, identify no direct harm by virtue of the Dealers' alleged conduct and, therefore, are not efficient enforcers for antitrust standing purposes.  With respect to implied preclusion, Plaintiffs do not meaningfully dispute the actual and potential conflicts between their claims and the CFTC regulatory scheme, and instead rely on an erroneous reading of Dodd-Frank's antitrust savings clause and its exception.  With respect to the statute of limitations, Plaintiffs have not adequately alleged *any* of the elements of the fraudulent concealment tolling doctrine that they invoke in an effort to preserve their pre-2012 claims.  Finally, Plaintiffs likewise fail to allege essential elements of their state law claims.

Contrary to Plaintiffs' assertions, all of these grounds for dismissal are based on the allegations of the complaints alone; none depends on attempts to dispute the truth of well-pled factual allegations.  The complaints should therefore be dismissed in their entirety.

## ARGUMENT

## I.  PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE ANTITRUST CLAIM.

### A.  Plaintiffs misstate the pleading standard.

Plaintiffs begin by misstating the governing pleading standard.  According to Plaintiffs, the complaints automatically satisfy the *Twombly* pleading standard because they purport to allege the "who, when, and where" of an "actual agreement" to prevent all-to-all IRS trading.

3

Opp. 26.  That assertion ignores the settled principle that "[t]he ultimate existence of an 'agreement' under antitrust law" is "a legal conclusion, not a factual allegation." *Citigroup*, 709 F.3d at 135-36.  Thus, "[a] plaintiff's job at the pleading stage" is "to allege enough facts to support the inference that a conspiracy actually existed." *Id.* at 136.  Merely alleging an "actual agreement" does not meet this standard, even if the plaintiff also attempts to identify the "who, when, and where" of the alleged agreement.  *See, e.g.*, *id.* at 135-36; *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) ("[P]laintiffs' attempt to distinguish *Twombly* on the basis that plaintiffs allege 'actual agreement' fails."); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 147 (E.D.N.Y. 2010) (rejecting argument that it was sufficient to allege "actual agreements" at specific meetings).

Plaintiffs' argument appears to confuse the "who, when, and where" of an alleged conspiracy with "direct evidence" of conspiracy.  Under Second Circuit law, allegations of "direct evidence" of conspiracy are sufficient by themselves to state a plausible conspiracy claim.  *See Citigroup*, 709 F.3d at 135-36.  Direct evidence of conspiracy, however, is "evidence that is explicit and [that] requires no inferences to establish the proposition or conclusion being asserted."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010).  Such evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices."  *Citigroup*, 709 F.3d at 136.  Here, Plaintiffs do not allege that there is any such "smoking gun" evidence of conspiracy.  *See id.*  Instead, they urge this Court to *infer* a conspiracy from allegations of parallel conduct and other circumstances.  *See* Opp. 26-42; JT Opp. 13-20.  Plaintiffs therefore bear the burden of pleading enough facts to sustain an inference of conspiracy that is not just "conceivable," but "plausible."  *See, e.g.*, *Twombly*, 550 U.S. at 570; *Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130, 143 (D. Conn. 2016)

("[A] complaint like this one, which omits a 'smoking gun,' may survive dismissal only if an actual agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.").[2]

Allegations of the "who, when, and where" of an alleged conspiracy ordinarily are *necessary* to meet the *Twombly* pleading standard, *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015), but they are not sufficient, *see Citigroup*, 709 F.3d at 135-36.  Moreover, although Plaintiffs assert otherwise in their Oppositions, they have not actually met their threshold obligation to plead "who, did what, to whom (or with whom), where, and when."  *Musical Instruments*, 798 F.3d at 1194 n.6.  The allegations that purport to provide these particulars consist primarily of (i) dry recitations of the board and membership rosters of entities such as Tradeweb, OTCDerivNet, ISDA, and FIA, and (ii) conclusory assertions that unidentified subsets of these individuals entered into illicit "agreements" at unidentified meetings of these organizations.  *See, e.g.*, Dealer Br. 30-31, 43;

---

[2]     None of Plaintiffs' cases is to the contrary; in each, the court required allegations of either (i) direct evidence of conspiracy or (ii) parallel conduct and "plus factors" sufficient to support a plausible inference of conspiracy.  *See Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012) ("given the above factual allegations and the reasonable inferences that may be drawn from them, the [complaint] is sufficient to make Anderson's antitrust claim plausible"); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *10-11 (S.D.N.Y. 2014) ("*In re CDS*") (concluding that allegations of an "abrupt[] and simultaneous[]" change in conduct, when combined with enumerated "plus factors," generated a plausible inference of conspiracy); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) ("*FX I*") ("The [complaint] offers direct evidence akin to the recorded phone call in which two competitors agreed to fix prices at a certain level—the Second Circuit's paradigmatic example of direct proof of a Section 1 violation."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 418 (4th Cir. 2015) ("[Plaintiff] has alleged enough to suggest a plausible agreement to engage in a group boycott."); *id.* at 432 n.2 (declining to address whether the plaintiff alleged "sufficient direct evidence"); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *22-23 (S.D.N.Y. 2013) (applying *Twombly* to determine that the plaintiffs alleged "plausible grounds to infer an agreement").  Plaintiffs also fail to note that the antitrust conspiracy holding of *In re Term Commodities Cotton Futures* was reversed on reconsideration.  2014 WL 5014235 (S.D.N.Y. 2014).

SCAC ¶¶ 127-37, 152-53, 182-83 & n.72.[3]  Stripped of Plaintiffs' rhetorical embellishments, these allegations amount to no more than assertions of "opportunities to conspire," which fail as a matter of law to support an inference of conspiracy.  *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

> **B.    Plaintiffs have not pled conduct inconsistent with rational and competitive business strategy.**

Nowhere in their Oppositions do Plaintiffs identify any alleged Dealer conduct that was inconsistent with "rational and competitive business strategy."  *Twombly*, 550 U.S. at 554.  As the Dealers explained in their opening brief, Plaintiffs allege that all-to-all startup platforms were threatening to gut the Dealers' trading profits, yet Plaintiffs also allege that the new platforms could not survive without the Dealers' support.  *See* Dealer Br. 33.  If those allegations are true, then the startup platforms were essentially asking for the Dealers' assistance in destroying the Dealers' own profits.  Under these circumstances, a parallel refusal to deal with the startups would not suggest an antitrust conspiracy.  Rather, "common economic experience, [and] the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior."  *In re Ins. Brokerage*, 618 F.3d at 326.

Plaintiffs counter that "absent a conspiracy, each Dealer Defendant would face a risk of being left behind by not supporting an all-to-all trading platform" (Opp. 51), but their own allegations refute that assertion.  According to Plaintiffs, each Dealer "want[ed] desperately to preserve the status quo" of dealer-to-client IRS trading.  SCAC ¶ 28; SJTC ¶ 6.  Thus, as in *Twombly*, each Dealer presumably "liked the world the way it was" and was "sitting tight,

---

[3]    Plaintiffs also assert that the heads of the Dealers' IRS trading desks held "monthly meetings in New York City from 2013 to 2015" (Opp. 33), but all their complaints allege is that *an interdealer broker* hosted meetings with these *customers* to discuss "issues relating to SEFs."  SCAC ¶ 204.

*expecting [its] neighbors to do the same thing.*"  *Twombly*, 550 U.S. at 568.  No inference of conspiracy may be drawn where, as here, each defendant can reasonably anticipate that its competitors, too, are likely to see the wisdom of sitting tight and continuing to do business as usual.  *See id.*; *Citigroup*, 709 F.3d at 139 (declining to infer conspiracy from "actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement"); *In re Ins. Brokerage*, 618 F.3d at 349 (where defendants are "[r]eaping enormous profits," it is natural for them to have "no desire to upset the apple cart").

Plaintiffs' allegations identify two additional reasons why a dealer would face little or no risk if it simply sat tight and waited to see which new platforms attracted a critical mass of support.  First, in the anonymous all-to-all trading environment envisioned by Plaintiffs, an early supporter of a trading platform could not obtain a lasting advantage over a latecomer.  Rather, in a world of "fully anonymous" all-to-all trading (SCAC ¶ 344; SJTC ¶ 377), no one would be able to tell one dealer from another; anonymous counterparties would be matched into trades by automated algorithms; and the last dealer to join an all-to-all trading platform could therefore compete for business on exactly the same footing as the first.  *See* SJTC ¶ 82 (alleging that order books "automatically match the best bids and offers"); SCAC ¶ 85 (same).

Second, Plaintiffs never allege that the support of one or two "early mover" dealers would be enough to make a trading platform viable.  To the contrary, in an effort to minimize their concession that certain early movers *did* support the Javelin platform, Plaintiffs assert that it would take "a handful of Dealer Defendants" to provide "sufficient liquidity," and that "the nominal participation of a small number of them on any one platform" would not be enough.[4]

---

[4]     *See* JT Opp. 17 (asserting that "meaningful participation by even a *handful of Dealer Defendants* would have easily provided sufficient liquidity"); SCAC ¶ 273 n.102 (alleging that RBS and UBS's (continued)

For this reason as well, a dealer that declined to be the first to support a new trading platform would face no significant risk of being "left behind" (Opp. 51), and a strategy of "sitting tight" and monitoring the progress of the startup platforms would be entirely in line with a dealer's individual self-interest. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1195 (conduct inconsistent with self-interest occurs "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement"); Areeda & Hovenkamp, *Antitrust Law* Vol. VI ¶ 1414 (3d ed. 2010) ("[A]n action contrary to self-interest . . . must be an action that is so irrational that no firm would have engaged in it except on the understanding that others were in agreement.").

Plaintiffs fare no better with their assertion that the Dealers acted against their individual self-interests by causing their FCM affiliates to decline to clear trades for all-to-all platforms. Opp. 41. To begin, there are no well-pled allegations that the FCM affiliates actually *did* decline to clear trades for *most* of the all-to-all platforms identified in the complaints. *See infra* at 21-27. Even if Plaintiffs had so alleged, however, there would be nothing contrary to unilateral self-interest about forgoing a modest amount of clearing revenue in order to protect "billions of dollars" in trading revenue. SJTC ¶ 14; SCAC ¶ 103. Indeed, declining to lend a helping hand to startup platforms that allegedly threatened the Dealers' profits is fully consistent with the "natural, unilateral reaction of each [defendant] intent on keeping" its market position. *Twombly*, 550 U.S. at 566; *see also Credit Bureau Servs., Inc. v. Experian Info., Inc.*, 2013 WL 3337676,

---

provision of liquidity to Javelin was not sufficient because "the nominal participation of a *small number of [Dealers]* on any one platform" is not enough); *id.* ¶ 276 (alleging that the Dealers account for "almost all of the liquidity in the IRS market"); *id.* ¶ 313 ("Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."); SJTC ¶ 238 ("because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform").

at *9 (C.D. Cal. 2013) (no inference of conspiracy where defendant "sacrificed the short-term profits from small reseller customers in order to reap longer-run competitive benefits").

In a final attempt to point to conduct inconsistent with the kind of conduct that non-conspiring dealers would have undertaken, Plaintiffs assert that the Dealers that invested in Project Fusion "jointly assumed control of Tradeweb's IRS business."  Opp. 31.  But Plaintiffs plead no *facts* indicating that investing in Project Fusion was anything other than "rational and competitive business strategy."  *Twombly*, 550 U.S. at 554.  There are no allegations that Project Fusion was an unattractive investment opportunity, or that only an antitrust conspirator would have wanted to invest.  To the contrary, Plaintiffs expressly allege that non-conspiring dealers *should* have been looking for opportunities to invest in cutting-edge electronic trading platforms—just as occurred in Project Fusion.  *See, e.g.*, SCAC ¶ 344 (alleging that dealers should have been seeking to "obtain[] an equity share" in new trading platforms).

The complaints thus suffer from the same basic flaw that plagued the complaints in *Twombly*, *Citigroup*, and numerous other cases:  they attempt to plead a conspiracy on the basis of conduct entirely consistent with "rational business behavior."  *Citigroup*, 709 F.3d at 137.  The complaints should therefore be dismissed.  *See id.* (dismissing claims based on "acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy").

### C.    Plaintiffs have not pled a plausible pre-2013 claim.

Plaintiffs also fail to overcome two additional defects in their pre-2013 allegations.  First, although the complaints allege that the Dealers began conspiring to block all-to-all IRS trading all the way back in 2007, the Oppositions acknowledge that necessary prerequisites to such trading were missing until at least 2013, when the Dodd-Frank clearing mandates took effect.  Second, Plaintiffs continue to rely on the Project Fusion joint venture as the unstable foundation

of their pre-2013 allegations. Plaintiffs do their best to portray that venture as the beginning of a far-sighted antitrust conspiracy, but their factual allegations do not support that inference.

### 1. The Oppositions confirm that essential prerequisites to all-to-all trading were absent in the pre-2013 period.

Plaintiffs' Oppositions confirm that at least two prerequisites to all-to-all IRS trading were absent until the Dodd-Frank clearing mandates took effect in 2013. First, the complaints acknowledge that clearing is a prerequisite to all-to-all trading (*see, e.g.*, SCAC ¶ 95; SJTC ¶ 92; Dealer Br. 8), and the Class Opposition now acknowledges "the fact [that] there was no investor clearing of IRS trades before Dodd-Frank." Opp. 45. Second, the Class Opposition also acknowledges that no one in the market even began *offering* electronic all-to-all IRS trading until 2013. *Id.* at 42. Although Plaintiffs offer a series of explanations and excuses for the absence of these prerequisites to all-to-all trading, none is supported by well-pled facts.

