**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010
TEL (212) 849-7000 FAX (212) 849-7100

**COHEN MILSTEIN**

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S INTERNET ADDRESS
**danbrockett@quinnemanuel.com**

Michael B. Eisenkraft
(212) 838-0177
meisenkraft@cohenmilstein.com

June 29, 2020

<u>**Via ECF**</u>

Hon. J. Paul Oetken
United States District Court, Southern District of New York
40 Foley Square, Room 2101, New York, NY 10007

Re:   *In re: Interest Rate Swaps Antitrust Litigation*, No. 16-MD-2704 (JPO)
    *This Document Relates To All Class Actions*

Dear Judge Oetken:

We write on behalf of Class Plaintiffs to inform the Court of an important regulatory development that bears directly on the pending motion for class certification. On June 25, 2020, the Commodity Futures Trading Commission ("CFTC") issued a Final Rule entitled "Post-Trade Name Give-Up on Swap Execution Facilities" (the "Rule," attached as Exhibit A). The Rule prohibits, with limited exceptions, the practice of post-trade name give-up (or simply "name give-up")—a requirement that two counterparties to a swap trade must disclose their identities before the trade is completed. The Rule thus gives interest rate swap ("IRS") market participants the option to trade IRS anonymously on Swap Execution Facilities ("SEFs"). The Rule is directly relevant to Plaintiffs' claim that Defendants boycotted Javelin, Tera, and trueEX because the CFTC's justification for the adoption of the Rule provides yet further confirmation that the anonymous trading protocols offered by those SEFs would have benefited class members in the world that would have existed "but for" Defendants' anticompetitive conduct.

This major ruling by the CFTC was issued over the objection of some of the Defendants here. The CFTC concluded—after more than a year of careful study—that IRS market participants (*i.e.*, members of the proposed class) should have the option to trade IRS fully anonymously because doing so promotes competition and customer choice, improves prices (lowers bid-offer-spreads), enhances liquidity, and deters anticompetitive behavior by dealers. In so doing, the CFTC rejected as unsupported many of the arguments Defendants advanced in opposition to class certification, including the assertion that anonymous trading does not, on balance, benefit all market participants. The Rule provides powerful support for Plaintiffs' showing of class-wide injury, and confirms that Defendants' counterarguments rest on faulty premises and discredited assertions.

*Background*

Name give-up is a trading protocol under which counterparties must "give up" their identities to each other at the conclusion of a trade initiated anonymously. *E.g.*, Dkt. 748 ("FAC") ¶¶ 321-22. Plaintiffs allege that name give-up is an anticompetitive practice that Defendants used to police their conspiracy by ensuring that the buy side (the members of the proposed class) cannot trade on inter-dealer broker ("IDB") platforms. FAC ¶¶ 18, 81, 152, 162-

71, 181-87, 229, 321-31.  This bifurcates the IRS market into "dealer-to-dealer" and "dealer-to-client" segments, which contributes to elevated IRS spreads (higher prices) by reducing the pools of liquidity and trading protocols available to the buy side.  In denying Defendants' motion to dismiss, the Court recognized the significance of name give-up in preserving this bifurcated market structure.  *See* Dkt. 237 at 59.  Discovery subsequently confirmed that Defendants prevented IDBs from becoming fully anonymous, including by forcing the IDBs to adopt name give-up.  Dkt. 723 Pls.' Class Cert. Br. at 38-43 (cataloging Defendants' efforts to prevent anonymous trading).

