# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Robert D. Wick

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5487
rwick@cov.com

The Honorable J. Paul Oetken  
Southern District of New York  
40 Foley Square, Room 2101  
New York, NY 10007

August 7, 2020

      Re:  *In re Interest Rate Swaps Antitrust Litig.*, No. 16-MD-2704-JPO (S.D.N.Y.)

Dear Judge Oetken:

      Defendants respectfully submit this letter to bring to the Court's attention two recent decisions that support denial of Plaintiffs' pending motion for class certification.

**I.**      ***In re Aluminum Warehousing Antitrust Litigation***.

      In *In re Aluminum Warehousing Antitrust Litigation*, 2020 WL 4218329 (S.D.N.Y. July 23, 2020) (Exhibit A hereto), Judge Engelmayer denied certification of a proposed class of industrial purchasers of aluminum. The plaintiffs in that action argued that the aluminum trading desks of Goldman Sachs, JPMorgan, and other defendants had conspired to inflate a benchmark price that appeared in the aluminum purchase contracts of proposed class members. The court denied class certification on the ground that the plaintiffs had failed to show that common proof could be used to establish the existence of classwide injury. *Id*. at *35–54. Several aspects of the court's opinion are directly relevant to why class certification should be denied here.

      **1. The legal standard**. *In re Aluminum* confirms that "to satisfy Rule 23(b)(3)'s predominance requirement," antitrust plaintiffs "must show that they can prove, through common evidence, that all class members were injured by the alleged conspiracy." *Id.* at *36.[1] The decision also emphasizes that courts must resolve, under a preponderance of the evidence standard, all factual and expert disputes bearing on the soundness of the proposed common proof of classwide injury. *See id*. at *29, *38–41, *46.

      **2. Plaintiffs' reliance on averages**. *In re Aluminum* also explains that proposed common proof of classwide injury is defective where, as here, "it relies on average impact and thereby masks the existence of uninjured class members." *Id*. at *53.

      In *In re Aluminum*, the nature of the available data made it difficult to model the impact of the alleged conspiracy on particular transactions. *See id*. at *48, *53–54. The plaintiffs' expert therefore used estimates of *average* impact that were easier to model. *Id*. The court

---

[1] Unless otherwise stated, emphasis is added, and internal citations and quotations are omitted.

COVINGTON

The Honorable J. Paul Oetken
August 7, 2020
Page 2

rejected those estimates as insufficient to prove classwide injury because they averaged away individual variation within the class and potentially "mask[ed]" the existence of uninjured class members. *See id.* at *48, *54. The court also objected that the plaintiffs' reliance on averaging yielded "false positives" because it attributed "damage" even to purchases that could not have been damaged. *Id.* at *54. "With the improper averaging mechanism excised," the court explained, the plaintiffs' model was "devoid of common proof that conspiratorial conduct caused pricing injury to all purchasers" throughout the six-year class period. *Id.* at *48.

Likewise here, Plaintiffs rely on estimates of average price impact that are incapable of proving classwide injury. Uncontroverted evidence establishes that there was wide variation in the "bid-ask spreads" that different class members paid on interest rate swaps during the proposed class period. *See* Class Cert. Opp., ECF No. 815, at 26–29. Instead of accounting for this variation, Plaintiffs' expert simply (i) estimated the *average* bid-ask spreads that were paid on various categories of swaps and (ii) arbitrarily assumed that all of those *average* bid-ask spreads would have experienced the same amount of "spread compression" in the but-for world. *See id.* at 23–25. Thus, just as in *In re Aluminum*, Plaintiffs' averaging approach assumes away individual variation within the proposed class and "masks" the existence of uninjured transactions and uninjured class members. *See id.* at 26–35.

Plaintiffs' approach also generates the same types of "false positives" identified in *In re Aluminum*. Unrebutted evidence establishes that numerous swaps executed during the class period could not have been "injured" because they were executed at bid-ask spreads at or below zero. *See* Class Cert. Opp. at 30–31. Plaintiffs nonetheless attribute "injury" to these swaps by falsely assuming that *no* swaps were executed at bid-ask spreads at or below zero and that *all* swaps that share a few basic characteristics were executed at exactly the same average spreads. *See id.* at 26–35. Like the plaintiffs in *In re Aluminum*, Plaintiffs argue that their expert's estimates identify few, if any, uninjured class members, but that is precisely the point. Their expert's estimates are *incapable* of identifying uninjured class members because they falsely assume that all swaps of a given type were executed at exactly the same spread in the actual world and would have been executed at exactly the same *lower* spread in the but-for world. *See id.* at 23–33. Once this "improper averaging mechanism" is excised, *see In re Aluminum* at *48, the resulting estimates show that at least 9 to 27% of class members were uninjured even under Plaintiffs' extreme assumption of immediate 80% spread compression in the but-for world.[2]

**3. "Qualitative" evidence**. *In re Aluminum* also confirms that Plaintiffs' "qualitative" evidence of the effects of the alleged conspiracy is incapable of proving classwide injury.

