**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION | MDL No. 2704<br>Master Docket No.  16 MD 2704 (JPO) |
| This Document Pertains To:<br><br>ALL CLASS ACTION CASES | Hon. J. Paul Oetken |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES,**
**LITIGATION EXPENSES, AND SERVICE AWARDS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT ......................................................................................................................... 6

I.      CO-LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE ..................... 6

        A.      The Fee Request is Reasonable Under the *Goldberger* Factors .............................. 7

                1.      Co-lead Counsel invested substantial time and resources ........................... 7

                2.      The case is incredibly complex ................................................................. 7

                3.      The case involved—and still involves—substantial risk .............................. 8

                4.      Co-Lead Counsel provided high-quality representation ............................... 9

                5.      The effective percentage being requested is below applicable
                        norms ..................................................................................................... 10

                6.      Public policy supports approval of the fee request ................................... 10

        B.      The Fee Request is Incredibly Reasonable Under the Lodestar Cross-
                Check ................................................................................................................. 11

        C.      The Reaction of the Classes ................................................................................ 13

II.     CO-LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION
        EXPENSES IS REASONABLE ...................................................................................... 13

III.    CO-LEAD COUNSEL'S REQUESTS ARE REASONABLE EVEN
        CONSIDERING THE TOTAL SIZE OF THE SETTLEMENT FUNDS ....................... 16

IV.     THE REQUESTED SERVICE AWARDS FOR CLASS REPRESENTATIVES
        ARE FAIR AND EQUITABLE ..................................................................................... 18

CONCLUSION ....................................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Page**

### **CASES**

*In re Adelphia Commc'ns Corp.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006)..........................................................................9

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2011 WL 2909162 (E.D.N.Y. July 15, 2011).........................................................................6

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018)..........................................................10, 15, 19

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001).................................................................................11

*In re Ampicilin Antitrust Litig.*,
526 F. Supp. 494 (D.D.C. 1981) .........................................................................................17

*Chen v. XpresSpa at Terminal 4 JFK LLC*,
2021 WL 4487835 (E.D.N.Y. Oct. 1, 2021).........................................................................21

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger*,
209 F.3d 43 ..........................................................................................................................11

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) .............................................................6, 11, 15

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016).........................................................................................20

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) ..................................................................................................6

*Fleisher v. Phoenix Life Ins. Co.*,
2015 WL 108814 (S.D.N.Y. Sep. 9, 2015)...........................................................................13

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
No. 13-cv-07789 (S.D.N.Y. August 16, 2018) (ECF No. 1115)..............................................15

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)........................................................................................7, 8, 11

*In re Holocaust Victim Assets Litig.*,
2007 WL 805768 (E.D.N.Y. Mar. 15, 2007).........................................................................8

*Iowa Public Employees' Ret. Sys. v. Merrill Lynch, Pierce Fenner & Smith Inc.*,
No 17-cv-06221, ECF No. 688 (S.D.N.Y. Sept. 11, 2024) ................................................15, 18

*Jones v. Treubig*,
2022 WL 1223215 (S.D.N.Y. Apr. 26, 2022) ...........................................................................12

*Kurtz v. Kimberly-Clark Corp.*,
2024 WL 184375 (E.D.N.Y. Jan. 17, 2024) ........................................................................14, 21

*Landau v. Chase Manhattan Bank, N.A.*,
556 F.2d 664 (2d Cir. 1977) .....................................................................................................17

*Laydon v. Mizubo Bank, Ltd.*,
No. 12-cv-3419 (S.D.N.Y. Nov. 10, 2016) (ECF No. 724) ......................................................19

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998) .....................................................................................................12

*In re Linerboard Antitrust Litig.*,
2004 WL 1221350 (E.D. Pa. June 2, 2004) ..............................................................................21

*LV v. New York City Dep't of Educ.*,
700 F. Supp. 2d 510 (S.D.N.Y. 2010) ......................................................................................12

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ...........................................................................................9, 14

*Melito v. Am. Eagle Outfitters*,
2017 WL 3995619 (S.D.N.Y. Nov. 11, 2017) .............................................................................6

*Meredith Corp. v. SESAC, LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015) .....................................................................................7, 16

*Moses v. New York Times Co.*,
79 F.4th 235 (2d Cir. 2023) ......................................................................................................19

*In re Namenda Direct Purchaser Antitrust Litig.*,
2020 WL 3170586 (S.D.N.Y. June 15, 2020) ..........................................................................18

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................................7

*Nordhaus v. Reichenbach Rest. Grp.*,
2024 WL 1514298 (S.D.N.Y. 2024) (Oetken, J.) .....................................................................17

*Oleniak v. Time Warner Cable*
2013 WL 12447094 (S.D.N.Y. Dec. 17, 2013) ........................................................................21

*Parker v. Jekyll & Hyde Ent. Holdings, LLC*,
  2010 WL 532960 (S.D.N.Y. Feb. 9, 2010)........................................................................21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2024 WL 640266 (E.D.N.Y. Feb. 15, 2024) .....................................................................18

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
  991 F. Supp. 2d 437 (E.D.N.Y. 2014)...........................................................................8, 9

*Reyes v. Altamera Group, LLC*,
  2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011)..................................................................21

*Rivas v. BG Retail, LLC*,
  2020 WL 264401 (N.D. Cal. Jan. 16, 2020) ....................................................................17

