PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

December 9, 2025

The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *In re Interest Rate Swaps Antitrust Litigation*, No. 16-md-2704-JPO; Request for Pre-Motion Summary Judgment Conference.

Dear Judge Oetken:

  Pursuant to the Court's Orders, we write on behalf of all Defendants to respectfully request a pre-motion conference in anticipation of filing for summary judgment. *See* ECF Nos. 394, 1059. Summary judgment should be granted for Defendants because the undisputed material facts show that Plaintiffs' remaining claims fail as a matter of law.[1]

**I. Overview**

  Plaintiffs trueEX, Javelin, and Tera allege that Defendant banks conspired to boycott their start-up electronic trading platforms to prevent the proliferation of anonymous all-to-all trading of interest rate swaps on central limit order books ("CLOBs"). After years of extensive discovery, Plaintiffs have no direct or indirect evidence to prove that any bank participated in the alleged boycott. Instead, discovery has shown that Plaintiffs fail to establish a triable group boycott claim.

  Defendants did not engage in any such boycott conspiracy. Instead, each Defendant provided varying levels of support to each Plaintiff at different times, based on each Defendant's independent assessment of each Plaintiff's relative strengths and weaknesses, and each Defendant's unique internal considerations. Plaintiffs' theory boils down to the idea that Defendants collectively agreed not to provide "more" support for the Plaintiff platforms than each Defendant actually provided, but, as in the recent *LIBOR* decision, summary judgment is appropriate here because such an agreement is "so vague that it would have been impossible to enforce" and makes no economic sense. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR*"), 2025 WL 2733020, at *13–17 (S.D.N.Y. Sept. 25, 2025). Moreover, there is no reason "why a defendant bank would be more incentivized to collude when . . . that bank also had a plausible and justifiable reason for its conduct, namely a unilateral incentive." *See id.* at *40. As discussed in more detail below, there was no economic incentive for any Defendant to participate on any of Plaintiffs' nascent, fledgling platforms more so than they did. Plaintiffs therefore cannot present evidence that tends to exclude the possibility that Defendants acted unilaterally, as they must, to establish a triable claim of conspiracy.[2] *See Anderson News, L.L.C.* v. *Am. Media, Inc.*,

---

[1] In accordance with the May 28, 2018 Case Management Order ("CMO"), ECF No. 394, Defendants are filing this letter within 14 days of the November 25, 2025 close of expert discovery. *See* ECF No. 1226; *see also* ECF No. 1059. The CMO also established a briefing schedule. ECF No. 394 at 3.

[2] This letter outlines Defendants' currently-identified primary arguments in support of summary judgment. Defendants reserve all rights to raise additional arguments in their motion.

899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

## II.   Legal Framework

Section 1 of the Sherman Act only "bans restraints on trade 'effected by a contract, combination, or conspiracy.'" *United States* v. *Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007)). The "crucial question in a Section 1 case is therefore whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 314–15. To raise a genuine issue of material fact as to a Section 1 conspiracy, a plaintiff must present either direct or circumstantial (indirect) evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Anderson News*, 899 F.3d at 98. "[I]f the evidence is in equipoise, then summary judgment must be granted." *Id.* Plaintiffs bear the burden of presenting sufficient "evidence 'pertaining to each defendant' to demonstrate that that defendant participated in the conspiracy." *Ross* v. *Am. Exp. Co.*, 35 F. Supp. 3d 407, 438 (S.D.N.Y. 2014), *aff'd sub nom. Ross* v. *Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015).[3]