Plaintiffs' first excuse is that the Dealers allegedly conspired through the OTCDerivNet joint venture to prevent buy-side access to clearing. *See* Opp. 45-47. That excuse is unsuccessful because all of Plaintiffs' *factual* allegations support the opposite conclusion. For example, the complaints admit that the Dealers formed OTCDerivNet in 2000—seven years before the conspiracy supposedly began—and they further admit that OTCDerivNet put up "100 percent of the funding" to launch SwapClear, the world's first IRS clearinghouse. *See* SCAC ¶¶ 177-80. In addition, with one exception, Plaintiffs never allege that either OTCDerivNet or SwapClear behaved any differently *during* the alleged conspiracy period than they did *before* that period. The one exception consists of Plaintiffs' recognition that, in the wake of the financial crisis, SwapClear launched a new clearing solution targeted specifically at the buy-side. *See* Dealer Br. 27-28. This conduct is precisely the opposite of what one would expect of a purported conspiracy to deny buy-side access to clearing.

Plaintiffs' next explanation is that the Dealers supposedly boycotted a never-launched product known as "CME Swaps on Swapstream" (Opp. 46 & n.34), but that explanation is equally unsuccessful.  Significantly, Plaintiffs do not accuse the Dealers of boycotting the CME's *clearing services*.  Instead, they accuse the Dealers of "boycotting *Swapstream*," a new "CME-designed IRS contract" that would have been "bundled together" with "a CME trading platform and a CME clearing solution."  *Id*.  Plaintiffs admitted in their prior complaints that the CME never even launched this novel IRS contract (CAC ¶ 291), and this Court may take notice of that admission, *see* Dealer Br. 30 n.48 (citing authorities).  Plaintiffs nowhere explain how the Dealers supposedly "boycotted" an IRS contract that never launched; nor do they explain how declining to support a single CME *contract* would have blocked buy-side access to CME *clearing*.  Finally, the CME allegations consist of wholly conclusory group-pleading allegations that fail to identify a single act by a single Dealer.  *See* SCAC ¶¶ 187-88; SJTC ¶¶ 355-56.

Plaintiffs' only other argument consists of a citation to their allegation that "no infrastructure limitations or other technical impediments prevented" all-to-all IRS trading before 2013.  Opp. 44 (citing SCAC ¶ 13).  That allegation, however, is beside the point.  There is a vast difference between alleging that the infrastructure for all-to-all trading was in some sense *available* and alleging that buy-side firms were prepared to *adopt and use* that infrastructure.  For example, with respect to clearing in particular, the complaints and the CFTC both recognize that the clearing of IRS trades involves substantial costs.[5]  Plaintiffs never allege that buy-side

---

[5]    *See, e.g.*, SCAC ¶¶ 91, 192, 212 (recognizing that clearing requires payment of clearing fees, posting of collateral, and technological infrastructure); Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284, 74,323 (Dec. 13, 2012) ("In order to comply with required clearing . . . market participants are likely to face certain startup and ongoing costs relating to technology and infrastructure, new or updated legal agreements, ongoing fees from service providers, and costs related to collateralization of their positions.").  In addition, Plaintiffs concede that the Court may consider at least *the fact* that buy-side entities filed public comments with the (continued)

firms were willing to bear those costs before Dodd-Frank forced them to do so.[6]  Plaintiffs'

failure to allege this "necessary premise" of their pre-2013 claims requires dismissal of those

claims.  *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 98 (2d Cir. 2017) (dismissing

antitrust claim as "implausible because it rests on a necessary premise that is not supported by

well-pleaded factual allegations"); *Muhammad v. Oliver*, 547 F.3d 874, 880 (7th Cir. 2008)

("The longer and more detailed a complaint is, the more compelling the inference that any

omission from it was deliberate and should bind the plaintiff.").[7]

Plaintiffs likewise fail to explain away the fact that *no one* in the market attempted to

launch an electronic all-to-all IRS platform until the Dodd-Frank mandates took effect in 2013.

Although Plaintiffs attempt to blame "the Dealer Defendants" for the absence of any such

platforms before the mandates took effect (Opp. 42), the complaints make clear that even *non-*

*defendants* such as Tera, Javelin, TrueEx, and Bloomberg waited until 2013 to launch their all-

---

CFTC requesting additional time to cope with the burdens associated with clearing.  *See* Dealer
Br. 7-8 & n.10 (collecting CFTC comments); Opp. 22 (recognizing that the Court may take notice of
CFTC comments).  Plaintiffs note that some of these comments came from organizations such as
SIFMA and FIA and assert that those organizations are dealer-oriented (Opp. 45), but in fact those
organizations have many more buy-side members than dealer members.  *See, e.g.*, SIFMA, *Member
Directory*, http://www.sifma.org/member-directory (listing membership).  In addition, Plaintiffs
wholly ignore other buy-side comments cited in the Dealers' opening brief.

[6]    The closest that Plaintiffs come to alleging that buy-side firms were willing to adopt the
necessary technology and pay for clearing before Dodd-Frank is in paragraph 187 of the Class
Complaint.  There, Class Plaintiffs allege that 33 firms among the "thousands" of participants in the
IRS market made some sort of "commitment" to the CME's never-launched Swapstream product,
and they urge the inference that "[t]his commitment shows that the buy-side was ready, willing, and
eager to clear their IRS trades."  SCAC ¶¶ 187, 386.  But alleging that a bare 33 firms expressed
interest in a never-launched IRS *product* is a far cry from alleging that buy-side firms were willing to
adopt and pay for IRS *clearing* before Dodd-Frank forced them to do so.

[7]    Plaintiffs also note that "Citi itself [] predicted" that "a significant portion of interest rate swap
volume is likely to migrate to clearing" (Opp. 44), but the cited prediction was made in *May 2012*
and predicted a migration to clearing *as a result of Dodd-Frank regulations*.  *See* Opp. 44 (citing
reference in SCAC ¶ 334 & n.155 to *Regulatory Paradigm Shift and the Impact on Fixed Income
Trading*, Citi, May 30, 2012).

to-all capabilities.[8]  Plaintiffs cannot argue that the alleged conspiracy deterred *those* entities

from launching their platforms before 2013 because, according to the complaints, none of those

entities could have had any idea that a conspiracy existed until 2014 at the earliest:

> Before [June 2014], no one other than the Defendants themselves knew or
> could have known about the Dealer Defendants' secret conspiracy to
> control the IRS market.  *Prior to that point, the Dealer Defendants had
> not publicly demonstrated their ability and intention to squash any threat
> to their collective dominance.*

SCAC ¶ 358; *see* SJTC ¶¶ 392-93.  In addition, although Plaintiffs assert that certain interdealer

brokers were brokering dealer-to-dealer trades on an "all-to-all" basis before 2013 (Opp. 9-10),

they do not deny that these IDBs relied on human voice-brokers, not electronic trading, and they

allege that buy-side firms wanted electronic trading, not voice-brokers.  *See infra* at 27-28.

Plaintiffs are therefore unsuccessful in their circular attempts to blame "the Dealer

Defendants" for the absence of any electronic all-to-all platforms in the pre-2013 period, and for

"the fact [that] there was no investor clearing of IRS trades before Dodd-Frank."  Opp. 45.  In

the absence of these prerequisites to all-to-all trading, the pre-2013 claims plainly should be

dismissed.  Plaintiffs have not *plausibly* alleged that the Dealers began conspiring to block all-to-

all trading many years before such trading was even possible.  Nor have they alleged any "injury

in fact" in the pre-2013 period:  Plaintiffs could not have suffered any alleged injury in the

period when essential prerequisites to all-to-all trading were missing.  *See* Dealer Br. 70-71.  For

both these reasons, even if Plaintiffs had pled enough facts to sustain their post-2013 claims (and

they have not), their pre-2013 claims still would warrant dismissal.  *See In re Commodity Exch.,*

*Inc., Gold Futures & Options Trading Litig.*, 2016 WL 5794776, at *15 & n.24 (S.D.N.Y. 2016)

---

[8]     The relevant allegations are collected at Dealer Br. 17 & n.34, 21 & n.39.  When the Dodd-
Frank SEF-trading mandates took effect in 2013 and 2014, any firm that wished to offer RFQ trading
of IRS was required to offer order book trading as well.  *See id.* at 10 n.20.

(dismissing pre-2006 and post-2012 portions of conspiracy claims); *In re CDS*, 2014 WL 4379112, at *14 (dismissing conspiracy claims that pre-dated Fall 2008); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1319-20 (S.D. Fla. 2010) (dismissing pre-2008 portion of conspiracy claims); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. 2014) (dismissing pre-2002 portion of conspiracy claims).

### 2. Plaintiffs' Project Fusion and Tradeweb allegations do not support their pre-2013 claims.

Plaintiffs continue to point to the 2007 Project Fusion joint venture as the beginning of the alleged conspiracy. *See* Opp. 3, 27-28; JT Opp. 14. Plaintiffs' continued reliance on Project Fusion leaves them at a loss to explain how BNPP and HSBC supposedly joined the alleged conspiracy, since neither of those Dealers ever participated in Project Fusion or invested in Tradeweb.[9] As for the Dealers that invested in Project Fusion, however, Plaintiffs argue that they did so in order to "take control" of Tradeweb and prevent it from launching an all-to-all IRS platform. *See id.* Plaintiffs make this argument despite their recognition that Tradeweb launched an "anonymous" all-to-all order book in 2013, when Dodd-Frank required that SEF platforms offer order books. *See* SCAC ¶¶ 303-04 & nn.122-23; SJTC ¶ 254 n.80. For several reasons, the Project Fusion allegations do not sustain a plausible inference that Project Fusion was anything other than a lawful joint venture to expand an electronic trading platform.

*First*, the Project Fusion allegations fail to satisfy the traditional criteria for pleading an antitrust conspiracy. Plaintiffs do not identify any alleged "direct evidence" that the Dealers conspired through Project Fusion; nor do they identify the type of parallel conduct and "plus factors" necessary to support an inference of such a conspiracy. Indeed, the only "parallel

---

[9]    Nor are there any allegations that BNPP participated in meetings of Tradeweb boards or committees, that it "neutralized TrueEx," or that it declined to clear for Javelin. *See* Dealer Br. 44.

conduct" that Plaintiffs assert with respect to Project Fusion consists of the common decision of multiple Dealers to invest in the 2007 joint venture. *See* Opp. 27, 39. As far as defendants are aware, however, no court has treated a common decision to invest in a lawful business venture as the type of "parallel conduct" that suggests an antitrust conspiracy. To the contrary, courts in antitrust conspiracy cases routinely decline to "read evidence of [a] benign agreement as evidence of a separate, illegal agreement." *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014), *aff'd*, 630 F. App'x 79 (2d Cir. 2015); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (declining to infer conspiracy from participation in a lawful joint venture); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369-70 (S.D.N.Y. 2016) (allegations that defendants participated in a narrow and lawful agreement "cannot support the broad [antitrust conspiracy] alleged").

*Second*, Plaintiffs are attempting to infer a conspiracy from allegations that, in the wake of Project Fusion, Tradeweb acted exactly the same way that numerous non-conspirators acted. Specifically, Plaintiffs urge this Court to infer a conspiracy from allegations that Tradeweb waited until 2013 to launch its all-to-all IRS order book, but that is precisely when non-defendants Tera, Javelin, TrueEx, and Bloomberg launched *their* all-to-all order books, and Plaintiffs do not suggest that there was anything conspiratorial about the timing of *those* launches. *Supra* at 12-13. Plaintiffs' conspiracy theory overlooks an "obvious alternative explanation" for the 2013 launch of Tradeweb's order book: it made perfect business sense to launch that order book when the Dodd-Frank swap mandates went into effect. *See Ins. Brokerage*, 618 F.3d at 322-23 (no inference of conspiracy should be drawn in the face of "obvious alternative explanations").

*Third*, although Plaintiffs allege that Tradeweb was "planning" for all-to-all IRS trading as early as 2007 (Opp. 27), these "planning" allegations are deliberately vague and conclusory. In the prior round of amended complaints, Plaintiffs made the far more specific allegation that Tradeweb was "poised" to launch all-to-all trading in 2007—long before such trading was actually possible.  CAC ¶ 101; JTC ¶ 248.  But when the Dealers responded by pointing out the absurdity of the allegation that Tradeweb was "poised" to attempt the impossible (*see* Dkt. 124 at 26), Plaintiffs hastily replaced that allegation with an ill-defined allegation that Tradeweb was "planning" for all-to-all trading in 2007 (SCAC ¶¶ 14, 111).  This amended allegation studiously avoids any mention of the level of development of the purported plans, whether Tradeweb proposed to implement any such plans before the buy-side adopted clearing, and whether there was any target date for implementation.  Plaintiffs' conspicuous retreat to a vague and conclusory "planning" allegation fails to satisfy their obligation to plead "not just ultimate facts" but "evidentiary facts."  *Kendall*, 518 F.3d at 1047.

*Finally*, even if Plaintiffs had adequately alleged that Project Fusion delayed the launch of Tradeweb's all-to-all order book, *there would be nothing unlawful about that result*.  As the Supreme Court has observed, "a joint venture, like any other firm, must have the discretion" to make decisions regarding the conduct of the venture.  *Texaco, Inc. v. Dagher*, 547 U.S. 1, 7 (2006).  Accordingly, the Project Fusion venture's decision about whether and when to offer all-to-all IRS trading is reviewable, at most, under the antitrust "rule of reason" and not the *per se* rule.  *See id.* at 5-7; *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 772 n.18, 776 (1984).  Plaintiffs never even *attempt* to plead a rule of reason claim that the joint venture violated the antitrust laws simply by deciding—like every other market participant—to defer offering all-to-all IRS trading until the Dodd-Frank mandates took effect.  Plaintiffs thus fail to allege that there

16

was anything unlawful about the joint venture's launch decision. *See Dagher*, 547 U.S. at 6 n.2
(refusing to analyze claim under the rule of reason when plaintiffs put forth solely a *per se*
claim); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (same).[10]

Plaintiffs also renew their argument that Tradeweb worked with the Project Fusion
investors to "conceal" the investors' ownership interests in Tradeweb. *See* Opp. 27-31. That
Plaintiffs have chosen to double down on these concealment allegations is baffling. The
allegations are demonstrably incorrect. For example, securities filings of Tradeweb's parent
corporation disclosed in November 2007 that the Dealers that invested in Project Fusion obtained
(i) a 15 percent interest in the entity responsible for Tradeweb's "established markets"
(Tradeweb Markets LLC) and (ii) an 80 percent interest in a separate entity that would pursue
"asset class expansion" into additional markets (Tradeweb New Markets LLC):

> On October 11, 2007, we announced that we had formed a partnership
> with a consortium of nine global securities dealers to seek to further
> expand TradeWeb, our electronic trading unit within Thomson Financial.
> The partnership will utilize TradeWeb's established market position to
> create a global multi-asset class execution venue for clients. Under the
> terms of the agreement, the dealers will invest approximately $180 million
> to purchase a 15% stake in an entity that includes TradeWeb's established
> markets . . . which will be named TradeWeb Markets. Additionally,
> Thomson and the dealers will fund additional investment in asset class
> expansion through a new entity, TradeWeb New Markets. . . . We will
> own 20% of TradeWeb New Markets and the consortium will own
> 80%. . . . Under terms of the agreement, these two entities will merge
> upon meeting either certain performance or time-based milestones.[11]

The Project Fusion investors' stakes in Tradeweb Markets and Tradeweb New Markets were re-

disclosed in subsequent securities filings in 2008, 2009, and 2010, in a public earnings call, and

---

[10]   Plaintiffs' OTCDerivNet allegations likewise fail because Plaintiffs do not allege a rule of
reason claim regarding the Dealers' participation in that joint venture. *See Dagher*, 547 U.S. at 7 n.2.