In late 2018, following years of criticism, the CFTC began considering proposals to ban name give-up in the swaps markets.  *See* Post-Trade Name Give-up on Swap Execution Facilities, 83 FR 61,571 (Nov. 30, 2018); *see also* FAC ¶¶ 169, 324, 336-39 (criticisms of name give-up).  Following an extensive comment period, publication of a proposed rule, and substantial dialogue with market participants and the SEC and foreign regulators, the CFTC published the final Rule on June 25.  *See* Rule at 2-4.  The Rule prohibits name give-up for centrally cleared swaps that begin anonymously.  *Id.* at 1.  The Rule "provides an exception for package transactions that include a component transaction that is not a swap intended to be cleared."  *Id.* at 1, 4-5.  Once effective, the Rule will abolish name give-up for many IRS that are traded on IDB platforms, thereby facilitating fully anonymous trading of such swaps.

### *The Rule Strongly Supports Plaintiffs' Class Certification Motion*

The Rule supports Plaintiffs' class certification motion because it:  (i) confirms there is substantial common evidence that anonymous IRS trading promotes competition and lowers bid-ask spreads (improves prices); (ii) shows these benefits are market wide, and are not confined to certain class members; and (iii) further validates the type of common proof Plaintiffs advanced, and which Defendants have argued is insufficient to meet Plaintiffs' burden under Rule 23.

***Anonymous Trading Yields Tangible Benefits for IRS Investors*:**  As part of our showing of class-wide impact, Plaintiffs established that all class members would benefit from having the option to trade on all-to-all anonymous trading platforms, like those offered by the boycotted SEFs (Javelin, Tera, and trueEX).  This is because having this option to trade anonymously improves competition, liquidity, and pricing for all class members.  Pls.' Class Cert. Br. at 46-52; Dkt. 869 Pls.' Class Cert. Reply Br. at 10-24.  In opposing class certification, Defendants and their experts took issue with the basic economic theories that amply supported Plaintiffs' theory of class-wide impact.  *E.g.*, Dkt. 891 Defs.' Sur-Reply ("Sur-Reply") at 2-4.  The CFTC Rule exposes Defendants' arguments as made-for-litigation sophistry; they are at odds with the clear weight of empirical literature on this subject and actual market practice in this and other analogous markets.

In adopting the Rule, the CFTC recognized that anonymous swaps trading promotes competition and liquidity by encouraging more market participants to trade on SEFs.  The CFTC found that, among other things, anonymous trading allows the buy side to trade without fear of information leakage (*i.e.*, other firms learning their trading strategy) or anticompetitive retaliation (*i.e.*, blowback from dealers who prefer to keep certain platforms off-limits to the buy side).  Rule at 10-12 (banning name give-up will "remov[e] barriers to greater participation and competition" in the swaps markets).  Recognizing the link between anonymous trading and

competition, the CFTC concluded that the only way to remedy these substantial anticompetitive effects was—just as the boycotted SEFs had sought—to provide market participants with a fully anonymous trading option. *See id.* at 12 (CFTC was "concerned by . . . assertions that post-trade name give-up enables anticompetitive behavior" and concluded that allowing fully anonymous trading "is therefore reasonably necessary to promote fair competition among market participants on pre-trade anonymous SEF markets for cleared swaps.").

The CFTC further explained that the benefits of anonymous trading are concrete and well established: "prohibiting post-trade name give-up is likely to increase competition on affected SEFs, which in turn should lead to lower overall transaction costs." *Id.* at 36. The conclusion was supported by "several studies . . . finding that post-trade anonymity ***tends to reduce trading costs and lead to better price quotes and lower realized spreads***." *Id.* at 36 (emphasis added throughout); *see also id.* at 37 (concluding anonymous trading "may reduce transaction costs and bid-ask spreads"). These findings confirm that anonymous trading yields more competition and better prices for class members. And they further corroborate Plaintiffs' showing of class-wide impact.[1]