Like Plaintiffs here, the plaintiffs in *In re Aluminum* argued that even without their quantitative economic model, qualitative evidence consisting of documents and testimony from

---

[2] *See* Defs. Sur-Reply, ECF No. 891, at 8–12. These percentages likely would have been higher if Plaintiffs' expert had not limited his dataset to (i) fewer than 70 non-representative types of IRS contracts among the thousands of contracts that traded during the class period and (ii) data on only 1,100 out of the estimated 8,000 proposed class members. *Id.* at 8–9, 14.

COVINGTON

The Honorable J. Paul Oetken
August 7, 2020
Page 3

defendants, industry analysts, and other market participants "could independently establish classwide injury." *In re Aluminum* at *38, *41.  Judge Engelmayer rejected that argument for three principal reasons.  First, the "broad generalizations" that appeared in the plaintiffs' qualitative evidence were "far too imprecise, indiscriminate, and disconnected from reliable factual moorings to reliably establish the economically complex proposition necessary for class certification:  that all purchasers at all times throughout the lengthy class period were injured." *Id*. at *42.  Second, relying on broad qualitative assertions to establish classwide injury "would assuredly yield false positives," *i.e.*, it would attribute "injury" even to purchases that were not injured.  *Id*.  Third, the plaintiffs' qualitative evidence was too inconclusive to prevent the *defendants* from "present[ing] individualized evidence that these statements are untrue for large numbers of individual purchases and purchasers."  *Id*.  "For these reasons," Judge Engelmayer observed, "courts in § 1 cases have consistently rejected attempts to establish classwide antitrust injury based on documentary or other lay evidence alone."  *Id*.

The same reasoning applies here.  Plaintiffs argue that broad generalizations selectively plucked from discovery documents and academic literature are sufficient to establish that the alleged conspiracy injured *all* of the estimated 8,000 members of the proposed class throughout the five-year class period.  But the generalized statements cited by Plaintiffs "do not, in terms, profess to opine on the necessary proposition here:  that defendants' conspiracy, as alleged in this litigation, unitarily worked antitrust pricing injury on all entities and persons now defined to fall within the putative class."  *In re Aluminum* at *41.  Furthermore, the relatively few documents and academic articles that *do* opine on whether *all* buy-side firms would be better off if more swaps were traded on anonymous all-to-all trading platforms expressly conclude that at least some buy-side firms would be worse off.  *See, e.g.,* Defs. Sur-Reply at 2–4 & n.2; Defs. Response to Pls. Letter re: CFTC Rule, ECF No. 916.  As a result, relying on Plaintiffs' qualitative evidence alone to prove classwide injury "would assuredly yield false positives." *In re Aluminum* at *42.  Indeed, if Plaintiffs' qualitative evidence were accepted as proof of classwide injury, it would falsely imply that even those swaps executed at bid-ask spreads at or below *zero* were injured by the alleged conspiracy.

Finally, just as in *In re Aluminum*, even if *Plaintiffs* were to rely solely on common qualitative evidence to try to prove classwide injury at trial, *Defendants* would have a right to present individualized qualitative *and quantitative* evidence "for large numbers of individual purchases and purchasers" to dispute Plaintiffs' qualitative showing.  *See In re Aluminum* at *42; *see also* Defs. Sur-Reply at 5.  Individual inquiries into impact and damages therefore would predominate at trial.

**4. Individual issues in applying the class definition**.  *In re Aluminum* reinforces an independent reason for denying class certification:  applying Plaintiffs' proposed class definition would require individual analysis of approximately two million swap transactions.

The proposed class in *In re Aluminum* was limited to (i) "first-level" purchases of aluminum (*i.e.*, direct purchases from producers) that were (ii) made under contracts that incorporated the allegedly-inflated benchmark price.  *See In re Aluminum* at *55.  The plaintiffs,

COVINGTON

The Honorable J. Paul Oetken
August 7, 2020
Page 4

however, lacked transaction data sufficient to identify purchases that met those criteria, *see id.* at *55 & n.49, and "ha[d] not identified a clean method to sort out such purchases," *id*. at *56.  As a result, "individual analysis of each class member's transactions" would have been necessary to isolate and identify transactions eligible for inclusion in the class, *id*. at *57, and the need for this individual analysis provided an additional reason why individual issues predominated over common issues, *see id*. at *55–57.

      Here, identifying the transactions eligible for inclusion in the proposed class would require an even greater level of individual analysis.  The class definition and the motion-to-dismiss ruling in this case require exclusion of all swaps that were (i) dealer-to-dealer swaps, (ii) executed in foreign commerce or export commerce, (iii) unsuited by nature for anonymous all-to-all trading, or (iv) components of a "package" trade.  *See* Defs. Sur-Reply at 14.  Plaintiffs must also exclude all swaps executed at spreads less than or equal to zero "to assure that defendants [a]re not held liable for losses they did not cause."  *In re Aluminum* at *57 & n.51.  But Plaintiffs have not presented any "clean method" for identifying such transactions among the roughly two million swaps executed during the class period.  Plaintiffs have usable transaction data for less than ten percent of those swaps, and even the limited data that they have are often insufficient to determine a swap's eligibility for inclusion in the class.  *See* Defs. Sur-Reply at 14–15.  Furthermore, according to Plaintiffs and their expert, the data are too "noisy" to permit identification and exclusion of individual swaps that were executed at bid-ask spreads of zero, at negative spreads, or at spreads lower than their estimated but-for spreads.  *See id*. at 13.