*Roberts v. Texaco*,
  979 F. Supp. 185 (S.D.N.Y. 1997)..............................................................................20, 21

*Sanz v. Johny Utah 51 LLC*,
  2015 WL 1808935 (S.D.N.Y. Apr. 20, 2015) ..................................................................10

*In re Sears, Roebuck & Co. Front-Loading Washer Prod. Liab. Litig.*,
  867 F.3d 791 (7th Cir. 2017) ...........................................................................................17

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ...........................................................................................14

*Tatum v. City of New York*,
  2010 WL 334975 (S.D.N.Y. Jan. 28, 2010) ....................................................................12

*In re Tenaris S.A. Secs. Litig.*,
  2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ..................................................................14

*Thornhill v. CVS Pharmacy, Inc.*,
  2014 WL 1100135 (S.D.N.Y. Mar. 20, 2014) ..................................................................10

*U.S. v. 110-118 Riverside Tenants Corp.*,
  5 F.3d 645 (2d Cir. 1993)..................................................................................................13

*In re Veeco Insts., Inc. Secs. Litig.*,
  2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007).....................................................................17

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom.*,
  *Wal-Mart*, 396 F.3d 96 (2d Cir. 2005) ...........................................................................16

*In re Vitamin C Antitrust Litig.*,
  2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ...................................................................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).................................................................................................6

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ..........................................................................6, 11

**RULES/STATUTES**

Fed. R. Civ. P. 23 ..............................................................................................................2, 5, 19

## PRELIMINARY STATEMENT

Over the last nine years, counsel expended over $23 million in out-of-pocket expenses and over $100 million in attorney time litigating this complex antitrust case on behalf of the class. Counsel now move for an award of attorneys' fees and litigation expenses and payment of service awards to the Class Representatives. Plaintiffs respectfully request fees and expenses of $35.5 million, combined, plus interest thereon—a small fraction of the huge amounts that class counsel invested in this case. Class Representatives and Co-Lead Counsel also move for payment of service awards of $25,000 for each of the two named Plaintiffs, plus interest thereon.

These amounts are fully warranted given the long and complex history of the case. For nearly a decade, Co-Lead Counsel invested substantial sums in an effort to enforce the nation's antitrust laws against a group of well-funded and well-represented Wall Street banks. While the Court eventually found the case could not proceed as a class action, that does not mean the need to incentivize the enforcement of our nation's laws went away. Or, at a minimum, the need for private enforcement should not be unduly *dis*-incentivized by piling onto the financial losses Co-Lead Counsel will incur regardless of the outcome of this motion.

Not surprisingly, most of the out-of-pocket expenses—which, at $23,386,346 alone account for much of the amount being requested—arise out of the work of experts. Working with such a high volume of data requires a team of blue-chip experts, and this case required particularly intensive expert work to compile and analyze the relevant data. Courts routinely recognize that class counsel should be reimbursed for such investments. Without them, Plaintiffs could not have secured any recovery for the class. And without reimbursement, counsel in future cases would unduly shy away from, or under-invest in, complex cases such as this one.

While the fee and expenses award, if granted, would collectively account for 50% of the common fund, that would still leave the law firms involved with substantial losses. If the full

expense award is granted, Co-Lead Counsel would be receiving only $12,113,654 for fees against a total investment of more than $100 million in attorney time over the last nine years—investments in attorney time made *on top of* the some $23 million investments by way of out-of-pocket expenses.

Co-Lead Counsel's fee and expense requests are supported by the accompanying declaration of Professor Brian Fitzpatrick, who specializes in the study of class action litigation with a particular focus on fee awards.  Prof. Fitzpatrick opines that Co-Lead Counsel's fee and expense requests are reasonable, individually and in tandem, as the fee request is well below the norm, and expense request is well within the norm, and together are justified.  Prof. Fitzpatrick Decl. ¶ 5.

The contributions of the named Plaintiffs—the "Class Representatives"—also warrant reasonable service awards.  The Class Representatives were diligent in overseeing Co-Lead Counsel and carrying out their duties as lead plaintiffs.  They actively participated in every aspect of discovery, and gave input into and supervised the settlement decisions.  Without the Class Representatives' involvement, this litigation would not have occurred, and important public policies would not have been vindicated.  Recently, the Second Circuit has made clear that Rule 23(e)(2)(D)'s instruction to consider equitable treatment of class members includes recognizing the efforts of class representatives in bringing suit, supervising the litigation, and cooperating in discovery.  The Class Representatives here request service awards of $25,000 each—in line with or below awards to plaintiffs in similarly sized class cases—for a total of $50,000.

## STATEMENT OF FACTS

***The nine-year history of this case.***  Co-Lead Counsel's work, as well as the riskiness and other relevant features of this case, are summarized in the accompanying April 16, 2025, Joint Declaration of Daniel L. Brockett and Michael B. Eisenkraft.  A very brief summary is below.

Prior to suit, Co-Lead Counsel conducted an extensive, proprietary investigation into the interest rate swaps industry.  This investigation eventually led to an 88-page Complaint, filed in November 2015.  A number of tag-along suits followed, which were consolidated into the present MDL in June 2016.  Two consolidated amended complaints and two motions to dismiss followed, which were denied in substantial part in July 2017.

Co-Lead Counsel undertook a massive discovery effort over the course of the next two years.  We obtained and reviewed millions of produced documents; we negotiated the production of emails and transaction data from more than a dozen  major banks and third party financial firms; we took and defended over 140 depositions in multiple countries; and we prepared responses to contention interrogatories that spell in detail the evidence of the banks' conspiracy.