## III.   Plaintiffs Lack Direct Evidence of a Conspiracy

Plaintiffs cannot identify direct evidence of a group boycott in the extensive record. Direct evidence "must be 'explicit' and require no inferences." *City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.* ("*Treasuries*"), 92 F.4th 381, 405 (2d Cir. 2024); *see also N. Am. Soccer League, LLC* v. *U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) (evidence of a conspiracy is "direct" only if it "evince[s] with clarity a concert of illegal action" (quoting *Cosmetic Gallery, Inc.* v. *Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007))). Paradigmatic examples of direct evidence include "an admission by one of the defendants" as to the existence of a conspiracy, *Anderson News*, 899 F.3d at 103, and "an admission by an employee of one of the conspirators[] that officials of the defendants had met and agreed explicitly on the terms of a conspiracy," *Treasuries*, 92 F.4th at 391. No such evidence exists here, despite voluminous discovery—more than 1.8 million produced documents, 75 depositions of Defendant witnesses, and extensive third-party discovery. The most Plaintiffs may point to are generalized market chatter and common perspectives among some defendants on certain market developments and issues. Courts have repeatedly recognized that these types of discussions are not direct evidence of a conspiracy. *See, e.g.*, *id.* at 398 (finding "conversations largely consist[ing] of market chatter, such as the traders' views on upcoming auctions and the market more generally" was only "idle 'shop talk'" that "does not come close to evincing a bid-rigging conspiracy"); *Anderson News*, 899 F.3d at 103 ("We can, … without suspecting illegal collusion, expect competing firms to keep close track of each other's [] market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it." (quoting *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015)).

---

[3] Accordingly, each Defendant may raise bank-specific arguments, as well as collective arguments. While Defendants intend to file an omnibus motion, certain Defendants may file supplemental motions addressing issues unique to them. Further, Defendants intend to move concurrently to exclude portions of Plaintiffs' experts' testimony to allow the Court the benefit of simultaneous review.

### IV. Plaintiffs Lack Indirect Evidence of a Conspiracy

Without direct evidence, Plaintiffs must identify sufficient indirect proof of conspiracy to survive summary judgment. *Anderson News*, 899 F.3d at 103. This requires evidence that Defendants engaged in "parallel conduct" as well as "plus factors" that "provide a basis to infer that a conspiracy arose." *Treasuries*, 92 F.4th at 391. To satisfy these two burdens, Plaintiffs cannot rely on "ambiguous evidence—'that is, evidence that is equally consistent with independent conduct as with illegal conspiracy.'" *Anderson News*, 899 F.3d at 98 (quoting *Apple*, 791 F.3d at 315). Rather, Plaintiffs bear the burden of adducing evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Id*. And, "[b]ecause plaintiffs' asserted conspiracy is economically senseless, plaintiffs 'must come forward with more persuasive evidence to support [their] claim[s] than would otherwise be necessary.'" *LIBOR*, 2025 WL 2733020, at *17 (quoting *Anderson News*, 899 F.3d at 99)). Plaintiffs cannot meet that burden for at least three independent reasons.

*First*, Plaintiffs cannot identify any parallel conduct that tends to exclude the possibility that the banks acted independently. Plaintiffs' core allegation is that Defendants did not sufficiently support their IRS trading platforms. But, as Judge Engelmayer recognized at the motion to dismiss stage, "each Dealer's decision to avoid the startup platforms" is "not—at all—suggestive of conspiracy." *In re Interest Rate Swaps Antitrust Litig.,* 261 F. Supp. 3d 430, 475 (S.D.N.Y. 2017). To the contrary, "[r]ational economic self-interest provides a ready explanation for the [Defendants'] supposed failure to patronize or invest in enterprises that could disrupt their business model." *Treasuries*, 92 F.4th at 403. Indeed, Plaintiffs' own liability expert conceded that it would be "rational for a dealer to wait and see if a new entrant platform was attracting significant trading [on the] platform before joining it." Abrantes-Metz Dep. Tr. at 85:21–86:8.

Plaintiffs therefore cannot satisfy the "tends-to-exclude" standard. *Anderson News*, 899 F.3d at 98. Rather, the challenged conduct is, at most, "equally consistent with both a conspiratorial explanation and an independent-action explanation"—which is insufficient to survive summary judgment. *Id.* at 103; *see also, e.g.*, *Tera Grp., Inc.* v. *Citigroup, Inc.*, 2024 WL 4501967, at *4 (2d Cir. 2024) (affirming dismissal of Tera's boycott claims because there was no reason "that it would not be a sound business strategy for each Dealer Defendant to take a wait-and-see approach"); *InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144, 165 (3d Cir. 2003) ("Evidence of [broker-dealer]'s decision not to do business with [platform] . . . does not 'tend[ ] to exclude the possibility' that [broker-dealer] acted individually instead of conspiring with other broker-dealers.").