[11]   The Thomson Corp. Form 6-K (Nov. 9, 2007), http://services.corporate-ir.net/SEC.Enhanced/
SecCapsule.aspx?c=76540&fid=5236874; *see also* The Thomson Corp., Annual Information Form,
Canadian Securities Administrators, Financial Note 21 at 98 (Mar. 30, 2009) (similar information).

in trade press articles,[12] all of which may be considered for purposes of assessing Plaintiffs' concealment allegations.[13]   In addition, although it would have been obvious to market participants that Tradeweb's "established markets" consisted of fixed income markets, Tradeweb's press releases repeatedly distinguished those established markets from "*new* asset classes, including equities and derivatives, *such as interest rate and credit default swaps*."[14]

In any event, any alleged "concealment" of the terms of Project Fusion would hardly be grounds for inferring an antitrust conspiracy.  No one who reviewed the public disclosures regarding Project Fusion could fail to understand, at a minimum, that the participating investors acquired substantial interests in both Tradeweb Markets and Tradeweb New Markets, that those two entities merged in 2010,[15] and that representatives of the investors occupied seats on

---

[12]   *See, e.g.*, Dealer Br. 77-78 & nn.91-95 (citing securities disclosures and published transcript of earnings call); *Tradeweb Eyes Equities Expansion in 2008*, Traders Magazine, Dec. 1, 2007 (noting, among other things, that "[t]he dealers will own 80 percent of Tradeweb's new markets").

[13]   *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (courts may take judicial notice of the contents of SEC disclosures); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (courts may take judicial notice of "the fact that press coverage . . . contained certain information").

[14]   Tradeweb, *Nine Global Dealers and Thomson Financial Complete the Formation of Premier Electronic Trading Venture Using TradeWeb* (Jan. 3, 2008), http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-Thomson-Financial-Complete-the-Formation-of-Premier-Electronic-Trading-Venture-Using-TradeWeb; *see also* Tradeweb, *Citi Takes Equity Stake in Tradeweb* (April 8, 2008) (cited in SCAC ¶ 123 n.41) ("Citi will become a liquidity provider in a number of *new* Tradeweb markets, *including interest rate swaps*"); Tradeweb, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007), http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-Thomson-Financial-Form-Premier-Electronic-Trading-Venture-Using-TradeWeb (noting that Tradeweb is "the leading electronic . . . network for the fixed-income markets").

[15]   The merger of the two Tradeweb entities was anticipated from the outset and took place in 2010 (*see* the block quotation above and SCAC ¶ 142), which makes it all the more puzzling that Plaintiffs devote so much attention to the purely temporary question of whether IRS trading was housed in Tradeweb Markets or Tradeweb New Markets.

Tradeweb's Board.[16]  In light of these fulsome disclosures, it smacks of desperation to assert that the purported failure to disclose yet more detail about Project Fusion is somehow suggestive of conspiracy.  *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law* Vol. VI ¶ 1417d (3d ed. 2010) (describing a "hidden meeting to plan . . . joint ventures" as an example of "innocent stealth").

### 3.   Plaintiffs' détente allegations do not support their pre-2013 claims.

The Oppositions also assert that ICAP and Tradeweb entered into a pre-2013 "détente" agreement that ceded the dealer-to-dealer segment of the IRS market to ICAP, and ceded the dealer-to-client segment to Tradeweb.  Opp. 66.  Although Plaintiffs repeatedly misstate these détente allegations in their briefs,[17] their core contention is that ICAP—a London-based interdealer broker—launched an electronic platform for dealer-to-dealer trading in Europe in 2009, but, as a result of the alleged détente, waited until 2013 to launch its electronic SEF platform in the U.S.  *See* SCAC ¶¶ 168-71; SJTC ¶¶ 336-39.

The Oppositions fail to overcome a series of fatal deficiencies in these détente allegations.  First, no inference of conspiracy can be drawn from ICAP's launch of its U.S. electronic trading platform in 2013 because, as noted above, that is when the Dodd-Frank mandates took effect, and numerous non-defendants launched their U.S. trading platforms at

---

[16]   *See, e.g.*, SCAC ¶ 127 & n.43 (press release identifying Goldman Sachs executive as Chairman of Tradeweb's Board of Directors); Compl. ¶ 140 nn.88-89, *Pub. Sch. Teachers' Pension & Ret. Fund of Chi. v. Bank of Am. Corp.*, No. 15-cv-9319 (SAS), Dkt. 1 (Nov. 25, 2015) (citing publicly available LinkedIn profiles of Dealer representatives that served as Tradeweb board members).

[17]   For example, although the Class Opposition asserts that ICAP "withdrew its plan to open its [European electronic trading platform] as an anonymous all-to-all trading platform in the United States" (Opp. 66), the complaints do not allege that ICAP ever had such plans, much less that it withdrew them.  *See* SCAC ¶ 168.  Similarly, the Class Opposition asserts that ICAP operated an "all-to-all" electronic platform in Europe starting in 2009 (Opp. 67), but the complaints allege that the platform in question served the "IDB" or interdealer broker market.  *See* SCAC ¶ 168.  Indeed, the platform could not possibly have served *buy-side* firms in 2009 because, as Plaintiffs concede, there was no buy-side clearing at that time.  Opp. 45.

precisely the same time.  *Supra* at 12-13.  Second, the alleged détente agreement makes no sense because there are no allegations that it constrained *any* of the firms that the complaints identify as ICAP and Tradeweb's key competitors (Bloomberg, Tradition, Tullet, and BGC).  *See* SCAC ¶¶ 303, 306.  Third, under *Twombly* and its progeny, allegations that ICAP and Tradeweb declined to pursue aggressive expansion outside their historical market segments are not suggestive of an antitrust conspiracy.  *See, e.g.*, *Twombly*, 550 U.S. at 567-69 (declining to infer conspiracy from defendants' "see[ing] their best interests in keeping to their old turf"); *see also* Dealer Br. 39, 41 (citing additional authority).  Finally, the détente allegations consist of conclusory group-pleading allegations that fail to identify a single act by a single Dealer, much less the "who, when, and where" of the alleged agreement.  *See* SCAC ¶ 169; SJTC ¶ 337.

### D.    Plaintiffs have not pled a plausible post-2013 claim.

Plaintiffs are equally unsuccessful in rehabilitating their post-2013 claims.  As noted above, Plaintiffs' fundamental problem is that the Dealers' alleged refusals to deal with all-to-all trading platforms are fully consistent with the conclusion that each Dealer acted unilaterally based on "common perceptions of the market."  *Twombly*, 550 U.S. at 554.  Plaintiffs try to overcome that problem by pointing to allegations of parallel conduct and so-called "plus factors," but none of those allegations supports their claims.

### 1.    Plaintiffs' "parallel conduct" allegations do not support their claims.

To plead parallel conduct indicative of an antitrust conspiracy, Plaintiffs must allege facts that go beyond parallel conduct consistent with "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Citigroup*, 709 F.3d at 137.  That is because "the mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion," and in most cases, "the first inference to be drawn is not that the firms are conspiring with each other, but that

20

competition, consumer preference, or market conditions have forced them to behave in a similar way."  Areeda & Hovenkamp, *Antitrust Law* Vol. II ¶ 307d1 (4th ed. 2014).  Thus, the type of parallel conduct allegations that "might be sufficient under *Twombly*'s standard" include allegations such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Citigroup*, 709 F.3d at 137.

Plaintiffs fail to identify any parallel conduct that meets these standards.  According to the complaints, a total of five electronic trading platforms offered anonymous, all-to-all IRS trading beginning in 2013:  Tera, Javelin, TrueEx, Bloomberg, and Tradeweb.  As shown below, although Plaintiffs purport to allege a parallel refusal to provide FCM clearing services to all five of these platforms, their well-pled factual allegations show no such thing.  Moreover, although Plaintiffs allege that most of the Dealers declined to trade on the new all-to-all platforms, these are just allegations of parallel *in*action that provide no basis for inferring a conspiracy.

TrueEx, Bloomberg, and Tradeweb.  As the Dealers explained in their opening brief, Plaintiffs' FCM allegations face a formidable threshold obstacle:  Plaintiffs never identify a *single* instance in which *any* Dealer declined to provide FCM services to TrueEx, Bloomberg, or Tradeweb, *i.e.*, to three of the five all-to-all IRS platforms.  *See* Dealer Br. 21, 36.

Class Plaintiffs attempt to fill this gaping hole in their FCM allegations by citing paragraph 194 of their complaint (Opp. 50), but that allegation asserts only that the Dealers withheld FCM services from "all-to-all anonymous trading platforms, including TeraExchange, Javelin, and TrueEx, *as detailed below*."  Plaintiffs carefully omit "as detailed below" from their quotation of this paragraph (*id.*), doubtless because the allegations "detailed below" are sorely

lacking.  No such allegations are ever provided as to Bloomberg or Tradeweb, and the only

allegation provided as to TrueEx is pled in the hypothetical:

> <u>Were</u> a buy-side investor to execute a trade on the [TrueEx] order book, it
> <u>would</u> have to clear the trade through one of the Dealer Defendants'
> FCMs, which <u>would</u> alert them of the transgression.  The Dealer
> Defendants <u>would</u> then retaliate against the buy side for accessing the
> 'forbidden' platform.

SCAC ¶ 282.  Beyond this hypothetical assertion of what supposedly *would* have happened,

there are no allegations that a Dealer ever *did* decline to clear for TrueEx (or Bloomberg or

Tradeweb), much less that a Dealer ever "retaliated" against a party to such a trade.[18]

      Plaintiffs' market-making allegations regarding these platforms are deficient as well.

Plaintiffs allege that six out of twelve Dealers have declined to trade on TrueEx (SCAC ¶ 283),

but the very articles that Plaintiffs quote and rely upon confirm that (i) JPMorgan and twelve

other unnamed dealers are trading on TrueEx, and (ii) at least twelve clearing firms are

supporting TrueEx.[19]  This Court may consider "the full contents" of the articles invoked in

---

[18]    Plaintiffs also make a conclusory group-pleading allegation that the Dealers' FCMs decline to provide pre-trade credit checks for order book trades (SCAC ¶ 197), but that allegation makes no sense as to dual-purpose platforms like TrueEx, Bloomberg, and Tradeweb, each of which is alleged to operate both an anonymous order book and an RFQ platform.  Plaintiffs never assert—nor could they—that TrueEx, Bloomberg, and Tradeweb notify FCMs of whether a proposed trade will occur via RFQ or order book when conducting pre-trade credit checks (or subsequently).

[19]    *See* Playforth Ex. 8, cited in SCAC ¶ 280 n.106 & SJTC ¶ 221 n.41 (Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, Institutional Investor, at 4 (July 21, 2015)); Ex. 12, cited in SCAC ¶ 284 n.109 & SJTC ¶ 224 n.44 (Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, Tabb Forum, at 1 (Feb. 26, 2015)); Ex. 13, cited in SCAC ¶ 23 n.7 & SJTC ¶ 6 n.2 (Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, Reuters, at 1 (Mar. 10, 2015)).  Although Plaintiffs assert that the Dealers trade customized or "bespoke" swaps on TrueEx (Opp. 40), TrueEx made a deliberate decision to focus on such swaps (*see* Dealer Br. 19 n.37), and Plaintiffs assert that customized swaps were within the scope of the alleged conspiracy (*see* SCAC ¶¶ 317-18).  Plaintiffs also make a conclusory group-pleading allegation that the Dealers provide liquidity only to TrueEx's RFQ platform (Opp. 40), but the article cited in the complaints for that proposition says no such thing (SCAC ¶ 284, citing Playforth Ex. 13).  In any event, according to the allegations of the complaints, the Dealers had unilateral reasons to prefer RFQ trading to all-to-all trading.  *See supra* at 6-8; Dealer Br. 33-35.

Plaintiffs' TrueEx allegations, *see Twombly*, 550 U.S. at 568 n.13, and the Court may draw a negative inference from Plaintiffs' allegation that six Dealers—but not the other six—declined to trade on TrueEx.  *See Muhammad*, 547 F.3d at 880.  As for Bloomberg and Tradeweb, Plaintiffs plead no facts at all in support of their conclusory assertion that the Dealers "refuse to trade" on the all-to-all order books offered by those platforms.  *See* SCAC ¶ 304; Dealer Br. 39-40 & n.54.