Defendants may argue that these conclusions are not specific to order book trading (one of the protocols offered by the boycotted SEFs) and are thus inapplicable. This is a hollow distinction. The benefits of ending name give-up—and thereby allowing the buy side to trade on legacy IDB platforms—are directly related to the benefits of all-to-all anonymous trading. Duffie Rept. ¶¶ 146-50; Grinblatt Rept. ¶ 129. This is a point Defendants' own documents make repeatedly. *See* Pls.' Class Cert. Br. at 38-43 (cataloging evidence that Defendants forced IDBs to adopt name give-up *because* Defendants believed name give-up was necessary to prevent all-to-all anonymous trading). Nor, as the Court expressly recognized, is Plaintiffs' class definition limited to order book trading. Dkt. 251 (Order on Motion for Clarification).[2]

***Anonymous Trading Benefits <u>All</u> IRS Investors***: In opposing class certification, Defendants maintain that individualized inquiry is necessary to determine whether a given class member would benefit from anonymous trading. *E.g.*, Sur-Reply at 2-7. The CFTC implicitly rejected this line of argument.

The CFTC found anonymous trading enhances "overall welfare"—it makes *everyone* better off. Rule at 40. To reach this conclusion, the CFTC reviewed the empirical literature, and considered counterarguments made by Defendants such as that providing an anonymous trading option would harm liquidity and pricing for firms that chose *not* to trade anonymously. *Id.* at 35 (noting argument "that without post-trade name give-up on dealer-to-dealer SEFs, pricing and

---

[1] Plaintiffs had no role in the CFTC proceedings. The CFTC made its findings independently.

[2] Defendants may point to a 2018 proposal by the CFTC that would have allowed SEFs to cease offering an order book trading protocol. *See* Proposed Rule, Swap Execution Facilities and Trade Execution Requirement, 83 Fed. Reg. 61,946, 61,975-78 (Nov. 30, 2018). But this proposal has not been adopted and was based in part on the lack of trading in order books, which itself was the result of Defendants' conspiracy. Pls.' Class Cert. Reply Br. at 29-30.

liquidity offered by dealers to clients via RFQ or over-the-counter (OTC) may suffer"). But, like Plaintiffs' experts, the CFTC rejected these arguments as misplaced. *Id.* at 36. It found that *even if* anonymous trading is less desirable in some circumstances than in others, it still *on balance* benefits the entire marketplace. This is because anonymous trading leads to a "***decrease in spreads***" that "ultimately improves overall welfare of market participants." *Id.* at 37. This conclusion, again, was based on empirical literature establishing that with a fully anonymous trading option, "***overall welfare would increase because the aggregate benefits of increased electronic trading at low spreads would more than offset the aggregate costs***." *Id.* at 40.

Notably, the Rule underscores that the improved liquidity flowing from anonymous trading benefits *all* swaps—even the larger or less liquid trades that Defendants claim are unsuitable for such trading. As the CFTC found, liquidity on SEFs today is artificially constrained by the lack of anonymous trading. *Id.* at 8, 36-37. By allowing anonymous trading, more participants will trade on SEFs, broadening the universe of swaps suitable for anonymous trading and leading to pricing benefits for *all* swaps trades. As the CFTC explained, "many [] market participants will choose to participate on these SEFs once [name give-up] is prohibited, leading to increased liquidity. ***Increased liquidity may benefit market participants by making it easier to execute transactions, especially larger transactions, quickly and without undue price impact***." *Id.* at 37.[3] This is the same phenomenon Plaintiffs' expert Prof. Duffie describes as a "virtuous feedback loop," Duffie Rept. ¶ 51, and it confirms that even relatively illiquid swaps would benefit from anonymous trading.

As the CFTC explained, the Rule is "based not upon the mere preference of certain market participants . . . ." Rule at 16. The CFTC instead concluded that the lack of anonymous trading "has reportedly deterred a significant segment of market participants from making markets on or otherwise participating on affected SEFs," and noted that the CFTC "has heard repeatedly and consistently from market participants eager to trade fully-anonymously on SEFs." *Id.* at 8; *see also id.* at 6 (crediting comment letter stating buy-side firms were "eager . . . to have the ability to transact cleared swaps anonymously"). This widespread support for anonymous trading confirms that *all* market participants benefit from having this option, and these benefits are not limited to certain class members such that individualized inquiry is necessary to determine who was injured by Defendants' conspiracy.