      Plaintiffs promise that they will devise a means of overcoming these obstacles at some point after class certification, *see* Pls. Class Cert. Reply, ECF No. 869, at 64–65, but as Judge Engelmayer explained, an unproven assurance that a solution will be found in the future "fails to carry [plaintiffs'] burden *now* to establish that each requirement of Rule 23 is met by at least a preponderance of the evidence."  *In re Aluminum* at *46; *see also* Defs. Sur-Reply at 15.

      **5. <u>Scope of the case</u>**.  *In re Aluminum* also applied previously-issued orders limiting the scope of the case.  There, the originally-assigned judge (Judge Forrest) dismissed certain types of transactions from the case for lack of antitrust standing, *see In re Aluminum* at *56, and denied leave to broaden the case to include harm allegedly arising from events in Europe, *see id*. at *45.  Judge Engelmayer thus restricted the claims of the putative class to the claims permitted by Judge Forrest.  *See id*. at *45–46, *56.  Similarly here, the originally-assigned judge dismissed for lack of antitrust standing all claims arising from swaps unsuited for anonymous all-to-all trading, *see* Class Cert. Opp. at 63–65, and Plaintiffs never sought leave to re-insert those claims into the case.  All such claims are thus beyond the scope of the permissible claims here.

**II.**    <u>*In re Lamictal Direct Purchaser Antitrust Litigation*</u>.

      The Third Circuit's recent decision in *In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184 (3d Cir. April 22, 2020) (Exhibit B hereto), reinforces the conclusion that Plaintiffs cannot rely on estimates of average price impact or broad generalizations made in "economic literature" to provide common proof of classwide injury.

**COVINGTON**

The Honorable J. Paul Oetken
August 7, 2020
Page 5

In *In re Lamictal*, the plaintiffs alleged that the defendants entered into an anticompetitive agreement to restrict the availability of a generic form of an anti-seizure drug. The plaintiffs offered three forms of "common evidence" to try to prove classwide injury to a proposed class of direct purchasers of the drug: (1) "economic literature" discussing the price effects of competition from generic drugs, (2) a defendant's internal "pricing forecast" indicating that competition from generics leads to price-cutting, and (3) data and a model purporting to show the average prices paid for the drug and "the price each purchaser would have paid" absent the challenged agreement. *See* 957 F.3d at 193. Defendants countered that the proposed common proof of classwide injury "ignored low outlier prices," failed to acknowledge wide variation in the prices paid by different purchasers, and impermissibly relied on estimates of "average" price impact. *Id*. at 192–94. Without resolving those factual and expert disputes, the district court certified the proposed class, reasoning that the jury could assess the soundness of the "common evidence" at trial. *See id*. at 193–94.

The Third Circuit vacated the class certification order, holding that "the District Court abused its discretion when it assumed, absent a rigorous analysis, that averages are acceptable." *Id*. at 194. The court remanded with instructions to resolve, under a preponderance of the evidence standard, the factual and expert disputes bearing on Rule 23(b)(3)'s predominance requirement, including whether the plaintiffs' reliance on averages could potentially "mask individualized injury." *Id*. The court also rejected the plaintiffs' argument that "so long as their evidence of class-wide antitrust injury could sustain a jury finding, they meet the predominance requirement." *Id*. at 191. Instead, the court explained, the plaintiffs must "prove by a preponderance of the evidence that they could establish, through common proof at trial . . . [that] all class members would have paid less" if not for the alleged antitrust violation—and not just that a "reasonable juror could believe the common proof at trial." *Id.* at 191–92.

Applying those principles here, Plaintiffs must prove by a preponderance of the evidence that their proposed common proof of classwide injury—*i.e.*, estimates of the average effects of the alleged conspiracy and broad generalizations drawn from qualitative evidence—is sufficient to prove injury to "each individual class member" and does not "mask" wide variation within the class. *Id*. at 192, 194. Plaintiffs must also prove the "factual predicates" for their claim of classwide injury, namely, that all purchasers of the same category of swap paid the same average spread in the actual world and would have paid the same universally *lower* spread in the but-for world. *See In re Lamictal*, 957 F.3d at 194. Contrary to Plaintiffs' suggestion, these factual questions determine whether proposed class members suffered any injury—not just the amount of any alleged damages—because they determine whether class members actually paid "inflated" bid-ask spreads. *See id.*; *see also In re Aluminum* at *40–42. For all these reasons, *In re Lamictal* supports denial of class certification.

COVINGTON

The Honorable J. Paul Oetken
August 7, 2020
Page 6

                                          Respectfully submitted,

                                          */s/ Robert D. Wick*
                                          Robert D. Wick

                                          *Counsel to the JPMorgan Defendants*