To support their motion for class certification, Co-Lead Counsel worked closely with a roster of blue-chip experts including leading market-structure economists, Prof. Mark Grinblatt and Prof. Darrell Duffie.  Our testifying experts were in term backed by a team of consulting experts with extensive experience cleaning, processing, and analyzing enormous data sets for litigation.  Notably, these experts analyzed some 36 kinds of quote and transactional data, across some 58 separate productions, in more than 17 *million* files.  These productions included more than six *billion* transaction records, 28 *billion* quote records, and covered more than $684 *trillion* in notional value transacted.

It is hard to overstate the difficulty and expense of working with data sets of this magnitude.  Defendants and third parties in this case produced more than 30 terabytes of data

encoded as simple text files—a volume equivalent to whole libraries of 4K video. It is usually faster and less expensive to *fly a hard drive across the country* to produce this data than it is to download it over modern business-grade internet connections. Data productions of this kind typically require days or weeks of custom coding and validation just to extract useful information. Accessing and using this data—for example, creating the synthesized LCH/Bloomberg/Tradeweb transaction dataset prepared by Dr. Grinblatt for his reply report— requires *days* of processing time on expensive industrial supercomputers. And this is just to *execute* custom code, to say nothing of the weeks of expert effort required to conceive and write the code in the first place.

In Plaintiffs' motion for class certification, Co-Lead Counsel also synthesized the results of the prior two years' discovery into a meticulously documented history of the Defendants' alleged conspiracy. The discussion included citations to hundreds of exhibits demonstrating that common evidence would overwhelmingly be available to prove the core antitrust violation issue at the center of the case.

After deposing Plaintiffs' testifying experts, Defendants submitted three separate opposing expert reports. We continued to work closely with our experts to prepare extensive reply reports, responding to Defendants' criticisms. We also added late-produced LCH data to Dr. Grinblatt's damages model, and addressed a number of arguments set forth by Defendants' experts. Unusually, briefing on Plaintiffs' motion extended into sur-replies and then many letter briefs offering supplemental authorities while the motion was pending.

Ultimately, the Court denied Plaintiffs' motion for class certification. We received the Court's opinion on December 15, 2023, and worked through the December holidays to meet the 14-day deadline to file a petition for appellate review under Fed. R. Civ. P. 23(f). While that

petition was pending before the Second Circuit, Co-Lead Counsel negotiated a final settlement of the case with the remaining Defendants.

*The Settlements.*  Prior to the Court's denial of class certification, we settled with Credit Suisse in late January 2022 for $25 million in cash.  At Credit Suisse's insistence, we agreed as part of the settlement terms to reduce the value of any judgment by 6.02%—implicitly valuing the entire case at more than $415 million in what was expected to be a discounted "icebreaker" settlement.  After the Court denied Plaintiffs' motion for class certification, Plaintiffs and Co-Lead Counsel settled with the Newly Settling Defendants in June 2024 for $46 million.  The difference between the two settlements reflected the dramatically reduced odds of success as a direct result of the Court's intervening opinion denying class certification.  *See, e.g.*, Prof. Fitzpatrick Decl. ¶ 21.

*The Class Representatives.*  Throughout the last nine years of this litigation, the Class Representatives contributed extensive institutional time and resources to evaluating, supervising, and settling the case, and even more time and resources cooperating with discovery requests, sitting for depositions, and otherwise serving as active and responsible representatives of the class.  These Class Representatives, each of whom are institutional investors, also took a considerable risk in publicly filing this lawsuit against an array of major Wall Street Banks. Many investors would have, and did, refuse to take such actions.  The Class Representatives took time out of official board meetings, offered key investment managers and internal staff up for deposition, devoted hours of their general counsels' time, and otherwise diverted key personnel away from their ordinary duties to pursue this litigation.

# ARGUMENT

## I.    CO-LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE

"It is well-established under the common fund doctrine that 'attorneys who create a fund for the benefit of a class of plaintiffs are entitled to reasonable compensation from that fund.'" *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *16 (S.D.N.Y. Apr. 26, 2016) ("*CDS*"). Awarding reasonable attorneys' fees from the common fund recognizes and compensates counsel's efforts in bringing and prosecuting this case, and advances the purpose of the antitrust laws, which rely on private actions like this one to further important public-policy goals. Without "adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2011 WL 2909162, at *6 (E.D.N.Y. July 15, 2011).

Courts have recognized that "[a]lthough courts award attorneys' fees under either the lodestar method or the percentage-of-the-fund method, the 'trend in this Circuit is toward the percentage method.'" *Melito v. Am. Eagle Outfitters*, 2017 WL 3995619, at * (S.D.N.Y. Nov. 11, 2017) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)). The percentage method provides "appropriate financial incentives" necessary "to attract well-qualified plaintiffs' counsel who are able to take a case to trial," while also "directly align[ing] interests of the class and its counsel" by providing "a powerful incentive for the efficient prosecution and early resolution of litigation." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355, 359 (S.D.N.Y. 2005). "[M]arket rates, where available, are the ideal proxy for compensation." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 51-52 (2d Cir. 2000).

A.     **The Fee Request is Reasonable Under the *Goldberger* Factors**

Courts evaluating whether a fee is reasonable consider "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50.