*Second*, discovery has confirmed that there were no parallel refusals to deal with Plaintiffs or to provide no more than a certain level of support to Plaintiffs. To the contrary, each Defendant provided differing levels of support to each Plaintiff at different times. Nearly all Defendants provided clearing support for at least one Plaintiff, eight Defendants traded on at least one Plaintiff platform, and several Defendants streamed prices to one or more of the Plaintiffs' CLOBs—conduct antithetical to the purported boycott conspiracy. In addition, the level of support each Platform received from Defendants tracked the degree of support that Platform received from the broader market. trueEX, as the best-known and best-funded new entrant Platform, received some degree of support from all but one Defendant. Javelin was the next-most-established new entrant Platform and thus received clearing or trading support from seven Defendants. Tera, the least established, initially focused on attracting alternative liquidity providers (rather than Defendants)

to serve as market-makers on its platform, and generated minimal customer interest. And yet even Tera still obtained clearing support from at least four Defendants. In short, Plaintiffs cannot prove parallel conduct because "defendants' responses to [the platform Plaintiffs] were not uniform," and "defendants each reacted in different ways" to Plaintiffs' CLOB offerings. *Anderson News*, 899 F.3d at 105.

*Third*, Plaintiffs lack the "plus factors" needed to withstand summary judgment. Proof of a conspiracy based on parallel conduct must be "reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *Treasuries*, 92 F.4th at 391. Such plus factors may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id*.

None of those plus factors supports an inference of conspiracy here. Plaintiffs cannot invoke a "common motive to conspire" because here, as in *Anderson News*, Defendants' conduct "made perfect business sense" even *absent* a conspiracy. 899 F.3d at 112; *see also, e.g.*, *Tera Grp.*, 2024 WL 4501967, at *3 (allegations that "each incumbent business has an incentive to exclude a newcomer" leads to "an equally plausible inference of mere interdependent behavior"); *Treasuries*, 92 F.4th at 403 (dealers' "objections to all-to-all trading are ones they would naturally have in common, absent any agreement"). To the extent that certain Defendants declined to invest time and money supporting the new entrant platforms, those actions were not contrary to their individual self-interest because "[t]here are many reasons that a broker-dealer might independently choose not to partner with a fledgling start-up whose technology and business model remained unproven," *InterVest*, 340 F.3d at 165—including lack of client demand, regulatory uncertainty, resource constraints, and Plaintiffs' technological and operational shortcomings. Indeed, Plaintiffs' own expert conceded at her deposition that taking a "wait-and-see" approach was a rational unilateral business strategy. And Defendants' rationality in doing so has been vindicated by the fact that even today, more than a decade after the first case was filed, the market still has not moved to all-to-all CLOB trading in any meaningful way. *See* Mason Dep. Tr. at 125:21–126:6; Newman Dep. Tr. at 231:15–18. Finally, Defendants' interfirm communications were consistent with their "legitimate business reason to constantly monitor competitors' behavior to determine [Plaintiffs'] ongoing viability as part of [each Defendant's] own independent assessment" of the platforms. *Anderson News*, 899 F.3d at 103.

At bottom, Plaintiffs' theory of the boycott—that Defendants agreed to provide some undefined, varied-but-insufficient level of support and chose to provide such support while purportedly knowing that the platforms would still fail—is unsupported and makes "no economic sense." *LIBOR*, 2025 WL 2733020, at *13. Plaintiffs likewise cannot explain how any such vague and amorphous agreement would have been monitored or enforced.

For all of the foregoing reasons and others, Defendants' forthcoming briefing will show that summary judgment should be granted on Plaintiffs' claims.

                                Respectfully submitted,

                                */s/Staci Yablon*
                                Staci Yablon

cc:       All Counsel of Record (via ECF)