 <u>Javelin</u>.  Plaintiffs' case is further eroded by their failure to allege that *eight out of twelve* Dealers ever declined to clear trades for Javelin.  *See* Dealer Br. 22, 36.  Plaintiffs respond by once again citing their allegation that the Dealers withheld FCM services "as detailed below" (Opp. 50, citing SCAC ¶ 194), but the "details below" identify only *four* FCMs that allegedly declined to clear for Javelin (Dealer Br. 22, 36).[20]  These allegations fall well short of alleging a parallel refusal to clear by twelve FCMs because courts will credit only "well-pleaded, nonconclusory factual allegation[s] of parallel behavior."  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint").

 Although Plaintiffs do allege that most of the Dealers' trading desks declined to make markets on Javelin, these are mere allegations of parallel inaction consistent with each Dealer's individual interest in preserving its profits.  Plaintiffs do not allege that these Dealers suddenly *stopped* trading on Javelin, but only that they never started.  All of the boycott cases that Plaintiffs rely upon, by contrast, involved situations in which the defendants *started* dealing with

---

[20] The other Dealers' FCMs apparently cleared more than a hundred IRS trades for Javelin.  *See* SCAC ¶ 191 (all trades on SEFs must be cleared, and Dealer FCMs are "effectively . . . gatekeepers for IRS clearing"); *id.* ¶ 278 (Javelin conducted "fewer than 200 trades"); *id.* ¶ 282 (any buy-side firm "would have to clear [its] trade through one of the Dealer Defendants' FCMs").

the plaintiff or *agreed* to deal with the plaintiff and then abruptly and simultaneously reversed course.[21]  No such abrupt and simultaneous reversal is alleged here, and no inference of conspiracy may be drawn where the "conduct claimed to be conspiratorial is nothing more than the continuation of preexisting [business] patterns." *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009).

In an effort to shore up their Javelin allegations, Plaintiffs assert that several Dealers referred to a "supposed lack of [buy-side] support" on Javelin as an "excuse" for declining to trade on Javelin.  Opp. 39.  But Plaintiffs' own allegations confirm that Javelin *did* have far less buy-side support than incumbent platforms like Bloomberg and Tradeweb.  Indeed, Plaintiffs allege that "fewer than two hundred trades" occurred on Javelin and that only "eighty" out of the "thousands" of participants in the IRS market signed up for Javelin's platform.  SCAC ¶¶ 267, 278, 386; *see also* Dealer Br. 17-18.  Accordingly, although Plaintiffs characterize the low level of buy-side participation on Javelin as a pretextual "excuse" (Opp. 39), their factual allegations indicate the opposite.[22]  Plaintiffs' "conclusory allegations, without more, do not permit the Court to draw the reasonable inference that [defendants'] justification for [their behavior] is a

---

[21]  *See Anderson News*, 680 F.3d at 187 ("defendants ceased, in virtual lock-step, to deal with [plaintiff]" after numerous communications in "the preceding two-week period"); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 48 (1st Cir. 2013) (defendant "abruptly withdrew its interest" in working with plaintiff after meeting with competitors); *SD3*, 801 F.3d at 428 (citing defendants' "abrupt and unexplained shift in behavior"); *In re CDS*, 2014 WL 4379112, at *10 (defendants "abruptly and simultaneously" changed their position and refused to work with CMDX).

[22]  Nor do Plaintiffs succeed in alleging some sort of parallel effort to discourage Javelin's customers.  Plaintiffs identify only one Dealer (Goldman) and only two customers (NISA and Citadel) allegedly involved in such efforts (*see* SCAC ¶¶ 265-66), and alleged efforts to persuade individual customers to trade on a dealer's preferred trading platform are consistent with unilateral behavior.  Moreover, although Plaintiffs speculate that Dexter Senft may have asked for relief from a Javelin non-disclosure agreement to coordinate pressure on Javelin's customers (SCAC ¶¶ 247, 264), no well-pled facts support that inference.  Indeed, it makes no sense to suggest that Mr. Senft—an alleged "ringleader" of an unlawful conspiracy (Opp. 39)—nonetheless was fastidiously law-abiding when it came to honoring a non-disclosure agreement with an alleged target of the conspiracy.

pretext." *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 427 (M.D. Pa. 2013).

Finally, Plaintiffs have no effective answer to the admitted facts that RBS traded on Javelin and that UBS fed liquidity to Javelin through its Neo aggregation service. Plaintiffs attempt to brush off this support as "limited and superficial" (Opp. 49), but those empty adjectives do not alter the fact that, under Plaintiffs' own allegations, RBS and UBS acted in direct opposition to the alleged "carefully planned and well-orchestrated conspiracy" (SJTC ¶ 5).

*Tera.* Plaintiffs' Oppositions fail to disguise the fact that, under Plaintiffs' own allegations, Tera was the weakest and least attractive of all of the startup platforms that were attempting to enter the IRS market:

- Fewer than fifteen firms out of "thousands" of market participants allegedly expressed interest in Tera (SCAC ¶¶ 220, 386; SJTC ¶ 194);

- Tera conducted only a single IRS trade before abandoning the market (SJTC ¶ 218);

- Tera did not attempt to recruit any traditional dealers to provide liquidity on its platform (Dealer Br. 19; SJTC ¶ 190; SCAC ¶¶ 213-15);[23]

- There are no allegations that Tera was willing to bear the "high cost" of building a direct data connection to the Dealers (*see* SJTC ¶ 172; Dealer Br. 21-22 & n.40); and

- There are no allegations that Tera connected to a credit hub before 2014, and no allegations of clearing difficulties with six of twelve Dealers after that date (*id.*).

Under these circumstances, continuing to trade on preexisting trading venues such as Bloomberg and Tradeweb, and declining to invest time or resources in the struggling Tera platform, was at

---

[23]   Although Plaintiffs coyly assert that Tera "welcomed and sought the participation" of the Dealers (Opp. 52), the complaints allege only that when certain *Dealers* reached out to *Tera*, Tera "was happy to meet with [them] and hoped to secure their support" (SCAC ¶ 222). According to the complaints, Tera never asked to meet and never did meet with the Dealers' *trading desks*, much less attempted to recruit them. *See* Dealer Br. 19; SCAC ¶ 223 (acknowledging that Tera "was not focusing on dealer recruitment"); SJTC ¶ 190 (Tera focused on attracting "non-traditional liquidity providers" instead of dealers).

least as consistent with "rational and competitive business strategy" as with a sprawling antitrust conspiracy.[24]  *Twombly*, 550 U.S. at 554.

Plaintiffs counter by citing their allegations that "multiple" Dealers referred to Tera as a "Trojan Horse" (Opp. 40), but those allegations are so vague and incomplete as to be almost meaningless.  Plaintiffs do not say *which* Dealers allegedly used that phrase, *how many* Dealers purportedly did so, *when* they did so, or in what context.  *See* SCAC ¶¶ 217, 242.  Plaintiffs would have pled these missing facts if it were in their interest to do so, but notably omitted them even from their amended complaints.  *See Puente v. Ridge*, 324 F. App'x 423, 428 (5th Cir. 2009) (dismissing claim where plaintiff "did not allege the facts that, if true, were well within her knowledge"); *Nowell v. Conner*, 2006 WL 36860, at *2 (N.D. Tex. 2006) ("If a complaint omits facts concerning pivotal elements of the pleaders' claim, the Court is justified in assuming the nonexistence of such facts.").[25]

Plaintiffs also renew their argument that four of the twelve Dealers' FCMs made a "pretextual" request to audit Tera's rulebook after Tera processed its first and only IRS trade (Opp. 52), but those allegations fail for the reasons set forth in the Dealers' opening brief (*see* Dealer Br. 37).  Plaintiffs fail to explain, among other things, how a request to audit Tera's

---

[24]    Although Plaintiffs deride as "pretextual" certain Dealers' alleged statements that they were "resource constrained" (SCAC ¶ 229), no well-pled facts support that conclusion, and courts do not accept conclusory allegations of "pretext."  *See Pennsylvania*, 948 F. Supp. 2d at 427.  In addition, Tera's own allegations and the CFTC rulemaking record confirm that setting up SEF-trading and clearing is resource intensive.  *See, e.g.*, SJTC ¶ 172 (referring to the "high cost" of a direct data connection); Dealer Br. 7-8 & nn.8-10; *id*. at 21 n.40 (describing resource requirements).

[25]    Although Plaintiffs also assert that certain Dealers inquired about investing in Tera (Opp. 17), that conduct is precisely what Plaintiffs allege that the Dealers *should* have been doing:  the complaints allege that dealers should have been looking to "obtain[] an equity share" in a new trading platform in order to "share in the profits of the enterprise" (SCAC ¶ 344).

rulebook could be considered "pretextual" when the rulebook *contractually binds* any FCM that

accesses Tera's platform. *See id.* at 37 n.52.[26]

> **2.      Plaintiffs' "bifurcation" and "plus factor" allegations do not support their claims.**

Plaintiffs also argue that certain "background conditions" and "plus factors" support their

claims.  Opp. 36-39; JT Opp. 16-20.  None of these arguments withstands scrutiny, and none

supports an inference of a far-flung antitrust conspiracy.  *See Citigroup*, 709 F.3d at 137 ("even

if a plaintiff alleges additional facts or circumstances—what we have previously called 'plus

factors'—these facts must still lead to an inference of conspiracy").

Bifurcation.  Although Plaintiffs make much of their allegations that the market is

"bifurcated" into a dealer-to-dealer wholesale segment and a dealer-to-client retail segment

(Opp. 37-39), their own complaints make clear that this so-called "bifurcation" emerged long

before the alleged conspiracy period for legitimate economic reasons.  *See* Dealer Br. 6-9, 39

(collecting the relevant allegations).  No inference of conspiracy should be drawn simply from

the alleged continuation of pre-existing trading patterns.  *See id.* at 39.

Plaintiffs' bifurcation arguments are further eroded by several additional circumstances.

First, Plaintiffs concede, as they must, that the Court may consider at least the *fact* that buy-side

comments to the CFTC overwhelmingly supported RFQ trading over all-to-all trading.  *See infra*

at 33-34.  Second, although Plaintiffs assert that all-to-all trading occurs on interdealer broker

platforms (Opp. 43), they do not deny that the vast majority of this so-called "all-to-all trading"

---

[26]    Unable to provide a cogent response, Plaintiffs resort to overstating the allegations of the
complaints, neither of which actually alleges that the other three FCMs at issue learned of the Tera
trade from BNPP as opposed to Tera.  *See* Opp. 51; SCAC ¶ 235; SJTC ¶ 205.

occurs through *human voice-brokers*.[27]  Finally, Plaintiffs do not dispute the New York Federal

Reserve Bank's finding that even the most commonly traded forms of IRS trade no more than

"150 times per day."[28]  The Court may take judicial notice of those undisputed figures, *see*

*Murphy v. Capella Educ. Co.*, 589 F. App'x 646, 654 & n.7 (4th Cir. 2014) (taking judicial

notice of published statistics that "contradict [plaintiff's] assertion"), and may also take notice

that Plaintiffs failed to allege any contrary figures in their amended complaints, even after the

Dealers relied on the New York Fed figures in their original motion to dismiss.  *See Muhammad*,

547 F.3d at 880; Dkt. 124 at 7 & n.6.  Not surprisingly, the complaints do not assert that *any*

financial instrument has *ever* sustained all-to-all trading at such low volumes.[29]

　　Penalty Allegations.  Although the Oppositions assert that the Dealers "penalized" market

participants that threatened their interests, their two main examples of purported penalties both

collapse upon inspection.  First, Plaintiffs rely on truncated quotations from a magazine article to

support their allegation that four FCMs raised the clearing fees of "buy-side firms that were

pushing against the bifurcated market structure."  SCAC ¶ 199.  But the quoted article

completely belies that allegation, explaining instead that FCM fee increases were the result of

---

[27]　The complaints make clear that interdealer trading occurs mainly through voice-brokers, and there are no allegations that buy-side firms had any interest in trading through interdealer voice-brokers.  *See, e.g.*, Dealer Br. 40 & nn.55-56; SCAC ¶ 85 (describing IDB voice-broker platforms and noting that IDBs "also" offer order books); *id.* ¶ 171 (referring to "voice-brokered trades" via interdealer broker ICAP); *id.* ¶ 13 (alleging that buy-side firms wanted "electronic trading").

[28]　*See* Dealer Br. 8-9; Playforth Ex. 26, CFTC Commissioner J. Christopher Giancarlo, *Pro-Reform Reconsideration of the CFTC Swaps Trading Rules: Return to Dodd-Frank*, at 9 & n.23 (Jan. 2015) (citing Michael Fleming et al., *An Analysis of OTC Interest Rate Derivatives Transactions: Implications for Public Reporting*, Federal Reserve Bank of New York, Staff Report No. 557, at 14 (Mar. 2012; rev. Oct. 2012)).

[29]　Plaintiffs' name give-up arguments fail for similar reasons, including that name give-up admittedly emerged long before the alleged conspiracy period for legitimate economic reasons.  *See* Dealer Br. 42.

"higher regulatory capital requirements."[30]   Second, although the Class Opposition leaves the impression that certain Dealers allegedly "threatened" the interdealer broker GFI *in the IRS market* (Opp. 14, 39 n.28), the prior round of complaints admitted that the conduct at issue allegedly occurred in a different market (Dealer Br. 45 n.62).[31]

As these examples show, Plaintiffs' "penalty" allegations are based on misleading citations and overblown rhetoric.  Moreover, to the extent that Plaintiffs allege that certain Dealers engaged in one-off, unilateral expressions of hostility to Tera or Javelin, such unilateral acts of "resisting competition" are exactly what one would expect in response to an alleged threat to the Dealers' profits.  *See Twombly*, 550 U.S. at 566; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) ("a desire to extinguish one's rivals is entirely consistent with . . . competition").

Motive.  Plaintiffs assert that the Dealers had a "motive to conspire" because each Dealer wanted to "collect[] inflated profits."  Opp. 36.  Every participant in every market, however, desires high profits; allegations of a profit motive therefore fail to supply a plus factor.[32]

---

[30]   The article reports that "faced with higher regulatory capital requirements, [FCMs] are hiking fees and giving clients the choice of paying up or moving on."  Playforth Ex. 19, cited in SCAC ¶ 199 n.82 & SJTC ¶ 231 n.48 (Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Risk at 1 (July 30, 2015)).  Nothing in the article remotely supports the proposition that FCMs were penalizing firms that resisted market bifurcation.