***Plaintiffs' Motion Rests on Rigorous Evidence***: Finally, the Rule directly addresses the lead argument in Defendants' Sur-Reply brief—that Plaintiffs were somehow wrong to support their class certification motion in part with what Defendants termed "qualitative" evidence—*e.g.*,

---

[3] Defendants can be expected to note that some swaps—such as uncleared swaps and certain package trades—are exempted from the Rule. But this is irrelevant, because the CFTC expressly recognized that facilitating anonymous trading for the swaps subject to the Rule would benefit the entire market. *E.g.*, *Id.* at 37. If anything, the Rule confirms that many swaps *are* suitable for anonymous trading. For example, the Rule finds "[m]any package transactions are traded anonymously," contrary to Defendants' suggestions that anonymous trading for such swaps is infeasible. *Id.* at 25; *compare with* Sur-Reply at 20-21.

4

expert and fact witness testimony, empirical literature, and Defendants' own documents. Sur-Reply at 2-7. Putting aside the non-qualitative evidence Plaintiffs drew on (*see*, *e.g.*, Pls.' Class Cert. Reply at 21-22 (noting quantitative evidence that Dodd-Frank's reforms caused a real-world decline in spreads)), the CFTC based its Rule on the very same types of evidence that Defendants deride as insufficient. This includes a paper co-authored by Plaintiffs' expert, Prof. Duffie, Rule at 41 & n.144, as well as comparisons to other markets, such as futures, equities, and U.S. Treasuries, *id.* at 9. The CFTC found that "on balance the empirical evidence presented in [] academic studies supports the benefits of anonymous trading." *Id.* at 38.[4] Based on these studies, the CFTC "conclude[d] that the value of anonymous trading is well-established." *Id.* at 42-43.[5]

Like Plaintiffs, the CFTC relied on this type of evidence because it is the most scientifically rigorous evidence available. As the CFTC explained, "it is not possible to conduct a quantitative analysis of the costs and benefits" of a market-structure change like the advent of anonymous trading, because that change by definition has not happened yet, and there is thus "no data on [its] effects" that can be analyzed. *Id.* at 42 & n.147. In situations like this, it is necessary to "consider[] the costs and benefits" of a market structure change "in qualitative terms," because the "effects on trading behavior, liquidity, and competition [] may be impossible to accurately predict or quantify" otherwise. *Id.* at 32. The same is true in this case. Defendants' conspiracy deprived an entire marketplace of all-to-all anonymous trading options, so the *only* way to analyze the effects of those trading options is to look to sources such as empirical literature and testimony from qualified experts.

If such "qualitative" evidence is sufficient to support an important regulatory rule change that was rigorously evaluated over more than a year, it is more than adequate to meet Plaintiffs' burden at the Rule 23 stage.

| /s/ Daniel L. Brockett | /s/ Michael Eisenkraft |
|---|---|
| Daniel L. Brockett | Michael Eisenkraft |
| Co-Lead Counsel for Plaintiffs | Co-Lead Counsel for Plaintiffs |

---

[4] *See also id.* at 9 ("[A]cademic literature suggests that markets with pre- and post-trade anonymity generally feature greater liquidity than those without."); *id.* at 36 ("The Commission is basing its belief on several studies . . . finding that post-trade anonymity tends to reduce trading costs and lead to better price quotes and lower realized spreads."); *id.* at 37 (empirical studies "on balance, support the premise that post-trade anonymity promotes trading liquidity").

[5] Echoing Defendants' arguments in this case, the CFTC noted that while "commenters who oppose the prohibition [including some Defendants in this case] assert that the studies are not informative because swaps markets are different than equity markets" those same commenters "did not provide data, evidence, or studies regarding the impact of post-trade anonymity." *Id.* at 37, 42.