1.     *Co-lead Counsel invested substantial time and resources*

As discussed in Section II below, Co-Lead Counsel have invested almost 200,000 hours of time from attorneys and professional support staff, and more than $23 million in expenses in connection with this case—the vast majority of which went to experts and data analysts. These enormous investments were required because of the complexity of the case, its length, and the amount of expert work and resources necessary to prosecute it. Our investigation began over nine years ago, and required over 140 depositions and the analysis of millions of data files. Accordingly, this factor strongly supports awarding the requested fee. *See also* Prof. Fitzpatrick Decl. ¶¶ 22-23.

2.     *The case is incredibly complex*

"[C]lass actions have a well-deserved reputation as being most complex," *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998), with antitrust cases being among the most "complex, protracted, and bitterly fought," *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015). *See also* Prof. Fitzpatrick Decl. ¶ 21.

The facts of this case also made it exceptionally complex. The defendant banks pay traders millions of dollars to understand the complexity of these investments and markets. The amount of out-of-pocket expenses incurred to gather, process, understand, and analyze the massive amounts of data in this case also speaks to the case's complexity—with Co-Lead Counsel expending more than $23 million on behalf of the class to hire testifying and consulting

experts who could understand the market and take on the challenges of working with *tens of billions* of transaction and quote records.

For all these reasons, a fee award that accounts for the prosecution of litigation that was "extraordinary in both complexity and scope" is appropriate. *In re Holocaust Victim Assets Litig.*, 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007).

    *3.    The case involved—and still involves—substantial risk*

The Second Circuit has "historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *Goldberger*, 209 F.3d at 54. When considering attorneys' fees in a contingency action, the Court should consider the risks of the litigation at the time the suit was brought. *Id.* at 55. This means, among other things, that the fact plaintiffs "did not piggyback on previous government action" supports the award, because Co-Lead Counsel were breaking new ground. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014). Even looking to the case's status at the time of settlement, Prof. Fitzpatrick opined that "even if [plaintiffs' 23(f) petition] had succeeded, class counsel would have had to win on numerous other legal issues to survive summary judgment and win at trial as well as to convince the jury to adopt their damages model rather than the defendants'. If you gave all these risks out, it is easy to conclude that the recovery here is better than the classes deserved." Prof. Fitzpatrick Decl. ¶ 21. Co-Lead Counsel took this case on a fully contingent basis. *See* Joint Decl. ¶ 88. "Counsel should be rewarded for undertaking [those risks] and for achieving substantial value for the class." *Payment Card*, 991 F. Supp. 2d at 441. Accordingly, the risk of the case strongly supports the requested fee award.

4. *Co-Lead Counsel provided high-quality representation*

Co-Lead Counsel are among the most experienced and skilled antitrust and class action firms in the country. Each firm, and many of the individual attorneys involved, has led several prior mega-fund class action cases, received numerous accolades, and tried class action cases to verdict. *See generally* Brockett Decl. Ex. C & Eisenkraft Decl. Ex. C (sample summaries of firm and attorney resumes). Even though it involved an "icebreaker," first-mover set of terms, the first settlement in the litigation, before the Court's denial of class certification, implied a case value of $415 million. Though ultimately the Court ruled against Plaintiffs on the class certification motion, our skill and tenacity are confirmed by the work evident in this case's docket, and by our ability to secure tens of millions of dollars in settlements despite the Court's ruling denying class certification.

Our ability to secure the Settlements, while facing aggressive, well-funded and well-represented Defendants, is not just a testament to the outcome; it also underscores the skill with which we have prosecuted this case. *See In re Marsh*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the settlement."); *In re Adelphia Commc'ns Corp*., 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."). As Prof. Fitzpatrick stated, "Frankly, the classes should be elated class counsel recovered as much as they did." Prof. Fitzpatrick Decl. ¶ 21.

For all these reasons, the quality of the representation in this case strongly supports the fee application.

5.    *The effective percentage being requested is below applicable norms*

Presuming the expense award is granted, the fee request would amount to the equivalent of only about 17% of the $71 million combined settlement fund.  This is significantly below what courts in this Circuit routinely award, and is reflective of the fact that we are taking massive losses on our investment in light of how the case ended.  *See* Section III below; Prof. Fitzpatrick Decl. ¶¶ 16-20 (showing that the fee request falls far below the percentages usually awarded for class actions, including antitrust class actions).  For instance, a 2017 study found that the mean and median awards in the Second Circuit are 28 percent and 30 percent, respectively.[1]  Surveys by courts themselves have reached similar results.  *See Thornhill v. CVS Pharmacy, Inc.*, 2014 WL 1100135, at *3 (S.D.N.Y. Mar. 20, 2014) (collecting cases, noting: "In this Circuit, courts typically approve attorneys' fees that range between 30 and 33⅓%."); *Sanz v. Johny Utah 51 LLC*, 2015 WL 1808935, at *1 (S.D.N.Y. Apr. 20, 2015) (same).

6.    *Public policy supports approval of the fee request*

"Public policy favors rewarding the successful prosecution of antitrust claims."  *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018).  This is particularly here, as this private antitrust lawsuit was brought without the assistance of any governmental investigation or prosecution.