[31]   Similarly, observing that Barclays did not participate in Project Fusion until 2009, Plaintiffs urge the inference that Barclays was placed in a "penalty box" until that date.  Opp. 47 n.36; SCAC ¶ 164.  That inference is wholly unwarranted:  Citi, too, was a latecomer to Project Fusion (SCAC ¶ 123), but Plaintiffs do not assert that Citi was placed in a "penalty box."  Nor do Plaintiffs identify who, when, or where any Dealer supposedly agreed to penalize Barclays.

[32]   *See Musical Instruments*, 798 F.3d at 1194 n.8 ("common motive for increased profits always exists"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("if a (continued)

29

Opportunity.  Plaintiffs assert that "Defendants had abundant opportunities to conspire" (Opp. 37; JT Opp. 18-19), but Second Circuit law squarely holds that "[t]he mere opportunity to conspire does not by itself support the inference that [] an illegal combination actually occurred." *Capital Imaging*, 996 F.2d at 545; *accord United States v. Taubman*, 297 F.3d 161, 166 (2d Cir. 2002) (it "is not the law" that "knowledge of and participation in an antitrust conspiracy can be inferred merely from the fact of meetings between persons engaged in competing businesses"); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) ("inferring a conspiracy from the existence of these communications would amount to speculation"); *Weit v. Cont'l Ill. Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir. 1981) ("Given the need for some degree of cooperation in a [joint venture], the opportunity to conspire evidence lacks significant probative value.").

Market Concentration.  Plaintiffs argue that the IRS market is "concentrated" and therefore susceptible to conspiracy (Opp. 36), but once again their factual allegations indicate just the opposite.  Plaintiffs allege that all twelve Dealers competed for IRS trades; they cite market share tables that identify four non-defendant dealers with market shares as big or bigger than those of UBS; they concede that non-defendant FCMs were serving the IRS market; and they identify no barriers to entry by additional FCMs.  *See* Dealer Br. 44 n.59; SCAC ¶¶ 191, 312 & nn.77, 135; SJTC ¶¶ 100, 362 & nn.14, 145.

Alleged Conduct in Other Markets.  As predicted (Dealer Br. 46-47), Plaintiffs try to bolster their inadequate allegations here by referring to allegations in other cases and other

---

motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a motive"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins. Co.*, 173 F. Supp. 3d 1293, 1300 (M.D. Fla. 2016) ("The mere desire to make a profit cannot constitute a 'plus factor,' because conscious parallelism is itself a profit-maximizing behavior."); *cf. Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (citing as a plus factor allegations indicating that "some form of agreement among defendants would have been needed to render the enterprises profitable").

markets. *See* Opp. 5-6. These efforts are improper and unavailing. As the Supreme Court and Second Circuit both have recognized, antitrust litigation exposes defendants to extraordinary discovery obligations and settlement pressures. *See Twombly*, 550 U.S. at 558-59; *Citigroup*, 709 F.3d at 137. For those reasons among others, a plaintiff cannot salvage otherwise deficient antitrust allegations by arguing that "if it [allegedly] happened there, it could have happened here." *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1104 n.3 (N.D. Cal. 2012) (rejecting "effort to imply [defendant's] propensity for engaging in anticompetitive behavior"; "the court does not find evidence of past actions—particularly those involving different conduct or products— relevant in considering the current motion"). Further, the cases involving other markets that Plaintiffs rely upon are plainly distinguishable from this action. For example, even accepting the analysis of *In re CDS* (which the Dealers believe is incorrect), that case involved allegations that the defendants (i) initially agreed to deal with the alleged target of a purported boycott conspiracy, and then (ii) "abruptly and simultaneously" refused any further dealings and (iii) jointly refused to license essential intellectual property to the alleged target. *See* 2014 WL 4379112 at *10; *see also* Dealer Br. 46-47. No remotely comparable allegations exist here.[33]

### E.   Plaintiffs continue to rely on impermissible group-pleading.

The complaints also should be dismissed because Plaintiffs continue to rely on blunderbuss allegations regarding "the Dealer-Defendants" as an undifferentiated whole.

---

[33]   Similarly, Plaintiffs' reference to a pending government subpoena "carries no weight in pleading an antitrust conspiracy claim." *Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009). Plaintiffs' reference to an alleged joint defense meeting in which in-house counsel allegedly discussed joint defense strategy and a coordinated motion to dismiss this action is even further afield. Any joint defense discussions that occurred in response to the filing of Plaintiffs' complaints would have no relevance to the plausibility of Plaintiffs' claims.

Contrary to Plaintiffs' assertions (Opp. 56), such group-pleading tactics are no more permissible in antitrust conspiracy cases than in other cases.  *See* Dealer Br. 42-43 (citing authority). Furthermore, group pleading is especially inappropriate here because Plaintiffs repeatedly make generalized allegations regarding "the Dealer Defendants" even when their own complaints make clear that such language is inaccurate:

- Plaintiffs assert that "the Dealer Defendants" boycotted Javelin and TrueEx (SCAC ¶ 27), but they elsewhere admit that RBS and UBS both supported Javelin, and the articles they cite in their TrueEx allegations confirm that JPMorgan and twelve other unnamed dealers supported TrueEx.  *See* Dealer Br. 18-20.

- Plaintiffs assert that "the Dealer Defendants" conspired to impose name give-up (SCAC ¶ 293), but elsewhere admit that UBS actually opposed name give-up.[34]

- Plaintiffs allege that "the Dealer Defendants" conspired through the Tradeweb Board of Directors (SCAC ¶ 151), but elsewhere admit that BNPP and HSBC never invested in Tradeweb and had no representatives on its Board.  Dealer Br. 16 n.33, 44.

Plaintiffs' collective allegations regarding "the Dealer Defendants" thus fail as a matter of both fact and law to support the conclusion that any individual Dealer engaged in the conduct at issue. *See, e.g.*, Dealer Br. 42-46 (citing authority); *In re Elevator*, 502 F.3d at 50-51 (affirming dismissal of antitrust claims made in "general terms without any specification of any particular activities by any particular defendant").[35]

---

[34]   *See* Opp. 54; Dealer Br. 44.  Plaintiffs argue that "the fact" of UBS's public opposition to name give-up "only confirms" that it colluded to impose the practice "pursuant to its agreement with the other Dealer Defendants."  Opp. 54.  This circular argument only underscores the fundamental flaw in Plaintiffs' claims:  the alleged *facts* show only that UBS opposed name give-up, and Plaintiffs cannot overcome those facts by relying on group-pleaded and conclusory allegations to the contrary.

[35]   The cases cited in the Opposition (at 56 n.43) do not accept group pleading as sufficient.  Those cases held only that specific complaints had pled sufficient facts about individual defendants.  *See, e.g.*, *FX I*, 74 F. Supp. 3d at 593 ("in addition to describing the alleged conspiracy in great detail, the U.S. Complaint makes specific allegations regarding each Defendant"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *13 (E.D.N.Y. 2011) ("While the general use of the term 'defendants' is problematic if used without any allegation as to each defendant, the Complaint does make specific allegations against specific defendants.").

Plaintiffs' Appendix B does not alter these conclusions.  Although Appendix B purports to list specific allegations that tie each Dealer to the alleged conspiracy, those allegations consist of either (i) allegations of mere opportunities to conspire, (ii) allegations of unilateral conduct, (iii) allegations of benign and lawful joint venture conduct, or (iv) impermissible group-pleading allegations about "the Dealer Defendants."  For the reasons set forth in the Dealers' opening brief (at 42-46), these allegations fail to link any individual Dealer to a conspiracy.

Finally, although Plaintiffs seek refuge in the adage that only "slight evidence" is needed to connect an additional defendant to a conspiracy (Opp. 58), they fail to acknowledge that the Second Circuit has rejected the slight evidence rule.  *See, e.g.*, *United States v. Huezo*, 546 F.3d 174, 180 & n.2 (2d Cir. 2008) (holding that use of the "slight evidence" rule "should be discontinued"); *id.* at 184 (Newman, J., concurring) (the rule is "incorrect, entered federal jurisprudence improvidently, ha[s] been routinely repeated without consideration of [its] infirmity, and should be discarded"); *see also In re Lithium Ion Batteries*, 2014 WL 309192, at *13 n.13 ("[T]he proffered 'slight connection' or 'slight evidence' rule has been disapproved as a standard for determining whether a defendant has joined a conspiracy in the first instance, and indeed as a standard applicable in district courts at all.").

## F.    The Dealers appropriately cite judicially noticeable information.

Contrary to Plaintiffs' assertions, the Dealers' arguments for dismissal do not depend on a "counterstatement of facts" drawn from materials outside the complaint.  Opp. 6.  Rather, the absence of any conduct contrary to unilateral self-interest and the additional pleading deficiencies discussed above require dismissal on their own.  Plaintiffs misstate the law, however, in suggesting that the Court cannot also consider "the full contents of the published articles referenced in the complaint," *Twombly*, 550 U.S. at 568 n.13, as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit,"

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).  Courts may consider such materials in deciding motions to dismiss, *see id.*, and a complaint's factual allegations need not be credited if "contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice."  *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011); *see also Ginx v. Soho*, 720 F. Supp. 2d 342, 345 (S.D.N.Y. 2010) ("To the extent that the complaint refers to or relies on a particular document, it is of course proper for the Court to consider the entire text of that document in deciding any motion to dismiss.").

The Court may also consider materials such as agency records, securities filings, and news articles for the fact of what was stated and for matters not subject to dispute.[36]  These categories account for many of the citations to which Plaintiffs object in their Appendix A,[37] and citations to materials quoted or relied upon in the complaints account for the remainder.[38]  Although the Dealers need not rely on such materials to prevail on their motion, the law is clear that the Court is entitled to consider them.

---

[36]     *See, e.g.*, Opp. 21-22 (acknowledging that the Court may consider the fact of what was stated in comments on CFTC rules); *id.* at 22 n.10 (acknowledging that courts may take notice of matters "'not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned,'" quoting *Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015)); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (courts "may consider matters of which judicial notice may be taken," including "press articles and SEC filings"); *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) ("[j]udicial notice may be taken of public filings" at the motion to dismiss stage); *Wells Fargo Bank, N.A.*, 127 F. Supp. 3d at 166 (courts may consider "newspaper articles, documents publicly filed with the SEC[,] . . . [and] documents filed with governmental entities and available on their official websites"); *Murphy*, 589 F. App'x at 654 & n.7 (taking judicial notice of published statistics); *Tavares v. N.Y. City Health & Hosps. Corp.*, 2015 WL 158863, at *3 (S.D.N.Y. 2015) (relying on judicially noticed information from a state-run website to refute plaintiff's claim).

[37]     These categories encompass Appendix A entries 1, 2, 4-8, 9, 12-17, 23, 36, 37, 43, 44, and 46. *See* Dealer Br. 6-12, 15, 19, 21, 30, 61, 65, 78.

[38]     This category encompasses Appendix A entries 3, 10, 11, 18-22, 24-30, 32-35, 38-42, and 45. *See* Dealer Br. 7, 9, 13-15, 17-20, 40, 42, 44, 45, 78.  The remaining Appendix A entries consist of materials cited in other defendants' briefs.

II.     **CLASS PLAINTIFFS LACK ANTITRUST STANDING.**

Class Plaintiffs' complaint should be dismissed for lack of antitrust standing because they are not efficient enforcers of the antitrust laws with respect to the conduct alleged.

This case is about the Dealers' purported efforts to prevent the development of certain IRS trading platforms.  The efficient enforcers for these claims are the affected platforms themselves.  But Class Plaintiffs are not those trading platforms.  Instead, they are a group of traders who allege that their IRS trades would have been executed at tighter bid-ask spreads had those platforms succeeded, connected to clearing facilities, caused traders to abandon the RFQ trading model, and attracted new liquidity providers to the marketplace.  Moreover, in critical distinction to the facts of *In re CDS*, 2014 WL 4379112, here, two allegedly affected platforms have brought suit, ensuring that the antitrust laws will be efficiently enforced even if Class Plaintiffs' claims are rightly dismissed for lack of antitrust standing.

Class Plaintiffs offer three overarching, yet unavailing, responses to the Dealers' standing arguments.  First, they call the Dealers' position "vacuous" because the Dealers "ignore" *McCready* and *DDAVP*, which held that when consumers allege that they were harmed by the exclusion of competitors from a market, the consumers have antitrust standing if their injuries are "inextricably intertwined" with the injuries that the defendants inflicted on the excluded competitors.  Opp. 71 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479-84 (1982); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)).  But whether Class Plaintiffs' injuries are inextricably intertwined with those of plaintiffs like Tera and Javelin goes to a distinct aspect of antitrust standing, *i.e.*, whether Class Plaintiffs can establish antitrust injury—something Dealers are not challenging in this motion.  *See DDAVP*, 585 F.3d at 688 (because plaintiffs' claimed injury was inextricably intertwined with the conduct's

anticompetitive effects, "[a]ntitrust injury is therefore present"). The "inextricably intertwined" analysis has no bearing on whether Class Plaintiffs are efficient enforcers.

Second, Class Plaintiffs claim that the Dealers' arguments are "fundamentally misguided" because "a court need not choose between different sets of victims of an antitrust conspiracy." Opp. 72. But the Dealers are not arguing that there can be only one efficient enforcer per case. Rather, the Dealers' position is that regardless of how many types of efficient enforcers there theoretically could be in this matter, Class Plaintiffs are not among them. Dealer Br. 48.

Third, Class Plaintiffs assert that "the central purpose of the antitrust laws is to protect consumers" from higher prices, and consequently, that denying consumers standing would contravene the "central goal" of the antitrust laws. Opp. 72 (quoting Areeda & Hovenkamp, *Antitrust Law* Vol. IIA ¶ 339d (3d ed. 2007) (discussing predatory pricing claims, not group boycotts)). In so arguing, Class Plaintiffs in essence advocate for a blanket rule that consumers are always efficient enforcers.