Had private counsel with our skill and resources not taken this lawsuit, the Settlement Classes may well have recovered nothing, and important public interests would not have been vindicated.  *See CDS*, 2016 WL 2731524, at *18 ("It is important to encourage top-tier litigators to pursue challenging antitrust cases . . . . Our antitrust laws address issues that go to the heart of our economy."); *WorldCom*, 388 F. Supp. 2d at 359 ("In order to attract well-qualified plaintiffs'

_____

[1]  Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. Rev. 937 (2017).

- 10 -

counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

Prof. Fitzpatrick, who has studied and written on the public policy benefits of class action lawyers as "private" attorneys general, emphasized the value that Co-Lead Counsel's efforts wrought—where the government did not pursue enforcement, and no individual class member could. Prof. Fitzpatrick Decl. ¶¶ 14-15. Accordingly, the public policy factor also supports the requested fee.

### B.    The Fee Request is Incredibly Reasonable Under the Lodestar Cross-Check

Courts recognize providing fee awards beyond standard hourly rates is necessary to incentivize attorneys to take cases despite the risks inherent in contingency-fee arrangements. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success."), *abrogated on other grounds by Goldberger*, 209 F.3d 43. *See also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (taking contingent fee risk "into account in determining the appropriate fee to award"). Thus, while it is normal to award fees above counsel's investment in the case, the lodestar method is used "as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *WorldCom*, 388 F. Supp. 2d at 359. "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

The cross-check in this case makes clear there is no windfall. To the contrary, these calculations show that, even if granted, Co-Lead Counsel would still be incurring significant losses for having taken this matter on a contingency basis despite the uncertain outcome. *See*

- 11 -

Prof. Fitzpatrick Decl. ¶ 23 (noting "the fee award will give them a dramatically 'negative' multiplier on their time, something that rarely happens").

As demonstrated in the supporting declarations, Co-Lead Counsel's attorneys and professional support staff collectively spent nearly 200,000 hours on this matter. *See* Joint Decl. ¶ 86. Using historic rate schedules, this translates to a lodestar investment in this case by Co-Lead Counsel of more than $100 million in attorney and staff hours. *See* Joint Decl. ¶ 87. Using current rate schedules would result in a much higher lodestar of more than $135 million. Given our fee request is just for just over $12 million, we are seeking a "multiplier" of 0.12 using historic figures. This is what is known as a "negative" or "fractional" multiplier, in the sense that Co-Lead Counsel are seeking *less* in a fee award, than what we would have obtained billing hourly clients to this matter. *See also* Prof. Fitzpatrick Decl. ¶ 23. This is in line with our conservative approach to the fee issue given the impact the Court's ruling had on the value of the case.[2] *See* Section III, *infra*.

Unsurprisingly given the incentive structure that fee awards are supposed to create—to incentivize the bringing and prosecution of tough and complex cases—the "multipliers" associated with our fee request here fall far below the norm. *See e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 108814 at *18 (S.D.N.Y. Sep. 9, 2015) ("courts regularly award Lodestar multipliers from 2 to 6 times Lodestar in this circuit") (collecting cases). No matter how

---

[2] If one were to consider the lodestar investment at *current* rates—which is recognized as appropriate by most courts—the lodestar multiplier becomes even further below 1.0, *i.e.*, Co-Lead Counsel's losses are even bigger, even if the full requested fee award is granted. *See, e.g.*, *Jones v. Treubig*, 2022 WL 1223215, at *2 (S.D.N.Y. Apr. 26, 2022) ("Courts look to "current rates, rather than historical rates, . . . to compensate for the delay in payment."); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("current rates, rather than historical rates, should be applied in order to compensate for the delay in payment"); *Tatum v. City of New York*, 2010 WL 334975, at *4-5 & n.4 (S.D.N.Y. Jan. 28, 2010); *LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 514 (S.D.N.Y. 2010) (same).

calculated, the lodestar method strongly supports the requested fee award.  This is, sadly, not a windfall situation; it is instead a very significant loss for all of the law firms involved.

###  C.  The Reaction of the Classes

The Notice stated that Co-Lead Counsel may apply to the Court for an award of attorneys' fees and litigation expenses out of the Settlement Fund, and that prior to the Fairness Hearing, Co-Lead Counsel will move for fees and litigation expenses not to exceed a total of 50% of each of the Settlement Funds, plus interest thereon.  The requests herein are consistent with the notice.  If approved, the fee portion here would only be approximately one-third of the combined request, for only around $12 million.  Co-Lead Counsel will update the Court on the reaction of the class in our reply papers, but at this point, no objections to the fee request have been received.

## II.  CO-LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION EXPENSES IS REASONABLE

Members of the Settlement Classes were informed that Co-Lead Counsel would fees and litigation expenses not to exceed a total of 50% of each of the Settlement Funds.  Our expense request of $23,386,346, when combined with our fee request, means the combined request herein is consistent with the maximum amount described in the notice.  *See* Joint Decl. ¶¶ 89-92.

"The equitable principle that all reasonable expenses incurred in the creation of a fund for the benefit of a class are reimburseable proportionately by those who accept benefits from the fund authorizes reimbursement of full reasonable litigation expenses as costs of the suit."  Alba Conte, 1 *Attorney Fee Awards* § 2:19 (3d ed. 2024) ("*Attorney Fee Awards*"); *accord U.S. v. 110-118 Riverside Tenants Corp.*, 5 F.3d 645, 646 (2d Cir. 1993).  "[C]ourts within the Second Circuit 'normally grant expense requests' for 'reasonable out-of-pocket expenses' in common fund cases as a matter of course."  *In re Tenaris S.A. Secs. Litig.*, 2024 WL 1719632, at *12

(E.D.N.Y. 2024); *see also In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.").