Class Plaintiffs are wrong both on their theory and its application. As an initial matter, the goal of the antitrust laws is not to keep consumer prices low, but to protect competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (Sherman Act was enacted out of "congressional concern with the protection of competition"); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (antitrust laws were enacted for protection of competition). Consistent with that goal, the efficient enforcer analysis is not primarily concerned with whether consumers can sue whenever they believe they have paid high prices; instead it is focused on whether antitrust violations can be efficiently adjudicated by the plaintiffs seeking to vindicate the public interest in antitrust enforcement. *See Gatt Commc'ns, Inc. v. PMC Assocs.,*

36

*LLC*, 711 F.3d 68, 80 (2d Cir. 2013); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983) ("*AGC*").

Moreover, even if Class Plaintiffs' doctrinal musings were correct, the conclusions they draw are unsupportable.  In its most recent pronouncement on the efficient enforcer analysis, the Second Circuit explicitly rejected the very proposition that Class Plaintiffs urge this Court to adopt—namely, that consumer status automatically makes a plaintiff an efficient enforcer.  As the Second Circuit explained, "consumer status is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the plaintiff is a consumer or competitor."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016).  For all these reasons, Class Plaintiffs have not shown they are efficient enforcers.

**A.      Class Plaintiffs' alleged injuries are indirect and remote.**

Class Plaintiffs contend that their injuries "could not be more direct" because they "bought IRS directly from the Dealer Defendants at inflated prices the Dealer Defendants were able to charge precisely because of their conspiracy to suppress competition."  Opp. 74.  This argument, however, conflates the issue of directly entering into IRS transactions with having direct injuries.  Dealer Br. 48.  What matters in the context of antitrust standing is the latter—the "directness or indirectness *of the asserted injury*."  *AGC*, 459 U.S. at 540.  On this point, Class Plaintiffs' own words are their downfall.

As Class Plaintiffs acknowledge, they were not harmed because of any action that the Dealers aimed directly at them, but rather because the Dealers allegedly prevented increased competition, and "common sense dictates, and empirical analyses confirm [that] competition lowers costs because the more competition for business, the better quotes the dealers tend to give and the narrower the spreads."  Opp. 74; *see also* SCAC ¶¶ 328-31 (discussing impact, absent alleged conspiracy, that *electronic all-to-all trading* ultimately would have had on Plaintiffs'

transactions).  Class Plaintiffs even assert that the size of their bid-ask spreads was negatively impacted by a supposed lack of all-to-all trading that kept third party non-dealers from providing quotes and that allegedly would have generated additional competition.  *Id.*  These statements make clear that the Dealers' alleged actions, at most, are only a but-for cause of their claimed injuries, and "but-for causation" is not the type of direct causation required for antitrust standing. *See, e.g.*, *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008).

Judge Lynch's decision in *AWB* is instructive.  There, a group of wheat farmers claimed that defendants' illicit actions caused a decrease in the prices at which they sold their wheat.  In finding that plaintiffs lacked antitrust standing and that plaintiffs were not efficient enforcers, Judge Lynch noted that a "multitude of factors" affected wheat prices, and AWB's conduct was, at most, only a "but for" cause of plaintiffs' asserted injury—which was insufficient under the law.  *Id.* ("Plaintiffs thus cannot show that AWB's conduct in Iraq was a 'proximate cause' of their injury, a required element of antitrust standing.").

Here, too, Class Plaintiffs do not allege that the Dealers' actions directly caused their harm.  Class Plaintiffs attempt to salvage their claim by asserting that their injuries "were the very reason for the conspiracy."  Opp. 75.  Once again, however, Class Plaintiffs' own allegations contradict their argument.  Class Plaintiffs plead that the Dealers' motivation was "to protect their privileged position as dealers in the IRS market," and ensure "that a dealer bank remains on one side of every trade."  SCAC ¶ 4.  Class Plaintiffs' alleged injuries are accordingly just trickle-down effects that might conceivably be traced to an alleged antitrust violation, which fail as a matter of law to sustain efficient enforcer standing.  *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).

**B.     More efficient enforcers exist and have already sought to enforce the antitrust laws.**

Class Plaintiffs do not deny that the Dealers' alleged activities were directed at SEFs and that the targeted SEFs are more efficient enforcers of the antitrust laws than Class Plaintiffs. Class Plaintiffs also do not dispute that, in contrast to *In re CDS*, here the more efficient enforcers have brought suit.  Nonetheless, Class Plaintiffs argue that they should be deemed efficient enforcers because the injuries they allegedly suffered as investors differ from those of the SEFs, and it would be "intolerable" to deny them compensation.  Opp. 79.

In so arguing, Class Plaintiffs essentially urge a black-letter rule that consumers are always efficient enforcers, and thereby evince a fundamental misunderstanding of the efficient enforcer analysis.  As the Second Circuit recently made clear, what is at issue in this analysis is not whether all alleged victims will be compensated, but whether "*the antitrust laws [will] be efficiently enforced.*"  *Gelboim*, 823 F.3d at 779.  "[I]mplicit in [this] inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws."  *Id.*

Class Plaintiffs simply are not necessary for the efficient enforcement of the antitrust laws in this case.  Indeed, the claims brought by the true efficient enforcers here—Tera and Javelin—essentially are identical to those of Class Plaintiffs.  As a result, denying Class Plaintiffs antitrust standing will not "'leave [an alleged] antitrust violation . . . unremedied.'"  *In re CDS*, 2014 WL 4379112, at *9 (quoting *DDAVP*, 585 F.3d at 689).

**C.     Class Plaintiffs' damages are highly speculative.**

Class Plaintiffs do not dispute that calculating damages in this case will involve enormous complexities.  Opp. 80-81.  "Where the 'theory of antitrust injury depends upon a complicated series of market interactions,' the damages are speculative."  *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *10 (S.D.N.Y. 2014) (quoting *Reading Indus., Inc. v.*

*Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980)).  And, the fact that Class Plaintiffs'

damages are highly speculative is a "sign" that Class Plaintiffs are "inefficient engine[s] of

enforcement."  *Gelboim*, 823 F.3d at 779-80.

Assuming that they can establish their claims, the allegedly boycotted SEFs could present

a straightforward argument that the alleged conduct caused their alleged injury.  But when it

comes to Class Plaintiffs, "to find antitrust damages [here] would engage the court in hopeless

speculation concerning the relative effect of an alleged conspiracy . . . on the price of [IRS

trades], where countless other market variables could have intervened to affect those pricing

decisions."  *Reading*, 631 F.2d at 13-14.  Antitrust standing does not extend to such "intricate

efforts to recreate the possible permutations in the causes and effects of a price change."  *Id.*

### D.    Apportioning damages would be prohibitively complex.

With respect to apportioning damages, Class Plaintiffs argue that they are seeking

"conceptually different measures of damages" from the SEFs.  Opp. 82.  But that is not in

dispute.  In their opening brief, the Dealers explicitly noted the differences in the types of

damages sought.  *See* Dealer Br. 57 ("Javelin and Tera seek to recover the capital that they

invested in their failed exchanges and the brokerage fees they purportedly would have earned

had the exchanges succeeded.  Class plaintiffs seek to recover the 'artificially inflated bid-ask

spreads' that they supposedly paid because the exchanges did not succeed.").  The reason that

apportioning damages here is prohibitively complex is not because the damages asserted by the

SEFs and the Class Plaintiffs are the same, but rather because the two measures of damages are

*negatively correlated*.  Specifically, there is an inherent tension between the two sets of

plaintiffs' damages claims because, if SEFs like Tera and Javelin had succeeded, and the Dealers

had made less money on IRS transactions, they presumably would have decreased the number of

IRS transactions in which they engaged with Class Plaintiffs, thus reducing Class Plaintiffs'

alleged damages.  *See id.*  Class Plaintiffs are tellingly silent on this point.

For these reasons, Class Plaintiffs lack efficient enforcer antitrust standing.

## III.   THE COMMODITY EXCHANGE ACT, AS AMENDED BY DODD-FRANK, IMPLICITLY PRECLUDES PLAINTIFFS' POST-DODD-FRANK CLAIMS.

Plaintiffs do not meaningfully address the actual and potential conflicts with the CFTC's

regulatory scheme that their antitrust claims would create.  They instead focus on Dodd-Frank's

antitrust savings clause.  As explained below, their interpretation of that clause should be

rejected, and their post-Dodd-Frank claims should be dismissed on implied preclusion grounds.

### A.   Dodd-Frank's savings clause does not bar the application of the implied preclusion doctrine to Plaintiffs' claims.

Unlike the antitrust savings clause at issue in *Verizon Communications Inc. v. Law*

*Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), the Dodd-Frank savings clause contains an

exception.  The clause reads:  "Nothing in this Act, or any amendment made by this Act, shall be

construed to modify, impair, or supersede the operation of any of the antitrust laws, *unless*

*otherwise specified*."  12 U.S.C. § 5303.  Plaintiffs assert a cramped reading of "unless otherwise

specified," positing that it refers to only four provisions in Dodd-Frank.  Opp. 84.  This

interpretation is incorrect:  it ignores Title VII's "Antitrust Considerations" provisions, and it

renders superfluous another antitrust savings clause located in Dodd-Frank's insurance title.

Properly read, the savings clause does not bar implied preclusion of Plaintiffs' claims.

The Title VII "Antitrust Considerations" provisions "modify . . . the operation of" the

Sherman Act for certain swap market actors that are pervasively regulated by the CFTC.  Those

provisions state that, "[u]nless necessary or appropriate to achieve the purposes of this Act, a

swap dealer or major swap participant shall not—(A) adopt any process or take any action that

results in any unreasonable restraint of trade; or (B) impose any material anticompetitive burden

on trading or clearing." 7 U.S.C. § 6s(j)(6); *see also, e.g., id.* § 7b-3(f)(11) (similar for swap execution facilities); *id.* § 7a-1(c)(2)(N) (similar for derivatives clearing organizations). In addition to the fact that the "Antitrust Considerations" heading specifically invokes the antitrust laws, "restraint of trade" is a term of art clearly drawn from and specifying the Sherman Act, *see* 15 U.S.C. § 1, and the "unreasonable" language is drawn from a century of Sherman Act jurisprudence, *see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).[39] Moreover, the "necessary or appropriate" exception to these provisions modifies the "operation," 12 U.S.C. § 5303, of the Sherman Act. This language provides that actions that otherwise would be prohibited as "unreasonable restraint[s] of trade" nonetheless are lawful if such actions are "necessary or appropriate" to achieve the purposes of the Commodity Exchange Act as modified by Dodd-Frank. This exception, of course, is administered by the CFTC, which has rulemaking and enforcement authority to define the scope of these modified antitrust obligations.[40] Thus, regulated actors in the swap market are permitted, under circumstances regulated and policed by the CFTC, to take actions that the Sherman Act might otherwise forbid.

Plaintiffs rely on *In re CDS*, which posited that the "necessary or appropriate" exceptions apply only to the extent that the Antitrust Considerations provisions exceed the scope of the Sherman Act. 2014 WL 4379112, at *17. With respect, that interpretation is unsupported by the text of the provisions, which create an exception for "*any* process or . . . action" that is

---

[39]   Plaintiffs cite no case holding that a law must be referenced by name and statutory citation in order to be "specified," nor could they. *See, e.g., Garcia-Villeda v. Mukasey*, 531 F.3d 141, 146 (2d Cir. 2008) (noting, in the context of the "[u]nless otherwise specified" provision in 8 U.S.C. § 1229a(a)(3), that "Congress *did* in fact specify otherwise" in 8 U.S.C. § 1231(a)(5)—a provision that does not cross-reference section 1229a(a)(3)).

[40]   *See* 7 U.S.C. § 12a(5) (granting the CFTC authority to "promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or accomplish any of the purposes of [the statutory] chapter"); *see also* 7 U.S.C. §§ 6s(j)(7), 6b-1, 9(4)(A), 13b.

"necessary or appropriate to achieve the purposes of this Act," not merely for some of them. Moreover, the *In re CDS* court reached its interpretation without conducting an analysis under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007). In the Antitrust Considerations provisions, Congress delegated to the CFTC the authority to administer the "necessary or appropriate" exception and thereby determine whether certain "unreasonable restraint[s] of trade" may nevertheless achieve the purposes of the CEA and Dodd-Frank and thus be permitted. Dealer Br. 69. Under *Billing*, allowing both the Antitrust Considerations provisions and the Sherman Act to operate would entail unworkable conflicts, thereby disrupting the CFTC's ability to comprehensively regulate the swap market.

Plaintiffs' reading of "unless otherwise specified" would also render superfluous another provision of Dodd-Frank (Dealer Br. 70 n.84)—a result that neither Plaintiffs nor the *In re CDS* court addresses. Title V of Dodd-Frank, which concerns insurance reform, contains a rule of construction stating that "[n]othing in this chapter . . . shall be construed to modify, impair, or supersede the application of the antitrust laws." 15 U.S.C. § 8231. It adds: "Any implied or actual conflict between this chapter . . . and the antitrust laws shall be resolved in favor of the operation of the antitrust laws." *Id.* These provisions would be wholly superfluous if, as Plaintiffs contend, the "unless otherwise specified" exception to the general Dodd-Frank savings clause referred only to four provisions of Dodd-Frank (none of which is located in Title V) and already barred any instance of implied repeal of the antitrust laws throughout Dodd-Frank.[41] Plaintiffs' interpretation of the exception should therefore be rejected under the settled rule that

---

[41]    Moreover, had Congress wanted to exempt just four provisions from the savings clause, it could have done so much more easily by simply cross-referencing those four provisions. *See, e.g.*, 47 U.S.C. § 152 note (1996) ("Except as provided in paragraphs (2) and (3), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.").

"a statute should be construed so that . . . no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009).