"The expenses that may be reimbursed from the common fund encompass 'all reasonable' litigation-related expenses." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010). As with fees, the treatment of expenses in the private market is the best proxy for reasonableness. *See, e.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge thinks costs too high in general is not.").

"When the 'lion's share' of expenses reflects the typical costs of complex litigation such as 'experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses,' courts should not depart from 'the common practice in this Circuit of granting expense requests.'" *Kurtz v. Kimberly-Clark Corp.*, 2024 WL 184375, at *4 (E.D.N.Y. Jan. 17, 2024). As described in the supporting declarations, that is exactly the situation here. Our expenses were associated with the typical costs of complex litigation.[3]

While the expenses in this case may seem large when viewed in a vacuum to an outsider, in large financial market antitrust cases like this one—involving extraordinarily complex computation and data management fees—these expenses are typical. In many cases, such investments pay for themselves, as they lead to even-more-massive settlements or recoveries. For example, in the stock lending antitrust class action, Judge Failla awarded expenses of

---

[3]  The non-expert related expenses in this case are relatively small (8.8 % of the total) and Co-Lead Counsel reviewed them closely and believe them to be reasonable. Both firms maintain industry-standard expense policies to ensure these expenses remained reasonable.

$18,845,997.91, plus interest.  *Iowa Public Employees' Ret. Sys. v. Merrill Lynch, Pierce Fenner & Smith Inc.*, No 17-cv-06221, ECF No. 688 (S.D.N.Y. Sept. 11, 2024).  In the ISDAFIX antitrust class action, Judge Furman approved the reimbursement of expenses in the amount of $18,429,687.63.  *Alaska Elec.*, 2018 WL 6250657, at *3.  In the foreign-exchange antitrust settlement, which involved the market for foreign exchange, Judge Schofield approved expense reimbursements of $22,490,654.29.  *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-07789 (S.D.N.Y. August 16, 2018) (ECF No. 1115).  *See also CDS*, 2016 WL 2731524, at *18 (reimbursing over $10 million in expenses incurred even pre-certification of the class, and noting that "[m]ost of these expenses were incurred in connection with retention of experts" and that this "expert work was essential to the litigation and invaluable to the Class").

Prof. Grinblatt's damages analysis, which estimated class-wide damages of $4.5 billion, was backed by extensive data processing and analysis from a leading litigation support firm.  Joint Decl. ¶ 61.  Had Plaintiffs obtained a $4.5 billion trial verdict, or even the implied $415 million settlement value Credit Suisse paid while certification was pending, the incurred expenses would represent an ordinary or even unusually low portion of recovered funds.  The expenses were thus for many reasons thoroughly reasonable *ex ante*.  That the Court's class certification decision made such outcomes very unlikely does not change that fact, nor the appropriateness of the award.

Prof. Fitzpatrick also opines that Co-Lead Counsel's expense request is reasonable.  *See* Prof. Fitzpatrick Decl. § V.  As Prof. Fitzpatrick states, "[t]here is no reason to think these expenditures were unnecessary: as I noted above, the stakes of this litigation were enormous and it is well known that high-stakes antitrust cases are very expensive to litigate." Prof. Fitzpatrick Decl. ¶ 24.  Prof. Fitzpatrick's conclusion is clear:  "Like class counsel's time, the monies class

counsel outlaid for expenses here were entirely at risk: if class counsel had recovered nothing, class counsel would have had no way to get that money back. . . . For this reason, in my opinion, it is even more imperative to award class counsel all their expenses." *Id.* at ¶ 25.

For the reasons discussed above, "substantial expenses were necessary in this complex antitrust case." *Meredith*, 87 F. Supp. 3d at 671. There is thus "no reason to depart from the common practice in this circuit of granting expense requests." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (granting $18.7 million expense request where bulk of expenses were "experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses"), *aff'd sub nom.*, *Wal-Mart*, 396 F.3d at 96.

## III.    CO-LEAD COUNSEL'S REQUESTS ARE REASONABLE EVEN CONSIDERING THE TOTAL SIZE OF THE SETTLEMENT FUNDS

As discussed in Sections I and II above, both the fee award and the expense award are reasonable and meet the standards courts in this Circuit normally apply to each type of request.

We are cognizant, however, that in combination the requests would account for a sizeable portion of the $71 million in settlement funds. As discussed above in Section II, courts routinely grant requests for out-of-pocket expenses. While both are of course ultimately for the Court to decide, Co-Lead Counsel understand more gray areas exist and thus discretion is typically exercised when it comes to fee awards. We thus *lowered* our requested fees substantially below the normal percentage, to ensure that our total combined awards would not surpass 50%.[4]

---

[4]    Accordingly, Co-Lead Counsel's expenses are reduced for any reason, we reserve the right to request at the Fairness Hearing that the fee award be increased concomitantly. Given Co-Lead Counsel's substantial investments in the case, even an "increased" award beyond some $12 million would readily meet the standards discussed in Section I above.