The Dealers' more natural reading of the savings clause not only avoids rendering another provision superfluous, but also accords with *Billing*, which found preclusion of the Sherman Act despite a savings clause providing that "the rights and remedies provided by this subchapter [of the securities laws] shall be in addition to any and all other rights and remedies that exist at law or in equity." *Compare Billing*, 551 U.S. at 275 (citing cases finding that the savings clause was not "so broad as to preserve all antitrust actions"), *with id.* at 288 (Thomas, J., dissenting) (arguing in dissent that the savings clause necessarily encompasses antitrust remedies and thus bars implied preclusion).

Plaintiffs' arguments based on Representative Conyers's floor statement are no more successful. *See* Opp. 87-89. As the Supreme Court has explained, there is "no reason to give greater weight to the views of two Senators than to the collective votes of both Houses." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 (2002); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 390 (2000) (Scalia, J., concurring in the judgment) ("[T]he statements of individual Members of Congress (ordinarily addressed to a virtually empty floor) . . . [are not] a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us."); *Zuber v. Allen*, 396 U.S. 168, 186 (1969) ("Floor debates reflect at best the understanding of individual Congressmen.").

Even if this Court were to consider Representative Conyers's July 2010 statement, it provides an incomplete and unreliable basis upon which to interpret the statutory text. In an earlier statement—ignored by Plaintiffs—Representative Conyers acknowledged that the "necessary or appropriate" exception in the Antitrust Considerations provisions "might

potentially be read to create exemptions from the antitrust laws."  155 Cong. Rec. E3013-02,

2009 WL 4824238 (daily ed. Dec. 9, 2009) (statement of Rep. Conyers).[42]  Although the House

Committee therefore removed the "necessary or appropriate" language[43] "to make clear that no

antitrust exemptions are intended," *id.*, the final bill *retained* that very language, *see* H.R. 4173

(July 15, 2010).  Representative Conyers's July 2010 floor statement is thus an effort to bolster

an individual preference that Congress ultimately rejected, and highlights the danger of

substituting a floor statement for the vote of the entire Congress.  *See Exxon Mobil Corp. v.*

*Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (cautioning that "judicial reliance on legislative

materials . . . may give unrepresentative committee members . . . both the power and the

incentive to attempt strategic manipulations of legislative history to secure results they were

unable to achieve through the statutory text").[44]

### B.    Plaintiffs' claims satisfy the four *Billing* factors.

Plaintiffs effectively concede that this case satisfies the first three *Billing* factors.  Their

cursory discussion of the fourth factor—conflicts—suffers from numerous errors.

Most broadly, Plaintiffs misunderstand and minimize the Supreme Court's decision in

*Billing*.  They argue, as if the point were dispositive, that they "are *not* attempting to outlaw RFQ

---

[42]    It is worth noting that, at the time Representative Conyers expressed this concern, the bill's derivatives section had a blanket antitrust savings clause, which had no "unless otherwise specified" exception.  *See* H.R. 4173 (Dec. 11, 2009).  The concerns Representative Conyers raised regarding the "unless necessary or appropriate" language would necessarily have been magnified when the antitrust savings clause was relaxed to allow exceptions.

[43]    *Compare* H.R. 4173 (Dec. 2, 2009) (as introduced) *with* H.R. 4173 (Dec. 11, 2009) (as passed by House).

[44]    Plaintiffs also point to Senator Kohl's statement that the conference report "contains an antitrust savings clause which provides that nothing in the act shall be construed to modify, impair, or supersede the operation of any of the antitrust laws."  *See* Opp. 88 n.73 (quoting 156 Cong. Rec. S5902-01, 2010 WL 2788026, at S5925 (daily ed. July 15, 2010) (statement of Sen. Kohl)).  But of course that statement is incorrect; at this point, the savings clause contained the "except otherwise specified" language.

trading, to mandate anonymous trading, or to prevent dealers from investing in SEFs.  Rather, Plaintiffs are simply seeking damages for . . . financial harm . . . ."  Opp. 91.  But the "chilling effect" of private antitrust lawsuits and the "risk of treble damages" was a primary concern in *Billing*, which explained that these threats could "seriously alter" market actors' conduct, leading them to avoid conduct that the relevant federal regulator "permits or encourages."  *See* 551 U.S. at 275, 281-83.  Tellingly, Plaintiffs do not contest that their antitrust claims are premised on treating key features of the swap market that the CFTC "permits or encourages"—such as the prevalence of RFQ trading, name give-up, and dealer ownership of SEFs—as evidence of the alleged conspiracy.  Dealer Br. 62-68; *see Elec. Trading Grp., LLC v. Banc of Am. Secs. LLC*, 588 F.3d 128, 138 (2d Cir. 2009) (implied preclusion warranted where regulatory scheme allows conduct that could "by 'reasonable but contradictory inferences' serve as evidence of conduct forbidden by the antitrust law" (quoting *Billing*, 551 U.S. at 282)).

Plaintiffs also err in their attempts to distinguish *Billing* and *Electronic Trading Group*. In those cases, as here, the plaintiffs made allegations of "secret, *per se* unlawful collusion." Opp. 83.  Moreover, in neither *Billing* nor *Electronic Trading Group* did the regulatory scheme approve of or require the alleged collusion.  Rather, both cases held that antitrust litigation aimed at recovering damages for collusion risked, "through error and disincentive," altering market conduct and disrupting the securities regulatory scheme.  *See, e.g.*, *Billing*, 551 U.S. at 283; *Elec. Trading Grp.*, 588 F.3d at 136.  And, although both decisions were concerned that the plaintiffs' claims would deter collaboration between market participants that the regulatory scheme permitted, neither decision suggested that this was the only type of conflict that would warrant implied preclusion.  Rather, both decisions spoke broadly of the potential or actual risk that the "[regulatory] and antitrust laws, if both applicable, would produce conflicting guidance,

requirements, duties, privileges, or standards of conduct." *Billing*, 551 U.S. at 275-76.[45]  In any event, the CFTC's policy permitting and even encouraging dealer investment in SEFs necessarily permits collaborative conduct between dealers both in making such an investment and in serving as joint owners going forward.  Dealer Br. 67.  This conduct, of course, is cited by Plaintiffs as key evidence of collusion.[46]

Finally, Plaintiffs assert that finding implied preclusion would fail to recognize the important role played by private antitrust enforcers.  Opp. 93.  To the contrary, the *Billing* Court observed—as a reason favoring preclusion—that "any enforcement-related need for an antitrust lawsuit is unusually small."  551 U.S. at 283.  The same factors *Billing* cited are present here: the CFTC has robust regulatory and enforcement authority, it takes antitrust considerations into account in regulating the swap markets, and private plaintiffs may sue under the CEA.  Dealer Br. 63-64.  Indeed, this is an *a fortiori* case:  unlike in *Billing*, the CFTC has express antitrust enforcement authority and is in fact undertaking a review of the allegations at issue.

---

[45]   Plaintiffs also argue that, unlike in this case, the circumstances in *Billing* and *Electronic Trading Group* "led to a 'serious legal line-drawing problem.'"  Opp. 92.  But this view cannot be squared with Plaintiffs' reading of the savings clause—and highlights the problems such a reading would create.  If, as the *In re CDS* decision implies, the "unless necessary or appropriate" carve-out applies to only some, but not all, actions with antitrust implications, then market actors—and courts—would be forced to determine whether each action fell under the umbrella of the original Sherman Act standards, or the supposedly "heightened" standards of the Antitrust Considerations—because this would determine whether the carve-out applied.  This is a paradigmatic and unworkable line-drawing problem.

[46]   Plaintiffs are also incorrect in stating that "where, as here, the alleged anticompetitive conduct would be forbidden under the competing regulatory regime in any event, there is no risk of conflict."  Opp. 90.  Plaintiffs' premise is false, but, in any event, *Billing* itself found implied preclusion even though it assumed that the "SEC has *disapproved* (and for argument's sake, we assume that it will continue to disapprove) the conduct that the antitrust complaints attack," citing difficulties that courts and juries would encounter in distinguishing between what the SEC permits, encourages, and forbids.  *Billing*, 551 U.S. at 279-82.

## IV.     CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED.

Because Class Plaintiffs fail to plead the elements of fraudulent concealment with particularity under Rule 9(b), their claims based on alleged injuries incurred before November 25, 2011 ("pre-2012 claims") are time-barred.  *Hinds*, 620 F. Supp. 2d at 520.[47]

### A.     Class Plaintiffs fail to plead "ignorance" of their pre-2012 claims.

As described in the Dealers' opening brief, the pre-2012 claims are based on publicly available news articles and publicly observable facts regarding the alleged state of the IRS market.  Dealer Br. 72-75.  Plaintiffs rely, for example, on allegations that the IRS market should have shifted to all-to-all trading by 2008; that only a conspiracy could explain the absence of such a shift; that the Dealers used well-publicized joint ventures to take control of Tradeweb and the SwapClear clearinghouse; and that Tradeweb and ICAP failed to expand into all-to-all trading when it would have made economic sense for them to do so.  *See, e.g.*, *id.*; SCAC ¶¶ 99, 346.  Thus, if Plaintiffs' pre-2012 allegations are sufficient to state a claim under *Twombly* (which they are not), then Class Plaintiffs were at least on inquiry notice of those claims.  *See Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013).[48]  Moreover, contrary to Class Plaintiffs' suggestion (Opp. 99-100), facts that raise a "suspicion" of a claim are sufficient to establish inquiry notice.[49]

---

[47]   For Morgan Stanley and HSBC, who were sued later than the other Dealers, all claims before February 25, 2012 are barred.

[48]   Class Plaintiffs contend that *Woori Bank* should not control here because they do not present "public, prominent smoking-gun evidence" analogous to the news articles and filings in that case. Opp. 102 n.87.  But they do not dispute that court's conclusion that a plaintiff cannot simultaneously satisfy *Twombly* and fail to trigger the statute of limitations if the complaint depends on public facts.

[49]   *See 131 Maine St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002), *aff'd*, 54 F. App'x 507 (2d Cir. 2002); *New York v. Cedar Park Concrete Corp.*, 684 F. Supp. 1229, 1233 (S.D.N.Y. 1988) (plaintiff would be on notice "if it had a suspicion of collusive bidding on a single contract"); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 121, 123 (S.D.N.Y. 2011) ("Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the (continued)

To avoid this dilemma, Class Plaintiffs now assert that their "pre-2012 allegations about the conspiracy are *not* based on news articles or other published information."  Opp. 100.  They argue instead that in June 2014, the Dealers began engaging in "increasingly aggressive" conduct, which caused Plaintiffs' counsel to launch an investigation that "uncovered critical facts concerning the Dealer Defendants' stealth takeover of Tradeweb's IRS business."  Opp. 101.  Class Plaintiffs thus assert that the timeliness of their pre-2012 claims hangs from the slender thread of the "critical facts" that they claim to have recently discovered regarding the alleged "stealth takeover" of Tradeweb.  But these "critical facts" have been publicly known for almost a decade.  Specifically, the Dealers' acquisition of an 80 percent stake in Tradeweb New Markets was reported in SEC filings and other public sources; the fact that these "New Markets" encompassed IRS was disclosed in Tradeweb press releases; and the 2010 merger of Tradeweb New Markets with Tradeweb Markets was disclosed in 2010 SEC filings.  *See supra* at 17-19.  Plaintiffs are therefore unable to plead ignorance of the "critical facts" that supposedly give rise to their claims.  *See In re Ciprofloxacin*, 261 F. Supp. 2d at 223 (plaintiffs cannot plead ignorance when conduct was disclosed in SEC filing).

## B.     Class Plaintiffs fail to plead diligence.

Contrary to Class Plaintiffs' suggestion, whether they have alleged diligence with specificity under Rule 9(b) is appropriate for resolution on a motion to dismiss.  *See, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *9 n.7 (D. Conn. 2005) ("[T]he ultimate question whether the plaintiffs' investigation or lack thereof was reasonable is one of fact," but "[t]hat does not . . . excuse plaintiffs from pleading the circumstances surrounding their diligence

---

alleged scam."); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225 (S.D.N.Y. 2003) ("Any fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim.").

or lack thereof."); *Hinds*, 620 F. Supp. 2d at 521-22 (dismissing complaint for failure to allege diligence); *Cedar Park*, 684 F. Supp. at 1233 (same). Dismissal is appropriate where, as here, the complaint alleges neither "specific inquiries" nor how plaintiffs discovered their time-barred claims. *Hinds*, 620 F. Supp. 2d at 521.

In an attempt to excuse their failure to make any specific inquiries about the publicly available information that forms the basis of their pre-2012 claims, Class Plaintiffs argue that "concealment made discovery through reasonable diligence impossible." Opp. 104-05. Not only is their premise invalid—as discussed below, no concealment has been adequately alleged—but were this the rule, the diligence prong would be superfluous. *See Hinds*, 620 F. Supp. 2d at 521 (rule that "allegations that due diligence would not have uncovered the antitrust violations [are] sufficient" is "problematic because it allows the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong").[50] Here, Class Plaintiffs not only "make no allegation of any specific inquiries" or of "when such inquiries were made, to whom, regarding what, and with what response," *Hinds*, 620 F. Supp. 2d at 521, but they also fail to explain why the publicly available facts cited in their pre-2012 allegations were unworthy of inquiry. They have therefore fallen short of their burden. *See id.*; *Publ'n Paper*, 2005 WL 2175139, at *6 ("Because the plaintiffs have not alleged anything regarding inquiries made into

---

[50]    Unlike in the benchmark price-fixing cases relied upon by Class Plaintiffs, no regulator subpoenas or announcements were required to unearth the supposed basis for Class Plaintiffs' claims. *See Alaska Elec. Pension Fund v. Bank of Am., Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (complaint alleged defendants could not have learned of the conspiracy until news sources reported a CFTC investigation into the conduct); *Gold Futures & Options Trading Litig.*, 2016 WL 5794776 (S.D.N.Y. 2016) (complaint alleged defendants could not have learned of the conspiracy until CFTC Commissioner issued statement); *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 131 (S.D.N.Y. 2016) (crediting allegations plaintiffs remained ignorant until a regulator "released a public notice" detailing alleged manipulation).

the activities alleged in the complaint or why such inquiries were not made, they have not satisfied their burden of pleading reasonable diligence.").