Prof. Fitzpatrick also evaluated the reasonableness of the combined requests in light of his research and expertise, and opined that the request is reasonable.  Prof. Fitzpatrick Decl. § VI.  Although the request "would be at the high-end of the range of what fees and expenses usually comprise of class action settlements," *id.* at ¶ 26, it is Prof. Fitzpatrick's "opinion that the combination of the fee and expense requests provides no reason to reject either one of them and that, in fact, the fee and expense awards are fully justified."  *Id.* at ¶ 28.  Indeed, there are instances where fees and expenses exceed 50% of the recovery, without being unreasonable or unusual.  *Id.* at ¶ 27.

In cases where counsel's lodestar far outstrips any reasonable fee award, it is not unusual for fee and expense awards to approach and even occasionally exceed the effective class recovery. *See, e.g.*, *In re Sears, Roebuck & Co. Front-Loading Washer Prod. Liab. Litig.*, 867 F.3d 791 (7th Cir. 2017) (Posner, J.) (awarding fees three times the amount collected by the class); *Landau v. Chase Manhattan Bank, N.A.*, 556 F.2d 664, 665 (2d Cir. 1977) (approving 50% award); *Nordhaus v. Reichenbach Rest. Grp.*, 2024 WL 1514298 (S.D.N.Y. 2024) (Oetken, J.) (awarding fees and expenses totaling 50% of fund); *Rivas v. BG Retail, LLC*, 2020 WL 264401 (N.D. Cal. 2020) (awarding 45% fees and 11.8% expenses); *In re Veeco Insts., Inc. Secs. Litig.*, 2007 WL 4115808 (S.D.N.Y. 2007) (combined award totaling 44%, with expenses of 14%); *In re Ampicilin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C. 1981) (45%).

As the district court noted in *In re Initial Public Offering Services Litigation*, awarding a 38% fee on a $586 million settlement:

> For those cases in which settlement is quick and the time and labor expended by counsel is low, a high percentage fee would be a windfall and therefore inappropriate.  Thus, in *Goldberger* and other recent Second Circuit class action fee decisions, the Circuit affirmed awards of a low percentage fee, but noted that such fees represented positive multipliers to counsel's lodestar figures.  This case is different.  Here, counsel is requesting a high percentage fee, but that fee ($195

- 17 -

million) still represents a negative multiplier to the total adjusted lodestar as calculated by this Court ($202 million). There is therefore no real danger of overcompensation.

....

[C]ounsel's requested fee already reflects a discount because the amount of time and labor counsel spent on this litigation is highly disproportionate to the settlement they achieved on behalf of the class . . . . Because counsel has already imposed a discount on its own fee, applying a further reduction will serve only to further penalize counsel and chill other class actions.

671 F. Supp. 2d 467, 514-15 (S.D.N.Y. 2009). Here, Co-Lead Counsel are requesting the equivalent of only 17% of the common fund for fees, and are asking for only the equivalent of 11.7% of the fees that would have been billed in an hourly arrangement for this matter using historic rates. But this makes the logic of *Initial Public Offering* only more applicable, in that to further cut into Co-Lead Counsel's request—either the standard expenses or the fee award—would undermine the incentive structure that courts strive to maintain.

## IV.   THE REQUESTED SERVICE AWARDS FOR CLASS REPRESENTATIVES ARE FAIR AND EQUITABLE

The requested awards of $25,000 for each Class Representative is in line with or below service awards—also sometimes known as "incentive awards"—granted by other courts in this Circuit in cases with multi-million dollar recoveries. *Iowa Public Employees' Retirement Sys. v. Bank of Am.*, ECF No. 688 (S.D.N.Y. Sept. 11, 2024) (awarding five named plaintiffs $100,000 each); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 640266, at *4 (E.D.N.Y. Feb. 15, 2024) (granting awards of up to $200,000 per Class Representative); *In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 3170586, at *2 (S.D.N.Y. June 15, 2020) (awarding $75,000 to each class representative even though they "made minimal contribution to the prosecution of the case"); *Alaska Elec.*, 2018 WL 6250657, at *4 (granting awards totaling

$500,000, including $100,000 for certain named plaintiffs); *Laydon v. Mizubo Bank, Ltd*., No.

12-cv-3419, ECF No. 724, at 2 (S.D.N.Y. Nov. 10, 2016) (awards totaling $580,000).

"Incentive awards encourage class representatives to participate in class action lawsuits,

which are designed to provide a mechanism by which persons, whose injuries are not large

enough to make pursuing their individual claims in the court system cost efficient, are able to

bind together with persons suffering the same harm and seek redress for their injuries." *Moses v.

New York Times Co*., 79 F.4th 235, 253 (2d Cir. 2023) (citing 1 Joseph McLaughlin, McLaughlin

on Class Actions § 1:1 (19th ed. 2022)). "Such incentive awards often level the playing field and

treat differently situated class representatives equitably relative to the class members who simply

sit back until they are alerted to a settlement." *Id.*[5]

The proposed awards here—$25,000 for each Class Representative, for a total of

$50,000—appropriately strike this equitable balance by providing compensation to the Class

Representatives for the valuable work they undertook on behalf of the class.