Class Plaintiffs' attempt to plead diligence also fails because they do not allege facts concerning the supposed discovery of their pre-2012 claims.  While the complaint states that Class Plaintiffs could not have discovered their injury "until sometime after June 2014, when the Dealers Defendants' campaign to squash SEFs from offering anonymous all-to-all trading to the buy side became apparent" (SCAC ¶ 357), the complaint does not explain how the three Named Plaintiffs learned of this purported "campaign," much less how it supposedly led them to discover their pre-2012 claims.  Their Opposition attempts to fill this gap by asserting that they "only discovered the true nature and scope of the collusion through an investigation by counsel," which "uncovered critical facts concerning the Dealer Defendants' stealth takeover of Tradeweb's IRS business that were *never* publicly disclosed."  Opp. 101 (emphasis in original). But their *complaint* makes no mention of such an investigation, and neither their complaint nor their Opposition provides any specifics about how this investigation supposedly uncovered the pre-2012 claims.[51]  This omission is fatal.  *See Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *2 (S.D.N.Y. 2003) (granting motion to dismiss where plaintiffs "failed to allege with adequate particularity the facts that were discovered during counsel's investigation and the inquiry performed to obtain those facts"); *Philip Morris Inc. v. Heinrich*, 1996 WL 363156, at *12 (S.D.N.Y. 1996) (finding failure to plead diligence where complaint lacked "specific information" about plaintiffs' "internal investigation" and when plaintiff "acquired 'actual knowledge'").

---

[51]   For example, if Class Plaintiffs' "investigation" involved reading SEC filings and press releases about Tradeweb, they are required to so allege, and to allege how reading these documents caused them to learn of the supposed conspiracy concerning Tradeweb.

### C.       Class Plaintiffs fail to plead concealment.

In a strained attempt to plead affirmative acts of concealment, Class Plaintiffs lead with the specious assertion that an October 11, 2007 Tradeweb press release was misleading because it "mentioned *only the Dealer Defendants' minority investment in the entity that did not actually own the IRS business*."  Opp. 28-29 (emphasis in original).  As an initial matter, this is insufficient, as the law is clear that an allegation of "[c]oncealment by mere silence is not enough" to satisfy Rule 9(b).  *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988).[52]

More importantly, as discussed above, the interest that the Dealers acquired in Tradeweb New Markets, which temporarily housed the IRS business along with other asset classes, was repeatedly disclosed to the public.  *See supra* at 17-19.  In a footnote, Class Plaintiffs half-heartedly claim that investors would have "had no reason to review" Thomson's SEC filings.  SCAC ¶ 122 n.40.  But investors would have had every reason to consult these filings:  Thomson was Tradeweb's owner and was prominently named in the press release announcing the Dealers' investments.  *See* SCAC ¶ 116 n.33 (citing to press release titled "Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb").  In fact, the press release refers readers to Thomson's SEC filings for further information.  *See id.* (referring to Thomson's Form 40-F as containing additional information concerning "risks").

---

[52]     *See also Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) ("Silence or passive conduct of the defendant is not deemed fraudulent . . . ." (quoting *Rutledge v. Boston Woven House & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) ("silence or passive conduct does not constitute fraudulent concealment," and the fact that defendants "passively concealed reports by not disclosing them to investors" did not qualify as an affirmative step); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987) ("To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct . . . would effectively nullify the statute of limitations in these cases.").

Other supposed acts of concealment (*see* Opp. 98) similarly fall short.  Class Plaintiffs'

assertion that the Dealers used "secret meetings" is plainly insufficient.  *See Precision Assocs.*,

2011 WL 7053807, at *50 (where "plaintiffs base their arguments of affirmative concealment on

the allegations that the defendants' [sic] formulated the conspiracy during secret meetings," they

fail to allege affirmative concealment because "[n]one of these allegations demonstrate an effort

to affirmatively deceive *the public*" (emphasis in original)).  Class Plaintiffs claim that the

Dealers' statements that they sought to make markets more "efficient" and "effective" were acts

of concealment (SCAC ¶¶ 107, 178-79, 367-69), but a plaintiff cannot rely on such vague

puffery.  *See Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 533 (E.D.N.Y. 2012)

(statement that motor home was best in class was puffery and did not toll statute of

limitations).[53]  Class Plaintiffs also cite supposedly misleading conduct within the four-year

limitations period.[54]  But that supposed conduct is irrelevant to concealment outside the

limitations period.  *See, e.g.*, *Long v. Abbott Mortg. Corp.*, 459 F. Supp. 108, 119 (D. Conn.

1978) (rejecting fraudulent concealment where alleged acts of concealment took place within the

limitations period).

Class Plaintiffs fare no better in attempting to allege a self-concealing conspiracy.  Unlike

the price-fixing and bid-rigging schemes that courts have found to be "inherently self-

concealing," the pre-2012 conspiracy that Class Plaintiffs attempt to allege does not entail

putting false information into the market or the "passing off of a sham article as one that is

---

[53]   The 2007 Tradeweb press release explicitly classifies statements that the Tradeweb "venture will
expand electronic trading on TradeWeb" and "is expected to provide a number of advantages to
clients" as forward-looking statements.  *See supra* note 14.

[54]   Class Plaintiffs allege that the Dealers provided "pretextual explanations" for the Dealers'
conduct in 2015 (SCAC ¶¶ 370-72, 107, 222-24); that certain Dealers' FCMs made statements
"masking . . . obstruction" in 2012 (Dealer Br. 98 (citing SCAC ¶¶ 227, 229)); and that the Dealers
"refused to discuss their groups on the record" in 2015 (SCAC ¶ 106).

genuine." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083-84 (2d Cir. 1988) (bid-rigging conspiracy self-concealing because some participants submitted false "accommodation bids . . . to make the low bid appear reasonable," thereby concealing the conspiracy).[55]

Contrary to Class Plaintiffs' assertion (Opp. 97 n.82), *Publication Paper* is on point. There, the court held that the plaintiffs failed to plead a self-concealing price-fixing scheme because the alleged parallel price increases could have triggered suspicion of conspiracy, and there were insufficient allegations that the price increases would have been assumed to be the "result of legitimate market forces." *Publ'n Paper*, 2005 WL 2175139, at *4. Likewise here, Class Plaintiffs allege that, during the pre-2012 period, the benefits of all-to-all trading were "widely recognized by market participants, regulators, and economists," and that "absent a conspiracy . . . [e]volution to all-to-all trading that would have been open to the entire market would have been inevitable." SCAC ¶¶ 87, 342; *see also id.* ¶ 99 ("There were . . . no natural or technological reasons why the IRS market did not evolve by 2008, at the latest, to allow the buy side to conduct all-to-all trading of IRS on electronic platforms."). Thus, under Plaintiffs' logic, the Dealers' investment in Tradeweb, followed by Tradeweb's failure to offer all-to-all trading, would have raised suspicions in the marketplace. *See Publ'n Paper*, 2005 WL 2175139, at *4 ("[T]he circumstances that are alleged . . . point to the opposite conclusion. The plaintiffs allege that the price increases were *not* explainable by ordinary market forces."). Class Plaintiffs fail to contest this conclusion, and instead argue that self-concealment can be established by a bare allegation that "*no one*, including sophisticated market participants, identified [that] what was

---

[55]  *Cf. In re London Silver Fixing, Ltd., Antitrust Litig.*, 2016 WL 5794777, at *24 (S.D.N.Y. 2016) (alleged "manipulation and misrepresentation" of benchmark rate self-concealing because it entails "passing off of a sham article as one that is genuine"); *Alaska Elec.*, 175 F. Supp. 3d at 66 (conduct self-concealing where defendants allegedly "falsely maintained that ISDAfix was an accurate, market-based rate through public statements describing the process by which ISDAfix was set").

happening in the market was the product of collusion." Opp. 97 (emphasis in original). Such a generic allegation is insufficient to qualify an alleged conspiracy as "self-concealing." Dealer Br. 79.

## V.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

Plaintiffs ignore the fatal flaws in their Donnelly Act, tortious interference, and unjust enrichment claims, and they do not dispute that those claims cannot survive if the Sherman Act claim is dismissed. *See* Opp. 106-07; JT Opp. 22-24. The Court should therefore dismiss these claims for the reasons set forth in the Dealers' opening brief. *See* Dealer Br. 79-84.[56] The recent decision in *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. 2017), further confirms that Class Plaintiffs' failure to identify the defendants with which they allegedly traded requires dismissal of their unjust enrichment claims. *See id.* at *35-36 (dismissing unjust enrichment claims that failed to identify the specific counterparties that plaintiffs allegedly "enriched").

### CONCLUSION

For the foregoing reasons, all claims should be dismissed with prejudice.

---

[56]   Contrary to the suggestion of Tera and Javelin, the Court should dismiss their state law claims along with their closely related federal law claims. *See, e.g., Finz v. Schlesinger*, 957 F.2d 78, 84 (2d Cir. 1992) (affirming exercise of jurisdiction over, and dismissal of, state law claims because "the district court's decision on the [federal] cause of action involved findings which related to [those] claims" and "[i]t would have thus been inefficient for the district court not to have addressed the merits of the state law issues"). Javelin and Tera's reliance on dicta in a footnote in *Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011) is misplaced. *Williams* in fact *upheld* a dismissal of state law claims, reversing only a denial of leave to replead. *Id.* at 215.

March 24, 2017                          Respectfully submitted,


                                        s/  Robert D. Wick
                                        Robert D. Wick
                                        Andrew D. Lazerow
                                        John S. Playforth
                                        Katharine Mitchell-Tombras
                                        COVINGTON & BURLING LLP
                                        One CityCenter
                                        850 Tenth Street, NW
                                        Washington, DC 20001
                                        Telephone:  (202) 662-6000
                                        Facsimile:  (202) 662-6291
                                        rwick@cov.com
                                        alazerow@cov.com
                                        jplayforth@cov.com
                                        kmitchelltombras@cov.com

                                        *Attorneys for Defendants JPMorgan Chase &
                                        Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan
                                        Securities LLC; and J.P. Morgan Securities plc*

s/  Kenneth A. Gallo (on consent)[57]
Brad S. Karp
Julia Tarver-Mason Wood
William A. Clareman
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bkarp@paulweiss.com
jwood@paulweiss.com
wclareman@paulweiss.com

Kenneth A. Gallo
Roberto J. Gonzalez
Ravi Romel Sharma
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
kgallo@paulweiss.com
rgonzalez@paulweiss.com
rsharma@paulweiss.com

*Attorneys for Defendants Citigroup Inc.;
Citibank, N.A.; Citigroup Global Markets Inc.;
and Citigroup Global Markets Limited*

---

[57]    Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's
ECF Rules and Instructions.

s/  Margaret M. Zwisler (on consent)
James E. Brandt
Christopher J. Clark
Lawrence E. Buterman
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
james.brandt@lw.com
chris.clark@lw.com
lawrence.buterman@lw.com

Margaret M. Zwisler
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
margaret.zwisler@lw.com

*Attorneys for Defendants Barclays PLC;*
*Barclays Bank plc; and Barclays Capital Inc.*

s/  Adam S. Hakki (on consent)
Adam S. Hakki
Richard F. Schwed
Keith R. Palfin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4000
ahakki@shearman.com
rschwed@shearman.com
kpalfin@shearman.com

*Attorneys for Defendants Bank of America*
*Corporation; Bank of America, N.A.; and*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

s/  Marshall H. Fishman (on consent)
Marshall H. Fishman
Christine V. Sama
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone:  (212) 813-8851
Facsimile:  (646) 558-4063
mfishman@goodwinlaw.com
csama@goodwinlaw.com

*Attorneys for Defendants BNP Paribas, S.A.
and BNP Paribas Securities Corp.*


s/  David G. Januszewski (on consent)
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse AG;
Credit Suisse Group AG; Credit Suisse
Securities (USA) LLC; and Credit Suisse
International*

s/  Tracy V. Schaffer (on consent)
Tracy V. Schaffer
Eric P. Stephens
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
tschaffer@jonesday.com
epstephens@jonesday.com

Paula W. Render
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
prender@jonesday.com

*Attorneys for Defendants Deutsche Bank AG
and Deutsche Bank Securities Inc.*

s/  Robert Y. Sperling (on consent)
Robert Y. Sperling
Joseph L. Motto
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 558-7941
Facsimile:  (312) 558-5700
rsperling@winston.com
jmotto@winston.com

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100
epapez@winston.com

Richard C. Pepperman II
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
geigerm@sullcrom.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc.; Goldman, Sachs & Co.; Goldman
Sachs Bank USA; Goldman Sachs Financial
Markets, LP; and Goldman Sachs International*

s/  Andrew S. Marovitz (on consent)
Andrew S. Marovitz
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 701-7116
Fax: (312) 706-8651
amarovitz@mayerbrown.com

*Attorneys for Defendants HSBC Bank plc;*
*HSBC Bank USA, N.A.; HSBC Securities (USA)*
*Inc.*

s/  Daniel Slifkin (on consent)
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
dslifkin@cravath.com
mpaskin@cravath.com

*Attorney for Defendants Morgan Stanley;*
*Morgan Stanley Bank, N.A.; Morgan Stanley &*
*Co. LLC; Morgan Stanley Capital Services*
*LLC; Morgan Stanley Derivative Products Inc.;*
*Morgan Stanley & Co. International plc; and*
*Morgan Stanley Bank International Limited*

s/  Arthur J. Burke (on consent)
Arthur J. Burke
James I. McClammy
Rebecca L. Martin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
arthur.burke@davispolk.com
james.mcclammy@davispolk.com
rebecca.martin@davispolk.com

*Attorneys for Defendants The Royal Bank of
Scotland Group plc; Royal Bank of Scotland
plc; and RBS Securities Inc.*


s/  David C. Bohan (on consent)
David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
david.bohan@kattenlaw.com

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
dswanson@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS
Securities LLC*