Courts in this District use a number of factors to determine if "incentive award[s] to

plaintiffs are reasonable and promote equity between class representatives and absent class

members." *Moses*, 79 F.4th at 245. "The guiding standard in determining an incentive award is

broadly stated as being the existence of special circumstances including the personal risk (if any)

---

[5]  The "equitable treatment requirement [of Rule 23(e)(2)(D)] protects the interests of class representatives who play an active role in the litigation—often providing the background information that forms the basis of the lawsuit, engaging in fact discovery, and devoting considerable time and effort into the settlement process—'from having absent class members free ride on their efforts.'" *Moses*, 79 F.4th at 253. As described in Newberg and by the Second Circuit, "if the class representatives face particular risks in serving the class and/or undertake valuable work on behalf of the class but cannot recover any of the costs of those efforts through an incentive fee award, they have a fair argument that the settlement is not treating them equitably relative to the absent class members." *Id*. (quoting 5 Newberg and Rubenstein on Class Actions §§ 17:3-4).

incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (*e.g.,* factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery."  *Roberts v. Texaco*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  All of these factors support the award to Plaintiffs.

*First*, the risk incurred by the named plaintiffs in representing class members is substantial.  The Class Representatives here—all institutional investors—publicly took on the largest investment banks in the world.  These institutional investors are dependent on these same investment banks to provide essential services.  Few investors are willing to put their investment relationships at risk to pursue such suits.  *See, e.g.*, *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016) ("the named Plaintiffs in this case assumed a substantial risk in antagonizing a longstanding, powerful business partner and suffering sweeping consequences in the marketplace as a result of filing this action").

*Second*, the time and effort expended by the Class Representatives support the award. The Class Representatives here are institutions, not individuals, which significantly increases the effort and time required to be a Class Representative.  *See Dial Corp.*, 317 F.R.D. at 439 (noting "courts have recognized the efforts of corporate representatives in granting incentive awards"). The Class Representatives preserved, gathered, and produced documents from multiple repositories.  They responded to follow up document and information requests.  They produced key personnel for depositions.  And they reviewed every significant filing and decision in the case.  From investigation to now, this litigation has spanned over nine years and their duties to act on behalf of the class have been unfaltering.  *See Kurtz*, 2024 WL 184375, at *9 (noting,

when approving service awards for litigation that extended through eight years, that "length and intensity of this lawsuit logically necessitated more extensive services and work by the named Plaintiffs").

*Third*, courts look at the requested award in comparison to the ultimate recovery for the class. Here, the total of the proposed awards ($50,000) is less than 0.1% of the cash recovery of $71 million. This is a far lower percentage than courts in this District often award as incentives.[6]

That this was an antitrust case brought without the assistance of a government action also counsels in favor of an incentive award. *See In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004) (noting that incentive payments are "particularly appropriate" in cases where "there was no preceding governmental action alleging a conspiracy").

## CONCLUSION

For the foregoing reasons, Co-Lead Counsel respectfully request that the Court approve Co-Lead Counsel's application for the payment of attorneys' fees and expenses in the amounts set forth above, plus interest thereon. Plaintiffs also request the Court approve the request for service awards, plus interest thereon. Co-Lead Counsel will submit proposed orders in connection with our reply papers.

DATED: April 16, 2025                    Respectfully submitted,

*I certify that this brief contains fewer than 8,750 words, in compliance with LCR 7.1(c),*

---

[6]  *See, e.g.*, *Chen v. XpresSpa at Terminal 4 JFK LLC*, 2021 WL 4487835, at *7-8 (E.D.N.Y. Oct. 1, 2021) (awarding 3.7 % of total award), *Oleniak v. Time Warner Cable* 2013 WL 12447094, at *10 (S.D.N.Y. Dec. 17, 2013) (approving $70,000 of incentive awards where Maximum Settlement Amount was $3.75 million); *Reyes v. Altamera Group, LLC*, 2011 WL 4599822, at *1, *9 (S.D.N.Y. Aug. 16, 2011) (approving service awards totaling $50,000, representing approximately 16.6% of the $300,000 settlement); *Parker v. Jekyll & Hyde Ent. Holdings, LLC*, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010) (approving service awards totaling 11% of the total recovery); *Roberts*, 979 F. Supp. at 200 (0.18% of a $115 million Fund).

*and is fewer than 25 pages, in compliance with the Court's Individual Rules and Practices in Civil Cases §2.B.*

**COHEN MILSTEIN SELLER & TOLL PLLC**

By: */s/ Michael B. Eisenkraft*
Michael B. Eisenkraft
Sharon K. Robertson
Christopher J. Bateman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
srobertson@cohenmilstein.com
cbateman@cohenmilstein.com

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Julie Goldsmith Reiser (*pro hac vice*)
Brent W. Johnson (*pro hac vice*)
Daniel H. Silverman (*pro hac vice*)
Robert W. Cobbs
1100 New York Ave NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
rcobbs@cohenmilstein.com

*Interim Co-Lead Counsel and Attorneys for Public School Teachers' Pension and Retirement Fund of Chicago and Los Angeles County Employees Retirement Association*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Jonathan B. Oblak
William R. Sears
David LeRay
Anna Deknatel
Maxwell Deabler-Meadows
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
jonoblak@quinnemanuel.com
willsears@quinnemanuel.com
davidleray@quinnemanuel.com
annadeknatel@quinnemanuel.com
maxmeadows@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com

*Interim Co-Lead Counsel and Attorneys for Public School Teachers' Pension and Retirement Fund of Chicago and Los Angeles County Employees Retirement Association*

**SUSMAN GODFREY L.L.P.**

William Christopher Carmody
Seth Ard
Cory Buland
Elisha B. Barron

560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
sard@susmangodfrey.com
cbuland@susmangodfrey.com
ebarron@susmangodfrey.com

*Attorneys for Mayor and City Council of
Baltimore*